## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARY M. COLLINS, Individually and as
Personal Representative of the Heirs and
Estate of JAMES DANIEL COLLINS,
Deceased

        Plaintiff(s),

    v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH AMERICA
CORPORATION (F/K/A FOSTER
WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and
as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and d/b/a O-
I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY IRON
WORKS);

GARLOCK SEALING TECHNOLOGIES
LLC (individually and as a successor-in-
interest to GARLOCK, INC);

AMETEK, INC. (individually and as a
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-merger

_____

**NOTICE OF REMOVAL**

**Filed on behalf of
VOLKSWAGEN OF AMERICA, INC.**

Counsel of Record for this Party:

Steven T. Davis, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE  19806

Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205

4123160

with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION
(individually , and as successor-in-interest to
AMERICAN SUPER TEMPERATURE
WIRE, and successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-merger to
HAVEG CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by merger to
HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK
BORSIG POWER, INC. f/k/a D.B. RILEY,
INC. f/k/a RILEY STOKER
CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC.
(individually and as successor-in-interest to
MUNDET CORK COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION LLC
(individually and f/k/a T.H. AGRICULTURE
& NUTRITION COMPANY, INC. f/k/a
THOMPSON-HAYWARD CHEMICAL
COMPANY);

PHILIPS ELECTRONICS NORTH
AMERICA CORP (individually and as
successor-in-interest to T H AGRICULTURE
& NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest to
KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENT CEMENT, INC.
(f/k/a KAISER CEMENT CORPORATION,
individually and as successor-in-interest to
KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as successor-in-
interest to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually
and as successor-in-interest to RPM, INC.
and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger to
WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest to
BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually and as
successor-in-interest to BORG-WARNER
CORPORATION);

HONEYWELL INTERNATIONAL, INC.
(individually and as successor-in-interest
To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION
(f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and as
successor-in-merger to PNEUMO ABEX
CORPORATION, successor-in-interest to
ABEX CORPORATION f/k/a AMERICAN
BRAKE SHOE and FOUNDRY COMPANY
including the AMERICAN BRAKEBLOK
DIVISION and FOUNDRY COMPANY
including AMERICAN BRAKEBLOK
DIVISION and THE AMERICAN
BRAKEBLOK CORPORATION f/k/a THE
AMERICAN BRAKE MATERIALS
CORPORATION);

MAREMONT CORPORATION (a
subsidiary of ARVIN INDUSTRIES, INC.
individually and as successor-in-interest to
GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC.
(individually and as successor-in-merger to
AMMCO TOOLS, INC and AMMCO
TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING
COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

Defendants.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and
as Personal Representative of the Heirs
and Estate of JAMES DANIEL
COLLINS, Deceased
            Plaintiff(s),

    v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH
AMERICA CORPORATION (F/K/A
FOSTER WHEELER ENERGY
CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY,
INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually
and as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and d/b/a
O-I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY
IRON WORKS);

GARLOCK SEALING
TECHNOLOGIES LLC (individually and
as a successor-in-interest to GARLOCK,
INC);

AMETEK, INC. (individually and as a
successor-in-interest to HAVEG

 

**NOTICE OF REMOVAL**


**Filed on behalf of
VOLKSWAGEN OF AMERICA,
INC.**

INDUSTRIES, INC. successor-by-merger
with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION
(individually , and as successor-in-interest
to AMERICAN SUPER
TEMPERATURE WIRE, and successor-
in-interest to HAVEG INDUSTRIES,
INC. successor-by-merger to  HAVEG
CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by merger
to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK
BORSIG POWER, INC. f/k/a D.B.
RILEY, INC. f/k/a RILEY STOKER
CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY,
INC. (individually and as successor-in-
interest to MUNDET CORK
COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION
LLC (individually and f/k/a T.H.
AGRICULTURE & NUTRITION
COMPANY, INC. f/k/a THOMPSON-
HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH

AMERICA CORP (individually and as
successor-in-interest to T H
AGRICULTURE & NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest
to KAISER GYPSUM COMPANY,
INC.);

HANSON PERMANENT CEMENT,
INC. (f/k/a KAISER CEMENT
CORPORATION, individually and as
successor-in-interest to KAISER
GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as
successor-in-interest to RPM, INC. and
BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC.
(individually and as successor-in-interest
to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger to
WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest
to BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually and
as successor-in-interest to BORG-
WARNER CORPORATION);

HONEYWELL INTERNATIONAL,
INC. (individually and as successor-in-
interest

To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER
CORPORATION (f/k/a CHRYSLER
CORPORATION);

GENERAL MOTORS CORPORATION;
FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and
as successor-in-merger to PNEUMO
ABEX CORPORATION, successor-in-
interest to ABEX CORPORATION f/k/a
AMERICAN BRAKE SHOE and
FOUNDRY COMPANY including the
AMERICAN BRAKEBLOK DIVISION
and FOUNDRY COMPANY including
AMERICAN BRAKEBLOK DIVISION
and THE AMERICAN BRAKEBLOK
CORPORATION f/k/a THE AMERICAN
BRAKE MATERIALS
CORPORATION);

MAREMONT CORPORATION (a
subsidiary of ARVIN INDUSTRIES,
INC. individually and as successor-in-
interest to GRIZZLY
MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC.
(individually and as successor-in-merger
to AMMCO TOOLS, INC and AMMCO
TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING
COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

       Defendants.

**NOTICE OF REMOVAL**

TO THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE:


AND NOW, comes defendant, Volkswagen of America, Inc. (VWoA) and files its Notice of Removal, and in support thereof avers as follows:

1.      On February 28, 2006, Plaintiffs James Daniel Collins and Mary M. Collins filed a Complaint against 40 Defendants, <u>not including VWoA</u>, in the Superior Court of New Castle County, Delaware.

2.      On information and belief, Plaintiffs' initial discovery responses were served in May, 2006.  These discovery responses disclosed Mr. Collins' employment history, including employment at two Volkswagen dealerships.

3.      On information and belief, James Daniel Collins was deposed on August 10, 2006, at which time he testified about exposure to VWoA products.

4.      On information and belief, Plaintiffs filed a motion to amend the Complaint on August 17, 2006 to add VWoA as a party to the lawsuit.  The motion was not immediately presented to the Superior Court of New Castle County, Delaware.  The Superior Court of New Castle County, Delaware granted the motion to amend on October 6, 2006.

5.      On information and belief, Plaintiff James Daniel Collins died on or about September 25, 2006.

6.      On information and belief, Plaintiff Mary Collins filed an Amended Complaint adding VWoA as a party to the lawsuit on October 17, 2006, attached hereto as Exhibit A.

7.      VWoA was served with original process on December 11, 2006, after the close of discovery in the case, and after the Plaintiff James Collins had died.  At that point in time, trial was scheduled for February 12, 2007.

8.     On December 9, 2006, an initial Motion to Substitute Parties and Add Wrongful Death Claim was filed. Thereafter, on January 24, 2007, a second Motion to Substitute Parties and Add a Wrongful Death Claim was filed. The Court granted the second Motion to Substitute Parties and Add Wrongful Death Claim on February 2, 2007. Mary M. Collins, in her own right, and as the Executrix of the Estate of James Daniel Collins is the Plaintiff in this action (hereinafter "Plaintiff").

9.     Plaintiff then filed a Second Amended Complaint on February 5, 2007, attached hereto as Exhibit B.

10.     Pursuant to provisions of Section 1441 and 1446 of Title 28 of the United States Code, VWoA removes this action to the United States District Court for the District of Delaware, which is the judicial district in which the action is pending.

11.     Upon information and belief, VWoA is the only remaining defendant in this action. Although the docket does not reflect such, Counsel for VWoA was informed on March 12, 2007, for the first time, that VWoA is the only defendant remaining in this case. This information was confirmed in written correspondence attached hereto as Exhibit C.

12.     Forty defendants were sued in this action, but the majority appears to have been only nominal defendants who were sued as part of a "mass tort" asbestos filing. They and their alleged asbestos-containing products were not identified in this asbestos action and those companies have been or will be dismissed through voluntary and/or stipulated dismissals. The remaining defendants other than VWoA have had summary judgment granted or have settled their claims, although those settlements (and some of the nominal defendant dismissals) are not yet reflected on the docket.

4123160

13.    There is complete diversity of citizenship between Plaintiff and VWoA in this action because:

    a.    Plaintiff is an individual and citizen of the State of Washington;

    b.    Defendant Volkswagen of America, Inc. is organized and incorporated under the laws of the State of New Jersey, with a principal place of business in Michigan;

    c.    More than $75,000, exclusive of interests and costs, is in controversy in this action; and

    d.    Other remaining defendants, whether or not diverse, are either nominal defendants (that have been or will be dismissed) or have settled the instant action.

14.    Thus, this court would have had original subject matter jurisdiction of this action under the provisions of 28 U.S.C. §1332 if the action as it stands had it originally been brought in federal court.  Removal is therefore proper under 28 U.S.C. §1441(a).

15.    Removal of this case on the basis of diversity of citizenship is not precluded by the provisions of Section 1441(b) of Title 28 of the United States Code because any parties in interest properly joined and served as a defendant that were citizens of the State of Delaware, the State in which this action was brought, are nominal defendants or have settled the claims against them.

16.    This Notice of Removal is timely under Section 1446(b) of Title 28 of the United States Code because VWoA received notice, confirmed in writing, that the case had become

removable on March 12, 2007. This Notice of Removal is filed within one year of the commencement of the action against VWoA.[1]

17.    Pursuant to Section 1446(a) of Title 28 of the United States Code, "a copy of all process, pleadings, and orders" served on Volkswagen of America, Inc. at the time of removal are attached as Exhibit D.[2]

**WHEREFORE**, Defendant Volkswagen of America, Inc., pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action from the Superior Court of New Castle County, Delaware, on this 14th day of March 2007.

Dated:  March 14, 2007

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY:    _____
Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE  19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219

AND

One Penn Center, 19th Floor

---

[1] If commencement of the action is measured by when the Complaint was filed without VWoA as a party, VWoA is entitled to an equitable exception to the one-year bar.

[2] See also all papers and pleadings filed via Lexis Nexis electronic file and serve from December 11, 2006 (E-filing ID No. 13151797) to March 5, 2007 (E-filing ID No. 14017420).

1617 JFK Boulevard
Philadelphia, PA  19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205

Counsel for Defendant,
Volkswagen of America, Inc.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of Volkswagen of America, Inc.'s Notice of Removal was served on Plaintiff's counsel this 14th day of March, 2007, via hand delivery.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY: _____

Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

AND

One Penn Center, 19th Floor
1617 JFK Boulevard
Philadelphia, PA 19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

Counsel for Defendant,
Volkswagen of America, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARY M. COLLINS, Individually and
as Personal Representative of the Heirs
and Estate of JAMES DANIEL
COLLINS, Deceased
        Plaintiff(s),

     v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH
AMERICA CORPORATION (F/K/A
FOSTER WHEELER ENERGY
CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY,
INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually
and as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and
d/b/a O-I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY
IRON WORKS);

GARLOCK SEALING
TECHNOLOGIES LLC (individually
and as a successor-in-interest to
GARLOCK, INC);

AMETEK, INC. (individually and as a

_____

**NOTICE OF REMOVAL**


**Filed on behalf of**
**VOLKSWAGEN OF AMERICA,**
**INC.**

successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-
merger with HAVEG CORPORATION);

CHAMPLAIN CABLE
CORPORATION (individually , and as
successor-in-interest to AMERICAN
SUPER TEMPERATURE WIRE, and
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-
merger to  HAVEG CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by
merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a
BABCOCK BORSIG POWER, INC.
f/k/a D.B. RILEY, INC. f/k/a RILEY
STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY,
INC. (individually and as successor-in-
interest to MUNDET CORK
COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION
LLC (individually and f/k/a T.H.
AGRICULTURE & NUTRITION
COMPANY, INC. f/k/a THOMPSON-
HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH
AMERICA CORP (individually and as
successor-in-interest to T H
AGRICULTURE & NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest
to KAISER GYPSUM COMPANY,
INC.);

HANSON PERMANENT CEMENT,
INC. (f/k/a KAISER CEMENT
CORPORATION, individually and as
successor-in-interest to KAISER
GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as
successor-in-interest to RPM, INC. and
BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC.
(individually and as successor-in-interest
to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger
to WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest
to BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually
and as successor-in-interest to BORG-
WARNER CORPORATION);

HONEYWELL INTERNATIONAL,
INC. (individually and as successor-in-

interest
To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER
CORPORATION (f/k/a CHRYSLER
CORPORATION);

GENERAL MOTORS
CORPORATION;
FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and
as successor-in-merger to PNEUMO
ABEX CORPORATION, successor-in-
interest to ABEX CORPORATION f/k/a
AMERICAN BRAKE SHOE and
FOUNDRY COMPANY including the
AMERICAN BRAKEBLOK DIVISION
and FOUNDRY COMPANY including
AMERICAN BRAKEBLOK DIVISION
and THE AMERICAN BRAKEBLOK
CORPORATION f/k/a THE
AMERICAN BRAKE MATERIALS
CORPORATION);

MAREMONT CORPORATION (a
subsidiary of ARVIN INDUSTRIES,
INC. individually and as successor-in-
interest to GRIZZLY
MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC.
(individually and as successor-in-merger
to AMMCO TOOLS, INC and AMMCO
TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING
COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

                    Defendants.

## CERTIFICATE OF NOTICE OF FILING

The undersigned attorneys of record for Volkswagen of America, Inc., certify that, in compliance with 28 U.S.C. §1446(d), a copy of the Notice of Removal of this action was filed with the Prothonotary of the Superior Court of New Castle County, Delaware on March 14, 2007.

The undersigned attorneys of record further certify that on the same day, in compliance with the requirements of 28 U.S.C. §1446(d), written notice of the removal was also delivered to all the parties, including the Plaintiffs, in this action directly or through their attorneys, along with a copy of the Notice of Removal filed in this court.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY:  _____
Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

AND

One Penn Center, 19th Floor
1617 JFK Boulevard
Philadelphia, PA 19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205

Dated:  March 14, 2007                Counsel for Defendant,
                                      Volkswagen of America, Inc.

4.      Plaintiffs' motion does not assert under what state's substantive law that the

Plaintiffs are attempting to amend the Complaint to add additional plaintiffs.  Since Plaintiffs

have previously indicated that the laws of the State of Washington should apply to this case,

Defendants presume that this request is also being set forth on the basis of Washington law.

5.      While Ford and GM do not oppose the substitution of the personal representative

of the estate for the decedent himself, these defendants take issue with Plaintiffs' efforts to

expand the scope of recovery as a result of the decedent's death.  Under the laws of the State of

Washington, any rights that flow from the Survival statute belong to the decedent's personal

representative alone.[3]  Mary M. Collins, as the personal representative of the decedent's estate,

is the only party who may assert a Survival claim.  While this claim is brought on behalf of and

for the benefit of the decedent's family,[4] all other individuals sought to be included in this

litigation[5] lack legal standing and are precluded from becoming a party to this cause of action as

a matter of law.

6.      Likewise, the Wrongful Death statute permits the personal representative "to

maintain an action for damages against the person causing the death ... ."[6]  Mary M. Collins, as

the personal representative of the decedent's estate, is the only party who may assert the

Wrongful Death claim.  While this claim is brought on behalf of and for the benefit of the

decedent's immediate family,[7] all other individuals sought to be included in this litigation[8] lack

legal standing to bring a separate and distinct wrongful death action against the defendants.

---

[3] RCWA § 4.20.046 ("All causes of action by a person or persons  against another person or persons shall survive to the personal representatives of the former ... .").
[4] See RWCA § 4.20.020 ("Every such action shall be for the benefit of the wife, husband, child or children, including stepchildren, of the person whose death shall have been caused.").
[5] Plaintiffs' Motion seeks to add the following individuals as plaintiffs:  Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen.
[6] RCWA § 4.20.010.  See also Solesski v. Oregon Auto. Ins. Co., 526 P.2d 68 (Wash. App. 1974).
[7] See RWCA § 4.20.020.
[8] Plaintiffs' Motion seeks to add the following individuals as plaintiffs:  Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen.

**WHEREFORE,** Defendants, General Motors Corporation and Ford Motor Company, respectfully request that this Court allow for the substitution of the Personal Representative, Mary M. Collins, in place of the decedent, James Daniel Collins, yet deny Plaintiffs' request to allow Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen to assert a separate wrongful death and survival claims.

WHITE AND WILLIAMS LLP

By:_____
**CHRISTIAN J. SINGEWALD (DE# 3542)**
824 Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 654-0424
Attorneys for Defendants,
Ford Motor Company and General Motors
Corporation

Dated:  December 12, 2006

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

IN RE ASBESTOS LITIGATION                 :
                                          :
JAMES DANIEL COLLINS          :    C.A. No.:  06C-02-281 ASB
MARLON CLARENCE OWENS         :    C.A. No.:  06C-02-241 ASB
ROLAND LEO GRENIER            :    C.A. No.:  05C-11-257 ASB
OLIVER EDWARD SANDAHL         :    C.A. No.:  05C-11-057 ASB
CHARLES CHRISTOPHER LENTILE   :    C.A. No.:  05C-11-256 ASB
ROLLIN JAMES OVERSTREET       :    C.A. No.:  05C-09-037 ASB

**DEFENDANT, GENERAL MOTORS CORPORATION'S, MEMORANDUM IN
SUPPORT OF MOTION IN LIMINE
TO EXCLUDE VIDEOTAPES, EVIDENCE AND TESTIMONY
OF DR. WILLIAM E. LONGO AND/OR MR. RICHARD L. HATFIELD**

WHITE AND WILLIAMS LLP

*Chris Singewald*

CHRISTIAN J. SINGEWALD (DE# 3542)
824 Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 654-0424
Attorneys for Defendant,
General Motors Corporation

Dated:   January 4, 2007

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................... i

TABLE OF EXHIBITS .......................................................................................... iii

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.    Chrysotile Asbestos In Brakes Turns To Innocuous Fosterite During The
        Brake Process...................................................................................................2

    B.    Dr. Longo/Mr. Hatfield's Testimony And Videotapes..............................3

        1.    The Blowout II Study And Video ..................................................... 5

        2.    The Hand Filing Study...................................................................... 7

    C.    Dr. Longo/Mr. Hatfield's Testing Analyses And Results.......................7

        1.    The NIOSH 7400 Method.................................................................. 8

        2.    The Unduly Prejudicial Videotape................................................. 10

ARGUMENT............................................................................................................11

II.     THE LONGO/HATFIELD VIDEOTAPES AND STUDIES SHOULD BE
       PRECLUDED AS INHERENTLY AND UNDULY PREJUDICIAL AND WILL
       MISLEAD AND INFLAME THE JURY..........................................................11

III.    DR. LONGO/MR. HATFIELD IS NOT QUALIFIED AS AN EXPERT IN THE FIELD
       IN WHICH HE IS EXPECTED TO TESTIFY ..............................................15

IV.    LONGO/HATFIELD'S TESTIMONY SHOULD BE PRECLUDED BECAUSE THE
       TESTIMONY AND VIDEOTAPED SIMULATIONS ARE NEITHER RELEVANT
       NOR RELIABLE UNDER *DAUBERT* STANDARDS. ..................................16

    A.    The Longo/Hatfield Videotapes Were Prepared Specifically For Litigation
        And Do Not Satisfy The Prerequisites For Admission Under Daubert................17

    B.    The Longo/Hatfield Videotapes And Measurements Do Not Meet The "Fit"
        Requirement Under *Daubert* And D.R.E. 702......................................................19

    C.    The Activities And Materials Depicted In The Longo/Hatfield Videotape
        Have Not Been, And Cannot Be Tested ...............................................................22

D.    Dr. Longo/Mr. Hatfield's Methodology For Preparing Videotaped Simulations Of Brake Work Has Not Been Published Or Subjected To Peer Review. ...................................................................................................22

E.    Dr. Longo/Mr. Hatfield's Conclusions Have No Identifiable Rate of Error. ........23

F.    The Staged Studies Are Not Based On Generally Accepted Scientific Protocols For Measuring Workplace Exposure To Asbestos Fibers .....................24

    1.    The Videotapes Are Staged Advocacy Not Applicable Or Relevant To Advance The Fact-Finding Process. ....................................................24

    2.    Any Quantitative Evaluation Of The "Simulated" Worker's Asbestos Exposure Is Inadmissible Because Longo/Hatfield's Methodology Is Contrary To Accepted Standards For Measuring Workplace Exposure To Asbestos. ..........................................................24

    3.    Any Quantitative Evaluation Of The Simulated Worker's Asbestos Exposure Is Also Inadmissible Because Dr. Longo/Mr. Hatfield's Sample Preparation Methodology Is Contrary To OSHA Mandated Counting Methods And Because It Breaks Fiber Bundles Into Multiple Individual Fibers. ....................................................................28

G.    Reference To Statistics In Four Older Articles Lacking Controls, Reliable Methodology And "Fit" To Mr. Waishes Or Mr. Bradley Cannot Save Dr. Longo/Mr. Hatfield's Baseless Testimony. ..........................................................30

CONCLUSION....................................................................................................................31

## TABLE OF EXHIBITS

A.  *In re: Lamar County Asbestos Litigation*, 6th District Court for Lamar County, Texas, Order, Lovett, J. (July 5, 2001).

B.  *Carlson v. Lear Siegler, et. al.*, Superior Court of San Francisco County, California, Aug. 13, 1998.

C.  *Lewis v. John Crane, et. al.*, Superior Court of San Francisco County, California, Apr. 3, 2000.

D.  *Grego v. Trailmobile Trailers, et al.*, Superior Court of San Francisco County, California, Feb. 10, 2000.

E.  *Campbell v. Abney Mills, et. al.*, Superior Court for King County, Washington, Oct. 9, 2002.

F.  *Berning v. A.P. Green, Industries, Inc.*, Cal. Super., San Francisco Cty., Case No. 319733, Jan. 8, 2002.

G.  *Ball v. Consolidated Rail Corp.*, 756 N.E.2d 1280, 1288 (Ohio Ct. App. 2001).

H.  Arthur Langer, Ph.D., "Reduction of the Biological Potential of Chrysotile Asbestos Arising From Conditions of Service on Brake Pads," 38 Regulatory Toxicology & Pharmacology at 71-77 (2003).

I.  Plaintiffs' Expert Disclosures, August 30, 2005.

J.  Excerpts from Deposition of Richard L. Hatfield, July 8, 2003.

K.  Curriculum Vitae of Richard L. Hatfield.

L.  Excerpts from Deposition of Richard L. Hatfield, August 13, 2003.

M.  *Brake Blow-Out II, Work Practice Study*, by Richard L. Hatfield, Larry R Newton & William E. Longo, January 2001.

N.  Bendix Brakes for Ford Vehicles Work Practice Simulation Demonstration, by Richard L. Hatfield, Larry R. Newton & William E. Longo.

O.  Bendix Brakes for Chrysler Vehicles Work Practice Simulation Demonstration, by Richard L. Hatfield, Larry R. Newton & William E. Longo.

P.  Bendix Brakes for Chrysler Vehicles Filing Demonstration Asbestos Analysis Results, by Richard L. Hatfield, Larry R. Newton & William E. Longo.

Q.  Testimony of William E. Longo in *In Re: Lamar County Asbestos Litigation*, District Court of Lamar County, Texas, June 20, 2001, at pages 65, 67-68.

WILDMS 138809v.1

R.    Excerpts from Deposition of Larry Newton, July 13, 2001, pages 105-10, 150-52, 163.

S.    Testimony of Richard L. Hatfield in <u>Leo Hart v. Abex</u>, pages 26-28.

T.    Testimony of William E. Longo in <u>Dunhoff v. A-Best Products</u>, Jan. 31, 2002, pages 64, 66.

U.    Testimony of William E. Longo in <u>Zimmerman v. Garlock</u>, Jan, 28, 2002, pages 73- 74.

V.    Testimony of William E. Longo in <u>Hamre v. Asbestos Defendants</u>, Nov. 9, 1997, pages 129-34.

W.    Testimony of Richard L. Hatfield in <u>Cook v. AC&S, Inc.</u>, Jan. 20, 2000, pages 104, 171.

X.    Testimony of William E. Longo in <u>Gilbert v. Bendix Corporation</u>, Court of Common Pleas of Northampton County, Pennsylvania, No. 96-C-3489, Aug. 11, 1998, page 259.

Y.    Testimony of Richard L. Hatfield in <u>Jones v. Owens Corning</u>, Superior Court of Fulton County, Georgia, Mar. 12, 2001, page 26.

Z.    Printout from Occupational Safety & Health Administration Web Page: <u>http://www.osha-slc.gov/SLTC/asbestos/evaluation.html</u>) on August 22, 2003.

AA.    Arthur N. Rohl et al., "Asbestos Exposure During Brake Lining Maintenance and Repair," 12 Environmental Research 110-128 (1976).

BB.    Arthur N. Rohl et al., "Asbestos Content of Dust Encountered in Brake Maintenance and Repair," 70 Proc.roy. Soc. Med., January 1977, 32-37.

CC.    Timo Kauppinen and Kari Korhonen, "Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods," Am. Ind. Hyg. Assoc. J. 48(5):499-504 (1987).

DD.    William V. Lorimer, M.D., Arthur N. Rohl, Ph.D. et al., "Asbestos Exposure of Brake Repair Workers in the United States," Mount Sinai Journal of Medicine Vol. 43, No. 3, May-June 1976 at 207-218.

iv

## PRELIMINARY STATEMENT

Defendant, General Motors Corporation ("GM"), submits this memorandum of law in support of its objection to, and motion *in limine* to exclude from trial the inherently unreliable videotapes, evidence and testimony of Dr. William E. Longo and/or Mr. Richard L. Hatfield.

Dr. Longo/Mr. Hatfield's testimony fails to meet the requisite standards of "fit" and reliability mandated under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d 513, 521-22 (Del. 1999) (adopting Daubert standard as Delaware law). Dr. Longo/Mr. Hatfield has no formal training in industrial hygiene, no practical automotive maintenance experience, and is nevertheless proffered by Plaintiffs as an "expert" to give his opinions on the level of exposure to asbestos fibers Plaintiffs may have encountered during their limited and sporadic work on automotive brakes. Dr. Longo/Mr. Hatfield relies on inadmissible work simulation "studies" designed and executed solely for advocacy in litigation, conducted in accordance with no recognized scientific standards, to measure the quantity of airborne asbestos fibers, collected and analyzed in a manner contrary to government mandated practices and procedures for such analyses and under conditions not even remotely similar to those encountered by Plaintiffs. Not surprisingly, these "studies" yield inherently misleading and unreliable results. See In re Armstrong World Industries, Inc., 285 B.R. 864 (Bankr. D. Del. 2002) (excluding asbestos measurements that failed to meet Daubert standard); In re Lamar County Asbestos Litigation, 6th District Court for Lamar County, Texas, Order (July 5, 2001) (Exhibit A), at 3-4 (striking Mr. Hatfield's colleague, Dr. Longo, as an expert and his simulations from evidence, stating that the tests conducted by Longo and Hatfield were not scientifically reliable and amounted to "junk science" not admissible under Daubert).

Plaintiffs proffer Dr. Longo/Mr. Hatfield not for any scientific expertise, but rather as a vehicle to present unduly prejudicial videotapes with no probative value, which will improperly

mislead and prejudice the jury. The simulations lack "fit" to the facts of the case and are not based on generally recognized scientific protocols for the measurement of airborne asbestos fibers. These videotapes cannot be admitted at trial.

Numerous courts have excluded Mr. Hatfield and his associate at Materials Analytical Services, Inc. ("MAS"), Dr. William E. Longo, from presenting evidence of their simulations and videos because: (a) the exercise was not a valid scientific test that has been generally accepted as reliable in the industries' science; (b) the alleged simulations did not reconstruct the actual work conditions of any plaintiff; and (c) the videotapes are litigation-driven demonstrative advocacy that is not reliable, is misleading, and will inflame and prejudice the jury. See pages 16-18 below and Exhibits A to G.

## STATEMENT OF FACTS

**A.      Chrysotile Asbestos In Brakes Turns To Innocuous Fosterite During The Brake Process.**

Assuming for purposes of this motion only, Plaintiffs' evidence will show that GM supplied original equipment brakes during the time Plaintiffs allegedly worked with such parts that contained chrysotile asbestos encapsulated in resin and other binders. The intense heat generated in such parts during the braking process transforms more than 99% of the asbestos fibers in GM's friction products to an innocuous, non-fibrous, material called fosterite. Any resulting "brake dust," to which Plaintiffs may have been exposed, was comprised primarily of harmless fosterite. See Arthur Langer, Ph.D., "Reduction of the Biological Potential of Chrysotile Asbestos Arising From Conditions of Service on Brake Pads," 38 Regulatory Toxicology & Pharmacology at 71-77 (2003) (Exhibit H). Moreover, chrysotile fibers not converted to fosterite during braking are broken down into structures too small to be counted as

2

"asbestos fibers" under OSHA protocols and do not count as asbestos exposure under OSHA guidelines. Id.

**B.    Dr. Longo/Mr. Hatfield's Testimony And Videotapes**

Plaintiffs are expected to call Dr. Longo/Mr. Hatfield as an expert in the field of "measurement and analysis of materials and determining the constituent ingredients in materials, and characterizing those materials and ingredients." See Plaintiffs' Expert Interrogatory Answers (Exhibit I). He is expected to testify about brake work and present videotapes showing alleged work simulations performed in a sealed, unventilated box under high intensity lights. One simulation is titled "Blowout II"[1] (Dr. Longo/Mr. Hatfield's write-up of his Blowout II study is attached as Exhibit M, the others are write-ups of these studies are attached as Exhibits N, O and P, respectively). Another videotaped simulation is titled "Hand Filing." Hatfield Dep., July 8, 2003, at 101 (Exhibit J). Notably, Dr. Longo/Mr. Hatfield does not claim that any of his simulations involved friction products actually manufactured or sold by GM.

Dr. Longo/Mr. Hatfield, a professional witness, makes his living performing litigation-specific asbestos studies. He has no formal training in: (1) the scientific protocols required to set up reliable workplace asbestos exposure simulations; (2) industrial hygiene; or (3) practices of automobile mechanics. He has never changed a brake himself or observed a brake job from start to finish and has no recollection of even partially observing such work within the last twenty years. Hatfield Dep., July 8, 2003, at 13-26, 54-55, 77-80 (Exhibit J), and Curriculum Vitae (Exhibit K). Aside from a few week-long courses sponsored by the National Institute of Occupational Safety and Health ("NIOSH"), Dr. Longo/Mr. Hatfield has no training in collecting asbestos air samples.

---

[1]    "Blowout I" relates to airplane brakes.

3

Mr. Hatfield and his colleagues, Dr. William Longo and Mr. Larry Newton, performed

these simulations in 2000 and 2001, at the request of Plaintiffs' lawyers from other cases pending

outside of Delaware. These simulations, together with four articles on asbestos exposures from

certain brake work (out of dozens on the topic) written by others more than fifteen years ago,

appear to be the limited and selective basis for Mr. Hatfield's anticipated opinion testimony.

Hatfield Dep., August 13, 2003, at 23-25 (Exhibit L).

The "Blowout II" simulation was conducted in an 8' x 15' x 20' enclosure specially

constructed in a warehouse in Dr. Longo's laboratory facilities to produce videotaped

simulations for Plaintiffs' use in litigation. See Hatfield Dep., July 8, 2003, at 108 (Exhibit J).

The walls of the enclosure were intentionally painted black to enhance the contrast and visibility

of airborne dust particles against the walls. The enclosure was lit by three (two 500 and one 1000

watt) high intensity theatre lights configured at right angles to one another, and obliquely to

cameras placed outside a window in the box in order to create a "Tyndall" light effect.

The videotape shows a person playing the role of simulated mechanic, wearing a Tyvek

spacesuit and a full face respirator, using a high pressure air hose to blast allegedly asbestos-

containing dust from the rear brake assemblies of a 25 year old car that someone found in a

junkyard for MAS.  Dr. Longo/Mr. Hatfield knows nothing about the vehicle's maintenance

history, how many times the brakes on the car had been replaced, how many miles the vehicle

had been driven, or any other history regarding the car. Most significantly, *the brakes on the*

*junked car at the time of the simulation did not contain asbestos.*

In the Hand Filing studies, the simulated mechanic, again wearing a Tyvek spacesuit and

respirator, filed the surfaces of asbestos-containing brake shoes manufactured by Bendix for

approximately 19 minutes. The videotape shows a virtual blizzard of dust floating in front of the

WILDMS 138809v.1

stage lights. The intense lighting deliberately exaggerates the appearance of dust, like the effect

seen when one looks in the direction of a movie projector and sees dust in the projected beam.

Dr. Longo/Mr. Hatfield has no idea what portion of this dust might be asbestos fibers. When the

stage lights were turned off there was little-to-no observable dust. Partial Transcript *In re: Lamar*

*County Asbestos Litigation, 6th District Court of Lamar County*, June 20, 2001 at 67-68 (Exhibit

Q).[2]

### 1.    The Blowout II Study And Video

As noted, the brakes that were the subject of the Blowout II study were asbestos–free.

Arguably, the visually impressive dust cloud contained no asbestos fibers at all. See Hatfield

Dep., July 8, 2003 at 103 (Exhibit J); see also *Brake Blow-Out II, Work Practice Study*, by

Richard L. Hatfield, Larry R Newton & William E. Longo, January 2001 (Exhibit M). Even if

the brakes had contained some asbestos, the asbestos was chrysotile asbestos encapsulated in a

resin binder which breaks down into harmless fosterite during the braking process. Most, if not

---

[2]     Hatfield and Longo refer to this lighting scheme as "Tyndall lighting."

The Hatfield/Longo stage lighting and videotaping scheme "magnifies" small particles, creating an optical illusion that greatly exaggerates the size, amount and density of the dust released during the purported brake work simulations. Hatfield Dep., July 8, 2003, (Exhibit L) at 111-12. The Tyndall lighting shows an artificial cloud, and is of no use in determining what amounts of the dust in the cloud (if any) are respirable asbestos.

First, when bright light is reflected off of a small object, it disperses in such a way as to create an image larger than the object itself. The brighter the light, the greater the exaggeration of the size of the object. By using very bright spotlights, Hatfield and Longo have exaggerated the apparent size of the particles of airborne dust and the apparent density of the resulting "cloud."

Second, the contrast effect caused by the bright lights exaggerate the apparent density of dust in the chamber. When a brightly-lit object is placed in our field of view, the human eye (and the photocell of a video camera) reacts by adjusting to the brighter object—as a result, we lose the ability to see the more dimly lit objects that had been visible earlier. Much like when a driver turns on the high beams of an automobile while driving during a snowstorm, the apparent density of the dust cloud in the stage lights "appears" to increase dramatically.

Third, the video recording utilized by Longo and Hatfield is "misleading" and exaggerates the size of the particle by recording them out of focus. See In re: Lamar County Asbestos Litigation (Exhibit A) (precluding Hatfield videos in part because they were "deceptively out of focus"), compounding the illusion that the dust is much more dense than it really is.

5

all, of the dust found in a typical automotive brake assembly, therefore, comprises fosterite and road grit, rather than respirable asbestos fibers. See Langer (Exhibit H). Blowout II, however, states that the dust in the brake drums contained some chrysotile asbestos fibers, but says nothing about the size or quantity of those fibers. (Exhibit L at 1). Even though there was no asbestos in the brakes from which dust was blown, Mr. Hatfield speculates that the assemblies may have contained dust from asbestos containing brakes that may have previously have been on the car at an unknown time before the car was junked.[3] Hatfield Dep., July 8, 2003, at 103-106 (Exhibit J). By Dr. Longo/Mr. Hatfield's own admission, there is no way of knowing even roughly how much dust was blown around in the chamber during the simulation, or how much asbestos it may have contained. Hatfield Dep., Aug. 13, 2003, at 121(Exhibit L).

The Blowout II description states "that a typical work practice used while repairing or replacing brakes was to blow the wheel, brake drums and brake assembly free of dust using compressed air." *Brake Blow-Out II, Work Practice Study*, at 2 (Exhibit M). Notwithstanding that neither Mr. Hatfield nor Dr. Longo are qualified to testify about "typical" work practices of auto mechanics, the purported simulation is invalid, and must be excluded because it does not even attempt to reproduce the practice of using a brush and a vacuum in addition to an air hose when working on brakes. Despite the vast differences between Plaintiffs' actual working conditions and those portrayed in the simulation, Dr. Longo/Mr. Hatfield claims that real-life working conditions are irrelevant. This testimony underscores the argument that there was no

---

[3]     Asbestos-containing brakes were found in the trunk of the car. (Exhibit O). However, Longo and Hatfield made no attempt even to see whether those brakes would even fit the car, Hatfield Dep., July 8, 2003, at 105-06 (Exhibit L), or how long it had been since they had been removed.

scientific attempt to simulate plaintiffs' conditions.[4] See Hatfield Dep., July 8, 2003, at 25, 48-51 (Exhibit J).

### 2.    The Hand Filing Study[5]

The Hand Filing video shows a simulated worker, again in a Tyvek spacesuit and wearing a respirator, using hand tools to file the edges of brakes purportedly manufactured by Bendix for a GM vehicle ("Bendix/GM") and also brakes manufactured by Bendix for a Chrysler vehicle ("Bendix/Chrysler"). (Exhibits N and O). As noted above, any asbestos contained in the brakes was encapsulated in the hard resin binder. (Langer, Exhibit H).

GM cannot replicate the simulations to evaluate their scientific validity because neither Hatfield or his colleagues have produced to the defendants the tools used in the simulation. Hatfield Dep., July 8, 2003, at 122 (Exhibit J). It is impossible, therefore, to verify whether the tools used in the simulation matched, or even reasonably compared to those plaintiffs may have used in their actual work practices.

### C.    Longo/Hatfield's Testing Analyses And Results

During the simulations, Dr. Longo/Mr. Hatfield collected air and dust samples, but failed to comply with government imposed standards for collecting such samples. He then analyzed the dust samples in a manner contrary to government required standards for measuring occupational exposure to asbestos fibers. (Exhibits M, N and O).

---

[4]    Larry Newton, a certified industrial hygienist and participant in the Blowout II and Hand Filing studies, however, admitted that investigation into the work practices of real mechanics prior to conducting either study is "important in determining whether [the] simulation actually simulated a real work practice." Newton Dep., July 13, 2001, (Exhibit T at 144-48). Cf. In re: Armstrong World Industries, Inc., 285 B.R. 864 (Bankr. D. Del. 2002) ("The nature of the activity in a room at any given time, air-flow patterns in the room and a host of other variables can affect [asbestos-level] test results."); see also Grego v. Trailmobile Trailers, Superior Court of San Francisco County, California, Feb. 10, 2000 (Exhibit C); In re: Lamar County Asbestos Litigation, (Exhibit A) (precluding Hatfield and Longo's studies that did not take into account other reasonable factors).

[5]    The Hand Filing simulation applies only to those matters in which Plaintiff testified that he filed new brake linings before installing them on cars.

7

1.    **The NIOSH 7400 Method**

Dr. Longo/Mr. Hatfield claims to have followed the NIOSH 7400 protocol for counting

asbestos fibers in an airborne sample. He, however, bases his conclusions on improper use of

protocols. NIOSH does not permit Transmission Electron Microscopy ("TEM") for counting

asbestos fibers to quantify asbestos exposure. NIOSH protocols require, rather, the use of Optical

Phase Contrast Microscopy ("PCM"), using an optical microscope at a magnification of 400X, to

count particles that are at least 5 microns ("um")[6] long, and at least 0.25 um wide, and have a

length-to-width ratio of 3:1 (the Occupational Safety and Health Administration's ("OSHA's")

definition of "fibers"). 29 C.F.R. § 1910.1001 App. A. PCM is the universally recognized and

scientifically accepted means of quantifying respirable airborne fibers.[7] This is so even though

PCM cannot distinguish asbestos from non-asbestos fibers. 29 C.F.R. § 1910.1001 App. B,

¶1.3(4). Unlike electron microscopy, the PCM technology has been widely available at a

reasonable cost for many years permitting data collection in a wide variety of working

environments. Data has been generated using this NIOSH mandated PCM methodology for years

and can be compared to historical epidemiological studies to help understand whether exposure

to various asbestos types of asbestos fibers under a multitude of environments and settings, leads

to certain ailments. Any data Dr. Longo/Mr. Hatfield may have obtained using TEM (electron

microscopy) via his own methodology is inherently unreliable because it cannot be compared to

data upon which historical epidemiological studies are based. NIOSH does recommend

Transmission Electron Microscopy ("TEM"), which can magnify particles up to 25,000X, for a

limited purpose: to distinguish asbestos fibers from other materials as well as among the fiber

---

[6]      An "um," or micron, is shorthand for "a millionth of a meter."

[7]      OSHA regulations state that one of the advantages of the PCM measurements is their continuity with
historical epidemiological studies, so that estimates of expected disease can be inferred from long-term
determinations of asbestos exposures. 29 C.F.R. § 1910.1001

8

types. NIOSH does <u>not</u> permit TEM for counting fibers to quantify exposure levels in this context.

In short, TEM must only be used to identify asbestos particles, not to count them. As OSHA, Delaware courts, and other courts considering Dr. Longo/Mr. Hatfield's studies have recognized, the use of TEM to count asbestos fibers is a scientifically unreliable method for quantifying asbestos fibers, and consistently over reports the number of asbestos fibers in the samples.[8]

Using TEM, Mr. Hatfield and Dr. Longo count every asbestos particle observed under TEM that is at least as long as 0.50 um, <u>one tenth the length</u> (5 um) of the OSHA standard fiber length upon which existing industrial hygiene and epidemiology data is based. (<u>See</u> Exhibit K at 104). They both concede that TEM measurements cannot be used to assess the hazardousness of asbestos exposure nor to make comparisons to any established exposure limitations.[9] However, this is precisely and deliberately what they do, and what they invite the jury to do. Using TEM,

---

[8]     <u>In re Lamar County Asbestos Litigation</u>, 6th District Court for Lamar County, Texas, Order (July 5, 2001) (Exhibit A), (discussing NIOSH 7400 method as allegedly applied by Hatfield; striking Hatfield and Longo as experts and their tests from evidence in part for proffering TEM measurements with no means of correlating them to relevant, OSHA-approved PCM numbers).

[9]     1.  Mr. Hatfield has testified that all standards for occupational airborne exposures are based on PCM. (Testimony of Hatfield in Leo Hart v. Abex (Exhibit U) at 27-28.) When asked what he uses his extensive TEM results for, Mr. Hatfield replied: "I may or may not compare them to anything. I may just use them at face value." <u>Id</u>. at 26-27.

2.  Dr. Longo has admitted that PCM is the only standard for occupational airborne exposures and that TEM "is not recognized by the federal government for measuring occupational exposures." (Testimony of Longo in <u>Dunhoff v. A-Best Products</u>, Jan. 31, 2002 (Exhibit V) at 64) He further testified that when comparing to an occupational standard, one should use PCM data, and that the TEM data Mr. Hatfield and he have generated is simply for their own "internal research." <u>Id</u>. at 66.

3.  Dr. Longo has agreed that there is no method to take TEM data and convert it to PCM data, nor is there any method which allows one to compare TEM data to current occupational exposure standards. (Testimony of Longo in <u>Zimmerman v. Garlock</u>, Jan, 28, 2002 (Exhibit W) at 73-74.)

4.  Dr. Longo knows of no study where TEM measurements have been correlated with asbestos related disease. Testimony of Longo in <u>Hamre v. Asbestos Defendants</u>, Nov. 9, 1997 (Exhibit X) at 133-34.

9

they systematically over count fibers and produce data that cannot be correlated with existing

OSHA standards or epidemiological data. Dr. Longo/Mr. Hatfield's purported simulations, thus,

show nothing about the relative hazards associated with brake repair work.

### 2.     The Unduly Prejudicial Videotape

The inherent irrelevance and unduly prejudicial effect of Mr. Hatfield and Dr. Longo's

artificially lighted videotapes is supported by their own testimony:

1. Mr. Hatfield admits that a person viewing the Blowout II video cannot differentiate asbestos fibers from general dust, which is prejudicial, particularly in light of the fact that the brakes in the assembly were asbestos-free. Hatfield Dep., Aug. 13, 2003, at 120 (Exhibit L). He has also admitted that the high intensity lighting can not distinguish asbestos from non-asbestos. Testimony of Hatfield in Cook v. AC&S, Inc., Jan. 20, 2000, at 171 (Exhibit W). He has further admitted that he would not even know how to convert what is shown in the simulations to valid PCM measurements, id. at 104.

2. Neither can Mr. Hatfield distinguish between asbestos and non-asbestos dust by merely viewing the videotapes. At one time Mr. Hatfield's associate, Dr. Longo, speculated that the percentage of asbestos in the visible dust falls between 1 and 100 percent. (In Re: Lamar County Asbestos Litigation, District Court of Lamar County, Texas, June 20, 2001 (Exhibit Q). "What I can tell the jury is that there is some percentage of asbestos in the cloud. We know that because we make the measurements. We haven't made the measurements to know exactly how much is asbestos and how much is not asbestos. I will tell the jury I don't think that's a hundred percent asbestos . . . I would certainly think it's more than one percent.") Id. at 67.

3. Moreover, the high intensity lighting produces heat which causes the dust particles suspended in hot air to rise keeping particles from settling and thereby increasing the number of particles collected. Gilbert v. Bendix Corporation, Court of Common Pleas of Northampton County, Pennsylvania, No. 96-C-3489, Aug. 11, 1998, at 259 (Exhibit X). Mr. Hatfield admits that the high-intensity lighting could cause the particles to rise and swirl and repeatedly pass by his dust collection devices. Hatfield Dep., July 8, 2003, at 110 (Exhibit J).

4. Mr. Hatfield has also admitted that neither he nor Dr. Longo have made any attempt to quantify the percentage of respirable asbestos fibers depicted in the airborne dust in the videotapes. Jones v. Owens Corning, Superior Court of Fulton County, Georgia, Mar. 12, 2001, at 26 (Exhibit Y).

Further, Dr. Longo concedes that Tyndall lighting is improper "to quantitate or qualify

asbestos fiber release in an occupational setting." Exhibit S at 46. Courts considering

10

WILDMS 138809v.1

Mr. Hatfield and Dr. Longo's Tyndall lighting videos have found as a matter of law that Tyndall

lighting is not used in the industrial hygiene community. See also In re: Lamar County Asbestos

Litigation, at 11, 13 (Exhibit A) (noting several experts' opinions that Mr. Hatfield and

Mr. Longo's lighting is not used for industrial hygiene).

## ARGUMENT

Before admitting expert testimony, the Court must determine:

> 1) that the expert witness [is] qualified [D.R.E. 702]; 2) that the evidence offered
> [is] otherwise admissible, relevant and reliable [D.R.E. 401 & 402]; 3) that the
> bases for the opinion are those 'reasonably relied upon by experts in the field'
> [D.R.E. 703]; 4) that the specialized knowledge being offered will assist the trier
> of fact to understand the evidence or determine a fact in issue [D.R.E. 702]; and
> 5) whether such evidence would create unfair prejudice, confuse the issues or
> mislead the jury [D.R.E. 403]."

Nelson v. State, 628 A.2d 69, 74 (Del. 1993) (citation omitted). Mr. Hatfield's videotapes,

evidence and testimony violate each of these well-established rules of evidence.

## II.   THE LONGO/HATFIELD VIDEOTAPES AND STUDIES SHOULD BE PRECLUDED AS INHERENTLY AND UNDULY PREJUDICIAL AND WILL MISLEAD AND INFLAME THE JURY.

The Dr. Longo/Mr. Hatfield staged videos have no probative value regarding Plaintiffs'

alleged exposure to asbestos. The videotaped simulations are misleading and create an undue risk

of prejudice to GM and must be precluded under Rules 401 and 403.

Demonstrative evidence, such as Dr. Longo/Mr. Hatfield's videotapes, does not meet the

threshold of admissibility, and must be excluded where Plaintiffs cannot establish that its

probative value outweighs its likelihood of improperly influencing the jury. Compare Stecyk v.

Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002) (proponents of videotaped tests

must make foundational showing that test conditions were "substantially similar" to conditions

of underlying event); In re Armstrong World Industries, Inc., 285 B.R. 864 (D. Del. 2002)

11

WILDMS 138809v.1

(rejecting asbestos collection procedure on grounds that any attempt to estimate airborne asbestos levels would be based on nothing more than subjective believe and sheer speculation); Fusco v. General Motors Corp., 11 F.3d 259, 264 (1st Cir. 1993) (excluding driving tapes because demonstration was not sufficiently close to original accident); Gladhill v. General Motors Corp., 743 F.2d 1049, 1051 (4th Cir. 1984) (finding that circumstances of accident were so different from test as to make results largely irrelevant if not misleading); Leonard v. Nichols Homeshield, Inc., 557 A.2d 743, 745 (Pa. Super. 1989) (excluding driving videotapes of testing of window screen because testing was done under conditions so dissimilar to accident that results and demonstrations were valueless).

Dr. Longo/Mr. Hatfield's videotapes provide no relevant information concerning the causation of Plaintiffs' injuries, or the risks associated with their exposure to potentially hazardous asbestos fibers. There is no way for any expert (let alone a lay juror) to relate Hatfield's purported work simulations to the nature or extent of any danger Plaintiffs may have experienced. (Hatfield Dep., Aug. 13, 2003, at 121 (Exhibit L); Newton Dep., July 13, 2001, at 163 (Exhibit R). In fact, there is significant risk that lay jurors — prodded by the deliberately alarming appearance of a worker in a Tyvek "spacesuit" wearing a respirator, in an artificial environment, and using work practices not conforming with those which Plaintiffs used — would erroneously interpret the apparent dust blizzard shown in the videos as asbestos dust, compare this to their own personal experiences under normal lighting conditions, and viscerally draw an improper inference that it is primarily asbestos. The mere appearance of the spacesuit and respirator in the video conveys an impression of extreme danger that may not actually exist. Regardless of what measurable hazard actually does or does not exist inside the closed room,

12

jurors will interpret the spacesuits and respirators as proof that the environment is extremely hazardous. (See n.4, above).

The risk that jurors will misinterpret the simulations as representative of Plaintiffs' working conditions substantially outweighs any minimal probative value the videotapes could possibly have in this matter. The videotapes have no scientific qualities. Indeed, Dr. Longo/Mr. Hatfield admits that the videotapes are for visual effect only, and that those visual effects are not part of the foundation for his opinion testimony. Hatfield Dep., July 8, 2003, at 111(Exhibit J); Hatfield Dep., August 13, 2003, at 121 (Exhibit L).

Larry Newton, a certified industrial hygienist and participant in the Blowout II and Hand Filing studies, has testified that none of the studies took into account ventilation, air exchanges, or the level of activity in any mechanic's real workspace, (Exhibit R at 105-110). In addition, no one at MAS investigated the work practices of real-world mechanics prior to conducting either study. Significantly, Mr. Newton testified that conducting such a background investigation would be "important in determining whether [the] simulation actually simulated a real work practice." Id. at 144-48.

Moreover, while conducting these simulations, Mr. Hatfield and Dr. Longo were dressed in Tyvek "moon suits," or black protective suits, and wore respirators (Exhibits M, N, O), creating the impression that a pervasive hazard was present despite their inability to establish or quantify the existence of the hazard. The videos utilized 2,000 watts of lighting in an area comprising a mere 300 square feet, against a black background for dramatic and misleading effect. The visible result of these artificial conditions is extraordinary, but lacks any scientific meaning.

WILDMS 138809v.1

Numerous courts have stricken Mr. Hatfield or Dr. Longo as expert witnesses and/or

excluded their staged videotapes for these reasons and others:

1.    *In re Lamar County Asbestos Litigation,* 6th District Court for Lamar County, Texas,
      Order (July 5, 2001) (Exhibit A), striking Dr. Longo as an expert and his simulations
      from evidence, stating that the tests conducted by Longo and Hatfield were not
      scientifically reliable and amounted to "junk science" not admissible under the Texas
      Rules of Evidence;

2.    *Lewis v. John Crane, et. al.,* Superior Court of San Francisco County, California, Apr. 3,
      2000, page 871 (Exhibit B) (excluding videotapes with moon suits and respirators: "[t]he
      other videotapes have an air of doom and gloom about them as a result of the use of
      moon suits and respirators [and] [t]he enclosed tents and the movement of the persons in
      them.");

3.    *Grego v. Trailmobile Trailers, et al.,* Superior Court of San Francisco County, California,
      Feb. 10, 2000 (Exhibit C) ("After viewing the tape and reviewing the written and oral
      arguments, my ruling is to exclude the Longo occupational simulation video tape and his
      testimony regarding any simulated workplace activities . . . . I believe that there is an
      insufficient foundation to show that the simulation was sufficiently similar to the asbestos
      exposure of the plaintiffs here and that the probative value of that evidence would be
      substantially outweighed by its prejudicial effect. I also believe it would be confusing to
      the jury.");

4.    *Campbell v. Abney Mills, et. al,* Superior Court for King County, Washington, Oct. 9,
      2002 (Exhibit D) ("With regard to the Longo videotape, I have looked at the videotape
      and it will be excluded as unfairly prejudicial.");

5.    *Carlson v. Lear Siegler, et. al.,* Superior Court of San Francisco County, California, Aug.
      13, 1998, page 139 (Exhibit E) ("With respect to the brakes Mr. Carlson worked on, I am
      also going to rule that Longo's testimony would not be admissible. I believe that
      whatever probative value it would have in that case is clearly outweighed by the
      confusion on the issues before the jury.");

6.    *Berning v. A.P. Green Industries, Inc.,* Cal. Super, San Francisco Cty., Case No. 319733,
      Jan. 8, 2002 (Exhibit F) (precluding Hatfield's videotapes, including Blowout II; study
      did not account for dimensions and ventilation of plaintiffs' workspaces and thus study
      was not a "fair picture of what would have been going on in the garage.").

7.    *Ball v. Consolidated Rail Corp.,* 756 N.E.2d 1280, 1288 (Ohio Ct. App. 2001) (reversing
      and remanding jury verdict partially on grounds that the trial court erred in admitting
      measurements of Hatfield/Longo, noting that "the experiment was not designed to show
      the level of asbestos exposure allegedly encountered by [the plaintiffs] and Longo should
      not have been allowed to testify concerning the amounts of asbestos released during the
      experiment.");

14

8.    *State Farm Mut. Auto Ins. Co. v. W. R. Grace & Co.*, No. 89-3022, Order at 2 (C.D. Ill. Feb. 5, 1993) ("any possible relevance of the simulation would be outweighed by possible confusion and prejudice to the jury because it was not conducted under scientifically controlled circumstances");

9.    *Sioux Valley Hosp. Ass 'n v. W. R. Grace & Co.*, No. 92-4081, Tr. at 10 (D. S. D. 1994) ("there's a lot of black screen with a lot of materials floating which appear to me to be enhanced and appear to me to be more prejudicial than probative");

10.    *One Wilshire Arcade Imperial v. W. R. Grace & Co.*, Civ. No. BC011763, Order (Cal. Super., L.A. Cty., Feb. 24, 1995) ("videotaped simulations have little probative value and any value is outweighed by the likelihood that the simulations will confuse the jury and are unduly prejudicial.").

For all of the reasons stated by the many courts confronted with this issue, the Hatfield/ Longo videotapes, evidence and testimony should be excluded from trial.

### III. DR. LONGO/MR. HATFIELD IS NOT QUALIFIED AS AN EXPERT IN THE FIELD IN WHICH HE IS EXPECTED TO TESTIFY

Even before reaching a <u>Daubert</u> analysis of whether Dr. Longo/Mr. Hatfield's testimony is sufficiently reliable to reach a jury, the Court must make the threshold determination of whether he is 'qualified as an expert by knowledge, skill, experience, training or education.'" <u>Cunningham v McDonald</u>, 689 A.2d 1190, 1193 (Del. 1997) (quoting D.R.E. 702). He is not.

By his own admission, Mr. Hatfield is not an industrial hygienist, has no graduate degree, and no training in occupational exposures to asbestos, or in replicating such exposures so as to accurately simulate them in any scientific manner under the tenets of <u>Daubert</u>. <u>See</u> Hatfield Dep., July 8, 2003, at 15-30 (Exhibit J). Mr. Hatfield nonetheless is offered for his expert opinion as to "the release of asbestos from brake materials and the exposures and ensuing exposures from certain work activities that relate to brakes." <u>Id</u>. at 35.

Dr. Longo/Mr. Hatfield is expected to testify that "the blowing out of brake dust" during the brake work Plaintiffs performed in their respective garages, without regard to the frequency of such work, the products they handled or the details of their work environment, "puts

15

significant amounts of asbestos in the air and poses exposures to those conducting the work and

those that are around the work being conducted." Exhibit J at 41-42; 48-50. Such testimony

requires experience and expertise, which Dr. Longo/Mr. Hatfield lacks. Dr. Longo/Mr. Hatfield

has no training in designing valid, scientific, industrial hygiene studies, or assessing individual

exposures or risks associated with asbestos. Hatfield Dep., July 8, 2003, at 13-26, 54-55 (Exhibit

J); Hatfield C.V. (Exhibit K). He is not a Certified Industrial Hygienist, has no mechanical

training, and admits he has never performed a brake job or observed a brake job from start to

finish. (Exhibit J at 77-80). Of the few brake jobs he claims to have casually witnessed as an

adolescent and service station patron, he has no recollection as to whether any of the brakes he

may have seen contained asbestos. Id. at 91.

Mr. Hatfield's undergraduate degrees and attendance at a few one-week courses in

microscopy and air sampling do not qualify him to offer opinions about the Plaintiffs' alleged

asbestos exposure in this case. He is not qualified as an expert, and must be precluded from

offering any evidence at trial. See Riggs Nat'l Bank v. Boyd, 2000 LEXIS 124 (Del. Super.)

(specialist physician with hospital privileges claiming "extensive experience" in credentialing

was nonetheless not qualified to testify as expert on hospital credentialing under D.R.E. 702).

## IV.     LONGO/HATFIELD'S TESTIMONY SHOULD BE PRECLUDED BECAUSE THE TESTIMONY AND VIDEOTAPED SIMULATIONS ARE NEITHER RELEVANT NOR RELIABLE UNDER <u>DAUBERT</u> STANDARDS.

Dr. Longo/Mr. Hatfield's proffered testimony and evidence must be excluded because

they fail to meet Delaware's standards for admissibility under Daubert and M. G.

Bancorporation. See Minner v. American Mortgage & Guaranty Co., 791 A.2d 826, 855 (Del.

Super. 2000) (rejecting "unscientific speculation" even "from a genuine scientist"); In re:

16

Armstrong World Industries, 285 B.R. 864 (precluding expert testimony about the quantity of asbestos fibers present in an office building because it failed to meet Daubert factors).[10]

### A.     The Longo/Hatfield Videotapes Were Prepared Specifically For Litigation And Do Not Satisfy The Prerequisites For Admission Under Daubert

"Delaware Rules of Evidence 702 and 703 require a trial judge to act as a 'gatekeeper' and to screen scientific, technical, or specialized opinion evidence in order to exclude from consideration such evidence as it finds to be unreliable as a matter of law." Cede & Co. v. Technicolor, Inc., 758 A.2d 485, 498 (Del. 2000). Where a party has challenged "the factual basis, data, principles, [or] methods" of an expert, or the "application" of those principles and methods, "'the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.'" Cede, 758 A.2d at 498 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999)) (some internal quotation marks omitted).

The Supreme Court has adopted the standards set forth in Daubert and Kumho Tire for determining the admissibility of all expert testimony on scientific, technical or other specialized matters within the ambit of Delaware Rule of Evidence 702. See M.G. Bancorporation, 737 A.2d at 521-22. Under Daubert, the Court is charged with ensuring, and the proponent bears the burden of proving, that all expert testimony is both relevant and reliable. See Daubert, 509 U.S. at 589; Kumho, 526 U.S. at 147.

---

[10]     "Ultimately, the testimony of an expert is admitted upon the theory that, in a particular case, the issue is such that the jurors are not competent to draw their own conclusions from the facts without the aid of the expert" Minner, 791 A.2d at 846. Mr. Hatfield's testimony, in its essence, is that blowing brakes out with an air hose, and filing them with a certain unspecified hand file, can generate dust. See Hatfield Dep., July 8, 2003, (Exhibit L) at 100. "When the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony." K-Mart Corp. v. Honeycutt, 24 S.W.2d 357, 360 (Tex. 2000) (applying Tex. R. Evid. 702, identical in pertinent part to D.R.E. 702). Such testimony is well within the common knowledge of any jury member and thus not helpful and inadmissible under Daubert. See Berning v. A.P. Green, (Exhibit F at 337) (precluding Hatfield videotape; "[t]he jurors can use their own experience in determining, well, obviously, there has got to be some kind of dust generated. No one is disputing that, but the question is how much?"). See also Ward v. Shoney's, Inc., 817 A.2d 799, 803 (Del. 2003) (fact that people cut corners is matter of common knowledge; expert opinion not appropriate and properly excluded).

Daubert sets forth four nonexclusive factors to consider in assessing the reliability of an

expert's testimony concerning a particular theory or technique: (1) whether the theory or

technique has been tested; (2) whether it has been subjected to peer review and publication; (3)

in the case of a specific scientific technique, its known or potential rate of error; and (4) whether

it has been generally accepted within the relevant scientific community. See Daubert, 509 U.S. at

593-94. Any step that renders the analysis unreliable under the Daubert factors renders the

entirety of the expert's testimony inadmissible. Armstrong, 285 B.R. at 870.

Delaware Rules of Evidence 702 provides that "[i]f scientific, technical or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert... may testify thereto in the form of an opinion or

otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods and (3) the witness has applied the principles and

methods reliably to the facts of the case." D.R.E. 702 (emphasis added).

Rule 703 permits an expert to base his or her opinion on facts or data perceived by or

made known to him or her prior to or at the hearing in question, even if the facts and data are not

admissible in evidence, but only if they "are of a type reasonably relied upon by experts in the

particular field," and only if the Court first determines that the "probative value" of such facts or

data substantially outweighs their prejudicial effect. D.R.E. 703.

Dr. Longo/Mr. Hatfield's testimony and the videotaped simulations are inherently suspect

because they were prepared specifically for asbestos litigation. Dr. Longo/Mr. Hatfield admitted

that the Hand Filing simulation was commissioned by a plaintiff's lawyer in Florida for use in

asbestos litigation. Hatfield Dep., August 13, 2003, at 78-79 (Exhibit L). Similarly, the Blowout

II study was prompted by a challenge to the submission of Mr. Hatfield's and Dr. Longo's

18

Blowout I study (commissioned for litigation, and which focused on aircraft brakes) when plaintiffs' counsel sought to introduce it as allegedly applicable to automobile brakes.

The reliability of Dr. Longo/Mr. Hatfield's testimony is further undercut by the fact that he is a professional witness who stands to benefit by producing "plaintiff friendly" results. Delaware courts have been traditionally wary of such expert testimony. See Minner, 791 A.2d at 846 (noting Delaware's skepticism of experts' "compensated advocacy").

Unpublished and unsupported, yet proffered and excluded in asbestos litigation from coast to coast,[11] Dr. Longo/Mr. Hatfield's studies are no more than theatrical advocacy produced for asbestos plaintiff litigation with absolutely no value outside a courtroom. This alone weighs against permitting Dr. Longo/Mr. Hatfield to testify. See Allen v. International Business Machines Corp., 1997 LEXIS 8016 *15, *54 (D. Del.), aff'd without op., 176 F.3d 471 (3d Cir. 1999) (Daubert analysis also considers the "non-judicial uses which the scientific techniques are put;" precluding testimony proffered without information whether the methodology would have any application outside the judicial setting); Celotex Corp. v. AIU Ins. Co., 196 B.R. 973, 984-85 (Bankr. M. D. Fla. 1996) (concerned that scientific research as to asbestos was funded by parties to this or similar litigation, and that methodology was litigation-driven, not science-driven; finding "Mr. Hatfield's methodology used to collect dust samples seemed anything but precise and accurate.").

**B.    The Longo/Hatfield Videotapes And Measurements Do Not Meet The "Fit" Requirement Under Daubert And D.R.E. 702.**

The requirement that expert testimony must be relevant, or "fit" the facts of the case, goes hand-in-hand with Rule 702's requirement that expert testimony assist the trier of fact in understanding the evidence or determining a fact in issue. See Daubert, 509 U.S. at 591. In

---

[11]    See Exhibits A-G and citations at pp. 17-18 above; Hatfield Dep., August 13, 2003, at 78-103(Exhibit N).

WILDMS 138809v.1

assessing the admissibility of studies on which Dr. Longo/Mr. Hatfield intends to rely, and in

performing its gatekeeping function, the Court must assess the "fit" of the proffered testimony

and methodology to the facts at issue in the case. See In re: Armstrong World Industries, 285

B.R. at 870. Evidence that does not "fit" the facts of the case must be excluded as irrelevant. To

meet the "fitness" requirement, Plaintiffs must establish by a preponderance of the evidence that

a "valid scientific connection" exists between Mr. Hatfield's proffered testimony and evidence as

a precondition to admissibility. Id. (Quoting Daubert 809 U.S. at 591)

   Dr. Longo/Mr. Hatfield's testing methods and protocols do not address the work

environments of Plaintiffs or any products manufactured or sold by GM.  Moreover, use of a

junked car with a completely unknown history fails to establish any scientific controls or

methodology let alone adequate controls. See Oddi v. Ford Motor Co., 234 F.3d 136, 156-59 (3d

Cir. 2000) (excluding expert "studies" of trucks of uncertain manufacturers as not sufficiently

related to defendant's vehicle, and for failure to consider other possible factors); see also Minner,

791 A.2d at 854-55 (rejecting physician testimony that, among other flaws, did not account for

other potential factors).

   Dr. Longo/Mr. Hatfield's proposed testimony and the videotaped simulations do not "fit"

the facts of this case for a variety of reasons, most of which are previously suggested above.

Among those reasons, Hatfield did not use automobile brake linings supplied by GM.  Moreover,

the simulated activities and the manner, in which they were performed in a 20' x 15' x 8'

enclosed room (smaller than one garage bay) with black walls, hot theater lights and no

ventilation, do not reflect or even resemble the actual activities or conditions under which

Plaintiffs purportedly worked.[12]

---

[12]     Even if the tests were purportedly used for measurement under OSHA test levels, they would not "fit".
         Both simulations involve dust releases for much longer periods than any mechanic would encounter. By

20

Proffered expert testimony and tests that do not reflect an analysis of asbestos exposure during a plaintiff's normal activity are inadmissible under Daubert. See In re: Armstrong World Industries, Inc., 285 B.R. at 868 ("the focus of the testing is not on how much asbestos is present in a room or building, but upon how many respirable asbestos structures are in the air *during normal activity*.") (emphasis added); see also In re: Lamar County Asbestos Litigation, (Exhibit A) (excluding Hatfield's tests because "no comparative tests were conducted in any other locations or under any other conditions"); Berning v. A.P. Green, (Exhibit F) (precluding Hatfield's videotapes, including Blowout II, because the simulation did not account for dimensions and ventilation of plaintiffs' workspaces and thus study was not a "fair picture of what would have been going on in the garage"). Because Plaintiffs have neither offered, nor can they offer any statistical correlation (nor even a practical basis of comparison) between the simulated activity and environment represented in the videotaped simulations and that encountered by Plaintiffs during their normal work activity, neither the videotapes nor Dr. Longo/Mr. Hatfield's testimony is reliable, and must be excluded. Id.

The videotaped simulations are also irrelevant because the hot theater lights used by Hatfield and Longo in making the videotapes caused thermal currents which made dust rise and kept dust particles suspended in the air longer than would have occurred in Plaintiffs' workplace. Hatfield Dep., July 8, 2003, at 110 (Exhibit J) (noting the theatrical lights used in the studies could make dust "rise and swirl"). This artificially raised the dust concentration levels, and artificially increased the quantity of dust captured in a sampling device.

---

shortening the dust collection time, and measuring dust only during the most severe period, any quantitative testimony about a brake mechanic's exposure will be vastly overstated because it fails to account for periods of low exposure that are part of OSHA's eight-hour standard.

21

**C.     The Activities And Materials Depicted In The Longo/Hatfield Videotape Have Not Been, And Cannot Be, Tested**

The staged videotapes and related testimony that Plaintiffs seek to introduce cannot be tested because the tapes present no quantitative information that can be tested.  The videotapes are merely visual representations of unspecified and immeasurable dust clouds. The three persons credited with the studies, Mr. Hatfield, Dr. Longo and Mr. Newton, each admit that the videotapes cannot distinguish between hazardous asbestos and harmless dust.  See Hatfield Dep., August 13, 2003, at 121 (Exhibit L); Newton Dep., July 13, 2001, at 163 (Exhibit R) ("Tyndall lighting" "is not a technique to quantitate [sic] levels of asbestos."); (Exhibit S).

Mr. Hatfield's studies should also be precluded under Daubert because, from the information contained in the reports, the tests cannot be replicated. See In re: Lamar County Asbestos Litigation, Exhibit A at 6. Further, without a way to distinguish what portion of the misleadingly-displayed dust may be harmful asbestos, (if any) there is no way to test Dr. Longo/Mr. Hatfield's hypothesis that Plaintiffs were exposed to any specified amount (or even his proffered range) of airborne asbestos during their work activity. Methodologies that cannot be tested do not meet the requirements of Daubert and must be precluded. In re: Armstrong World Industries, 285 B.R. at 870.

**D.     Dr. Longo/Mr. Hatfield's Methodology For Preparing Videotaped Simulations Of Brake Work Has Not Been Published Or Subjected To Peer Review.**

Mr. Hatfield has admitted that neither he nor Dr. Longo have submitted their studies or methodology for preparing videotaped simulations of work on friction brake parts for peer review or publication. Hatfield Dep., July 8, 2003, at 61-62 (Exhibit J). It, thus, fails to meet one of the most basic elements of reliability under Daubert. In re: Armstrong World Industries, Inc., 285 B.R. 864 at 870; Allen v. IBM, 1997 LEXIS 8016, at *52-53 (excluding expert testimony

where proffering party failed to establish methodology had been reviewed, utilized or recognized by others in his field).

     **E.     Dr. Longo/Mr. Hatfield's Conclusions Have No Identifiable Rate of Error.**

The videotaped simulations cannot satisfy the "known or potential rate of error" standard of the Daubert test, because they are purely subjective. The videotapes cannot distinguish between potentially harmful asbestos fibers and other types of dust. Therefore, there is no basis from the simulations for determining what, if any, asbestos fibers Plaintiffs may have encountered during any particular activity, much less over their respective careers, or of measuring any rate of error for that exposure. See Carlson v. Siegler, at 127-29, 139 (Exhibit B) (lacking evidence of how much of dust blowing around in study was asbestos, Longo's proffered testimony was not relevant and inadmissible). At his deposition, Mr. Hatfield could not even begin to assess any level of "statistical significance" of his data because he says such an analysis is unnecessary. Hatfield Dep., July 8, 2003, at 29 (Exhibit J). Instead, he contends that his conclusions are significant merely because "[w]hen things are measured above zero, there is a difference." Hatfield Dep. at 28-29 (Mr. Hatfield has no qualifications to permit him to testify as to the exposures of individual workers or the health impacts of such exposures.). Dr. Longo/Mr. Hatfield's proffered simulation and any expert testimony fails another Daubert factor. In re: Armstrong World Industries, 285 B.R. at 870 (evidence not admissible where "known or potential rate of error has not been quantified"); Allen v. IBM, 1997 LEXIS 8016, at *52-53 (excluding testimony where no rate of error offered).[13]

---

[13]    Mr. Hatfield testified that he won't (likely because he can't) testify as to "a specific exposure amount." He speculates Plaintiffs may have encountered during their work practices, but intends to suggest an unspecified "range" of such exposure levels. See Hatfield Dep., July 8, 2003, (Exhibit L) at 42. As Plaintiffs have not proffered acceptable rates of error for the parameters Mr. Hatfield intends to offer, even such a "range" is inadmissible. Allen v. IBM, 1997 LEXIS 8016, at *52-53.

F.    **The Staged Studies Are Not Based On Generally Accepted Scientific Protocols For Measuring Workplace Exposure To Asbestos Fibers**

1.    **The Videotapes Are Staged Advocacy Not Applicable Or Relevant To Advance The Fact-Finding Process.**

The artificial lighting scheme employed by Mr. Hatfield and Dr. Longo does not employ a scientific methodology to isolate, identify or quantify the asbestos fibers that are relevant to the risks to Plaintiffs. While Hatfield and Longo's write-ups on the brake work studies cite documents that mention "Tyndall" lighting, Mr. Hatfield has testified that the lighting in his videos serves no scientific purpose, but is, rather, intended to amplify the simulation's "visual effect," Hatfield Dep., July 8, 2003, at 111 (Exhibit J), and has no scientific purpose.  The court, in In re: Lamar County Asbestos Litigation, stated that "[t]he use of Tyndall lighting in the MAS tests is not an acceptable industrial hygiene practice and is not relevant or reliable for the quantification of airborne asbestos fibers." Exhibit A at 13.

The alarmist nature and purely theatrical value of Mr. Hatfield and Dr. Longo's videotaped simulations is underscored by the testimony of Mr. Boelter, a Certified Industrial Hygienist, in a Texas case:

> THE COURT: Let me ask you, would you think it would be safe to work without respirators or special clothing in the atmosphere and in what you saw in the videotape Doctor Longo ran.
>
> THE WITNESS: Yes, as a matter of fact, I do my tests without respiratory protection.
>
> THE COURT: So you would go into that environment as shown in Dr. Longo's videotape without special breathing equipment?
>
> THE WITNESS: Yes, sir.

(Exhibit A at Appendix A, recounting testimony, exhibit [Q] at 94).

2.    **Any Quantitative Evaluation Of The "Simulated" Worker's Asbestos Exposure Is Inadmissible Because Longo/Hatfield's Methodology Is**

24

### Contrary To Accepted Standards For Measuring Workplace Exposure To Asbestos.

Mr. Hatfield admits that the "best" way to measure an individual's exposure to asbestos is to do a personal air sampling. Hatfield Dep., July 8, 2003, at 84 (Exhibit J). He then admits that neither he nor Dr. Longo have <u>ever</u> done any such sampling of mechanics doing brake changes in garages. <u>Id</u>. While something less than the "best" methodology is not in all cases fatal under <u>Daubert</u> (<u>see</u> <u>Minner</u>, 791 A.2d at 848), Mr. Hatfield and Dr. Longo have sought to apply techniques that have been categorically rejected as inherently unreliable. <u>See</u> <u>In re Armstrong World Industries</u>, 285 B.R. 864 (rejecting TEM analysis); <u>In re Lamar County Asbestos Litigation</u>, Exhibit A at 7 (finding "[n]o respectable community of scientists has used TEM for counting asbestos fibers;" rejecting Longo and Hatfield's proffered TEM results as not obtained through proper OSHA and NIOSH protocols, and for failing to report as uncountable fibers below a certain size).

OSHA has regulated the permissible exposure limits of asbestos in the workplace for nearly thirty years and prescribes the methods and manner in which airborne asbestos fiber samples are collected and measured. These methods are identified by OSHA as the ID-160 method, or by NIOSH as the NIOSH 7400 method. <u>See</u> 20 C.F.R. § 1910.1001(d)(6)(i) and App. A thereto. These methods require a microscopist using phase contrast microscopy (PCM) to count <u>only</u> fibers greater than 5 microns in length with an aspect ratio of at least 3:1.[14] Only fibers with a width of at least 0.25 microns are counted.

The results are measured in fibers per cubic centimeter (f/cc), and can be compared to Permissible Exposure Limits (PELs) set by OSHA, which are based on the results of epidemiological studies. 29 C.F.R. § 1910.1001(c). Collecting dust by these methods and

---

[14]    Aspect ratio refers to the ratio of the fiber's length to its width

25

comparing the results to the PELs is done everyday in the real world to protect the health of

people working in industrial facilities throughout the United States.

Mr. Hatfield and Dr. Longo, however, analyzed their samples by using PCM and TEM,

and even the PCM analysis is contrary to the accepted methods because they do not employ the

quality control methods required by OSHA.

The OSHA Reference Method provides:

Sampling and Analytical Procedure

* * *

14: Blind recounts shall be conducted at the rate of 10 percent.

Quality Control Procedures

Intralaboratory program. Each laboratory and/or each company with more than
one microscopist counting slides shall establish a statistically designed quality
assurance program involving blind recounts and comparisons between
microscopists to monitor the variability of counting by each microscopist and
between microscopists. In a company with more than one laboratory, the program
shall include all laboratories and shall also evaluate the laboratory-to-laboratory
variability.

2.a. Interlaboratory program. Each laboratory analyzing asbestos samples for
compliance determination shall implement an interlaboratory quality assurance
program that as a minimum includes participation of at least two other
independent laboratories. Each laboratory shall participate in round robin testing
at least once every 6 months with at least all the other laboratories in its
interlaboratory quality assurance group. Each laboratory shall submit slides
typical of its own work load for use in this program. The round robin shall be
designed and results analyzed using appropriate statistical methodology.

29 C.F.R. § 1910.1001 App. A.

Furthermore, NIOSH 7400 requires that MAS "maintain a set of reference slides to be

used on a daily basis," and "perform blind recounts by the same counter on 10% of filters

counted." Manual of Analytical Methods, 4th ed., Aug. 15, 1994 (quoted in See In re Lamar

County Asbestos Litigation, Exhibit A at 5).

Despite skipping these procedures, Mr. Hatfield and Dr. Longo reported, and even testified in other litigation that they had complied with the OSHA-approved methodology. While Mr. Hatfield testified recently that MAS now participates in Proficiency Analytical Testing (or "PAT") analyses (Hatfield Dep., August 13, 2003, (Exhibit L) at 121-22), and that they "do blanks," id., neither the Blowout II nor Hand Filing results were ever verified by an independent laboratory.

Courts that have considered Mr. Hatfield and Dr. Longo's simulations have roundly rejected their claims that they follow the requisite quality control protocols, particularly where, as here, their proffered studies make no reference to such measures. See In re Lamar County Asbestos Litigation, Exhibit A at 6. (finding that MAS was not a lab certified under NIOSH regulations and that reference slides mandated by NIOSH, despite Longo's representation to the contrary, were not handled as required by NIOSH's Method 7400).

In addition to the flawed PCM analysis, Hatfield and Longo use TEM methods for an impermissible use, that is, to analyze the quantity of fibers in their samples. While Mr. Hatfield has testified that he will not likely offer these TEM measurements at trial, Hatfield Dep., July 8, 2003, at 127-28 (Exhibit J), the fact that Mr. Hatfield and Dr. Longo even proffer these measurements in their reports is indicative of both the flaws in their techniques and the unreliability of their results.

Though it might seem that a more accurate analysis can be done with a more powerful microscope (an electron microscope, as opposed to a light microscope), this is not so. In fact, OSHA specifically rejects TEM for fiber counting, noting that "Transmission Electron Microscopy (TEM) methods can be used to identify fibers, but may not be used to quantify air concentrations for occupational exposure." (Occupational Safety & Health Administration

WILDMS 138809v.1

internet web page regarding asbestos, http://www.osha-slc.gov/SLTC/asbestos/evaluation.html, Exhibit Z). Mr. Hatfield acknowledges that OSHA has rejected TEM as a method of analysis, and that there is no way to correlate or equate PCM fiber measurements with those made by the TEM method. See discussion, citations at page 12 above.[15]

Despite these conceded shortcomings, Mr. Hatfield and Dr. Longo nonetheless use TEM for the overwhelming majority of their measurements. Perhaps more curiously, Mr. Hatfield has stated that he intends to offer PCM "measurements," see Hatfield Dep., July 8, 2003, at 73-74 (Exhibit J), despite the fact that his findings are almost exclusively based on TEM. There being no scientific correlation between the two methods, Mr. Hatfield's proffering of PCM measurements from a TEM-based study is utterly lacking in foundation, casting further doubt as to the scientific legitimacy of his proposed testimony. See In re Lamar County Asbestos Litigation, Exhibit A (precluding Longo and Hatfield's PCM and TEM figures where they failed to mention an accepted means of converting their TEM measurements into meaningful PCM figures).

"*[A]ny step that renders [an expert's] analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.*" In re: Armstrong World Industries, 285 B.R. 864 at 870 (emphasis in original). Each of the above noted inherent flaws in the Hatfield/Longo studies render Mr. Hatfield's proffered testimony and evidence inadmissible on separate and equally sufficient grounds.

> 3.    **Any Quantitative Evaluation Of The Simulated Worker's Asbestos Exposure Is Also Inadmissible Because Dr. Longo/Mr. Hatfield's**

---

[15]    See In re Lamar County Asbestos Litigation (Exhibit A) and In re Armstrong World Industries, 285 B.R. 864 at 869: "At present, a single direct relationship between asbestos- containing dust and potential human exposure does not exist." (both quoting ASTM D55755-95, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations.

**Sample Preparation Methodology Is Contrary To OSHA Mandated Counting Methods And Because It Breaks Fiber Bundles Into Multiple Individual Fibers.**

Dr. Longo/Mr. Hatfield's simulation further deviates from generally accepted scientific techniques by failing to count fiber bundles as one fiber. The OSHA mandatory asbestos fiber analysis rules for counting require that the observer "count bundles of fibers as <u>one</u> fiber unless individual fibers can be can be identified by observing both ends of an individual fiber. 29 C.F.R. 1910 1001 App. A at ¶ 13d.

Dr. Longo/Mr. Hatfield disregards OSHA's <u>mandatory</u> counting rule by indirectly preparing the samples for fiber analysis. Dr. Longo/Mr. Hatfield's indirect preparation involves sonication, *i.e.*, using ultrasonic energy to mix and distribute the material onto a new filter medium. (Exhibit X at 216). The indirect preparation method results in grossly inflated and exaggerated fiber counts by ensuring that all fibers are free and countable prior to microscopic analysis. (See Exhibit Q at 55-56). This indirect preparation method is *not* a part of the generally accepted method for asbestos fiber counting, and has, in fact, been expressly rejected by the District of Delaware on grounds that there is no way to tell how such indirect preparation affected the number of respirable fibers present in the sample. <u>In re Armstrong World Industries, Inc.</u>, 285 B.R. at 869 (noting that one study reported a 1000 fold difference between the highest and lowest concentrations of asbestos structures reported by different laboratories using the indirect preparation method). The method's only purpose in the instant matter appears to be to avoid established counting rules and grossly inflate the resulting fiber count. Moreover, this method of indirect preparation alters the original sample to such an extent that the samples are no longer representative of the actual occupational exposure to asbestos. By failing to follow the mandatory counting procedures, Hatfield haphazardly deviates from the generally accepted method for asbestos fiber counting.

29

G.    **Reference To Statistics In Four Older Articles Lacking Controls, Reliable Methodology And "Fit" To Plaintiffs Cannot Save Dr. Longo/Mr. Hatfield's Baseless Testimony.**

Finally, Dr. Longo/Mr. Hatfield also testified he intends to base his expert opinion in part on four articles regarding studies of asbestos exposure during performance of automotive repair work. These articles, neither authored by Dr. Longo/Mr. Hatfield or any of his colleagues nor published within the last fifteen years, are irrelevant, hearsay, unreliable, and lack probative value. They provide no foundation for, and cannot salvage, Dr. Longo/Mr. Hatfield's staged advocacy videos and measurements.

Dr. Longo/Mr. Hatfield's lack of qualifications as a Certified Industrial Hygienist renders him incapable of relying on such articles. Plaintiffs, thus, have no proper "expert" to offer this information. Further, two of the articles (Arthur N. Rohl et al., "Asbestos Exposure During Brake Lining Maintenance and Repair," 12 Environmental Research 110-128 (1976) (Exhibit AA) and Arthur N. Rohl et al., "Asbestos Content of Dust Encountered in Brake Maintenance and Repair," 70 Proc.Roy. Soc. Med., January 1977, 32-37 (Exhibit BB), rely on the inherently unreliable TEM method for counting asbestos fibers and do not discuss any relevant PCM exposure equivalent. The other two (Limo Kauppinen and Kari Korhonen, "Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods," Am. Ind. Hyg. Assoc. J. 48(5):499-504 (1987) and William V. Lorimer, M.D., Arthur N. Rohl, Ph.D. et al., "Asbestos Exposure of Brake Repair Workers in the United States," Mount Sinai Journal of Medicine Vol. 43, No. 3, May-June 1976 at 207-218 (Exhibits CC and DD, respectively), provide no indication of their methodologies whatsoever. The Lorimer study was performed on a select group of mechanics from a single garage in New York that performed work not just on automobiles as did Plaintiffs, but rather on heavily used city equipment such as taxis and buses. Additionally, the Lorimer study used no control groups or comparisons to determine if its results

30

were scientifically meaningful. A later study by Lorimer and Dr. William Nicholson, et al.,

commissioned by NIOSH, contradicts the Lorimer paper, which Hatfield cites in support of his

opinions, yet Hatfield is only vaguely familiar with the subsequent controlled study. Nicholson,

et al., Investigation of Health Hazards in Brake Lining Repair and Maintenance Workers

Occupationally Exposed to Asbestos, NTIS, PB83-220897, August 1984; Hatfield Dep., July 8,

2003 (Exhibit J). The Rohl and Langer studies, likewise, do not fit the facts of this case, as they

measured exposures well beyond peak measurements and did not measure asbestos fibers that

were of a respirable size. Each of these articles is inadequate under Daubert because they did not

provide information regarding exposures during brake repair work that is similar to that of either

Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Defendant, General Motors Corporation, requests that the

Court strike Dr. Longo/Mr. Hatfield as an expert witness and preclude his testimony and exhibits

relating to brake repair work and also use of the mock activities represented in Mr. Hatfield and

Dr. Longo's videotaped studies. GM requests that the Court conduct a Daubert hearing or similar

proceeding should the Court deem it necessary.

WHITE AND WILLIAMS LLP

_Chris Singewald_

CHRISTIAN J. SINGEWALD (BAR ID# 3542)
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
(302) 654-0424
Attorney for Defendant,
General Motors Corporation

Dated: January 4, 2007

31



EFiled: Jan 4 2007 3:41P
Transaction ID 13347710

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| **IN RE ASBESTOS LITIGATION** | : |
| | : |
| JAMES DANIEL COLLINS | : C.A. No.: 06C-02-281 ASB |
| MARLON CLARENCE OWENS | : C.A. No.: 06C-02-241 ASB |
| ROLAND LEO GRENIER | : C.A. No.: 05C-11-257 ASB |
| OLIVER EDWARD SANDAHL | : C.A. No.: 05C-11-057 ASB |
| CHARLES CHRISTOPHER LENTILE | : C.A. No.: 05C-11-256 ASB |
| ROLLIN JAMES OVERSTREET | : C.A. No.: 05C-09-037 ASB |

## DEFENDANT, GENERAL MOTORS CORPORATION'S, MOTION IN LIMINE TO EXCLUDE VIDEOTAPES, EVIDENCE AND TESTIMONY OF DR. WILLIAM E. LONGO AND/OR MR. RICHARD L. HATFIELD

Defendant, General Motors Corporation ("GM"), hereby objects to and moves in *limine* to exclude the inherently unreliable and misleading videotapes, evidence and testimony of Dr. William E. Longo and/or Mr. Richard L. Hatfield.

1.    Plaintiffs proffer Dr. Longo/Mr. Hatfield, who has no formal training in industrial hygiene, or any practical automotive experience, to provide his "expert" opinion as to each individual Plaintiffs' alleged exposure to asbestos during their brief and sporadic work removing used automotive brakes allegedly associated with Defendant. Dr. Longo/Mr. Hatfield is expecting to proffer a quantitative analysis of Plaintiffs' purported exposure to asbestos during their work with Defendant's brake products, based principally on videotaped "demonstrative" studies he conducted with his partner, Dr. Longo/Mr. Hatfield.

2.    Dr. Longo/Mr. Hatfield has never performed a brake job, much less worked with parts manufactured or supplied by Defendant. The videotaped studies he proffers were performed on parts not supplied by Defendant and do not remotely resemble Plaintiffs' workplaces or the circumstances of their alleged exposures. Despite these fatal flaws, Plaintiffs proffer Dr. Longo/Mr. Hatfield to inform and "demonstrate" Plaintiffs' alleged exposures to asbestos for the jury.

WILDMS 138809v.1

3.      Dr. Longo/Mr. Hatfield's litigation-driven videotapes and testimony fail to meet the requisite standards of "fit" and reliability mandated by the courts, see Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); M.G. Bancorp., Inc. v. Le Beau, 737 A.2d 513, 521-22 (Del. Super. 1999) (adopting Daubert standard as Delaware law).

4.      Dr. Longo/Mr. Hatfield's proffered videotaped demonstrations bear no relation to the circumstances of Plaintiffs' alleged exposures. The demonstrations are no more than staged theatrics, complete with costume (moon suits and respirators), deliberately deceptive stage lighting and drama, which Courts across the country have precluded as either not sufficiently similar to the circumstances of the case they are being offered to prove, thus failing Daubert's "fit" requirement, or so inflammatory that the undue prejudice they will work on the jury far outweighs any probative value they might have. See, e.g., In re: Lamar County Asbestos Litigation, 6th District Court for Lamar County, Texas, Order, Lovett, J. (July 5, 2001); Carlson v. Lear Siegler, et. al., Superior Court of San Francisco County, California, Aug. 13, 1998; Lewis v. John Crane, et. al., Superior Court of San Francisco County, California, Apr. 3, 2000; Grego v. Trailmobile Trailers, et al., Superior Court of San Francisco County, California, Feb. 10, 2000; Campbell v. Abney Mills, et. al., Superior Court for King County, Washington, Oct. 9, 2002 (Exhibits "A" to "E" to Moving Defendants' Memorandum of Law, incorporated as if fully set forth herein).

5.      Neither Dr. Longo/Mr. Hatfield nor his colleagues who designed and performed the videotaped tests, in which the "space men," in a tiny dark chamber, blow out a dusty old brake shoe of unknown origin with an air hose, and file a brake shoe with a hand file they no longer even have, have any formal training or practical experience in automobile mechanics or brake repair practices. Neither Mr. Hatfield nor his colleague, Dr. Longo, are qualified to offer

2

testimony regarding the normal procedures for repairing automobile brake assemblies and do not

have the requisite training, background or experience to create a simulation of such practices.

      6.      The demonstration offer no probative evidence because Dr. Longo/Mr. Hatfield

does not measure the quantity of asbestos or non-asbestos airborne particles that are dramatically

illuminated by 300 watts of theater lights. He admits that it is impossible to discern from the

video how much of the dust shown in the magnifying stage lights and deceptively focused lens,

if any, is asbestos. The brakes in the principal "Blowout II" video, relied on by Dr. Longo/Mr.

Hatfield, are not even asbestos-containing brakes. Therefore, there is no scientific connection nor

the prerequisite "fit" under Daubert between Dr. Longo/Mr. Hatfield's demonstrations and the

opinions he has formulated from them and the issues the jury must decide.

      7.      Dr. Longo/Mr. Hatfield's studies fail to meet any of the Daubert factors for

reliability: (1) they were designed specifically and exclusively for advocacy in litigation; (2) they

have never been subject to peer review or publication; (3) they have no measurable rate of error;

(4) they cannot be replicated; and (5) they employed a method of measurement that allows no

statistical or logical correlation between their results and epidemiological data generated by

generally accepted practices. See In re Armstrong World Industries, Inc., 285 B.R. 864 (Bankr.

D. Del. 2002); In re: Lamar County Asbestos Litigation (Exhibit A to Memorandum of Law).

      8.      Scientifically-accepted procedures for collecting and measuring air samples to

quantify exposure to airborne asbestos fibers have been codified in federal regulations for more

than ten years. Dr. Longo/Mr. Hatfield did not comply with that protocol and failed in his staged

demonstrations to comply with government-mandated quality control procedures.

      9.      Dr. Longo/Mr. Hatfield admits that the analysis he conducted is not only contrary

to the government-approved method, but has actually been rejected by the United States

3

Government and Courts as inherently unreliable under <u>Daubert</u> as a means of measuring workplace asbestos exposure. <u>In re: Armstrong World Industries.</u>, 285 B.R. 864 at 870-71. The nebulous "ranges" of exposure to asbestos fibers that Dr. Longo/Mr. Hatfield claims Plaintiffs may have experienced, the crux of the opinion he intends to offer at trial, cannot be determined from the results of his demonstrations.

      10.    The Court must not allow Plaintiffs' improper attempt to unduly prejudice the jury with Dr. Longo/Mr. Hatfield's foundationless testimony, misleading and highly prejudiced videotapes and faulty analysis masquerading as an expert opinion. As Plaintiffs cannot meet their burden of establishing that Dr. Longo/Mr. Hatfield's testimony and methods are both relevant and reliable under Delaware law, or that the probative value of the advocacy in the staged videotapes substantially outweighs the undue prejudice to Defendants they will work on the jury, this Court should follow precedent and exclude Dr. Longo/Mr. Hatfield's testimony and proffered video demonstrations.

      WHEREFORE, the Defendant, General Motors Corporation, requests that the Court preclude Dr. Longo/Mr. Hatfield's testimony and proffered evidence. The testimony does not satisfy the requirements of the Delaware Rules of Evidence or the criteria for admitting expert testimony established by <u>Daubert</u> and <u>M.G. Bancorp., Inc.</u> Alternatively, General Motors Corporation requests the Court to hold a <u>Daubert</u> hearing to determine the admissibility of Dr. Longo/Mr. Hatfield's testimony and proffered evidence.

WILDMS 138809v.1

WHITE AND WILLIAMS LLP

CHRISTIAN J. SINGEWALD (DE# 3542)
824 Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 654-0424
Attorneys for Defendant,
General Motors Corporation

Dated:   January 4, 2007

5

EFiled: Jan 4 2007 3:41P EST
Transaction ID 13347710

# EXHIBIT A

17/12/01  THU 15:23 FAX 214 768 7332          GODWIN WHITE & GRUBER PC                          ☒602
        JUL-11-2001 WED 04:29 PM DUNN, KACAL  DALLAS          FAX NO. 214 651 8116          P. 02

JIM D. LOVETT
DISTRICT JUDGE
6TH JUDICIAL DISTRICT

PO BOX 904 • CLARKSVILLE, TEXAS 75426-0904 • 903/427-2274 • FAX 903/427-9004

July 5, 2001

OFFICE OF THE DISTRICT CLERK
LAMAR COUNTY COURTHOUSE
PARIS TEXAS 75426

RE:  MASTER ASBESTOS LITIGATION FILE

ORDER RELATING TO DAUBERT/ROBINSON HEARING

Please file the enclosed ORDER with EXHIBIT 'A' attached and furnish a copy
of the order and exhibit to WATERS & KRAUS for distribution to all parties.

A copy order with exhibit should also be furnished to RAY HARRISON,
attorney for Garlock, Inc.

Thanks.

Sincerely yours,

LUCILLE LOLLAR
Secretary and Court Coordinator for
JIM D. LOVETT, 6th District Judge

SERVING THE COUNTIES OF LAMAR, FANNIN, AND RED RIVER

07/12/01  THU 15:23 FAX 214 760 7332        GODWIN WHITE & GRUBER PC                    ⓩ003
JUL-11-2001 WED 04:28 PM DUNN, KACAL  DALLAS        FAX NO. 214 651 6116            P. 03

IN THE 6TH DISTRICT COURT IN AND FOR LAMAR COUNTY TEXAS

IN RE: LAMAR COUNTY ASBESTOS LITIGATION CASES FILED OR TO BE FILED BY WATERS & KRAUS IN
LAMAR COUNTY, TEXAS

ORDER
Relating to Garlock, Inc. Motion to Suppress Testimony of
Dr. William Longo and Mr. Richard Hatfield
with
Findings of Fact and Conclusions of Law

On June 20, 2001 this matter came on before the court upon a motion filed by Garlock, Inc. to strike Dr. William Longo and Richard Hatfield (Longo-Hatfield) of Materials Analytical Services, Inc. (MAS) from plaintiffs list of expert witnesses. Plaintiffs joined issue and the court on April 23, 2001 issued its Order stating the date for

"... hearing qualifications of William Longo and Richard Hatfield under the Daubert/Robinson standards to provide expert testimony involving various products involved in the Lamar County Asbestos Litigation ... all parties affected by the testimony of such witnesses will be bound by the results of the hearings and rulings of the court ..."

After announcements of ready the court proceeded with the hearing. The parties waived opening statements, the court received testimony and exhibits from the parties together with final arguments. Plaintiffs tendered the testimony of Dr. Longo for both Dr. Longo and for Mr. Hatfield.

Based upon the testimony, documents and photographs admitted at the hearing and the subsequent review of all the evidence, the court makes the following findings of fact and conclusions of law. Each finding of fact shall also be considered a conclusion of law and each conclusion of law shall also be considered a finding of fact insofar as they are not clearly delineated as one or the other or possibly involve both.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    Government and professional association standards perpetuated by the Occupational Safety and Health Administration (OSHA), the United States Environmental Protection Agency (EPA), National Institute of Occupational Health and Safety (NIOSH) and the American Society of Testing Materials (ASTM) for measuring airborne asbestos fibers for human exposures, are minimum standards that do not provide a defense for compliance. Such standards do, however, provide reliable source evidence for the court in understanding generally accepted scientific methodologies and the judicial reliability standards of Daubert-Robinson[1] vis-à-vis Rules 401, 402, 403, 702 and 705 of the Texas Rules of Evidence.

2.    The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield (Longo-Hatfield) on removal, scraping, hand wire brushing and electric wire brushing of gaskets, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds as reflected in PX Longo 1, 6, 13, 14, 15, 34 and 35, are not scientifically reliable and are not admissible.

3.    The MAS tests constitute "junk science."

4.    The MAS tests do not meet the requirements of Rules 401 and 402 Texas Rules of Evidence in that the tests are not sufficiently tied to the facts of any individual case in a manner to aid the finder of fact in resolving a factual dispute.

5.    The MAS tests fail to account for reasonably foreseeable conditions and pathways of exposure that could be experienced with respect to the removal, scraping, hand wire brushing and electric wire brushing of gaskets, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds so as to render the MAS tests little more than speculation.

6.    If this court has misunderstood the testimony and exhibits admitted during the Daubert/Robinson hearing so as to be incorrect in its findings of facts and conclusions of law, the error(s) was caused by the confusing, misleading and prejudicial presentation of the evidence to the finder of fact.

7.    A Judge does not have to be trained in science to evaluate the reliability of a scientific theory or technique. Although the details of science may be complex, the characteristics of valid scientific knowledge and the kind of reasoning that produce it are not difficult to grasp. Judges are capable of understanding and evaluating scientific reliability.

8.    The court makes no findings upon the truth or falsity of the opinions expressed in this case by Dr. Longo individually or on behalf of Mr. Hatfield concerning exposures or pathways of injury.

_____

[1]  The abbreviation Daubert-Robinson is used to indicate the following decisions: Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U. S. 379 (1993) and E. I. Du Pont de Nemours v. Robinson, 923 S. W. 549 (Tex. 1995).

9.      These findings of fact and conclusions of law are binding upon all parties affected by the testimony of the witnesses, Longo-Hatfield, concerning the products about which they testified, to wit: scraping and removal of compressed asbestos gaskets by hand and electric wire brushing, pouring joint compounds, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.

10.     Exhibit A, attached hereto and made a part hereof for all purposes, contains the factual analysis by the court of the relevant exhibits and testimony.

The Motion by Garlock, Inc. to Suppress the testimony of Dr. William Longo and Mr. Richard Hatfield is granted. This order is binding as to Garlock, Inc. and all other defendants in the Lamar County Asbestos Litigation cases filed by Watters & Kraus using the testimony of Longo-Hatfield and tests by MAS against parties who market or produce gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding.)

Entered this ___ day of _____, 2001.

_____
Judge Jim D. Lovett

EXHIBIT A

Exhibit A
Fact Analysis Of Relevant Exhibits And Testimony
*(Summaries, paraphrases and comments are italicized)*

RULE 702 REQUIREMENTS

(1)    The witness must be qualified.
       *The court is of the opinion that Dr. William Longo and Mr. Richard Hatfield are qualified by both education and experience in relevant evidence to be allowed to testify.*

(2)    The proposed testimony must be "scientific knowledge,"
       *The court is of the opinion that the tests conducted by Longo-Hatfield on the products involved in this hearing are scientifically unproven and not accepted by a respectable community within the relevant science.*

(3)    The testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.
       *The court is of the opinion that the Longo-Hatfield testimony is neither relevant nor reliable, that it is confusing and that it will not assist the trier of fact.*

RELEVANT EXHIBITS

DX Garlock 1, Asbestos and Other Fibers by PCM.
       *This is the NIOSH Method 7400 from the Manual of Analytical Methods, Fourth Edition, 8/15/94. The MAS tests claimed to have followed this Method.*
       "APPLICABILITY: ... This method gives an index of airborne fibers. It is primarily used for estimating asbestos concentrations, though PCM does not differentiate between asbestos and other fibers. Use this method in conjunction with electron microscopy (e.g., Method 7402) for assistance in identification of fibers..."
       *Note that PCM is to be used with this method. TEM is to be used only for "identification" of fibers, not for counting the fibers as was improperly done in the MAS tests. Furthermore, MAS misused Method 7400 instead of Method 7402 for assistance in identification of fibers, rendering the results scientifically unreliable.*
       "CALIBRATION AND QUALITY CONTROL:
       11.   Document the laboratory's precision for each counter for replicate fiber counts.
             A.    Maintain as part of the laboratory quality assurance program a set of reference slides to be used on a daily basis.... The Quality Assurance Officer should maintain custody of the reference slides and should supply each counter with a minimum of one reference slide per workday. Change the labels on the reference slides periodically so that the counter does not become familiar with the samples."
             *The MAS laboratory was not certified as required and the reference slides were not handled in conformity to requirements of this Method.*
       13.   Perform blind recounts by the same counter on 10% of filters counted (slides relabeled by a person other than the counter).
             *The MAS tests failed to conform to this required standard as well as the instructions to disregard samples that exceeded the specified limits.*
             *Further, the MAS tests failed to use the calculations, evaluations and reporting methods required by NIOSH Method 7400.*

PX LONGO 15, Garlock Industrial Products Catalog
       *The Garlock, Inc. catalog provides an abundance of information about the variable specifications, models, types and conditions that should be considered and then eliminated or otherwise accounted for through application of proper scientific methodologies. The MAS tests failed even to consider the following variables.*
       pg. 62 – Gasketing Compound No. 101-A. A non-hardening plastic compound used as a surface leveler on flanged joints and for temporary repair of torn or blown gaskets, joints on which it is used do not "freeze," and are easy to disassemble at any time. Recommended for use at temperatures ranging from below 0° to +300° F on pipelines or other equipment handling water, steam, air, oil, gasoline, gas, weak acids or alkalies.
       pg. 21 – Shows eight different "compressed asbestos gaskets" available from Garlock, Inc. in style numbers 900, 7021, 7228, 7705, 8714, 7819, 9037 and 9500. These eight models contain varying characteristics, to wit:
       –they are made from two types of asbestos, white chrysotile asbestos and blue crocidolite asbestos;
       –tensile strength vary with the grain from a low of 1,600 p.s.i. to a high of 9,000 p.s.i. and across grain from a low of 1,000 p.s.i. to a high of 4,600 p.s.i.;
       –variances in oil resistance after 5 hrs. in: ASTM #3 oil @ 300° F with thickness increases ranging from 1% to 63% and a tensile losses ranging from a low of 10% to a high of 76%;
       –fuel resistance, after 5 hrs. in: ASTM Ref. Fuel B @ R.T. Thickness increases as low as 5% and as high as 76%;

EXHIBIT A

-density variations from as low as .83 ct. to as high at 1.0 ct.

-16 sheet sizes (inches) ranging from 10 x 10 to 150 x 150

-wide variations in tolerance on thicknesses and specifications:

-style numbers 908, 7021, 7358 and 7705 are branded with Garlock name and style number thru 60". Over 60" std. is unbranded unless otherwise specified

pg 5 - warns that the basic factors surrounding any application (fluid, temperature, pressure, speed and type of motion) added to the age and condition of equipment make concrete recommendations very difficult based only on type of equipment and fluid involved;

pg na. (not shown on the exhibit) - located on the page next to the page entitled "Garlock Materials vs. various media under typical conditions" has the following information in fine print at the top of the page:

"This chart indicates the general suitability of basic materials commonly used in packings and gaskets against various media and is intended only for the general information of the packing user. Obviously the subject of the interaction of packing materials with the several liquids listed is too complex to be covered adequately in a few words. Although chemical considerations are important in the selection of packings, the mechanical properties of the packing itself usually are of greater importance. Packings rarely are fully exposed to the gas or liquid and, therefore, do not necessarily react in the same degree as indicated for the base material. For these reasons packings or gaskets should not be accepted or rejected for any application solely on the basis of chemical consideration."

The catalog lists the following materials: graphite yarn, viton and fluoral, phenolic resins, TFE Fluorocarbon, white asbestos, blue asbestos, cotton, flax, viscose rayon, paper and leather.

pg 28 - Garlock CHEMSEAL jacketed gaskets with 8364 TFE jackets (often called envelopes) are claimed to be ideal for applications where corrosion, contamination or other undesirable effects must be combated. "Good examples" are glass-lined piping and such processing equipment as reactors, kettles, condensers, heat exchangers and columns. PX Longo 3, 6, 34 and 35 MAS Work Practice Studies and videotapes dated April 21, April 23 and June 2000.

The MAS studies listed specific and generally accepted methodologies claimed to have been utilized in the three tests. These include Tyndall lighting, NIOSH Method 7400 and the indirect method of sample preparation by the ASTM D5755-95.

After the hearing the court read and studied the exhibits. It then became clear that the methodologies claimed in the MAS tests were not followed. Further, the tests were deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure. Dr. Longo's testimony was at least disingenuous.

The MAS tests improperly mixed direct and indirect methods of sample preparation, misused and misrepresented TEM analyses and application of Tyndall light. The report failed to mention that there was no index to convert TEM data to PCM data to enable the use of the index of exposure in the OSHA epidemiological studies. Additionally, Dr. Longo's testimony improperly claimed that the tests covered all pathways of exposure ("one size fits all".)

As to the ASTM Method D 5755-95 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the tests:

1)    the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations" - this method was misused to measure airborne asbestos fibers;

2)    test results were reported in structures/cc rather than structures/cm² - this is a misrepresentation of a reportable result.

As to NIOSH Method 7400 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the tests:

1)    MAS used the indirect sample preparation method instead of the required direct sampling method;

2)    MAS failed to report at unacceptable the fiber count above 1100 fibers/mm² as required.

The test reports failed to explain the failure of the MAS tests to utilize the direct transfer NIOSH 7402 Method thus noted. "This method is used to determine asbestos fibers in the optically visible range and is intended to complement the results obtained by phase contrast microscopy (Method 7400). "The court assumes the reason to be the claim of Dr. Longo that the filters were too heavily loaded with fibers to use the direct method of sample preparation required by NIOSH 7402. Additionally, the provenance of the flanges and gaskets used in the tests were inadequately explained in the test reports. The test reports should have explained these matters but failed to do so.

Furthermore, the MAS tests cannot be duplicated from the information contained in the report or in Dr. Longo's testimony. There is no established rate of error, insufficient information was furnished on the ample, concentration and density of Tyndall light. The videotaping was deceptively out of focus, misrepresents asbestos exposure levels and fails to compare dust generated from non-asbestos gaskets. Further, the June 2000 report involved invalid air samples due to obstructions in the airflow feed-throughs located in the ECL walls and the April 21 and April 23 tests fail to report decontamination of the ECL chamber prior to testing. Indeed, the three results provide suspiciously wide and unexplained variations considering that they were conducted in identical conditions in the ECL.

## EXHIBIT A

*Such lapses and unverified variances in the test methodologies cast doubt on the efficacy of the MAS tests and specifically reflect on the violation of standards for the lack of Quality Assurance Certification of the MAS laboratory.*

*It is apparent that the MAS tests started with the assumption that persons had been exposed to airborne asbestos fibers from work place activities involving Garlock and other brands of gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding) and then selected methods to achieve the desired results stated in the MAS reports and testimony of Longo-Hatfield. This is not permitted.*

*The limitations of the MAS tests became even more apparent when compared to standards set for and methodologies followed by the Environmental Protection Agency studies currently being conducted in Libby, Montana. PX Longo 8, Phase 2 Sampling and Quality Assurance Project Plan, Revision 0 for Libby, Montana, March 2001. An open pit vermiculite mine near Libby, Montana is suspected as a source of on-going asbestos exposure to current and future residents in the Libby area. The United States Environmental Protection Agency is engaged in the first known study by non-litigation scientists to utilize a combination of Phase Contrast Light Microscopy (PCM) and Transmission Electron Microscopy (TEM) as an analytical technique for counting airborne asbestos fibers and dust and converting the counts to the OSHA index of exposure that will convert TEM for the first time to the generally accepted epidemiological studies. Up to this time the scientific community has used and recommended TEM as a method of identifying asbestos fibers, not as a method of counting them. No respectable community of scientists has used TEM for counting asbestos fibers.*

*In Phase 1 of this study EPA gathered samples from multiple indoor and outdoor locations around the community, along with samples of different potential sources of asbestos fibers in air (note by contrast that the MAS samples were from only one site and tested under only one controlled environment).*

*The EPA results indicate that amphibole-type asbestos fibers are present in a number of environments samples, including indoor air, dust, soil, and insulation. The report notes that the human health risk is mediated by inhalation exposure and utilized stationary air monitors located in the principal living area of various homes to gather samples. TEM has been used to estimate the concentration of these fibers. The report states at pg. 1 "However, there are issues which exist with regard to both the collection technique and the analytical technique (TEM) (note by contrast that MAS fails to recognize this issue.)*

*EPA notes that the collection technique may have acceptably measured "passive" activity in homes but may underestimate exposures of the people directly engaged in activities, which do generate dust populating asbestos fibers. The EPA report continues*

"Therefore, the first objective of this sampling effort (Phase 1 of the environment characterization project plan) is to measure asbestos levels in the breathing zone of individuals engaged in routine and special activities in and about Libby, and to compare those measurements to data collected from co-located stationary air monitors. This information will be helpful in deciding what type of air sampling method is needed to evaluate risks to individuals engaged in both routine and special activities in the home." (note by contrast that no such considerations were discussed in the MAS tests and all the data comes from only fifteen tests conducted by MAS under only one set of conditions; no comparative tests were conducted in any other location or under any other conditions, although one suspects that the MAS KCL could have been programmed to test a variety of conditions; no satisfactory explanation is offered by MAS or Dr. Longo as to why tests were not conducted under a variety of test conditions.)

"With regard to the analytical technique, the issue is that air samples have historically been analyzed for asbestos using Phase Contrast Light Microscopy (PCM), and the EPA current slope factor for quantifying lung cancer risk from asbestos in air is expressed in units of risk per PCM fiber per cc of air (USEPA 2000a). Thus, even though it is widely recognized that TEM analyses are more accurate and more powerful than PCM analyses, measurements of asbestos concentration based on TEM are difficult to convert to an equivalent concentration by PCM (this is referred to us PCM equivalence, or PCME). Thus, the second objective of this sampling effort is to analyze a series of different air samples by both the TEM and PCM methods in order to derive a site-specific relationship between the two, and to help judge which type of measurement is most appropriate." (note by contrast that the MAS tests failed to mention the conversion problem and the lack of a reliable method to measure PCME.)

"As noted above, the chief reason for collecting data on asbestos fiber levels in air is to support risk assessment and risk management decision-making. Thus, the third objective of the study is to utilize the data collected to derive preliminary assessments of the potential health risk to people who engage in the types of routine and special activities investigated during the study. Because the study will not span all possible exposure conditions and all exposure locations, the data will be used to help estimate the range of different levels (and hence health risks) that residents of Libby may experience from both routine and special activities" (note by contrast that the MAS tests fail to recognize and test for reasonably foreseeable conditions of exposure;

## EXHIBIT A

further, the MAS tests are not reliable even to estimate *range of different levels* of airborne asbestos generated while wire brushing a gasket.

The EPA developed a seven-step plan Data Quality Objectives (DQO) procedure designed to ensure that sampling and analysis plans are carefully thought out and that results of the effort will be adequate to meet basic objectives of the program. The seven-step plan is applied to each of these main objectives of the project and is as follows:

Step 1. State the Problem;
Step 2. Identify the Decision;
Step 3. Identify Inputs to the Decision;
Step 4. Define the Study Boundaries;
Step 5. Develop a Decision Rule;
Step 6. Specify Limits of Decision Errors;
Step 7. Optimize the Design for Obtaining Results.

The details of the EPA tests conrast sharply with the generalizations and non-specific plans of the MAS tests.
PX Longo 17, United States Environmental Protection Agency publication EPA 560/5-89-004, "Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques.

At page 3, II. Conclusion and Recommendations. "The results from the ... (EPA) seven studies – including one by Dr. Eric John Chatfield, whose affidavit is considered below) ..., lead to the following conclusions:

- TEM analysis of air samples using indirect transfer methods tends to provide estimates of total airborne asbestos structure concentration that are higher than those obtained using direct transfer methods. This conclusion is consistent with general opinion and implies that airborne asbestos levels estimated by one method are not directly comparable to those estimated by the other;

- Evidence. A review of available data (seven studies) revealed this relationship in every study despite variations in sampling, analytical, and counting protocols.
There is no single factor that can be applied to convert measurements made using an indirect transfer method to a value that is comparable with measurements made using a direct transfer method. The quantitative relationship between estimates obtained by the two transfer methods is expected to depend on sampling and analytical protocols as well as the nature of the asbestos structures in the air.

PX Longo 32, 41086 Federal Register/ Vol 59, No. 153, Wed., August 10, 1994
This federal regulation states as follows:

"(iv)(A) If a gasket is visibly deteriorated and unlikely to be removed intact, removal shall be undertaken within a glovebag as described in paragraph (g)(5)(ii) of this section. (B) The gasket shall be thoroughly wetted with amended water prior to its removal. (C) The wet gasket shall be immediately placed in a disposal container. (D) Any scraping to remove residue must be performed wet."

This OSHA Federal Regulation provides that "possible" asbestos exposure be avoided but also reasonably implies that moisture in the form of rain, snow, ice, fog, mist and humidity "possibly" affect the manner in which asbestos becomes airborne in the workplace while scraping or brushing a gasket. The MAS tests fail to test or account for such reasonably foreseeable conditions.

DX Garlock 2. OSHA §1910.1001 Asbestos
(a) Scope and Application. (1) This section applies to all occupational exposures to asbestos in all industries covered by the Occupational Safety and Health Act, except as provided in paragraph (a)(2) and (3) of this section.
The exception in para (a)(2) refers to construction work and para. 3 to shipbuilding and related activities.
It is the understanding of the court that OSHA does not regulate potential airborne asbestos exposures relating to gaskets since they contain asbestos binding material.

PX Longo 33, letter from Colt Industries relating to handling Garlock products containing asbestos in general and compressed asbestos sheet in particular.

Although not required by OSHA asbestos regulation §1910.1001 to place warning labels on its gaskets, Garlock, Inc. nevertheless did so voluntarily and notified its dealers concerning the possible release of excess amounts of asbestos under extreme conditions. The letter says "The user should, therefore, refer to 29CFR 1910.1001 for information on handling asbestos and monitoring the release of asbestos fibers."

It appears that even though Garlock did not regulate its gaskets, Garlock voluntarily sent this notice of possible release of excessive airborne asbestos under some extreme conditions. This is not a confession of fault by Garlock, Inc. From the evidence offered and admitted in this hearing it appears to be a reasonable, voluntary action by the manufacturer to warn its dealers and end users.

## EXHIBIT A

DX Garlock 3, ASTM D 5755-95, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations[1]

5.1    This microvacuum sampling and indirect analysis method is used for the general testing of non-airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on surfaces in buildings such as ceiling tiles, shelving, electrical components, duct work, carpet, etc. This test method provides an index of the concentration of asbestos structures in the dust per unit area analyzed as derived from a quantitative TEM analysis.

5.1.1    This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials, or compliance with federal, state, or local regulations or statutes. It is the user's responsibility to make these determinations.

5.1.2    At present, a single direct relationship between asbestos-containing dust and potential human exposure does not exist. Accordingly, the user should consider these data in relationship to other available information in their evaluation.

5.2    This test method used the definition, sanitable particulate material, found in Test Method D 1739 as the definition of dust. This definition accepts all particles small enough to pass through a 1 mm (No. 18) screen. Thus, a single, large asbestos containing particle(s) (from the large end of the particle size distribution) dispersed during sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample. It is, therefore, recommended that multiple independent samples are secured from the same area, and a minimum of three samples analyzed by the entire procedure.

> *The above requirements were violated in the MAS tests as follows:*
> 1)   *the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations" - this method was misused to measure airborne asbestos fibers;*
> 2)   *the test results were reported in structures/cc rather than structures/cm² - this is a misrepresentation of a reportable result;*
> 3)   *the tests attempt to provide results in a single direct relationship between asbestos-containing dust and potential human exposure, which does not exist*
> 4)   *the tests ignored the warning that sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample.*

PX Longo 19, Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling, November 1991 American Industrial Hygiene Association Journal.

PX Longo 22, Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing, March/April 1993 American Industrial Hygiene Association Journal.

> *These companion studies were sponsored in part by the Plaintiff's Executive Committee of the National Schools' Class Action for Cost Recovery. The eight co-authors included three of the witnesses in this court: Dr. William Longo (and through him, Richard Hatfield) of Materials Analytical Service, Inc. (address in Norcross, Ga.) and Dr. James R. Millette of McCrone Environmental Services, Inc (address in Norcross, Ga.) and Millette. Yonder Wood and Associates, Inc. (address in Norcross, Ga.). Also see PX Longo 20, immediately below, that appears to be closely related to PX 19 and 22.*

> *The studies properly sounded a warning that workers should wear respirators while performing these work place activities because of the "possibility" of improper exposure to air-borne asbestos fibers.*

> *In both these articles, however, it is clearly recognized and acknowledged that their purpose was not to compare exposure levels to current or previous OSHA PEL, adding that "...Further research is still necessary to standardize dust and air sampling techniques, including the number of samples necessary to characterize a given surface area, recovery efficiency from various surfaces and the analytical technique employed when heavy concentrations of asbestos and other particles are encountered."*

> *Some of the testimony of plaintiffs' witnesses Longo (and through him, Hatfield) and Millette is either at a variance with their opinions expressed in these two articles or involved faulty memories and otherwise evasive answers. Furthermore, plaintiffs failed to cite the court to currently performed scientific studies or properly peer reviewed scientific publications to justify any changes of their opinions as expressed in PX Longo 19 and 22. These articles, while peer reviewed, fail to fulfill plaintiffs' burden to cite peer reviewed published articles in support of their current scientific positions.*

---

[1] This test method is under the jurisdiction of ASTM Committee D-22 on Sampling and Analysis of Atmospheres and is the direct responsibility of Subcommittee D21.07 on Sampling and Analysis of Asbestos.[2]

Dr. Eric John Chatfield, whose affidavit is considered below, claims he is a member of the D-22 committee and was honored by it in 1997 "... in recognition of outstanding contributions in development of ASTM and International Standard analytical methods for determination of asbestos." Dr. Chatfield further claims that all his analytical standards development activities were, and continue to be, voluntary.

## EXHIBIT A

In any event these studies would have very limited use when attempting to apply them to the varied indoor, outdoor, internal and external conditions experienced in the work place while scraping and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compound.
PX Longo 29, Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities, November 1994 Appl. Occup. Environ. Hyg. 9(11)

This study appears to be closely related to the studies shown in PX Longo 19 and 22, immediately above. Its co-authors include the same three plaintiffs' witness but only two of the other authors, having lost three co-authors without explanation. Further, this study was not sponsored by the Plaintiffs' Committee of the National Schools' Class Action for Cost Recovery. New sponsors included Dies, Dies and Henderson (Orange, Texas) and the West Virginia State Attorney General's Office (Charleston, W.V.)

The purpose of the study was to provide evidence of "possible" exposures to dangerous levels of airborne asbestos while performing certain maintenance duties in the work place. This study was designed to provide information to the authors so they could design an O&M (Operations & Maintenance) program "... based upon our extensive experience (estimated at 20 man-years) in designing, implementing, and evaluating O&M programs for buildings with ACM."

It was not the purpose of this study to provide information that could be converted to the OSHA index of exposure. It instead states. "Statistical analyses were applied to the logarithm (base 10) of the measured concentrations. The log transformation tends to equalize variances and permit the use of standard statistical tests that would otherwise be inappropriate. Previous studies of air pollution data have demonstrated that air pollution data tend to be lognormally distributed."

No other evidence of "lognormal distribution" was submitted to the court, or if it was, it not recalled and not located in the exhibits at this point. Although not specifically mentioned in the Libby, Montana study by EPA being currently conducted (PX Longo 8, see above), the first objects of the EPA Libby study indicates that there is no method of conversion from the TEM direct analytic methods used in these studies to the PCM index of asbestos exposure. The court assumes that if the lognormal distribution is correctly understood by the court to be the conversion method used in this study (PX Longo 10), that the plaintiffs would have submitted appropriate supporting material. Absent such material the court finds that plaintiffs have failed in discharge their burden of proof and rejects this as a substantiating study in satisfaction Daubert/Robinson standards.

In any event this study (PX Longo 10) would have very limited use when attempting to apply it to the varied indoor, outdoor, internal and external conditions experienced in the work place while scraping and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.
DX Garlock 4, ASTM D 6281 - 98, Standard Test Method for Airborne Asbestos Concentration in Ambient and Indoor Atmospheres as Determined by Transmission Electron Microscopy Direct Transfer (TEM)
1.1    This test method[a] is an analytical procedure using transmission electron microscopy (TEM) for the determination of the concentration of asbestos structures in ambient atmospheres and includes measurement of the dimension of structures and of the asbestos fiber found in the structures from which aspect ratios are calculated.
1.2    This test method is suitable for determination of asbestos in both ambient (outdoor) and building atmospheres.
1.3    The direct analytical method cannot be used if the general particulate matter loading of the sample collection filter as analyzed exceeds approximately 10% coverage of the collection filter by particulate matter.
ASTM 6281-98 is not mentioned in the MAS reports. It appears it was not utilized because of this 10% coverage limitation but, if so, this should have been mentioned in the MAS reports so as to explain its methodologies.
Other Exhibits Not Specifically Reviewed
Exhibits not reviewed above by the court are deemed either not to relate to the Daubert/Robinson issues of reliability or relevancy or are considered to be unnecessarily duplicative of other cited exhibit.

## RELEVANT TESTIMONY AND AFFIDAVITS

William Rochter, transcript of testimony, June 28, 2001.
William Rochter is an environmental engineer, a certified industrial hygienist/consultant, 1971 graduate of Purdue University with B.S. degree and a former OSHA compliance officer in Milwaukee and Chicago from 1976 through 1980 supporting various regional offices as well as the national office. He was called to testify for the defendant, to wit:

---

[a]This test method was adapted from International Standard ISO 10312 "Air quality - Determination of asbestos fibres - Direct transfer transmission electron microscopy method."
Note that Dr. Eric John Chatfield, whose affidavit is set forth below, is the author of ISO 10312. He is also author of ISO 13794 which is a corresponding indirect-transfer analytical method, both of which were affirmed by International ballot and published as International Standards.

## EXHIBIT A

**225/14:**

"... I wasn't really sure what *(light)* he *(Dr. Longo)* used *(in the issue)*. There was not really a specific reference made to the type of light and consequently I selected based on what I saw in the video a similar looking theater light and a wattage that I believe was what was being used. But I weren't really sure what was used."

**217/21:**

"... Tyndall lighting is not used in the industrial hygiene community. It may have been attempted at various times for various occupations but it is not widely used. I don't know anybody that uses it with the exception of Doctor Longo."

**213/3:**

"... The EPA historical data is mass based; whereas OSHA's historical data and the epidemiology is based on fiber sizes and inhalation. The EPA mass base has no relationship to epidemiological data. It is an air quality issue independent of epidemiology."

**231/5:**

"Q. (by the Court) Let me ask you, would you think it would be safe to work without respirators or special clothing in the atmosphere and in what you saw in the videotape Doctor Longo has? *(PX Longo 34 and 35)*
A. Yes. As a matter of fact, I do my tests without respiratory protection.
Q. (by the Court) So you would go into that environment as shown in Dr. Longo's videotape without special breathing equipment?
A. Yes sir."

**235/10:**

"Q. You're not an electron microscopist like Doctor Longo, is that correct?
A. I thought he described himself as a material scientist.
Q. And who has more expertise in electron microscopy, you or Dr. Longo?
A. That may be a draw.
Q. Do you work an electron microscope?
A. I used to own a laboratory that we had an electron microscope. We were NAVLAC certified, as well as AIHA.
Q. Did you prepare the samples?
A. I prepared some, yes.

**236/8:**

Q. You know that some of those PCM levels *(in the MAS tests)* are as high as 20 fibers per cc. Is that correct?
A. I don't believe the numbers"

**238/1:**

"Q. ... If you're in an environment where an activity is producing one fiber per cc, you're supposed to protect yourself. Is that correct?
A. That's not what an excursion limit is.
Q. Why don't you tell us what it is.
A. An excursion limit is where an infrequent activity which cannot be valued on a time-weighted average basis is conducted where the concentration would exceed one fiber per cc on a 30-minute sample.
Q. Fair enough. And those levels reported in the study by MAS would exceed the excursion limit. Correct?
A. They weren't excursion samples. That's not — what I'm trying to explain is industrial hygiene. The samples were not collected in the way to compare against the excursion limit. It wasn't an excursion activity and therefore to compare them against an excursion limit would be improper.

**240/25:**

Q. So you think Doctor Longo just lied when he got up here and said he opened the flange and that was the way the gasket was?
A. I have known Dr. Longo a long time and I am simply saying that I do not know what the conditions were of these gaskets. But I have been in the industrial environments for a very long time and I have never seen the conditions that are demonstrated in that video.
Q. Are you suggesting to the court that Dr. Longo somehow doctored those flanges and threw gaskets before performing those tests, that he lied to the court?
A. I did my own tests involving 30 fittings and I have never encountered a gasket of that type.

**242/11:**

"I have a long history of being around pipe, plumbers, pipe fitters. My father was a plumbing contractor and I have been around the piping trades for my entire life and I have done considerable work in industrial environments, which include pipe fitters."

## EXHIBIT A

243/19:

"The results I had in a study (such as *the MAS studies*) which involved ten  different types of removals and replacements of gaskets and packing, the highest concentration that I received on an eight hour time-weighted average was .06. Most of the results were in the .03 to .04 ranges."

269/7:

Q. And OSHA has never passed a standard (*relating to airborne asbestos*) with respect to the industry standards? (*as opposed to construction standards relating to airborne asbestos*)

A. That's correct.

*The court finds that William Boelter is qualified as an expert in a relevant science to render the opinions expressed in his testimony set forth above, that such testimony is properly corroborated and is both relevant and reliable in accordance with Daubert/Robinson standards.*

Eric John Chatfield, Ph.D, affidavit dated January 6, 2001.

*Dr. Chatfield is a Canadian citizen and a world-class scientist with M.A. in Natural Science and Ph.D. in Colloid Science from Cambridge University. He has more than 25 years experience in identification and analysis of asbestos fibers and their behavior in air and water through both optical and electron microscopy. He has written and published more than 60 peer-reviewed scientific articles relating to asbestos analysis, has been actively involved in the creation of recognized standards and honored by being chosen as the chairman of various prestigious organizations related to asbestos science.*

*Dr. Chatfield's credibility is an issue since he has testified extensively and exclusively for defendants in asbestos cases. His affidavit states:*

pg. 3, para. 11:

"Other than to determine whether fibers found in the air are asbestos fibers, TEM is not generally used to measure occupational exposure to asbestos."

"World-wide, occupational exposure to airborne asbestos is measured by phase contrast optical microscopy (PCM)... To my knowledge, no country has used, or is proposing to use, transmission electron microscopy (TEM) for routine monitoring of occupational exposure to airborne asbestos..."

"... the (PCM) measurement represents an index of exposure to asbestos. This index is directly relatable to past measurements which are associated with the epidemiology."

pg. 4, para. 11:

"If the studies made by Mr. Hatfield and Dr. Longo, NIOSH Method 7402 (as opposed to NIOSH Method 7400) should have been used for the analysis of the air samples. This would have yielded data directly comparable with the epidemiological database. Instead, they elected to use an indirect-transfer TEM specimen preparation, and thereby generate data of no value because there are no scientific standards against which these data can be compared."

pg. 4, para. 12:

"The method chosen by Mr. Hatfield and Dr. Longo to analyze the air filters from their studies is stated as ASTM Method D 5755-95... (this method) does not include application to the analysis of air samples, and is it an improper use of the ASTM standards, given that airborne particulate rather than surface dust was being analyzed. The results of ASTM D 5755-95 are specified to be reported in structures/cm², not structures/cc as used in the studies by Mr. Hatfield and Dr. Longo."

"Indirect-transfer TEM specimen preparation of airborne asbestos or asbestos-containing surface dust (as done by Longo-Hatfield in the MAS tests) causes large changes to occur in the fiber size distributions, particularly in the case of chrysotile, and the measure fiber size distribution derived from such a preparation bears little resemblance to that which existed in the original sample..."

pg. 5, para. 12:

"The indirect-transfer TEM measurements made by Mr. Hatfield and Dr. Longo therefore do not provide reliable information about the actual exposures during their experiments."

pg. 5, para. 14:

"Moreover, if the width distributions of the asbestos structures reported in Mr. Hatfield and Dr. Longo's indirect dust measurements were really those that existed in the original airborne material, the results reported would contradict conventional physics."

pg. 7, para. 16:

"Comparison of indirect-transfer and direct-transfer TEM specimen preparations of air samples collected from airborne particulates derived by libration of asbestos-containing materials shows that the majority of the asbestos structures reported by the indirect-transfer method (improperly used in the MAS studies by Longo-Hatfield) did not exist as separate entities in the original airborne particulate material) (Chatfield, 2000)."

EXHIBIT A

**Ex. 7, par. 17**

"[Tyndall illumination used in the video recordings by Longo-Hatfield in the MAS studies -PX Longo 34, 15]... are misleading for the following reasons: (a) ... the Tyndall effect does not discriminate between asbestos fibers and other types of particle. The construction of asbestos to the dust deployed in the video recordings, and whether the particles are respirable or non-respirable, are therefore unknown; (b) "... de-focusing creates an extended illumination source from each point source, giving the overall effect of a snow storm. This type of demonstration grossly mis-represents the actual amount and size of the dust particles, and it is therefore misleading."

Dr. Chatfield's opinions are corroborated by details and conclusions in independent, peer reviewed and generally accepted scientific publications and standards that provide a level of confidence for the court in his credibility. Furthermore, his opinions are fortified by similarly corroborated opinions by other experts who are deemed credible by this court. The court finds that Dr. Chatfield is qualified in a relevant science to render the opinions quoted above and that such opinions are both relevant and reliable in accordance with Daubert/Robinson standards.

John W. Spencer affidavit dated June 6, 2000 (attached as Exhibit A to Garlock's Motion to Strike William Longo and Richard Hatfield as Plaintiffs' Experts

Mr. Spencer is a certified industrial hygienist whose affidavit states that his CV is attached. The CV was not included with the copy furnished to the court, so the only knowledge of the court on the requirement of being a certified industrial hygienist is contained in the testimony of Mr. Frederick William Boelter, another certified industrial hygienist who testified live before the court. At page 320 line 7 of the court transcript of Boelter's testimony is the following:

Q.    What are the requirements to become a certified industrial hygienist?
A.    You have to have a degree in the sciences, as well as five years of experience doing industrial hygiene work, and then sit for a two-part examination.
Q.    And you completed all that in 1980?
A.    Yes.
Q.    Does the examination for certified industrial hygienist -- does the industrial hygienist exam require that you demonstrate mastery on the collection of analysis of air samples for occupational exposure?
A.    Yes.
Q.    In particular, occupational exposure to asbestos?
A.    Not necessarily in particular. It is a very broad test because it's a comprehensive certification. It encompasses sampling and analytical procedures broadly for the industrial hygiene field.

For the purpose of these findings and conclusions the court assumes that Mr. Spencer fulfilled these same requirements.

The following is a summary and paraphrased version of the Spencer affidavit.

1.    The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire brushing and electric wire brushing, as reflected in PX Longo 3, 6, 14 and 15 in April and June 2000, failed to use standard or generally recognized test procedures or any combination of such procedures that are recognized by any substantial number of the relevant scientific community or that have been peer-reviewed and published.

2.    The Spencer opinions are associated with a wealth of materials that are generally recognized within the relevant scientific community and by peer-reviewed articles that have been published in recognized and generally accepted scientific journals.

3.    In Spencer's opinion the tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire brushing and electric wire brushing, as reflected in PX Longo 3, 6, 14 and 15 in April and June 2000, failed to follow the requirements of the NIOSH 7400 and ASTM D5755-95 tests that are cited for support in the MAS reports. Specifically the MAS tests utilized the direct and indirect methods of sample preparation required by each test. The methods used in the MAS tests are not generally recognized within the relevant scientific community, are not recognized within a respectable portion of the relevant scientific community and are not recognized by peer reviewed articles that have been published in recognized and generally accepted scientific journals.

4.    The methods used in the MAS tests are demonstrably incorrect.

5.    All laboratories that determine fiber-in-air concentrations are required to have stringent quality control programs to monitor the proficiency of the laboratory against the methods criteria.

6.    Although TEM is used in connection with NIOSH 7402, it is only for the purpose of identifying asbestos fibers above 5 microns in length, 0.25 microns in width and less than 3:1 length to width aspect ratio, not for counting asbestos fibers as was improperly done in the MAS tests.

7.    The use of Tyndall lighting in the MAS tests is not an acceptable industrial hygiene practice and is not relevant or reliable for the quantification of airborne asbestos fibers.

The above cited facts and opinions contained in the Spencer affidavit are detailed, cite a wealth of easily verifiable and generally accepted standards and peer-reviewed publications. These along with the testimony of other

11

07/12/01  THU 15:29 FAX 214 760 7332      GODWIN WHITE & GRUBER PC                    ☐014
      JUL-11-2001 WED 04:34 PM DUNN, KACAL  DALLAS      FAX NO. 214 651 6118          P. 14

EXHIBIT A

experts deemed competent by the court corroborate Spencer's opinion, Mr. Spencer is found to be qualified in a relevant science to testify to the opinions shown above and that those opinions are both relevant and reliable under Daubert/Robinson standards.

Dr. William Longo testimony at Daubert/Robinson hearing on June 20, 2001.

   Dr. Longo presented at the hearing with testimonial charisma and convincing demeanor. His educational qualifications and experience were impressive. He claims to have conducted business and testified fairly for both plaintiffs and defendants. Dr. Longo's testimony sounded reasonable and this court accepted it at face value until completing study of all the exhibits, affidavits and testimony.

   After considerable study by the court, it became clear that the methodologies claimed to be used by MAS in the test reports were not followed. Further, no respectable community of scientists in the relevant professions recognizes the methods used by MAS. And although Dr. Longo claimed that the tests covered the pathways of exposure ("one size fits all") for gaskets (removing, hand wire brushing, electric wire brushing), insulating cement (pouring), Kayla products (sawing) and Kelly-Moore joint compound (mixing and sanding), the MAS tests were also deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure.

   Neither the MAS tests nor Dr. Longo offer a satisfactory explanation as to why tests were not conducted under a foreseeable variety of test conditions.

   Re-reading Dr. Longo's testimony reveals it to be practiced and to employ misdirection and evasiveness. It is at best disingenuous, not credible and unsupported by any respectable community of scientists.

James R. Millette, Ph.D., deposition dated June 7, 2001; affidavit dated May 21, 2001.

   Dr. Millette is an educator and scientist who describes himself as an Environmental Scientist. He has worked and written extensively about asbestos. He gave his videotaped deposition in this case for the plaintiffs on June 7, 2001. He claims that he has testified in the past for other plaintiffs but not for any defendants. His affidavit consists of less than one and one-half pages of opinions with sixteen pages of attached CV.

   Dr. Millette opines that the use of Tyndall lighting is not misleading and that the MAS tests describe results by both PCM and TEM. He then cites to one of his co-authored articles concerning levels of asbestos fiber release from gaskets "depending on the type of activity to which the gaskets are subjected." He further opines that the results of the MAS tests "...are not very different from the values reported in the scientific literature." He further describes the MAS test results as "...useful in understanding the release of asbestos fibers from gasket material." He concludes that "...TEM asbestos values are not new or novel and are generally accepted by the scientific community."

   The court is disturbed by the lack of proper scientific corroboration, explanations and annotations in support of Dr. Millette's opinions. He fails to reconcile the mixing of procedures under NIOSH 7400 and ASTM D-5755-95 and does not cite any respectable scientific sources in support of such novel procedures. The entire body of work of OSHA, EPA, NIOSH and ASTM are ignored. Neither does he cite any more authority than his anecdotal experience on the use of Tyndall light.

   Indeed, this court assumes that if there was proper scientific support shown for the novel procedures utilized by MAS that the plaintiffs would have submitted a copy of the corroboration cited by Dr. Millette to his own article in the EIA technical journal 3(1): 10-15, 1995) relating to air sampling results for gasket activities. The court presumes that Dr. Millette's article was not offered into evidence because it would not have been supportive of plaintiffs' position.

   Dr. Millette also presented in his videotaped deposition with testimonial charisma much in the same fashion as Dr. Longo. In the early part of his testimony Dr. Millette could not remember enough about the MAS test details to be credible. Later, when confronted by cross-examination concerning the details of NIOSH 7400, ASTM D-5755-95 and Tyndall lighting, his answers were consistently evasive and disingenuous at best, not unlike the performance of Dr. Longo during the hearing.

   In Robinson at page 559 the supporting testimony of plaintiffs' expert, Dr. Werde that there was a "...99% probability that Dr. Whitcomb's conclusion ...was correct" was considered and rejected by the court.

   The court likewise rejects the testimony of Dr. Millette as being insufficiently corroborated by peer reviewed publications and lacking in corroboration with any respectable community of scientists who accept the methodologies of the MAS tests. When combined with his faulty memory and evasive answers, his opinions are not credible.

07/12/01   THU 15:30 FAX 214 760 7332          GODWIN WHITE & GRUBER PC                    ☎015

JUL-11-2001 WED 04:34 PM DUNN, KACAL  DALLAS          FAX NO. 214 651 8116          P. 15

LAMAR COUNTY ASBESTOS LITIGATION          Garlock, Inc. Daubert Order          12

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

---oO---

HON. INA LEVIN GYEMANT, JUDGE                    ROOM 502

---oOo---

JOHN CARLSON, ET AL,                    )
                                        )
            PLAINTIFF,                  )
                                        )
VS.                                     )      NO.  979595
                                        )
LEAR SIEGLER, ET AL                     )
                                        )
            DEFENDANT.                  )
_____)

REPORTER'S TRANSCRIPT OF TESTIMONY OF DOCTOR WILLIAM LONGO

AUGUST 13, 1998

---oOo---

FOR THE PLAINTIFF:          BRAYTON, HARLEY & CURTIS
                            ATTORNEY AT LAW
                            BY: BRUCE JACKSON
                            BY: STEPHEN FISHBACK

FOR THE DEFENDANT:          KEESAL, YOUNG & LOGAN
                            ATTORNEY AT LAW
                            BY: THOMAS M. MCCALISTER

                            HARDIN, COOK, LOPER, ENGEL,
                            & BERGEZ, LLP
                            ATTORNEY AT LAW
                            BY:  AMES A. MIKACICH
                            BY:  EUGENE BROWN

                            LISA OBERG
                            ATTORNEY AT LAW

---oOo---

## TABLE OF WITNESSES

FOR THE PLAINTIFF:

WILLIAM EDWARD LONGO                                          1

DIRECT EXAMINATION
CROSS EXAMINATION BY MS. OBERG                               12
CROSS EXAMINATION BY MS. ADAMS                              19
CROSS EXAMINATION BY MR. BROWN                              19
EXAMINATION BY THE COURT                                    23
CROSS EXAMINATION BY MS. ADAMS                              26
EXAMINATION BY THE COURT                                    37
CROSS EXAMINATION BY MR BROWN                               41
DIRECT EXAMINATION BY MR. JACKSON                           45
VOIR DIRE EXAMINATION BY MR. BROWN                          65
DIRECT EXAMINATION BY MR. JACKSON                           66
CROSS EXAMINATION BY MR. BROWN                              92
CROSS EXAMINATION BY MS. ADAMS                              93
RE-DIRECT EXAMINATION BY MR. JACKSON                        94
RECROSS EXAMINATION BY MR. BROWN                            95
RE-CROSS EXAMINATION BY MS. OBERG                           95
RE-DIRECT EXAMINATION BY MR. JACKSON                        97
EXAMINATION BY THE COURT                                   120
RE-CROSS EXAMINATION BY MR. MCCALLISTER                    121
EXAMINATION BY THE COURT                                   122
EXAMINATION BY THE COURT                                   123
DIRECT EXAMINATION BY MR. JACKSON                          129
CROSS-EXAMINATION BY MR. CAMPAGNE                          134
RE-DIRECT EXAMINATION BY MR. JACKSON                       138


## INDEX OF EXHIBITS:


FOR THE PLAINTIFF:


| NO. | DESCRIPTION | IDENT. | EVID. |
|-----|-------------|--------|-------|
| B. | TEST RESULTS | 69 | |
| C. | TEST RESULTS | 69 | |
| D. | TEST RESULTS | 69 | |
| F-1 | STUDY | 97 | |
| F-2 | STUDY | 97 | |
| E. | FINDINGS, TRANSITE PIPE | 130 | |
| G. | JOINT COMPOUND FINDINGS | 130 | |

---oOo----

120

1   THIS, YOUR HONOR.

2   Q.   DOCTOR LONGO, DID YOU ALSO DO DUST SAMPLES FOR THE

3   BRAKE PRODUCTS, THE AUTOMOTIVE BRAKE PRODUCTS, DURING THE

4   CLEAN-UP?

5   A.   YES, WE DID.

6   Q.   YES, YOU DID?

7   A.   YES, WE DID.

8       MR. JACKSON:   YOUR HONOR, RATHER THAN TAKING DOCTOR

9   LONGO THROUGH THIS PROCEDURE --  I THINK I MIGHT HAVE

10  DONE THIS THIS MORNING --  IF THERE ARE ANY FOUNDATIONAL

11  CONCERNS YOU WOULD WANT ME TO ADDRESS, I WILL CERTAINLY

12  DO THAT.

13      I THINK AT LEAST WITH RESPECT TO THE

14  CROSS-EXAMINATION ISSUES, I THINK I AM SATISFIED THAT

15  THEY HAVE BEEN TALKED ABOUT AND COVERED.  THE SIZE OF THE

16  CHAMBERS, I DON'T THINK DOCTOR LONGO HAS TESTIFIED ABOUT

17  THAT.  IT COULD MAKE A DIFFERENCE ON HIS AIR SAMPLING, IF

18  IT WAS A BIGGER LOCATION.

19      THE COURT:  I GUESS THE QUESTIONS IS:  DO YOU HAVE

20  ANY MORE QUESTIONS.

21      MR. JACKSON:  YES.  I AM ASKING YOU, I SUPPOSE, IF

22  THERE IS AN OBJECTION THAT COUNSEL IS STATING, SINCE I

23  HAVE NOTHING IN WRITING AS TO WHAT THOSE OBJECTIONS ARE,

24  I WOULD LIKE TO HAVE THOSE SPECIFIED SO AT LEAST I HAVE

25  AN OPPORTUNITY TO ADDRESS THEM BEFORE YOU MAKE A RULING.

26      THE COURT:  OKAY.  I JUST HAVE A COUPLE OF

27  QUESTIONS.

28                  EXAMINATION BY THE COURT

121

1    Q.  WHAT WAS THE METHOD YOU USED TO DEVELOP --

2    A.  WE USED AN IN THE FIELD TECHNIQUE.

3    Q.  DID YOU INTERVIEW PEOPLE THAT WORKED ON BRAKES?

4    A.  YES.

5    Q.  WHAT WERE THE TOOLS THEY TOLD YOU THEY DID BEVELING

6    WITH?

7    A.  WITH HAND FILES.  MORE LIKELY THAN NOT WITH A HAND

8    FILE.  THE OTHER TECHNIQUES WERE USING AN ELECTRIC

9    GRINDER WHICH WAS A STONE WHEEL AND OCCASIONALLY THEY

10   WOULD USE SAND PAPER.

11       THE COURT:  OKAY, DO YOU HAVE ANYTHING ELSE?

12       MR. MCCALLISTER:  I HAVE A COUPLE OF MORE QUESTIONS

13   ON THE STUDY ON THE CLEAN UP.

14                  RE-CROSS EXAMINATION

15   Q.  DID THE DUST YOU WERE STUDYING ON THE CLEAN UP

16   INCLUDE ANY DUST THAT MAY HAVE BEEN THERE DUE TO THE

17   ORIGINAL FILING DOWN OF THE BRAKES ON NEW PRODUCTS YOU

18   COULD I.D.?

19   A.  THAT IS ALL IT WAS.

20   Q.  THAT IS ALL IT WAS, WAS NEW PRODUCTS YOU COULD I.D.?

21   A.  YES.

22   Q.  NOT ON USED BRAKES?

23   A.  NO, SIR.

24   Q.  WHEN YOU WERE DOING THIS CLEAN UP STUDY, DID IT

25   INVOLVE -- WHAT I AM ASKING IS DID THE CLEAN UP STUDIES

26   INVOLVE DUST THAT WAS ONLY FROM THE ORIGINAL FILING OF

27   THE BRAKES; IS THAT CORRECT?

28   A.  THAT IS CORRECT.

122

1    Q.   DO YOU HAVE ANY IDEA WHAT PERCENTAGE OF THE DUST, IF

2    ANY, OF MR. CARLSON'S GARAGES CONSISTED OF OLD BRAKE DUST

3    VERSUS NEW BRAKE DUST.

4    A.   NO, SIR, I DON'T.

5        MR. MCCALLISTER:  THAT IS ALL I HAVE.   THANK YOU.

6        MR. JACKSON:  NOTHING FURTHER, YOUR HONOR.

7        THE COURT:  I HAVE JUST ONE QUESTION.

8                    EXAMINATION BY THE COURT

9    Q.   FROM MY MEMORY FROM THE VIDEO TAPE I WATCHED BEFORE

10   OF THE TRUCK SHOES --

11   A.   IN CARLSON'S, YES.

12   Q.   IN CARLSON'S, WAS THAT IT WASN'T A HAND FILE THAT WAS

13   USED.   SOMETHING ELSE WAS USED?

14   A.   NO.   ACTUALLY, THAT WAS A HAND FILE.

15   Q.   THAT WAS A HAND FILE?

16   A.   YES, MA'AM.

17       ATTORNEY NO. 2:  YOUR HONOR, I BELIEVE WE WATCHED

18   THE CARLISLE VIDEO.   IT WAS A LARGE BLOCK WITH AN

19   INDUSTRIAL SIZED SIZE PIECE OF EQUIPMENT AND THERE WAS A

20   BIG RASP THEY WERE USING ON IT, IF I AM NOT MISTAKEN.

21       MR. JACKSON:  I THINK DOCTOR LONGO CAN EXPLAIN IT.

22       I WILL ONCE AGAIN STATE, FOR THE RECORD, THAT HIS

23   STUDIES WITH RESPECT TO THE CARLISLE VIDEO, I AM NOT EVEN

24   GOING TO ASK HIM ABOUT OR EVEN REFER HIM TO THE

25   AUTOMOTIVE.   I CAN'T SPEAK.   IT IS GETTING LATE.

26       THE AUTOMOTIVE BRAKE ASBESTOS COUNT IS WHAT I AM

27   GOING TO BE OFFERING HIM AS A WITNESS FOR.   I WAS MORE

28   CONCERNED ABOUT THE METHOD USED IN THE TEST.

123

1      THE WITNESS:  THERE ACTUALLY WAS A FILE.

2                    EXAMINATION BY THE COURT

3           THE COURT:  Q.   BUT DID YOU USE A RASP ON THE OTHER

4      ONE?

5      A.   WE USED A RASP AND A FILE ON THE AUTOMOTIVE.  THAT IS

6      HOW THEY USED TO DO IT.

7      Q.   SO NOW I THINK IT IS NOT CLEAR?

8      A.   ON THE CAR, LIKE THE BRAKES, THIS WAS JUST FILED

9      BECAUSE THEY USED TO JUST FILE THE EDGE ON THE AUTOMOTIVE

10     WHERE THEY HAD HIGH SPOTS.  TO FILE DOWN THEY WOULD

11     TYPICALLY USE EITHER A RASP AND FILE OR JUST A FILE.

12     Q.   AND YOU USED WHAT, A RASP AND A FILE IN YOUR STUDIES?

13     A.   YES.

14     Q.   AND DID YOU DISTINGUISH BETWEEN THE AMOUNT OF

15     ASBESTOS YOU WOULD GET USING A RASP AND WHEN YOU WERE

16     USING THE FILE?

17     A.   NO, MA'AM.  WE INTERVIEWED OR READ TESTIMONY THEY

18     WOULD USE BOTH.  THEY WOULD USE ONE AND THEN THE OTHER TO

19     SORT OF TAKE OFF THE THE MATERIAL, THEN SMOOTH IT UP WITH

20     THE FILE SO WE JUST WANTED TO REPEAT WHAT THE INDIVIDUALS

21     DID.

22     Q.   DID THEY TELL YOU HOW LONG THEY USED THE RASP OR HOW

23     LONG THEY USED THE FILE?

24     A.   THIS USUALLY WAS ALWAYS BETWEEN THREE AND FOUR

25     MINUTES PER SHOE AND THAT IS WHAT WE DID.

26     Q.   I DON'T WANT TO BELABOR THIS BUT THE 3 OR 4 MINUTES

27     USING WHAT?

28          USING BOTH THE RASP AND THE FILE.  SO THE WAY I

124

1   MEASURE. IS YOU HAVE ONE SHOE THAT YOU HAVE TO LEVEL AND

2   FIT INTO A WHEEL DRUM AND IT TOOK THEM BETWEEN THREE AND

3   FOUR MINUTES USING BOTH TOOLS.

4       OKAY. ANYTHING ELSE?

5       MR. MCCALLISTER: NO, YOUR HONOR.

6       MR. JACKSON: NO, YOUR HONOR.

7       MR. MCCALLISTER: I WOULD SUBMIT THAT HE IS NOT

8   QUALIFIED OR THIS TESTIMONY IS NOT COMPETENT TO GO BEFORE

9   THE JURY BECAUSE THIS IS NOT ANY WHERE CLOSE TO

10  SUBSTANTIALLY SIMILAR TO THE ENVIRONMENT THAT JOHN

11  CARLSON WORKED IN OR THE ISSUES THAT ARE INVOLVED IN THE

12  CASE. I THINK WHAT IS A BIG POINT HERE IS THAT THEY'RE

13  MEASURING EXPOSURE FROM NEW IDENTIFIABLE BRAKE PRODUCTS.

14      OUR CASE IS ONLY ABOUT EXPOSURE TO PRODUCTS THAT

15  ARE BEING REMOVED FROM CARS AFTER THEY HAVE BEEN USED

16  THAT ARE NOT GROUND WITH A RASP OR NOT GROUND WITH A FILE

17  OF ANY SHORT. THAT IS WHAT THIS WHOLE MARKET SHARE

18  THEORY IS ABOUT. THIS IS NOT ABOUT NEW PRODUCTS BECAUSE

19  THEY CAN IDENTIFY THOSE AND MR. CARLSON IDENTIFIED

20  SEVERAL PRODUCTS THAT HE ACTUALLY WORKED WITH EARLIER IN

21  THE CASE AND THOSE PEOPLE ARE NOT IN THE CASE ANYMORE.

22      SO THE MARKET SHARE THEORY FOR MY CLIENT ONLY DEALS

23  WITH, BECAUSE MARKET SHARE DOES NOT APPLY WHEN YOU HAVE A

24  INDENTIFIABLE PRODUCT, THIS IS A THEORY THAT IS ONLY

25  BASED UPON WHEN YOU CAN'T IDENTIFY PRODUCTS. THE ONLY

26  PRODUCTS THEY CAN'T IDENTIFY ARE THE ONES THAT ARE TOO

27  OLD. ALL OF THE MARKINGS HAVE COME OFF. SO WE ARE ONLY

28  DEALING WITH DUST FROM USED BRAKES. THAT IS THE ONLY

125

1 THING THAT IS APPLICABLE IN A CASE WITH ASBESTOS EXPOSURE

2 FROM THOSE BRAKES.

3  THE COURT:  ARE YOU SAYING MR. CARLSON DIDN'T PUT

4 ON NEW BRAKE PADS.

5  MR. MCCALLISTER:  I AM SURE HE DID THAT BUT THAT IS

6 NOT THE ISSUE IN THIS CASE BECAUSE THE MARKET SHARE

7 THEORY, THE ONLY REASON WE ARE IN THIS CASE, IS BASED

8 UPON ONLY USED PRODUCTS.  THAT IS THE WHOLE THEORY OF

9 THIS CASE IS THEY CAN IDENTIFY ALL THE PRODUCTS MAKERS

10 BECAUSE HE WAS A SUPERVISOR.  HE KNEW ALL THE PRODUCTS

11 THAT WERE COMING INTO HIS STORE.

12  SO WHEN YOU HAVE A PRODUCT I.D., THIS DOES NOT

13 APPLY TO MARKET SHARE BECAUSE HE HAS A WAY TO GET A

14 RECOVERY.  MARKET SHARE IS ONLY IF YOU CAN'T IDENTIFY

15 ANYBODY LIKE IN THE SINDEL CASE WHERE THEY COULDN'T

16 IDENTIFY WHICH PILL THEY WERE TAKING.

17  SO WHAT THE PLAINTIFFS HAVE DONE IS CARVE OUT THIS

18 LITTLE AREA WHERE YOU TAKE OFF THE BRAKE.  YOU CAN'T

19 IDENTIFY THEM AND THEN THEY GET THIS DUST FROM THOSE

20 BRAKES, NOT THE NEW ONES, NOT DUST THAT IS COMBINED WITH

21 THAT DUST, IT IS ONLY EXPOSURE FROM THE FOSTER-RITE STUFF

22 THAT WE ARE TALKING ABOUT AND HE DOES NOT HAVE ANY

23 INFORMATION THAT IS RELEVANT TO THIS CASE BASED UPON

24 THAT.

25  SO HE SHOULD ABE EXCLUDED FROM THIS CASE AND ALL OF

26 HIS STUDIES DEALING WITH BRAKES THAT WERE BRAND NEW.  YOU

27 DON'T FILE NEW BRAKES.  YOU DON'T GRIND THEM.  YOU DON'T

28 DO ANYTHING TO THEM EXCEPT FOR TAKING THEM OFF AND

126

1    THROWING THEM AWAY.  THAT IS WHY I ASKED HIM THAT

2    QUESTION.  SO HIS STUDY WOULD BE IRRELEVANT TO THIS CASE.

3        MR. JACKSON:  WELL, WHAT MR. MCCALLISTER IS DOING

4    HERE IS ESSENTIALLY COMBINING AN ARGUMENT OF CAUSATION

5    WITH THE ARGUMENT OF THE LIABILITY PORTION OF IT WITH

6    RESPECT TO WHAT SOMEONE CAN PROCEED UNDER, WHAT TYPE OF

7    EXPOSURE, UNDER MARKET SHARE.

8        AT THIS POINT WE ARE OFFERING THIS EVIDENCE TO

9    ESTABLISH THAT MR. CARLSON WAS EXPOSED TO ASBESTOS

10   FRICTION MATERIALS AND THAT HAS CAUSED HIM TO SUSTAIN

11   INJURIES.  NOW, THE SECOND QUESTION IS WHAT LEAR

12   SIEGLER'S LIABILITY IS.

13       THAT GOES TO PLAINTIFF'S MARKET SHARE THEORY OF

14   LIABILITY IN THE FIRST PHASE, ALL EXPOSURE TO BRAKE

15   FRICTION PRODUCTS WHICH CAUSED MR. CARLSON'S INJURIES.

16   CAUSATION AS TO DAMAGES IS ABSOLUTELY RELEVANT.

17       NOW, MR. MCCALLISTER IS STILL ENTITLED TO PUT ON

18   EVIDENCE ABOUT LEAR SIEGLER'S PRODUCTS, THAT HE WASN'T

19   EXPOSED TO LEAR SIEGLER'S PRODUCT AND THAT GETS US TO

20   MARKET SHARE.  THAT IS A DIFFERENT QUESTION.  WE HAVEN'T

21   EVEN RESOLVED THAT ISSUE YET.

22       I BELIEVE THE STANDARD IS IF A PRODUCT IS FUNGIBLE

23   AND AND A SUBSTANTIAL AMOUNT OF A PERSON'S EXPOSURE IS

24   THROUGH REPAIR, THIS DOES NOT MEAN THAT HE CAN'T HAVE ANY

25   EXPOSURE TO NEW BRAKE PRODUCTS.  IN FACT MR. CARLSON DID

26   TESTIFY THAT HE ARCED AND GROUND BRAKES AND HE DID

27   TESTIFY THIS WAS DUSTY.  HE JUST TESTIFIED TO THAT

28   YESTERDAY.  AS TO NEW PRODUCTS, IF HE CAN'T IDENTIFY

137

1    THOSE, AND THOSE CAUSED HIS EXPOSURE, I THINK STILL WE
2    WOULD BE ENTITLED, AS LONG AS THERE IS A SUBSTANTIAL
3    AMOUNT OF EXPOSURE THAT IS STILL COMING FROM REPAIR JOBS
4    ON NONE INDENTIFIABLE OR UNIDENTIFIABLE BRAKES PRODUCTS,
5    THIS IS STILL RELEVANT.
6        THE COURT:  SO YOU'RE GOING TO ASK THIS JURY TO
7    DISTINGUISH --  FIRST, YOU'RE GOING TO ASK THEM WHAT IS
8    THE MR. CARLSON'S TOTAL ASBESTOS DAMAGE AND THEN YOU'RE
9    GOING TO ASK THEM TO DISTINGUISH BETWEEN HOW MUCH HE GETS
10   FROM BLOWING OUT THE OLD RESIDUE AND HOW MUCH HE GOT FROM
11   FILING AND BEVELING THE NEW SHOES AND THEN FROM THERE WE
12   GO INTO OF THE OLD DUST, WHAT IS LEAR SIEGLER'S MARKET
13   SHARE OF THAT, AND THEN THAT THAT WILL DETERMINE HOW MUCH
14   THEY ARE GOING TO PAY.
15       MR. JACKSON:  UNDER WHEELER I THINK THE STANDARD IS
16   IF A SUBSTANTIAL AMOUNT OF THE EXPOSURE IS FROM REPAIR
17   WORK, IN OTHER WORDS, NONE IDENTIFIABLE PRODUCTS AND
18   THOSE MATERIALS ARE FUNGIBLE AND THE OTHER STANDARDS ARE
19   MET FOR PROCEEDING UNDER MARKET SHARE.  I DON'T THINK THE
20   JURY HAS TO MAKE THAT DETERMINATION.  I THINK THEY JUST
21   HAVE TO FIND IF THERE IS A SUBSTANTIAL AMOUNT OF
22   EXPOSURE.  THEY HAVE TO MAKE A DETERMINATION THAT THE
23   MAJORITY OF THE EXPOSURE WAS DUE TO BRAKE PRODUCTS OR NEW
24   BRAKE PRODUCTS.  THEY DO HAVE TO DO THAT.  I DON'T THINK
25   THEY HAVE TO COME UP WITH ANY EXACT PERCENTAGE.
26       THE COURT:  WHAT IS THE RELEVANCE OF THIS TESTIMONY
27   UNLESS YOU HAVE DOCTOR LONGO DO A STUDY OF THE AMOUNT OF
28   ASBESTOS DUST THERE IS IN BLOWING OUT THE OLD PRODUCT?  I

128

1  DON'T SEE HOW THIS TESTIMONY, ALONE, IS RELEVANT IN THE

2  CARLSON CASE.

3      MR. JACKSON:  BECAUSE AT STEP ONE WE HAVE -- STILL

4  HAVE THE INITIAL BURDEN, THAT IS, TO PROVE THAT ASBESTOS

5  HAS CAUSED -- ASBESTOS HAS CAUSED MR. CARLSON'S INJURIES,

6  CAUSATION AND DAMAGES.  THE 3RD LEVEL IS WHO IS

7  RESPONSIBLE FOR THE LIABILITY.  THAT IS A SEPARATE ISSUE

8  BUT AT SOME POINT WE'RE GOING TO ASK HIM TO DISTINGUISH

9  BETWEEN THE OLD DUST AND NEW BEVELING.

10      THE COURT:  WHEN ARE YOU GOING TO DO THAT?

11      MR. JACKSON:  THAT IS A FACTUAL DETERMINATION THAT

12  THE JURY HAS TO MAKE.

13      THE COURT:  WHEN ARE THEY GOING TO DO THAT.

14      MR. JACKSON:  IN THE LIABILITY PHASS, WHAT LEAR

15  SIEGLER'S LIABILITY IS.

16      THE COURT:  SO THEN YOU'RE GOING TO HAVE AN EXPERT

17  IN TO SAY HOW MUCH OF THE ASBESTOS CAME FROM THE DUST

18  FROM THE OLD.  WHAT INFORMATION ARE YOU GOING TO GIVE THE

19  JURY UPON WHICH THEY ARE GOING TO BASE THIS DECISION.

20      MR. JACKSON:  TO DETERMINE THE PERCENTAGE OF

21  EXPOSURE TO NEW BRAKE TERMS AS OPPOSED TO USED?

22      THE COURT:  RIGHT.

23      MR. JACKSON:  I THINK THE ONLY QUESTION THAT WILL

24  BE PUT TO THEM IS WAS THIS WHETHER A SUBSTANTIAL SHARE OF

25  HIS EXPOSURE WAS DUE TO USED MATERIALS.  I THINK THAT IS

26  THE STANDARD THEY DO HAVE TO MEET.

27      THE COURT:  WHAT EVIDENCE ARE THEY GOING TO HAVE TO

28  BASE A DECISION ON?

113

1       MR. JACKSON: MR. CARLSON'S TESTIMONY?

2       THE COURT: BUT THIS IS LOP-SIDED. YOUR EVIDENCE

3   IS LOP-SIDED. YOU'RE NOT GIVING THEM ANY INFORMATION ON

4   THE FIBER COUNT OF BLOWING OUT THE OLD DUST?

5       MR. JACKSON: THAT IS TRUE. I DO NOT HAVE THAT

6   INFORMATION. THAT IS CORRECT. I DO NOT HAVE HAVE THAT

7   INFORMATION TO OFFER.

8       THE COURT: OKAY, DO YOU ANYTHING ELSE.

9       MR. MCCALLISTER: JUST TO SUM UP, THAT ALONE SHOWS

10  THAT THE PREJUDICE OF HAVING DOCTOR LONGO TESTIMONY MAKES

11  THE PROBATIVE VALUE OF THIS SO FAR OUTWEIGHED BY THE

12  PREJUDICE HERE, BECAUSE OF THAT STATEMENT ALONE, THAT IT

13  DO IT SHOULD BE EXCLUDED.

14      THIS IS NOT HELPFUL TO THE JURY IN ANY WAY AND I

15  SPECIFICALLY ASKED HIM IF HE HAD AN OPINION ABOUT THE

16  PERCENTAGE OF ASBESTOS EXPOSURE FROM THE NEW STUFF VERSUS

17  THE OLD STUFF AND HE DOES NOT HAVE AN OPINION ON THAT.

18  SO HE CAN'T HELP THIS JURY IN ANY WAY. ALL HE CAN DO IS

19  PREJUDICE MY CLIENT AND CONFUSE THE ISSUES.

20      THE COURT: OKAY, ANYTHING ELSE.

21      MR. JACKSON: I THINK I HAVE STATED EVERYTHING I

22  HAVE TO SAY ON THAT ISSUE.

23      THE COURT: OKAY, SO SHALL WE MOVE TO THE JOINT

24  COMPOUND.

25      MR. JACKSON: YES. AND I WILL TRY TO SPEED THINGS

26  UP.

27              DIRECT EXAMINATION

28  Q.  WHAT AIR SAMPLING, IF ANY, HAVE YOU DONE ON

130

1    ASBESTOS-CONTAINING JOINT COMPOUND.

2    A.   WE HAVE SAMPLED AIR DURING MIXING THE JOINT COMPOUND

3    AS WELL AS AT THE SANDING OF JOINT COMPOUNDS THAT CONTAIN

4    ASBESTOS, OF COURSE.

5    Q.   AND DID YOU MAKE A WRITTEN RECORD OF THOSE FINDINGS?

6    A.   YES, SIR, I DID.

7    Q.   DID YOU BRING A COPY OF THOSE WITH YOU TODAY?

8    A.   YES, SIR.

9         MR. JACKSON:   I ASK A COPY OF THESE WRITTEN

10   FINDINGS BE MARKED AS PLAINTIFF'S NEXT IN ORDER?

11        (THEREUPON THE AFOREMENTIONED DOCUMENT WAS MARKED

12   AS PLAINTIFF'S PLAINTIFF'S G FOR IDENTIFICATION

13   PURPOSES.)

14        MR. JACKSON:   Q.   DOCTOR LONGO, I WILL SHOW YOU

15   PLAINTIFF'S EXHIBIT G.   JUST SO WE ARE CLEAR FOR THE

16   RECORD, THIS IS A COPY OF THE WRITTEN FINDINGS FROM YOUR

17   DESK STUDY WHICH YOU DID ON ASBESTOS JOINT COMPOUND

18   MATERIALS STUDIES?

19   A.   YES.

20   Q.   DID YOU ANALYZE THE CONTENT OF THE ABESTOS JOINT

21   COMPOUND MATERIALS BEFORE YOU DID THE SAMPLING?

22   A.   YES.

23   Q.   WHAT DID YOU FIND TO BE THE ABESTOS CONTENT OF THE

24   JOINT COMPOUND.

25   A.   TEN PERCENT.

26   Q.   TEN PERCENT.   TEN PERCENT BY WEIGHT OR VOLUME?

27   A.   THIS WAS BY VOLUME, BUT THAT IS PRETTY CLOSE TO THE

28   WEIGHT PERCENTAGE.

1   Q.  AND WHEN DID YOU DO THE TESTING?

2   A.  IN SEPTEMBER OF 1997.

3   Q.  DID YOU DO THIS TESTING IN THE CHAMBER WHICH WE HAVE

4   BEEN TALKING ABOUT MOST OF THE DAY?

5   A.  THE SAME CHAMBER.

6   Q.  WERE THE AIR EXCHANGE AND AIR FLOW IN THE CHAMBER

7   SIMILAR TO WHAT YOU HAVE DESCRIBED EARLIER WHEN WE TALKED

8   ABOUT TRANSITE PIPE?

9   A.  YES, SIR.  THEY WERE THE SAME.

10  Q.  AND HOW EXACTLY DID YOU GO ABOUT TESTING JOINT

11  COMPOUND IN TERMS OF -- WHAT DID YOU?

12  A.  WELL, WE FIRST DID A CONSTITUENT ANALYSIS TO FIND OUT

13  WHAT WAS IN THE JOINT COMPOUND MATERIAL.  WE THEN HUNG

14  DRYWALL INSIDE OF THE CHAMBER.  WE CONTRACTED WITH AN

15  INDIVIDUAL WHO WAS AN EXPERIENCED DRY-WALLER AND JOINT

16  COMPOUND SANDER AND HE WAS ALSO SKILLED IN THE USE OF

17  ASBESTOS.  SO HE KNEW HOW TO WEAR A RESPIRATOR AND THAT

18  SORT OF THING AND HE DID THE MIXING AND APPLIED THE JOINT

19  COMPOUND ONTO THE JOINT, THE TAPING AND THE JOINT

20  COMPOUND.  AFTER TWENTY-FOUR HOURS, WHEN IT DRIED,

21  MR. HATFIELD AND I WENT IN WITH PULSE SANDERS AND BRIEFLY

22  SANDED THE JOINT COMPOUND AND THE JOINTS.

23       DURING THAT TIME WHEN THE MATERIAL WAS MIXED WE

24  SAMPLED THE AIR AND WHEN THE MATERIAL WAS SANDED WE

25  SAMPLED THE AIR.

26  Q.  HOW DID YOU DECIDE HOW YOU WERE GOING TO MIX THE

27  JOINT COMPOUND BEFORE APPLYING THIS?

28  A.  WELL, WE PRETTY MUCH LEFT THAT UP TO THE INDIVIDUAL

132

1    WHO DID THAT STUDY IN THAT HE WAS A DRYWALLER AND I TOLD

2    HIM TO MIX IT UP JUST LIKE HE WOULD MIX IT UP ON AN

3    AVERAGE JOB.

4    Q.    SO THIS INDIVIDUAL WHO DID THE MIXING WAS EXPERIENCED

5    IN MIXING JOINT COMPOUND?

6    A.    MIXING AND APPLYING JOINT COMPOUND TO THE JOINT

7    DURING THE TAPING AND PUTTING THE JOINT COMPOUND ON.

8    Q.    HOW LONG WAS THE MIXING PROCEDURE DONE DURING THE

9    TIME YOU TOOK THE ASBESTOS SAMPLES FROM THE MIXING?

10   A.    THE TOTAL MIXING TOOK ABOUT TEN MINUTES.

11   Q.    WITH RESPECT TO THE SANDING, HOW WAS THAT WORK

12   PERFORMED?

13   A.    THAT WAS DONE WITH WHAT IS KNOWN AS PULSE SANDERS.

14   THIS IS A DEVICE THAT HOLD THE SANDPAPER AND IN THIS CASE

15   WE USED AN EIGHTY AND A ONE HUNDRED GRIT SANDPAPER AND

16   THE SURFACE WAS SANDED UNTIL THIS WAS SMOOTH.  THAT IS

17   THE JOINTS WERE SANDED UNTIL THIS WAS SMOOTH WHICH IS THE

18   PROCEDURE THAT INDIVIDUALS WOULD DO WHILE SANDING THIS

19   MATERIAL.

20   Q.    AND HOW DID YOU GO ABOUT ASSURING THIS WAS ACTUALLY

21   HOW DRYWALL SANDERS GO ABOUT SANDING THIS MATERIAL?

22   A.    I USED TO DO THIS.

23   Q.    SO YOU HAVE SANDED DRYWALL YOURSELF?

24   A.    YOU DON'T SAND DRYWALL.  YOU SAND THE COMPOUND.  WHEN

25   YOU FIRST PUT YOUR SKIM COAT ON, YOU HAVE TO FEATHER IT

26   OFF THE EDGES, SO YOU CAN PUT YOUR SECOND AND SOME

27   SOMETIMES YOUR 3RD COAT ON.  THEN THE OBJECT IS SANDED SO

28   WHEN SOMEBODY COMES BACK AND PAINTS THE SURFACE YOUR EYE

133

1    CANNOT SEE THE JOINT.

2    Q.  AND HOW LONG DID DID YOU DO THE SANDING DURING THE

3    TIME YOU DID THE AIR SAMPLING.

4    A.  GIVE ME ONE SECOND.  SIXTEEN MINUTES.

5    Q.  AND DO YOU EVER LOOK AT WORK HISTORIES OR DEPOSITIONS

6    AND THINGS OF DRYWALL SANDERS, GENERALLY, PRIOR TO GOING

7    FORWARD WITH THIS AIR SAMPLING ON THE JOINT COMPOUND?

8    A.  YES, SIR, BESIDES MY OWN EXPERIENCE, BESIDES

9    MR. HATFIELD'S EXPERIENCE, BESIDES INSTRUCTIONS FROM THE

10   PROFESSIONAL PERSON WE HAD DO THIS.  WE ALSO REVIEWED

11   DEPOSITIONS OF INDIVIDUALS WHO USED THE SAME JOINT

12   COMPOUND AND WE WERE ALL DOING IT THE SAME WAY.

13   Q.  AND, DOCTOR, YOU WERE NOT PROVIDED ANY INFORMATION

14   WITH RESPECT TO THE WORK THAT MR. PACHECO MAY HAVE DONE

15   AROUND DRYWALL OR JOINT COMPOUND?

16   A.  I WAS NOT.

17   Q.  YOU HAVE NO IDEA WHAT HE DID FOR A LIVING?

18   A.  I AM ASSUMING HE SANDED JOINT COMPOUND.  OTHER THAN

19   THAT, I DON'T KNOW.

20   Q.  WELL, ASSUME THAT MR. PACHECO HAS NOT TESTIFIED YET.

21   WHAT MY HYPOTHETICAL WILL BE IS TO ASSUME MR. PACHECO

22   WILL TESTIFY THAT HE WORKED IN CLOSE PROXIMITY TO SANDERS

23   IN VARIOUS SIZED ROOMS AT BOTH COMMERCIAL AND RESIDENTIAL

24   JOB SITES?

25   A.  YES, SIR.

26   Q.  WITH THAT TYPE OF INFORMATION BEFORE YOU --

27        LET ME WITHDRAW THAT QUESTION BECAUSE THIS IS

28   GETTING COMPLICATED.

134

1    GIVEN THAT HYPOTHETICAL, WOULD THAT PUT MR. PACHECO

2    IN A WORKING CONDITION WHICH WOULD BE SUBSTANTIALLY

3    SIMILAR AS TO THOSE CONDITIONS WHICH WERE PERFORMED BY

4    YOU IN TAKING OR DOING THIS AIR SAMPLE ON THE JOINT

5    COMPOUND?

6    A.   WELL, IF HE WAS IN THE SAME ROOM OR THE NEXT ROOM HE

7    WOULD HAVE BY-STANDER EXPOSURE.

8        MS. CAMPAGNE:   YOUR HONOR, I AM GOING NO OBJECT AS

9    NON-RESPONSIVE?

10       THE COURT:   NO, I AM OVERRULING THE OBJECTION.

11       MR. JACKSON:  Q.  HOW DOES THAT WORK.

12   A.   WELL, BY-STANDER EXPOSURE IS TYPICALLY SOMEBODY WHO

13   WORKS IN A DIFFERENT TRADE BUT WORKS IN AND AROUND AREAS

14   WHERE OTHER INDIVIDUALS ARE USING ASBESTOS.   THE ASBESTOS

15   FIBER GETS INTO THE AIR AND WILL CONTAMINATE THE

16   SURROUNDING AREAS.  THIS IS ESPECIALLY TRUE OF JOINT

17   COMPOUND BECAUSE OF THE DUST, THE EXTREMELY DUSTY NATURE

18   OF THIS ACTIVITY OF SANDING JOINT COMPOUND.   IT TENDS TO

19   GET EVERYWHERE.   SO IF YOU'RE IN THE SAME ROOM OR IN THE

20   SAME VICINITY YOU WOULD HAVE THE SAME EXPOSURE.

21       MR. JACKSON:  I BELIEVE THAT IS ALL I HAVE, YOUR

22   HONOR.

23                  CROSS EXAMINATION

24       MS. CAMPAGNE:  Q.  I WILL TRY TO MAKE IT BRIEF.

25   DOCTOR LONGO?

26   A.   THAT IS FINE.

27   Q.   YOU HAVE NO INFORMATION WITH REGARD TO MR. PACHECO'S

28   PARTICULAR WORK HISTORY YOURSELF, DO YOU?

235

1   A. I DO NOT.

2   Q. YOU HAVE NO INFORMATION AS TO WHETHER MR. PACHECO

3   EVER EMPLOYED JOINT COMPOUND OR SANDED JOINT COMPOUND,

4   HIMSELF?

5   A. I DO NOT KNOW.

6   Q. DO YOU KNOW THAT -- DO YOU HAVE ANY INFORMATION AS TO

7   WHETHER THE JOINT COMPOUND THAT MR. PACHECO ALLEGES HE

8   WAS AROUND WAS A POWDERED JOINT COMPOUND OR PRE-MIXED

9   JOINT COMPOUND?

10   A. I DON'T KNOW.

11   Q. AND IN YOUR STUDY YOU ONLY USED A POWDERED JOINT

12   COMPOUND, IS THAT NOT CORRECT?

13   A. THAT IS CORRECT. DURING THE MIXING THAT WOULD MAKE A

14   DIFFERENCE, BUT ONCE APPLIED AND SANDED IT WOULD BE NO

15   DIFFERENT BETWEEN POWDER AND PRE-MIXED.

16   Q. BUT THIS WOULD MAKE A SUBSTANCE DIFFERENT DURING THE

17   MIXING OF THE PRODUCT; IS THAT CORRECT?

18   A. ABSOLUTELY. YOU OPEN A CONTAINER AND TAKE IT OUT AND

19   APPLY IT. ONE OF THE PRIMARY REASONS TO MAKE THE PRE-MIX

20   IS TO STOP PEOPLE FROM MIXING IT WITH ASBESTOS IN IT.

21   Q. WITH REGARD TO YOUR SIMULATION OF THE JOINT COMPOUND

22   APPLICATION, I JUST WANT TO GET STRAIGHT EXACTLY HOW YOU

23   DID THAT. YOU DIDN'T PARTICIPATE, PERSONALLY, IN THE

24   APPLICATION. THIS WAS THE PROFESSIONAL DRY-WALLER THAT

25   YOU HIRED; IS THAT CORRECT?

26   A. THAT IS CORRECT.

27   Q. AND YOU HUNG THE SHEET ROCK OR HE HUNG THE SHEET ROCK

28   AND PUT A COAT OF JOINT COMPOUND OVER THE SHEET ROCK?

136

1    A.  HE TAPED AND -- ESSENTIALLY HE TAPED THE JOINT.  SO

2    HE PUT THE FIRST COAT ON.  HOW THAT IS DONE, YOU PUT THE

3    FIRST COAT ON.  THEN YOU USE A TROWEL, A SPECIAL JOINT

4    COMPOUND TROWEL, WHAT WE USED TO CALL A SKIM BAR.  PUT

5    THAT ON, BUT THE PAPER IN AND THEN RUN ANOTHER SKIM COAT

6    OVER THAT AND LET IT DRY.

7    Q.  YOU PUT A PIECE OF TAPE, ESSENTIALLY, OR PAPER, OVER

8    THE JOINT.  THEN YOU PUT ANOTHER COAT ON IT.  THEN YOU

9    LET IT DRY?

10   A.  CORRECT.

11   Q.  YOU DIDN'T SAND OR HE DIDN'T SAND BETWEEN WHEN HE PUT

12   ON THE FIRST COAT AND THE TAPE, CORRECT?

13   A.  NO.  THE TAPE GOES ON WITH THE FIRST COAT.  THAT IS

14   HOW YOU --

15   Q.  ANOTHER COAT IS EMPLOYED OVER THAT?

16   A.  WELL, HOW YOU DO IT IN THE FIRST STEP, IS YOU GO OVER

17   THE JOINT.  YOU PUT THE TAPE IN.  THEN YOU RUN A SKIM

18   COAT RIGHT OVER IT, RIGHT?  WHEN YOU DID THAT, THEN YOU

19   LET THAT DRY.  THAT IS CONSIDERED THE FIRST COAT.  YOU

20   SAND THAT AND THEN GO BACK AND DO YOUR SECOND COAT AND

21   SOMETIMES YOUR THIRD COAT.

22   Q.  TELL ME WHAT BRAND OF JOINT COMPOUND YOU USED IN YOUR

23   --

24   A.  WE USED KAISER GYPSUM JOINT COMPOUND.  WE ALSO USED

25   U.S. GYPSUM PERF-A-GAP FOR THE PAPER.

26   Q.  DOCTOR, YOU DIDN'T USE ANY HAMILTON PRODUCTS IN ANY

27   OF YOUR TESTING, DID YOU?

28   A.  I DID NOT.

137

1    Q.  DO YOU HAVE ANY UNDERSTANDING OF WHAT THE ASBESTOS

2    CONTENT OF ANY HAMILTON PRODUCT IS?

3    A.  YES, I DO.

4    Q.  AND HOW IS THAT?

5    A.  I HAVE BEEN PROVIDED IN THE PAST WITH HAMILTON

6    INDUSTRY FORMULAS.  THEY'RE UNDER A PROTECTIVE ORDER.

7    UNLESS YOU'RE GOING TO WAIVE THAT PROTECTIVE ORDER FOR

8    ME, I CAN'T ANSWER THAT, I GUESS.

9    Q.  WELL, WHY DON'T I ASK YOU MORE SPECIFIC QUESTIONS.

10        DO YOU HAVE ANY INFORMATION AS TO THE ASBESTOS

11   CONTENT OF THE HAMILTON TOPPING COMPOUND?

12   A.  I READ A DEPOSITION FROM THE FOUNDER OF HAMILTON BUT

13   HE WAS -- I DON'T BELIEVE HE SAID WHAT ACTUALLY THE

14   AMOUNT IN IT WAS.  I GUESS I HAVE TO ANSWER YOUR QUESTION

15   I DON'T HAVE DIRECT KNOWLEDGE OF THE TOPPING COMPOUND.

16   Q.  LET ME ASK YOU A HYPOTHETICAL QUESTION.  IF THE TOP

17   LAYER OF COMPOUND OR THE TOPPING COMPOUND THAT WAS BEING

18   SANDED WAS A NONE ASBESTOS CONTAINING MATERIAL, THAT WOULD

19   MARKEDLY CHANGE THE DUST COUNT IN THE AIR, WOULDN'T THIS?

20   A.  IF YOU SAND A NON-ASBESTOS MATERIAL, I WOULD EXPECT

21   YOU NOT TO FIND ANY ASBESTOS IN THE AIR.

22        MS. CAMPAGNE:  YOUR HONOR, I AM GOING TO LEAVE THIS

23   AT THAT.  I HAVE NO FURTHER INQUIRY OF DOCTOR LONGO.

24        I WILL REPRESENT TO YOU, FOR THE RECORD,  BOTH

25   HAMILTON GO29 AND HAMILTON COMPOUND HAS BEEN A

26   NON-ASBESTOS CONTAINING MATERIAL.  THAT IS THE MATERIAL

27   THAT MR  PACHECO ALLEGED DURING THE DEPOSITION WAS

28   SANDED.  THEREFORE, I WOULD OBJECT TO THE JOINT COMPOUND

138

1   STUDY AS DOCTOR LONGO DISCUSSED AND AS BEING SIMPLY

2   IRRELEVANT.

3             RE-DIRECT-EXAMINATION

4      MR. JACKSON:  ONE QUICK QUESTION TO DOCTOR LONGO.

5   Q.  WITHOUT REFERENCE TO THE SPECIFIC ASBESTOS CONTENTS

6   OF THE JOINT COMPOUND FOR HAMILTON, CAN YOU GIVE US AN

7   OPINION.  YOU DID DO AN ANALYSIS OF THE ASBESTOS CONTENT

8   FOR THE KAISER GYPSUM JOINT COMPOUND, CORRECT?

9   A.  YES, SIR.

10   Q.  YOU SAID THIS WAS ABOUT 10 PERCENT.

11   A.  THAT IS CORRECT.  NO, 10 PERCENT WAS TYPICAL IN THE

12   INDUSTRY.

13   Q.  CAN YOU AT LEAST GIVE AN OPINION THAT HAMILTON'S

14   JOINT COMPOUND MATERIALS WOULD BE SUBSTANTIALLY SIMILAR

15   IN ASBESTOS CONTENT TO THE KAISER GYPSUM?

16   A.  THAT PUTS ME IN A DIFFERENT POSITION.

17      MS. CAMPAGNE:  I WILL REPRESENT TO THE COURT G029

18   WILL SUPPORT THAT OUR HIGHEST ASBESTOS CONTENT IN JOINT

19   COMPOUND, I BELIEVE, WAS 3.3 PERCENT.

20      MR. JACKSON:  Q.  OKAY.  I WILL NOT PUT YOU IN THAT

21   POSITION, EITHER.

22      THEN, LET ME ASK YOU THIS:  ASSUME THAT MR. PACHECO

23   WILL TESTIFY THAT HE HAS WORKED IN CLOSE PROXIMITY TO

24   DRYWALL SANDERS SANDING JOINT COMPOUNDS.  DOES THAT PUT

25   HIM IN A POSITION SIMILAR TO WHAT YOU HAVE DESCRIBED AS

26   THE CONDITION BEING IN THE AIR SAMPLING YOU DID FOR THE

27   JOINT COMPOUND?

28   A.  YES.  IT WOULD BE BYSTANDER EXPOSURE

139

1    MR. JACKSON: THAT IS ALL I HAVE.

2    THE COURT: THANK YOU.

3    OKAY ANY OTHER ARGUMENT?

4    MR. JACKSON: NONE, YOUR HONOR.

5    THE COURT: WELL, MY RULING THEN WOULD BE, FOR THE

6    JOINT COMPOUND, THAT DOCTOR LONGO'S TESTIMONY WOULD NOT

7    BE ADMITTED. I DON'T THINK THIS IS RELEVANT. THIS

8    DOESN'T SEEM TO HAVE ANY PROBATIVE VALUE WHATSOEVER.

9    IT CERTAINLY WOULD BE OUTWEIGHED BY THE UNDUE

10   CONSUMPTION OF TIME AND CONFUSION OF THE ISSUES BUT IT

11   REALLY DOES NOT SEEM TO HAVE ANY PROBATIVE VALUE.

12   WITH RESPECT TO THE THE BRAKES MR. CARLSON WORKED

13   ON. I AM ALSO GOING TO RULE THAT DOCTOR LONGO'S TESTIMONY

14   WOULD NOT BE ADMISSIBLE. I BELIEVE THAT WHATEVER

15   PROBATIVE VALUE IT WOULD HAVE IN THAT CASE IS CLEARLY

16   OUTWEIGHED BY THE CONFUSION OF THE ISSUES BEFORE THE

17   JURY.

18   MR. MCCALLISTER: YOUR HONOR, IS THERE ALSO A

19   RULING THAT THE TESTS PERFORMED WERE SUBSTANTIALLY

20   SIMILAR WITH REGARD TO DOCTOR LONGO'S TESTIMONY IN THE

21   CARLSON CASE?

22   MR. JACKSON: SUBSTANTIALLY SIMILAR TO WHAT?

23   THE COURT: RIGHT.

24   MR. MCCALLISTER: AS FAR AS THE OBJECTION THEY ARE

25   NOT TESTS WHERE THEY ARE SUBSTANTIALLY SIMILAR TO THE

26   WORK ENVIRONMENT THAT MR. CARLSON WORKED IN.

27   THE COURT: YOU'RE ONLY IN THE CASE FOR

28   MR. CARLSON'S EXPOSURE TO ASBESTOS TAKING OFF OLD BRAKE

102

1    PRODUCTS.

2        MR. MCCALLISTER:  RIGHT.

3        THE COURT:  NOT WORKING ON NEW BRAKE PRODUCTS.

4    THEN I DON'T THINK THE TESTS DOCTOR LONGO DID WOULD BE

5    PROBATIVE AT ALL IN MR. CARLSON'S CASE.

6        MR. JACKSON:  CAN I ASK FOR CLARIFICATION WITH

7    RESPECT TO THE JOINT COMPOUND. YOUR RULING TO EXCLUDE

8    THAT. YOUR UNDERSTANDING OF WHY IT LACKS PROBATIVE VALUE.

9        THE COURT:  WHY?  BECAUSE THERE WAS NO ASBESTOS IN

10   THEIR TOPPING COMPOUND.

11       MR. JACKSON:  WELL, THERE CERTAINLY WAS ASBESTOS IN

12   THE JOINT COMPOUND MATERIALS SIMILAR IN NATURE TO THE

13   JOINT COMPOUND MATERIALS WHICH HE DID TESTING ON AND

14   MR. PACHECO WILL TESTIFY THAT HE WORKED IN CLOSE

15   PROXIMITY TO PERSONS WHO SANDED JOINT COMPOUND.

16       THE COURT:  THE TOPPING MATERIAL WAS THE ONE THAT

17   WAS PUT ON THE TOPPING THAT WAS SANDED.  THIS WITNESS

18   TESTIFIED THERE SHOULD BE NO ASBESTOS IN THAT.

19       MR. JACKSON:  BUT THE JOINT COMPOUND IS ALSO

20   SANDED.  THAT IS WHAT WAS SANDED, ACTUALLY, IN THE STUDY.

21   THAT IS WHAT MR. PACHECO SANDED.

22       THE COURT:  THAT IS NOT WHAT DOCTOR LONGO JUST

23   SAID.

24       MS. CAMPAGNE:  I HAVE BEEN TRYING TO EXPLAIN THIS

25   TO HIM.

26       MR. JACKSON:  I UNDERSTAND YOUR RULING.

27                    ---oOo---

28

EFiled: Jan 4 2007 3:41P
Transaction ID 13347710

# EXHIBIT C

817

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2       IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

3       BEFORE THE HONORABLE DIANE ELAN WICK, JUDGE

4               DEPARTMENT 611

5                   --oOo--

6   MARK LEWIS, SHIRLEY HACKETT,)
                        )

7       PLAINTIFFS,   )
                        )

8     VS.          )   NO.  306774
                        )

9   JOHN CRANE, INC., and GASKET)
   HOLDINGS, INC.,       )

10                  ).

11       DEFENDANTS.   )
                        )

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16          MONDAY, APRIL 3, 2000

17          AFTERNOON SESSION

18            VOLUME 6-B

19

20

21

22

23

24

25

26

27

28   REPORTED BY:  JOSEPH HAYDEN VICKSTEIN, CSR No.

818

A P P E A R A N C E S:

For the Plaintiff:

Law Offices of WARTNICK, CHABER, HAROWITZ, SMITH & TIGERMAN
By: STEPHEN M. TIGERMAN, Attorney at Law
101 California Street, Suite 2200
San Francisco, Ca 94111

For the Defendant JOHN CRANE, INC.:

Law Offices of HASSARD BONNINGTON
By: JOHN H. CUMMINGS and MARGARET O'SULLIVAN BYRNE,
        Attorneys at Law
Two Embarcadero Center, Suite 1800
San Francisco, Ca 94111

For the Defendant GASKET HOLDINGS, INC.:

Law Offices of HAIGHT, BROWN & BONESTEEL
By: FRANK BERFIELD, Attorney at Law
100 Bush Street, 27th Floor
San Francisco, Ca 94104

JOSEPH J. VICKSTEIN, CSR No. 4722

867

1    observation until earlier, then please let me know. Just

2    bring me a little slip. You don't have to announce it in

3    front of everyone. Just bring me a little note tomorrow.

4    Otherwise, we will aim for recessing on Good Friday by noon.

5         So with that, if there are no questions, I will

6    remind you of the admonition not to discuss the case among

7    yourselves, and we will see you tomorrow morning not later

8    than 8:30. Thank you.

9         (WHEREUPON the following proceedings are had in

10   open court, out of the presence of the jury:)

11        THE COURT: At this time then a number of things,

12   Mr. Tigerman, I'm going to have to remind you that this is

13   not an interview, and to avoid the banter. I know it's

14   schmoozing the jury. You know it's not the appropriate way.

15   It's by question and answer. And so I am going to ask you

16   and your witnesses to -- as well as defense counsel, to

17   avoid doing that.

18        MR. TIGERMAN: Yes, Your Honor.

19        THE COURT: Also, the Court made some rulings and

20   before you leave today, you need to have the charts that

21   have been marked. And as a matter of fact, you may want to

22   have the pages and the rest of the tablet marked that you

23   know you are going to be using, because the record needs to

24   be made as the pages are being marked what pages they are.

25        MR. TIGERMAN: Yes, Your Honor.

26        THE COURT: Next, there were a number of rulings

27   that I made this morning off the record so that the

28   testimony of Dr. Longo could go forward. And that was

868

1  before we had the reporter in. And so my rulings were as

2  follows:

3       With respect to the Defendants' motion to exclude

4  the testimony of Captain Messer-Fuller as a naval historian

5  regarding ship repair, the Court denied it in part and

6  granted it in part. Captain Messer-Fuller will be permitted

7  to testify as a researcher of Navy records. She may testify

8  as to the documents she obtained, where she obtained them,

9  and the contents of the documents. She may also testify as

10  to what others told her about the content, i.e., defining

11  certain terms.

12       She may not interpret the documents and she may

13  not answer any hypothetical questions, as an insufficient

14  foundation has been established as to her expertise to do

15  so. It is questionable whether she would qualify as a naval

16  historian. And if so, it would be naval with a small "n" as

17  opposed to a U.S. Navy with a capital "N" historian.

18       Next, I did not rule on this this morning, but I

19  am prepared to do it at this time. And this is regarding

20  the Plaintiff's motion to exclude evidence of the Navy's

21  negligence and apportionment of damages to the Navy.

22  Plaintiff's motion is denied. In particular, the Richards

23  case which Plaintiff was relying on is distinguishable from

24  the facts of this case. Richards was based on a California

25  immunity to tobacco companies, Civil Code Section 1714.45,

26  based upon a legislative judgment that tobacco companies

27  could not be held responsible for smoking-related disease.

28       In other words, the California Legislature

1  may testify about the installation of insulation at the

2  shipyards where he was employed as well as his observations

3  about the use of gaskets and/or packing materials of the

4  Defendants.  He may not use any samples.  He may show the

5  U.S. Navy training film on insulation installation.  He may

6  not testify as to any testing that he has done on gaskets or

7  packing materials, as there's been an insufficient

8  foundation laid as to his ability to render such an opinion.

9       And then with respect to the motions concerning

10  the use of videotapes on Tyndall lighting and all of the

11  motions related thereto, it was granted in part and denied

12  in part.  The first segment of the Millette Tyndall

13  videotape that shows the Crane Packing Company gasket is

14  admissible.  The second segment showing the Garlocke gasket

15  is not admissible as it is not relevant in this case.

16       As to the other five videotapes submitted by the

17  Plaintiff, they are excluded pursuant to Evidence Code

18  Section 352 as this Court believes their prejudice

19  substantially outweighs their probative value.

20       The Millette video portrays the movement of

21  airborne particles in the Tyndall light.  The other

22  videotapes have an air of doom and gloom about them as a

23  result of the use of moon suits and respirators.  The

24  enclosed tents and the movement of the persons in them.

25       Testimony by experts such as that just given by

26  Dr. Longo; however, as to work simulations is admitted so

27  long as there is sufficient foundation laid by the Plaintiff

28  and his co-workers and other witnesses.  If the foundation

872

1    is not laid, the Court will strike the work simulation

2    testimony.

3            Testimony from experts such as studies or work

4    simulations or experiments on reentrainment of fibers is

5    excluded as it lacks a sufficient foundation as to its

6    reliability in the scientific community.

7            Plaintiff and his co-workers, however, may testify

8    as to their observations of fibers on their clothing. When

9    the Plaintiff's counsel then proposed using the photograph

10   of one of the Tyndall tests taken from one of the five

11   videos, that did not include the moon suits, the

12   respirators, et cetera, the Court permitted that exhibit to

13   be used, which Dr. Longo just did.

14           MR. TIGERMAN: May I seek some clarification just

15   on one item, Your Honor?

16           THE COURT: Yes.

17           MR. TIGERMAN: On the issue of reentrainment,

18   there will be medical testimony that that is significant

19   exposure without attempting to quantify it.

20           THE COURT: That is acceptable. There the Court

21   is not excluding that.

22           MS. BYRNE: Can I get clarification? Though it's

23   not to be based upon a hypothetical question based upon

24   Dr. Longo's counts. Because as we showed in our brief,

25   there is absolutely nothing in the literature today that

26   allows somebody to determine whether those levels as counted

27   by Dr. Longo, are significant in terms of a health risk. So

28   I take your order to mean that all experts are excluded from

873

1    using those numbers.

2                MR. TIGERMAN:  Your Honor, actually --

3                MS. BYRNE:  That was our motion.

4                MR. TIGERMAN:  The medical evidence will be that

5    if there is that level of asbestos on clothing, that that is

6    a significant health risk, period.  Nobody will attempt to

7    quantify how many fibers come off the clothes.  Although I

8    do want the Court to understand that -- and we may have to

9    do this outside the presence of the jury.  There is a

10   concept called "K Factor."  And scientists have measured the

11   amount of fiber release based on K Factor.  And, in fact,

12   Dr. Millette has even done studies on K Factors and fiber

13   release from surfaces, and he is able to and prepared to

14   testify about the release of fiber based on K Factor

15   studies.

16               We never did address all of the K Factor

17   information, because we wanted the Court to understand we

18   are not attempting to quantify the amount of dust that is

19   released from clothing, and we are not attempting to

20   quantify the amount of dust that's released from surfaces.

21               THE COURT:  All right.

22               MR. TIGERMAN:  All we want to do is have our

23   people say that that is a significant source of potential

24   exposure and it is actually a significant industrial hygiene

25   concern and a significant health risk.

26               THE COURT:  And if your witnesses, your experts

27   are able to testify to that as being sufficient, then they

28   may do so.  However, they may not quantify it.

874

1          MR. TIGERMAN:  Right.  They will not quantify the

2     release of the fiber from the clothing and none of them has

3     attempted to do that.  And none of them will attempt to

4     quantify it other than to describe it as a significant risk

5     or a significant --

6          THE COURT:  So they can't take the levels that

7     Dr. Longo has now placed on the clothes and attempt to

8     extrapolate by showing what would be released.

9          MR. TIGERMAN:  No, other than to say that would

10     definitely be a risk or an area of concern.

11          MS. BYRNE:  No.

12          THE COURT:  Right.

13          MR. TIGERMAN:  And medically that is very well

14     established and we can lay the foundation for that.

15          THE COURT:  But they can't testify that that would

16     be, that that amount would be reentrained.

17          MR. TIGERMAN:  No, they will actually testify that

18     that amount will not be reentrained.  But they will testify

19     that if that were indeed the case in any work environment,

20     it would be something that would be very much an issue of

21     increased risk.

22          THE COURT:  It can't be quantified.  That is the

23     Court's ruling.

24          MS. BYRNE:  So the question cannot be asked, "I

25     want you to assume that Dr. Longo did this experiment" --

26          THE COURT:  I am not going to allow that.  You can

27     make your record at the end of tomorrow or so, outside the

28     presence of the jury, so you have got a record for going up.

87S

1    But I am not going to allow that.

2           Okay, anything else?

3           MS. BYRNE:  Or anything even not based on

4    Dr. Longo.  "Assuming there was this level."

5           THE COURT:  Because that gets into the

6    reentrainment and there's been insufficient foundation.

7    Now, let's move on.  I am not hearing more argument.

8           MR. TIGERMAN:  Your Honor, I just want to know

9    when I can make a record on the issue of the entrainment,

10   not quantification.  Because the fact --

11          THE COURT:  Well, is Dr. Longo gone?  Or is he the

12   one that's going to make it?

13          MS. BYRNE:  He admits he can't.  It's in the

14   testimony.

15          MR. TIGERMAN:  That's not true, Your Honor.  He

16   doesn't admit he can't.

17          MS. BYRNE:  He swore under oath he can't.

18          MR. TIGERMAN:  The record has been misrepresented.

19   I told the Court I didn't have an opportunity to respond to

20   this.

21          MS. BYRNE:  The deposition's been taken and --

22          MR. TIGERMAN:  He is here, and I would like to lay

23   the foundation.

24          THE COURT:  Excuse me, but I need an hour's lunch

25   break.  I was in at 7:00 in the morning and I am going to

26   take a lunch break.

27          MR. TIGERMAN:  Can we return at 2:45 just to

28   elicit the foundational questions from him?  And then when

# EXHIBIT D

1

1     IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SAN FRANCISCO

3        HONORABLE DIANE ELAN WICK, JUDGE PRESIDING

4                    DEPARTMENT NO. 611

5                      ---oOo---

6     WARTNICK GROUP #53          ) CASE NUMBER: 996240
      (OTTONE GREGO)              )
7                                 )
                  PLAINTIFF,      )
8                                 )
                   -v-            )
9                                 )
      TRAILMOBILE TRAILERS, LLC   )
10                                )
                                  )
11                DEFENDANT.      )
      _____) IN LIMINE MOTIONS
12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 MONDAY, FEBRUARY 7, 2000
14             THURSDAY, FEBRUARY 10, 2000

15                    ---oOo---

16

17    APPEARANCES:

18        FOR THE PLAINTIFF:      RICHARD A. BRODY,
                                  DIANA M. GARCIA,
19                                WARTNICK CHABER HAROWITZ
                                  SMITH & TIGERMAN
20                                101 CALIFORNIA STREET
                                  SUITE 2200
21                                SAN FRANCISCO, CA 94111
                                  (415) 986-5566
22

23        FOR THE DEFENDANT:      PETER LINDH &
                                  JENNIFER SANCHEZ,
24                                GIBSON & ROBB, LLP
                                  275 BATTERY STREET
25                                EMBARCADERO CENTER WEST
                                  SUITE 920
26                                SAN FRANCISCO, CA 94111
                                  (415) 283-2300
27    REPORTED BY:                BRENDA C. FIELDS
                                  OFFICIAL REPORTER
28                                CSR NUMBER 7235

          BRENDA C. FIELDS, CSR NUMBER 7235

2

1    MONDAY, FEBRUARY 7, 2000                9:00 O'CLOCK A.M.

2                    P-R-O-C-E-E-D-I-N-G-S

3                        ---000---

4            THE COURT:  WE'RE HERE IN THE WARTNICK CASES.

5            PRESENT ARE MR. BRODY, MR. JACOBS, MR. LINDH,

6    MISS SANCHEZ, MR. CIRELLI, MR. VACCHINA, MISS CHOY.

7            AND WE HAVE JUST VIEWED THE PROPOSED TAPE THAT

8    PLAINTIFF WOULD LIKE DOCTOR WILLIAM LONGO TO BE ABLE

9    TO USE DURING HIS TESTIMONY.

10            AND I RECEIVED PAPERS ON BEHALF OF PLAINTIFF

11    TO PERMIT USE OF THE TAPE.  AND I HAVE OPPOSING

12    BRIEFS FROM CARLISLE AND LEAR SIEGLER.

13            BUT BECAUSE THE COURT PERMITTED JOINDER, THE

14    COURT IS REVIEWING THOSE AND IF ANYONE BELIEVES THAT

15    THEY NEED TO ADD SOMETHING, YOU CAN; OR YOU CAN MAKE

16    A VERBAL ARGUMENT THIS MORNING.

17            MR. LINDH:  YOUR HONOR, ON BEHALF OF

18    TRAILMOBILE, I DON'T KNOW THAT I GOT PLAINTIFF'S

19    MOVING PAPERS.

20            MR. BRODY:  I HAVE LEFT THOSE PAPERS HERE LAST

21    WEEK, YOUR HONOR, AND INDICATED ON THE RECORD THAT

22    THEY WERE AVAILABLE FOR REVIEW BY DEFENSE COUNSEL.

23            THE COURT:  DO YOU HAVE EXTRA COPIES?

24            MR. BRODY:  I DO.  AND I HAVE PROVIDED A COPY

25    OF THAT MOTION TO MR. LINDH.

26            THE COURT:  IF COUNSEL ARE GOING TO BRING ANY

27    OPPOSING PAPERS IN, YOU NEED TO BRING THEM IN

28    TOMORROW MORNING.

                BRENDA C. FIELDS, CSR NUMBER 7235

70

1   THAT WILL SHOW YOU WHAT A BACKING PLATE IS.

2        THE COURT:  THE CASE WAS SUBMITTED AND I'M

3   PREPARED TO RULE.  ANY PROBLEM?

4        MR. BRODY:  NO, YOUR HONOR.  I'LL SUBMIT.

5        MR. JACOBS:  SUBMITTED.

6        MR. LINDH:  SUBMITTED.

7        MISS ADAMS:  SUBMITTED.

8        THE COURT:  AFTER VIEWING THE TAPE AND

9   REVIEWING THE WRITTEN AND THE ORAL ARGUMENTS, MY

10  RULING IS TO EXCLUDE THE DOCTOR LONGO OCCUPATIONAL

11  SIMULATION VIDEO TAPE AND HIS TESTIMONY REGARDING ANY

12  SIMULATED WORKPLACE ACTIVITIES PURSUANT TO EVIDENCE

13  CODE 352.

14       I BELIEVE THAT THERE IS AN INSUFFICIENT

15  FOUNDATION TO SHOW THAT THE SIMULATION WAS

16  SUFFICIENTLY SIMILAR TO THE ASBESTOS EXPOSURE OF THE

17  PLAINTIFFS HERE AND THAT THE PROBATIVE VALUE OF THAT

18  EVIDENCE WOULD BE SUBSTANTIALLY OUTWEIGHED BY ITS

19  PREJUDICIAL EFFECT.  I ALSO BELIEVE IT WOULD BE

20  CONFUSING TO THE JURY.

21       SO THAT'S MY RULING.  THE RECORD IS MADE.  NOW

22  DOES THAT ELIMINATE THE COPYRIGHT ISSUE?

23       MR. JACOBS:  I THINK IT DOES.

24       THE COURT:  OKAY.  SO THAT TAKES CARE OF THAT.

25       THERE'S STILL SOME MISCELLANEOUS MOTIONS.  BUT

26  DOES ANYONE ELSE HAVE ANYTHING ELSE FOR THIS MORNING?

27       MR. BRODY:  NOTHING, YOUR HONOR.  I'LL

28  INDICATE THAT I'LL HAVE SOMETHING TO THE COURT AT THE

# EXHIBIT E



1     IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
           IN AND FOR THE COUNTY OF KING
2
PATRICK CAMPBELL,                    )
3                                    )
        Plaintiff,                   )
4                                    )
        vs.                          ) No. 00-2-11084-7SEA
5                                    )
ABNEY MILLS CORPORATION, et al.,     )
6                                    )
        Defendant.                   )
7                                    )
8     ─────────────────────────────────────────────
9            VIDEOTAPE TRIAL PROCEEDING
                  OCTOBER 9, 2002
10       BEFORE THE HONORABLE SHARON ARMSTRONG
11    ─────────────────────────────────────────────
12
13
14
15
16
17
18
19
20
21
22
23
24
25          Reported by Toni Ziomas, CSR

LIKKEL & ASSOCIATES, COURT REPORTING & LEGAL VIDEO
    2722 Colby Avenue, #706, Everett, WA  98201
                 (425) 259-3330

5

```
 1              With regard to the Longo videotape, I have
 2   looked at the videotape, and it will be excluded as
 3   unfairly prejudicial.
 4              MR. VEIERA:   Your Honor, can I ask the
 5   jury-- it occurred to me that I'm looking through here and
 6  ·I see a lot of folks that have sat on criminal juries --
 7   the standard question, Do you understand the distinction of
 8   the burden of proof?  I don't want to get into instructing
 9   folks on the law.  Am I allowed to ask at least on that
10   topic?
11              THE COURT:   Yes.  Yes, you may.
12              MR. WILLIAMS:   To just be clear, Your
13   Honor, obviously we don't want to repeat yesterday; so I
14   will tell you one of the questions I want to ask the jury
15   is, one, with respect to how they feel about unfair --
16   being treated unfairly.  I don't want get into obviously
17   the issue about --
18              THE COURT:   Tell me exactly what you are
19   going to say.
20              MR. WILLIAMS:   I'm going to ask them, Have
21   you ever been wrongly accused of anything?  How did you
22   feel?
23              THE COURT:    That's fine.
24              MR. VEIERA:   Judge, what we're not going to
25   hear is, We are here to defend our name.  We're the last
```

# EXHIBIT F

1/8/02  Berning (Abraham, Ben-Zion)

227

1
2                    SUPERIOR COURT OF CALIFORNIA
3                     COUNTY OF SAN FRANCISCO
4        BEFORE THE HONORABLE ALEX SALDAMANDO, JUDGE PRESIDING
5                     DEPARTMENT NUMBER 318
6                          —OOO—
7    JOHN B. BERNING AND BERNADINE        )
     A. BERNING,                          )
8                                         )
           PLAINTIFFS,        ) CASE NO. 319733
9                             ) JURY TRIAL
     VS.                      ) (PAGES 227 - 344)
10                            )
     A.P. GREEN INDUSTRIES, INC.,         )
11   ET AL.,                   )
                               )
12         DEFENDANTS.         )
     ─────────────────────────────────────
13
14          REPORTERS' TRANSCRIPT OF PROCEEDINGS
15              TUESDAY, JANUARY 8, 2002
16   APPEARANCES OF COUNSEL:
17   FOR PLAINTIFFS:
18      PAUL & HANLEY
        4905 CENTRAL AVE., SUITE 200
19      RICHMOND, CALIFORNIA 94804
        BY:  BRUCE JACKSON
20          ATTORNEY AT LAW
21
22   FOR DEFENDANT ALLIEDSIGNAL, INC., SUCCESSOR IN INTEREST TO THE
     BENDIX CORPORATION:
23
        GORDON & REES, LLP
24      EMBARCADERO CENTER WEST, 20TH FL.
        275 BATTERY STREET
25      SAN FRANCISCO, CALIFORNIA 94111
        BY:  JOSEPH J. KUBANCIK
26          STEPHANIE B. BRADSHAW
            ATTORNEYS AT LAW
27
28   REPORTED BY:  VALERIE PAPALE, CSR NO. 6899
                   JUDITH N. THOMSEN, CSR NO. 5591
                           228

10/7/02  7:40 AM                                          227

1/8/02 Berning (Abraham, Ben-Zion)

1    CASE AMONGST YOURSELVES NOR WITH ANYONE ELSE. IF ANYONE

2    CONTACTS YOU IN ANY WAY, I WANT TO HEAR ABOUT IT WHEN WE

3    RECONVENE AGAIN TOMORROW. THAT, AGAIN, WILL BE AT 8:30. EXPECT

4    A FULL DAY, 8:30 TO 1:30. AND WE WILL SEE YOU THEN.

5        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE OF

6    THE JURY:)

7        MR. JACKSON: YOUR HONOR, I HAVE A BRIEF ON -- IN OPPOSITION

8    TO ALLIEDSIGNAL'S MOTION IN LIMINE TO APPLY KANSAS LAW.

9        I HAVE NOT YET FILED THAT. I HAVE THE ORIGINAL TO FILE

10    AFTER COURT.

11        DOES THE COURT REQUIRE ME TO GIVE A FILE ENDORSED COPY NOW,

12    OR IS A COURTESY COPY TO THE CLERK SUFFICIENT? BECAUSE I

13    HAVEN'T GIVEN YOU A COPY YET.

14        THE COURT: A COURTESY COPY IS FINE. I AM, OBVIOUSLY, NOT

15    GOING TO DECIDE THAT TODAY.

16        MR. JACKSON: OKAY. THEN I WILL PROVIDE THAT TO GAIL

17    (INDICATING).

18        THE CLERK: WHAT IS THIS?

19        MR. JACKSON: THE MOTION IN LIMINE OPPOSITION.

20        THE CLERK: ARE YOU GOING TO FILE THIS DOWNSTAIRS?

21        MR. JACKSON: YES.

22        THE CLERK: OKAY.

23        MR. JACKSON: I HAVE THE ORIGINAL TO FILE.

24        THE CLERK: OKAY,

25        MR. JACKSON: AND THEN IN TERMS OF TODAY, I THINK ONE OF THE

26    ISSUES WE DO HAVE TO RESOLVE IS THE ISSUE OF THE TESTIMONY OF

27    RICHARD HATFIELD IS A COLLEAGUE OF DR. BILL LONGO AT THE MAS

28    LABORATORIES IN GEORGIA, WHO HAS DONE TESTING AND AIR SAMPLING

10/6/02  5:06 PM                                                334

1/8/02  Berning (Abraham, Ben-Zion)

1    ON BENDIX BRAKE PRODUCTS AND IS HERE TOMORROW TO GIVE TESTIMONY
2    REGARDING HIS AIR SAMPLING RESULTS.
3        AND THE PLAINTIFFS ALSO INTEND TO OFFER AS PART OF HIS
4    TESTIMONY VIDEOTAPED SIMULATIONS, WHICH HAVE VIDEOTAPED THE
5    TESTING OF THE BENDIX BRAKE LININGS THAT HE HAS DONE, WHICH
6    WOULD INCLUDE BLOWING OUT A BRAKE DRUM, WHICH WOULD INCLUDE
7    GRINDING OF A BRAKE, AND WHICH WOULD INCLUDE CLEANUP AFTER BRAKE
8    REPAIR WORK INVOLVING BENDIX BRAKE LININGS.
9        THE TESTIMONY IS TWOFOLD —
10        THE COURT: WELL, LET ME CUT TO THE CHASE ON THIS.
11        MR. JACKSON: OKAY.
12        THE COURT: THE ISSUE HERE IS WHETHER OR NOT THE EXPERIMENTS
13    THAT ARE BEING DONE ARE SUBSTANTIALLY SIMILAR TO THE FACTUAL
14    SITUATION WE HAVE IN OUR CASE.
15        AT THIS POINT THE TESTIMONY OF THE BERNING SONS IS — AND I
16    BELIEVE MR. BERNING ALSO TESTIFIED — IS THAT HE DID HIS REPAIR
17    WORK, BRAKE JOBS, EITHER INSIDE THE GARAGE OR OUTSIDE THE
18    GARAGE, DEPENDING ON THE WEATHER. HIS GRINDER WAS INSIDE THE
19    GARAGE. HE USED A RASP, AS WELL AS A GRINDER, TO HAVE THE — TO
20    FIT THE LININGS SO THAT THEY WOULD BE ADJUSTED. HE WOULD BLOW
21    OUT EITHER USING HIS LUNG POWER OR PERHAPS ONE OR MORE OCCASIONS
22    SOME KIND OF AIR COMPRESSOR THAT HE HAD IN HIS SHOP.
23        MY RECOLLECTION OF THE EVIDENCE — AND COUNSEL CAN CORRECT
24    ME IF I'M WRONG — IS THAT NONE OF THE WITNESSES TESTIFIED AS TO
25    THE DIMENSIONS OF THE GARAGE, CEILING HEIGHT OR THE SQUARE
26    FOOTAGE OR IN ANY OTHER WAY. THERE WAS A GARAGE DOOR. IT
27    WASN'T EVEN CLEAR TO ME AT THE TIME THAT HE WAS DOING HIS BRAKE
28    JOBS WHETHER THE GARAGE DOOR WAS OPENED OR CLOSED.

1/8/02  Berning (Abraham, Ben-Zion)

1       THERE WAS NO EVIDENCE PRESENTED AS TO THE VENTILATION OF THE

2       GARAGE, WHETHER IT WAS JUST OPEN TO THE AIR WHEN THE DOOR WAS

3       OPEN, WHETHER THERE WERE ANY WINDOWS OR ANYTHING ELSE.  SO NOT

4       HAVING SEEN THE, THE VIDEOS, BUT MY UNDERSTANDING BASED ON THE

5       REPRESENTATIONS MADE IN THE PAPERS IS THAT THESE EXPERIMENTS

6       WERE CONDUCTED IN SOME KIND OF CLOSED ENVIRONMENT.

7       MR. KUBANCIK:  THAT'S CORRECT, YOUR HONOR.

8       THE COURT:  IT'S NOT CLEAR TO ME WHAT THE VENTILATION SYSTEM

9       WAS.  AND I DON'T KNOW WHAT THE SQUARE FOOTAGE OF THE

10      ENVIRONMENT WAS.  AND SO IT APPEARS TO ME THAT THERE IS A

11      POTENTIAL HERE THAT THE EXPERIMENTS WILL UNDULY EMPHASIZE THE

12      DISPERSAL OR THE -- NOT DISPERSAL BUT THE LACK OF DISPERSAL OF

13      THE SUBSTANCE EITHER THROUGH VENTILATION, AN OPEN DOOR, BLOWING

14      WINDOW -- I MEAN, BLOWING WIND OR SOME OTHER WORK THAT WAS BEING

15      DONE OUTSIDE.

16      NOW, THE GRINDING, OBVIOUSLY, WAS DONE INSIDE.

17      THERE WAS ONE OF THE WITNESSES; ONE OF THE BERNING BROTHERS,

18      TESTIFIED THAT AT ONE POINT OR ANOTHER HE WAS ABLE TO SEE THE

19      ACTUAL DUST SUSPENDED IN THE AIR BECAUSE OF THE LIGHTING

20      CONDITIONS.  IT WOULD APPEAR TO ME THAT JURORS ARE SOMEWHAT

21      FAMILIAR WITH THE DISPERSAL OF DUST FROM THINGS.  SO I AM NOT

22      SURE THAT THIS -- THESE EXPERIMENTS ARE SUBSTANTIALLY SIMILAR

23      ENOUGH THAT THEY SHOULD BE SHOWN TO THE JURY.

24      MR. JACKSON:  OKAY.  A COUPLE OF POINTS HERE THAT I WANT TO

25      MAKE ON THE PURPOSE OF MR. HATFIELD'S TESTIMONY.  BECAUSE FROM

26      OUR PERSPECTIVE IT IS CRITICAL AS TO THE RELEVANCE OF IT.

27      THE COURT:  I AM NOT SAYING IT IS NOT RELEVANT, COUNSEL.

28      THE QUESTION IS IS IT -- ONE OF THE PROBLEMS IS -- WITH THESE

1/8/02 Berning (Abraham, Ben-Zion)

1    EXPERIMENTS IS IS IT — IS THE PREJUDICE TO THE OTHER SIDE

2    OUTWEIGHING WHATEVER RELEVANCY THE INFORMATION HAS BECAUSE IT'S

3    NOT SUBSTANTIALLY SIMILAR TO THE ACTUAL CONDITIONS.

4         AND ONE OF THE THINGS THAT THIS EVIDENCE TENDS TO SHOW IS

5    HOW THIS THING APPEARS TO THE NAKED EYE. AND ONE OF THE

6    PROBLEMS I SEE WITH THIS IS I DON'T KNOW HOW BIG THIS GARAGE

7    WAS. SO I DON'T KNOW WHETHER WHATEVER CONFINED SPACE THAT THESE

8    EXPERIMENTS WERE CONDUCTED IN ARE SIMILAR ENOUGH THAT IT REALLY

9    GIVES A FAIR PICTURE OF WHAT WOULD HAVE BEEN GOING ON IN THE

10   GARAGE. BECAUSE WE ALL KNOW THAT A PICTURE IS WORTH A THOUSAND

11   WORDS. WE HAVE TESTIMONY OF WITNESSES SAYING IT. THE JURORS

12   CAN USE THEIR OWN EXPERIENCE IN DETERMINING, WELL, OBVIOUSLY,

13   THERE HAS GOT TO BE SOME KIND OF DUST GENERATED. NO ONE IS

14   DISPUTING THAT, BUT THE QUESTION IS HOW MUCH.

15        MR. JACKSON: BEFORE I BEGIN TO ARGUE, IS IT THE COURT'S

16   LEANING AT THIS POINT BASED UPON —

17        THE COURT: I WILL BE HAPPY TO LOOK AT THE VIDEOS, COUNSEL.

18        MR. JACKSON: OKAY.

19        THE COURT: BUT I THINK YOU HAVE GOT AN UPHILL BATTLE

20   BECAUSE I DON'T KNOW THE DIMENSIONS OF THE GARAGE.

21        MR. JACKSON: WHAT I DO WANT TO UNDERSTAND, FIRST, BEFORE I

22   SPEAK TO THE ISSUE IS IS IT THE COURT'S INTENTION TO EXCLUDE THE

23   VIDEOTAPED DEMONSTRATIONS, THE WORK PRACTICE SIMULATIONS, ON 352

24   GROUNDS BUT TO PROVIDE OR TO ALLOW MR. HATFIELD TO GIVE

25   TESTIMONY REGARDING THE TESTING THAT HE HAS DONE AND THE RESULTS

26   THAT HE HAS HAD BY HIS OWN EXPERT OPINION?

27        THE COURT: I THOUGHT — I HAD SPEED READ THESE MOTIONS.

28   BUT MY RECOLLECTION OF THE MOTION IS THE ONLY THING THEY WERE

10/6/02 5:06 PM                                    337

1/8/02  Berning (Abraham, Ben-Zion)

1  SEEKING TO EXCLUDE WERE THE VIDEOTAPES.  WERE YOU ALSO SEEKING

2  TO EXCLUDE THE TESTIMONY?

3      MR. KUBANCIK:  I BELIEVE THAT WAS PART OF IT, YOUR HONOR.

4      THE COURT:  WELL....

5      MR. JACKSON:  AND THE REASON I ASKED THAT IS BECAUSE IF WE

6  ARE GOING TO DISCUSS VIDEOTAPED TESTIMONY, I WILL SUBMIT A BRIEF

7  ON THAT ISSUE.  BUT IF WE ARE GOING TO TALK ABOUT THE PERTINENT

8  OPINIONS OF MR. HATFIELD, I DO WANT TO EXPLAIN TO THE COURT WHY

9  HE IS BEING OFFERED AND WHY THE TESTIMONY THAT HE IS GOING TO

10  GIVE ABOUT HIS RESULTS ON TESTING BENDIX IS CRITICAL TO THE

11  ISSUES IN THIS CASE.

12      THE COURT:  I DON'T HAVE ANY PROBLEM WITH A WITNESS

13  TESTIFYING AS TO, YOU KNOW, HE HAS DONE SOME EXPERIMENT.  YOU

14  KNOW, IT'S PROBABLY SIMILAR ENOUGH TO WHAT IS GOING ON IN THE

15  REAL WORLD TO BE OF SOME PROBATIVE VALUE.

16      BUT I DO HAVE A PROBLEM WITH SOMETHING THAT UNDULY SUGGESTS,

17  YOU KNOW, HOW SOMETHING ACTUALLY HAPPENED BY USING SOME KIND OF

18  VISUAL MEANS.

19      MR. JACKSON:  WELL, THE PURPOSE OF HIS TESTIMONY, YOUR

20  HONOR, IS NOT TO GIVE THE TESTIMONY THAT THIS IS WHAT ACTUAL

21  EXPOSURE THAT MR. BERNING HAD.  AND I DON'T THINK IT WOULD BE

22  APPROPRIATE FOR ANY INDUSTRIAL HYGIENIST, DEFENSE OR PLAINTIFFS,

23  TO DO THAT.

24      THE COURT:  YES, BUT THE EXPERIMENTS ARE SUBSTANTIALLY

25  SIMILAR, COUNSEL.

26      MR. JACKSON:  BUT THE ISSUE, THOUGH, IS NOT TO RECREATE HIS

27  ACTUAL EXPOSURE.  THE ISSUE IS TO ADDRESS WHAT ARE THE DISPUTES

28  IN THIS CASE.

10/6/02  5:06 PM                                              338

12/22/02  13:34 FAX    @021 _____

1/8/02  Berning (Abraham, Ben-Zion)

1    AND THE DISPUTE THAT I AM UP AGAINST, YOUR HONOR, IS THAT

2    THEIR INDUSTRIAL HYGIENIST WILL SAY THAT USE OF BRAKES IS SAFE,

3    THAT IT DOESN'T RELEASE ASBESTOS, THAT WHEN YOU BLOW OUT A BRAKE

4    DRUM, YOU ONLY HAVE A VERY LITTLE AMOUNT OF FIBER BECAUSE OF THE

5    FACT THAT IT'S CONVERTED —

6        THE COURT:  AND YOU WILL HAVE YOUR WITNESS CONTRADICTING

7    THAT TESTIMONY.

8        MR. JACKSON:  AND THE REASON IT CONTRADICTS IT IS BECAUSE HE

9    IS ACTUALLY, UNLIKE THEIR INDUSTRIAL HYGIENIST — HE HAS

10   ACTUALLY TESTED A BENDIX BRAKE, HE HAS GRINDED IT, AND HE HAS

11   TAKEN MEASUREMENTS TO SEE WHAT HAPPENS.  AND IT'S THIS SIMPLE:

12       THE COURT:  IF HE TESTIFIES TO THAT, I DON'T HAVE ANY

13   PROBLEM WITH THAT.

14       MR. JACKSON:  OKAY.  SO YOUR RULING—

15       THE COURT:  MY PROBLEM IS WITH THE VIDEOS.

16       MR. JACKSON:  YOUR RULING IS THAT MR. HATFIELD CAN GIVE HIS

17   TEST RESULTS THAT HE HAS DONE AND THE OPINIONS THAT HE HAS DONE

18   BASED ON THAT AS THE FORM OF AN EXPERT.  BUT THE VIDEOTAPED

19   TYNDALL BEAM DEMONSTRATIONS ARE EXCLUDED.

20       THE COURT:  YES.

21       MR. JACKSON:  I JUST WANT A CLARIFICATION, AND THEN I HAVE

22   NO FURTHER ARGUMENT.

23       THE COURT:  ANYTHING FURTHER?

24       MR. KUBANCIK:  NO, YOUR HONOR.  SUBMITTED.

25       THE COURT:  AT THIS POINT THE MOTION IS GRANTED TO THE

26   EXTENT THAT THE VIDEOTAPED EXPERIMENTS ARE EXCLUDED FOR THE

27   REASONS WHICH I HAVE STATED.  THE COURT DOESN'T FIND THAT THEY

28   WOULD BE SUBSTANTIALLY SIMILAR TO THE EVIDENCE THAT IS GOING TO

1/8/02 Berning (Abraham, Ben-Zion)

1       BE BEFORE THE JURY.

2           MR. JACKSON: AND ALSO, AS A PART OF THAT RULING, THAT THE

3       ACTUAL TESTING HE HAS DONE AND THE OPINIONS THAT HE HAS FORMED

4       BASED ON THOSE TESTS ARE ADMISSIBLE.

5           THE COURT: THAT'S WHAT I SAID, COUNSEL. THAT'S WHAT I

6       SAID.

7           MR. JACKSON: THANK YOU, YOUR HONOR.

8           THE CLERK: SO THE MOTION TO EXCLUDE VIDEO DEPOSITION IS

9       GRANTED?

10          THE COURT: YES. THE VIDEOTAPES ONLY BUT NOT THE ACTUAL

11      TESTIMONY.

12          ALL RIGHT. ANYTHING ELSE WE NEED TO RESOLVE TODAY?

13          MR. JACKSON: NOT IN TERMS OF SUBSTANTIVE MOTIONS. BUT I

14      SHOULD ALERT THE COURT TO WHAT OUR SCHEDULE IS SINCE WE ARE VERY

15      FAR AHEAD OF SCHEDULE.

16          AT THIS POINT TOMORROW OUR TESTIMONY IS DR. RICHARD COHEN

17      AND THEN MR. HATFIELD. AND WE ARE THEREAFTER DONE WITH OUR LIVE

18      WITNESSES. GIVEN THE TESTIMONY THAT WE HAVE HAD ON CAUSATION,

19      THE PROBLEMS THAT I HAVE HAD IN SCHEDULING DR. ALLAN SMITH, WHO

20      WAS MY LAST LIVE WITNESS, WE ARE NOT GOING TO CALL HIM TO GIVE

21      TESTIMONY IN TRIAL. SO AFTER THE WITNESSES TOMORROW, THEN THE

22      BODY OF EVIDENCE THAT WE HAVE TO SUBMIT COMES IN THE FORM OF

23      DOCUMENTS AND DEPOSITION TESTIMONY WITH RESPECT TO THE CORPORA

24      NEGLIGENCE AND PUNITIVE DAMAGES CLAIMS AGAINST ALLIED.

25          THE COURT: ALL RIGHT. SO TOMORROW IS THE 9TH. SO YOU CAN

26      PRETTY MUCH FILL TOMORROW.

27          MR. JACKSON: I CAN FILL TOMORROW WITH THE LIVE WITNESSES.

28          AND THEN THE DOCUMENTS REALLY SHOULD AMOUNT TO NO MORE THAN

10/6/02 5:06 PM                                                    340

# EXHIBIT G

LEXSEE 2001 OHIO APP LEXIS 1780

JACK L. BALL, ET AL., Plaintiffs-Appellees -vs- CONSOLIDATED RAIL CORP., ET AL., Defendants-Appellants

NO. 77531

COURT OF APPEALS OF OHIO, EIGHTH APPELLATE DISTRICT, CUYAHOGA COUNTY

*142 Ohio App. 3d 748; 756 N.E.2d 1280; 2001 Ohio App. LEXIS 1780*

April 19, 2001, Date of Announcement of Decision

**SUBSEQUENT HISTORY:** [***1] Motion for Reconsideration Denied May 10, 2001, Reported at: *2001 Ohio App. LEXIS 5361.*

**PRIOR HISTORY:** CHARACTER OF PROCEEDINGS : Civil appeal from Common Pleas Court. Case No. CV-363793.

**DISPOSITION:** REVERSED AND REMANDED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Plaintiffs-Appellees: BRIAN A. GOLDSTEIN, MICHAEL H. DORAN, Dorian & Murphy, LLP, Buffalo, NY.

For Defendants-Appellants: DAVID A. DAMICO, Burns, White & Hickton, Pittsburgh, PA.

**JUDGES:** JUDGE ANNE L. KILBANE. PATRICIA ANN BLACKMON, P.J., AND FRANK D. CELEBREZZE, JR. CONCUR.

**OPINIONBY:** ANNE L. KILBANE

**OPINION:** [**1282] [*752] JOURNAL ENTRY AND OPINION

ANNE L. KILBANE, J :

This is an appeal from a jury verdict following trial before Visiting Judge Harry A. Hanna that resulted in the award of compensatory damages to appellees Jack Ball and William Winland for asbestos-related personal injury claims, and from an order denying appellant

Consolidated Rail Corporation and American Financial Group, Inc. (collectively, Conrail ) a new trial. Ball and Winland brought this action under the Federal Employers' Liability Act (FELA), section 51 et seq., Title 45 U.S.Code, and the Locomotive Boiler Inspection Act (LBIA), section 22 et seq., Title 45, U.S.Code, claiming asbestos exposure in Conrail's buildings and trains. Conrail claims it was error: (1) to admit portions of an asbestos survey report [***2] revealing the presence of asbestos in the air of certain areas of its property but refuse to admit the complete report revealing where asbestos was not found or, when found, below permissible limits; (2) to admit unreliable scientific evidence; (3) to allow prejudicial reference to asbestos as a carcinogen even though cancer was not at issue; and (4) to fail to instruct the jury to apportion damages in relation to each plaintiff's contributory negligence, as required by FELA. We reverse the judgment.

On September 1, 1998, Ball, Winland, and six other plaintiffs filed a complaint against Conrail and its predecessors, alleging asbestos-related injuries in violation of the FELA, the LBIA, other federal statutes, and common-law negligence. On Conrail's motion, and over the plaintiffs' [**1283] objections, the case was transferred to the Common Pleas Court's asbestos docket.

A jury trial began on September 20, 1999, with six of the original eight plaintiffs remaining, and after four plaintiffs agreed to settlements on September 21, 1999, the trial continued on only the claims of Ball and Winland. Ball, then age sixty-four, testified that he had worked for Conrail or its predecessors from 1953 [***3] until 1993, initially as a laborer in a storage building and, since 1964, as a train conductor. He testified that he had

142 Ohio App. 3d 748, *; 756 N.E.2d 1280, **;
2001 Ohio App. LEXIS 1780, ***

been regularly exposed to asbestos materials while working in the storage job and, later, exposed to asbestos insulation while riding in train engines or cabooses. Winland, fifty-eight years old at the time of trial, worked as a conductor for the railroad from 1965 until 1987. Both men testified that they spent significant time in buildings at the Conway train yard near Pittsburgh, Pennsylvania and, while riding in the trains, they would rest their feet on boiler pipes wrapped with insulation, and that the insulation was regularly frayed. Ball testified that he recognized that the insulation contained asbestos, and not some other material, because he had seen labeled materials and had learned to recognize asbestos while working in the storage building. [*753]

Over Conrail's objection, the judge admitted a number of documents offered to show the presence of asbestos fibers in the air of buildings at the Conway yard where Ball and Winland had worked, as evidence of their exposure to asbestos. The documents were part of a report prepared in 1988, subsequent to an asbestos [***4] survey and inspection by Professional Service Industries (PSI), a Pittsburgh company. Although offered as business records, the judge admitted them as admissions against interest, on the basis that PSI was Conrail's agent when it inspected and reported on asbestos at the Conway facility. Through the use of these PSI documents, Ball and Winland's medical witnesses established their asbestos exposure and, therefore, a diagnosis that each suffered from asbestosis. The physicians testified that both men suffered from lung fibrosis consistent with asbestos exposure, but neither could have made such a diagnosis without evidence that each had, in fact, been exposed.

The judge also admitted, over Conrail's objection, evidence of an experiment by Dr. William Longo, Ph.D., through which he attempted to recreate the conditions encountered by Ball and Winland when they rested their feet on insulated boiler pipes while riding trains, to show that such activity could release asbestos fibers into the air. Conrail argued that Longo's methods were not scientifically sound, did not adequately approximate the conditions encountered by Ball and Winland, or should be excluded as evidence of the amount [***5] of asbestos fiber released during the experiment.

Conrail also objected to evidence of historical knowledge concerning asbestos as a carcinogen, arguing that it was irrelevant or unduly prejudicial because neither man suffered from cancer or sought damages for the fear or risk of contracting cancer. The judge allowed the evidence to show that Conrail had notice of asbestos' health hazards and, therefore, had the duty to take steps to protect its employees. Although Conrail argued that this evidence could be presented without reference to asbestos as a carcinogen, the judge ruled the evidence

admissible because the severity of the risk would affect the scope of Conrail's duty.

In defense, Conrail elicited or presented evidence that Ball and Winland had significant histories of cigarette smoking, and all the medical witnesses agreed that their major symptoms -- shortness of breath -- could be caused by smoking. Conrail's [**1284] medical witnesses testified that smoking could cause lung fibrosis, although they found no significant damage to either man's lungs. Larry Liukonen, an industrial hygienist, testified, inter alia, that asbestos insulation was not used on boiler pipes inside the locomotives, [***6] and that such pipes were not insulated at all. Conrail also attempted to admit, through Liukonen, more of the documents from the PSI report concerning the absence of asbestos in the buildings at the Conway train yard because Ball and Winland had introduced only selected [*754] documents from that comprehensive report, and that the remainder of the report was necessary to place the asbestos information in context. The judge, however, rejected that evidence as hearsay.

In accordance with the FELA claims, Conrail requested a jury instruction on apportionment of damages, but the judge rejected it, finding that Conrail did not present any evidence that Ball or Winland were contributorily negligent. The judge found that Conrail's witnesses had opined only that Ball and Winland did not have asbestosis and, although they stated that smoking can cause shortness of breath or lung fibrosis, no one had testified that smoking had caused Ball and Winland to have such conditions. The judge did approve an instruction stating that Conrail was liable only for the injuries proximately caused by its negligence or statutory violations.

On September 30, 1999, the jury returned a verdict finding Conrail liable [***7] to Ball for $ 275,000, and to Winland for $ 395,000, and that Conrail violated the LBIA. On October 5, 1999, judgment was entered on the verdict, and Conrail moved for a new trial under Civ.R. 59, citing the judge's failure to admit the entire PSI report and his failure to instruct the jury on apportionment of damages. Its motion was denied on December 21, 1999.

Conrail's first assignment of error states:

> I. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON APPORTIONMENT OF DAMAGES UNDER THE FELA AND TO INCLUDE APPORTIONMENT ON THE VERDICT SLIP.

The FELA allows workers to recover if an employers' negligence or statutory violation contributed in any way to their injuries. *Rogers v Missouri Pacific*

*RR. Co. (1957), 352 U.S. 500, 506, 77 S. Ct. 443, 448, 1 L. Ed. 2d 493, 499.* The statute also requires a parallel apportionment of damages whenever the evidence shows a worker's contributory negligence caused any part of his injuries. *Dixon v. Penn Cent. Co. (C.A.6, 1973), 481 F.2d 833, 835.* Apportionment is not allowed, however, where an employer is liable for violating certain safety statutes, including the Locomotive Boiler Inspection Act [***8] (LBIA). *Rogers, 352 U.S. at 506 and n.12, 77 S. Ct. at 448 and n.12, 1 L. Ed. 2d at 499 and n.12.* Because the jury found an LBIA violation, Conrail was not entitled to apportionment for contributory negligence, and the asserted error is necessarily harmless. Conrail contends that the error was prejudicial because the jury might have apportioned damages if instructed to do so, despite the LBIA violation, but we fail to see how the apportionment instruction could have affected the jury's determination of liability under the LBIA. The first assignment of error is without merit.

The second assignment of error states:

II. THE TRIAL COURT ERRED IN ADMITTING PORTIONS OF AN ASBESTOS SURVEY REPORT USED BY PLAINTIFFS DURING THEIR CASE IN CHIEF AS AN ADMISSION AGAINST INTEREST AND [*755] IN FURTHER FAILING TO PERMIT DEFENDANTS FROM INTRODUCING THE REMAINING PORTIONS OF THE EXACT SAME REPORT.

A judge has discretion when deciding close evidentiary questions, and we will [**1285] not reverse evidentiary rulings unless there was an abuse of that discretion. *Calderon v. Sharkey (1982), 70 Ohio St. 2d 218, 222-23, 436 N.E.2d 1008, 1012.* The documents showing airborne asbestos [***9] fiber at the Conway yard were admitted as admissions of a party-opponent. Evid.R. 801(D)(2).

The exhibits were introduced during the video deposition of Conrail industrial hygienist Ramon Thomas. Thomas did not begin work at Conrail until 1994, and the documents at issue were produced in 1988 and 1989. He testified that he had never seen the documents before, although they were kept in his department's offices, and that Conrail's lawyer, and not he, had compiled the documents to be presented at his deposition. He identified them as part of a report prepared by PSI, not by Conrail, relating to the presence of asbestos in buildings at the Conway yard.

The documents were forms, dated November 1988, identifying locations where asbestos was found and a cover letter, dated January 1989, from PSI to Conrail

summarizing the findings. The judge admitted them as statements by an agent of Conrail over Conrail's objection that no evidence showed PSI prepared the report as its agent.

The parties initially raise a question concerning whether the statements are admissions or statements against interest under Evid.R. 804(B)(3). Putting aside the question of witness availability, if the evidence [***10] concerns a party, it is governed by Evid.R. 801(D)(2). *State v. Gatewood (1984), 15 Ohio App. 3d 14, 16, 15 Ohio B. Rep. 36, 472 N.E.2d 63, 64-65.* Unless it can be attributed to Conrail, the evidence is irrelevant, and therefore Evid.R. 804 is inapplicable.

Secondly, although Ball and Winland originally argued that the documents were admissible as records of regularly conducted activity, Evid.R. 803(6), they successfully excluded the remainder of the report. If the documents were admissible under this exception, Conrail would be entitled to a reversal because denying it the right to submit the complete report would be error. Moreover, had the judge ruled the documents admissible as business records, Conrail would have had an opportunity to further oppose the documents as double hearsay under Evid.R. 805. We can therefore affirm the judgment only if the documents were admissions of a party-opponent under Evid.R. 801(D)(2).

If a statement is not a direct admission, it can still be the admission of a party-opponent and not hearsay under three circumstances relevant here: (1) the party has manifested his adoption or belief in its truth, (2) the party authorized the [*756] declarant to make [***11] the statement, or (3) the statement was made by an agent or servant in the course of the employment or agency relation. Thomas did not know whether Conrail had taken action to remove asbestos or otherwise remedy conditions identified in the report, and there was no other evidence that Conrail adopted the report as its own. Evid.R. 801(D)(2)(b). To be admissible, the documents must satisfy the authorization or agency requirements in Evid.R. 801(D)(2)(c) or (d).

Where admission through agency is alleged, one must show the existence of an agency relationship, that the statement was made during the course of the relationship, and was within the scope of the agency. *Pappas v. Middle Earth Condominium Assn. (C.A.2, 1992), 963 F.2d 534, 537.* For purposes of the evidentiary rule, an agency relationship does not require authority to make damaging statements, but requires only the authority to take action concerning the subject matter [**1286] of the statements. *Id., at 538.* In keeping with the liberal policy of admitting statements under Evid.R. 801(D)(2), the fact and scope of the agency can be proven through circumstantial evidence. *Id.* Moreover,

despite the Pappas court's [***12] statement to the contrary, Fed.R.Evid. 801(d)(2) was subsequently amended to allow consideration of a statement's content in order to show authorization or agency. See Weissenberger's Ohio Evidence (2000), 327-28, Ch. 801. We are unaware that any Ohio court has ruled on this issue since the federal amendment, and the parties have pointed to no cases in aid of our determination. The content of the documents at issue supports the conclusion that PSI was hired to do asbestos inspections by Conrail and authorized to report on their results, and in the absence of contrary argument or authority, we cannot find that the judge would have abused his discretion in considering the contents of the statements.

Even when the contents of the reports are used, however, there is no evidence of an agency or employment relationship between Conrail and PSI. It appears PSI was an independent contractor without power to bind Conrail, and such relationships do not satisfy the requirements of Evid.R. 801(D)(2)(d). *Forte v. Lewis (1978), 241 Ga. 109, 243 S.E.2d 38; Gottlieb & Sons, Inc. v. Hanover Ins. Co., 1994 Ohio App. LEXIS 1682* (Apr. 21, 1994), Cuyahoga App. No. 64559, unreported; cf. *Szymczak v. Midwest Premium Fin. Co. (1984), 19 Ohio App. 3d 173, 177-78, 19 Ohio B. Rep. 280, 483 N.E.2d 851,* 857-58 [***13] A principal's control of the relationship provides the basis for attributing the statement of an agent as an admission, and such control is absent in an independent contractor relationship. *Forte.*

The documents can be admissible under Evid.R. 801(D)(2)(c) if PSI is a party authorized by Conrail to make a statement on the subject of asbestos. Historically, however, this form of admission is construed more narrowly than the [*757] agency exclusion, as the declarant must be someone authorized to act as a speaking agent for the principal, expressly or implicitly designated to make statements on that party's behalf. See, e.g., *Covington v. Sawyer (1983), 9 Ohio App. 3d 40,* 43-44, 9 Ohio B. Rep. 43, 458 N.E.2d 465, 469 (physician implicitly authorized to discuss patient's symptoms when referring her to specialist); *Madden v. Albainy, 1989 Ohio App. LEXIS 1445* (Apr. 20, 1989), Cuyahoga App. No. 55301, unreported (law firm expressly authorized to write letter on client's behalf); *Lockwood v. AC&S, Inc. (1987), 109 Wn.2d 235, 262, 744 P.2d 605, 620.* Although the evidence here shows that PSI was hired to investigate and report on asbestos content at the Conway yard, this does not mean that it was authorized [***14] to make statements to third parties on Conrail's behalf. There is no evidence that Conrail was willing to adopt PSI's reports as its own without further investigation.

Because we find the documents were improperly admitted as admissions of a party-opponent, we need not address Conrail's argument that it was entitled to admission of the entire report under Evid.R. 106. We note, however, that our opinion does not entirely forbid admission of the documents on remand. We find only that, on the foundation shown, the documents were not admissible under any of the hearsay exclusions in Evid.R. 801(D)(2). Conrail's second assignment of error is sustained.

The third assignment of error states:

> III. THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT, DR. WILLIAM LONGO AND THE VIDEOTAPE OF HIS EXPERIMENT ON THE GROUND THAT SAID EVIDENCE [**1287] DID NOT COMPLY WITH RULE 702 OF THE OHIO RULES OF EVIDENCE.

Because it does not appear that application of Ohio evidentiary rules will affect a substantive federal right, and because Ball and Winland have not objected to application of Ohio law, we will accept the proposition that Evid. [***15] R. 702 applies, rather than its federal counterpart. We also recognize that this may be a distinction without a difference, for even though the language of the two evidentiary rules differ, the Ohio Supreme Court, in *Miller v. Bike Athletic Co. (1998), 80 Ohio St. 3d 607, 687 N.E.2d 735,* expressly adopted the leading federal case on the issue, *Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469.*

The judge's role is preliminary, analyzing whether the expert evidence satisfies threshold requirements of validity and reliability, and not whether an expert witness's opinion is correct. *Miller, 80 Ohio St. 3d at 613-14, 687 N.E.2d at 741.* Conrail submits that, under *Daubert,* Dr. Longo's experiment did not satisfy *Daubert's* non-exhaustive, four-factor test for reliability. Under this [*758] test, scientific evidence should be analyzed to determine: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. *Id. at 611, 687 N.E.2d at 740.* [***16]

Dr. Longo testified that he performed the experiment, recorded on video tape, in a controlled chamber to determine whether the abrasion of asbestos pipe insulation would release fibers into the air. Two persons rubbed their shoes across insulated pipe, as Ball and Winland testified they had done and, occasionally, one person would touch the pipe with his hands because

142 Ohio App. 3d 748, *; 756 N.E.2d 1280, **;
2001 Ohio App. LEXIS 1780, ***

Ball and Winland had told Longo they had sometimes touched the boiler pipes with their hands to adjust the position of the insulation. Longo then measured the amount of fibers released.

Conrail does not question Longo's methods for measuring airborne fibers, but instead attacks his experiment as an artificial and inaccurate representation of the conditions encountered by Ball and Winland in its trains. Despite the fact that Longo stated his experiment was designed only to determine whether manipulation of the asbestos insulation could lead to any exposure to asbestos fibers, Conrail contends that the experiment had no value to the jury without a showing of the level of exposure. Conrail then submits that Longo improperly testified about the levels of asbestos fibers released during his experiment.

An experiment is [***17] admissible if it is relevant and helpful to one aspect or principle of the event at issue, even though it does not re-create the conditions of the event. Miller, paragraph two of the syllabus. Ball and Winland did not assert that Dr. Longo's experiment was a full reenactment of conditions on locomotives, but instead limited the scope to determination of whether asbestos fibers could be released if some conditions they had described had occurred. Despite Conrail's arguments about the reliability of Dr. Longo's experiment, the crux of its dispute is whether the experiment was sufficiently relevant to the events at issue to aid the jury. The record indicates that the jury was amply informed about the differences between Dr. Longo's experiment and the conditions Ball and Winland may have experienced, and the judge did not abuse his discretion in admitting the evidence and allowing the jury to weigh it. Id. at 614-15, 687 N.E.2d at 742. [**1288]

We agree, however, that the experiment was not designed to show the level of asbestos exposure allegedly encountered by Ball and Winland and Dr. Longo should not have been allowed to testify concerning the amounts of asbestos released during [***18] the experiment. The testimony about these levels and the reference to them in closing argument was outside the express purpose of the [*759] experiment and beyond the permissible scope of testimony. Conrail's third assignment of error is, in part, well taken.

The fourth assignment of error states:

IV. THE TRIAL COURT ERRED IN ADMITTING TESTIMONY REGARDING THE RISK OF DEVELOPING CANCER WHEN EXPOSED TO ASBESTOS WHERE THERE WAS NO EVIDENCE TO SUGGEST THAT PLAINTIFFS WOULD DEVELOP CANCER.

Although the judge initially granted Conrail's motion in limine on this issue, he reversed the ruling at trial and allowed testimony that asbestos was a carcinogen. Because Ball and Winland claimed only to have asbestosis and did not request damages for increased risk of cancer or fear of contracting cancer, Conrail contends that evidence that asbestos was a known carcinogen was irrelevant or unduly prejudicial and should have been excluded under Evid.R. 402 or 403.

At trial, Ball and Winland sought to establish that Conrail knew of asbestos' hazards prior to or during the time of their employment, and to prove that Conrail had a higher duty to take protective action, introduced the cancer-asbestos [***19] relationship. The judge was within his discretion in finding the evidence relevant for this purpose. See, e.g., Aparicio v. Norfolk & Western Ry. Co. (C.A.6, 1996), 84 F.3d 803, 810 (duty is measured in proportion to danger posed). Because Ball and Winland did not claim injury or damages related to cancer, the judge instructed the jury to award damages only for those injuries caused by Conrail and Conrail did not request any further limiting instruction, and there is no evidence the jury awarded damages for the risk or fear of cancer. We cannot find the judge abused his discretion in finding the probative value of the evidence was not substantially outweighed by its prejudicial effect. Evid.R. 403(A); Aparicio. The fourth assignment of error is overruled.

Judgment reversed and remanded.

It is ordered that the appellant recover from appellees its costs herein taxed.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

JUDGE

ANNE L. KILBANE

PATRICIA [***20] ANN BLACKMON, P.J., AND FRANK D. CELEBREZZE, JR. CONCUR

N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc. App.R.22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E), unless a motion for reconsideration with supporting brief, per App.R. 26(A) is filed within ten

142 Ohio App. 3d 748, *; 756 N.E.2d 1280, **;
2001 Ohio App. LEXIS 1780, ***

(10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S. Ct. Prac.R. II, Section 2(A)(1).

# EXHIBIT H



ACADEMIC PRESS

Available online at www.sciencedirect.com

SCIENCE (d) DIRECT®

Regulatory Toxicology and Pharmacology 38 (2003) 71–77

Regulatory Toxicology and Pharmacology

www.elsevier.com/locate/yrtph

# Reduction of the biological potential of chrysotile asbestos arising from conditions of service on brake pads

Arthur M. Langer*

*Ph.D. Program in Earth and Environmental Sciences, The Graduate School and University Center, 365 Fifth Avenue, New York, NY 10016, USA*

Received 1 November 2002

### Abstract

Data exist that show that chrysotile asbestos does not retain its mineral properties, or biological activity, at temperatures far below the olivine transformation point. Temperatures hundreds of degrees below this point cause the mineral to lose structural water with accompanying crystal structure degradation. The loss of structure is accompanied by modification of its surface and reduction or loss of biological activity. Using heating studies and milling as an approximation of thermal and mechanical shear stress that chrysotile is subjected to on a brake lining, biological blunting is shown to begin much earlier than the olivine transformation process. Minimal degradation of the chrysotile surface structure imparts a disproportionately great effect on its biological activity. Biological and epidemiological data for brake workers exposed to chrysotile asbestos should be viewed in context with the conditions of service to which the product was subjected over a lower range of temperatures than previously considered important.
© 2003 Elsevier Science (USA). All rights reserved.

*Keywords:* Chrysotile asbestos; Brake pad; Service conditions; Structural degradation; Surface modification

## 1. Asbestos dust in a brake mechanics environment

There have been many studies undertaken here in the United States, as well as overseas, concerning the release of asbestos dust into the air of garages where brake maintenance and repair is undertaken (read review in Nicholson et al., 1982). For example, a longitudinal study over 5 years (1972–1976) conducted by the National Institute for Occupational Safety and Health, cited in Nicholson et al. (1982), found a time-weighted mean of 0.18 f/ml of air for automobile brake repair work, with a range of 0.01–1.34 f/ml of air. The high value outlier was obtained in a garage in which dust control devices were absent.

Garages in which dust controls were present have consistently yielded values between 0.02 and 0.30 f/ml of air (Marsh, 1979; Raybestos Manhattan unpublished data, communicated to and reported in Nicholson et al., 1982). Municipal garages in New York City in the mid-1970s, with available control devices in place at that time,

yielded a mean value of 0.22 f/ml of air for activities that included changing brake pads, brushing off wear debris, blowing off of wear debris, and sweeping up debris at the end on the work day (Nicholson et al., 1982).

Hickish and Knight (1970) found very low values for automobiles in Great Britain, but measured higher values for truck brake work. Outliers of up to 1.48 f/ml of air for an 8-hour time-weighted average were measured in some garages. Brake replacement, beveling, and cleaning truck brakes here in the United States also produced high excursion values, but much lower time-weighted averages than reported by Hickish and Knight. An average short-term excursion of about 37 f/ml of air, measured for a time period of several minutes, was obtained during the beveling of Department of Sanitation truck brakes yielding a time-weighted average of about 0.23–0.62 f/ml of air (Rohl et al., 1976). Rohl et al. used the NIOSH 7200 direct method for the analysis of personal air samples, but dust samples were prepared with the "rub-out" technique. This latter method of preparation tends to create diameter artifacts so that fiber number and width distribution measurements were not made.

* Corresponding author. Fax: 1-914-946-6524.
*E-mail address:* artlanger@aol.com.

0273-2300/03/$ - see front matter © 2003 Elsevier Science (USA). All rights reserved.
doi:10.1016/S0273-2300(03)00070-9

The highest levels of asbestos measured in the air of garages followed work grinding and refurbishing truck brakes. compressed-air blowouts of wear debris from brake housings in general, and dry, uncontrolled sweeping of wear debris from the floors of these facilities (Nicholson et al., 1982)

Release of fiber from brake pads used in other devices has been investigated as well. Simulation studies on large presses, reported by Eimermacher (1980), revealed an average fiber release of 0.022 f/ml of air as an 8-h time-weighted average

## 2. Brake mechanics and the asbestos diseases

Nicholson et al. (1982) examined 421 workers, members of several unions in New York City, who engaged primarily in brake service and replacement activities. The experience of this group was compared to other categories of workers who were also employed in the garage setting, e.g., auto body workers, under coaters, and welders. Among the brake repair workers. parenchymal markings (profusion ranking according to the ILO/UC classification equal to or greater than 1/0) were found in 101 of the 421 men (~24%), with 34 cases showing pleural thickening as well. However, pulmonary function within this group was better than found among persons in the general population of the state of Michigan examined just prior to this time. Pulmonary decrements were observed only among older workers who were cigarette smokers, men with occupational histories reflecting exposure to asbestos dust in other settings, e.g., shipyard employment, and among the auto body workers in general. Auto body repair involved exposure to mineral dust during grinding of fillers and to welding fumes. It was this group of garage workers that also showed the greatest profusion of markings and pulmonary function loss among all the categories of workers studied. Study of brake workers with uncomplicated work histories failed to show the presence of "serious" abnormalities

Proportional mortality studies on groups of workers engaged in automotive or brake repair have shown that their cancer deaths (and for mesothelioma specifically) were equal to or less than values calculated for their respective control groups. Of significance, mesothelioma among these workers was either not found at all or equal to the number of cases anticipated for the population as a whole (e.g., McDonald and McDonald, 1980; Teschke et al., 1997; Teta et al., 1983; Woitowitz and Rodelsperger, 1994). In other mortality studies. lung cancer deaths were also low, and in instances where the anticipated number of cases *was* slightly greater than expected, the excesses were explained equally well by common confounders, e.g., cigarette smoking and diesel exhaust, rather than

asbestos (e.g., Gustavsson et al., 1990; Jarvhol and Brisman, 1985)

## 3. Biologically important properties of the asbestos minerals

Most experimentalists in the asbestos field today would acknowledge that length of fiber is an important determinant of biological activity. Fibers with lengths well below 5 μm are considered "inert" while those exhibiting lengths just below this value exhibit markedly less activity than their counterparts of greater length when tested in the same system. Simply put, the physical status of the fiber and the state of aggregation of its dust are important variables in judging the degree of hazard associated with an asbestos exposure. Fiber length has been used as a handy "index" of activity An overview of the fiber length issue is provided in Langer et al (1978).

In that paper, Langer and colleagues focused on the importance of surface properties by providing data confirming that length reduction methods employed by experimentalists in the past inadvertently imposed both surface and structural modifications on the fiber. They noted that both length reduction and surface and structure modification co-varied so that early interpretations of biological outcome based on one parameter change (length) could be as well explained by other changes that were not obvious to, nor measured by, the investigators. A discussion of surface properties and activity, with a review of major papers in the literature. was provided in Langer and Nolan (1994a,b) The hypothesis advanced in those papers was that the surface chemistry and properties of mineral fiber (and minerals in general) were the *primary* determinants of biological activity. Further, any modification of these properties by any means, would result in corresponding changes in activity

## 4. Surface properties drive the activity of mineral fiber

Macnab and Harington (1967) demonstrated that asbestos fibers behave as other fibrogenic minerals do that is, they are membrane active. They later demonstrated that the membrane activity of chrysotile asbestos might be blunted if the chemical functionalities that existed on the surface of the mineral were "blocked" with serum proteins, phosphate groups from buffered saline, and other negatively charged compounds (Harington et al. 1971). To support the magnesium functionality theory, they removal magnesium from the *surface* of the fiber with the chelator EDTA (ethylenediamine tetraacetic acid), retested it in the same in vitro system, and rendered chrysotile inactive. Later experi-

*A M Langer f Regulatory Toxicology and Pharmacology 38 (2003) 71-77*     73

mental use of acid-treated chrysotile, leached of magnesium, showed that mesothelioma could not be induced in laboratory animals (Morgan et al., 1977) In all experimental studies the ionized magnesium functionality at the surface of the fiber was considered to be the site of biological interaction.

Schnitzer blunted chrysotile activity by means of modification of the fiber's surface chemistry (e.g., Schnitzer, 1974). Schnitzer found that negatively charged polyanions, covalently bound to the mineral, inactivated the fiber surface. Magnesium again was the binding site. Polyanionic compounds worked best as antagonists, either markedly inhibiting or completely blocking membrane activity.

## 5. Heating and milling of chrysotile

Depending on the nature and magnitude of the manipulation, heating and milling of chrysotile induces profound change in the mineral. Heating of the fiber in the temperature range well below its complete breakdown temperature induces subtle thermal decomposition that creates a chemically, structurally and surface altered mineral (Hodgson, 1979).

Heat dehydroxylates chrysotile in a diffusion-controlled manner that begins at temperatures as low as 150°C (see review of studies in Hodgson, 1979). Some 2.5% of the structural water is lost in the temperature range 150–500°C. Complete water-loss occurs at $650 \pm 20$°C, noted by a characteristic strong endothermic peak on differential thermal analysis (Martinez, 1966) This marks the complete breakdown of the mineral structure and creation of an amorphous mixture of silica and magnesia, which mineralogists have dubbed "serpentine anhydride."

The mechanism by which water is driven from chrysotile is thought to be donor-acceptor in character The donor regions of the mineral supply cations and oxygen to the acceptor regions where they react with protons to form water. The donor regions thereby lose material to form "pores" in the surface structure Monkman (1967) initially described the breakdown of

the chrysotile "lattice" at about 525°C, a temperature almost 300° below the major olivine transformation point. Incipient olivine formation has been recognized forming at temperatures hundreds of degrees below 810°C (Naumann and Dresher, 1966)

Milling of chrysotile reduces fiber length and causes structural and surface changes as well. However, milling involves superimposed thermal events so that some effects cannot be process separated. Milling superimposes physical changes as well as chemical ones and similar alteration of the mineral's properties can be followed (Langer et al., 1978)

## 6. Conditions generated during brake pad service

Brake pads used in automobiles and trucks are made of a complex of inorganic property modifiers held in a phenolic resin thermo set matrix that is chrysotile fiber reinforced (Rohl et al., 1976). Vehicle motion is slowed ("decelerated") by conversion of forward motion (kinetic energy) into friction and heat (Anderson, 1969; Carroll, 1962). During the process the components of the pads are subjected to extreme thermal and shear stress (Anderson, 1967). The "rubbing interface" on the pad during "normal" service attains temperatures of up to 650°C, but "hot spots" generate temperatures well above this, some reaching as high as 1000°C (Anderson, 1987). The former temperature is sufficient to completely dehydroxylate chrysotile and the latter is well above the olivine transformation temperature, which occurs at about 810–820°C

The heating of chrysotile asbestos at the brake surface at temperatures sufficient to drive off structural water (differential thermal analysis indicates a gradual loss of structural water in the 150–500°C range) is accompanied by about 30% loss of the fiber's structure, indexed as loss of X-ray counts for reflections of principal structural planes (Table 1) Virtually 70% of the chrysotile structure is lost by 575°C. Total loss of structure occurs at about 650°C the temperature at which water has been completely removed and chrysotile the mineral no longer exists The end product is an

Table 1
Thermal stress of chrysotile and loss of mineral structure

| Temperature of heating | | X-ray intensity in CPS | | Observation |
|---|---|---|---|---|
| Fahrenheit (F) | Centigrade (°C) | (002) | (004) | |
| 750 | ~400 | 1100 | 700 | No structural change |
| 930 | ~500 | 800 | 500 | 30% of structure lost |
| 1070 | ~575 | 300 | 300 | 70% of structure lost |
| 1200 | ~650 | ~0 | ~0 | 100% of structure lost |
| 1300 | ~410 | 0 | 0 | 100% of structure lost |

These data are from Butler (1980).
The degradation of the chrysotile structure was followed by loss of X-ray counts under two major reflection peaks the 7.3 Å d-spacing (002) and the 3.65 Å d-spacing (004). CPS, counts per second At 650°C chrysotile loses all its structural water and forms serpentine anhydride

amorphous mixture of magnesia and silica (read in Hodgson 1979).

The heating of chrysotile was also studied by the asbestos industry They, however, followed application properties rather biological change. The industry reported degradation of fiber strength with increasing temperature. Even heating of chrysotile fiber for a time as short as 3 min at 650 °C resulted in 68% loss of the fiber's strength (Sinclair, 1952) Fiber strength and structural integrity co-vary

## 7. Mechanical forces exerted on chrysotile during braking

The brake contact interface subjects the pad to mechanical shear stress The stress may be severe, especially at times involving "emergency" stops. Chrysotile fiber is greatly reduced in size by this action as evidenced by the measurement of fiber lengths in brake drum dust (Rohl et al., 1976). These investigators studied recovered dusts by transmission electron microscopy and found that 56–99% of the fibers in these populations were less than 0.4 μm in length. Very few fibers in the wear debris examined were 5-μm or longer in length Selected area diffraction characterization of surviving "long" fiber bundles indicated that structural degradation of the mineral had taken place.

## 8. Studies that mimic the conditions on brake pads during service

Langer et al. 1978) studied the physical milling of chrysotile asbestos and accompanying modification of its properties The fiber source and character, techniques of study, preparation protocols, and analytical details were published in that report. These data are used here as an approximation of the effects on chrysotile caused by shear stress at the brake pad interface based on similar features that characterize both brake wear debris and milled fiber First, there occurs a marked reduction

of fiber length so that the resulting population is shorter than that which characterized the material originally used in the product Secondly, the shortened fibers exhibit both structural degradation and surface property change

The milling of chrysotile, and its effect on the size distribution of the mineral, was followed by electron microscopic examination. The particle population became so small that fiber measurement and characterization was beyond the resolving power of the light microscope. The sizing of the population necessitated that measurement be undertaken on photomicrographs obtained by transmission electron microscopy at 10,000× magnification Some 5169 such measurements were made.

The milling of chrysotile asbestos for a length of time between 1 and 5 min (60–300 s) reduced the total measured fiber and fibril population to less than 5 μm in length (Table 2). The limit of detection of less than 5 μm objects, based on the number of objects below this size (n = 3954) is ~0 025%, less than three parts in 10,000 Fibrils (single unit strands of chrysotile about 0 3 μm in diameter) were reduced to less than 5 μm lengths in a time period shorter than 1 min (Table 2). Mechanical manipulation of chrysotile opens fiber bundles and reduces fiber length

## 9. Accompanying reduction of crystallinity

The milling of chrysotile for a period of less than 1 min produced a loss in the mineral's crystallinity (Langer et al., 1978) This was first noted as the increased rapidity of fibers and fibrils to undergo electron beam damage (described in Langer et al., 1974). Table 3 illustrates two properties measured on the bulk powder. the reduction of X-ray counts under the strongest reflection of chrysotile (d-spacing ~7 3 Å), and a corresponding change in its infrared (IR) spectrum Between five- and ten-minutes there was a marked loss of crystallinity followed as a loss of X-ray counts under the

**Table 2**
Change of fiber and fibril length with milling time

| Sample | Fibers | | | | Fibrils | | | |
|---|---|---|---|---|---|---|---|---|
| | Fiber length (μm) | | | | Fibril length (μm) | | | |
| | N | <1 | 1.0–4.9 | >5.0 | N | <1 | 1.0–4.9 | >5 0 |
| As received | 214 | 140 (64 4) | 64 (29 9) | 10 (4.7) | 800 | 692 (86 6) | 96 (12 5) | 10 (1 2) |
| 60-s | 191 | 108 (56 5) | 80 (41 7) | 3 (1 8) | 779 | 746 (95 7) | 33 (4 3) | 0 (0 0) |
| 300-s | 251 | 217 (86 5) | 34 (13.5) | 0 (0 0) | 962 | 952 (99.0) | 10 (1 0) | 0 (0 0) |
| 1200-s | 162 | 160 (99 0) | 2 (1.0) | 0 (0 0) | 839 | 837 (99 7) | 2 (0 3) | 0 (0 0) |
| 3600-s | 123 | 123 (100.0) | 0 (0.0) | 0 (0.0) | 858 | 857 (99.9) | 1 (0.1) | 0 (0.0) |

These data are from Langer et al. (1978)
The progressive milling of chrysotile produces a less than 5-μm length population of fibers and fibrils in less than 5 min Fibrils are length reduced more rapidly than fibers Total particle population measured was 5169 fibers and fibrils

Table 3
Degradation of chrysotile structure with milling time

| Sample | XRD (7.36 Å) X-ray counts | IR spectrum of Si-O-Mg at 1020 cm⁻¹ |
|---|---|---|
| As received | 1450 | Standard chrysotile spectrum |
| 60-s | 1360 | Standard chrysotile spectrum |
| 300-s | 7461 | Slight broadening at 1020 cm⁻¹ |
| 1200-s | 4977 | Marked broadening at 1020 cm⁻¹ |
| 3600-s | 3541 | Marked broadening at 1020 cm⁻¹ |

These data are from Langer et al. (1978)

Chrysotile's 7.36 Å d-spacing corresponds to its (002) plane, its strongest reflection.

The broadening of the 1020 cm⁻¹ reflection reflects an increase in the Si–O·Mg bond length and a corresponding decrease in bond strength.

The milling process imparted a 56% loss of structure in 3600-s: a structural degradation corresponding to loss measured when chrysotile is heated to 575 °C for 24 h.

7.3 Å reflection and an ever-increasing bond length and change in co-ordination between the silica and brucite layers of the mineral (indicated by both shift and broadening of specific vibration bands in the IR spectrum).

Distortion of chrysotile's crystal lattice was also studied by means of electron spin resonance (Langer et al., 1978). Loss of hyperfine resonance was observed with progressive milling with accompanying resonance spectral broadening and reduced intensity. The authors reported the same effect when the mineral was heated to temperatures slightly below 450 °C. Heating to temperatures in the 600–800 °C range produced a marked shift in the position of the resonance peak with an accompanying loss of peak intensity. These changes have been interpreted as dehydroxylation of chrysotile's brucite layer in the former instance and the recoordination of the anhydrous magnesium silicate to olivine (forsterite).

## 10. Alteration of chrysotile surface properties

Both milling and thermal events altered chrysotile's ability to physisorb or interact with organic compounds (Langer et al., 1978). The authors noted that the ability of chrysotile to reduce the stable free radical diphenylpicrylhydrazyl to the hydrazine state was markedly reduced when the mineral was milled. Further, its ability to bind polar molecules was also greatly reduced.

## 11. Change in membranolytic behavior

Langer and Nolan (1994a,b) also studied the biological behavior of manipulated chrysotile. Table 4 shows the fiber's hemolytic behavior and its antagonist binding behavior. In the time period between 1 and 5 min the ability of the chrysotile to rupture red cell

Table 4
Alteration of membrane activity and surface binding character with milling time

| Sample | Hemolysis percent (1 mg/ml) | Amount of chrysotile to produce 50% H (mg) | Antagonist CMC 4 µg/ml %H |
|---|---|---|---|
| As received | 100.0 | 0.4 | 21 |
| 60-s | 93.6 | 0.4 | 38 |
| 300-s | 65.0 | 1.0 | 29 |
| 600-s | 29.8 | 2.6 | 19 |
| 1200-s | 15.0 | 4.4 | 11 |
| 3600-s | — | 7.5 | 6 |

These data are from Langer et al. (1978)

The antagonist compound used was carboxymethylcellulose. CMC

membranes was reduced by one-third. It was found that this activity loss was associated with ~12% loss of the mineral structure (Table 3). The structural disruption appeared to begin on the mineral surface. Milling beyond this time reduced chrysotile membrane activity to even greater degree.

Alteration of the surface character was demonstrated by the change in the ability of the mineral to bind compounds that antagonize hemolysis. Although milling increased the surface area of chrysotile dust, it altered the brucite layer's proton distribution thereby disrupting its electron flow properties and reducing its membrane activity (Langer et al., 1978).

## 12. Discussion

For the most part, studied groups of workers that have been chrysotile-exposed in brake repair environments show no statistically significant excess asbestos-associated cancer mortality. The small excesses of lung cancers that have been observed are explained equally well by the presence of confounding agents. Brake installers and maintenance workers appear to exhibit no increased risk of mesothelioma.

These findings have previously been explained by low cumulative exposure to asbestos dust, short fiber length, fiber type, conversion of chrysotile to olivine in the high temperatures generated during brake service, and the presence of confounders. Generally omitted from consideration in these studies is the accompanying partial modification of the fiber's properties that blunts activity without ever requiring conversion to olivine. The presence of "short fiber" might actually be an index of altered fiber.

Many investigators consider only the olivine transformation temperature as the point at which chrysotile is converted to a biologically inactive substance. However, mechanical and thermal events cause effects hundreds of degrees below this temperature. Profound changes in the mineral's crystal structure, with

*A. M. Langer / Regulatory Toxicology and Pharmacology 38 (2003) 71–97*

accompanying changes in its surface character, begin to occur at temperatures as low as 150 °C. Seventy percent of the mineral's structure is lost by 575 °C. At temperatures of about 650 °C the chrysotile completely dehydroxylates to form "serpentine anhydride," a material void of structure and absent of chrysotile properties.

## 13. Conclusions

Studies have shown that thermal treatment and mechanical manipulation of chrysotile alters both its surface and structure. Service conditions created on brake pads both heats and tears down the fiber. Chrysotile subjected to these severe conditions cannot, and does not, retain its natural properties. Chrysotile biological activity is thereby greatly reduced, and can become virtually nil hundreds of degrees below the olivine transformation temperature. Complete transformation of the mineral is not required to result in loss of activity. Exposure to fiber in these work environments might occur as the result of product manipulation during brake installation. Beveling and arcing of pads to fit vehicles, cleaning and refurbishing of brake surfaces (especially large truck brakes, see Rohl et al., 1976) produce dust that has not been subjected to the same conditions as pad service. These practices require the attention of the dust control engineer and industrial hygienist. Modern dealerships supply brake pads that are manufactured as model-specific replacements. Design change has aided in the improvement of workplace safety.

There are several other issues to consider. The NIOSH-OSHA environmental assay instrument for mineral fiber (phase contrast optical microscopy) generally cannot distinguish between altered and unaltered fiber. Such assays in the past "overstated" exposure and attendant hazard. The assay tool could distinguish form only. Workers in such environments were afforded that much more protection per fiber count. Further, structurally damaged chrysotile is more sensitive to chemical degradation, and based on size and damage measurement, the fibers likely lack biopersistence and might breakdown more readily in the lung.

## Acknowledgments

The following acknowledgment of support was given in the two major papers from which data were taken. Langer et al. acknowledged support under a Center

Grant from the National Institute of Environmental Health Sciences, ES 00978. Rohl et al. were supported by a grant from the Health Research Council of New York City HRC U 2329. Rohl et al. also acknowledged financial assistance from the Ford Motor Company.

## References

Anderson, A.E., 1969. Wear in brake materials. Proceedings of the American Society of Metals Wear Conference.

Anderson, A.E., 1987. Brake system performance. Effects of fiber types and concentrations. Proceedings of the Fibers in Friction Materials Symposium. The Asbestos Institute. Montreal. Canada. pp. 3–49.

Butler, M.A., 1980. The Physical and Chemical Characteristics of Serpentine Rocks and Minerals. Ph.D. Thesis submitted to the Department of Mineral Exploitation. University College Cardiff. Wales, 348 pp.

Carroll, W.G., 1962. The manufacture of brake linings. Br. Plastics 8, 414–417.

Einenmacher, J.P., 1980. Clutch and Brake Lining Investigation. Test Report Document No. 4344. Cincinnati Incorporated. September 19, 1980. 7p and attachments. unpublished study.

Gustavsson, P., Plato, N., Lidstrom, E.B., Hogstedt, C., 1990. Lung cancer and exposure to diesel exhaust among bus garage workers. Scand. J. Work Environ. Health 16, 348–354.

Harington, J.S., Miller, K., Macnab, G., 1971. Hemolysis by asbestos. Environ. Res. 4, 95–104.

Hickish, D.E., Knight, K.L., 1970. Exposure to asbestos during brake maintenance. Ann. Occup. Hyg. 13, 17–21.

Hodgson, A.A., 1979. Chemistry and physics of asbestos. In: Michaels, L., Chissick, S.S. (Eds.), Asbestos. Wiley. New York. pp. 67–114.

Jarvholt, B., Brisman, J., 1985. Asbestos associated tumors in car mechanics. Br. J. Ind. Med. 45, 645–646.

Langer, A.M., Nolan, R.P., 1994a. Factors controlling the biological potential of inorganic dusts: surface chemistry and character. In: Mohr, U. et al. (Eds.), Toxic and Carcinogenic Effects of Solid Particles in the Respiratory Tract. ILSI Monographs. ILSI Press. Washington, DC. pp. 147–157.

Langer, A.M., Nolan, R.P., 1994b. Chrysotile: its occurrence and properties as variables controlling biological effects. Ann. Occup. Hyg. 38, 427–451.

Langer, A.M., Mackler, A.D., Pooley, F.D., 1974. Electron microscopical investigation of asbestos fibers. Environ. Health Perspect. 9, 63–80.

Langer, A.M., Wolff, M.S., Rohl, A.N., Selikoff, I.J., 1978. Variation of properties of chrysotile asbestos subjected to milling. J. Toxicol. Environ. Health 4, 173–188.

Macnab, G., Harington, J.S., 1967. Hemolytic activity of asbestos and other mineral dusts. Nature (London) 214, 522.

Marsh, J., 1979. Unpublished data from Raybestos Manhattan communicated to William Nicholson. Cited in Nicholson et al. 1982.

Martinez, E., 1966. Chrysotile asbestos: relationship of the surface and thermal properties to the crystal structure. Can. Mining Metallur. Bull. 69, 416–420.

McDonald, A.D., McDonald, J.C., 1980. Malignant mesothelioma in North America. Cancer 46, 1650–1656.

Monkman, L., 1967. Thermal decomposition of chrysotile asbestos. In: Proceedings of the First International Conference on the Asbestos Minerals. Published Abstract. Oxford University. May 1967.

Morgan, A., Davies, J.C., Wagner, J.C., Berry, G., Holmes, A., 1977. The biological effects of magnesium-leached chrysotile asbestos. Br. J. Exp. Pathol. 58, 465–473.

Naumann. A W . Dresher. W H . 1966  The influence of sample texture on chrysotile dehydration. Am Mineral 51, 1200–1211

Nicholson. W J . Daum. S M , Lorimer. W V . Velez. H . Lilis. R., et al . 1982 Investigation of the health hazards in brake lining repair and maintenance workers occupationally exposed to asbestos. Report to the National Institute for Occupational Safety and Health NIOSH Contract 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  Unpublished Report. 99 pp  and appendix.

Rohl, A N . Langer, A M  Wolff. M B . Weisman, I , 1976 Asbestos exposure during brake lining maintenance and repair Environ Res  12, 110–128

Scheiner, R J . 1974  Modification of the biological surface activity of particles. Environ  Health Perspect. 9, 261–266

Sinclair, W E . 1952. Asbestos: Its Origin, Production and Utilization Mining Pub., Salisbury House, London

Teschke, K , Morgan, M S . Checkoway  H , Franklin, G . Spinelli J J , van Belle, G., Weiss. N S . 1997  Mesothelioma surveillance to locate sources of exposure to asbestos. Can  J  Public Health 88 163–168

Teta, M L . Lewinsohn, H C . Meigs. J . Vidone. R A . Mowad  L Z . Flannery, J T . 1983  Mesothelioma in Connecticut, 1955–1977 Occupational and geographic associations J  Occup  Med 25, 749–756

Woitowitz. H J . Rodelsperger. K . 1994  Mesothelioma among car mechanics  Ann  Occup. Hyg. 38  635–638

# EXHIBIT I

EFiled: Aug 30 2005 6:07PM EDT
Transaction ID 6598095

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

In Re: Asbestos Litigation      )
                         )     C.A. No. 77C-ASB-2

Master Asbestos          )

### MASTER EXPERT WITNESS LIST

Come now Plaintiffs, by and through their attorneys, Bifferato, Gentilotti & Biden, and pursuant to Superior Court Rule 26(4)(A)(i) file their Master Expert Witness List June 10, 2005.     Plaintiffs disclose the following witnesses, offer a statement of the substance of the facts and opinions to which the experts are expected to testify, and summaries for the grounds for their opinions. Based on their education, experience and background, any and all of these listed experts may be called to testify regarding plaintiff and/or product specific causation, including, but not necessarily limited to responding to hypotheticals based upon facts specific to any given case. The experts may be called to testify live or by deposition. The experts and their opinions are listed as follows:

1.    **Dr. Carlos Bedrossian, M.D., Hutzel Hospital, Dept. of Pathology, Cytopathology Section, 4707 St. Antoine Blvd., Detroit, MI 48201, (313) 745-0795.**

        i.    Dr. Bedrossian is a pathologist and is expected to testify and opine with a reasonable degree of medical certainty regarding asbestos related issues, including but not limited to the following:

             Dr. Bedrossian is expected to testify as to his pathological findings, the pathological effects of asbestos on the lungs and body and the various disease process it may cause, regarding a plaintiff / decedent's medical condition(s), the cause(s) and consequences thereof, including but not limited to diagnosis, disability, prognosis, causation, pain and suffering, loss of a normal life, emotional distress experienced, and reasonable

1

19.   **Richard Hatfield, Materials Analytical Services, 3945 Lakefield Court, Suwanee, GA 30024.**

i.   Mr. Richard Hatfield is a Senior Consultant for MAS, Inc. and is expected to testify and opine with a reasonable degree of professional certainty regarding asbestos related issues, including but not limited to the following:

Mr. Hatfield is expected to testify regarding the evaluation of and methods of analyzing/evaluating asbestos materials in various products and regarding the evaluation and analysis of asbestos in the air in a bystander situation / application, materials testing techniques, air sampling techniques, fiber counting techniques, the potential for and the techniques of measuring the ability of fibers to release, and fiber release simulations and experiments. Mr. Hatfield is expected to testify and opine as to the identity of certain products. Mr. Hatfield is expected to testify on the analysis and results of asbestos fibers in settled dust. Mr. Hatfield is further expected to testify regarding federal and state policies, regulations and guidelines pertaining to asbestos in materials / products / buildings and the use of air sampling in determining exposure. Mr. Hatfield may testify and offer opinions concerning whether specific asbestos-containing products have a potential to release respirable asbestos fibers. He may also show fiber release video.

ii.   Mr. Hatfield's conclusions and opinions may be found in various deposition and/or trial testimony of Mr. Hatfield in jurisdictions throughout the United States and various literature and/or publications authored and/or co-authored by Mr. Hatfield and identified in his C.V. attached hereto; also see report(s), if any, pertaining to a specific Plaintiff / Decedent and/or pertaining to a specific defendant sent to the Defense Coordinating Counsel in connection with Asbestos Litigation filed by Bifferato, Gentilotti & Biden. In addition, please see those reports identified in the attached chart identified as "Reports of MAS, Inc. / Richard Hatfield and Dr. William Longo" attached hereto.

The basis for Mr. Hatfield's conclusions and opinions includes, but is not limited to, Mr. Hatfield's education, experience, extensive research, review of corporate records, historical documents, association literature, general literature, general medical literature, corporate and industrial historical literature, asbestos regulations, answers to interrogatories, and review of deposition and/or trial testimony and/or sources specified in each report.

iii.   Please see attached Curriculum Vitae of Mr. Hatfield; and

22

iv.   Please see the attached chart identified as "Reports of MAS, Inc. /
      Richard Hatfield and Dr. William Longo" attached hereto. A copy of any
      said report(s) identified therein will be made available to counsel for
      Defendant upon written request. In addition, please see any deposition
      and/or trial testimony of Mr. Hatfield, literature and/or publications
      authored and/or co-authored by Mr. Hatfield and identified in his C.V.
      attached hereto.      In addition, please see any report(s) pertaining to a
      specific Plaintiff / Decedent sent to the Defense Coordinating Counsel
      (along with an electronically filed notice to all other parties) in accordance
      with the Superior Court of Delaware Standing Order No. 1.

20.   **Dr. Edwin Holstein, M.D., Environmental Health Associates, 135 Raritan
      Center Parkway, Edison, NJ 08837, (201) 225-1370.**

      i.    Dr. Edwin Holstein has specialized in occupational and environmental
            health since 1976 and is expected to testify and opine with a reasonable
            degree of medical and professional certainty regarding asbestos related
            issues, including but not limited to the following:

            Dr. Edwin Holstein will testify and opine persons exposed to asbestos will
            develop asbestosis and have a significantly greater risk of contracting lung
            cancer and/or mesothelioma. Dr. Holstein is expected to testify a person
            who is exposed to asbestos and smokes cigarettes has a 50 plus times
            greater risk of developing lung cancer than the non-smoking person not
            exposed to asbestos. Further, Dr. Holstein is expected to testify in his
            opinion a person exposed to asbestos has a five times greater chance of
            developing lung cancer than a non-exposed person. This opinion is
            independent of any contribution that smoking may play.

            Dr. Holstein is expected to testify on the physiology of the lungs and their
            reaction of asbestos exposure, detailing the development of pulmonary
            fibrosis, pleural thickening and calcification in a person exposed to
            asbestos. He will opine asbestos causes scarring which is progressive in
            nature. He is expected to testify as to the clinical and physical
            manifestations in a person with asbestosis. Further, he is expected to
            testify in detail regarding the increased risk of gastrointestinal cancer
            among persons exposed to asbestos. Dr. Holstein may also testify
            concerning the biological and toxicological effects of asbestos as
            evidenced by himself and others, as to biological responses to brief
            exposures to asbestos, effects produced by various fiber types,
            concerning mechanisms of asbestos-induced diseases including fibrosis,
            carcinogenesis and concerning asbestos deposits and migration in and
            through the lungs.

23

EFiled: Jan 4 2007 3:41P EST
Transaction ID 13347710

# EXHIBIT J

7/8/2003 Hatfield, Richard L. (Bradley)

```
1        IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
              IN AND FOR NEW CASTLE COUNTY
2

3

4    ERNEST BRADLEY and PATSY           )
     BRADLEY, his wife,                 )
5                                       )   C.A. No. 00C-05-31-ASB
     EDWARD HARRY WAISHES and           )
6    BONNIE WAISHES, his wife,          C.A. No.02C-06-130-ASB
7                  Plaintiffs,          )
                                        )
8         vs.                           )
                                        )
9    FORD MOTOR COMPANY,                )
     et al.,                            )
10                                      )
                  Defendants.           )
11

12

13

14                  DEPOSITION OF

15               RICHARD L. HATFIELD

16

                    July 8, 2003

17

                     9:10 a.m.

18

19              1740 Peachtree Street

20                Atlanta, Georgia

21

           Frances Buono, RPR, CCR-B-791

22
```

1

7/8/2003 Hatfield, Richard L. (Bradley)

1      by MAS?

2           A.     Sure.   From roughly 1987 to roughly 1995

3      or '96 Materials Analytical Services, MAS, was a

4      partially owned subsidiary of Law Engineering, and I

5      was an employee of Law Engineering and worked very

6      closely with the laboratory.

7                  Then in the mid '90s Dr. Longo, as the

8      president, bought out the interest of Law

9      Engineering.   In a similar time period, not exactly

10     the same, but in a similar time period I moved from

11     Law Engineering over to MAS.

12          Q.     Who owned Law Engineering?

13          A.     Employees.

14          Q.     And who was this CEO of Law Engineering?

15                 MR. CRUMPLAR:   I am just going to

16          note an objection.   I am going to allow

17          this, but I think this covers stuff that

18          has been covered in prior depositions and

19          we would allow you to incorporate all his

20          background in prior depositions.

21                 MS. CAFFREY:   Okay.   I have not seen

22          any of the background for his involvement

23          with MAS and the move over from Law

24          Engineering, and I don't have his CV in

25          front of me because it is being copied so,

13

7/8/2003  Hatfield, Richard L. (Bradley)

1      if you will give me a little latitude.

2          MR. CRUMPLAR:  I am just making the

3      objection, I am not instructing him not to

4      answer.

5          THE WITNESS:  R.K. Siegal.

6      Q.    (By Ms. Caffrey)  Who is R.K. Siegal?

7      A.    He was CEO of Law Engineering.

8      Q.    Do you know what his background was?

9      A.    Engineer.

10     Q.    What was Law Engineering's business?

11     A.    It is a company that specializes in

12     construction, testing and evaluation in environmental

13     issues.

14     Q.    What did you do for Law Engineering?

15     A.    Well, maybe it is easier just to trace my

16     history with Law and probably cover everything

17     quickly that way.

18          In roughly 1979 I joined Law Engineering,

19     and one of my first major projects was to work with

20     the U.S. EPA in the Asbestos in Schools Program in

21     1979.  That project was about a nine-month project.

22          After completing that project, I initiated

23     the laboratory testing for asbestos in bulk

24     materials.  I also began working with the sampling,

25     collection and sampling of air for asbestos around

14

7/8/2003 Hatfield, Richard L. (Bradley)

1    asbestos disturbances, abatement projects, et cetera.

2           Then in 1982 I was asked to join and form

3    an office for McCrone, which was called McCrone

4    Environmental Services here in Atlanta, and I ran

5    that organization from 1982 to 1987.

6           In 1987 I moved back to Law Engineering as

7    a senior consultant.  Did consulting on large

8    projects, also worked on projects that were related

9    to litigation.  Best known as property damage cases.

10          And then I had also been doing that when I

11    was at McCrone.

12    Q.    When you say doing that, you mean the

13    property damage litigation?

14    A.    The property cases, yes.  And in 1996 I

15    moved over to MAS where I am a senior consultant

16    there, and deal with primarily asbestos-related

17    issues, sometimes in litigation, sometimes not.

18    Q.    Okay.  Back in 1979 when you joined Law

19    Engineering, what educational background did you

20    have?

21    A.    I have two degrees, both of them are

22    Bachelor of Science degrees from North Carolina State

23    University, one is in experimental statistics and the

24    other is in geology.

25    Q.    Do you have any postgraduate or post

15

7/8/2003 Hatfield, Richard L. (Bradley)

1    college training in any area?

2        A.    Not by enrollment.  Certainly there were

3    some courses that were graduate level courses, but I

4    didn't go to graduate school.

5        Q.    What graduate level courses did you take?

6        A.    I don't know, I would have to look back

7    and see what was in that level.  I know there were

8    some statistics courses that were graduate level.

9    Certainly could have been some geology courses, too,

10   I don't recall.

11       Q.    Did you audit those courses or did you

12   matriculate into a program?

13       A.    No.  I would have just taken those courses

14   as part of my program or taken them as electives

15   or --

16            MR. CRUMPLAR:  While he was an

17       undergraduate.

18            THE WITNESS:  Right.  Right.

19       Q.    (By Ms. Caffrey)  After graduating from

20   college, did you have any more formal educational

21   training?

22       A.    After I graduated in '79, or really it was

23   right in December of '78, I didn't take any

24   additional college courses.

25       Q.    When did you get your BS in experimental

16

7/8/2003  Hatfield, Richard L. (Bradley)

1     statistic?

2          A.    That was in '74.

3          Q.    And the geology was December of '78?

4          A.    Correct.

5          Q.    All right.  Have you taken any courses in

6     industrial hygiene?

7          A.    Yes.

8          Q.    What courses have you taken in industrial

9     hygiene?

10         A.    Well, courses primarily related to

11    asbestos.  I took the McCrone course for

12    identification of asbestos in bulk materials and

13    their advanced course for that.

14              I took the, what is now known as NIOSH 582

15    course.  Took that.  That is to instruct people how

16    to collect and evaluate air samples using phase

17    contrast microscopy.

18              In addition to taking that course, I

19    taught that course a couple of times for the

20    University of Alabama.

21              I took an industrial hygiene course

22    related to some chemistry.  One of the continuing

23    education courses.

24              Let me see what else would fall in that

25    category.  Certainly some of the courses that are

17

7/8/2003 Hatfield, Richard L. (Bradley)

1    required under the AHERA regulations that you are

2    dealing with asbestos in schools, would include

3    industrial hygiene training, such as the supervisor's

4    course, or supervising asbestos abatement projects.

5              That is pretty much what I can think of.

6        Q.    Prior to your graduation in December of

7    1978, did you have any experience or training in the

8    collection and evaluation of air samples for asbestos

9    content?

10       A.    No.

11       Q.    Prior to your graduation in December of

12   1978, did you have any education or training in the

13   analysis of bulk materials for asbestos?

14       A.    I would have to say yes to that.  In

15   geology one of the things you learn to do is identify

16   minerals using the polarized light microscope and of

17   course that is what is done with asbestos.  While we

18   didn't concentrate particularly on asbestos minerals,

19   we were looking at all minerals.  It would have been

20   basically that kind of training.  Same kind of

21   training.

22       Q.    Do you recall specifically doing any work

23   in your undergraduate course work where you were

24   actually identifying asbestos versus another mineral?

25       A.    If I recall, and it has been quite a

18

1    while, one of the minerals that I did do

2    identification work on was tremolite, and while

3    tremolite can be in both asbestiform and

4    nonasbestiform minerals, it is, nevertheless, the

5    same mineral.

6        Q.    Do you recall whether you were identifying

7    asbestiform or nonasbestiform tremolite during your

8    college career?

9        A.    Don't recall.

10       Q.    Do you know if you were able to

11   distinguish between the two at the time you were in

12   college?

13       A.    Sure.  I would have known the morphology.

14       Q.    What is the difference in morphology

15   between asbestiform or nonasbestiform tremolite?

16       A.    Being fibrous versus nonfibrous.

17       Q.    The asbestiform is fibrous and the

18   nonasbestiform is nonfibrous?

19       A.    Correct.

20       Q.    Is there a chemical difference between the

21   two?

22       A.    No.

23       Q.    Other than using polarized light

24   microscopes in your geology course work to identify

25   different minerals, did you have any other training

19

7/8/2003  Hatfield, Richard L. (Bradley)

1    during your college career in the identification of

2    asbestos in bulk materials?

3              MR. CRUMPLAR:  You say in bulk

4         materials?  Okay.

5              THE WITNESS:  Not really.  I mean,

6         the only other thing we did, we did some

7         work with powered x-ray diffraction, which

8         is, again, just another way to identify

9         minerals.  It wasn't specifically -- we

10        didn't use it specifically for asbestos.

11        Q.    (By Ms. Caffrey)  Just minerals in

12   general?

13        A.    Correct.

14        Q.    All right.  After you graduated in

15   December of '78, at some point you took the McCrone

16   course in the identification of asbestos in bulk

17   materials?

18        A.    Correct.

19        Q.    Do you recall, was that the first course

20   that you took that involved the identification of

21   asbestos or the collection or a sampling of asbestos?

22        A.    Yes.  That was the first course that was

23   specifically for that.  I had training and

24   information that BFA had provided me on that subject

25   matter, but the course itself I took during 1979.

7/8/2003 Hatfield, Richard L. (Bradley)

1      Q.     The McCrone course you took in 1979?

2      A.     Correct.

3      Q.     And at that time you were with the Law

4   Engineering group?

5      A.     I was with Law Engineering and I was

6   working on the EPA's Asbestos in Schools Project.

7      Q.     Who taught the McCrone course?

8      A.     Dr. McCrone.

9      Q.     And how long did it last?

10     A.     A week, as I recall.

11     Q.     What did it consist of?

12     A.     Consisted of teaching people the

13  understanding of minerals and crystallography, the

14  understanding of a polarized light microscope, how

15  light interacts with minerals in various media or

16  emulsion oils as we use them, and what the crystal

17  properties are of various asbestos minerals and of

18  other minerals or materials which may be similar or

19  may be included in insulation type materials, in

20  hands-on practice and identification, among others.

21     Q.     Was this a course taught in a laboratory

22  setting?

23     A.     It wasn't in a laboratory, per se, but we

24  would set up a room so that we had a series of

25  microscopes on tables and so forth.

21

7/8/2003 Hatfield, Richard L. (Bradley)

1       Q.      And you took that course one time?

2       A.      Well, I arranged, when I was in New York

3    with EPA, I arranged to have that course taught and

4    contacted Dr. McCrone and invited him to come there

5    and teach the course, and so I helped him set up all

6    the microscopes and things like that, and then I took

7    the course while I was there.

8               Then in the later date, a year or so

9    later, I also took his advanced course, which was, I

10   don't know, two days, three-day course, something

11   like that.

12      Q.      And what did that consist of?

13      A.      Just somewhat more of the same.  More

14   work, I guess, with the crystalline structures,

15   minerals and identification of materials which also

16   may be in insulating materials which are nonasbestos

17   materials.

18      Q.      Okay.  When did you first take the NIOSH

19   582 course?

20      A.      I believe that was in 1981.  At that time

21   it was really referred to as P & CAM 239.  I took

22   that.  The University of Arizona sponsored that

23   course.

24      Q.      How long was that course?

25      A.      A week.

22

7/8/2003 Hatfield, Richard L. (Bradley)

1        Q.    Did you receive any sort of certification

2   following that course?

3        A.    You receive a certificate for completion.

4        Q.    Did you have to take any tests following

5   that course?

6        A.    As I recall there was some final test or

7   whatever.

8        Q.    And again, that was bulk sample analysis?

9        A.    No, that is collection, evaluation of air

10  samples.

11       Q.    Okay.  Was that the first time that you

12  had any training in the collection and evaluation of

13  air samples?

14       A.    From a formal class.  I certainly received

15  a sufficient amount of information from EPA to

16  understand what the collection and evaluation of

17  asbestos in air was all about and what various

18  microscopes could be used to count fibers and

19  identify fibers and et cetera.

20       Q.    What did you do for the EPA during the

21  nine months you were with them?

22       A.    Help disseminate information to various

23  people, school facilities and other individuals about

24  the concerns with asbestos, what asbestos was, what

25  types of materials typically contained asbestos, how

23

7/8/2003 Hatfield, Richard L. (Bradley)

1    to evaluate asbestos in place in buildings, how to

2    develop a control program or a corrective action

3    program for the presence of asbestos in buildings,

4    how to clean up, et cetera.  The hazards of asbestos.

5        Q.    While you were with the EPA, was that a

6    paid position?

7        A.    Yes.

8        Q.    When you were with the EPA, did you do any

9    air sampling?

10        A.    Did I do any air sampling?

11        Q.    Yes.

12        A.    No.

13        Q.    Did you do any bulk sample analysis?

14        A.    No.

15        Q.    You said you took some chemistry course

16    that was part of an industrial hygiene program?

17        A.    Correct.

18        Q.    What was that about?

19        A.    It was really had to do with calculations

20    on how to calculate the amount of material that,

21    let's say, would go into the air from a certain

22    chemical and calculate a concentration in a

23    particular head space of a container that had a

24    certain chemical in it.  That is basically what it

25    was about.

24

7/8/2003 Hatfield, Richard L. (Bradley)

1     Q.     And when did you take that, you can

2   estimate?

3     A.     I would say five years ago.

4     Q.     Okay.  Was asbestos part of that course?

5     A.     No.  No.

6     Q.     And where was that?

7     A.     I took it here in Atlanta.

8     Q.     You are not a certified industrial

9   hygienist?

10     A.     Not a certified industrial hygienist.

11     Q.     And then you said you took some courses

12   that were required under AHERA, a supervisor's course

13   for asbestos abatement.  When was that?

14     A.     Yes.  Well, the AHERA regulations came out

15   in 1980 -- basically '87 let's call it.  And if you

16   are going to do certain things with schools, you have

17   to have courses, and the courses included inspection

18   of buildings for bulk sampling, the writing of

19   management plans for schools.  And that is a separate

20   course.

21          And then there is a supervisor's course if

22   you are going to supervise asbestos abatement

23   personnel or monitor projects.

24          Then there is the design of asbestos

25   abatement projects.  And I took all those courses.

25

7/8/2003 Hatfield, Richard L. (Bradley)

1    And each year they have you take a refresher course

2    in those things.  I kept most of them up.  I don't

3    think I have the designer one anymore.  I just don't

4    do that.

5         Q.    You are not designing abatement programs?

6         A.    No.

7         Q.    Can you tell me at the present time how

8    much time you spend in legal consulting, any research

9    that is primarily for legal work versus any other

10   type of work?

11        A.    I have always said, and it is probably

12   still true now, it may be a little bit less, but

13   probably about 50 percent of the time.

14        Q.    What do you do the other 50 percent?

15        A.    Working on nonlegal situations.

16        Q.    Can you give me an example of what you are

17   doing now?

18        A.    Sure.  People call up and want my advice

19   on how to do this or how do I test for this or what

20   kind of analysis would be the best for this and they

21   will send it in.

22              I manage the electron microscopy section

23   of the company and we get samples in from all kinds

24   of people, which are not necessarily litigation

25   related.  And sometimes I will work on nonasbestos

26

7/8/2003 Hatfield, Richard L. (Bradley)

1    projects, too, but that is not that often.

2        Q.    Now, your degree in statistics, you said

3    it is experimental statistics?

4        A.    Correct.

5        Q.    Do you do any applied statistics in your

6    work now?

7        A.    Sometimes.  It would be fairly basic.

8        Q.    Do you have the background that would

9    allow you to calculate statistical probabilities of

10   occurrences of observed phenomena in your research?

11       A.    Sure.

12       Q.    Have you done that for any of the three

13   studies you have with us here today?

14       A.    No.

15       Q.    Why is that?

16       A.    Because I don't see the purpose of it.

17       Q.    As a statistician you don't see it to be

18   important to know whether or not the findings that

19   you have and you are going to testify about are

20   statistically significant?

21            MR. CRUMPLAR:  Object to form and

22       foundation.

23            THE WITNESS:  That isn't what I said.

24       Q.    (By Ms. Caffrey)  Do you think it is

25   important to know whether or not your findings are

27

7/8/2003 Hatfield, Richard L. (Bradley)

1    statistically significant?

2            MR. CRUMPLAR:  Objection to form,

3        foundation.

4            THE WITNESS:  We have to define what

5        you mean by statistically significant.

6        Q.    (By Ms. Caffrey)  Well, you are a

7    statistician, you can calculate statistical

8    significance, correct?

9        A.    Sure.

10       Q.    Have you calculated the statistical

11   significance of any of the findings in your Brake

12   Blowout II study?

13           MR. CRUMPLAR:  Let's -- I object to

14       form and foundation.  We don't know whether

15       that is something that you do statistical

16       significance for.

17           MS. CAFFREY:  Well, he can tell me,

18       and I would request that you not make

19       speaking objections.

20           THE WITNESS:  Well, I guess the

21       problem is it doesn't appear that you

22       understand what statistical significance

23       means.

24           You can't take a particular event and

25       calculate a statistical significance of

28

7/8/2003 Hatfield, Richard L. (Bradley)

1   something if you don't have some historic

2   work to compare it to.

3        But, I mean, you could take something

4   like the background samples that we have

5   collected and say are they statistically

6   significant?  Is there a statistical

7   significance between the backgrounds and

8   what we got in this study.

9        I mean, one could do that, but we

10  have always gotten zeros in the background,

11  so I know that they are statistically

12  significant.

13  Q.    (By Ms. Caffrey)  But you haven't done the

14  calculations?

15  A.    I don't have to do the calculation.  When

16  things are measured above zero, there is a

17  difference.  The calculation is clear.

18  Q.    Do you have any professional

19  certifications of any type?

20       MR. CRUMPLAR:  Why don't we take a

21  break and get the CV and we can get it

22  copied later.  I think it is slowing down

23  the process.

24       (A recess was taken.)

25       (Defendants' Exhibits 2 - 8 were

29

7/8/2003 Hatfield, Richard L. (Bradley)

1           marked for identification.)

2           Q.    (By Ms. Caffrey)  Mr. Hatfield, what

3      courses have you taken in the design of scientific

4      research studies?

5           A.    That is basically what most of the

6      statistical courses were on.

7           Q.    Were on the design of scientific research?

8           A.    Sure, or testing.  You know, whatever,

9      sampling, testing.

10          Q.    What courses have you taken regarding the

11     design of scientific tests in the area of geology?

12          A.    Well, a number of the courses certainly

13     touched on that.  Sediment courses talked about

14     designing studies of grain sizes and predicting where

15     sand grains had been generated or from what source

16     certain sand grains had been generated from.  That

17     would certainly fall into that category.

18          Q.    Any others?

19          A.    I would think -- well, the whole course

20     work is to design to provide a person with the tools

21     to study geology, and the study of geology is the

22     study of the formations of the rocks and how they

23     occurred and how they got the way they are and that

24     kind of thing.  So, you know, I would think in

25     general all of it comes from that.

30

7/8/2003 Hatfield, Richard L. (Bradley)

1    reentrainment of dust, did you?

2         A.    No, we did not do hands-on work.  We were

3    advisors from EPA to other people.

4         Q.    What opinions do you intend to give in the

5    Waishes case?

6         A.    Well, I think the primary opinions that I

7    will provide will have to do with the release of

8    asbestos from brake materials and the exposures and

9    ensuing exposures from certain work activities that

10   relate to brakes.

11        MR. CRUMPLAR:  Let me just also say,

12        he will, depending on whether the

13        Defendants are still in there with regard

14        to tile material, too, for Waishes.  But we

15        are not dealing with that today, I know.

16        MR. FALK:  Ceiling or floor or both?

17        MR. CRUMPLAR:  Both.

18        Q.    (By Ms. Caffrey)  Other than giving

19   opinions regarding the release of asbestos from brake

20   materials and exposures from work activities related

21   to brakes, are there any other opinions which you

22   intend to give in the Waishes matter with the caveat

23   that Mr. Crumplar included some tile opinions?

24        A.    Nothing else particularly comes to mind.

25        Q.    What is the basis for you giving the

35

7/8/2003 Hatfield, Richard L. (Bradley)

1       reports, correct?

2           A.    I believe so.

3           Q.    Now, I think we are all on the same page

4       with regard to the exhibits.

5                 For exhibit -- or rather you said that the

6       release of asbestos from brake materials, the

7       opinions you are going to render in that are based

8       upon what we have now marked as Exhibit 9, Brake

9       Blowout II, correct?

10          A.    That is for that specific case.

11          Q.    For the Waishes case?

12          A.    For the Waishes case.

13          Q.    Is there any other basis for the opinions

14      that you will render regarding the release of

15      asbestos from brake materials in the Waishes case,

16      other than Brake Blowout II?

17          A.    Yes.

18          Q.    What is that?

19          A.    Studies conducted by others such as

20      studies conducted by Mount Sinai School of Medicine,

21      and there is probably another one or two also.  Just

22      slips my mind right now, but there is probably a

23      couple other studies that would be applicable.

24          Q.    What Mount Sinai studies specifically do

25      you intend to rely upon as the basis of the opinions

40

7/8/2003 Hatfield, Richard L. (Bradley)

1    that you will give regarding the release of asbestos

2    from brake materials in the Waishes case?

3        A.    Well, they did a study on brake repairs in

4    one of the New York City garages.

5        Q.    Are you talking about the Lorimer study?

6        A.    Lorimer is one.

7        Q.    Any others?

8        A.    I didn't have the opportunity to grab a

9    bunch of that stuff.  There may be some others, but

10   those would be the ones that have been identified

11   before.

12       Q.    Do you have the 1983 -- have you reviewed

13   or evaluated the 1983 unpublished report by

14   Dr. Nicholson, it is a follow-up to the Lorimer

15   study?

16       A.    I may have.

17       Q.    Do you intend to rely upon that document?

18       A.    At this time I can't say one way or

19   another.

20       Q.    Are you familiar with that study?

21       A.    Not intimately.

22       Q.    Exactly what opinions will you give in

23   Waishes regarding the release of asbestos from brake

24   materials?

25       A.    That the blowing out of brake dust puts

41

7/8/2003  Hatfield, Richard L. (Bradley)

1    significant amounts of asbestos in the air and poses

2    exposures to those conducting the work and those that

3    are around the work being conducted.  And then any

4    cleaning of either the brake materials or the floors

5    that have become contaminated will also result in

6    exposures to asbestos.

7        Q.    Do you intend to give any quantification

8    as to how much asbestos you believe Mr. Waishes would

9    have been exposed to as a result of his work as a

10   mechanic doing brake jobs?

11       A.    I won't provide a specific exposure

12   amount, but I may provide some range or quote some

13   levels from either my studies or some other studies.

14       Q.    What level of exposure do you intend to

15   testify to that Mr. Waishes would have had or did

16   have through his brake work?

17       A.    I would say that he had an opportunity to

18   be exposed to levels above background, certainly at

19   minimum around a half a fiber per cc to as much as 30

20   fibers per cc or maybe even more.

21       Q.    On what do you base your opinion that

22   Mr. Waishes had the opportunity to be exposed to

23   levels of exposure above background?

24       A.    My basis is the information that I have

25   been provided on what kind of activities he

42

7/8/2003 Hatfield, Richard L. (Bradley)

1       for anybody sitting here?

2           MR. CRUMPLAR:  No, any objection

3       covers everyone else.  If you want to break

4       from the pack, do that, but if you don't

5       say something, I would agree, I would

6       assume that you are part of the whole

7       defense team.

8           (Discussion ensued off the record.)

9       Q.    (By Ms. Caffrey)  So at least as of now,

10      all you know about Mr. Waishes is what is contained

11      in Exhibit 5 and your brief review of whatever

12      medical -- of the Hammar and Churg medical reports;

13      is that correct?

14      A.    Yes.  And brief discussion with

15      Mr. Crumplar.

16      Q.    Do you have any understanding as to how

17      long Mr. Waishes worked as a mechanic?

18      A.    Well, I have been told it is somewhere

19      between two and maybe pushing as much as five years,

20      but it is sometimes it appears that sometimes it was

21      a profession and other times it was more of a

22      maintaining family cars.

23      Q.    Do you know how many brake changes he

24      claimed to have personally performed during his

25      lifetime?

48

7/8/2003  Hatfield, Richard L. (Bradley)

1      A.    No, I don't necessarily know that.

2      Q.    Is that significant?

3      A.    Well, of course the more you conduct work

4    with asbestos the more exposure one has and so from

5    that standpoint, of course it is significant.  The

6    exact number I don't think is necessarily

7    significant.

8      Q.    Is the frequency with which he performed

9    brake changes significant in the amount of exposure

10    he might have had?

11      A.    I don't think the frequency necessarily

12    plays a role.

13      Q.    Why is that?

14      A.    Well, let's take as an example, let's just

15    say he did 50 brake jobs.  If he did 50 brake jobs in

16    a week or if he did 50 brake jobs over two years, I

17    don't think there is that much difference.

18      Q.    Is the design and layout of the facility

19    and the ventilation significant in any potential

20    exposures Mr. Waishes may have had while performing

21    brake changes?

22      A.    I would doubt that that would have much

23    affect.

24      Q.    The ventilation does not have much affect?

25      A.    Unless there is some local ventilation

49

7/8/2003  Hatfield, Richard L. (Bradley)

1   designed to remove asbestos, I don't believe there

2   would be any real significant difference between

3   ventilations in one garage versus another.

4        Q.    Well, is the size of the garage and the

5   number of mechanics working in that garage at all

6   relevant to the potential for him to have -- of his

7   asbestos exposure?

8        A.    It could have some affect.  Generally from

9   a person doing the work, the size of the garage

10  doesn't necessarily affect that exposure.

11            It could affect it if we are talking about

12  a garage large enough to have additional bays where

13  other people are working on brakes and blowing out

14  brakes at the same time, then that could increase his

15  exposure from that standpoint.

16            And if it is, you know, the building size,

17  unless there is a substantial difference, I wouldn't

18  think it would have too much affect on even as

19  bystander levels.

20       Q.    All right.  I want to go back to the

21  ventilation.  If Mr. Waishes testified that he worked

22  in a garage where the doors were primarily kept open,

23  would that affect his potential for asbestos exposure

24  when doing brake work?

25            MR. CRUMPLAR:  When he himself is

50

7/8/2003 Hatfield, Richard L. (Bradley)

1       doing the brake work as opposed to being

2       around somebody else doing the work?

3            MS. CAFFREY:  Right.

4            THE WITNESS:  I don't believe that

5       would have much affect on his exposure.  It

6       could, having the doors closed and multiple

7       jobs going on, certainly could increase

8       exposure that way.

9            Q.   (By Ms. Caffrey)  Would having the doors

10      open affect the ability of the asbestos to be

11      reentrained into the atmosphere?

12           A.   Reentrained from where?

13           Q.   From wherever it lands?

14           A.   No.  I don't think having the garage door

15      open would affect reentrainment.

16           Q.   Do humidity conditions affect

17      reentrainment?

18           A.   I don't believe that humidity will affect

19      reentrainment until the point it would be -- the air

20      would be saturated, and it would be raining then.

21           Q.   I want to go back to your comment that you

22      intend to give an opinion that Mr. Waishes have the

23      opportunity to be exposed at levels above background

24      which would be from his brake work of between one

25      half fiber per cc to over 30 fibers per cc.

51

7/8/2003 Hatfield, Richard L. (Bradley)

1    to brakes.  What opinions do you intend to give

2    regarding exposures to work activities related to

3    brakes about Mr. Waishes?

4        A.    I don't know.  Maybe I missed it, but I

5    thought you had asked me that before.

6            MR. CRUMPLAR:  I thought he covered

7        it, too.

8            THE WITNESS:  Yeah, I mean we talked

9        about blowing out the brakes with

10       compressed air and brushing them off and --

11           MR. CRUMPLAR:  Maybe the other thing

12       was the reentrainment.

13           THE WITNESS:  Well, the reentrainment

14       can come from bushing, sweeping, cleaning,

15       dusting off clothing, whatever.

16       Q.    (By Ms. Caffrey)  What courses have you

17   taken regarding the aerosol qualities of asbestos

18   fibers?

19       A.    I don't know of any course on that

20   subject.

21       Q.    What courses have you taken on the

22   aerosol qualities of particles in general?

23       A.    I guess I don't understand what you mean

24   by the quality of aerosols.

25       Q.    I don't think that was part of my question

54

7/8/2003 Hatfield, Richard L. (Bradley)

1    but if it was I will rephrase it.

2             What courses have you taken on the aerosol

3    nature of dust or the properties, the aerosol

4    properties of dust particles?

5             MR. CRUMPLAR:  I am going to object

6         to form, but if you understand the

7         question.  Rephrase it, the answer in a

8         scientific manner.

9             THE WITNESS:  Well, I think that

10        perhaps the NIOSH course for collecting and

11        evaluating asbestos dust would fit into

12        that category.  That is as far as course

13        goes.

14             As far as information on the nature

15        of aerosols and fine dust materials, I

16        think EPA provided me with some

17        understanding of that in some of their

18        guidance documents.

19    Q.    (By Ms. Caffrey)  And those were guidance

20    documents for asbestos in schools, correct?

21    A.    Correct.

22    Q.    Those weren't guidance documents for

23    people doing brake work; is that right?

24    A.    Well, while they were titled under the

25    guidance for schools, they provided general

55

7/8/2003 Hatfield, Richard L. (Bradley)

1    work back in the '50s, at least some '50s cars are

2    listed.  '64, '66, family cars, uncles, service

3    station in 1959.

4            MR. FALK:  So the record is clear,

5        you are reading from Exhibit 5, correct?

6            THE WITNESS:  I am reviewing

7        Exhibit 5 --

8            MR. CRUMPLAR:  Yes.

9            THE WITNESS:  -- to provide this

10       information.  Looks like it could have been

11       some work up in even in the '80s.  But that

12       would have been more the off and on home

13       repair.

14       Q.    (By Ms. Caffrey)  Do you have any

15   understanding as to how frequently Mr. Waishes

16   performed brake work in the '60s?

17       A.    In the '60s.  No, I don't really have very

18   much on the frequency.

19       Q.    Okay.  I want to turn your attention to

20   the first page of Exhibit 5.  About two-thirds of the

21   way down there is a bullet point that says:  "He used

22   a brush and vacuum and an air hose."

23       A.    Yes.

24       Q.    Would the use of a vacuum affect the

25   amount of asbestos that Mr. Waishes could have been

59

7/8/2003 Hatfield, Richard L. (Bradley)

```
1        A.    No.

2              MR. CRUMPLAR:  I haven't asked him to

3        give any opinions, I just told him to tell

4        what he knows.

5              THE WITNESS:  Be here.

6              MR. CRUMPLAR:  His opinions on what

7        he believes, not what I want him to

8        believe.

9        Q.    (By Ms. Caffrey)  I just want to confirm

10       again.  The only study of yours that you intend to

11       rely on in the Waishes case is Brake Blowout II,

12       correct?

13       A.    I believe that is correct.

14       Q.    By the way, when were you first retained

15       in the case?

16       A.    I don't know.

17       Q.    And you first received any file materials

18       I believe yesterday; is that correct?

19       A.    That is correct.

20             MR. CRUMPLAR:  It was supposed to

21       have been sent to him earlier but we found

22       out the mistake.

23             THE WITNESS:  Yeah.

24       Q.    (By Ms. Caffrey)  Have you submitted Brake

25       Blowout II for publication?
```

61

7/8/2003 Hatfield, Richard L. (Bradley)

1      A.    No.

2      Q.    Why haven't you submitted it for

3   publication?

4      A.    Haven't had time.

5      Q.    Do you intend to submit it for

6   publication?

7      A.    I don't know.

8      Q.    Why don't you know?

9      A.    Because we haven't decided.

10     Q.    When you say we, you mean you and

11  Dr. Longo?

12     A.    Yes.

13     Q.    Now, I just want to be clear, you haven't

14  rendered any reports in this case, am I right?

15     A.    Correct.

16     Q.    The only thing we have, I believe, is the

17  Exhibit 8, the expert interrogatory?

18          MR. CRUMPLAR:  Right, which is the

19          same one which was given in Bargelski, too.

20          MR. SINGEWALD:  Just for purposes of

21          the record, that is incorrect.  That was

22          not provided in Bargelski.

23          MR. CRUMPLAR:  Well, it was provided

24          in Bargelski for Dr. Longo and MAS, and in

25          Bargelski we had a Longo and Hatfield both

62

7/8/2003 Hatfield, Richard L. (Bradley)

1          he will actually look at the deposition.

2              MS. CAFFREY:  Counsel, is he going to

3          look at anything other than the deposition?

4          I know what is in the deposition.

5              MR. CRUMPLAR:  I am not planning on

6          it, with regard to Mr. Bradley, having him

7          look at anything else.

8              MS. CAFFREY:  What about with regard

9          to Mr. Waishes, other than the deposition?

10             MR. CRUMPLAR:  No.

11         Q.    (By Ms. Caffrey)  Have you spoken to

12         either Mr. Bradley or Mr. Waishes?

13             MR. CRUMPLAR:  Mr. Bradley is dead.

14             MS. CAFFREY:  Okay.  Did we get

15         information about that?

16             MR. CRUMPLAR:  The medical records --

17             MR. SINGEWALD:  Is Mr. Bradley dead?

18             MR. CRUMPLAR:  I thought he was.

19         Strike that.

20             (Discussion ensued off the record.)

21             THE WITNESS:  The answer is no, I

22         have not spoken to either gentlemen.

23             MS. CAFFREY:  Do you intend to have

24         him speak with them prior to trial?

25             MR. CRUMPLAR:  I will tell you what,

65

**7/8/2003 Hatfield, Richard L. (Bradley)**

1      if I do, I will have him speak to them

2      prior to the next deposition.  Hadn't

3      really thought of doing that, but that is

4      fine.

5          Q.    (By Ms. Caffrey)  What is the basis of

6      your opinion that Mr. Bradley had significant

7      exposure from cleaning out brakes?

8          A.    Basically from the same information that

9      we were talking about, is it Mr. --

10         Q.    Waishes?

11         A.    -- Waishes.

12         Q.    Exhibit 4?

13         A.    Yes.

14         Q.    Would the basis be the same as for

15     Mr. Waishes with regard to the basis for your

16     opinion, that being your Brake Blowout II study?

17         A.    Brake Blowout II study and other studies

18     on blowing out and cleaning brakes.

19         Q.    You said that he had exposure from sanding

20     and filing new brakes.  What is your understanding of

21     Mr. Bradley sanding and filing of new brakes?

22         A.    That he would file or sand high spots off

23     of brakes to make them fit better.

24         Q.    Did he file or sand?

25         A.    Well, from what I can gather here he may

66

7/8/2003 Hatfield, Richard L. (Bradley)

1   have done both.  I see the obvious reference to

2   filing high spots off.  And then in another statement

3   somewhere in here he talked about sanding.

4            Now whether he is using those

5   interchangeably or not, I can't say with absolute

6   certainty.

7            Under the section of where he worked in

8   the E.F. Auto, the last bullet point there said he

9   would remove old brakes, install new ones, take it

10  out for a test drive, come down and sand the high

11  spots.

12       Q.    Do you know what he used to sand the high

13  spots?

14       A.    Well, I know he used a file and may have

15  also used sandpaper.  I don't know that specifically.

16       Q.    What type file did he use?

17       A.    A coarse file, a rasp, a heavy file.

18       Q.    Where do you find that he used a heavy

19  file?

20       A.    On the very first page of the summary,

21  under the bullet point that says procedure.  If you

22  go to the first sentence in the second paragraph:

23  "We would take a wood rasp, a file, a heavy file, and

24  file those high spots off and smooth them down so

25  your lining came in good contact with your drum."

1    Q.   Do you know the frequency with which he

2  would do that?

3    A.   I don't have any absolute frequency, but

4  it does appear from the description that he would do

5  that most of the time.

6    Q.   Do you know that to be a fact?

7    A.   I only know my impression I get from

8  reading this information.

9    Q.   All right.  What is the basis, I don't

10  mean the factual basis, but what is the scientific

11  basis for your opinion that he was exposed to

12  asbestos from sanding and filing new brakes?

13    A.   Again, from our study of filing and

14  sanding brakes and from the study of others, such as

15  the group at Mount Sinai studying grinding, sanding,

16  filing brakes.

17    Q.   And which study is that?

18    A.   I think there is some data in there in the

19  Lorimer study and there has certainly been a number

20  of studies that would have included grinding of

21  brakes or sanding of brakes, excuse me.

22    Q.   Mr. Bradley didn't do any grinding to your

23  knowledge, did he?

24    A.   No, at least I don't have any information

25  that he either used an arc grinder or a bench

68

7/8/2003 Hatfield, Richard L. (Bradley)

1     Q.    Do you have any understanding as to how

2  long Mr. Bradley would sand or file a brake?

3     A.    Well, sanding and filing only takes

4  several minutes, you know that kind of thing.

5     Q.    Well, do you have any understanding as to

6  how long it took him to do it?

7     A.    He says it took him a couple of minutes,

8  depends on if the spot was that long on the shoe or

9  if it was that long.  Obviously he is making a

10  gesture of some sort that didn't get on the record.

11     Q.    Do you have any information as to how

12  large the facility was, where any of the facilities

13  were where Mr. Bradley did brake work?

14     A.    Doesn't appear to be any real information

15  on the size of the facilities.

16     Q.    Okay.  Do you have any information

17  regarding the ventilation in any of the facilities?

18     A.    No.

19     Q.    I just want to go over some of your

20  understanding of performing brake work.  Have you

21  ever personally changed a brake on a vehicle?

22     A.    No.  I have not changed a brake on a

23  vehicle, I have watched it done but I haven't done

24  it.

25     Q.    When was the first time you observed

77

7/8/2003 Hatfield, Richard L. (Bradley)

1      anyone change a brake on a vehicle?

2              A.    Probably when I was a teenager.

3              Q.    Was that somebody just doing it --

4              A.    In the shop, yeah, in a shop, sure.

5              Q.    When was the most recent time that you

6      have observed somebody doing a brake change?

7              A.    I don't really remember.

8              Q.    Can you estimate decade?

9              A.    I really just don't know.  It has been a

10     while, but hadn't been that long.  I just don't know.

11             Q.    Can you estimate how many times you have

12     observed somebody changing a brake?

13             A.    I don't know.  My lifetime maybe a dozen

14     times, something like that.

15             Q.    Were any of the times when you have

16     observed a brake change being done, was the purpose

17     for your observation just the fact that somebody was

18     working on a car maybe that you owned or somebody

19     else owned or was it for professional reasons where

20     you went to observe?

21             A.    No, it would have been your first

22     description there, it was kind of a casual being

23     there watching.

24             Q.    Have you watched an entire brake job being

25     performed?

78

7/8/2003 Hatfield, Richard L. (Bradley)

1       A.    I don't know whether I have -- I doubt I

2    have sat there and watched the entire thing minute

3    for minute.

4       Q.    Do you think you have observed a brake

5    change during the 1990s?

6            MR. CRUMPLAR:  When you are talking

7            about a professional as opposed to a

8            laboratory, I mean, brake change being

9            done.

10           MS. CAFFREY:  Anywhere.

11           MR. CRUMPLAR:  Okay.

12           MS. CAFFREY:  I don't mean as part of

13           these studies, I mean a brake change on an

14           automobile.

15           MR. CRUMPLAR:  That is what I mean,

16           someone who is changing a brake at Sears or

17           in his home or A.B. Texaco, okay.

18           THE WITNESS:  I can't really recall

19           one, but there could have been.

20       Q.    (By Ms. Caffrey)  Do you think you

21    observed a brake change during the 1980s?

22       A.    I would certainly think so.

23       Q.    Do you recall how far you stood from the

24    person who was changing the brakes?

25       A.    Depends on when you are talking about.  I

79

7/8/2003 Hatfield, Richard L. (Bradley)

1    mean I think the more recent times have probably been

2    10, 15 feet away, usually in like in a waiting area

3    where there is a glass window and you watch what is

4    going on.

5                    In the earlier years when I was a teenager

6    it could have been right beside the person.

7          Q.    When you have observed brake work being

8    done on your car, or a vehicle more recently, were

9    the garage doors open or closed?

10                   MR. CRUMPLAR:  This is when he was

11              behind the window in the waiting area?

12                   MS. CAFFREY:  Yep.

13                   THE WITNESS:  What I recall most of

14              the time on something like that would be

15              some of them would be up and some of them

16              would be down.

17          Q.    (By Ms. Caffrey)  Have you ever gone into

18    a garage and taken measurements of the airflows or

19    air currents within a garage?

20          A    No.

21          Q.    All right.  I know that you use in your

22    test chamber an exchange of four air exchanges per

23    hour on average; is that correct?

24          A.    Four to five, yes.

25          Q.    Four to five.  What is the basis of your

80

7/8/2003 Hatfield, Richard L. (Bradley)

1          A.     If there is air blowing in and it has an

2     avenue to blow out, then it will be ventilated with

3     the doors or windows.

4          Q.     Do you agree that the best way to measure

5     an individual's exposure to asbestos is to do a

6     personal air sampling?

7          A.     Yes.

8          Q.     Have you done any tests where you did

9     personal air sampling of mechanics doing brake

10    changes in garages?

11         A.     No.

12         Q.     Can you tell me when you observed brake

13    work being done, can you tell me the procedures you

14    observed the mechanics use?

15         A.     Sure.

16         Q.     Well, let me take one step back.  If it

17    varied by times when you were a kid and observed

18    versus more recently observing someone through a

19    glass window, can you tell me that, too?

20         A.     Well, I don't know whether I can remember

21    with that specific task in mind.  I think I can tell

22    you in general what I have observed.

23         Q.     Okay.  Please do.

24         A.     I mean, generally you will find a mechanic

25    will take the lug nuts off to remove the wheel.  The

84

7/8/2003 Hatfield, Richard L. (Bradley)

1        That is what I have seen.  I don't --
2    trying to recall whether I personally have ever seen
3    them sand or arc grind brake pads while I was
4    standing there.  I can't really recall that.  But, of
5    course, if that was what was necessary, then probably
6    do it.
7        Q.    But you don't --
8        A.    And that wouldn't -- certainly arc
9    grinding wouldn't take place right there where you
10   were watching the wheel, that would be somewhere
11   else.
12       Q.    You don't have a specific recollection of
13   watching somebody sand or grind?
14       A.    Not that I can think of.
15       Q.    On the times when you have observed brake
16   changes, have you typically seen the mechanic change
17   both the front and the rear brakes or just one or the
18   other?
19       A.    I have seen both.
20       Q.    I am not sure I understand both because I
21   think it is how poorly I worded the question.  Have
22   you seen them change just one axle or both axles?
23       A.    I have seen both circumstances.
24       Q.    Thank you.
25       A.    Maybe that is the best way to handle that.

86

1    Mr. Waishes did that, correct?

2        A.    That is right.  I mean, he referred to it

3    as high spots.

4        Q.    Now, when you have observed brake changes,

5    do you know whether or not the brakes that were

6    either removed or installed contained asbestos?

7        A.    Some of them probably did.

8        Q.    Do you have any specific knowledge one way

9    or the other?

10       A.    No.

11       Q.    Do you know, do you have any information

12   as to how brakes have changed chemically over time?

13            MR. CRUMPLAR:  Chemically?

14       Q.    (By Ms. Caffrey)  In their chemical

15   composition?

16            MR. CRUMPLAR:  I am just going to

17            object to the form of the question.  Brakes

18            as being chemical, but.

19            THE WITNESS:  Well, it depends on

20            what time you are talking about.  Many,

21            many years ago brakes were made out of

22            woven pads of asbestos and then they

23            changed to a phenolic resin composition.

24            That is a fairly major change in brakes,

25            but that took place many, many years ago.

91

7/8/2003 Hatfield, Richard L. (Bradley)

1    set up the videos, but if you need to distinguish

2    between the two, I will ask you to do that and let me

3    know which one you are talking about.  I am trying to

4    circumvent us going through each one step by step.

5        A.    Sure.

6        Q.    Okay.  What was the purpose of the study

7    design that is set up in these two videos?

8        A.    I guess what you are really asking me is

9    what was the purpose in taking video?

10       Q.    Right.

11       A.    For the study?

12       Q.    For the study, yes.

13       A.    The purpose was to be able to show and

14   demonstrate to individuals what we did, and by using

15   the Tyndall light it allowed persons to see dust

16   particles that are smaller than what you would

17   normally resolve with your naked eye, and they could

18   see what work practices or work activities generated

19   dust, how it generated dust, where the dust went when

20   it was generated, and how people can become exposed

21   to asbestos, which is in the dust, sort of a pathway

22   of exposure.  So, that was the reason to do the

23   video.

24       Q.    All right.  I want to talk about the

25   hand-filing video.  When was this created?

100

Page 101

1      A.    The hand-filing videos were conducted with
2  the study here.
3      Q.    Sorry.
4      A.    Which is marked Exhibits 10 and 11.  They
5  were both done in December of '97.
6      Q.    Since neither of these cases had been
7  filed as of December of '97, am I correct in assuming
8  that these were done for some prior case and not
9  specifically for the Bradley or Waishes cases?
10     A.    That is correct.
11     Q.    And I guess with the hand-filing we are
12  just talking about Bradley, correct?
13     A.    Yes.  We are.
14     Q.    All right.  What were you trying to
15  simulate in the hand-filing video?
16     A.    We were trying to do the work practice of
17  filing the brakes, whether it be filing for high
18  spots or filing the edges so they were smoother and
19  wouldn't scrape the drum brake.  So I guess you could
20  call this high spots, too.
21     Q.    In the video you have the braking device
22  turned on its side, correct?
23     A.    Yes.  I would have to go back and look at
24  the video.  That may certainly be part of it.
25     Q.    And you filed at the edges of the brakes?

7/8/2003 Hatfield, Richard L. (Bradley)

1      A.    Filed at the edges of the brakes.

2      Q.    And that is the portion that we said that

3   the mechanics don't typically file, correct?

4      A.    No.  They do file the edges, they just

5   don't file the side.

6      Q.    In the video were you filing the side?

7      A.    No, we were filing the edges.

8      Q.    For how long did you file the brakes?

9      A.    Well, I would have to watch the video to

10   time that, to see exactly how long the filing was

11   taking place.

12      Q.    Can you estimate or do you recall?

13      A.    I can't estimate or recall.  I would have

14   to watch the video to see exactly how long the filing

15   was done on each of the brakes.

16      Q.    Now, the brake blowout video, what were

17   you trying to simulate in that video?

18      A.    The blowing out of residue brake dust with

19   compressed air was the activity that we were

20   conducting.  The drum brake and the brake assembly.

21      Q.    You said that was a brake or I think your

22   study reports that it is a brake on a 1976 Chrysler

23   Newport?

24      A.    I think you are right.

25      Q.    And if I am correct from your prior

102

7/8/2003 Hatfield, Richard L. (Bradley)

1  deposition I read, you got that brake assembly from a

2  junkyard?

3      A.    Correct.

4      Q.    Do you know anything about the ownership

5  of that vehicle prior to the time you got it out of

6  the junkyard?

7      A.    No.

8      Q.    Do you know, there was a brake in the

9  drum, am I correct, or in the --

10     A.    There were brakes mounted on the brake

11  assembly, yes.

12     Q.    And those brakes were not asbestos,

13  correct?

14     A.    Those did not contain asbestos.

15     Q.    Do you know how long those brakes were on

16  that wheel assembly or in that wheel assembly before

17  you did your study?

18     A.    No.  I don't know how long.  I mean, they

19  were warn, but I just don't know how long they had

20  been on there.

21     Q.    And do you know what type or brand of

22  brake they were?

23     A.    No.

24     Q.    You don't know who manufactured them?

25     A.    No.

103

7/8/2003 Hatfield, Richard L. (Bradley)

1     Q.    Do you know what brand or type of brake

2    was on that -- or in that wheel assembly prior to the

3    one that you did the work on?

4     A.    No.

5     Q.    So when you demonstrated the blowout in

6    the video, you were demonstrating the blowout of the

7    dust from the nonasbestos brake, correct?

8     A.    Well, no.  I believe it had dust from the

9    nonasbestos brake and previous brakes that had been

10   on the car.

11    Q.    All right.  Well, what is the basis for

12   your opinion that there was dust from the previous

13   brakes that were on the car?

14    A.    Because the dust from the brake assembly

15   had asbestos in it.

16    Q.    Did you do any study to determine where

17   that -- strike that.  How do you know that the dust

18   in the assembly was from some prior brake?

19    A.    Because it had asbestos in it.

20    Q.    So that is an assumption that you made

21   based on --

22          MR. CRUMPLAR:  Objection.

23          THE WITNESS:  No, it is not an

24      assumption.  If I know that the brake is on

25      there now is not made of asbestos, but

104

7/8/2003 Hatfield, Richard L. (Bradley)

1       there is asbestos in the brake dust, then

2       it had to come from another brake assembly.

3            MR. CRUMPLAR:  It is called basic

4       scientific reasoning.

5            MS. CAFFREY:  Objection, counsel.  I

6       ask you to keep your comments to yourself,

7       please.

8       Q.   (By Ms. Caffrey)  So when you did the

9       blowing out, can you say where or when the asbestos

10      brake -- or when the asbestos brake was on the car?

11      A.    Well, I can say this.  First of all, there

12      was a used set of brakes in the trunk of this car

13      that were asbestos-containing.  And one can assume

14      that that was the last set of brakes that were on the

15      car before the nonasbestos brakes, or may be a set

16      before that, I don't know for certain.

17           But I know there was an asbestos set of

18      brakes, used set of brakes in the trunk of the car.

19      I know that the set that was on the wheel tested

20      negative for asbestos.  I know the dust in the brake

21      assembly, prior to blowing it out, contained

22      asbestos.

23      Q.    The brakes that were in the trunk of the

24      car, you don't know how long they had been there?

25      A.    No.

105

7/8/2003 Hatfield, Richard L. (Bradley)

1     Q.    Did you see if they fit the car?

2     A.    No.  I don't think we did that.

3     Q.    You are just drawing a conclusion that

4     they had previously been on the car by the fact that

5     they were in the trunk; is that correct?

6     A.    Correct.

7     Q.    You don't have any other information that

8     supports that, is that correct?

9     A.    That is correct.

10     Q.    Were there any markings or labels on those

11     brakes that would allow you to identify the make,

12     manufacture or year of manufacture of the brakes you

13     found in the trunk?

14     A.    Not that I am aware of.

15     Q.    Do you know how long the car was in the

16     junkyard?

17     A.    No.

18     Q.    Do you know when the car had last been

19     driven?

20     A.    No.

21     Q.    How many miles did the car have on it?

22     A.    Let me see if I have that information.

23     And I may have a little bit of it.  No, I thought

24     maybe the odometer might have been noted, but it

25     doesn't look like it was.

106

7/8/2003 Hatfield, Richard L. (Bradley)

1    video is dated January 30, 2001?

2        A.    Okay.

3        Q.    So that is when the actual study was

4    performed and then the analysis occurred thereafter?

5        A.    Let me see that and I will tell you

6    exactly the day we conducted this study.  January 30,

7    that is right.

8        Q.    All right.  And you did this like you have

9    other studies in your test chamber?

10       A.    Yes.

11       Q.    It is a room you have designed

12   specifically for performing these tests, correct?

13       A.    Yes.

14       Q.    And it is either painted black or has a

15   black cloth as a backdrop; is that correct?

16       A.    Correct.

17       Q.    And then you used Tyndall lighting to show

18   the dust particles, correct?

19       A.    Well, we used the spotlight to generate

20   the Tyndall light effect which makes small particles

21   visible.

22       Q.    Do you remember how many light sources you

23   had in the room?

24       A.    For this study?

25       Q.    For this study.  And if you need the book

108

7/8/2003 Hatfield, Richard L. (Bradley)

1    A.    Sure.

2    Q.    Called the convection effect, it makes it

3    swirl?

4    A.    The lights could do that just like a hot

5    engine could.

6    Q.    The lights, when they -- well, a hot

7    engine you are not using for a visual effect,

8    correct?

9    A.    Yeah, but it has the same effect on the

10   particles.

11   Q.    Okay.  The lights that you have, it can

12   cause the dust to rise and swirl?

13   A.    Sure.

14   Q.    It can cause the dust to pass by a

15   collection device, be it a personal or a room sampler

16   more than one time?

17       MR. CRUMPLAR:  You are talking about

18       possibility or probability?

19       MS. CAFFREY:  I am talking about

20       possibility.

21       MR. CRUMPLAR:  Okay.

22       THE WITNESS:  Sure, sure it can pass

23       by.  That doesn't mean it gets collected on

24       it twice.

25   Q.    (By Ms. Caffrey)  It gives it two

7/8/2003 Hatfield, Richard L. (Bradley)

1    opportunities for collection, doesn't it?

2        A.    Well, any time you have air circulating

3    and you have people in there doing an activity, you

4    are going to have air circulating, whether it is

5    being caused by heat or it is caused by people

6    walking around.  Your body temperature makes

7    particles rise.

8        Q.    But, the Tyndall lighting, the only

9    purpose was to demonstrate the dust, am I right?

10       A.    Sure.

11       Q.    It didn't have any other scientific

12   contribution to the experiment itself, it was a

13   visual effect?

14           MR. CRUMPLAR:  I object to form.

15           THE WITNESS:  The scientific effect

16       of it was to make it visual.  Or visible

17       would be a better way to put it.

18       Q.    (By Ms. Caffrey)  You could have done

19   Brake Blowout II, the study, and the analysis of all

20   your collection without the use of the Tyndall

21   lighting?

22       A.    Could have done everything but the Tyndall

23   lighting, sure.

24       Q.    And you would have received results, but

25   you added the Tyndall lighting so that you had the

111

7/8/2003 Hatfield, Richard L. (Bradley)

1    visual effect?

2        A.    So somebody could see what was going on,

3    sure.  It is just like using a microscope, you get

4    the chance to see something that is too small to be

5    seen by the naked eye.

6        Q.    Did you measure the impact of the Tyndall

7    lighting on the airflow circulation around the

8    collection devices?

9            MR. CRUMPLAR:  Objection to

10            foundation, that assumes it has an effect.

11            THE WITNESS:  I didn't make any

12            measurements on it.  I don't believe there

13            is any effect.

14        Q.    (By Ms. Caffrey)  On what basis do you not

15    believe there is any effect?

16        A.    Because the collection devices are not

17    placed that close to the lights anyway.

18        Q.    Do you agree that the lights create an

19    electromagnetic field?

20            MR. CRUMPLAR:  The lights in this

21            particular study or?

22            MS. CAFFREY:  The lights that they

23            use for the Tyndall effect.

24            MR. CRUMPLAR:  How large of an

25            electromagnetic field?  In that question,

112

**7/8/2003 Hatfield, Richard L. (Bradley)**

1      Q.    Same question for Mr. Bradley, calculated

2  any eight-hour time-weighted averages for him?

3      A.    Only what we talked about today.

4      Q.    Cumulative lifetime exposures for

5  Mr. Waishes, you have not calculated that?

6      A.    That is correct.

7      Q.    Cumulative lifetime exposures for

8  Mr. Bradley, you have not calculated that?

9      A.    That is correct, and I don't think you

10  could do an accurate calculation.

11      Q.    Okay.  The Bendix Ford and Bendix Chrysler

12  Hand-Filing tests, is it still true that the file or

13  files used in those tests are missing or is missing?

14      A.    I don't even know whether they were ever

15  saved.

16      Q.    Okay.

17      A.    But I can go buy you one if you want one.

18      Q.    If you will just refresh your recollection

19  because this is a dance you and I have done before.

20  The hand-filing tests were done at the old MAS

21  facility in Norcross, Georgia; is that correct?

22      A.    I believe that is correct.

23      Q.    And my recollection of your past testimony

24  has been that in the move from Norcross to Suwanee,

25  the files somehow did not make it to --

120

7/8/2003 Hatfield, Richard L. (Bradley)

1        MR. CRUMPLAR:  By files, you are

2    talking about an instrument as opposed

3    to --

4        MR. FALK:  Yes, exactly.

5        THE WITNESS:  I suspect that you may

6    be getting some of that testimony from

7    Dr. Longo rather than myself.

8    Q.    (By Mr. Falk)  Okay.

9    A.    Because I don't necessarily recall

10   specifically saving the files.  They could have been

11   set aside to be saved, or possibly saved and then

12   they didn't make it or whatever.

13   Q.    Fair enough.  As we sit here today, you

14   don't know the whereabouts of the hand files

15   themselves?

16   A.    I don't have them, no.

17   Q.    And as you sit here today, you don't

18   recall the degree of coarseness or fineness of those

19   files, correct?

20   A.    I don't recall, necessarily, the number of

21   ridges to the inch or whatever they measure those in.

22   I probably could go over to Home Depot, though, and

23   find that same file without too much trouble.

24   Q.    The purpose of the hand-filing and sanding

25   test was to remove high spots, correct?

121

7/8/2003 Hatfield, Richard L. (Bradley)

1        A.    The --

2        Q.    That is a poor question, let me rephrase

3    it.

4              Mr. Bradley's purpose in filing or sanding

5    was to remove high spots, correct?

6        A.    Correct.

7        Q.    And you have seen that testimony from

8    other mechanics over the years, correct?

9        A.    Correct.

10       Q.    And it is true that in the brakes for the

11   hand-filing test, you and Dr. Longo did not ascertain

12   whether there were any high spots on any of those

13   brakes; is that correct?

14       A.    That is correct.

15       Q.    In the Bendix Ford test, there were a

16   total of four brake shoes that you filed, correct?

17       A.    I think that is correct.

18       Q.    And four also in Bendix Chrysler; is that

19   correct?

20       A.    I think that is also correct.

21       Q.    And the sampling time for Bendix Chrysler,

22   the time that the personal samples ran, was 24

23   minutes, correct?

24       A.    Let me just confirm that.  That sounds --

25   for the Ford, it was 21 minutes.

122

1    30 minutes, correct?

2        A.    I think the definition now for that is

3    30 minutes.

4        Q.    And none of the tests that you did here of

5    the personal sampling lasted as long as 30 minutes,

6    correct?

7        A.    Pretty close, but not quite 30 minutes.

8        Q.    The sanding test lasted, what, five

9    minutes, I believe if we look at this?

10       A.    Probably, could be; I don't know.

11       Q.    We don't have the sanding data here to

12   estimate that, to calculate that, correct?

13       A.    I don't.  However, the description of it

14   may reflect on that.  If we have that sanding one.  I

15   think you want to -- that may be it right there.  I

16   don't have the sampling time for that.

17       Q.    The Bendix Ford we have identified was 21

18   minutes and the Bendix Chrysler was 24 minutes,

19   correct?

20       A.    Correct.

21       Q     And I believe Brake Blowout II, the

22   sampling time was five minutes, correct?

23       A.    That is probably true.  But I think that

24   OSHA would accept 70 percent of this time as a

25   reasonable estimate of the entire time.

126

7/8/2003 Hatfield, Richard L. (Bradley)

1      Q.    What documentation do you have to base

2  that statement that OSHA would accept a short-term

3  exposure limit that is less than 30 minutes?

4          MR. CRUMPLAR:  Object to the term

5      limit.

6          THE WITNESS:  In some of the NIOSH

7      documents dealing with procedures for

8      sampling and some of the -- I have to look

9      back, but there is some references to

10     monitoring personnel and that 70 percent --

11     I know that they have used the rule of 70

12     percent of an eight-hour time period is

13     acceptable for an eight-hour time-weighted

14     period.

15      Q.    (By Mr. Falk)  What NIOSH document would

16  that be, is it 7400?

17      A.    It is not in 7400, it is in one of the

18  guides to sampling that NIOSH has done.  It may also

19  make reference to that in some of the old P & CAM 239

20  material that was given out in the course.  But I do

21  know that that is an acceptable amount of time to

22  estimate a TWA.

23      Q.    One final question or two.  Just to

24  clarify, when you testify at trial in this case and

25  quantify for the jury the exposures that Mr. Waishes

127

7/8/2003 Hatfield, Richard L. (Bradley)

1    and Mr. Bradley had from the various brake

2    activities, the quantification, the exposure numbers

3    that you will be giving in these two cases will come

4    from the PCM data from your tests, correct, and PCM

5    data from other --

6            A.    Right.  And other people's tests, yes.  It

7    will come from PCM tests.

8            Q.    And the TEM data is just for your own

9    in-house comparison, it is not for quantifying any

10   occupational exposures?

11           A.    Primarily it is for our own use in

12   comparing study to study, looking at the overall

13   amount of asbestos that is in the air.

14              MR. FALK:  All right.  That is it.

15              MR. CRUMPLAR:  Thank you.  Let's go.

16              MR. BAKER:  Before we go.  We are

17        going to continue this deposition at a

18        later date, is that correct, because I am

19        going to have a lot of questions.

20              MR. CRUMPLAR:  Right.  Yes.

21              MR. BAKER:  But before we go, I would

22        like you --

23              MR. CRUMPLAR:  Yes.

24              MR. BAKER:  -- you mentioned earlier,

25        counsel, that Mr. Hatfield has some

128

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710

# EXHIBIT K

# CURRICULUM VITAE

Richard L. Hatfield
Senior Consultant
MAS, Inc.
3945 Lakefield Court
Suwanee, Georgia 30024
Work Telephone: (770) 866-3200

## EDUCATION

1974      Received Bachelor of Science degree; Experimental Statistics, North
Carolina State University.

1978      Received Bachelor of Science degree; Geology, North Carolina State
University.

## CAREER SUMMARY

Mr. Hatfield joined Materials Analytical Services in 1996 as a Senior Consultant to perform
consulting services for asbestos and other environmental and materials related problems.

Mr. Hatfield joined Law Engineering in 1978 and was assigned to the U.S. EPA's
"Asbestos in Schools" program in 1979. With the completion of that program and the initial
attention of building managers toward the asbestos problems, Mr. Hatfield continued to
assist Law by consulting with clients and developing methods to solve asbestos problems

In 1982, Mr. Hatfield was recruited by a prominent laboratory, McCrone Environmental, to
develop and manage their Atlanta based company. Their goal was to provide quality field
and laboratory services for the asbestos abatement industry. These services included
building surveys, air and project monitoring, consulting, expert testimony, and extensive
analytical and microscopy services. During this time, the company, McCrone
Environmental Services, was recognized as a leader in the specialized fields of light and
electron microscopy.

During 1987, some significant changes in the industry were made, notably the formulation
of Law Associates, Inc. and its subsidiary electron microscopy laboratory, Materials
Analytical Services, Inc. Later in 1987, Mr. Hatfield returned to the Law Companies Group
by joining Law Associates to help develop its consulting services and assist the laboratory
in the development of special analytical services.

DEFENDANT'S
EXHIBIT
7-8-03
#2   Hatfield

Richard L. Hatfield
Page 2

## ASBESTOS RELATED EXPERIENCE

Mr. Hatfield has been actively engaged in asbestos related services since 1979 when he served as a Technical Field Advisor for U.S. EPA's "Asbestos in Schools Program". While serving on this program, Mr. Hatfield assisted in the formulation of New York State, New Jersey and the City of New York asbestos programs. He helped with training state and local government personnel, contractors and the general public in regulations, building surveys and in work procedures associated with the discovery, control and removal of asbestos-containing materials.

Upon completion of the EPA's project, Mr. Hatfield returned to Law and began its development of asbestos related services, particularly its analytical services. Mr. Hatfield's knowledge and experience has been sought to further many other's education in dealing with asbestos-related problems. It should be noted that Mr. Hatfield's teaching experience began as a prime instructor in some of the earliest and most recognized training programs.

While directing McCrone Environmental, Mr. Hatfield began serving as an expert witness in property damage, "cost recovery" litigation. Utilizing the expertise of the microscopy laboratory, Mr. Hatfield developed procedures for the identification of asbestos-containing products and special methods for evaluation asbestos contamination in buildings. In addition to individual property damage cases, Mr. Hatfield testified at the Johns Manville Hearing for Property Damage settlements in Washington, D.C.

Upon returning to Law, Mr. Hatfield had been involved with management and training of project engineers, consulting with a broad spectrum of clients and the development of special analytical services for the laboratory, Materials Analytical Services. Working closely with Dr. Longo and the other microscopists, Mr. Hatfield shared his procedures and experience to further develop analytical testing services for building evaluation and property damage litigation.

Mr. Hatfield's knowledge and experience has been sought to further many other's education in dealing with asbestos-related problems. In addition to lecturing, Mr. Hatfield has twice taught the NIOSH Course No. 582, "Sampling and Evaluating Airborne Asbestos Dust" for the University of Alabama in Birmingham, and was appointed as an expert advisor to EPA's negotiated rule-making committee to promulgate new regulations for asbestos in schools. These regulations are known as the Asbestos Hazard Emergency Response Act (AHERA) regulations. Additionally, Mr. Hatfield has participated in the U.S. EPA's Peer Review of research projects.

Richard L. Hatfield
Page 3

## PUBLICATIONS AND PRESENTATIONS

Longo, W.E., Egeland, W.B., Hatfield, R.L., Stapleton, R., and Hubbard J., "Tremolite Analysis of Chrysotile Containing Friction and Gasket / Packing Products", ASTM Johnson Conference, Johnson Vermont, July 2002.

Longo, W.E., Egeland, W.B., Hatfield, R.L., and Newton, L.R., "Fiber Release During the Removal of Asbestos-Containing Gaskets:  A Work Practice Simulation" Appl. Occup. Environ. Hyg. 17(1) 55-62, 2002.

Hatfield, R.L., Krewer, J.A., and Longo, W.E., "A Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Buildings with Asbestos Containing Materials" (M.E. Beard and H.L. Rook) in Advances in Environmental Measurement Methods for Asbestos, ASTM #STP 1342,301, January 2000.

Keyes, D. L., Chessan, J., Ewing, W. M., Faas, J. C., Hatfield, R. L., Hayes, S. M., Longo, W. E. and Millette, J. R. "Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above and Suspended Ceiling" Am. Ind. Hyg. Assoc. J. (52) Nov. 1991

Keyes, D. L., Chessan, J., Hayes, S. M., Hatfield, R. L., Ewing, W. M., Longo, W. E. and Millette, J. R. "Re-Entrainment of Asbestos from Dust in a Building with Acoustical Plaster" Environmental Choice, Technical Support, Volume I, (6), 1992.

Ewing, W. M., Chesson, J., Dawson, T. A., Ewing, E. M., Hatfield, R. L., Hays, S. M., Keyes, D. L., Longo, W. E., Millette, J. R., and Spain, W. H. "Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing" Environmental Choices Technical Supplement, Volume I, (2), 1993.

## PROFESSIONAL MEMBERSHIPS

1)     American Industrial Hygiene Association

2)     ASTM D-22 Committee

3)     Environmental Information Association

4)     National Institute of Building Sciences

# EXHIBIT L

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

```
1       IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
                IN AND FOR NEW CASTLE COUNTY
2
                        - - -
3
        ERNEST BRADLEY and    : C.A. NO. 00C-05-31-ASB
4       PATSY BRADLEY, his    :
        wife                  :
5                             :
        EDWARD HARRY WAISHES   :C.A. NO. 02C-06-130-ASB
6       and BONNIE WAISHES,   :
        his wife,             :
7           Plaintiffs        :
                              :
8           vs.              ; : NON-ARBITRATION CASE
                              :
9       FORD MOTOR COMPANY,   :
        et al,                : TRIAL BY JURY OF
10          Defendants        : TWELVE DEMANDED
11                      - - -
12              Continuing Oral deposition of
13      RICHARD L. HATFIELD, was taken, pursuant to
14      notice, at the Marriott Philadelphia Airport
15      Hotel, Room 2, One Arrivals Road,
16      Philadelphia, Pennsylvania 19153, on
17      Wednesday, August 13, 2003, beginning at 10:20
18      a.m., before Donna Bucci Stein, Registered
19      Professional Reporter and Notary Public, there
20      being present:
21                      - - -
22
23
24
25
```

0002

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    for the continuation of your deposition?

2    A    I was provided with this summary chart,

3    and I've looked at that.

4                    MR. CRUMPLAR:  It's the same

5    summary chart that we had given to Doctor

6    Lemmon.  It's just a summary of the

7    deposition.

8                    MS. CAFFREY:  There are two

9    pages regarding Mr. Waishes and one regarding

10   Mr. Bradley.  Let's mark these as the next two

11   exhibits consecutively just so we have that

12   for Mr. Hatfield's deposition.

13                    MR. CRUMPLAR:  That's fine.

14                    - - -

15                    (Whereupon Hatfield Exhibit

16   Numbers 20 and 21 were marked for

17   identification purposes at this time.)

18                    - - -

19   BY MS. CAFFREY:

20   Q    Since the time of the last deposition on

21   July 9th have you spoken to either Mr. Bradley

22   or Mr. Waishes?

23   A    No.

24   Q    Have you reviewed any additional medical

25   records that are not contained within the

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    materials you have before you?

2    A    No.  Nothing in addition to what we have

3    here.

4    Q    During our last deposition you gave some

5    opinions regarding the levels of exposure that

6    each Mr. Waishes and Mr. Bradley would have

7    had.  It was a range, I think, for each

8    gentleman.  You said that it was based upon

9    both your studies, which we identified, which

10   was, I think, Blow Out II for Mr. Waishes and

11   then the Blow Out II and then the hand filing

12   video for Mr. Bradley.  Correct?

13   A    Correct.

14   Q    Are there any additional studies of

15   yours that you are relying upon for the

16   opinions you are going to give at trial?

17                 MR. CRUMPLAR:  Beyond what he

18   mentioned?  I mean you asked him that same

19   question a month ago.

20                 MS. CAFFREY:  I'm asking

21   him --

22                 MR. CRUMPLAR:  If he has new

23   information?

24   BY MS. CAFFREY:

25   Q    If you have any new information or

0023

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    studies that you are going to rely upon?

2    A    No.

3    Q    At the time you told me that there would

4    be some publications by Mt. Sinai, and I think

5    the only one you identified by name at that

6    time was the Lorimer study.   Correct?

7    A    Correct.

8    Q    We were provided with a binder

9    yesterday, which is entitled Asbestos Exposure

10   During Brake Lining Maintenance and Repair.

11   There are four articles in here.   I will

12   identify them for the record.  The first is by

13   Rohl and Langer, et al, Asbestos Exposure

14   During Brake Lining Maintenance and Repair

15   from Environmental Research in 1976.   Correct?

16   A    Correct.

17   Q    Is this an article that you rely upon as

18   part of the basis of your opinions?

19   A    Yes.

20   Q    There is also a 1977 article by Rohl and

21   Langer, et al entitled Asbestos Content of

22   Dust Encountered in Brake Maintenance and

23   Repair.  Is this another article that you rely

24   upon for your opinions?

25   A    Yes.

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    Q    The third is the Kauppinen and Korhonen

2    article from 1987; Exposure to Asbestos During

3    Brake Maintenance of Automotive Vehicles by

4    Different Methods.  It was published in the

5    American Industrial Hygiene Association

6    Journal.  Is this another article that you

7    rely upon as a basis of your opinions?

8    A    Yes.

9    Q    And then finally we have the 1976

10   Lorimer article that we discussed at the first

11   deposition.  Correct?

12   A    Correct.

13   Q    That's correct?

14   A    Correct.

15   Q    And that's by Lorimer, Rohl, et al.

16            Other than these four

17   articles, is there any other scientific

18   literature in addition to your studies that

19   you will be relying upon for the opinions

20   you'll render at trial?

21            MR. CRUMPLAR:  I will just

22   make an objection in terms of any other

23   scientific literature.  With basic physics and

24   everything else I think it's a little absurd

25   to say everything.  These are the primary.

0025

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1   to build the room and all that stuff.

2   Q    When MAS does a test on its own without

3   first being retained by a law firm, my

4   understanding is that once that test is used

5   in the litigation MAS charges a twenty-five

6   hundred dollar fee for the first time the test

7   is used for each law firm?

8   A    Yes.  Typically that's what we will do.

9   Sometimes people will want more studies and

10  we'll give them a package deal.

11  Q    So, for example, Brake Blow Out II which

12  you have talked about was a test that was done

13  for MAS was not retained by a plaintiff's law

14  firm.  Correct?

15  A    That's correct.

16  Q    I will just pull some plaintiff law firm

17  names out of the hat and I will use them as an

18  example for what I am trying to illustrate.

19  If the first time the Casson firm in

20  California wants to use brake blow out tests

21  you charge them twenty-five hundred dollars?

22  A    Correct.

23  Q    The first time the Goldberg firm in

24  Pittsburgh wants to use the Brake Blow Out II

25  you charge them twenty-five hundred dollars;

8/13/2003 Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    the first time Ness Motley in South Carolina,

2    twenty-five hundred dollars, and so on down

3    the line.  Correct?

4    A    Right.

5    Q    So now I have the finances straightened

6    out.  I want to try to get a list here of

7    tests that you have done.  I guess probably

8    the easiest thing to do would be to first deal

9    with and put out of the way all of the brake

10   tests.  You have done three hand filing

11   tests:  Bendix Ford, Bendix Chrysler and

12   Carlisle.  Correct?

13   A    Correct.

14   Q    They were done because you were retained

15   by a lawyer in Florida whose name is David

16   Littman.  Correct?

17   A    Correct.

18   Q    So those would be tests where there

19   would be a charge of ten to fifteen thousand

20   dollars.  Correct?

21   A    Correct.

22   Q    You also did the hand sanding test that

23   we've talked about here and that was done for

24   a lawyer here in the Philadelphia area named

25   Edward Rubin in a case called Coletti.

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    Correct?

2    A     You are probably up on it more than I

3    am.  I can't say for sure.  It may very well

4    have been.

5    Q     On that issue are you willing to defer

6    to my recollection and your prior testimony?

7    A     Certainly for the point of discussion

8    here, yes.

9    Q     Fair enough.

10          You have also done the hand

11   grinding test or sometimes called the Bench

12   Gringer Test.  Correct?

13   A     Yes.

14   Q     That was done for a lawyer named Russell

15   Cooke down in Texas, although the brakes

16   actually were obtained by Joe Blanks down in

17   Texas.  Correct?

18   A     It probably was.  I don't recall off the

19   top of my head.

20   Q     You did the test that is commonly known

21   as Brake Blow Out I, the aircraft brake.  I

22   forget the name of the lawyer, but that was

23   also done for a lawyer down in Texas in a case

24   involving B-17 bombers.  Correct?

25   A     Yes.  I don't know whether it was B-17

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley)

1    bombers.  I think it was P-17 training planes,

2    if I'm not mistaken.

3    Q    The blow out assembly came from a PT-14

4    trainer.  The case dealt with a B-17 bomber.

5    A    Fair enough.

6    Q    Now, you have also done on brakes two

7    arc grinding tests which were released into

8    the litigation, but also two that were not,

9    for a total of four.  Correct?

10    A    Yes.

11    Q    Let's break those down.  The first one

12    released into the litigation was May 2000, Arc

13    Grinding I.  Correct?

14    A    Correct.

15    Q    That was done for MAS and you were not

16    retained by a law firm.  Correct?

17    A    I think that is correct.

18    Q    Shortly after the test was done it was

19    released into the litigation.  Correct?

20    A    Correct.

21    Q    Do you recall the name of the law firm

22    to whom it was first released?

23    A    No.

24    Q    If I were to tell you it was the Casino

25    Vaughn firm out of Chicago do you have any

0081

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    reason to disagree with me?

2    A    I don't have any information either way.

3    Q    The second one released into the

4    litigation, Arc Grinding II, was done in

5    August of 2000.  Correct?

6    A    It probably was.

7    Q    Now, my understanding from Doctor Longo,

8    who I have questioned on the matter, is that

9    the brakes from Arc Grinding II have been

10   misplaced.  Is that correct?

11   A    There is a set that has been misplaced.

12   I think it was from there.  We try to hold on

13   to everything, but every once in awhile --

14   Q    I understand.

15              MR. CRUMPLAR:  I will just

16   note an objection.  We don't have grinding in

17   these cases.  I think we're wasting a little

18   bit of time.  You folks can divide up the time

19   how you wish.

20              MR. FALK:  For the record, my

21   view is a complete list obviously goes to

22   credibility issues and things like that.

23   We'll let the Judge review that.

24   BY MR. FALK:

25   Q    Arc Grinding II was done for MAS and not

0082

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1   for a law firm.  Correct?

2   A     I believe so.

3   Q     Shortly after it was done it was

4   released into the litigation.  Can you recall

5   the name of the law firm to whom it was first

6   released?

7   A     No.

8   Q     If I were to tell you it was the Whites

9   & Luxenburg firm in New York City do you have

10  any reason to disagree with that?

11  A     No.

12  Q     You have brought with you here today,

13  and I know there was discussion early on about

14  the record, the 1998 test on the sanding of

15  clutches.  Correct?

16  A     Yes.

17  Q     That was done for Barren & Budd out of

18  Texas.  Correct?

19  A     That is correct.

20  Q     Let's go back to Kaylo.  We have the two

21  Kaylo tests that we talked about earlier.

22  Correct?

23  A     Correct.

24  Q     Those were done for the Humphrey,

25  Farrington, McClain firm out of Kansas City.

0083

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    Missouri.  Is that correct?

2    A    Correct.

3    Q    You also mentioned the Kaylo laundry

4    exposure test.  When was that done?

5    A    There were two of those.  I don't

6    remember what years they were.

7    Q    Do you recall whether they were done for

8    MAS or whether they were done for a law firm?

9    A    The first one I'm almost certain was

10   done at the request of the law firm because it

11   was kind of case specific on that one.  The

12   other one I can't tell you one way or the

13   other.

14   Q    Do you recall the name of the law firm?

15   A    No.  I recall the circumstances more

16   than I do the law firm.

17   Q    What were the circumstances?

18   A    It was a little bit unique because this

19   person, part of their job was to go into a

20   submarine car that is used to transport molten

21   steel and it's lined with Kaylo inside.  His

22   job was to go in that -- it was just a small

23   hole, to go in there and beat all that Kaylo

24   out of there.

25   Q    Now, in which one, or maybe it was both,

0084

8/13/2003 Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    of the Kaylo laundry exposure tests did you

2    guys actually do the shake out of the clothes

3    of the dryer, or was it both?

4    A      In both of them the clothes were shaken

5    out.

6    Q      That's what I'm talking about.  So in

7    both of the Kaylo laundry tests we have not

8    just settled dust from the clothing

9    themselves, we also have an airborne testing

10   from the actual process of shaking out?

11   A      Yes, absolutely.

12   Q      Unibestos, one time or two times?

13   A      For what?

14   Q      For how many times you have done

15   workplace simulations on Unibestos.

16   A      I believe there is an original Unibestos

17   and there is a Unibestos II and then there is

18   a clothing shake out that's also with

19   Unibestos.

20   Q      Unibestos I, or the original Unibestos,

21   was it done for MAS or for a plaintiff law

22   firm?

23   A      I believe that was part of the Humphrey

24   Farrington original.

25   Q      When you say original it's because

0085

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    Humphrey Farrington was the first law firm to

2    approach you guys about this.  Right?

3    A    Yes.

4    Q    You and I have talked about that in the

5    past?

6    A    Sure.

7    Q    Unibestos II, what was the activity in

8    Unibestos II?

9    A    The same thing:  hand sawing.

10   Q    For MAS or for a plaintiff law firm?

11   A    I believe that both the Kaylo II and the

12   Unibestos II were done initially by MAS

13   because we wanted the midget impinger data.

14   That's the way I recall.

15   Q    And then Unibestos clothing, for MAS or

16   for a plaintiff law firm, if you know?

17   A    I really don't know.

18   Q    Just so that we're clear, any testing

19   where you are retained by a plaintiff's law

20   firm, there is a one-time charge of ten to

21   fifteen thousand dollars to that law firm; any

22   testing that's done for MAS we have the

23   twenty-five hundred first-time user charge?

24   A    Correct.

25   Q    I had a reference in some of my

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    materials to Careytemp.  Did you guys ever

2    test Careytemp?

3    A    We did a sawing on Careytemp.

4    Q    Just the one?

5    A    I believe that's all we have done.

6    Q    For Humphrey Farrington?

7    A    I don't know.

8    Q    Was it for a plaintiff law firm or was

9    it for MAS?

10   A    I don't know.

11   Q    I had a reference to Pabco.  Did you

12   guys do a Pabco test?

13   A    We did some sawing on Pabco.

14   Q    Just one?

15   A    Just one.

16   Q    For a plaintiff law firm or --

17   A    I don't know.

18   Q    Now we get to the one where I always get

19   confused as to how many: gaskets.  I will

20   take a guess and then you can tell me if I am

21   wrong.  Is it six now?

22   A    It probably would depend on how you

23   broke it down.

24   Q    Put packing off to the side.  I'm just

25   talking about gaskets themselves, whether they

0087

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1     be pre-formed gaskets or sheet gaskets.  I

2     know you have done the hand brushing, the

3     electric brushing, the scraping.  I'm just

4     looking for a total number of gasket tests.

5     A    One of the things that we did early on

6     was we took some gasket material and we did

7     sheet gasket material and we did what they

8     call donut gaskets or manhole gaskets and we

9     wire brushed those to see if they would

10    release.  They were new material.  So that's

11    one thing.  We started on the scraping and

12    wire brushing and electric wire brushing.  The

13    original one, I think, was the flanges that

14    were sent from Hawaii.  Then we did gasket

15    two, three, four and five.  So you can add

16    them up however you want.

17    Q    It sounds as though we have between the

18    various activities and the various

19    companies -- let's identify the companies.

20    Which companies were the various gaskets from?

21    A    In the early test where we did the new

22    gasket material, that was Garlock gaskets.  In

23    the balance of the studies we don't know who

24    manufactured the gaskets because they were

25    used and you can't figure out whose they are.

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    Q      They were in place on the flanges?

2    A      Exactly.

3    Q      Have you done any testing on John Crane

4    gaskets?  I thought you had.  Or is it John

5    Crane packing?

6    A      We did something on testing it and heat

7    treating it or something to that effect.

8    Doctor Longo did most of that.  That was more

9    of a physical nature, the material-type test.

10   Q      Was that to ascertain or derive

11   information on transformation of chrysotile to

12   fosterite or was it simply for the purposes of

13   finding out what happens when a gasket is on a

14   steam line or a high "D" acid line?

15   A      I'm kind of thinking it was packing and

16   not gaskets.  I can't actually recall the

17   purpose of that.  I haven't talked about it

18   much.

19   Q      Durabla gaskets have you tested?

20   A      We did a test manufacturing gaskets from

21   Durabla material.

22   Q      I'm trying to keep packing and gaskets

23   separate.  We will get to packing in the next

24   set of questions.  I will have to just start

25   throwing out names.  Tell me if it's packing

D089

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    or gaskets.

2                    Chesterton?

3    A    I don't believe we have done anything

4    with Chesterton.

5    Q    Argo?

6    A    I don't believe we have done anything --

7    I think you have exhausted the gasket studies

8    as far as any kind of workplace-type studies

9    and so forth.

10   Q    So it looks as though we have

11   approximately six work practice studies

12   involving gaskets?

13   A    Yes.  Depending on how you count them at

14   least six.

15   Q    Of those at least six gasket studies,

16   how many of them were done at the request of

17   plaintiff law firms and how many of them were

18   done by MAS?

19   A    Some of the earlier ones were done at

20   the request of some plaintiff counsel.  Gasket

21   five, gasket four and gasket three were

22   definitely done for MAS.

23   Q    Do you recall which plaintiff counsel

24   the earlier ones were done for, or for whom?

25   A    The very first ones we talked about,

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1     that was Humphrey Farrington.

2     Q     Were any done for Gary Gallagher as part

3     of that Hawaii case?

4     A     Yes.     The ones from Hawaii were

5     definitely done for that case.

6     Q     Were any of them done for either Steve

7     Casson's firm or the Braden firm?

8     A     Not that I'm aware of.

9     Q     All right.

10               Packing, again because it gets

11     confusing with the gaskets, how many of the

12     packing tests have you done?

13     A     There's been three studies that were

14     conducted.

15     Q     Whose packing and what type of work

16     practices?

17     A     The first one was removal.  I'm trying

18     to think whose packing we used.  I believe it

19     was Crane.  We have used Crane and Garlock.

20     So that's the easy way to put it.

21     Q     Of these three packing tests involving

22     removal of Crane and Garlock packing products,

23     how many of them, if any, were done for

24     plaintiff law firms versus being done for MAS?

25     A     I don't really recall.  As you know, the

8/13/2003 Hatfield, Richard (continuation of dep re: Walshes/Bradley(

```
1    first one didn't contain hardly any asbestos-
2    containing packing in there.  So hence the
3    reason for two.  I think we really did three
4    because I think two was Crane material and we
5    did three with Garlock.  It's only the
6    replacement material that we know about.
7    Q    I need to go back to the brake arc
8    grinding tests.  We talk about the two that
9    were released into litigation, but there were
10   actually two others that were not officially
11   released into the litigation.  One is January
12   2000 where you were trying to do midget
13   impinger data.  You were unsuccessful.  Is
14   that correct?
15   A    I think so.
16   Q    Do you know whether or not that data was
17   ever released into the litigation separate and
18   apart from anything that you and I have done
19   at depositions where you have produced
20   materials to me?
21   A    No.  I think we viewed those testings as
22   not sufficient enough to utilize.  So we just
23   kind of forgot about them.
24   Q    Let me ask you this, and I will ask you
25   to assume this as being true.  If that data
```

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    from the January 2000 arc grinding test was

2    released by the Ness Motley firm into the

3    litigation in a Minnesota case three weeks

4    after you guys did it in January of 2000, do

5    you know how that would have occurred?

6                    MR. CRUMPLAR:  This is

7    Delaware litigation.  I know you are national

8    counsel and what goes on in Minnesota may be

9    relevant, but we only have a limited amount of

10   time.

11                   MR. FALK:  I understand your

12   objection.

13                   THE WITNESS:  I don't have any

14   idea about that.

15   BY MR. FALK:

16   Q     Would Ness Motley have gotten that data

17   from anybody other than MAS?

18   A     I wouldn't believe they have would.

19   Q     So if it was released by Ness Motley it

20   would have been through MAS then?

21   A     I would think so.

22   Q     And the fourth and final arc grinder

23   test was one where there were some problems

24   with the arc grinder and the arc grinder

25   actually came to a stop and no data was

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    generated.  Correct?

2    A    You said four.  I think you meant two.

3    Q    Okay.  Four total, one of them had the

4    problem with the arc grinder?

5    A    Exactly.

6    Q    You have produced today asbestos-

7    containing floor tile tests for Flintkote that

8    was done in June of last year for the Goldberg

9    Persky firm in Pittsburgh.  Correct?

10   A    I believe it was.

11   Q    There was also another prior asbestos-

12   containing floor tile test in '98 or '99 for

13   Barren & Budd also on Flintkote.  Is that

14   correct?

15   A    I think there was.

16   Q    There were also two sheet flooring tests

17   involving Congoleum sheet flooring.  Correct?

18   A    There were some studies on that.  I

19   think there's two.

20   Q    Those were also done for Barren & Budd I

21   believe?

22   A    I couldn't tell you one way or another.

23   Q    You have also done a test involving the

24   pouring of Grefco/Eagle-Picher cement.

25   Correct?

0094

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1     A     Correct.

2     Q     It's basically an Eagle-Picher cement

3     that carried a general refractories brand

4     name.  Correct?

5     A     Correct.

6     Q     Was that done for a plaintiff law firm

7     or for MAS?

8     A     That was done for a plaintiff law firm.

9     Q     Which law firm, if you recall?

10    A     That was Barren & Budd.

11    Q     Monokote gunning, you have done that.

12    Right?

13    A     Yes.

14    Q     How many Monokote gunning tests?

15    A     The one that's labeled that way is a

16    pouring test.  There is another pouring test

17    that's related to Monokote/Zonolite.  Then

18    there is a study that has kind of two parts to

19    it and it's the pulverization of Monokote and

20    the dumping of dust and debris.

21    Q     So between pouring and pulverization we

22    have a total of three tests on the product

23    known as Monokote.  Correct?

24    A     I think that's probably accurate.

25    Q     Were any of those tests done for a

5095

8/13/2003 Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    plaintiff law firm?

2    A    The gunning -- I think they were.   I

3    think all of them were.

4    Q    Do you recall which law firm or firms?

5    A    I can recall that the gunning was for

6    the firm over in Birmingham, the environmental

7    litigation group.  I believe the pulverization

8    dumping -- I believe that was done for Spites

9    & Rennan.

10    Q    You talked about five joint compound

11    tests, three of which were news to me:  U.S.

12    Gypsum; Kaiser Gypsum; J.C. Penney; Bondex and

13    Best Wall.  These were tests involving the

14    mixing of the dry mix and then sanding it once

15    it's applied onto the wall.  Correct?

16    A    Right.  Most of them included some clean

17    up, too, I think.

18    Q    How many of those five were done for

19    plaintiff law firms and how many of those five

20    were done for MAS?

21    A    I really am not going to be able to tell

22    you.  I can tell you that a number of them

23    were done for plaintiff counsel.

24    Q    One of the new ones from last week:

25    bakelite.  Was that done for MAS or for a

8/13/2003  Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1     plaintiff law firm?

2     A     I don't know for certain.  I believe it

3     might have been at a request.

4     Q     Do you recall the name of the law firm?

5     A     No.

6     Q     The list that you produced last week in

7     West Virginia made a reference to Mundet.

8     What kind of product was tested for Mundet?

9     A     Mundet is a thermal block type.

10    Q     Would that have been for the Humphrey

11    Farrington firm?

12    A     No.  That was done later on.  I think it

13    was a request, but I don't know.

14    Q     Was it hand sawing or electric sawing of

15    pipecovering and block?

16    A     I think it was just the hand sawing of a

17    piece of Mundet.  I think it was probably a

18    piece of block.

19    Q     The calidria (phonetic) test, that was

20    new that I didn't know about.  For whom was

21    the calidria test done?

22    A     That I believe was an internal one.

23    Q     How many aspects were tested in the

24    calidria test?  Calidria is a raw fiber.

25    Correct?

0097

8/13/2003  Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    A    Correct.

2    Q    So what was tested with the calidria

3    fiber?

4    A    The real goal of the work wasn't a work

5    practice.  It was to study the characteristics

6    of the calidria fiber -- airborne asbestos

7    fiber.  So the work that was done was simply

8    to get the fiber airborne so we could sample

9    it and then we could study the lengths and the

10   widths and the configurations of the fibers.

11   So that was the goal.

12   Q    I understand.

13           The wire test that you have

14   brought here today, was that done for MAS or

15   was that done for a plaintiff law firm?

16   A    I don't know who, but I'm certain it was

17   probably originally initiated by one of the

18   law firms.

19   Q    The Narco gun test, who was that done

20   for?

21   A    I don't know.

22   Q    But it was done for a plaintiff law

23   firm?

24   A    Probably, but I don't know for sure.

25   Q    When we talk about Narco gun I guess we

0098

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley)

1    should be complete for the record.  We're

2    talking about a cement made by North American

3    Refractories.  Correct?

4    A    Correct.

5    Q    Stic Tite, who was that done for?

6    A    I don't recall.  I suspect it was a

7    request.

8    Q    And again for the record, Stic Tite is a

9    cement I associate it with Combustion

10   Engineering.

11   A    I think you're probably right.

12   Q    There was a second Grefco test on

13   aerogun.  Do I have that right?

14   A    There is an aerogun.

15   Q    That was a Grefco product?

16   A    I thought that was North American

17   Refractories, also.

18   Q    Then I had it under the wrong name.

19   A    Maybe I'm wrong.  I was thinking that an

20   aerogun and Narco gun were all made by the

21   same manufacturer.

22   Q    But they are two separate cements.

23   Correct?

24   A    Yes.

25   Q    And in the cement test what you did was

00.3

8/13/2003 Hatfield, Richard (continuation of dep re: Walshes/Bradley(

1    simulate the pouring and mixing of the cement

2    itself?

3    A    Just pouring it basically.

4    Q    Not the actual spray gunning of it?

5    A    No.  No.  No.  Just pouring it out of

6    the bag.

7    Q    The Kaylo laundry test, the two of them

8    we've talked about.  You did a Grefco laundry

9    test.  Correct?

10   A    No.

11   Q    No?

12   A    No.

13   Q    I thought you did.  My mistake.

14                      Felcrow (phonetic) automotive

15   gaskets?

16   A    There was a look at one of the gaskets

17   from Felcrow.  It was a new test just to see

18   if that material could release asbestos.

19   Q    And that was done at the request of

20   David Littman.  Correct?

21   A    It was.

22   Q    The same case in fact as the hand filing

23   case.  Correct?

24   A    I think so.

25   Q    Micarta, how many times have you guys

0100

8/13/2003 Hatfield, Richard (continuation of dep re; Waishes/Bradley(

1    tested micarta?

2    A    Well, we've tested the micarta composite

3    panel several times.  We have also tested the

4    individual components which micarta composite

5    panel is two sheets of micarta with maronite

6    in-between.

7    Q    Between the various tests how many times

8    do you think you have tested micarta?

9    A    Let's just go with four right now and

10    we'll see how close that really is.

11    Q    How many of them were for plaintiff law

12    firms and how many were for MAS?

13    A    One of them I know was at the request of

14    Ron Motley.  I don't remember really when we

15    did the second cutting of the composite panel,

16    who that was for or whether it was for

17    someone.  It may have been.  I believe the

18    cutting of the maronite was at the request of

19    defendant.

20    Q    You mentioned the ceiling tile test

21    today and I guess I'm a little unclear.  Was

22    that something done during the property damage

23    litigation or was it a post '96 --

24    A    It was post '96.

25    Q    And was that for MAS or was that for a

0101

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    plaintiff law firm?

2    A    It was for a plaintiff law firm.  It was

3    for Humphrey Farrington.

4    Q    Lest I forget, we also have the Kent

5    cigarette filter test, correct, that was an

6    article you guys actually published?  Right?

7    A    It was something that Doctor Longo did.

8    Q    Was that done for MAS or was that done

9    at the request of a plaintiff law firm in the

10   tobacco litigation?

11   A    I believe it was done at the request of

12   someone.  I wasn't there when it was done, so

13   I can't tell you.

14   Q    Fair enough.

15                I forgot cement pipe.  How

16   many times have you tested asbestos-containing

17   cement pipe?

18   A    There have been three studies that have

19   been completed.

20   Q    That's what I have.  Do you know which

21   manufacturers for the three studies?

22   A    Yes.  It was Johns-Manville and

23   Certain-Teed twice.

24   Q    And were those for MAS or were those for

25   plaintiff law firms?

0102

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

```
1    A     The first two I believe were at the
2    request of someone.  The third one was our
3    study.
4    Q     Let's switch gears here.  You had a long
5    talk with Sharon about the process known as
6    dehydroxylization that results from the
7    heating of chrysotile, at what point you get
8    to the end of your area of expertise, the
9    health hazards and things of that sort.
10   Correct?
11   A     Correct.
12   Q     Do you know whether or not fosterite
13   would be characterized as a nuisance dust
14   under Table "Z" of the OSHA regulations?
15   A     I don't know.
16   Q     And you certainly would not consider
17   yourself as having any expertise on the health
18   hazards of fosterite.  You would have to defer
19   to others who have studied that issue.
20   Correct?
21   A     Correct.
22   Q     And, in fact, as you have told me in the
23   past, the health hazards of asbestos exposures
24   from any of your simulations and tests is
25   again not in the field of your expertise; you
```

0103

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1                        - - -

2                    EXAMINATION

3                        - - -

4    BY MS. CAFFREY:

5    Q    I want to talk to you a little bit about

6    the Brake Blow Out II video, the actual

7    video.  There is no way to visually tell what

8    is asbestos and not asbestos when you see the

9    dust in the light.  Correct?

10   A    That's correct.

11   Q    Now, I do have a question about in the

12   Brake Blow Out II.  Did you follow OSHA's

13   quality control methods with regard to your

14   PCM analysis?

15   A    I believe we did.

16   Q    Can you tell me what steps you took to

17   follow their quality control methods?

18   A    We would have utilized live recounts.

19   We would have or we do participate in the PAT

20   program.  We participate in a round robin of

21   trading slides with other laboratories.

22   Q    Which laboratories do you do that with?

23   A    I don't know them off the top of my

24   head.  Somebody else handles that.  We have

25   blanks.  We do blanks.  We have an AIG

8/13/2003 Hatfield, Richard (continuation of dep re: Waishes/Bradley(

1    accredited lab.

2    Q    On Brake Blow Out II did you get

3    overloaded filters?

4    A    I would have to look.  With that kind of

5    dust there's possibilities that there was some

6    with high loaded.

7    Q    Doctor Longo has on a number of times

8    testified as to your methodology.  Do you

9    stand behind his testimony?

10    A    I believe that you would find his

11    testimony and my testimony to be consistent.

12                MS. CAFFREY:  I think that's

13    all I have.

14                MR. CRUMPLAR:  Okay.

15                    - - -

16                (Whereupon the witness was

17    excused at this time.)

18                    - - -

19                (Whereupon the deposition

20    concluded at 1:10 p.m.)

21                    - - -

22

23

24

25

EFiled:  Jan  4 2007  3:41PM EST
Transaction ID 13347710

# EXHIBIT M, PART 1



# BRAKE BLOW-OUT II

# Work Practice Study

By:

Richard L. Hatfield
Larry R. Newton, CIH/CSP
William E. Longo, Ph.D.

Materials Analytical Services, Inc.
January, 2001



DEFENDANT'S
EXHIBIT
7-8-03
#9   Hatfield

et
reet ~ Suite 101

Atlanta Office:
7945 Lakefield Court



MEMORANDUM

DATE:     April 6, 2001

TO:        File

FROM:     William E. Longo

RE:        Brake Blowout II

---

### December 18 – 22, 2000

Paul Liss went to Quality Used Auto Parts in Fayetteville, Georgia and inquires about any pre-1980 automobiles that may contain a rear axle in which we might be able to harvest for a brake blowout study.

A 1976 Chrysler Newport was located on the lot. The right rear brake drum was removed and a small amount of dust and debris was scraped with a screwdriver and collected in a sealed Ziplock bag by Mr. Liss (estimated amount was 1/10 to 1/4 gram).

### January 8 – 12, 2001

The dust was examined by Mr. Bill Egeland and was determined that the material was contaminated with chrysotile asbestos.

Mr. Liss went back out to Quality Used Auto Parts and make arrangements to pick up the assembly. Additionally, Mr. Liss took pictures of the auto and inspected the interior and in the trunk. Mr. Liss found two sets of brake shoes in the trunk.

Before transporting the axle assembly to MAS, it was wrap in plastic and sealed by Mr. Liss. Additionally, Mr. Liss acquired the two sets of brake shoes found in the trunk.

Raleigh Office
616 Hutton Street • Suite 101
Raleigh, NC 27606

Atlanta Office
3945 Lakefield Court
Suwanee, Georgia 30024



# TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS.**

3945 Lakefield Court
Suwanee, GA 30024
PH: (770) 866-3200
FAX: (770) 866-3259

Co. Name: _MAS_
Address: _____

PH: _____
FAX: _____

Project Number: _____
Project Name: _____
Work Area Description: _____
Project Representative: _____
Sampling Date: _1/16/01_

brake blow out IT

Sheet ____ of ____

| Date | Sample No. | Sample Location | Sample Type | Sample Times (Minutes) | | | Flow Rate (Liters per Minute) | | |
|------|-----------|-----------------|-------------|-------|------|----------|--------|-------|---------|
| | | | | Start | Stop | Duration | Before | After | Average |
| 1/16/01 | #1 | brake-axle assembly | #76 Neerport | | | (whole) | | | |
| " | #2 | brake shoe (A) | | | | | | | |
| " | #3 | brake shoe (B) | | | | | | | |
| " | #4 | brake shoe (C) | | | | | | | |
| " | #5 | brake shoe (D) | | | | | | | |
| | | *Note: brake shoes found in trunk at customer Neerport | | | | | | | |
| | | *Samples 1-5 delivered to MAS by Paul Liss | | | | | | | |

**CHAIN OF CUSTODY**

| | Mode of Transfer | Log-In Date | Received By |
|---|---|---|---|
| Initial Shipment Date: 1/16/01 | by hand | | |
| First Transfer By: | by hand | | |
| Second Transfer By: | | | |
| Third Transfer By: | | | |









# Table of Contents

**Brake Blowout II**

*Work Practice Study*



**Study, Design & Protocol**

**2**

**Summary of Data**

PCM, TEM, & Fabric Analysis

**3**

**Bulk Sample Analysis**

1. M25750

**4**

**Air Sample Analysis**

1. M25336

**5**

**Dust Analysis Results**

1. M25317

**6**

**Fabric Analysis Results**

1. M25337

**7**

**Photographs**

**8**



# Brake Blowout II
# Work Practice Study

*This study was designed and conducted by Richard Hatfield, William Longo, and Larry R. Newton.*

<u>Study Design and Methodology</u>

The study was performed in the exposure characterization lab (ECL). The size of the ECL is approximately 20 ft x 15 ft x 8 ft and the walls and ceiling are constructed of a painted plastic laminate. The ECL is constructed with two viewing windows for video taping purposes and has a ventilation rate of approximately 200 cubic feet per minute with two primary inlet sources and a negative air machine that produces a constant airflow during the study. Before the study, the inside of the ECL was decontaminated by standard asbestos abatement methods including HEPA vacuuming of all dust and debris, wet wiping of all surfaces and repainted.

During video taping of the work practice study, lighting is utilized inside the ECL to increase the possible observations of dust released during the work practice. Previous studies have shown that the use of, what is commonly referred to as the "Tyndall light phenomena", is an effective method of displaying respirable airborne dust generated from workplace activities.[1,2,3,4] To minimize light reflection, the walls, floor and ceiling inside the ECL are painted black.

MAS obtained a rear axel assembly from a 1976 Chrysler Newport. This assembly included the rear drum brake system with intact wheel drums. The rear axel assembly was placed in the ECL on a movable stand. Examination of the dust inside the left wheel drum before the study determined that chrysotile asbestos fibers were present in the dust. Examination of the four in-place brake shoes were found not to contain asbestos. However, used brake shoes were found in the trunk of the car during removal of the axel assembly and when these brake shoes were analyzed, they were found to contain 25% chrysotile asbestos. This suggested that there had been a recent brake replacement job performed on the car before it was junked. Even though the brake shoes in the axel assembly were non-asbestos, the decision was made to perform the work practice study as planned.

During the study, air samples were collected using standard 25 mm cassettes containing 0.8-micron pore size mixed cellulose ester (MCE) filter on a 5.0 micron backing pad. The air sampling pumps were calibrated both before and after the sample collection. High volume pumps were used for area air samples during the study. The

[1] Surgen Commander P.G. Harris, "The Effects and Control of Disease Associated with Exposure in Devonport Dockyard," Doctoral Dissertation.

[2] G. Burdett, K.S. Dodd, "Asbestos Fly Ash, ... y Report," John Wiley & Sons C... munation

[3] D.T. Chambers, "Dust Control Development and its Effectiveness in Controlling Asbestos, Volume 2, Properties, Applications and Hazards, John Wiley & Sons 8, 193, 1979.

[4] I. J. Selikoff, "Insulation Hygiene Progress Report," Volume 3, No. 4, Winter, 1971.



pumps were located outside the ECL and connected to the air samples cassettes by Tygon® tubing through the walls of the ECL. The four area air samples were located around the work site. The area air sampling cassettes were placed approximately five feet from the floor and 6 to 7 feet from the work activity. The high volume pumps were calibrated to a flow rate of 10 liters per minute for the area samples collected during the study. The two investigators performing the work practice were each fitted with two personnel air sampling pumps with connecting tubing and standard 25 mm MCE air sampling cassettes. The air sampling cassettes were attached to each shoulder and within the breathing zone of each investigator. The personnel air sampling pumps were calibrated to a flow rate of 2 liters per minute. Before blowing out the brake assembly with compressed air, background samples were run inside and outside the ECL. The air samples were collected in general accordance with NIOSH Method 7400 for measuring airborne asbestos fibers. At the end of the blowout study, an air cassette was opened in the chamber for 30 seconds then closed. This sample was analyzed as a field blank.

The individuals working inside the ECL wore Tyvek® suits under cotton work clothes, and were supplied air through, full-face pressure demand respirators equipped with an escape HEPA filter system. The ECL design included a decontamination area for clothing removal and a shower to remove residual asbestos contamination before the individuals left the ECL area.

Blowout Study

Information provided by mechanics and in other similar studies indicated that a typical work practice used while repairing or replacing brakes was to blow the wheel, brake drums and brake assembly free of dust using compressed air. This study was conducted to determine if the use of compressed air to remove dust from a brake assembly that contained non-asbestos brakes, but contained residual contaminated dust from the previous asbestos containing brakes, would cause release respirable asbestos fibers into the breathing environment of a mechanic.

Analytical Methods

The air sample cassette filters were analyzed by NIOSH Method 7400 PCM method using A counting rules. A portion of the filter material from the air samples was analyzed by TEM using the washout redeposit indirect method. The fabric samples were analyzed by the recommended EPA method to determine the level of asbestos contamination of the clothing worn by the investigators. The brake linings was analyzed by PLM to determine the asbestos content.



## Results

During the study, the mechanics were exposed to levels of airborne asbestos fibers between 0.52 and 1.72 fibers per cc by PCM and between 33.9 and 209.0 structures/cc by TEM. The clothing worn by the mechanic was found to be highly contaminated with respirable asbestos fibers. The fabric sample resulted in a level of 55.5 million asbestos structures per square foot. The PLM analysis determined that chrysotile asbestos was present in the old brake shoes at a concentration of 25% by volume.

## Conclusion

MAS conducted a study to determine exposures to airborne asbestos fibers generated while performing compressed air blowout on a brake assembly that contained non-asbestos brake shoes, but contained residual asbestos contaminated brake dust from the previous shoe friction material. During this process, significant amounts of asbestos fibers are released into the air. The PCM air sample counts were bias low due to the tremendous filter loading with non-asbestos particulate.

This study also showed that the work clothing of the mechanics was contaminated with asbestos fibers. The operator's clothing contamination level was measured at 55.5 million asbestos structures per square foot and contaminated clothing offers additional opportunities for asbestos exposure to the workers and family members if the contaminated clothing is left at work or taken home.

Also, the indirect TEM air analysis data collected in this study was done for internal research purposes and was not used to compare to any occupational exposure (OSHA) standards. The direct PCM analysis was done for that purpose.



**BRAKE BLOWOUT II**
**Work Practice**
**January 30, 2001**

*Protocol*

Richard Hatfield, William E. Longo, Ph.D., Larry R. Newton, CIH, CSP

I.  **ECL SET-UP**

    A.    Study is to be performed in the exposure characterization lab (ECL) constructed using negative airflow asbestos abatement technology. The size of the ECL is approximately 15' x 20' x 8'.

    B.    Air exchange inside the ECL will be approximately 200 cubic feet per minute as measured (Extech Model 451126) at the air exhaust of the HEPA filter negative air machine (Aramsco, Comanche Model #55011).

    C.    Tyndall lighting setup according to the protocol as described in D.T. Chambers, "Asbestos", John Wiley & Sons, 6, 193, 1979.

II.  **BACKGROUND AIR SAMPLES (Filter Cassettes) -- January 30, 2001**

    A.    Adjust and calibrate high volume area pumps to 10 liters per minute.

    B.    Setup four area air samples inside the ECL. Use 25 mm air cassettes containing 0.8 micron pore size mixed cellulose ester (MCE) filters with a 5.0 micron backing pad.

    C.    Locate the area air samples in each quadrant of the ECL at a height of 55" from the floor and a distance of approximately 6 feet from the work activity.

III.  **WORK PRACTICE STUDY – January 30, 2001**

The investigators (mechanics) will remove the brake drum of one wheel and using compressed air blow out the brake assembly and drum. After a sample time of 5 minutes, the pumps are to be turned off and new filter cassettes installed on both area and personnel pumps. Then the pumps are turned on and the second brake assembly and drum will be blown-out and air sampling will continue for 5 minutes. The pressure of the compressed air will be approximately 100 psi.

1) The axel assembly was placed in the ECL on a movable jack assembly.

2) The two mechanics will each be fitted with two personnel air pumps and air cassettes on each shoulder located in their breathing zone and calibrated at a flow rate of 2.0 liters/minute.

3) The mechanics will wear appropriate protective clothing, work apparel and respiratory protection equipment.

4) The work practice will be performed under Tyndall lighting. The entire procedure will be video taped with three separate cameras.

5) During filming, the Tyndall lighting will be turned off and overhead lights turned on at least once during the simulation.

6) After the one brake assembly is cleaned with compressed air the personnel and area sample will be exchanged with new air cassettes.

7) After the second brake assembly is cleaned with compressed air, the area and personnel pumps are turned off and only the area samples are exchanged with new air cassettes. These area samples will be started 30 minutes after the compressed air clean-out portion of the study is completed and run for a time span of 30 minutes.

8) After the study is completed, the ECL will be decontaminated using typical asbestos abatement techniques including HEPA vacuuming and wet wiping.

IV.    **Laboratory Analysis**

A. The air cassette air samples will by analyzed by the NIOSH 7400 PCM method using A counting rules. A portion of the filter will be removed for the PCM analysis and the additional material from the filter will be used for the TEM analysis.

B. For the TEM analysis, all samples will be analyzed by the modified EPA Level II Protocol. Samples will be prepared using the redeposit washout method.

C. Fabric samples will be analyzed by the recommended EPA method.

MATERIALS ANALYTICAL SERVICES, INC.



## Work Practice Simulation Protocol

I)  **Chamber Setup**

    A)    The walls, ceiling, and floor are painted black to diminish light reflection.

    B)    Arranged lighting for Tyndall effect in general accordance with the method described in by D.T. Chambers, "Asbestos", John Wiley & Sons, 6, 193, 1983.

II)  **Background Air Samples**

    A)    Adjust and calibrate high volume area pump to appropriate flow rate.

    B)    Set up two or more air samples inside the chamber and one outside air sample in general accordance with the procedure outlined in the NIOSH 7400 method.[1]

III)  **Work Practice Study[2]**

    A)    Review the appropriate information on work practices simulation.

    B)    Acquire all necessary tools and materials required for work practice simulation.

    C)    Calibrate personnel and high volume sampling pumps appropriate to flow rates.

    D)    Set ventilation to 200 cubic feet per minute as measured with the Extech Flow Anemometer.

    E)    Set up two or more inside air samples and one outside air sample in general accordance with the procedure outlined in the NIOSH 7400 Method.[1]

    F)    Participants in the study are to wear protective clothing, work apparel, and respiratory protection equipment.

    G)    Set up the personnel air samples in general accordance with the procedure outlined in the NIOSH 7400 method.[1]

    H)    Determine the appropriate time for the length of study.

    I)    Work practice study performed as determined in Section III, A&B.

---

[1] If midget impinger air sampling is to be done, set up the samples in general accordance with the ACGIH method.

[2] Parts of the procedure may be done in advance of chamber set up.



    J)       If appropriate, film the work practice study from start to finish in two directions. During filming, turn off Tyndall lighting and turn the overhead lights on at least on one occasion.

## IV.    ANALYSIS

    A)       Analyze air samples by NIOSH 7400 PCM methods with A counting rules.[3] *(See Note)*

    B)       Analyze air samples by the TEM indirect method.

    C)       Analyze the cloth/fabric samples by the recommended EPA method.

    D)       Analyze dust samples by the ASTM D-5755-95 method.

## V.    RESULTS

    A)       Air: Report PCM results as fibers/cc, report TEM results all sizes (structures/cc) and greater than or equal to 5 microns in fibers/cc.

    B)       Fabric: Report TEM results as number of asbestos structures per $cm^2$ and per square foot of cloth sample.

    C)       Dust: Report TEM results as number of asbestos structures per $cm^2$ and per square foot of surface area sampled.

## VI.    OPTIONAL ANALYSIS

    A)       Midget impinger samples analyzed by the ACGIH method.

    B)       Dust samples analyzed by the ASTM D-5755-95.

Note: According to the NIOSH 7400 method, fiber counts outside 100-1300 fibers/$mm^2$ range have greater than optimal variability and are probably biased.

---

[3] If the air samples are too overloaded for PCM analysis, use the indirect washout method.

# BRAKE BLOWOUT II
## ASBESTOS AIR & FABRIC ANALYSIS RESULTS

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Str/cc | TEM Fibers ≥ 5µm/cc |
|---|---|---|---|---|
| A-O-A | IWA Background | <0.01 | <0.04 | N/A |
| A-O-B | IWA Background | <0.01 | <0.04 | N/A |
| A-O-C | IWA Background | <0.01 | <0.04 | N/A |
| A-O-D | IWA Background | <0.01 | <0.04 | N/A |

### 1st Wheel Blowout

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Str/cc | TEM Fibers ≥ 5µm/cc |
|---|---|---|---|---|
| A-1-A | IWA Area Sample | 0.09 | 6.58 | 1.32 |
| A-1-B | IWA Area Sample | 0.07 | 14.61 | 3.98 |
| A-1-C | IWA Area Sample | 0.04 | 7.83 | 2.61 |
| A-1-D | IWA Area Sample | 0.09 | 6.61 | 1.32 |
| P-1-A (WL-R) | IWA Personnel | 0.79 | 47.19 | 6.74 |
| P-1-B (WL-L) | IWA Personnel | 1.03 | 33.86 | 6.77 |
| P-1-C (RH-R) | IWA Personnel | 0.59 | 53.70 | 6.71 |
| P-1-D (RH-L) | IWA Personnel | 0.52 | 47.40 | 6.77 |

### 2nd Wheel Blowout

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Str/cc | TEM Fibers ≥ 5µm/cc |
|---|---|---|---|---|
| A-2-A | IWA Area Sample | 0.11 | 17.11 | 3.95 |
| A-2-B | IWA Area Sample | overloaded | 30.01 | 7.83 |
| A-2-C | IWA Area Sample | 0.07 | 30.67 | 5.33 |
| A-2-D | IWA Area Sample | 0.10 | 17.11 | ND |
| P-2-A | IWA Personnel | 0.56 | 167.07 | 33.41 |
| P-2-B | IWA Personnel | 0.76 | 209.00 | 20.23 |
| P-2-C | IWA Personnel | 0.81 | 155.75 | 40.63 |
| P-2-D | IWA Personnel | 1.72 | 148.97 | 6.77 |

### 30 Minutes After Work Practice

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Str/cc | TEM Fibers ≥ 5µm/cc |
|---|---|---|---|---|
| A-3-A | IWA Area Sample | 0.03 | 3.25 | 0.96 |
| A-3-B | IWA Area Sample | 0.03 | 3.05 | 0.76 |
| A-3-C | IWA Area Sample | 0.02 | 3.05 | 0.57 |
| A-3-D | IWA Area Sample | 0.01 | 4.02 | 0.19 |

| Sample # | Clothing | Structures/sq ft. | Structures/cm² |
|---|---|---|---|
| WL-F-B | Blank | <2.8 million | <3.0 thousand |
| WL-F-1 | Clothing | 55.4 million | 59.7 thousand |

### Dust from Brake Drum Assembly

| 1 | Rt. Rear Wheel Drum | 7.82 billion | 8.4 million |
|---|---|---|---|

Page 1 of 1

## MATERIALS ANALYTICAL SERVICES, INC.
## CHAIN-OF-CUSTODY

CLIENT: Materials Analytical Services, Inc.

CONTACT: Richard Hatfield

PHONE: (770) 866-3200

CLIENT JOB NAME: 1976 Newport Rear Axle Various Samples

CLIENT JOB#:

CLIENT DOC(S):

FAX NUMBER:

MAS JOB: M25750

DATE RECEIVED: 4/6/01

SUBMITTED BY: Paul Liss

TRANSPORT: Hand Delivery

RECEIVED BY: Bill Egeland

CONDITION: OK

| MAS # | CLIENT SAMPLE # | TYPE MATERIAL | MAS # | CLIENT SAMPLE # | TYPE MATERIAL |
|-------|-----------------|---------------|-------|-----------------|---------------|
| 001 | Brake Blowout II "A" | Brake Material | | | |
| 002 | Brake Blowout II "B" | Brake Material | | | |
| 003 | Brake Blowout II "C" | Brake Material | | | |
| 004 | Brake Blowout II "D" | Brake Material | | | |
| 005 | 76 Newport A-Left | Brake Material | | | |
| 006 | 76 Newport B-Left | Brake Material | | | |
| | 76 Newport A-Right | Brake Material | | | |
| 008 | 76 Newport B-Right | Brake Material | | | |

INITIAL FILE REVIEW: _____ DATE: _____

SAMPLE PREP BY: _____ DATE: _____

SAMPLE ANALYSIS BY: _____ DATE: _____

Materials Analytical Services, Inc.
3945 Lakefield Court
Suwanee, Georgia  30024
(770) 866-3200

MATERIALS ANALYTICAL SERVICES, INC.
PLM ANALYSIS

Proj#-Spl#:  M25750 - 001        Analyst  W.B. Egeland        Date:  4/6/01
ClientName:  Materials Analytical Services, Inc.        ClientSpl:  Brake Blowout II "A"
Location:  76 Newport Brake (in trunk)
Type_Mat:  Brake Material

Gross     Black. Compressed. Resiny binder with opaques and fiber bundles throughout.
Visual:

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | |
|---|---|
| Morphology | Wavy |
| Pleochroism | None |
| Refract Index | 1.555/1.548 |
| Sign | + |
| Extinction | Parallel |
| Birefringence | Low |
| Melt | No |
| Fiber Name | Chrysotile |

| ASBESTOS MINERALS | EST. VOL. % |
|---|---|
| Chrysotile | 25 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS

NON FIBROUS COMPONENTS

| Binder | 75 |
|---|---|

Effervescence:

Binder Description:  Fine aggregate, opaque grains and reddish resiny matrix

Comments:

## MATERIALS ANALYTICAL SERVICES, INC.
## PLM ANALYSIS

Proj#-Spl#:  M25750-002        Analyst  W.B. Egeland        Date:  4/6/01

ClientName:  Materials Analytical Services, Inc.        ClientSpl:  Brake Blowout II "B"

Location:  76 Newport Brake (in trunk)

Type_Mat:  Brake Material

Gross Visual:  Black. Compressed. Resiny binder with opaques and fiber bundles throughout.

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | |
|---|---|
| Morphology | Wavy |
| Pleochroism | None |
| Refract Index | 1.555/1.548 |
| Sign | + |
| Extinction | Parallel |
| Birefringence | Low |
| Melt | No |
| Fiber Name | Chrysotile |

| ASBESTOS MINERALS | EST. VOL. % |
|---|---|
| Chrysotile | 25 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS

NON FIBROUS COMPONENTS

| Binder | 75 |
|---|---|

Effervescence:

Binder Description:  Fine aggregate, opaque grains and reddish resiny matrix

Comments:

### MATERIALS ANALYTICAL SERVICES, INC.
### PLM ANALYSIS

Proj#–Spl#:    M25750-003    Analyst  W.B. Egeland    Date:  4/6/01

ClientName:  Materials Analytical Services, Inc.    ClientSpl:    Brake Blowout II "C"

Location:    76 Newport Brake (in trunk)

Type_Mat:    Brake Material

Gross Visual:    Black.  Compressed.  Resiny binder with opaques and fiber bundles throughout.

#### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | Wavy | | |
| Pleochroism | None | | |
| Refract Index | 1.555/1.548 | | |
| Sign | + | | |
| Extinction | Parallel | | |
| Birefringence | Low | | |
| Melt | No | | |
| Fiber Name | Chrysotile | | |

ASBESTOS MINERALS                EST. VOL. %

| | |
|---|---|
| Chrysotile | 25 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS

NON FIBROUS COMPONENTS

| | |
|---|---|
| Binder | 75 |

Effervescence:

Binder Description:  Fine aggregate, opaque grains and reddish resiny matrix

MATERIALS ANALYTICAL SERVICES, INC.
PLM ANALYSIS

Proj#-Spl#:     M25750-004      Analyst W.B. Egeland     Date:  4/6/01
ClientName: Materials Analytical Services, Inc.          ClientSpl:     Brake Blowout II "D"
Location:     76 Newport Brake (in trunk)
Type_Mat:     Brake Material

Gross     Black.  Compressed.  Resiny binder with opaques and fiber bundles throughout.
Visual:

OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | |
|---|---|
| Morphology | Wavy |
| Pleochroism | None |
| Refract Index | 1.555/1.548 |
| Sign | + |
| Extinction | Parallel |
| Birefringence | Low |
| Melt | No |
| Fiber Name | Chrysotile |

ASBESTOS MINERALS                              EST. VOL. %

| | |
|---|---|
| Chrysotile | 25 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS

NON FIBROUS COMPONENTS

| | |
|---|---|
| Binder | 75 |

Effervescence:

Binder Description:   Fine aggregate, opaque grains and reddish resiny matrix

Comments:

**MATERIALS ANALYTICAL SERVICES, INC.**
**PLM ANALYSIS**

Proj#-Spl#:     M25750~005          Analyst  W.B. Egeland        Date:  4/6/01

ClientName:  Materials Analytical Services, Inc.          ClientSpl:     76 Newport A-Left

Location:   76 Newport Brake

Type_Mat:   Brake Material

Gross       Black.  Compressed.  Black opaque binder with reddish resiny grains and cellulose fibers throughout.
Visual:

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | | | |
| Pleochroism | | | |
| Refract Index | | | |
| Sign | | | |
| Extinction | | | |
| Birefringence | | | |
| Melt | | | |
| Fiber Name | | | |

**ASBESTOS MINERALS**                          **EST. VOL. %**

                                               NO ASBESTOS OBSERVED

Chrysotile.............

Amosite..................

Crocidolite...............

Tremolite/Actinolite....

Anthophyllite...........

**OTHER FIBROUS COMPONENTS**

Cellulose -ribbony                                15

**NON FIBROUS COMPONENTS**

Binder                                            85

Effervescence:

Binder Description:   Fine opaque aggregate with reddish grains throughout.

Comments:

### MATERIALS ANALYTICAL SERVICES, INC.
### PLM ANALYSIS

| | | | | |
|---|---|---|---|---|
| Proj#-Spl#: | M25750-006 | Analyst W.B. Egeland | Date: | 4/6/01 |
| ClientName: | Materials Analytical Services, Inc. | | ClientSpl: | 76 Newport B-Left |
| Location: | 76 Newport Brake | | | |
| Type_Mat: | Brake Material | | | |

Gross Visual: Black. Compressed. Black opaque binder with reddish resiny grains and cellulose fibers throughout.

#### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | | | |
| Pleochroism | | | |
| Refract Index | | | |
| Sign | | | |
| Extinction | | | |
| Birefringence | | | |
| Melt | | | |
| Fiber Name | | | |

**ASBESTOS MINERALS**          **EST. VOL. %**

NO ASBESTOS OBSERVED

| | |
|---|---|
| Chrysotile | |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

**OTHER FIBROUS COMPONENTS**

| | |
|---|---|
| Cellulose - ribbony | 15 |

**NON FIBROUS COMPONENTS**

| | |
|---|---|
| Binder | 85 |

Effervescence:

Binder Description: Fine opaque aggregate with reddish grains throughout.

Comments:

```
MATERIALS ANALYTICAL SERVICES, INC.
           PLM ANALYSIS
```

Proj#-Spl#:  M25750-007     Analyst  W.B. Egeland     Date:  4/6/01

ClientName: Materials Analytical Services, Inc.          ClientSpl:   76 Newport A-Right

Location:  76 Newport Brake

Type_Mat:  Brake Material

Gross Visual:  Black.  Compressed.  Black opaque binder with reddish resiny grains and cellulose fibers throughout.

## OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | | | |
| Pleochroism | | | |
| Refract Index | | | |
| Sign | | | |
| Extinction | | | |
| Birefringence | | | |
| Melt | | | |
| Fiber Name | | | |

| ASBESTOS MINERALS | EST. VOL. % |
|---|---|
| | NO ASBESTOS OBSERVED |
| Chrysotile | |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS

| | |
|---|---|
| Cellulose -ribbony | 15 |

NON FIBROUS COMPONENTS

| | |
|---|---|
| Binder | 85 |

Effervescence:

Binder Description:  Fine opaque aggregate with reddish grains throughout.

Comments:

MATERIALS ANALYTICAL SERVICES, INC.
PLM ANALYSIS

Proj#-Spl#:   M25750 - 008          Analyst W.B. Egeland          Date:  4/6/01

ClientName: Materials Analytical Services, Inc.          ClientSpl:  76 Newport B-Right

Location:   76 Newport Brake

Type_Mat:  Brake Material

Gross    Black.  Compressed.  Black opaque binder with reddish resiny grains and cellulose fibers throughout.
Visual:

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | | | |
| Pleochroism | | | |
| Refract Index | | | |
| Sign | | | |
| Extinction | | | |
| Birefringence | | | |
| Melt | | | |
| Fiber Name | | | |

ASBESTOS MINERALS                    EST. VOL. %

                                     NO ASBESTOS OBSERVED

Chrysotile........
Amosite........
Crocidolite........
Tremolite/Actinolite........
Anthophyllite........

OTHER FIBROUS COMPONENTS

Cellulose -ribbony          15

NON FIBROUS COMPONENTS

Binder                      85

Effervescence:

Binder Description:  Fine opaque aggregate with reddish grains throughout.

Comments:

# MATERIALS ANALYTICAL SERVICES
## PROJECT LOG

Client Code: [MASCORP]

| | | | |
|---|---|---|---|
| MAS ID: | M25336 | Client Job No: | |
| Client Name: | Materials Analytical Services, Inc. | Client PO: | |
| Project Name: | Chamber Brake Blow-Out II | Date In: | 1/30/2001 |
| Logged By: | dmazzaferro | | |

**TRANSPORT INFORMATION:**

| | | | |
|---|---|---|---|
| Submitted By: | | Documents: | COC |
| Delivery By: | Hand Delivery | | |
| Received By: | dmazzaferro | | |
| Condition: | good | Comments for COC: | |

**CONTACT INFORMATION:**

| | | | | |
|---|---|---|---|---|
| Contact: | Bill Longo | Work Phone: | (770) 866-3200 | Ext: |
| Title: | First Name:  Last Name:  Suffix | Other Phone: | | Ext: |
| Mr. | William  Longo | Fax: | (770) 866-3259 | |

## M25336                 SAMPLE INFORMATION:

| # | Client ID | Volume | # | Client ID | Volume |
|---|---|---|---|---|---|
| 001 | A-0-A | | 020 | P-2-A | |
| 002 | A-0-B | | 021 | P-2-B | |
| 003 | A-0-C | | 022 | P-2-C | |
| 004 | A-0-D | | 023 | P-2-D | |
| 005 | A-0-E | | 024 | A-3-A | |
| 006 | A-1-A | | 025 | A-3-B | |
| 007 | A-1-B | | 026 | A-3-C | |
| 008 | A-1-C | | 027 | A-3-D | |
| 009 | A-1-D | | | | |
| 010 | A-1-E | | | | |
| 011 | P-1-A | | | | |
| 012 | P-1-B | | | | |
| 013 | P-1-C | | | | |
| 014 | P-1-D | | | | |
| 015 | FB1 | | | | |
| 016 | A-2-A | | | | |
| 017 | A-2-B | | | | |
| 018 | A-2-C | | | | |
| 019 | A-2-D | | | | |

M25336                    SAMPLE INFORMATION:

| # | Client ID | Volume | # | Client ID | Volume |
|---|-----------|--------|---|-----------|--------|

SIGNATURES

RECEIVED BY: _____

REVIEWED BY: _____

PREPARED BY: _____

ANALYZED BY: _____

REPORTED BY: _____

DEPOSED BY: _____

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHAMBER BRAKE BLOWOUT II_  Sample # _M25 736-612_
Sample Date: _____  Analysis Date: _4/4/01_  Analyst: _L.D.J II_

| | | | | | |
|---|---|---|---|---|---|
| — | 2 | — | — | — | |
| — | — | — | — | — | 10 |
| — | — | 1 | 2 | — | 20 |
| 1½ | — | — | — | — | 30 |
| — | — | 1 | — | # | |
| 1 | — | — | — | 1 | 40 |
| — | — | — | — | — | 50 |
| 1 | — | — | — | 1 | 60 |
| — | — | — | — | 1 | |
| — | ½ | 1 | — | 1 | 70 |
| — | 1 | — | 1 | 1 | 80 |
| 1 | — | — | — | — | 90 |
| — | — | — | — | — | 100 |

SAMPLE ID. _P-1-B_

PUMP SER. #

CALIB. DATE

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)  (FR)

_____ Sample Duration in Min.  (T)

_10_ Sample Volume = FR X T  (V)

_21_ Total Fibers Counted in Sample  (FCS)

_100_ Total Fields Counted in Sample  (FLS)

_0_ Total Fibers Counted in Field Blank  (FCB)

_100_ Total Fields Counted on Field Blank  (FLB)

_385_ Area of _25_ mm Filter  (AF)

_0.0785_ Graticule Field Area in sq. mm  (GFA)

CALCULATION OF FIBER DENSITY  (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _26.752_ F/mm²

NOTES: _ABUNDANT FINE PARTICULATE_
_THROUGHOUT_

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _1.030_ F/cc

Office:
Hutton Street • Suite 101
Raleigh, NC 27606
(919) 829-7041 • FAX (919) 829-5518

Atlanta Office:
345 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHAMBER BRAKE DUSTOUT II_    Sample # _Γ 25 736-BI 3_
Sample Date: _____    Analysis Date: _4/4/01_    Analyst: _W.B. JLI_

| | | | | |
|---|---|---|---|---|
| — | — | ½ | — | — |
| — | — | — | — | — | 10
| — | — | — | — | — | 20
| — | — | — | — | — |
| 1 | — | — | 1 | — | 30
| — | — | 2 | — | — |
| — | — | — | — | — | 40
| — | — | — | — | — |
| 2 | — | 1 | — | — | 50
| — | — | — | — | — |
| — | — | 1 | — | — | 60
| — | — | — | — | — |
| — | — | ½ | — | — | 70
| — | — | — | — | — |
| — | 1 | — | — | — | 80
| — | — | — | — | — | 90
| — | — | 1 | — | 1 |
| — | — | — | — | — | 100

SAMPLE ID.  _P-1-C_

PUMP SER. # _____

CALIB. DATE _____

START _____  STOP _____  TIME _____

_____ Pump Flow Rate (L/M)  (FR)

_____ Sample Duration in Min.  (T)

_10_ Sample Volume = FR X T  (V)

_12_ Total Fibers Counted in Sample  (FCS)

_100_ Total Fields Counted in Sample  (FLS)

_0_ Total Fibers Counted in Field Bank  (FCB)

_100_ Total Fields Counted on Field Bank  (FLB)

_385_ Area of _25_ mm Filter  (AF)

_0.00785_ Graticule Field Area in sq. mm  (GFA)

CALCULATION OF FIBER DENSITY  (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

NOTES: _ABUNDANT PARTICULATE_
_THROUGHOUT._

E = _15.287_ F/mm²

CALCULATION OF FIBER CONCENTRATION  (C)
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _0.539_ F/cc

Office:
6 Hutton Street • Suite 101
leigh, NC 27606
19) 829-7041 • FAX (919) 829-5313

Atlanta Office:
3965 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CLEANDER BRAKE BLOW OUT II_    Sample # _A25376-014_
Sample Date: _____    Analysis Date: _4/4/01_    Analyst: _W.B. LEE_

SAMPLE ID. _P-1-0_

PUMP SER. #

CALIB. DATE

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

_10_ Sample Volume = FR X T (V)

_16 ½_ Total Fibers Counted in Sample    (FCS)

_100_ Total Fields Counted in Sample    (FLS)

_0_ Total Fibers Counted in Field Bank    (FCB)

_160_ Total Fields Counted on Field Bank    (FLB)

_385_ Area of _25_ mm Filter    (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

NOTES: _ABUNDANT FINE PARTICULATE_
_THROUGHOUT SAMPLE._

$E =$ _13.376_ F/mm²

CALCULATION OF FIBER CONCENTRATION    (C)
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

_0.515_ F/cc

Raleigh Office:
_____ Hutton Street - Suite 101
Raleigh, NC 27606
1 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

oject Name: _CHAMPER BRAKE BLOWOUT II_    Sample # _M25306-015_
le Date: _____  Analysis Date: _4/4/01_  Analyst: _W. S. Zull_

SAMPLE ID.  _FB-1_

PUMP SER. #

CALIB. DATE

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (LJM)  (FR)

_____ Sample Duration in Min.  (T)

_O_  Sample Volume = FR X T (V)

| _0_ | Total Fibers Counted in Sample | (FCS) |
| _100_ | Total Fields Counted in Sample | (FLS) |
| | Total Fibers Counted in Field Bank | (FCB) |
| | Total Fields Counted on Field Bank | (FLB) |
| _385_ | Area of _25_ mm Filter | (AF) |
| _0.00785_ | Graticule Field Area in sq. mm | (GFA) |

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _0.000_  F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _____ F/cc

TES : _____

n Office:
6 Hutton Street - Suite 101
leigh, NC 27606
9) 829-7041 - FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**≈MAS**

oject Name: _CHAMBER BRAKE BLOWOUT II_  Sample # _M25336-016_
mple Date: _____  Analysis Date: _4/4/01_  Analyst: _L.S.J.L_

SAMPLE ID.  _A-2-A_

PUMP SER. #

CALIB. DATE

START _____  STOP _____  TIME _____

_____ Pump Flow Rate (L/M)  (FR)

_____ Sample Duration in Min.  (T)

_51_ Sample Volume = FR X T  (V)

_11_ Total Fibers Counted in Sample  (FCS)

_100_ Total Fields Counted in Sample  (FLS)

_0_ Total Fibers Counted in Field Bank  (FCB)

_100_ Total Fields Counted on Field Bank  (FLB)

_385_ Area of _25_ mm Filter  (AF)

_0.00785_ Graticule Field Area in sq. mm  (GFA)

CALCULATION OF FIBER DENSITY  (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

TES: _EXTREMELY ABUNDANT FINE_
_PARTICULATE THROUGHOUT._
_OVER LOADED_

$$E = \_14.013\_ \quad F/mm^2$$

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)\ (AF)}{1000V}$$

$$C = \_0.106\_ \quad F/cc$$

n Office:
5 Hutton Street - Suite 101
leigh, NC 37606
9) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3257

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: *CHAMBER BRAKE DECONEST #1*    Sample # *MAS 396-017*

Date:    Analysis Date: *4/4/01*    Analyst: *L.B.3.11*

| | | | | |
|---|---|---|---|---|
| | | | | 10 |
| | | | | 20 |
| | | | | 30 |
| | | | | 40 |
| | | | | 50 |
| | | | | 60 |
| | | | | 70 |
| | | | | 80 |
| | | | | 90 |
| | | | | 100 |

SAMPLE ID.    *A-2-B*

PUMP SER. #

CALIB. DATE

START         STOP         TIME

Pump Flow Rate (L/M)    (FR)

Sample Duration in Min.    (T)

*51*    Sample Volume = FR X T    (V)

Total Fibers Counted in Sample    (FCS)

Total Fields Counted in Sample    (FLS)

Total Fibers Counted in Field Bank    (FCB)

Total Fields Counted on Field Bank    (FLB)

Area of _____ mm Filter    (AF)

Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = \{(FCS/FLS) - (FCB/FLB)\}/GFA$$

NOTES: _____

*FLB OVER LOADED TO*

*ATTEMPT TO COUNT*

*JUST 2 LARGE BLACK MASS OF PARTICULATE*

E = _____    F/mm$^2$

CALCULATION OF FIBER CONCENTRATION    (C)
IN FIBERS PER cc

$$C = \frac{(E) (AF)}{1000V}$$

C = _____    F/cc

Raleigh Office
6 Hutton Street · Suite 101
Raleigh, NC 27606
(919) 829-7041 · FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 · FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

## MAS

oject Name: CHAMBER BRAKE BLOWOUT II    Sample # 1725 336-018

mple Date:             Analysis Date: 4/8/01    Analyst: E. B. Jall

SAMPLE ID.    A-2-C

PUMP SER #

CALIB. DATE

START              STOP              TIME

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.   (T)

51    Sample Volume = FR X T   (V)

1½    Total Fibers Counted in Sample    (FCS)

100    Total Fields Counted in Sample    (FLS)

0    Total Fibers Counted in Field Bank   (FCB)

100    Total Fields Counted on Field Bank   (FLB)

385    Area of    25    mm Filter    (AF)

0.00785  Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

ES: EXTREMELY ABUNDANT FINE
PARTICULATE THROUGHOUT.

OVERLOADED

E =    9.554    F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C =    0.072    F/cc

. Office:
Hutton Street • Suite 101
eigh. NC 27606
7) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: CHANNEL BRAKE BLOWOUT II    Sample # 725775-019
Sample Date: _____ Analysis Date: 4/1/01   Analyst: L.B.JW

| | | | | | |
|---|---|---|---|---|---|
| — | — | 1½ | — | — | |
| — | — | — | — | 1 | 10 |
| — | 1 | — | 1 | — | |
| — | — | 1 | — | — | 20 |
| — | 1 | — | — | — | |
| — | 1 | — | 1 | — | 30 |
| — | — | — | 1 | — | |
| — | — | — | — | — | 40 |
| — | — | — | — | 2 | |
| | | | | | 50 |
| — | — | — | — | — | |
| — | — | — | — | — | 60 |
| — | — | — | — | — | |
| — | — | — | — | — | 70 |
| — | ½ | — | — | — | |
| — | — | — | — | — | 80 |
| — | — | — | — | — | |
| | | | | | 90 |
| | | — | — | — | |
| | | — | — | — | 100 |

SAMPLE ID.    A-2-0

PUMP SER. # _____

CALIB. DATE _____

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.   (T)

51    Sample Volume = FR X T (V)

10    Total Fibers Counted in Sample      (FCS)

100   Total Fields Counted in Sample      (FLS)

0    Total Fibers Counted in Field Bank   (FCB)

100   Total Fields Counted on Field Bank   (FLB)

205   Area of   25    mm Filter      (AF)

0.00785   Graticule Field Area in sq. mm   (GFA)

CALCULATION OF FIBER DENSITY    (E)

NOTES: EXTREMELY ABUNDANT FINE
PARTICULATE THROUGHOUT
OVERLOADED

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = 12.739   F/mm$^2$

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = 0.096   F/cc

Raleigh Office:
Hutton Street • Suite 101
Raleigh, NC 27606
(9) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

## HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

**roject Name:** _CHANNEL DRIVE DCOW OUT II_   **Sample #** _1725 336-020_
**mple Date:** _____ **Analysis Date:** _4/4/01_  **Analyst:** _W.S. SWD_

| | | | | | |
|---|---|---|---|---|---|
| — | — | ½ | — | — | |
| ı | — | — | — | ⁻ | 10 |
| — | — | — | ı | ½ | |
| — | — | 2 | — | — | 20 |
| — | | | | | |
| — | — | — | — | ı | 30 |
| ⁻ | — | — | — | ı | |
| — | — | — | ı | — | 40 |
| — | — | — | — | — | |
| — | — | — | — | — | 50 |
| — | — | — | — | — | |
| ı | — | — | — | — | 60 |
| — | ı | — | — | — | |
| — | ı | — | — | — | 70 |
| — | — | — | — | — | |
| — | — | — | — | — | 80 |
| — | — | — | — | — | |
| ı | | | | | 90 |
| ½ | | | | | |
| — | — | — | — | — | 100 |

**SAMPLE ID** _P-2-A_ _____

_____

_____

**PUMP SER. #** _____

**CALIB. DATE** _____

**START** _____ **STOP** _____ **TIME** _____

_____ Pump Flow Rate (L/M)   (FR)

_____ Sample Duration in Min.   (T)

_10_ Sample Volume = FR X T   (V)

_11½_ Total Fibers Counted in Sample     (FCS)

_100_ Total Fields Counted in Sample     (FLS)

_0_ Total Fibers Counted in Field Bank     (FCB)

_100_ Total Fields Counted on Field Bank     (FLB)

_385_ Area of _25_ mm Filter     (AF)

_0.00785_ Graticule Field Area in sq. mm     (GFA)

**CALCULATION OF FIBER DENSITY   (E)**

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _14.650_ F/mm²

**CALCULATION OF FIBER CONCENTRATION   ( C )**
**IN FIBERS PER cc**

$$C = \frac{(E)(AF)}{1000V}$$

C = _0.564_ F/cc

**'ES:** _ABUNDANT FINE_
_PARTICULATE THROUGHOUT_

_____

_____

_____

_____

Office
rutton Street • Suite 101
igh, NC 27606
) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3100 • FAX (770) 866-3259

PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHAMBER DANCE DECK at II_  Sample # _M25 336-021_
Date: _____  Analysis Date: _4/4/01_  Analyst: _CID-J.W_

| | | | | | |
|---|---|---|---|---|---|
| — | — | — | — | — | |
| — | — | — | 2 | — | 10 |
| — | — | / | — | — | |
| — | — | — | — | — | 20 |
| — | — | — | — | — | |
| — | — | — | — | — | 30 |
| / | — | — | — | — | 40 |
| — | — | — | — | — | |
| ½ | — | — | / | — | 50 |
| — | — | — | — | — | |
| — | — | — | / | — | 60 |
| — | / | — | — | — | 70 |
| — | / | — | — | — | |
| — | / | — | / | — | 80 |
| — | / | — | — | — | |
| / | — | — | — | / | 90 |
| — | — | — | — | / | |
| — | — | / | / | — | 100 |

SAMPLE ID.  _P-2-B_

PUMP SER #  _____

CALIB. DATE  _____

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)  (FR)

_____ Sample Duration in Min.  (T)

_10_ Sample Volume = FR X T (V)

_15 ½_ Total Fibers Counted in Sample  (FCS)

_100_ Total Fields Counted in Sample  (FLS)

_0_ Total Fibers Counted in Field Bank  (FCB)

_100_ Total Fields Counted on Field Bank  (FLB)

_385_ Area of _25_ mm Filter  (AF)

_.00785_ Graticule Field Area in sq. mm  (GFA)

CALCULATION OF FIBER DENSITY  (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

NOTES: _ABUNDANT FINE PARTICULATE_  E = _19.745_ F/mm²
_THROUGHOUT_

CALCULATION OF FIBER CONCENTRATION  (C)
IN FIBERS PER cc

$$C = \frac{(E)\ (AF)}{1000V}$$

C = _0.760_ F/cc

Office
Hutton Street • Suite 101
Raleigh, NC 27606
(9) 829-7041 • FAX (919) 829-5519

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS                     **MAS**

roject Name: *CHAMBER BRAKE BLOWOUT II*          Sample # *125336-022*
ample Date:                    Analysis Date: *4/4/01*   Analyst: *W.B.Sill*

| | | | | |
|---|---|---|---|---|
| — | — | / | — | — |
| — | — | | | 10 |
| — | | / | / | |
| / | — | | | 20 |
| — | — | | | |
| — | — | ½ | | 30 |
| — | — | | | |
| — | — | | | 40 |
| ½ | — | — | / | — |
| / | — | — | — | / | 50 |
| — | / | — | — | ½ |
| — | — | ½ | | 60 |
| — | ½ | — | / | 70 |
| — | — | — | | |
| / | — | — | — | 80 |
| — | / | | | |
| / | — | — | — | 90 |
| / | — | — | | |
| | | | | 100 |

SAMPLE ID. *P-2-C*

PUMP SER. #

CALIB. DATE

START            STOP            TIME

_____ Pump Flow Rate (L/M)   (FR)

_____ Sample Duration in Min.   (T)

*10* Sample Volume = FR X T  (V)

*16½* Total Fibers Counted in Sample    (FCS)

*100* Total Fields Counted in Sample    (FLS)

*0* Total Fibers Counted in Field Blank  (FCB)

*100* Total Fields Counted on Field Blank (FLB)

*385* Area of  *25*  mm Filter        (AF)

*0.00785* Graticule Field Area in sq. mm   (GFA)

CALCULATION OF FIBER DENSITY   (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

ES: *ABUNDANT FINE PARTICULATE*  E = *21.619*   F/mm²
    *THROUGHOUT*

CALCULATION OF FIBER CONCENTRATION  ( C )
            IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = *0.799*   F/cc

· Office:
rlutton Street • Suite 101
rgh. NC 27606
) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 – FAX (770) 866-3259

PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHAMBEL BRAKE BLOWOUT II_    Sample # _M25 338-023_

Date: _____    Analysis Date: _4/4/01_    Analyst: _L.A.S.II_

| | | | | | |
|---|---|---|---|---|---|
| / | / | — | / | / | |
| — | — | — | — | / | 10 |
| — | | | | | |
| — | / | / | / | / | 20 |
| | | | | | |
| | | | | | 30 |
| — | / | | | — | |
| — | / | — | | / | 40 |
| — | / | | — | — | |
| — | — | — | | | 50 |
| / | — | —½ | / | — | |
| ½ | / | / | — | / | 60 |
| | — | — | — | | |
| — | — | — | — | — | 70 |
| — | / | ½ | — | — | |
| / | / | ½ | / | 2 | 80 |
| — | — | | | — | |
| — | / | / | — | — | 90 |
| — | — | — | — | — | |
| — | / | — | / | / | 100 |

SAMPLE ID. _P-2-D_

_____

PUMP SER. # _____

CALIB. DATE _____

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)   (FR)

_____ Sample Duration in Min.   (T)

_10_   Sample Volume = FR X T   (V)

_75_   Total Fibers Counted in Sample   (FCS)

_100_   Total Fields Counted in Sample   (FLS)

_6_   Total Fibers Counted in Field Bank   (FCB)

_100_   Total Fields Counted on Field Bank   (FLB)

_385_   Area of _25_ mm Filter   (AF)

_0.00785_   Graticule Field Area in sq. mm   (GFA)

**CALCULATION OF FIBER DENSITY   (E)**

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _44.586_   F/mm²

NOTES: _ABUNDANT FINE PARTICULATE_
_THROUGH OUT_

**CALCULATION OF FIBER CONCENTRATION   ( C )**
IN FIBERS PER cc

$$C = \frac{(E)\ (AF)}{1000V}$$

C = _1.717_   F/cc

Raleigh Office:
6 Hutton Street – Suite 101
Raleigh. NC 27606
(919) 829-7041 • FAX (919) 829-5516

Atlanta Office:
3945 Lakefield Court
Suwanee. Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: CHAMBER BLAKE Blow ub II    Sample # H25335-068

Sample Date: _____ Analysis Date: 4/4/01 Analyst L.A.S.M

SAMPLE ID. A-1-C

PUMP SER. # _____

CALIB. DATE _____

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)  (FR)

_____ Sample Duration in Min.  (T)

51 Sample Volume = FR X T (V)

4 ½ Total Fibers Counted in Sample    (FCS)

100 Total Fields Counted in Sample    (FLS)

∂ Total Fibers Counted in Field Bank    (FCB)

100 Total Fields Counted on Field Bank    (FLB)

385 Area of 25 mm Filter    (AF)

0.00785 Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

NOTES: EXTREMELY ABUNDANT FINE
PARTICULATE THROUGHOUT

OVERLOADED

* E = LIMIT OF DETECTION = 7 F/mm²

E = 5.732 F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E) (AF)}{1000V}$$

C = _____

0.043

Raleigh Office:
5 Hutton Street • Suite 101
Raleigh NC 27606
(919) 829-7041 • FAX (919) 829-5518

Atlanta Office
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710

# EXHIBIT M, PART 2

# HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

'oject Name: _CHANDER DRAPE ROLLOUT II_    Sample # _1725 336-009_
'e Date:_____    Analysis Date: _4/4/01_    Analyst: _w.b.jll_

| | | | | | |
|---|---|---|---|---|---|
| — | 1 | — | — | — | |
| — | — | 1/2 | — | — | 10 |
| 1 | — | — | 1 | — | |
| 2/ | — | — | — | — | 20 |
| — | — | — | — | — | |
| — | — | — | — | 1 | 30 |
| — | — | — | — | — | 40 |
| 1 | — | 1 | — | — | |
| — | — | — | — | — | 50 |
| — | — | — | — | — | |
| — | — | — | — | — | 60 |
| — | — | — | — | — | |
| ) | — | — | — | — | 70 |
| — | — | — | 1 | — | |
| — | — | — | — | — | 80 |
| — | — | — | — | — | |
| — | 1 | — | — | — | 90 |
| — | — | — | — | — | |
| — | — | — | — | — | 100 |

SAMPLE ID.    _A-1-0_

PUMP SER. #

CALIB. DATE

START          STOP          TIME

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

_51_ Sample Volume = FR X T    (V)

_9½_ Total Fibers Counted in Sample    (FCS)

_100_ Total Fields Counted in Sample    (FLS)

_0_ Total Fibers Counted in Field Bank    (FCB)

_100_ Total Fields Counted on Field Bank    (FLB)

_3.85_ Area of _25_ mm Filter    (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _12.102_    F/mm²

TES: _ABUNDANT FINE PARTICULATE
THROUGHOUT_

CALCULATION OF FIBER CONCENTRATION    ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _0.001_    F/cc

h Office:                                    Atlanta Office:
6 Hutton Street · Suite 101                  3945 Lakefield Court
leigh, NC 27606                              Suwanee, Georgia 30024
9) 829-7011 · FAX (919) 829-5518             (770) 866-3200 · FAX (770) 866-3259

# HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

## MAS

roject Name: _CHAMBER BRAKE OCONOUT II_     Sample # _M25393-611_
ple Date: _____     Analysis Date: _4/4/81_     Analyst: _D. S.PM_

SAMPLE ID.    _P-1-A_

PUMP SER. #    _____

CALIB. DATE    _____

START    _____    STOP    _____    TIME    _____

_____ Pump Flow Rate (L/M)    {FR}

_____ Sample Duration in Min.    {T}

_10_ Sample Volume = FR X T    {V}

_16_ Total Fibers Counted in Sample    {FCS}

_100_ Total Fields Counted in Sample    {FLS}

_0_ Total Fibers Counted in Field Bank    {FCB}

_100_ Total Fields Counted on Field Bank    {FLB}

_385_ Area of _25_ mm Filter    {AF}

_0.00785_ Graticule Field Area in sq. mm    {GFA}

CALCULATION OF FIBER DENSITY    (E)

E = ((FCS/FLS)-(FCB/FLB))/GFA

E =    _20.382_    F/mm²

CALCULATION OF FIBER CONCENTRATION   ( C )
IN FIBERS PER cc

C = (E) (AF)
     1000V

C =    _0.725_    F/cc

TES: _ABUNDANT FINE PARTICULATE_
_THROUGHOUT_

s Office:
S Hutton Street - Suite 101
leigh, NC 27606
9) 829-7041 - FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHAMBER BRAKE BLOWOUT II_    Sample # _M25336-614_

Sample Date: _____    Analysis Date: _4/4/01_    Analyst: _L.A.M._

SAMPLE ID. _A-3-A_

PUMP SER. #

CALIB. DATE

START _____    STOP _____    TIME _____

_____ Pump Flow Rate (L/M)   (FR)

_____ Sample Duration in Min.   (T)

_957_ Sample Volume = FR X T   (V)

_19_ Total Fibers Counted in Sample   (FCS)

_100_ Total Fields Counted in Sample   (FLS)

_0_ Total Fibers Counted in Field Bank   (FCB)

_100_ Total Fields Counted on Field Bank   (FLB)

_385_ Area of _25_ mm Filter   (AF)

_0.00785_ Graticule Field Area in sq. mm   (GFA)

CALCULATION OF FIBER DENSITY   (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _24.204_ F/mm²

NOTES: _EXTREMELY ABUNDANT_
_FINE PARTICULATE THROUGHOUT_

_OVERLOADED_

CALCULATION OF FIBER CONCENTRATION   (C)
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _0.036_ F/cc

Raleigh Office:
Hutton Street - Suite 101
Raleigh, NC 27606
(919) 829-7041 - FAX (919) 829-5813

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS    **MAS**

roject Name: _CHAMBER BRAKE BCOWOUT II_    - Sample # _1725335-025_

-ple Date: _____    Analysis Date: _4/4/01_    Analyst: _L. A. SLL_

SAMPLE ID. _A-3-B_

PUMP SER. # _____

CALIB. DATE _____

START _____    STOP _____    TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

_357_ Sample Volume = FR X T (V)

_2 0_ Total Fibers Counted in Sample    (FCS)

_100_ Total Fields Counted in Sample    (FLS)

_0_ Total Fibers Counted in Field Bank    (FCB)

_100_ Total Fields Counted on Field Bank    (FLB)

_385_ Area of _25_ mm Filter    (AF)

_0.01785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _25.478_ F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C = _0.027_ F/cc

ES: _ABUNDANT FINE PARTICULATE_
_THROUGHOUT_

Office:
Hutton Street - Suite 101
igh, NC 27606
919) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS          **MAS**

oject Name: _CHAMBER BRAKE BLOWOUT II_          Sample # _M25336-026_

mple Date: _____     Analysis Date: _4/9/01_     Analyst: _C.D.III_

SAMPLE ID.   _A-3-C_

PUMP SER. #   _____

CALIB. DATE   _____

START _____   STOP _____   TIME _____

_____ Pump Flow Rate (L/M)   (FR)

_____ Sample Duration in Min.   (T)

_357_ Sample Volume = FR X T (V)

_15_ Total Fibers Counted in Sample          (FCS)

_100_ Total Fields Counted in Sample          (FLS)

_0_ Total Fibers Counted in Field Blank          (FCB)

_100_ Total Fields Counted on Field Blank          (FLB)

_385_ Area of _25_ mm Filter          (AF)

_0.00785_ Graticule Field Area in sq. mm          (GFA)

CALCULATION OF FIBER DENSITY     (E)

ES: _EXTREMELY ABUNDANT_
_FINE PARTICULATE THROUGHOUT._
_OVER LOADED_

E = ((FCS/FLS)-(FCB/FLB))/GFA

E = _19.108_  F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

C = (E) (AF)
     1000V

C = _0.021_  F/cc

n Office:
Hutson Street • Suite 101
eigh. NC 27606
?) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee. Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

ject Name: CHAMBER BRAKE BLOW OUT  Sample # M25336-027

*e Date:_____ Analysis Date: 4/4/01  Analyst: _____

| | | | | |
|---|---|---|---|---|
| — | | / | | — |
| — | / | | | — | 10 |
| — | / | / | | — |
| / | / | — | 7 | — | 20 |
| — | — | — | — | — | 30 |
| — | | — | — | | 40 |
| — | — | — | — | | |
| — | — | — | — | / | 50 |
| — | — | — | — | | |
| — | — | — | — | | 60 |
| — | — | — | — | | 70 |
| — | / | — | — | | 80 |
| — | — | — | — | | |
| — | — | — | — | | 90 |
| — | — | — | — | | |
| — | — | — | — | | 100 |

SAMPLE ID.  A-3-0

PUMP SER. #_____

CALIB. DATE_____

START_____ STOP_____ TIME_____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.  (T)

354  Sample Volume = FR X T  (V)

10  Total Fibers Counted in Sample    (FCS)

100  Total Fields Counted in Sample    (FLS)

0  Total Fibers Counted in Field Bank    (FCB)

100  Total Fields Counted on Field Bank    (FLB)

383  Area of  25  mm Filter    (AF)

0.00785  Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

ES: EXTREMELY ABUNDANT
FINE PARTICULATE

_____ OVER LOADED

E = ((FCS/FLS)-(FCB/FLB))/GFA

E =  12.739  F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

C = (E) (AF)
    1000V

C =  0.014  F/cc

h Office:
Hutton Street – Suite 101
eigh, NC 27606
) 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# MAS Indirect TEM ANALYSIS M25336-001

| CLIENT NAME: Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-O-A |
|---|---|---|---|
| Sample Area/Volume: | 1818    Liters | Date Analyzed: | 2/1/01 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100    KV |
| Sample type: | Air | Indicated Mag: | 25    KX |
| Analysis type: | Dust | Screen Mag: | 20    KX |
| Grid Acceptance: | YES       3 % | Grid box Number: | 5948 |

| Str < 5um: | 0 |
|---|---|
| Str ≥ 5um: | 0 |
| Total str: | 0 |
| Str / cc > 5: | 0.0000   /cc |

| Number of grids: | 2 | #1: | 114 | #3: | 113 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 114 | #4: | 114 |

| Average Grid Size: | 0.012939 |
|---|---|
| Total Area Analyzed: | 0.129 |

| Filter used | Dilution | Dilution Factor |
|---|---|---|
| 1/ 2 | 30 | 6.666667 |

| Detect_cc: | 0.04 |
|---|---|
| Total cc: | 0.00 |

| Str: | Square/D: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | B4-C6 | | NSD | | | | | |
| | E3 | | NSD | | | | | |
| | G2 | | NSD | | | | | |
| | I5 | | NSD | | | | | |
| | F8 | | NSD | | | | | |
| | B5-H7 | | NSD | | | | | |
| | F9 | | NSD | | | | | |
| | C7 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| | D2 | | NSD | | | | | |

M25336 001    Sample Comments:

# MAS  Indirect TEM ANALYSIS  M25336-002

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-0-8 | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 1800 Liters | | Date Analyzed: | 2/1/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES | 3 % | Grid box Number: | 5948 | |

| | | | | | |
|---|---|---|---|---|---|
| Str < 5um: | 0 | | Number of grids: | 2 | #1: 114   #3: 114 |
| Str ≥ 5um: | 0 | | Number of openings: | 10 | #2: 113   #4: 112 |
| Total str: | 0 | | | | |
| Str / cc > 5: | 0.0000 /cc | | Average Grid Size: | 0.012825 | |
| | | | Total Area Analyzed: | 0.128 | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 0.04 |
|---|---|---|---|---|
| 1/2 | 30 | 6.666667 | Total cc: | 0.00 |

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | A4-C3 | | NSD | | | | | |
| | E2 | | NSD | | | | | |
| | H4 | | NSD | | | | | |
| | I7 | | NSD | | | | | |
| | G9 | | NSD | | | | | |
| | A5-I6 | | NSD | | | | | |
| | F9 | | NSD | | | | | |
| | C7 | | NSD | | | | | |
| | B4 | | NSD | | | | | |
| | E2 | | NSD | | | | | |

M25336 002    Sample Comments:



# MAS indirect TEM ANALYSIS M25336-004

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-O-D |
|---|---|---|---|---|
| Sample Area/ Volume: | 1800   Liters | Date Analyzed: | 2/1/01 | |
| Filter Type: | MCE 47mm | Analyst: | Al Hannon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES     3 % | Grid box Number: | 5948 | |

| Str < 5nm: | 0 |
| Str ≥ 5nm: | 0 |
| Total str: | 0 |
| Str / cc > 5: | 0.0000  /cc |

| Number of grids: | 2 | #1: | 114 | #3: | 113 |
| Number of openings: | 10 | #2: | 113 | #4: | 113 |

| Average Grid Size: | 0.012826 |
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 0.04 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 0.00 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E1-C3 | | NSD | | | | | |
| | F4 | | NSD | | | | | |
| | I7 | | NSD | | | | | |
| | E4 | | NSD | | | | | |
| | D4 | | NSD | | | | | |
| | D1-D3 | | NSD | | | | | |
| | B6 | | NSD | | | | | |
| | F8 | | NSD | | | | | |
| | D7 | | NSD | | | | | |
| | B4 | | NSD | | | | | |

M25336 004     Sample Comments:

# MAS  Indirect TEM ANALYSIS  M25336-006

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-1-A |
|---|---|---|---|---|
| Sample Area/Volume: | 51 | Liters | Date Analyzed: | 2/5/01 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Air | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES | 8 % | Grid box Number: | 5948 |

| Str < 5um: | 4 |
|---|---|
| Str ≥ 5um: | 1 |
| Total str: | 5 |
| Str / cc > 5: | 1.3161 /cc |

| Number of grids: | 2 | #1: 113 | #3: 114 |
|---|---|---|---|
| Number of openings: | 10 | #2: 114 | #4: 113 |

| Average Grid Size: | 0.012882 |
|---|---|
| Total Area Analyzed: | 0.129 |

| | Filter used | Dilution | Dilution Factor | Detect_cc: | 1.32 |
|---|---|---|---|---|---|
| | 1/2 | 30 | 6.666667 | Total cc: | 6.58 |

| Str# | SquareID | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E9-C4 | | NSD | | | | | |
| | B2 | | NSD | | | | | |
| 1 | F1 | C | M-F | 1.00 | 0.04 | X | X | Print Out |
| | H5 | | NSD | | | | | |
| 2 | G1 | C | M-F | 0.60 | 0.03 | X | X | |
| | E10-D8 | | NSD | | | | | |
| | D5 | | NSD | | | | | |
| 3 | C3 | C | F | 0.80 | 0.03 | X | X | |
| 4 | I4 | C | M-F | 6.00 | 0.04 | X | X | |
| 5 | A6 | C | M-F | 0.60 | 0.03 | X | X | |

M25336_006    Sample Comments:

MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  10:15
Cursor: 8.040KeV = 16          ROI (SIKα) 1.660: 1 820=73

0.000                              VFS = 32     10 240
    6      M25336-006; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-007

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-1-B | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 51    Liters | | Date Analyzed: | 2/5/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Hamon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES    15 % | | Grid box Number: | 5948 | |

| Str < 5um: | 8 |
|---|---|
| Str ≥ 5um: | 3 |
| Total str: | 11 |
| Str / cc > 5: | 3.9833 | /cc |

| Number of grids: | 2 | #1: | 113 | #3: | 112 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 114 | #4: | 113 |

| Average Grid Size: | 0.012769 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 1.33 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 14.61 |

| Str# | Square ID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D9-B9 | C | M-F | 8.00 | 0.05 | X | X | Print Out |
| 2 | E8 | C | M-F | 3.00 | 0.04 | X | X | |
| 3 | E8 | C | M-F | 2.00 | 0.03 | X | X | |
| 4 | E8 | C | M-B | 4.00 | 0.20 | X | X | |
| 5 | E8 | C | F | 2.40 | 0.04 | X | X | |
| 6 | D4 | C | M-F | 6.00 | 0.05 | X | X | |
| 7 | F2 | C | M-F | 3.00 | 0.03 | X | X | |
| 8 | F2 | C | M-F | 2.00 | 0.04 | X | X | |
| | I5 | | NSD | | | | | |
| | D10-G9 | | NSD | | | | | |
| 9 | F9 | C | M-F | 2.00 | 0.05 | X | X | |
| | C8 | | NSD | | | | | |
| 10 | B4 | C | F | 5.00 | 0.04 | X | X | Print Out |
| 11 | E3 | C | M-F | 0.60 | 0.03 | X | X | |

M25336 007    Sample Comments:



MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  12:59
Cursor: 8.040keV = 176      ROI (SIKα) 1.660: 1.820=80

0 000                                  VFS = 128    10 240
    7      MES336-007; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  13:18
Cursor: 8.040KeV = 29       ROI (SIKα) 1.660: 1.820=76

0 000                                    VFS = 32    10 240
56      H25336-007; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-008

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-1-C |
|---|---|---|---|---|

| Sample Area/ Volume: | 51  Liters | Date Analyzed: | 2/5/01 | |
|---|---|---|---|---|
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES   15 % | Grid box Number: | 5948 | |

| Str < Sens | 4 |
|---|---|
| Str ≥ Sens | 2 |
| Total str: | 6 |
| Str / cc > 5: | 2.6091 | /cc |

| Number of grids: | 2 | #1: | 114 | #3: | 114 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 114 | #4: | 114 |

| Average Grid Size: | 0.012996 |
|---|---|
| Total Area Analyzed: | 0.130 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 1.30 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 7.83 |

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | C9-16 | | NSD | | | | | |
| | H10 | | NSD | | | | | |
| 1 | F8 | C | F | 4.00 | 0.04 | X | X | Print Out |
| 2 | C10 | C | M-F | 1.00 | 0.03 | X | X | |
| | C2 | | NSD | | | | | |
| 3 | C10-F8 | C | F | 4.00 | 0.05 | X | X | |
| 4 | F8 | C | M-B | 12.00 | 0.40 | X | X | |
| | C9 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| 5 | E1 | C | F | 6.00 | 0.05 | X | X | |
| 6 | E1 | C | M-F | 4.00 | 0.05 | X | X | |
| | G2 | | NSD | | | | | |

M25336_008   Sample Comments:



MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  14:11
Cursor: 8.040keV = 57       ROI (SIKα) 1.660: 1.820=30

0 000                              VFS = 64        10 240
    11      M23336-008; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-009

| CLIENT NAME: Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | A-1-D |
|---|---|---|

| | | | | |
|---|---|---|---|---|
| Sample Area/Volume: | 51 Liters | Date Analyzed: | 2/5/01 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES  10 % | Grid box Number: | 5948 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Str < 5um: | 4 | Number of grids: | 2 | #1: 113 | #3: 113 | |
| Str ≥ 5um: | 1 | Number of openings: | 10 | #2: 113 | #4: 114 | |
| Total str: | 5 | | | | | |
| Str / cc > 5: | 1.3219 | /cc | Average Grid Size: | 0.012826 | | |
| | | | Total Area Analyzed: | 0.128 | | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 1.32 |
|---|---|---|---|---|
| 1/2 | 30 | 6.666667 | Total cc: | 6.61 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B9-C2 | C | M-F | 2.00 | 0.04 | X | X | Print Out |
| | E4 | | NSD | | | | | |
| | I1 | | NSD | | | | | |
| 2 | D7 | C | M-F | 3.00 | 0.04 | X | X | |
| | D7 | | NSD | | | | | |
| | B10-D10 | | NSD | | | | | |
| 3 | B9 | C | M-F | 1.00 | 0.03 | X | X | |
| | G4 | | NSD | | | | | |
| 4 | E2 | C | M-F | 6.00 | 0.04 | X | X | |
| 5 | A3 | C | F | 3.00 | 0.04 | X | X | |

| M25336 009 | Sample Comments: |
|---|---|
| | |



MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  15:51
Cursor: 8 040keV = 11        ROI (SIKα) 1.660: 1.820=42

0.000                                VFS = 32    10.240

8      M25336-009; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-011

| CLIENT NAME: Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-1-A | |
|---|---|---|---|---|
| Sample Area/ Volume: | 10     Liters | Date Analyzed: | 2/5/01 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES     8 % | Grid box Number: | 5948 | |

| Str < 5um: | 6 |
|---|---|
| Str ≥ 5um: | 1 |
| Total str: | 7 |
| Str / cc > 5: | 6.7418 |   /cc

| Number of grids: | 2 | #1: | 113 | #3: | 113 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 113 | #4: | 114 |

| Average Grid Size: | 0.012826 |
|---|---|
| Total Area Analyzed: | 0.128 |

| | Filter used | Dilution | Dilution Factor | Detect_cc: | 6.74 |
|---|---|---|---|---|---|
| | 1/ 2 | 30 | 6.666667 | Total cc: | 47.19 |

| Str: | Square ID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | A9-B10 | | NSD | | | | | |
| 1 | E10 | C | M-B | 3.00 | 0.30 | X | X | Print Out |
| 2 | J8 | C | M-F | 2.00 | 0.03 | X | X | |
| 3 | J8 | C | F | 1.00 | 0.03 | X | X | |
| | I7 | | NSD | | | | | |
| 4 | G2 | C | M-F | 0.60 | 0.03 | X | X | |
| | A10-G2 | | NSD | | | | | |
| 5 | I5 | C | M-F | 1.00 | 0.04 | X | X | |
| 6 | E8 | C | M-F | 0.60 | 0.03 | X | X | |
| | C6 | | NSD | | | | | |
| 7 | A1 | C | F | 2.00 | 0.04 | X | X | |

M25336 011   Sample Comments:

MATERIALS ANALYTICAL SERVICES          MON 05-FEB-01  10:58
Cursor: 8.040KeV = 251      ROI (SIKα) 1.660: 1.820=164

0.000                                    VFS = 128      10.240
      9      M25336-011; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-012

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-1-B | |
|---|---|---|---|---|---|
| Sample Area/Volume: | 10  Liters | | Date Analyzed: | 2/5/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES  10 % | | Grid box Number: | 5948 | |

| Str < 5um: | 4 |
|---|---|
| Str ≥ 5um: | 1 |
| Total str: | 5 |
| Str / cc > 5: | 6.7716 /cc |

| Number of grids: | 2 | #1: | 113 | #3: | 113 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 112 | #4: | 114 |

| Average Grid Size: | 0.012769 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 6.77 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 33.86 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | E7-C6 | C | F | 2.90 | 0.03 | X | X | Print Out |
| | E6 | | NSD | | | | | |
| | E10 | | NSD | | | | | |
| 2 | H4 | C | F | 4.80 | 0.05 | X | X | |
| | F3 | | NSD | | | | | |
| | D7-D6 | | NSD | | | | | |
| | B8 | | NSD | | | | | |
| 3 | C18 | C | M-F | 5.00 | 0.04 | X | X | |
| 4 | H8 | C | M-F | 2.00 | 0.04 | X | X | |
| 5 | G5 | C | M-F | 1.00 | 0.03 | X | X | |

M25336 012    Sample Comments:



MATERIALS ANALYTICAL SERVICES          TUE 06-FEB-01   09:57
Cursor: 8.040keV = 189      ROI (SIKα) 1.660: 1.820=89

0.000                          VFS = 64        10.240
    19     M25336-012; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-013

| CLIENT NAME: Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | P-1-C |
|---|---|---|

| Sample Area/Volume: | 10 | Liters | Date Analyzed: | 2/6/01 | |
|---|---|---|---|---|---|
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES | 12 % | Grid box Number: | 5948 | |

| Str < 5um: | 7 | | Number of grids: | 2 | #1: | 114 | #3: | 114 |
|---|---|---|---|---|---|---|---|---|
| Str ≥ 5um: | 1 | | Number of openings: | 10 | #2: | 113 | #4: | 113 |
| Total str: | 8 | | | | | | | |
| Str / cc > 5: | 6.7123 | /cc | Average Grid Size: | 0.012882 | | | | |
| | | | Total Area Analyzed: | 0.129 | | | | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 6.71 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 53.70 |

| Str: | SquareID: | Type: | Structure: | Length: | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E6-E8 | | NSD | | | | | |
| 1 | C7 | C | M-F | 1.00 | 0.03 | X | X | Print Out |
| 2 | B4 | C | M-F | 1.00 | 0.04 | X | X | |
| | D3 | | NSD | | | | | |
| 3 | B4 | C | F | 2.00 | 0.03 | X | X | |
| 4 | D6-G3 | C | F | 1.00 | 0.03 | X | X | |
| 5 | G3 | C | M-F | 2.00 | 0.04 | X | X | |
| 6 | D6 | C | M-F | 4.00 | 0.04 | X | X | |
| | B8 | | NSD | | | | | |
| 7 | D9 | C | M-F | 1.00 | 0.03 | X | X | |
| 8 | D9 | C | M-F | 8.00 | 0.04 | X | X | |
| | F9 | | NSD | | | | | |

M25336_013     Sample Comments:

MATERIALS ANALYTICAL SERVICES          TUE 06-FEB-01   10:35
Cursor: 8.040keV = 8        ROI (SIKα) 1.660: 1.820=29

0.000                              VFS = 32    10.240
    ii     M25336-013; CHRYSOTILE

# MAS Indirect TEM ANALYSIS M25336-014

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-1-D | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 10 Liters | | Date Analyzed: | 2/6/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES  10 % | | Grid box Number: | 5948 | |

| Str < 5um: | 6 |
|---|---|
| Str ≥ 5um: | 1 |
| Total str: | 7 |
| Str / cc > 5: | 6.7716 |/cc |

| Number of grids: | 2 | #1: 113 | #3: 113 |
|---|---|---|---|
| Number of openings: | 10 | #2: 113 | #4: 113 |

| Average Grid Size: | 0.012769 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | | |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Detect_cc: | 6.77 |
| | | | Total cc: | 47.40 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B6-12 | C | M-F | 1.00 | 0.03 | X | X | Print Out |
| 2 | F1 | C | M-F | 2.00 | 0.04 | X | X | |
| | B7 | | NSD | | | | | |
| 3 | E8 | C | F | 0.60 | 0.03 | X | X | |
| 4 | F9 | C | M-F | 1.00 | 0.03 | X | X | |
| | B7-A5 | | NSD | | | | | |
| 5 | A7 | C | M-F | 1.00 | 0.04 | X | X | |
| 6 | D5 | C | C-B | 8.00 | 0.30 | X | X | |
| | F3 | | NSD | | | | | |
| 7 | I5 | C | M-F | 1.00 | 0.03 | X | X | |

M25336 014    Sample Comments:

MATERIALS ANALYTICAL SERVICES          TUE 06-FEB-01  13:13
Cursor: 8.040KeV = 13        ROI (SIKα) 1.660: 1.820=55

0.000                                    VFS = 22    10.240
    8    M25336-014; CHRYSOTILE

# MAS Indirect TEM ANALYSIS M25336-016

| CLIENT NAME: Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | A-2-A |

| | | | | |
|---|---|---|---|---|
| Sample Area/Volume: | 51 Liters | Date Analyzed: | 2/7/01 | |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES   15 % | Grid box Number: | 5948 | |

| | | | | |
|---|---|---|---|---|
| Str < 5um: | 10 | Number of grids: | 2 | #1: 113  #3: 113 |
| Str ≥ 5um: | 3 | Number of openings: | 10 | #2: 114  #4: 114 |
| Total str: | 13 | | | |
| Str / cc > 5: | 3.9484 | /cc | Average Grid Size: | 0.012882 |
| | | | Total Area Analyzed: | 0.129 |

| Filter used | Dilution | Dilution Factor | |
|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Detect_cc: 1.32 |
| | | | Total cc: 17.11 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | A1-C6 | C | F | 1.00 | 0.03 | X | X | Print Out |
| 2 | B4 | C | B | 12.00 | 0.40 | X | X | |
| 3 | D1 | C | F | 0.80 | 0.03 | X | X | |
| 4 | G2 | C | M-F | 1.00 | 0.03 | X | X | |
| 5 | J6 | C | B | 7.00 | 0.30 | X | X | |
| 6 | J6 | C | B | 16.00 | 1.00 | X | X | |
| 7 | A2-I2 | C | M-F | 4.00 | 0.04 | X | X | |
| 8 | I2 | C | M-F | 1.00 | 0.03 | X | X | |
| 9 | I2 | C | F | 3.00 | 0.04 | X | X | |
| | D3 | | NSD | | | | | |
| 10 | B4 | C | M-F | 2.00 | 0.04 | X | X | Print Our |
| 11 | G9 | C | M-F | 2.00 | 0.04 | X | X | |
| 12 | G9 | C | M-F | 1.00 | 0.03 | X | X | |
| 13 | H1 | C | M-F | 2.00 | 0.03 | X | X | |

M25336 016   Sample Comment:

MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  13:08
Cursor: 8 040keV = 130      ROI (SIKα) 1.660: 1.820=238

0.000                                    VFS = 256     10.240

8     M2533E-016; CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  13:56
Cursor: 8.040KeV = 21        ROI (SIKα) 1.660: 1.820=46

0.000                                  VFS = 32      10.240
  10    M25336-016; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-017

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-2-B |
|---|---|---|---|---|
| Sample Area/ Volume: | 57    Liters | Date Analyzed: | 2/7/01 | |
| Filter Type: | MCE 47mm | Analyst: | Al Hamon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES    15 % | Grid box Number: | 5948 | |

| Str < 5um: | 17 |
|---|---|
| Str ≥ 5um: | 6 |
| Total str: | 23 |
| Str / cc > 5: | 7.8274 |

| Number of grids: | 2 | #1: | 114 | #3: | 114 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 114 | #4: | 114 |

| Average Grid Size: | 0.012996 |
|---|---|
| Total Area Analyzed: | 0.130 |

| Filter used | Dilution | Dilution Factor |
|---|---|---|
| 1/ 2 | 30 | 6.666667 |

Detect_cc: 1.30
Total cc: 30.01

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B1-B1 | C | M-F | 7.00 | 0.05 | X | X | Print Out |
| 2 | E1 | C | B | 4.00 | 0.30 | X | X | |
| 3 | E1 | C | B | 3.00 | 0.15 | X | X | |
| 4 | G3 | C | B | 4.00 | 0.40 | X | X | |
| 5 | G3 | C | M-F | 3.00 | 0.04 | X | X | |
| 6 | I5 | C | M-B | 4.00 | 0.20 | X | X | |
| 7 | I5 | C | F | 2.00 | 0.04 | X | X | |
| 8 | G5 | C | B | 3.00 | 0.20 | X | X | |
| 9 | G5 | C | B | 8.00 | 0.30 | X | X | |
| 10 | D10 | C | B | 3.00 | 0.60 | X | X | Print Out |
| 11 | D10 | C | M-F | 10.00 | 0.05 | X | X | |
| 12 | D10 | C | M-F | 1.00 | 0.03 | X | X | |
| 13 | B1-C3 | C | F | 3.00 | 0.03 | X | X | |
| 14 | C3 | C | F | 3.00 | 0.04 | X | X | |
| 15 | C3 | C | M-B | 4.00 | 0.26 | X | X | |
| 16 | C3 | C | M-F | 1.00 | 0.03 | X | X | |
| 17 | D6 | C | B | 6.00 | 0.30 | X | X | |
| 18 | G6 | C | M-F | 2.00 | 0.04 | X | X | |
| 19 | G6 | C | M-B | 6.00 | 0.20 | X | X | |
| 20 | G6 | C | F | 2.00 | 0.04 | X | X | Print Out |
| 21 | H4 | C | M-F | 1.00 | 0.03 | X | X | |
| 22 | F1 | C | M-B | 12.00 | 0.30 | X | X | |
| 23 | F1 | C | M-F | 2.00 | 0.04 | X | X | |

M25336 017    Sample Comments:

# MAS  Indirect TEM ANALYSIS  M25336-017

| CLIENT NAME: | Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | A-2-B |
|---|---|---|---|

# TEM SAMPLE DATA

Prep SOP#:   MT-003
Prep Status:   Complete
Sample Type:   Air
Analysis type:   Dust

N25336

Prep date: 1/31/01   Prep Tech: dmazzaliero

## Archival Information

Slides: 167   Filters: ___   Bottles: 730   Grid_box: 5948

Archive Comments:
Disposal Comments:

Page 1 of 3

Return Dates ___

| Sample Number | Sample ID | Area | Filter Portion | Test Stop | Dilution Factors | #1 | #2 | #3 | #4 | #5 | | | #7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000 | lab blank 1/31/01 | 0 | 1/1 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 001 | A-O-A | 1818 | 1/2 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 002 | A-O-B | 1800 | 1/2 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 003 | A-O-C | 1836 | 1/2 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 004 | A-O-D | 1800 | 1/2 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 005 | A-O-E | 1818 | 1/2 | 100 | Dilution Factors | 30 | 0 | 0 | 0 | 0 | | | 0 |
| 006 | A-1-A | 51 | 1/2 | 100 | Dilution Factors | 100 | 8 | 0 | 0 | 0 | | | 0 |
| 007 | A-1-B | 51 | 1/2 | 100 | Dilution Factors | 1 | 1212 | 0 | 0 | 0 | | | 0 |
| 008 | A-1-C | 51 | 1/2 | 100 | Dilution Factors | 200 | 1212 | 0 | 0 | 0 | | | 0 |
| 009 | A-1-D | 51 | 1/2 | 100 | Dilution Factors | 1 | 9 | 0 | 0 | 0 | | | 0 |
| 010 | A-1-E | 200 | 1/2 | 100 | Dilution Factors | 6.667 | 0 | 0 | 0 | 0 | | | 0 |

Filtered Volumes in ml

# TEM SAMPLE DATA

Prep SOP#: MT-003
Prep Status: Complete
Sample Type: Air
Analysis Type: Dust

**M25336**

prep_date: 1/3/07    Prep Tech: dimazzaferro

## Archival Information

Slides: 187    Filters: ___    Bottles: 730    Grid_box: 55d8

Archive Comments:
Disposal Comments:

Page 2 of 3

Review Dates

| | | Dilution Factors | | | | | |
|---|---|---|---|---|---|---|---|
| 011 | P-1-A | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 012 | P-1-B | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 013 | P-1-C | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 014 | P-1-D | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 015 | FB1 | 0 | 30 | 0 | 6.667 | 0 | 0 |
| 016 | A-2-A | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 017 | A-2-B | 1 | 200 | 0 | 22.22 | 0 | 0 |
| 018 | A-2-C | 51 | 200 | 0 | 22.22 | 0 | 0 |
| 019 | A-2-D | 51 | 200 | 0 | 22.22 | 0 | 0 |
| 020 | P-2-A | 10 | 200 | 0 | 22.22 | 0 | 0 |
| 021 | P-2-B | 10 | 200 | 0 | 22.22 | 0 | 0 |
| 022 | P-2-C | 10 | 200 | 0 | 22.22 | 0 | 0 |



# TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS**

| | |
|---|---|
| Co. Name | MAS |
| Address | 3945 Lakefield Court |
| | Suwanee, GA 30024 |
| PH: | 770-866-3200 |
| FAX: | |

3945 Lakefield Court
Suwanee, GA 30024
PH: (770) 866-3200
FAX: (770) 866-3259

Project Number: _____
Project Name: Brake Blowout II
Work Area Description: _____
Project Representative: _____
Sampling Date: 1/30/01

Sheet ___ of ___

Background

| Date | Sample No. | Sample Location | Sample Type | Start | Stop | Duration | Before | After | Average | Total Air Volume (Liters) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/01 | A-O-A | IWA-NE | Area | 0850 | 1150 | 180 | 10.1 | 10.1 | 10.1 | 1818 |
| | A-O-B | IWA-NE | | | | 180 | 10.0 | 10.1 | 10.0 | 1800 |
| | A-O-C | IWA-SW | | | | 180 | 10.1 | 10.2 | 10.2 | 1836 |
| | A-O-D | IWA-NW | | | | 180 | 10.0 | 10.0 | 10.0 | 1800 |
| 1/30/01 | A-O-E | OWA-SE | Area | 0850 | 1150 | 180 | 10.0 | 10.2 | 10.1 | 1818 |

(Sample Times (Minutes); Flow Rate (Liters Per Minute))

CHAIN OF CUSTODY
Initial Shipment Date: 1/30/01

| | Made or Transfer | Logged Date | Received By |
|---|---|---|---|
| First Transfer By: | Hord | 1-30-01 | |
| Second Transfer By: | | | |
| Third Transfer By: | | | |

Clean/Stain/Worn/TBA Contents

# TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS.**

3946 Lakefield Court
Suwanee, GA 30024
PH: (770) 866-3200
FAX: (770) 866-3259

| Co. Name | MAS |
| Address | 3945 Lakefield Court |
| | Suwanee, GA 30024 |
| PH: | 770-866-3200 |
| FAX: | |

| Project Number: | |
| Project Name: | Brooke Blakenet II |
| Work Area Description: | |
| Project Representative: | |
| Sampling Date: | 1/30/01 |
| | Sheet ___ of ___ |

| Date | Sample No. | Sample Location | Sample Type | Sample Times (Military) Start | Sample Times (Military) Stop | Duration | Flow/Field (Liters per Minute) Before | Flow/Field (Liters per Minute) After | Flow/Field (Liters per Minute) Average | Total Air Volume Liters |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/01 | A-1-A | IWA-NE | Area | 1350 | 1355 | 5 | 10.1 | 10.2 | 10.2 | 51.0 |
| | A-1-B | IWA-SE | | | | 5 | 10.1 | 10.2 | 10.2 | 51.0 |
| | A-1-C | IWA-SW | | | | 5 | 10.2 | 10.1 | 10.2 | 51.0 |
| | A-1-D | IWA-NW | ↓ | ↓ | ↓ | 5 | 10.0 | 10.2 | 10.1 | 50.5 |
| | A-1-E | OWA-SE | Area | 1350 | 1410 | 20 | 10.2 | 9.7 | 10.0 | 200.0 |
| | P-1-A | WL-R | Personal | 1350 | 1355 | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | P-1-B | WL-L | | | | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | P-1-C | RH-R | | ↓ | | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | P-1-D | RH-L | ↓ | | ↓ | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | FB-1 | Field Blank | | — | — | 0 | — | — | 0 | 0.0 |

**CHAIN OF CUSTODY**

First Transfer By: XRobert    Initial Shipment Date: 1/30/01

| | Made of Transfer | Location Date | Received By |
|---|---|---|---|
| | Hand | 1-30-01 | (signature) |

Second Transfer By:

Third Transfer By:

Chen's Industries TEM Clearance

# TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS.**

3945 Lakefield Court
Suwanee, GA 30024
PH: (770) 866-3200
FAX: (770) 866-3259

| Co. Name | MAS |
|---|---|
| Address | 3945 Lakefield Court |
| | Suwanee, GA 30024 |
| PH: | 770-866-3200 |
| FAX: | |

Project Number:
Project Name:
Work Area Description:
Project Representative:
Sampling Date: 1/30/01

Sheet ____ of ____

| Date | Sample No. | Sample Location | Sample Type | Sample Times (Minutes) | | | Flow Rate (liters per Minute) | | | 7th Air Volume / liters |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Start | Stop | Duration | Before | After | Average | |
| 1/30/01 | 4-2-A | IWA-NE | Area | 1404 | 1409 | 5 | 10.1 | 10.2 | 10.2 | 51.0 |
| | 4-2-B | IWA-SE | | | | 5 | 10.1 | 10.2 | 10.2 | 51.0 |
| | 4-2-C | IWA-SW | | | | 5 | 10.2 | 10.1 | 10.2 | 51.0 |
| | 4-2-D | IWA-NW | | | | 5 | 10.0 | 10.2 | 10.1 | 50.5 |
| | 12-2-A | WL-R | Personal | 1404 | 1409 | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | 12-2-B | WL-L | | | | 5 | 2.0 | 2.0 | 2.0 | 10.2 |
| | 12-2-C | WH-R | | | | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | 12-2-D | WH-L | | | | 5 | 2.0 | 2.0 | 2.0 | 10.0 |
| | WL-F-B | | Fabric Blank | | | | | | | |
| | WL-F-1 | | Fabric After | | | | | | | |

**CHAIN OF CUSTODY**

First Transfer By: _KM20_    Initial Shipment Date: 1/30/01    Mode of Transfer: _Hand_    Log-in Date: 1-30-01    Received By: _[signature]_
Second Transfer By:
Third Transfer By:

TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS.**

3945 Lakefield Court
Suwanee, GA 30024
PH: (770) 866-3200
FAX: (770) 866-3259

| Co. Name | MAS |
|---|---|
| Address | 3945 Lakefield Court |
| | Suwanee, GA 30024 |
| PH: | 404-866-3200 |
| FAX: | |

Project Number:
Project Name: Brete Blount II
Work Area Description:
Project Representative:
Sampling Date: 1/30/01

Sheet ____ of ____

| Date | Sample No. | Sample Location | Sample Type | Sample Times (Minutes) | | | Flow Rate (Liters per Minute) | | | Total Air Volume (Liters) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Start | Stop | Duration | Before | After | Average | |
| 1/30/01 | A-3-A | IWA-NE | Area | 1434 | 1514 | 35 | 10.1 | 10.2 | 10.2 | 357.0 |
| | A-3-B | IWA-SE | | | | 35 | 10.1 | 10.2 | 10.2 | 357.0 |
| | A-3-C | IWA-SW | | | | 35 | 10.2 | 10.1 | 10.2 | 357.0 |
| | A-3-D | IWA-NW | ↓ | ↓ | ↓ | 35 | 10.0 | 10.2 | 10.1 | 353.5 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

CHAIN OF CUSTODY
Initial Shipment Date: 1/30/01

| | Mode of Transfer | Login Date | Received By |
|---|---|---|---|
| First Transfer By: | HandCar | 1-30-01 | |
| Second Transfer By: | | | |
| Third Transfer By: | | | |

# HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

oject Name: _CHANDOR DRAKE BLOWOUT II_  - Sample # _725326-001_
nle Date: ____ Analysis Date: _4/4/01_  Analyst _6 DSH_

SAMPLE ID. _A-0-A_

PUMP SER. # ____

CALIB. DATE ____

START ____ STOP ____ TIME ____

____ Pump Flow Rate (L/M)   (FR)

____ Sample Duration in Min.   (T)

_1818_ Sample Volume = FR X T (V)

_2½_ Total Fibers Counted in Sample        (FCS)

_100_ Total Fields Counted in Sample        (FLS)

_0_ Total Fibers Counted in Field Bank     (FCB)

_100_ Total Fields Counted on Field Bank   (FLB)

_285_ Area of _25_ - mm Filter           (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY   (E)

E = ((FCS/FLS)-(FCB/FLB))/GFA

TES: _LOD = LIMIT OF DETECTION = 7 F/MM²_   E = _3.185_ F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

C = (E) (AF)
     1000V

C = _____

_0.0007_

h Office
6 Hutton Street • Suite 101
Raleigh, NC 27606
(919) 829-7041 • FAX (919) 829-5515

Atlanta Office
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

# PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

MAS

Project Name: _CHATHAM GRAGE blow.out II_    Sample # _1725336-002_
Date: _____  Analysis Date: _4/4/01_  Analyst: _L.B.S.B_

SAMPLE ID.   _A - O - B_

PUMP SER. #  _____

CALIB. DATE  _____

START _____  STOP _____  TIME _____

_____  Pump Flow Rate (L/M)  (FR)

_____  Sample Duration in Min.  (T)

_1800_  Sample Volume = FR X T  (V)

_5_  Total Fibers Counted in Sample  (FCS)

_100_  Total Fields Counted in Sample  (FLS)

_0_  Total Fibers Counted in Field Bank  (FCB)

_100_  Total Fields Counted on Field Bank  (FLB)

_385_  Area of _25_ mm Filter  (AF)

_0.00785_  Graticule Field Area in sq. mm  (GFA)

CALCULATION OF FIBER DENSITY  (E)

E = ((FCS/FLS)-(FCB/FLB))/GFA

NOTES : _LOD = LIMIT OF DETECTION = 7 F/mm²_  E =  _5.096_  F/mm²

CALCULATION OF FIBER CONCENTRATION  (C)
IN FIBERS PER cc

C = (E) (AF)
     1000V

C =   _<LOD_   F/cc
     _0.001_

Office:
Hutton Street · Suite 101
Raleigh, NC 27606
9 829-7041 · FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 · FAX (770) 866-3259

# IASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS.**

ject Name: _CHALMER BRAKE BLOWOUT II_    Sample # _M25 836-003_
e Date: _____ Analysis Date: _4/4/41_    Analyst: _N.B.S.II_

| | | | | | |
|---|---|---|---|---|---|
| | ~ | ~ | ~ | — | |
| | — | — | — | — | 10 |
| | — | — | — | — | 20 |
| | — | — | / | — | |
| | — | — | — | — | 30 |
| | — | — | — | — | 40 |
| | ~ | — | — | — | |
| | — | — | — | $\frac{1}{2}$ | 50 |
| | — | — | ~ | — | 60 |
| | — | — | — | — | |
| | ~ | — | ~ | — | 70 |
| | — | — | ~ | — | |
| | — | ~ | — | — | 80 |
| | — | — | — | / | 90 |
| | ~ | — | / | | |
| | — | — | — | | 100 |

SAMPLE ID.    _A-O-C_
_____

PUMP SER. # _____

CALIB. DATE _____

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

_1836_ Sample Volume = FR X T  (V)

_5½_ Total Fibers Counted in Sample    (FCS)

_100_ Total Fields Counted in Sample    (FLS)

_0_ Total Fibers Counted in Field Bank    (FCB)

_100_ Total Fields Counted on Field Bank    (FLB)

_385_ Area of _25_ mm Filter    (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

E = _7.006_ _____ F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)~(AF)}{1000V}$$

C = _0.001_ _____ F/cc

TES : _____

_____

_____

_____

.gh Office
16 Hutton Street - Suite 101
aleigh. NC 27606
919) 829-7041 • FAX (919) 829-5518

Atlanta Office
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS    **MAS**

oject Name: CHAMBER BRAKE MONITOR II    Sample # 1725336-064
r—la Date: _____    Analysis Date: 4/4/01    Analyst: W.O.S.H.

SAMPLE ID.    A - O - D

_____

PUMP SER. # _____

CALIB. DATE _____

START _____    STOP _____    TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

1800    Sample Volume = FR X T (V)

5 ½    Total Fibers Counted in Sample    (FCS)

100    Total Fields Counted in Sample    (FLS)

0    Total Fibers Counted in Field Bank    (FCB)

100    Total Fields Counted on Field Bank    (FLB)

385    Area of    25.    mm Filter    (AF)

0.00785    Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

$E =$    7.006    F/mm²

CALCULATION OF FIBER CONCENTRATION   ( C )
IN FIBERS PER cc

$$C = \frac{(E)(AF)}{1000V}$$

C =    0.001    Fiber

TES : _____
_____
_____
_____
_____

Jh Office
16 Hutton Street • Suite 101
aleigh, NC 27606
.19) 829-7041 • FAX (919) 829-5518

Atlanta Office
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

HASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS    **MAS**

oject Name: _CHAMBER BRAKE BONUS II_    Sample # _125336-066_
mple Date: _____ Analysis Date: _4/4/05_    Analyst: _C.B.S_



SAMPLE ID.    _A-1-A_

PUMP SER. #

CALIB. DATE

START _____ STOP _____ TIME _____

_____ Pump Flow Rate (L/M)    (FR)

_____ Sample Duration in Min.    (T)

_51_ Sample Volume = FR X T  (V)

_95_ Total Fibers Counted in Sample    (FCS)

_160_ Total Fields Counted in Sample    (FLS)

_0_ Total Fibers Counted in Field Bank    (FCB)

_160_ Total Fields Counted on Field Bank    (FLB)

_385_ Area of _25_ - mm Filter    (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

TES: _ABUNDANT FINE PARTICULATE_
_THROUGHOUT SAMPLE._

E = ((FCS/FLS)-(FCB/FLB))/GFA

E =    _12.102_ _____ F/mm²

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

C = (E) (AF)
      1000V

C =    _0.031_ _____ F/cc

...gh Office:
5 Hutton Street - Suite 101
leigh, NC 27606
9) 829-7041 • FAX (919) 829-5516

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 • FAX (770) 866-3259

PHASE CONTRAST MICROSCOPY AIRBORNE FIBER ANALYSIS

**MAS**

Project Name: _CHANNEL DRAKE BLOW OUT II_    Sample # _1725336-607_
Sample Date: _____    Analysis Date: _4/4/01_    Analyst: _W.B.Sull_

| | | | | | |
|---|---|---|---|---|---|
| — | — | — | — | | |
| — | — | — | — | 1 | 10 |
| 1 | — | | — | | |
| — | — | — | — | — | 20 |
| — | — | — | — | | |
| — | — | — | — | | 30 |
| — | 1 | — | — | | 40 |
| — | — | — | — | — | |
| — | 1 | — | — | 50 | |
| 1 | — | — | — | | |
| — | — | — | — | | 60 |
| — | — | — | — | | |
| 1 | — | 1 | — | | 70 |
| — | — | — | — | | 80 |
| — | — | — | — | | 90 |
| — | — | — | — | | 100 |

SAMPLE ID. _A-1-B_

PUMP SER. # _____

CALIB. DATE _____

START _____ STOP _____ TIME _____

Pump Flow Rate (L/M)    (FR) _____

Sample Duration in Min.   (T) _____

_51_  Sample Volume = FR X T  (V)

_7_  Total Fibers Counted in Sample    (FCS)

_100_  Total Fields Counted in Sample    (FLS)

_0_  Total Fibers Counted in Field Bank    (FCB)

_100_  Total Fields Counted on Field Bank    (FLB)

_385_  Area of _25_ mm Filter    (AF)

_0.00785_ Graticule Field Area in sq. mm    (GFA)

CALCULATION OF FIBER DENSITY    (E)

$$E = ((FCS/FLS)-(FCB/FLB))/GFA$$

EXTREMELY

NOTES:  _ABUNDANT FINE PARTICULATE_
_THROUGHOUT SAMPLE._

_OVERLOADED_

$E =$ _8.917_  F/mm$^2$

CALCULATION OF FIBER CONCENTRATION  ( C )
IN FIBERS PER cc

$$C = \frac{(E)\ (AF)}{1000V}$$

$C =$ _0.067_  F/cc

_a Office:_
_Mutton Street - Suite 101_
Leigh, NC 27606
91 829-7041 • FAX (919) 829-5518

Atlanta Office:
3945 Lakefield Court
Suwanee, Georgia 30024
(770) 866-3200 - FAX (770) 866-3259

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710



# EXHIBIT M, PART 3

# MATERIALS ANALYTICAL SERVICES
## PROJECT LOG

Client Code: MASCORP

| | | | |
|---|---|---|---|
| MAS ID: | M25317 | Client Job No: | NA |
| Client Name: | Materials Analytical Services, Inc. | Client PO: | NA |
| Project Name: | IN-HOUSE BRAKE | Date In: | 1/27/01 |
| Logged By: | Will Stark | | |

### TRANSPORT INFORMATION:

| | | | |
|---|---|---|---|
| Submitted By: | | Documents: | COC |
| Delivery By: | Hand Delivery | | |
| Received By: | Will Stark | Comments for COC: | |
| Condition: | OK | | |

### CONTACT INFORMATION:

| Contact: | Richard Hatfield | | Work Phone: (770) 866-3200 | Ext: |
|---|---|---|---|---|
| Title: First Name: | Last Name: | Suffix | Other Phone: | Ext: |
| Mr.    Richard | Hatfield | | Fax: | |

## M25317                    SAMPLE INFORMATION:

| # | Client ID | Volume | # | Client ID | Volume |
|---|---|---|---|---|---|
| 001 | 1 | Dust from brake drum | | | |

### SIGNATURES

RECEIVED BY: _____

REVIEWED BY: _____

PREPARED BY: _____

ANALYZED BY: _____

RECORDED BY: _____

MATERIALS ANALYTICAL SERVICES, INC.
CHAIN OF CUSTODY FORM

PAGE ___ OF ___

MAS PROJ. NO.: _____

JOB NAME/P.O.: In house brake

REC'D FROM: Blow-out study Via: _____

INITIATED BY: _____

DATE INITIATED: _____

| SAMPLE NO. | SAMPLE DESCRIPTION | INITIATE COC DATE REC'D | FIRST TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D | SECOND TRANSFER TRANS TO | DATE SENT | MODE TRANS | REC'D BY | DATE REC'D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dust from Brake Drum | 1/26/01 | MAS | 1/26/01 Fedex Harriet Platt | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

FORM 41.000



**MATERIALS ANALYTICAL SERVICES**

SAMPLE CASSETTE LABEL DATA

MAS PROJECT NUMBER: _M25317_
PREPARED BY: _____

MAS SAMPLE NO.                    DATA

_001_          1. Brake dust from right rear wheel drum
                      7cm × 8cm

3577 Parkway Lane • Suite 250
Norcross, Georgia 30092
(404) 448-3200   FAX (404) 368-8256



# TEM DUST ANALYSIS          M25317    001

Materials Analytical Services, Inc.
**IN-HOUSE BRAKE**                              Client Sample ID:        1

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 56 cm2 | | Date Analyzed: | 1/29/01 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Dust | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES    15 % | | Grid_box: | 5896 |

| | | | | |
|---|---|---|---|---|
| Str < 5um: 43 | Number of grids: 2 | #1: 113   #3: 114 | Average Grid Size: | 0.012939 |
| Str ≥5um: 4 | Number of openings: 10 | #2: 114   #4: 114 | Total Area Analyzed: | 0.129 |
| Total Str: 47 | | | | |

Volume Filtered    0.1 ml
Dilution Factor    1000

| Str / sqr ft | 7.816E+09 | Str / cm2 | 8.413E+06 |
|---|---|---|---|
| Str / sqr ft >=5 | 6.652E+08 | Str / cm2 >=5 | 7.160E+05 |

## TEM DATA

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | A1-H2 | C | M-F | 1.00 | 0.03 | X | X | Print Out |
| 2 | H8 | C | M-F | 1.50 | 0.04 | X | X | |
| 3 | H8 | C | M-F | 2.00 | 0.04 | X | X | |
| 4 | H8 | C | F | 2.00 | 0.03 | X | X | |
| 5 | H8 | C | F | 4.00 | 0.04 | X | X | |
| 6 | H8 | C | F | 1.00 | 0.05 | X | X | |
| 7 | I9 | C | M-F | 3.00 | 0.04 | X | M24642 | |
| 8 | I9 | C | M-F | 2.00 | 0.04 | X | M24643 | |
| 9 | I9 | C | M-F | 4.00 | 0.04 | X | M24644 | |
| 10 | I9 | C | F | 1.50 | 0.04 | X | | Print Out |
| 11 | I9 | C | F | 6.00 | 0.05 | X | X | |
| 12 | I9 | C | M-F | 3.00 | 0.04 | X | X | |
| 13 | G10 | C | M-F | 14.00 | 0.04 | X | X | |
| 14 | G10 | C | F | 5.00 | 0.04 | X | X | |
| 15 | G10 | C | F | 1.50 | 0.03 | X | X | |
| 16 | D8 | C | F | 2.00 | 0.04 | X | X | |
| 17 | D8 | C | F | 2.00 | 0.04 | X | X | |
| 18 | D8 | C | F | 3.00 | 0.04 | X | X | |
| 19 | D8 | C | M-F | 1.00 | 0.03 | X | X | |
| 20 | D8 | C | F | 3.00 | 0.04 | X | X | Print Out |
| 21 | D8 | C | F | 2.00 | 0.03 | X | X | |
| 22 | D6 | C | F | 4.00 | 0.04 | X | X | |
| 23 | D6 | C | M-F | 4.00 | 0.04 | X | X | |
| 24 | D6 | C | F | 3.00 | 0.04 | X | X | |
| 25 | B1-F8 | C | F | 3.00 | 0.04 | X | X | |
| 26 | F8 | C | F | 1.00 | 0.05 | X | X | |
| 27 | F8 | C | F | 2.00 | 0.04 | X | X | |
| 28 | F8 | C | M-F | 1.00 | 0.03 | X | X | |
| 29 | C9 | C | M-F | 1.00 | 0.03 | X | X | |

| 30 | C9 | C | M-F | 1.00 | 0.03 | X | X | Print Out |
|----|----|----|-----|------|------|---|---|-----------|
| 31 | C9 | C | F | 2.00 | 0.04 | X | X | |
| ? | C9 | C | M-F | 1.00 | 0.03 | X | X | |
| 33 | C9 | C | B | 3.00 | 0.20 | X | X | |
| 34 | B6 | C | F | 2.00 | 0.04 | X | X | |
| 35 | B6 | C | F | 2.00 | 0.04 | X | X | |
| 36 | B6 | C | F | 3.00 | 0.04 | X | X | |
| 37 | B6 | C | M-F | 2.00 | 0.04 | X | X | |
| 38 | B6 | C | M-F | 1.50 | 0.03 | X | X | |
| 39 | B6 | C | M-F | 2.00 | 0.04 | X | X | |
| 40 | B6 | C | F | 14.00 | 0.04 | X | X | Print Out |
| 41 | C3 | C | M-F | 2.00 | 0.04 | X | X | |
| 42 | C3 | C | F | 2.00 | 0.04 | X | X | |
| 43 | C3 | C | M-F | 1.00 | 0.03 | X | X | |
| 44 | C3 | C | M-F | 3.00 | 0.04 | X | X | |
| 45 | C3 | C | F | 4.00 | 0.04 | X | X | |
| 46 | F4 | C | M-F | 1.00 | 0.03 | X | X | |
| 47 | F4 | C | M-F | 2.00 | 0.04 | X | X | |

M25317 001

MATERIALS ANALYTICAL SERVICES          MON 29-JAN-01  09:27
Cursor: 8.040KeV = 80        ROI (SIKα) 1.660: 1.820=44

0.000                                    VFS = 64      10 240
     8      H25317-001; CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          MON 29-JAN-01  10:58
Cursor: 8.040keV = 59        ROI (SIKα) 1.660: 1.820=47

0.000                                    VFS = 64    10.240
4729    M25317-001; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          MON 29-JAN-01  12:39
Cursor: 8.040keV = 25     ROI (SIKα) 1.660: 1 820=34

0.000                              VFS = 32     10 240
    26      M25317-001; CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          MON 29-JAN-01  12:55
Cursor: 8.040KeV = 36      ROI (SIKα) 1.650: 1.820=21

0 000                              VFS = 32    10 240
31      M25317-001; CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          MON 29-JAN-01  13:10
Cursor: 8.040keV = 209     ROI (SIKα) 1.660: 1.820=45

0.000                                    VFS = 64      10.240
  12      M25317-001; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-015

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | FB1 |
|---|---|---|---|---|
| Sample Area/ Volume: | 0 Liters | Date Analyzed: | 2/1/01 | |
| Filler Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance: | YES  2 % | Grid box Number: | 5948 | |

| Str < 5um: | 0 | | Number of grids: | 2 | #1: | 112 | #3: | 113 |
|---|---|---|---|---|---|---|---|---|
| Str ≥ 5um: | 0 | | Number of openings: | 10 | #2: | 113 | #4: | 113 |
| Total str: | 0 | | | | | | | |
| Str / cc > 5: | #Error | /cc | Average Grid Size: | 0.012713 | | | | |
| | | | Total Area Analyzed: | 0.127 | | | | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | #Div/0! |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | #Error |

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| | E4-G8 | | NSD | | | | | |
| | I6 | | NSD | | | | | |
| | G4 | | NSD | | | | | |
| | E5 | | NSD | | | | | |
| | B7 | | NSD | | | | | |
| | E5-H8 | | NSD | | | | | |
| | F9 | | NSD | | | | | |
| | C7 | | NSD | | | | | |
| | D4 | | NSD | | | | | |
| | E2 | | NSD | | | | | |

M25336-015    Sample Comments:

MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  15:29
Cursor: 8 040keV = 8      ROI (SIKα) 1 660: 1 820=22



0 000                          VFS = 16      10 240
  7      M25336-017: CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  15:43
Cursor: 8.040KeV = 65       ROI (SIKα) 1.660: 1.820=88

0.000                          VFS = 128      10.240
101     M25336-017; CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  15:55
Cursor: 8.040KeV = 10      ROI (SIKα) 1.660: 1.820=39

0.000                                    VFS = 16    10 240
   15     M25336-017; CHRYSOTILE

# MAS Indirect TEM ANALYSIS  M25336-018

| CLIENT NAME: Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-2-C |
|---|---|---|---|

| Sample Area/ Volume: | 5I | Liters | Date Analyzed: | 2/8/01 |
|---|---|---|---|---|
| Filter Type: | MCE 47mm | | Analyst: | Al Hannon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES | 15 % | Grid box Number: | 5948 |

| Str < Sum: | 19 |
|---|---|
| Str ≥ Sum: | 4 |
| Total str: | 23 |
| Str / cc > 5: | 5.3347 | /cc |

| Number of grids: | 1 | #1: | 112 | #3: | 113 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 113 | #4: | 113 |

| Average Grid Size: | 0.012713 |
|---|---|
| Total Area Analyzed: | 0.127 |

| Filter used | Dilution | Dilution Factor |
|---|---|---|
| 1/ 2 | 30 | 6.666667 |

| Detect_cc: | 1.33 |
|---|---|
| Total cc: | 30.67 |

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C1-C3 | C | F | 3.00 | 0.04 | X | X | Print Out |
| 2 | C3 | C | M-F | 1.00 | 0.03 | X | X | |
| 3 | C3 | C | B | 3.00 | 0.30 | X | X | |
| 4 | I10 | C | F | 2.00 | 0.04 | X | X | |
| 5 | I10 | C | M-F | 3.00 | 0.04 | X | X | |
| 6 | J8 | C | M-F | 1.00 | 0.04 | X | X | |
| 7 | J8 | C | M-F | 2.00 | 0.04 | X | X | |
| 8 | J8 | C | M-F | 4.00 | 0.04 | X | X | |
| 9 | H5 | C | M-B | 6.00 | 0.20 | X | X | |
| 10 | H5 | C | F | 2.00 | 0.04 | X | X | Print Out |
| 11 | E3 | C | M-B | 3.00 | 0.20 | X | X | |
| 12 | C3-H4 | C | M-B | 8.00 | 0.20 | X | X | |
| 13 | H4 | C | M-F | 4.00 | 0.04 | X | X | |
| 14 | D2 | C | M-F | 3.00 | 0.04 | X | X | |
| 15 | D2 | C | B | 21.00 | 0.40 | X | X | |
| 16 | B4 | C | M-F | 1.00 | 0.04 | X | X | |
| 17 | B4 | C | B | 4.00 | 0.15 | X | X | |
| 18 | C7 | C | M-F | 2.00 | 0.04 | X | X | |
| 19 | C7 | C | B | 2.00 | 0.20 | X | X | |
| 20 | D9 | C | M-F | 1.00 | 0.03 | X | X | Print Out |
| 21 | D9 | C | B | 7.00 | 0.30 | X | X | |
| 22 | D9 | C | M-F | 3.00 | 0.04 | X | X | |
| 23 | D9 | C | F | 2.00 | 0.04 | X | X | |

M25336-018    Sample Comments:



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  09:51
Cursor: 0 000KeV = 0         ROI   (1) 0.000: 0.000

0.000                                        VFS = 64    10 240
     13     M25336-018;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES             THU 08-FEB-01  10:06
Cursor: 0.000keV = 0           ROI   (1) 0.000: 0.000

0 000                                    VFS = 128    10 240
     6     M25336-018:  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  10:30
Cursor: 0.000keV = 0          ROI   (1) 0.000: 0.000

0 000                                    VFS = 32      10.240
     9    M25G36-018; CHRYSOTILE

# MAS   Indirect TEM ANALYSIS   M25336-019

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-2-D | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 51 | Liters | Date Analyzed: | 2/8/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Hannon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES | 15 % | Grid box Number: | 5948 | |

| | | |
|---|---|---|
| Str < 5μm: | 13 | |
| Str ≥ 5μm: | 0 | |
| Total str: | 13 | |
| Str / cc > 5: | 0.0000 | /cc |

| Number of grids: | 3 | #1: 113 | #3: 114 |
|---|---|---|---|
| Number of openings: | 10 | #2: 114 | #4: 113 |

| Average Grid Size: | 0.017882 |
|---|---|
| Total Area Analyzed: | 0.179 |

| Filter used | Dilution | Dilution Factor |
|---|---|---|
| 1/ 2 | 30 | 6.666667 |

Detect_cc: 1.32
Total cc: 17.11

| Str# | Square ID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D1-G2 | C | F | 1.00 | 0.03 | X | X | Print Out |
| 2 | I1 | C | M-F | 1.00 | 0.04 | X | X | |
| 3 | I1 | C | M-B | 3.00 | 0.20 | X | X | |
| 4 | G7 | C | M-F | 1.00 | 0.03 | X | X | |
| 5 | E9 | C | M-F | 3.00 | 0.04 | X | X | |
| 6 | C7 | C | M-F | 1.00 | 0.03 | X | X | |
| 7 | D2-D5 | C | M-F | 2.00 | 0.04 | X | X | |
| 8 | F4 | C | F | 1.00 | 0.03 | X | X | |
| 9 | F4 | C | M-F | 1.00 | 0.04 | X | X | |
| 10 | E5 | C | M-B | 4.00 | 0.40 | X | X | Print Out |
| 11 | E5 | C | M-F | 1.00 | 0.04 | X | X | |
| 12 | B8 | C | F | 3.00 | 0.04 | X | X | |
| 13 | E10 | C | M-B | 3.00 | 0.20 | X | X | |

M25336 019   Sample Comments:



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  13:12
Cursor: 0.000KeV = 0          ROI  (1) 0.000: 0.000

0.000                                    VFS = 256    10 240
  11      M25336-019;  CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  12:53
Cursor: 0.000keV = 0          ROI  (1) 0.000: 0.000

VFS = 128

0.000                                              10.240

18      M25336-019;  CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-020

| | | | | |
|---|---|---|---|---|
| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-2-A |
| Sample Area/Volume: | 10    Liters | | Date Analyzed: | 2/7/01 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100    KV |
| Sample type: | Air | | Indicated Mag: | 25    KX |
| Analysis type: | Dust | | Screen Mag: | 20    KX |
| Grid Acceptance | YES    15 % | | Grid box Number: | 9948 |

| | |
|---|---|
| Str < 5um: | 20 |
| Str ≥ 5um: | 5 |
| Total str: | 25 |
| Str / cc > 5: | 33.4132    /cc |

| | | | |
|---|---|---|---|
| Number of grids: | 1 | #1: 114 | #3: 114 |
| Number of openings: | 10 | #2: 114 | #4: 113 |

| | |
|---|---|
| Average Grid Size: | 0.012939 |
| Total Area Analyzed: | 0.129 |

| Filter used | Dilution | Dilution Factor | | |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Detect_cc: | 6.68 |
| | | | Total cc: | 167.07 |

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | E1-D2 | C | M-B | 2.00 | 0.20 | X | X | Print Out |
| 2 | D2 | C | M-F | 3.00 | 0.04 | X | X | |
| 3 | G4 | C | M-B | 18.00 | 4.00 | X | X | |
| 4 | G4 | C | M-B | 7.00 | 0.30 | X | X | |
| 5 | H7 | C | M-F | 8.00 | 0.05 | X | X | |
| 6 | H7 | C | B | 2.00 | 0.15 | X | X | |
| 7 | E8 | C | M-F | 1.00 | 0.04 | X | X | |
| 8 | E8 | C | F | 3.00 | 0.04 | X | X | |
| 9 | E8 | C | F | 2.00 | 0.04 | X | X | |
| 10 | C6 | C | M-F | 1.00 | 0.04 | X | X | Print Out |
| 11 | C6 | C | M-F | 1.00 | 0.03 | X | X | |
| 12 | C6 | C | M-F | 1.00 | 0.04 | X | X | |
| 13 | E3-A6 | C | F | 1.00 | 0.04 | X | X | |
| 14 | A6 | C | F | 2.00 | 0.04 | X | X | |
| 15 | A6 | C | F | 4.00 | 0.04 | X | X | |
| 16 | A6 | C | M-F | 2.00 | 0.04 | X | X | |
| 17 | A6 | C | B | 8.00 | 0.40 | X | X | |
| 18 | D8 | C | F | 1.00 | 0.03 | X | X | |
| 19 | D8 | C | M-B | 6.00 | 0.30 | X | X | |
| 20 | D8 | C | B | 3.00 | 0.20 | X | X | Print Out |
| 21 | H7 | C | F | 2.00 | 0.03 | X | X | |
| 22 | H7 | C | M-F | 1.00 | 0.03 | X | X | |
| 23 | G5 | C | M-F | 2.00 | 0.03 | X | X | |
| 24 | G5 | C | F | 2.00 | 0.04 | X | X | |
| 25 | F3 | C | F | 1.00 | 0.02 | | X | |

M25336-020    Sample Comments:

# MAS  Indirect TEM ANALYSIS  M25336-020

| CLIENT NAME: | Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | P-2-A |
| --- | --- | --- | --- |

MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  14:21
Cursor: 8.040keV = 18      ROI (SIKα) 1.650: 1.820=58

0.000                                    VFS = 32      10.240
    7        M25336-020; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01  14:33
Cursor: 8.040KeV = 17        ROI (SIKα) 1.660: 1.820=87

0.000                              VFS = 32    10 240
    7    M25336-020; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          WED 07-FEB-01   14:44
Cursor: 8.040keV = 27        ROI (SIKα) 1.660: 1.820=84

0 000                              VFS = 64      10 240
   21     M25336-020; CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-021

| | | | |
|---|---|---|---|
| CLIENT NAME: Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-2-B |
| Sample Area/ Volume: | 10  Liters | Date Analyzed: | 2/8/01 |
| Filter Type: | MCE 47mm | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | Scope Number: | 3 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100  KV |
| Sample type: | Air | Indicated Mag: | 25  KX |
| Analysis type: | Dust | Screen Mag: | 20  KX |
| Grid Acceptance | YES  15 % | Grid box Number: | 5948 |

| | | | | |
|---|---|---|---|---|
| Str < 5um: | 28 | Number of grids: | 2 | #1: 114  #3: 111 |
| Str ≥ 5um: | 3 | Number of openings: | 10 | #2: 114  #4: 114 |
| Total str: | 31 | | | |
| Str / cc > 5u | 20.2261 /cc | Average Grid Size: | 0.012825 | |
| | | Total Area Analyzed: | 0.128 | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 6.74 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 209.00 |

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | A4-J1 | C | M-F | 0.70 | 0.10 | X | X | Print Out |
| 2 | J1 | C | M-B | 2.00 | 0.20 | X | X | |
| 3 | J1 | C | M-B | 3.00 | 0.50 | X | X | |
| 4 | J1 | C | M-B | 2.30 | 0.20 | X | X | |
| 5 | H1 | C | M-F | 4.00 | 0.10 | X | X | |
| 6 | H1 | C | F | 1.70 | 0.10 | X | X | |
| 7 | F2 | C | M-F | 0.80 | 0.10 | X | X | |
| 8 | F2 | C | F | 0.70 | 0.10 | X | X | |
| 9 | F2 | C | M-F | 0.90 | 0.06 | X | X | |
| 10 | F2 | C | M-B | 11.00 | 0.50 | X | X | Print Out |
| 11 | G4 | C | M-B | 3.70 | 0.70 | X | X | |
| 12 | I4 | C | M-F | 2.30 | 0.10 | X | X | |
| 13 | I4 | C | F | 1.50 | 0.05 | X | X | |
| 14 | B4-C3 | C | F | 0.80 | 0.02 | X | X | |
| 15 | C1 | C | F | 2.60 | 0.05 | X | X | |
| 16 | C1 | C | F | 1.20 | 0.10 | X | X | |
| 17 | C1 | C | M-B | 3.00 | 0.40 | X | X | |
| 18 | C1 | C | M-F | 0.70 | 0.10 | X | X | |
| 19 | C1 | C | M-B | 0.90 | 0.20 | X | X | |
| 20 | C1 | C | F | 0.70 | 0.10 | X | X | Print Out |
| 21 | D2 | C | M-F | 1.60 | 0.10 | X | X | |
| 22 | D2 | C | F | 1.30 | 0.10 | X | X | |
| 23 | D2 | C | F | 16.00 | 0.10 | X | X | |
| 24 | D2 | C | F | 1.00 | 0.10 | X | X | |
| 25 | D2 | C | | 3.70 | | X | X | |
| 26 | G3 | C | | 4.70 | 0.10 | X | X | |
| 27 | R9 | C | B | 5.30 | 0.50 | X | X | |
| 28 | R9 | C | M-F | 1.70 | 0.10 | X | X | |

# MAS  Indirect TEM ANALYSIS  M25336-021

| CLIENT NAME: | Materials Analytical Services, Inc. | | | | | CLIENT SAMPLE ID: | | P-2-B | |
|---|---|---|---|---|---|---|---|---|---|
| 29 | H9 | C | F | 1.30 | 0.10 | X | X | | |
| 30 | JS | C | G-F | 1.20 | 0.10 | X | X | Print Out | |
| 31 | JS | C | F | 0.70 | 0.10 | X | X | | |

M25336 021    Sample Comments:

GS

2B
START? Y:







MATERIALS ANALYTICAL SERVICES          THU 06-FEB-41  17:05
Cursor: 1.280KeV = 11          RCI (SIKα) 1.650: 1.820=59
                               ROI (MGKα) 1.180: 1.340=59

FS = 16          13 546

M25035-21 . CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-022

| CLIENT NAME: Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-2-C |
|---|---|---|---|
| Sample Areal Volume: | 10  Liters | Date Analyzed: | 2/9/01 |
| Filter Type: | MCE 47mm | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | Scope Number: | 3 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 KV |
| Sample type: | Air | Indicated Mag: | 25 KX |
| Analysis type: | Dust | Screen Mag: | 20 KX |
| Grid Acceptance: | YES  10 % | Grid box Number: | 5948 |

| Str < 5um: | 17 |
|---|---|
| Str ≥ 5um: | 6 |
| Total str: | 23 |
| Str / cc > 5: | 40.5296 /cc |

| Number of grids: | 2 | #1: 113 | #3: 113 |
|---|---|---|---|
| Number of openings: | 10 | #2: 113 | #4: 113 |

| Average Grid Size: | 0.012769 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 6.77 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 155.75 |

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | A5-H4 | C | F | 0.70 | 0.10 | X | X | Print Out |
| 2 | B4 | C | M-F | 5.70 | 0.10 | X | X | |
| 3 | B4 | C | M-B | 24.00 | 0.40 | X | X | |
| 4 | F2 | C | F | 2.00 | 0.10 | X | X | |
| 5 | C4 | C | B | 3.50 | 0.50 | X | X | |
| 6 | C4 | C | M-F | 1.70 | 0.10 | X | X | |
| 7 | C4 | C | M-F | 2.00 | 0.20 | X | X | |
| 8 | B7 | C | B | 0.90 | 0.20 | X | X | |
| 9 | F9 | C | M-F | 0.70 | 0.10 | X | X | |
| 10 | F9 | C | B | 11.00 | 1.00 | X | X | Print Out |
| 11 | F9 | C | M-F | 1.30 | 0.10 | X | X | |
| 12 | B5-I9 | C | M-B | 2.00 | 0.20 | X | X | |
| 13 | I9 | C | M-F | 1.00 | 0.10 | X | X | |
| 14 | I9 | C | M-B | 4.00 | 0.50 | X | X | |
| 15 | H6 | C | M-B | 7.30 | 0.30 | X | X | |
| 16 | H6 | C | M-F | 1.00 | 0.10 | X | X | |
| 17 | H6 | C | B | 10.40 | 0.60 | X | X | |
| 18 | I1 | C | B | 0.60 | 0.10 | X | X | |
| 19 | G7 | C | M-F | 3.70 | 0.10 | X | X | |
| 20 | G7 | C | F | 0.60 | 0.10 | X | X | Print Out |
| 21 | G7 | C | B | 5.60 | 1.00 | X | X | |
| 22 | D9 | C | M-B | 8.60 | 0.20 | X | X | |
| 23 | D9 | C | B | 3.70 | 0.60 | X | X | |

M25336-022    Sample Comments:

# MAS  Indirect TEM ANALYSIS  M25336-022

| CLIENT NAME: | Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | P-2-C |
|---|---|---|---|









EFiled: Jan 4 2007 3:41P
Transaction ID 13347710

# EXHIBIT M, PART 4

# MAS  Indirect TEM ANALYSIS  M25336-023

| CLIENT NAME:  Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | P-2-D |
|---|---|---|---|
| Sample Area/Volume: | 10    Liters | Date Analyzed: | 2/8/01 |
| Filter Type: | MCE 47mm | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | Scope Number: | 3 |
| Effective Filter Area: | 1287 | Accelerating Voltage: | 100    KV |
| Sample type: | Air | Indicated Mag: | 25    KX |
| Analysis type: | Dust | Screen Mag: | 20    KX |
| Grid Acceptance | YES    10 % | Grid box Number: | 5948 |

| Str < 5um: | 21 |
|---|---|
| Str ≥ 5um: | 1 |
| Total str: | 22 |
| Str / cc > S: | 6.7713 |

| Number of grids: | 2 | #1: | 113 | #3: | 114 |
|---|---|---|---|---|---|
| Number of openings: | 10 | #2: | 111 | #4: | 114 |

| Average Grid Size: | 0.012770 |
|---|---|
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 6.77 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 148.97 |

| Str# | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D4-E9 | C | F | 0.80 | 0.16 | X | X | Print Out |
| 2 | H9 | C | M-B | 3.60 | 0.40 | X | X | |
| 3 | J6 | C | F | 0.60 | 0.02 | X | X | |
| 4 | H4 | C | M-B | 1.60 | 0.20 | X | X | |
| 5 | F4 | C | F | 0.90 | 0.10 | X | X | |
| 6 | G7 | C | F | 0.70 | 0.02 | X | X | |
| 7 | G7 | C | F | 0.70 | 0.04 | X | X | |
| 8 | D5-I4 | C | M-F | 0.70 | 0.02 | X | X | |
| 9 | I4 | C | M-B | 1.30 | 0.40 | X | X | |
| 10 | I4 | C | F | 0.60 | 0.10 | X | X | Print Out |
| 11 | I4 | C | M-F | 0.80 | 0.30 | X | X | |
| 12 | I4 | C | F | 0.60 | 0.10 | X | X | |
| 13 | I4 | C | F | 1.70 | 0.10 | X | X | |
| 14 | G6 | C | F | 1.00 | 0.10 | X | X | |
| 15 | G6 | C | F | 0.60 | 0.03 | X | X | |
| 16 | G6 | C | F | 1.20 | 0.03 | X | X | |
| 17 | E9 | C | M-F | 2.00 | 0.10 | X | X | |
| 18 | E9 | C | M-F | 7.00 | 0.30 | X | X | |
| 19 | E9 | C | F | 0.60 | 0.05 | X | X | |
| 20 | E9 | C | F | 1.30 | 0.02 | X | X | Print Out |
| 21 | 49 | C | M-B | 1.30 | 0.30 | X | X | |
| 22 | B3 | C | M-F | 0.38 | 0.03 | X | X | |

M25336-023    Sample Comments:



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-41  15:24
Cursor: 1.240keV = 25      ROI (SiKα) 1 560: 1 620=140
                           ROI (MgKα) 1 180: 1 240=118



MATERIALS ANALYTICAL SERVICES           THU 06-FEB-41   16:30
Cursor: 1 240keV = 20          ROI (SIKα) 1 660: 1.920=114
                               ROI (MGKα) 1 180: 1 340=95

2 000                                    VFS = 64    13 240
     6    455336-23   CHRYSTILE



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-41  16:40
Cursor: 1 240keV = 17          ROI (SIKα) 1 650: 1.820=63
                               ROI (MGKα) 1 180: 1.340=64

3 000                          VFS = 64        10 240
    E   M25336-23 . CHRYSOTILE

# MAS  Indirect TEM ANALYSIS  M25336-024

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-3-A | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 357    Liters | | Date Analyzed: | 2/8/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon | |
| Pore size: | 0.45 | | Scope Number: | 2 | |
| Effective Filter Area: | 1287 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES    12 % | | Grid box Number: | 5946 | |

| | | | | | |
|---|---|---|---|---|---|
| Str < 5um: | 12 | Number of grids: | 2 | #1: 112 | #3: 113 |
| Str ≥ 5um: | 5 | Number of openings: | 10 | #2: 112 | #4: 113 |
| Total str: | 17 | | | | |
| Str / cc > 5: | 0.9568 | /cc | Average Grid Size: | 0.012657 | |
| | | | Total Area Analyzed: | 0.127 | |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 0.19 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 3.25 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | E9-D2 | C | B | 3.00 | 0.15 | X | X | Print Out |
| 2 | D3 | C | F | 4.00 | 0.05 | X | X | |
| 3 | B6 | C | B | 8.00 | 0.30 | X | X | |
| 4 | B6 | C | F | 3.00 | 0.04 | X | X | |
| 5 | B6 | C | M-B | 3.00 | 0.20 | X | X | |
| 6 | B6 | C | M-B | 5.00 | 0.20 | X | X | |
| 7 | E7 | C | M-F | 3.00 | 0.05 | X | X | |
| 8 | E7 | C | M-F | 4.00 | 0.05 | X | X | |
| 9 | I8 | C | B | 6.00 | 0.30 | X | X | |
| 10 | J3 | C | M-B | 4.00 | 0.50 | X | X | Print Out |
| 11 | J3 | C | M-F | 3.00 | 0.03 | X | X | |
| 12 | E10-G2 | C | F | 2.00 | 0.03 | X | X | |
| 13 | D4 | C | M-F | 1.00 | 0.03 | X | X | |
| 14 | C6 | C | M-B | 32.00 | 0.40 | X | X | |
| 15 | C6 | C | B | 5.00 | 0.15 | X | X | |
| 16 | D9 | C | M-F | 1.00 | 0.03 | X | X | |
| 17 | F8 | C | F | 1.00 | 0.04 | X | X | |

M25336-024    Sample Comments

MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  14:39
Cursor: 0.000keV = 0          ROI   (1) 0.000: 0.000

0 000                                    VFS = 128    10.240
     S    M25336-024;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-FEB-01  14:26
Cursor: 0 000keV = 0          ROI   (1) 0.000: 0.000

0.000                                      VFS = 32    10 240
10    M25336-024;  CHRYSOTILE

# MAS Indirect TEM ANALYSIS M25336-025

| CLIENT NAME: Materials Analytical Services, Inc. | CLIENT SAMPLE ID: | A-3-B |
|---|---|---|

| Sample Area/ Volume: | 357 Liters | Date Analyzed: | 2/12/01 | |
|---|---|---|---|---|
| Filter Type: | MCE 47mm | Analyst: | Al Harmon | |
| Pore size: | 0.45 | Scope Number: | 2 | |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | Screen Mag: | 20 | KX |
| Grid Acceptance | YES 15 % | Grid box number: | 5948 | |

| Str < 5um: | 12 |
|---|---|
| Str ≥ 5um: | 4 |
| Total str: | 16 |
| Str / cc > 5: | 0.7621 | cc |

| Number of grids: | 2 | #1: 113 | #3: 112 |
|---|---|---|---|
| Number of openings: | 10 | #2: 113 | #4: 113 |

| Average Grid Size: | 0.012713 |
|---|---|
| Total Area Analyzed: | 6.127 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 0.19 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 3.05 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | D9-H8 | C | M-F | 1.06 | 0.04 | X | X | Print Out |
| 2 | H8 | C | M-B | 3.00 | 0.30 | X | X | |
| 3 | E7 | C | M-B | 3.00 | 0.20 | X | X | |
| 4 | E7 | C | M-B | 2.00 | 0.20 | X | X | |
| 5 | C6 | C | M-F | 2.00 | 0.04 | X | X | |
| 6 | C6 | C | M-F | 1.00 | 0.04 | X | X | |
| 7 | D3 | C | M-B | 3.00 | 0.30 | X | X | |
| 8 | D3 | C | M-F | 2.00 | 0.04 | X | X | |
| 9 | G1 | C | F | 1.00 | 0.03 | X | X | |
| 10 | D10-C3 | C | M-B | 5.00 | 0.30 | X | X | Print Out |
| 11 | G1 | C | M-F | 10.00 | 0.20 | X | X | |
| 12 | G1 | C | B | 4.00 | 0.30 | X | X | |
| | J4 | | NSD | | | | | |
| 13 | H8 | C | M-F | 1.00 | 0.04 | X | X | |
| 14 | H8 | C | M-F | 2.00 | 0.04 | X | X | |
| 15 | H8 | C | B | 12.00 | 0.30 | X | X | |
| 16 | E7 | C | B | 10.00 | 1.00 | X | X | |

M25336-025   Sample Comments:





MATERIALS ANALYTICAL SERVICES          MON 12-FEB-01  10:38
Cursor: 0.000keV = 0          ROI   (1) 0.000: 0.000

0.000                              VFS = 32        10.240
    6    M25336-025; CHRYSOTILE

# MAS Indirect TEM ANALYSIS M25336-026

| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-3-C | |
|---|---|---|---|---|---|
| Sample Area/ Volume: | 357 | Liters | Date Analyzed: | 2/11/01 | |
| Filter Type: | MCE 47mm | | Analyst: | Mehrdad Motamedi | |
| Pore size: | 0.45 | | Scope Number: | 3 | |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 | KV |
| Sample type: | Air | | Indicated Mag: | 25 | KX |
| Analysis type: | Dust | | Screen Mag: | 20 | KX |
| Grid Acceptance | YES | 10 % | Grid box Number: | 5948 | |

| Str < 5um: | 13 |
|---|---|
| Str ≥ 5um: | 3 |
| Total str: | 16 |
| Str / cc > 5: | 0.5716 |

| Number of grids: | 2 | #1: 114 | #3: 111 |
|---|---|---|---|
| Number of openings: | 10 | #2: 113 | #4: 113 |

| Average Grid Size: | 0.012713 |
|---|---|
| Total Area Analyzed: | 0.127 |

| Filter used | Dilution | Dilution Factor | Detect_cc: | 0.19 |
|---|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Total cc: | 3.06 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C9-C2 | C | M-F | 1.50 | 0.20 | X | X | Print Out |
| 2 | C2 | C | M-F | 1.36 | 0.10 | X | X | |
| | F3 | | NSD | | | | | |
| 3 | B5 | C | M-B | 5.30 | 0.40 | X | X | |
| 4 | B5 | C | M-F | 17.00 | 0.10 | X | X | |
| 5 | E7 | C | M-B | 6.40 | 0.60 | X | X | |
| 6 | E7 | C | B | 3.50 | 0.30 | X | X | |
| 7 | B8 | C | F | 1.80 | 0.10 | X | X | |
| 8 | C10-B10 | C | M-F | 0.80 | 0.10 | X | X | |
| 9 | C8 | C | F | 0.90 | 0.03 | X | X | |
| 10 | C8 | C | F | 0.70 | 0.02 | X | X | Print Out |
| 11 | C8 | C | M-B | 1.60 | 0.20 | X | X | |
| 12 | D4 | C | M-F | 1.00 | 0.10 | X | X | |
| 13 | D4 | C | F | 0.70 | 0.01 | X | X | |
| 14 | D4 | C | M-F | 2.00 | 0.10 | X | X | |
| 15 | D4 | C | F | 3.50 | 0.10 | X | X | |
| | F3 | | NSD | | | | | |
| 16 | B5 | C | M-B | 2.00 | 0.50 | X | X | |

M25336-026    Sample Comments:



MATERIALS ANALYTICAL SERVICES        SUN 11-FEB-41  13:27
Cursor: 1 290keV = 10       ROI (SIKα) 1.660: 1.820=130
                            ROI (MGKα) 1.180: 1.340=118

0 300                               /FS = 32      10 240
 1     M25036-26 , CHRYSOTILE



# MAS  Indirect TEM ANALYSIS  M25336-027

| | | | | |
|---|---|---|---|---|
| CLIENT NAME: | Materials Analytical Services, Inc. | | CLIENT SAMPLE ID: | A-3-D |
| Sample Area/ Volume: | 354 Liters | | Date Analyzed: | 2/11/01 |
| Filter Type: | MCE 47mm | | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | | Scope Number: | 3 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Air | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES  10 % | | Grid box Number: | 5948 |

| | |
|---|---|
| Str < 5um: | 20 |
| Str ≥ 5um: | 1 |
| Total str: | 21 |
| Str / cc > 5: | 0.1913 /cc |

| | | | |
|---|---|---|---|
| Number of grids: | 2 | #1: 112 | #3: 112 |
| Number of openings: | 10 | #2: 114 | #4: 114 |

| | |
|---|---|
| Average Grid Size: | 0.012768 |
| Total Area Analyzed: | 0.128 |

| Filter used | Dilution | Dilution Factor | |
|---|---|---|---|
| 1/ 2 | 30 | 6.666667 | Detect_cc: 0.19 |
| | | | Total cc: 4.02 |

| Str: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | B9-B8 | C | M-B | 3.40 | 0.20 | X | X | Print Out |
| 2 | H8 | C | M-F | 1.00 | 0.10 | X | X | |
| 3 | H8 | C | M-B | 2.00 | 0.20 | X | X | |
| 4 | G5 | C | M-B | 2.00 | 0.20 | X | X | |
| 5 | G5 | C | F | 1.30 | 0.10 | X | X | |
| 6 | I3 | C | F | 2.00 | 0.10 | X | X | |
| 7 | E7 | C | M-B | 2.40 | 0.40 | X | X | |
| 8 | E7 | C | M-F | 2.20 | 0.10 | X | X | |
| 9 | E7 | C | F | 0.60 | 0.10 | X | X | |
| 10 | C9 | C | M-F | 2.00 | 0.10 | X | X | Print Out |
| 11 | B10-C1 | C | F | 2.00 | 0.10 | X | X | |
| 12 | C1 | C | M-F | 0.90 | 0.10 | X | X | |
| 13 | C1 | C | M-B | 2.00 | 0.30 | X | X | |
| 14 | C1 | C | M-B | 2.00 | 0.20 | X | X | |
| 15 | E1 | C | M-F | 2.00 | 0.10 | X | X | |
| 16 | I3 | C | M-F | 1.50 | 0.10 | X | X | |
| 17 | G6 | C | M-B | 4.00 | 0.20 | X | X | |
| 18 | G6 | C | F | 5.00 | 0.10 | X | X | |
| 19 | G6 | C | F | 3.00 | 0.10 | X | X | |
| 20 | G6 | C | M-F | 1.40 | 0.04 | X | X | Print Out |
| 21 | G6 | C | F | 1.00 | 0.10 | X | X | |
| | J4 | | NSD | | | | | |

M25336 027    Sample Comments:







MATERIALS ANALYTICAL SERVICES          SUN 11-FEB-41  14:23
Cursor: 1.280KeV = 7          ROI (SIKα) 1.660: 1.820=64
                              ROI (MGKα) 1.180: 1.340=46

## MATERIALS ANALYTICAL SERVICES
## PROJECT LOG

Client Code:   MASCORP

| | | | |
|---|---|---|---|
| MAS ID: | M25337 | Client Job No: | |
| Client Name: | Materials Analytical Services, Inc. | Client PO: | |
| Project Name: | Chamber Brake Blow-Out II | Date In: | 1/30/01 |
| Logged By: | dmazzaferro | | |

**TRANSPORT INFORMATION:**

| | | | |
|---|---|---|---|
| Submitted By: | | Documents: | COC |
| Delivery By: | Hand Delivery | | |
| Received By: | dmazzaferro | Comments for COC: | |
| Condition: | good | | |

**CONTACT INFORMATION:**

| | | | | |
|---|---|---|---|---|
| Contact: | Bill Longo | Work Phone: | (770) 866-3200 | Ext: |
| Title:  First Name:  Last Name: | Suffix | Other Phone: | | Ext: |
| Mr.    William    Longo | | Fax: | (770) 866-3259 | |

### M25337                     SAMPLE INFORMATION:

| # | Client ID | Volume | # | Client ID | Volume |
|---|---|---|---|---|---|
| 001 | WL-F-B | | | | |
| 002 | WL-F-1 | | | | |

**SIGNATURES**

RECEIVED BY:  *[signature]*

REVIEWED BY:  *[signature]*

PREPARED BY:  *[signature]*

ANALYZED BY:  *[signature]*

REPORTED BY:



# TEM SAMPLE DATA

Prep Source: MT-017
Prep Status: Complete
Sample Type: Fabric
Analysis Type: Dust

M25337

Page 1 of 1

prep_date: 2/1/01   Prep Tech: dmazzaferro

## Archival Information

Slides: 167   Filters:   Bottles: 732   Grid_box: 5042

Archive Comments:
Disposal Comments:

Reprep Dates

| Sample Number | Sample ID | Area | | Filter Portion | Total Susp | | | #1 | #2 | Filtered Volumes in ml | #3 | #4 | #5 | #6 | #7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000 | lab blank 2/1/01 | 0 | cm2 | 1/1 | 200 | Dilution Factors | | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 001 | WL-B | 42 | cm2 | 1/1 | 250 | Dilution Factors | | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | 6.667 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | 8.333 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 002 | WL-1 | 28 | cm2 | 1/1 | 250 | Dilution Factors | | 10 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | 25 | 8.333 | 0 | 0 | 0 | 0 | 0 | 0 | |

# TEM DUST ANALYSIS     M25337   001

| Materials Analytical Services, Inc. | | Client Sample ID: | WL-F-B |
|---|---|---|---|
| Chamber Brake Blow-Out II | | | |

| | | | |
|---|---|---|---|
| Sample Areal Volume: | 42 cm2 | Date Analyzed: | 2/12/01 |
| Filter Type: | MCE 47mm | Analyst: | Al Harmon |
| Pore size: | 0.45 | Scope Number: | 2 |
| Effective Filter Area: | 1297 | Accelerating Voltage: | 100   KV |
| Sample type: | Fabric | Indicated Mag: | 25   KX |
| Analysis type: | Dust | Screen Mag: | 20   KX |
| Grid Acceptance: | YES   8 % | Grid_box: | 5942 |

| Str < 5um: | 0 | Number of grids: | 2 | #1: 114 | #3: 114 | Average Grid Size: | 0.012882 |
|---|---|---|---|---|---|---|---|
| Str ≥5um: | 0 | Number of openings: | 10 | #2: 113 | #4: 113 | Total Area Analyzed: | 0.129 |
| Total Str: | 0 | | | | | | |

| Volume Filtered | 30 ml | Str / sqr ft | 0.000E+00 | Str / cm2 | 0.000E+00 |
|---|---|---|---|---|---|
| Dilution Factor | 8.333333 | Str / sqr ft >=5 | 0.000E+00 | Str / cm2 >=5 | 0.000E+00 |

| | TEM DATA | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
| | E1-I6 | | NSD | | | | | |
| | G8 | | NSD | | | | | |
| | D7 | | NSD | | | | | |
| | A5 | | NSD | | | | | |
| | C3 | | NSD | | | | | |
| | E2-J7 | | NSD | | | | | |
| | H2 | | NSD | | | | | |
| | B4 | | NSD | | | | | |
| | C6 | | NSD | | | | | |
| | E10 | | NSD | | | | | |

M25337  001

# TEM DUST ANALYSIS          M25337    002

| Materials Analytical Services, Inc. | | | |
|---|---|---|---|
| Chamber Brake Blow-Out II | | Client Sample ID: | WL-F-1 |

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 28 cm2 | | Date Analyzed: | 2/12/01 |
| Filter Type: | MCE 47mm | | Analyst: | Al Harmon |
| Pore size: | 0.45 | | Scope Number: | 2 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Fabric | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES | 15 % | Grid_box: | 5942 |

| Str <5um: | 14 | Number of grids: | 2 | #1: 113 | #3: 114 | Average Grid Size: | 0.012939 |
|---|---|---|---|---|---|---|---|
| Str ≥5um: | 6 | Number of openings: | 10 | #2: 114 | #4: 114 | Total Area Analyzed: | 0.129 |
| Total Str: | 20 | | | | | | |

| Volume Filtered | 30 ml | Str / sqr ft | 5.543E+07 | Str / cm2 | 5.967E+04 |
|---|---|---|---|---|---|
| Dilution Factor | 8.333333 | Str / sqr ft >=5 | 1.663E+07 | Str / cm2 >=5 | 1.790E+04 |

### TEM DATA

| Str#: | SquareID: | Type: | Structure: | Length: | Width: | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C1-D3 | C | F | 2.00 | 0.03 | X | X | Print Out |
| 1 | D3 | C | F | 6.00 | 0.04 | X | X | |
| 3 | D3 | C | B | 6.00 | 1.00 | X | X | |
| 4 | D3 | C | F | 2.00 | 0.04 | X | X | |
| 5 | E2 | C | F | 0.80 | 0.03 | X | X | |
| 6 | E2 | C | F | 2.00 | 0.04 | X | X | |
| 7 | J5 | C | F | 2.00 | 0.04 | X | X | |
| 8 | J5 | C | M-F | 2.00 | 0.04 | X | X | |
| 9 | H8 | C | M-F | 1.00 | 0.03 | X | X | |
| 10 | F9 | C | M-B | 2.00 | 0.20 | X | X | Print Out |
| 11 | C2-G2 | C | M-B | 6.00 | 0.30 | X | X | |
| 12 | G2 | C | B | 5.00 | 0.20 | X | X | |
| 13 | G2 | C | F | 1.00 | 0.03 | X | X | |
| 14 | E3 | C | B | 6.00 | 0.20 | X | X | |
| 15 | E3 | C | F | 2.00 | 0.04 | X | X | |
| 16 | B4 | C | F | 1.00 | 0.03 | X | X | |
| 17 | B4 | C | F | 5.00 | 0.04 | X | X | |
| 18 | D7 | C | F | 2.00 | 0.04 | X | X | |
| 19 | H9 | C | F | 1.00 | 0.03 | X | X | |
| 20 | H9 | C | C-F | 2.00 | 0.04 | X | X | Print Out |

M25337  002



MATERIALS ANALYTICAL SERVICES                MON 12-FEB-01  13:20
Cursor: 0.000keV = 0          ROI    (1) 0.000: 0.000

0.000                                    VFS = 32      10 240
    6    M25337-002;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          MON 12-FEB-01  13:07
Cursor: 0.000KeV = 0        ROI   (1) 0.000: 0.000

0.000                                  VFS = 32      10.240
1107      M25337-002;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES            MON 12-FEB-01  12:55
Cursor: 0.000KeV = 0        ROI   (1) 0.000: 0.000

0.000                                    VFS = 32      10.240
   29      M25337-002;  CHRYSOTILE











