**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and as
Personal Representative of the Heirs and
Estate of JAMES DANIEL COLLINS,
Deceased
        Plaintiff(s),

    v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH AMERICA
CORPORATION (F/K/A FOSTER
WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and
as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and d/b/a O-
I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY IRON
WORKS);

GARLOCK SEALING TECHNOLOGIES
LLC (individually and as a successor-in-
interest to GARLOCK, INC);

AMETEK, INC. (individually and as a
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-merger

_____

**NOTICE OF REMOVAL**

**Filed on behalf of**
**VOLKSWAGEN OF AMERICA, INC.**

Counsel of Record for this Party:

Steven T. Davis, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION
(individually , and as successor-in-interest to
AMERICAN SUPER TEMPERATURE
WIRE, and successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-merger to
HAVEG CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by merger to
HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK
BORSIG POWER, INC. f/k/a D.B. RILEY,
INC. f/k/a RILEY STOKER
CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC.
(individually and as successor-in-interest to
MUNDET CORK COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION LLC
(individually and f/k/a T.H. AGRICULTURE
& NUTRITION COMPANY, INC. f/k/a
THOMPSON-HAYWARD CHEMICAL
COMPANY);

PHILIPS ELECTRONICS NORTH
AMERICA CORP (individually and as
successor-in-interest to T H AGRICULTURE
& NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest to
KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENT CEMENT, INC.
(f/k/a KAISER CEMENT CORPORATION,
individually and as successor-in-interest to
KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as successor-in-
interest to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually
and as successor-in-interest to RPM, INC.
and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger to
WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest to
BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually and as
successor-in-interest to BORG-WARNER
CORPORATION);

HONEYWELL INTERNATIONAL, INC.
(individually and as successor-in-interest
To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION
(f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and as successor-in-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION and FOUNDRY COMPANY including AMERICAN BRAKEBLOK DIVISION and THE AMERICAN BRAKEBLOK CORPORATION f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC. individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC. (individually and as successor-in-merger to AMMCO TOOLS, INC and AMMCO TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

   Defendants.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and
as Personal Representative of the Heirs
and Estate of JAMES DANIEL
COLLINS, Deceased
               Plaintiff(s),

    v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH
AMERICA CORPORATION (F/K/A
FOSTER WHEELER ENERGY
CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY,
INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually
and as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and d/b/a
O-I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY
IRON WORKS);

GARLOCK SEALING
TECHNOLOGIES LLC (individually and
as a successor-in-interest to GARLOCK,
INC);

AMETEK, INC. (individually and as a
successor-in-interest to HAVEG

_____

**NOTICE OF REMOVAL**


**Filed on behalf of**
**VOLKSWAGEN OF AMERICA,**
**INC.**

INDUSTRIES, INC. successor-by-merger
with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION
(individually , and as successor-in-interest
to AMERICAN SUPER
TEMPERATURE WIRE, and successor-
in-interest to HAVEG INDUSTRIES,
INC. successor-by-merger to  HAVEG
CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by merger
to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK
BORSIG POWER, INC. f/k/a D.B.
RILEY, INC. f/k/a RILEY STOKER
CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY,
INC. (individually and as successor-in-
interest to MUNDET CORK
COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION
LLC (individually and f/k/a T.H.
AGRICULTURE & NUTRITION
COMPANY, INC. f/k/a THOMPSON-
HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH

6

AMERICA CORP (individually and as
successor-in-interest to T H
AGRICULTURE & NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest
to KAISER GYPSUM COMPANY,
INC.);

HANSON PERMANENT CEMENT,
INC. (f/k/a KAISER CEMENT
CORPORATION, individually and as
successor-in-interest to KAISER
GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as
successor-in-interest to RPM, INC. and
BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC.
(individually and as successor-in-interest
to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger to
WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest
to BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually and
as successor-in-interest to BORG-
WARNER CORPORATION);

HONEYWELL INTERNATIONAL,
INC. (individually and as successor-in-
interest

To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER
CORPORATION (f/k/a CHRYSLER
CORPORATION);

GENERAL MOTORS CORPORATION;
FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and
as successor-in-merger to PNEUMO
ABEX CORPORATION, successor-in-
interest to ABEX CORPORATION f/k/a
AMERICAN BRAKE SHOE and
FOUNDRY COMPANY including the
AMERICAN BRAKEBLOK DIVISION
and FOUNDRY COMPANY including
AMERICAN BRAKEBLOK DIVISION
and THE AMERICAN BRAKEBLOK
CORPORATION f/k/a THE AMERICAN
BRAKE MATERIALS
CORPORATION);

MAREMONT CORPORATION (a
subsidiary of ARVIN INDUSTRIES,
INC. individually and as successor-in-
interest to GRIZZLY
MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC.
(individually and as successor-in-merger
to AMMCO TOOLS, INC and AMMCO
TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING
COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

       Defendants.

## **NOTICE OF REMOVAL**

TO THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE:

AND NOW, comes defendant, Volkswagen of America, Inc. (VWoA) and files its Notice of Removal, and in support thereof avers as follows:

1.    On February 28, 2006, Plaintiffs James Daniel Collins and Mary M. Collins filed a Complaint against 40 Defendants, <u>not including VWoA</u>, in the Superior Court of New Castle County, Delaware.

2.    On information and belief, Plaintiffs' initial discovery responses were served in May, 2006. These discovery responses disclosed Mr. Collins' employment history, including employment at two Volkswagen dealerships.

3.    On information and belief, James Daniel Collins was deposed on August 10, 2006, at which time he testified about exposure to VWoA products.

4.    On information and belief, Plaintiffs filed a motion to amend the Complaint on August 17, 2006 to add VWoA as a party to the lawsuit. The motion was not immediately presented to the Superior Court of New Castle County, Delaware. The Superior Court of New Castle County, Delaware granted the motion to amend on October 6, 2006.

5.    On information and belief, Plaintiff James Daniel Collins died on or about September 25, 2006.

6.    On information and belief, Plaintiff Mary Collins filed an Amended Complaint adding VWoA as a party to the lawsuit on October 17, 2006, attached hereto as Exhibit A.

7.    VWoA was served with original process on December 11, 2006, after the close of discovery in the case, and after the Plaintiff James Collins had died. At that point in time, trial was scheduled for February 12, 2007.

8.    On December 9, 2006, an initial Motion to Substitute Parties and Add Wrongful Death Claim was filed. Thereafter, on January 24, 2007, a second Motion to Substitute Parties and Add a Wrongful Death Claim was filed. The Court granted the second Motion to Substitute Parties and Add Wrongful Death Claim on February 2, 2007. Mary M. Collins, in her own right, and as the Executrix of the Estate of James Daniel Collins is the Plaintiff in this action (hereinafter "Plaintiff").

9.    Plaintiff then filed a Second Amended Complaint on February 5, 2007, attached hereto as Exhibit B.

10.    Pursuant to provisions of Section 1441 and 1446 of Title 28 of the United States Code, VWoA removes this action to the United States District Court for the District of Delaware, which is the judicial district in which the action is pending.

11.    Upon information and belief, VWoA is the only remaining defendant in this action. Although the docket does not reflect such, Counsel for VWoA was informed on March 12, 2007, for the first time, that VWoA is the only defendant remaining in this case. This information was confirmed in written correspondence attached hereto as Exhibit C.

12.    Forty defendants were sued in this action, but the majority appears to have been only nominal defendants who were sued as part of a "mass tort" asbestos filing. They and their alleged asbestos-containing products were not identified in this asbestos action and those companies have been or will be dismissed through voluntary and/or stipulated dismissals. The remaining defendants other than VWoA have had summary judgment granted or have settled their claims, although those settlements (and some of the nominal defendant dismissals) are not yet reflected on the docket.

13.     There is complete diversity of citizenship between Plaintiff and VWoA in this action because:

      a.     Plaintiff is an individual and citizen of the State of Washington;

      b.     Defendant Volkswagen of America, Inc. is organized and incorporated under the laws of the State of New Jersey, with a principal place of business in Michigan;

      c.     More than $75,000, exclusive of interests and costs, is in controversy in this action; and

      d.     Other remaining defendants, whether or not diverse, are either nominal defendants (that have been or will be dismissed) or have settled the instant action.

14.     Thus, this court would have had original subject matter jurisdiction of this action under the provisions of 28 U.S.C. §1332 if the action as it stands had it originally been brought in federal court.  Removal is therefore proper under 28 U.S.C. §1441(a).

15.     Removal of this case on the basis of diversity of citizenship is not precluded by the provisions of Section 1441(b) of Title 28 of the United States Code because any parties in interest properly joined and served as a defendant that were citizens of the State of Delaware, the State in which this action was brought, are nominal defendants or have settled the claims against them.

16.     This Notice of Removal is timely under Section 1446(b) of Title 28 of the United States Code because VWoA received notice, confirmed in writing, that the case had become

4123160                                              11

removable on March 12, 2007. This Notice of Removal is filed within one year of the

commencement of the action against VWoA.[1]

17.    Pursuant to Section 1446(a) of Title 28 of the United States Code, "a copy of all

process, pleadings, and orders" served on Volkswagen of America, Inc. at the time of removal

are attached as Exhibit D.[2]

**WHEREFORE**, Defendant Volkswagen of America, Inc., pursuant to these statutes and

in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action from the

Superior Court of New Castle County, Delaware, on this 14th day of March 2007.

Dated:  March 14, 2007

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY:

Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE  19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219

AND

One Penn Center, 19th Floor

---

[1] If commencement of the action is measured by when the Complaint was filed without VWoA as a party, VWoA is entitled to an equitable exception to the one-year bar.

[2] See also all papers and pleadings filed via Lexis Nexis electronic file and serve from December 11, 2006 (E-filing ID No. 13151797) to March 5, 2007 (E-filing ID No. 14017420).

1617 JFK Boulevard
Philadelphia, PA 19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

Counsel for Defendant,
Volkswagen of America, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of Volkswagen of America, Inc.'s Notice of Removal was served on Plaintiff's counsel this 14th day of March, 2007, via hand delivery.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY: _____

Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

AND

One Penn Center, 19th Floor
1617 JFK Boulevard
Philadelphia, PA 19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

Counsel for Defendant,
Volkswagen of America, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and
as Personal Representative of the Heirs
and Estate of JAMES DANIEL
COLLINS, Deceased
    Plaintiff(s),

  v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC;

FOSTER WHEELER NORTH
AMERICA CORPORATION (F/K/A
FOSTER WHEELER ENERGY
CORPORATION);

GEORGIA-PACIFIC CORPORATION
(individually and as successor to
BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY,
INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-
BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually
and as successor-in-interest to OWENS-
ILLINOIS GLASS COMPANY and
d/b/a O-I);

ZURN INDUSTRIES, INC. 9A/j/a and
successor-by-merger to ERIE CITY
IRON WORKS);

GARLOCK SEALING
TECHNOLOGIES LLC (individually
and as a successor-in-interest to
GARLOCK, INC);

AMETEK, INC. (individually and as a

_____

**NOTICE OF REMOVAL**

**Filed on behalf of
VOLKSWAGEN OF AMERICA,
INC.**

successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-
merger with HAVEG CORPORATION);

CHAMPLAIN CABLE
CORPORATION (individually , and as
successor-in-interest to AMERICAN
SUPER TEMPERATURE WIRE, and
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by-
merger to  HAVEG CORPORATION);

HERCULES, INC. (individually, and as
successor-in-interest to HAVEG
INDUSTRIES, INC. successor-by
merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a
BABCOCK BORSIG POWER, INC.
f/k/a D.B. RILEY, INC. f/k/a RILEY
STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY,
INC. (individually and as successor-in-
interest to MUNDET CORK
COMPANY);

3M COMPANY (individually and f/k/a
MINNESOTA, MINING and
MANUFACTURING COMPANY a/k/a
"3M");

T.H. AGRICULTURE & NUTRITION
LLC (individually and f/k/a T.H.
AGRICULTURE & NUTRITION
COMPANY, INC. f/k/a THOMPSON-
HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH
AMERICA CORP (individually and as
successor-in-interest to T H
AGRICULTURE & NUTIRTION LLC);

KAISER CEMENT CORPORATION
(individually and as successor-in-interest
to KAISER GYPSUM COMPANY,
INC.);

HANSON PERMANENT CEMENT,
INC. (f/k/a KAISER CEMENT
CORPORATION, individually and as
successor-in-interest to KAISER
GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually and as
successor-in-interest to RPM, INC. and
BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC.
(individually and as successor-in-interest
to RPM, INC. and BONDEX
INTERNATIONAL, INC.);

VIACOM, INC. (individually and as
successor-in-merger to CBS
CORPORATION, successor-by-merger
to WESTINGHOUSE ELECTRIC
CORPORATION);

THE GOODYEAR TIRE & RUBBER
COMPANY;

BORGWARNER MORSE TEC, INC.
(individually and as successor-in-interest
to BORG-WARNER CORPORATION);

BORGWARNER, INC. (individually
and as successor-in-interest to BORG-
WARNER CORPORATION);

HONEYWELL INTERNATIONAL,
INC. (individually and as successor-in-

interest
To ALLIED-SIGNAL, INC. and THE
BENDIX CORPORATION);

DAIMLERCHRYSLER
CORPORATION (f/k/a CHRYSLER
CORPORATION);

GENERAL MOTORS
CORPORATION;
FORD MOTOR COMPANY;

PNEUMO ABEX LLC (individually and
as successor-in-merger to PNEUMO
ABEX CORPORATION, successor-in-
interest to ABEX CORPORATION f/k/a
AMERICAN BRAKE SHOE and
FOUNDRY COMPANY including the
AMERICAN BRAKEBLOK DIVISION
and FOUNDRY COMPANY including
AMERICAN BRAKEBLOK DIVISION
and THE AMERICAN BRAKEBLOK
CORPORATION f/k/a THE
AMERICAN BRAKE MATERIALS
CORPORATION);

MAREMONT CORPORATION (a
subsidiary of ARVIN INDUSTRIES,
INC. individually and as successor-in-
interest to GRIZZLY
MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC.
(individually and as successor-in-merger
to AMMCO TOOLS, INC and AMMCO
TOOLS, CO. d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING
COMPANY, INC.

VOLKSWAGEN OF AMERICA, INC.

Defendants.

## CERTIFICATE OF NOTICE OF FILING

The undersigned attorneys of record for Volkswagen of America, Inc., certify that, in compliance with 28 U.S.C. §1446(d), a copy of the Notice of Removal of this action was filed with the Prothonotary of the Superior Court of New Castle County, Delaware on March 14, 2007.

The undersigned attorneys of record further certify that on the same day, in compliance with the requirements of 28 U.S.C. §1446(d), written notice of the removal was also delivered to all the parties, including the Plaintiffs, in this action directly or through their attorneys, along with a copy of the Notice of Removal filed in this court.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

BY: _____

Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE  19806

AND

OF COUNSEL:
Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219

AND

One Penn Center, 19th Floor
1617 JFK Boulevard
Philadelphia, PA  19103

AND

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205

Dated:  March 14, 2007

Counsel for Defendant,
Volkswagen of America, Inc.

| 67 | G5 | C | F | 8 | .04 | X | X | |
| 68 | G5 | C | B | 4 | .2 | X | X | |
| | G5 | C | F | 2 | .04 | X | X | |
| 0 | G5 | C | D | 6 | .3 | X | X | Print Out |
| 71 | G5 | C | F | 1 | .04 | X | X | |
| 72 | G5 | C | F | 2 | .04 | X | X | |
| 73 | G5 | C | F | 4 | .5 | X | X | |
| 74 | E2 | C | B | 5 | .4 | X | X | |
| 75 | E2 | C | F | 8 | .04 | X | X | |
| 76 | E2 | C | B | 25 | .5 | X | X | |
| 77 | E2 | C | B | 4 | .2 | X | X | |
| 78 | E2 | C | F | 4 | .04 | X | X | |
| 79 | E2 | C | F | 3 | .05 | X | X | |
| 80 | E2 | C | F | 3 | .05 | X | X | Print Out |
| 81 | E2 | C | C-F | 1 | .04 | X | X | |
| 82 | E2 | C | C-F | 1 | .03 | X | X | |
| 83 | E2 | C | F | 2 | .04 | X | X | |
| 84 | E2 | C | C-F | 2 | .04 | X | X | |
| 85 | E2 | C | F | 3 | .04 | X | X | |
| | E2 | C | B | 4 | .2 | X | X | |
| | E2 | C | F | 12 | .05 | X | X | |
| 8 | E2 | C | F | 3 | .04 | X | X | |
| 89 | E2 | C | F | 1 | .03 | X | X | |
| 90 | E2 | C | F | 4 | .04 | X | X | Print Out |
| 91 | E2 | C | B | 3 | .2 | X | X | |
| 92 | E2 | C | F | 2 | .04 | X | X | |
| 93 | E2 | C | F | 8 | .03 | X | X | |
| 94 | E2 | C | F | 2 | .05 | X | X | |
| 95 | E2 | C | F | 3 | .04 | X | X | |
| 96 | E2 | C | F | 6 | .05 | X | X | |
| 97 | E2 | C | C-F | 2 | .04 | X | X | |
| 98 | E2 | C | F | 3 | .04 | X | X | |
| 99 | E2 | C | B | 5 | .2 | X | X | |
| 100 | E2 | C | F | 2 | .04 | X | X | Print Out |
| 101 | E2 | C | F | 1 | .03 | X | X | |
| 102 | E2 | C | F | 2 | .03 | X | X | |



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:04
Cursor: 0.000keV = 0        ROI (SIKα) 1.650: 1.820=67

0 000                              VFS = 32      10 240
     7    M18384-001; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:10
Cursor: 0.000keV = 0          ROI (SIKα) 1.650: 1.820=19

0 000                                    VFS = 32      10.240
    12    M18884-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:16
Cursor: 0 000KeV = 0        ROI (SIKα) 1.660: 1.820=93

0.000                                    VFS = 32      10 240
  5    M18884-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:23
Cursor: 0 000keV = 0          ROI (5)Kα) 1.660: 1.820=49

0.000                          VFS = 64     10.240
   17    M18884-001; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98   14:31
Cursor: 0.000KeV = 0          ROI (SIKα) 1.660: 1 820=231

0 000                          VFS = 64      10.240
   7     M18S84-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:47
Cursor: 0.000keV = 0        ROI (SIKα) 1.560: 1.920=97

0.000                                    VFS = 32      10.240
  5      M18884-001: CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  14:55
Cursor: 0 000keV = 0        ROI (SIKα) i 660: 1.820=32

VFS = 32     10.240

1S    M18884-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  15:00
Cursor: 0.000KeV = 3       ROI (SIKα) 1.560: 1.820=48

0.000                                              VFS = 32    10.240
     S     M18884-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES        THU 08-JAN-98  15:12
Cursor: 0.000KeV = 0        ROI (SIKα) 1 660: 1 820=123

0.000                                    VFS = 32      10 240
  13    M18884-001;  CHRYSOTILE



MATERIALS ANALYTICAL SERVICES        THU 08-JAN-98  15:25
Cursor: 0.000keV = 0        ROI (SIKα) 1 660: 1 820=27

0 000                              VFS = 32    10.240
   1S      H18884-001; CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  15:39
Cursor: 0.000keV = 0        ROI (SIKα) 1.660: 1.820=26

0 000                              VFS = 32      10.240
17     M18884-001; CHRYSOTILE

# TEM DUST ANALYSIS     M18884     002

**Materials Analytical Services**
**Filing Chrysler Bendix Brake Shoes**                     Client Sample ID:     1-IV-BWL

| | | | | |
|---|---|---|---|---|
| Sample Area/ Volume: | 49 cm2 | | Date Analyzed: | 1/8/98 |
| Filter Type: | MCE 47mm | | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | | Scope Number: | 3 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Fabric | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES     4 % | | Grid_box: | 5145 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Str <5um: | 82 | Number of grids: | 2 | #1: 114  #3: 113 | Average Grid Size: | 0.012939 |
| Str ≥5um: | 38 | Number of openings: | 2 | #2: 113  #4: 115 | Total Area Analyzed: | 0.026 |
| Total Str: | 120 | | | | | |

| | | | | |
|---|---|---|---|---|
| Volume Filtered | 5 ml | Str / sqr ft | 5.702E+09 | Str / cm2   6.137E+06 |
| Dilution Factor | 50 | Str / sqr ft >=5 | 1.806E+09 | Str / cm2 >=5   1.943E+06 |

**TEM DATA**

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C6-H8 | C | B | 4 | .2 | X | X | Print Out |
| 2 | H8 | C | F | 3 | .1 | X | X | |
| 3 | H8 | C | F | 4.5 | .05 | X | X | |
| | H8 | C | F | 4 | .05 | X | X | |
| 5 | H8 | C | F | 1.8 | .1 | X | X | |
| 6 | H8 | C | F | 6.3 | .1 | X | X | |
| 7 | H8 | C | B | 5 | .2 | X | X | |
| 8 | H8 | C | F | 3 | .04 | X | X | |
| 9 | H8 | C | F | 5.7 | .1 | X | X | |
| 10 | H8 | C | F | 5 | .2 | X | X | Print Out |
| 11 | H8 | C | B | 1 | .2 | X | X | |
| 12 | H8 | C | F | 9 | .2 | X | X | |
| 13 | H8 | C | F | 5.9 | .1 | X | X | |
| 14 | H8 | C | F | 4.4 | .02 | X | X | |
| 15 | H8 | C | F | 18 | .1 | X | X | |
| 16 | H8 | C | F | 2.7 | .1 | X | X | |
| 17 | H8 | C | F | 1.8 | .1 | X | X | |
| 18 | H8 | C | B | 13 | .8 | X | X | |
| 19 | H8 | C | B | 3 | .3 | X | X | |
| 20 | H8 | C | F | 2 | .04 | X | X | Print Out |
| | H8 | C | F | 7 | .1 | X | X | |
| | H8 | C | B | 9.4 | .3 | X | X | |
| 23 | H8 | C | B | 3.5 | .3 | X | X | |
| 24 | H8 | C | B | 4.5 | .5 | X | X | |
| 25 | H8 | C | B | 1.4 | .2 | X | X | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 26 | H8 | C | F | 1.8 | .04 | X | X | |
| 7 | H8 | C | F | 2.3 | .03 | X | X | |
| 28 | H8 | C | F | 8 | .1 | X | X | |
| 29 | H8 | C | B | 17.6 | .3 | X | X | |
| 30 | H8 | C | F | 2 | .03 | X | X | Print Out |
| 31 | H8 | C | F | 6 | .1 | X | X | |
| 32 | H8 | C | F | 8 | .1 | X | X | |
| 33 | H8 | C | F | 1.6 | .04 | X | X | |
| 34 | H8 | C | F | 17.5 | .1 | X | X | |
| 35 | H8 | C | B | 4 | .2 | X | X | |
| 36 | H8 | C | F | 3.7 | .06 | X | X | |
| 37 | H8 | C | F | 2 | .05 | X | X | |
| 38 | H8 | C | F | 2.6 | .05 | X | X | |
| 39 | H8 | C | B | 4.3 | .3 | X | X | |
| 40 | H8 | C | F | 1 | .1 | X | X | Print Out |
| 41 | H8 | C | F | .9 | .1 | X | X | |
| 42 | H8 | C | F | 4 | .1 | X | X | |
| 43 | H8 | C | F | .9 | .1 | X | X | |
| 44 | H8 | C | F | 5.8 | .02 | X | X | |
| 5 | H8 | C | F | .9 | .1 | X | X | |
| 6 | H8 | C | F | 8 | .1 | X | X | |
| 47 | H8 | C | F | 3.8 | .2 | X | X | |
| 48 | H8 | C | F | 5.7 | .1 | X | X | |
| 49 | H8 | C | F | 5.9 | .1 | X | X | |
| 50 | H8 | C | F | 3 | .1 | X | X | Print Out |
| 51 | H8 | C | F | 2 | .04 | X | X | |
| 52 | H8 | C | F | 2.6 | .04 | X | X | |
| 53 | H8 | C | F | 2.7 | .1 | X | X | |
| 54 | H8 | C | B | 4 | .4 | X | X | |
| 55 | H8 | C | F | 2 | .1 | X | X | |
| 56 | H8 | C | B | 5.4 | .2 | X | X | |
| 57 | H8 | C | F | 4 | .05 | X | X | |
| 58 | H8 | C | F | 3.4 | .04 | X | X | |
| 59 | H8 | C | F | 9 | .1 | X | X | |
| 60 | H8 | C | F | 2.7 | .1 | X | X | Print Out |
| 61 | H8 | C | B | 11 | .3 | X | X | |
| 62 | H8 | C | F | 14 | .05 | X | X | |
| | H8 | C | B | 5 | .2 | X | X | |
| | H8 | C | F | 2.4 | .1 | X | X | |
| 55 | H8 | C | F | 1 | .1 | X | X | |
| 66 | H8 | C | M-F | 2 | .04 | X | X | |

| 67 | H8 | C | B | 4.6 | .4 | | X | X | |
| | H8 | C | F | 5.6 | .1 | | X | X | |
| | D6-J7 | C | M-F | 2 | .2 | | X | X | |
| 70 | J7 | C | M-F | 2.5 | .1 | | X | X | Print Out |
| 71 | J7 | C | F | 1.6 | .1 | | X | X | |
| 72 | J7 | C | F | 4.6 | .16 | | X | X | |
| 73 | J7 | C | F | 4 | .06 | | X | X | |
| 74 | J7 | C | F | 4.8 | .05 | | X | X | |
| 75 | J7 | C | F | 1.7 | .1 | | X | X | |
| 76 | J7 | C | F | 2.3 | .06 | | X | X | |
| 77 | J7 | C | B | 14 | 1 | | X | X | |
| 78 | J7 | C | F | 3.7 | .03 | | X | X | |
| 79 | J7 | C | F | 2.8 | .04 | | X | X | |
| 80 | J7 | C | B | 8.3 | .2 | | X | X | Print Out |
| 81 | J7 | C | F | 3 | .05 | | X | X | |
| 82 | J7 | C | F | 2 | .1 | | X | X | |
| 83 | J7 | C | F | 3.5 | .06 | | X | X | |
| 84 | J7 | C | F | 2.4 | .05 | | X | X | |
| 85 | J7 | C | F | 5 | .1 | | X | X | |
| | J7 | C | B | 7.8 | .2 | | X | X | |
| | J7 | C | F | 4 | .1 | | X | X | |
| 88 | J7 | C | F | 2 | .1 | | X | X | |
| 89 | J7 | C | B | 2.3 | .4 | | X | X | |
| 90 | J7 | C | M-B | 2.5 | .3 | | X | X | Print Out |
| 91 | J7 | C | B | 1.7 | .3 | | X | X | |
| 92 | J7 | C | F | 2.8 | .1 | | X | X | |
| 93 | J7 | C | F | 4.4 | .05 | | X | X | |
| 94 | J7 | C | F | 3.7 | .1 | | X | X | |
| 95 | J7 | C | B | 2 | .3 | | X | X | |
| 96 | J7 | C | B | 7 | .3 | | X | X | |
| 97 | J7 | C | F | 2.8 | .05 | | X | X | |
| 98 | J7 | C | B | 2 | .3 | | X | X | |
| 99 | J7 | C | M-B | 5 | .8 | | X | X | |
| 100 | J7 | C | F | 2.4 | .04 | | X | X | Print Out |
| 101 | J7 | C | F | 3.7 | .1 | | X | X | |
| 102 | J7 | C | B | 1.7 | .7 | | X | X | |
| 103 | J7 | C | F | 3.6 | .02 | | X | X | |
| | J7 | C | B | 4 | .5 | | X | X | |
| 105 | J7 | C | F | 1.6 | .1 | | X | X | |
| 106 | J7 | C | .3 | 2.1 | .3 | | X | X | |
| 107 | J7 | C | F | 1.5 | .1 | | X | X | |

| 108 | J7 | C | F | 4 | .2 | | X | X | |
| 109 | J7 | C | F | 2 | .1 | | X | X | |
| | J7 | C | F | 2 | .02 | | X | X | Print Out |
| 11 | J7 | C | B | 10 | 1 | | X | X | |
| 112 | J7 | C | U | 2 | .2 | | X | X | |
| 113 | J7 | C | F | 2.6 | .04 | | X | X | |
| 114 | J7 | C | F | 8 | .02 | | X | X | |
| 115 | J7 | C | F | 4 | .1 | | X | X | |
| 116 | J7 | C | B | 4 | .2 | | X | X | |
| 117 | J7 | C | F | 6.7 | .1 | | X | X | |
| 118 | J7 | C | B | 6 | .5 | | X | X | |
| 119 | J7 | C | F | 11 | .1 | | X | X | |
| 120 | J7 | C | F | 6 | .1 | | X | X | Print Out |



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  12:45
Cursor: 1.270KeV = 7        ROI (SIKα) 1.660: 1.810=85
                            ROI (MGKα) 1.180: 1.330=73

0.000                              VFS = 16      10.240
   3     M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES              THU 08-JAN-98  12:13
Cursor: 1.270KeV = 3          ROI (SIKα) 1.660: 1.810=75
                              ROI (MGKα) 1.180: 1.330=68

0.000                         VFS = 16      10.240
   3    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES              THU 08-JAN-98  12:27
Cursor: 1.270KeV = 6          ROI (SIKα) 1 660: 1 810=82
                              ROI (MGKα) 1.180: 1 330=65

0.000                         VFS = 16      10 240
   3    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  11:29
Cursor: 1.270KeV = 2          ROI (SIKα) 1.660: 1.810=86
                              ROI (MGKα) 1.180: 1.330=57

0.000                              VFS = 16      10.240
    3     M18884-2 , CHRYSOTILE


MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  11:49
Cursor: 1.270KeV = 8          ROI (SIKα) 1.660: 1.810=84
                              ROI (MGKα) 1.180: 1.330=75

0.000                              VFS = 32      10.240
    3     M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  11:02
Cursor: 1.270keV = 6          ROI (SIKα) 1.660: 1.810=108
                              ROI (MGKα) 1.180: 1.330=65

0.000                                    VFS = 32      10.240
   3    M18894-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  11:16
Cursor: 1.270keV = 1          ROI (SIKα) 1.660: 1.810=78
                              ROI (MGKα) 1.180: 1.330=43

0.000                                    VFS = 16      10.240
   2    M18894-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  10:39
Cursor: 1.270KeV = 8      ROI (SIKα) 1.660: 1.810=125
                          ROI (MGKα) 1.180: 1.330=30

0.000                              VFS = 32        10.240
   6    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  10:53
Cursor: 1.270KeV = 4      ROI (SIKα) 1.660: 1.810=76
                          ROI (MGKα) 1.180: 1.330=48

0.000                              VFS = 16        10.240
   2    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  10:04
Cursor: 1 270keV = 3          ROI (SIKα) 1.660: 1.810=59
                              ROI (MGKα) 1.180: 1.330=37

0.000                                  VFS = 16      10.240
  2    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  10:18
Cursor: 1 270keV = 3          ROI (SIKα) 1.660: 1.810=66
                              ROI (MGKα) 1.180: 1.330=54

0.000                                  VFS = 32      10.240
  4    M18884-2 , CHRYSOTILE



MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  09:23
Cursor: 1.270KeV = 8        ROI (SIKα) 1.660: 1.810=107
                            ROI (MGKα) 1.180: 1.330=71

0.000                                VFS = 32    10.240
   4    M1S884-2 , CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          THU 08-JAN-98  09:46
Cursor: 1 270KeV = 4        ROI (SIKα) 1.660: 1.810=73
                            ROI (MGKα) 1.180: 1.330=56

0.000                                VFS = 16    10.240
   3    M1S884-2 , CHRYSOTILE

# LABORATORY BLANK

| | | Result | | |
|---|---|---|---|---|
| | | | Str/mm² | |

AS JOB NUMBER: M _18884_     #G.O.Jgrids counted _____ _1_

GRID ORIENTATION: (1) ___F___ (2) _F_     Avg. G.O. area _____ µm²

ANALYST AND DATE ___AA___ _1-8-98_    Grid Opening _____ µm² X _____ µm²

                   Measurement _____ µm² X _____ µm²

*Record result in blanks notebook and place sheet in project file.*

| STR. # | GRID # SQUARE # | TYPE | STRUCTURE | LENGTH (µm) | WIDTH (µm) | CONFIRMATION | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | MORPH. | SAED | EDS |
| | D2-A4 | | NSD | | | | | |
| | B6 | | NSD | | | | | |
| | C8 | | NSD | | | | | |
| | D10 | | NSD | | | | | |
| | F4 | | NSD | | | | | |
| | D1-C6 | | NSD | | | | | |
| | D4 | | NSD | | | | | |
| | B2 | | NSD | | | | | |
| | A4 | | NSD | | | | | |
| | I6 | | NSD | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# MATERIALS ANALYTICAL SERVICES
## PROJECT LOG

Client Code: 90196

| | | | |
|---|---|---|---|
| MAS ID: | M18891 | Client Job No: | none given |
| Client Name: | Materials Analytical Services | Client PO: | none given |
| Project Name: | Clean-Up Chrysler Bendix Brake Shoes | Date In: | 1/5/98 |
| Logged By: | denise mazzaferro | DateDue: | 1/9/98 |

**TRANSPORT INFORMATION:**

| | | | |
|---|---|---|---|
| Submitted By: | | Documents: | coc |
| Delivery By: | Richard Hatfield | | |
| Received By: | | | |
| Condition: | good | Comments for COC: | |

**CONTACT INFORMATION:**

| | | | | |
|---|---|---|---|---|
| Contact: | Bill Longo | Work Phone: | (770) 448-3200 | Ext: |
| Title: First Name: | Last Name: | Suffix | Other Phone: | Ext: |
| William | Longo | | Fax: (770) 368-8256 | |

## SAMPLE INFORMATION:

| # | Client ID | Volume | | # | Client ID | Volume |
|---|---|---|---|---|---|---|
| 001 | I-IV-A | 44 | cm2 | | | |

**SIGNATURES**

RECEIVED BY: _Amazaferro_

REVIEWED BY: _Amazaferro_

PREPARED BY: _Amazaferro_

ANALYZED BY: _[signature]_

REPORTED BY:

DEPOSED BY:

# TEM CLEARANCE AIR SAMPLING DATA SHEET

**MAS**

3597 Parkway Lane, Suite 250
Norcross, GA 30092
PH: (770) 448-3200
FAX: (770) 368-8256

Co. Name: _____
Address: _____
PH: _____
FAX: _____

Project Number: _____ Clean-up
Project Name: _____ Chrysolos Asbestos
Work Area Description: _____
Project Representative: _____
Project Sample: _____
Sampling Date: 1-5-98

Sheet ____ of ____

| Date | Sample No. | Sample Location | Sample Type | Sampling Times (Minutes) | | | Flow Rate (Liters Per Minute) | | |
|------|-----------|-----------------|-------------|-------|------|----------|--------|-------|---------|
| | | | | Start | Stop | Duration | Before | After | Average |
| 1-5-98 | I-I-A | I LW | Background | 9:50 | 1:05 | | 10 L/m | 10 L/m | |
| | I-I-B | I LW | Background | 9:50 | 1:05 | | 10 L/m | 10 L/m | |
| | I-I-C | O LW | Background | 9:50 | 1:05 | | 10 L/m | 10 L/m | |
| 4-5-98 | I-II-A | I LW | Area | 4:18 | 4:52 | | 10 L/m | 10 L/m | |
| | I-II-B | I LW | Area | ↓ | ↓ | | 10 L/m | 10 L/m | |
| | I-II-C | O LW | Area | ↓ | ↓ | | 24 L/m | 24 L/m | |
| | I-III-A-RWI LW | Personnel | 4:18 | 4:52 | | 24 L/m | 24 L/m | |
| | I-III-B-RWI LW | Personnel | ↓ | ↓ | | 24 L/m | 24 L/m | |
| | I-III-C-RWI LW | Personnel | ↓ | ↓ | | 24 L/m | 24 L/m | |
| | I-IV-A | fabric | | | | | | |

| CHAIN OF CUSTODY | Initial Shipment Date: | Mode of Transfer | Log-in Date | Received By |
|------------------|------------------------|------------------|-------------|-------------|
| First Transfer By: | | Hand | 1-5-98 | |
| Second Transfer To: | | | | |
| Third Transfer By: | | | | |
| Third Transfer To: | | | | |



# TEM SAMPLE DATA

| Prep SOP#: | MT-017 |
| Prep Status: | Complete |
| Sample Type: | Fabric |
| Analysis Type: | Dust |
| Filter Type: | MCE 47mm |
| Pore Size: | 0.45 |

## M18891

prep date:  11/6/98    Prep Tech:  denise mazzaferro

### Archival Information

Slides: [13]    Filters: [ ]    Bottles: [59]    Grid_box: [5144]

Archive Comments:

Disposal Comments:

Reprep Dates:

| Sample Number | Sample ID Location | Area | | Filter Portion | Total Susp | Filtered Volume in ml | | | | | | | Sample Information |
| | | | | | | #1 | #2 | #3 | #4 | #5 | #6 | #7 | |
| 000 | lab blank 1/6/99 | 0 | cm2 | 1/1 | 200 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 001 | 1:R/A | 44 | cm2 | 1/1 | 250 | 5 | 30 | 0 | 0 | 0 | 0 | 0 | |

# TEM DUST ANALYSIS        M18891    001

Materials Analytical Services
Clean-Up Chrysler Bendix Brake Shoes

| | | | Client Sample ID: | I-IV-A |
|---|---|---|---|---|
| Sample Area/ Volume: | 44 cm2 | | Date Analyzed: | 1/9/98 |
| Filter Type: | MCE 47mm | | Analyst: | Mehrdad Motamedi |
| Pore size: | 0.45 | | Scope Number: | 3 |
| Effective Filter Area: | 1297 | | Accelerating Voltage: | 100 KV |
| Sample type: | Fabric | | Indicated Mag: | 25 KX |
| Analysis type: | Dust | | Screen Mag: | 20 KX |
| Grid Acceptance | YES | 5 % | Grid_box: | 5144 |

| Str <5um: | 12 | Number of grids: | 2 | #1: 113 | #3: 113 | Average Grid Size: | 0.012769 |
|---|---|---|---|---|---|---|---|
| Str ≥5um: | 7 | Number of openings: | 10 | #2: 113 | #4: 113 | Total Area Analyzed: | 0.128 |
| Total Str: | 19 | | | | | | |

| | | | | |
|---|---|---|---|---|
| Volume Filtered | 5 ml | Str / sqr ft | 2.037E+08 | Str / cm2 | 2.193E+05 |
| Dilution Factor | 50 | Str / sqr ft >=5 | 7.506E+07 | Str / cm2 >=5 | 8.080E+04 |

## TEM DATA

| Str#: | SquareID: | Type: | Structure: | Length | Width | Morph: | SAED: | EDS: |
|---|---|---|---|---|---|---|---|---|
| 1 | C6-18 | C | F | 1.5 | .1 | X | X | Print Out |
| 2 | I8 | C | F | 3.8 | .07 | X | X | |
| 3 | G6 | C | M-F | 2.3 | .04 | X | X | |
| | G6 | C | F | 5.9 | .1 | X | X | |
|  | E8 | C | F | 1.3 | .1 | X | X | |
| 6 | C9 | C | F | 8.1 | .1 | X | X | |
| 7 | B7 | C | F | .7 | .02 | X | X | |
| 8 | B7 | C | F | .6 | .01 | X | X | |
| 9 | B6-A6 | C | F | 4 | .06 | X | X | |
| 10 | A6 | C | F | 3.6 | .04 | X | X | Print Out |
| 11 | B7 | C | F | 14.6 | .2 | X | X | |
| 12 | B7 | C | M-B | 2.5 | .5 | X | X | |
| 13 | B8 | C | F | 2 | .05 | X | X | |
| 14 | B8 | C | B | 1.5 | .2 | X | X | |
| 15 | B8 | C | F | 3 | .05 | X | X | |
| 16 | A9 | C | B | 10 | .5 | X | X | |
| 17 | A9 | C | B | 6 | .5 | X | X | |
| 18 | A9 | C | C-B | 30 | .4 | X | X | |
| 19 | E5 | C | B | 10 | .1 | X | X | |



MATERIALS ANALYTICAL SERVICES          FRI 09-JAN-98  10:57
Cursor: 1.320keV = 4       ROI (SIKα) 1.660: 1.810=87
                           ROI (MGKα) 1.180: 1.330=66

0.000                                   VFS = 16      10.240
    28    M16891-1 , CHRYSOTILE

MATERIALS ANALYTICAL SERVICES          FRI 09-JAN-98  11:02
Cursor: 1.320keV = 2       ROI (SIKα) 1.660: 1.810=46
                           ROI (MGKα) 1.180: 1.330=37

0.000                                   VFS = 16      10.240
    17    M16891-1 , CHRYSOTILE

# LABORATORY BLANK

Result [ < 7.8 ] Str/mm³

AS JOB NUMBER: M 18891-BL   #G.O./grids counted 10/2

RID ORIENTATION: (1) 1L (2) L   Avg. G.O. area 12769 μm²

ANALYST AND DATE 1-9-98   Grid Opening 113 μm² X 113 μm²

Measurement 113 μm² X 113 μm²

**Record result in blanks notebook and place sheet in project file.**

| STR. # | GRID # SQUARE # | TYPE | STRUCTURE | LENGTH (μm) | WIDTH (μm) | CONFIRMATION MORPH. | SAED | EDS |
|--------|-----------------|------|-----------|-------------|------------|---------|------|-----|
| | A.6 – C9 | | NSD | | | | | |
| | D9 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| | E2 | | NSD | | | | | |
| | B3 | | NSD | | | | | |
| | A9 – E1 | | NSD | | | | | |
| | C3 | | NSD | | | | | |
| | B5 | | NSD | | | | | |
| | J2 | | NSD | | | | | |
| | A5 | | NSD | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710

# EXHIBIT P



### Bendix Brakes for Chrysler Vehicles
### Filing Demonstration
### Asbestos Air Analysis Results

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Structures/cc | TEM ≥ 5.0μm Fibers/cc |
|---|---|---|---|---|
| I-I-A | IWA Background | <0.002 | <0.027 | N/A |
| I-I-B | IWA Background | 0.002 | <0.027 | N/A |
| 1-II-A | IWA Area | 2.87 | 17,297 | 1,830 |
| 1-II-B | IWA Area | 2.45 | 16,929 | 508 |
| I-III-A | RHR - Personnel | 9.02 | 16,800 | 1,497 |
| I-III-B | RHL - Personnel | 8.81 | 13,984 | 699 |
| I-III-C | WLR - Personnel | 8.53 | 17,023 | 1,685 |
| I-III-D | WLL - Personnel | 9.91 | 27,565 | 1,114 |

| | | Structures/sq.ft | Structures/cm² |
|---|---|---|---|
| I-IV-A-RH | Fabric | 4.9 Billion | 5.3 Million |
| I-IV-B-WL | Fabric | 5.7 Billion | 6.1 Million |

DEFENDANT'S
EXHIBIT
7-8-23
# 7 Hatfield



### Bendix Brakes for Chrysler Vehicles
### Clean-up After Filing Demonstration
### Asbestos Air Analysis Results

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Structures/cc | TEM $\geq 5.0\mu m$ Fibers/cc |
|---|---|---|---|---|
| II-I-A | IWA Background | <0.002 | <0.021 | N/A |
| II-I-B | IWA Background | 0.002 | <0.020 | N/A |
| II-II-A | IWA Area | 5.12 | 3,232 | 285 |
| II-II-B | IWA Area | 4.16 | 3,680 | 437 |
| II-III-A | RHR - Personnel | 14.23 | 4,439 | 1,002 |
| II-III-B | RHL - Personnel | 13.79 | 3,137 | 285 |
| II-III-C | RHR - Personnel | 14.67 | 3,294 | 716 |

| | | Structures/sq.ft | Structures/cm$^2$ |
|---|---|---|---|
| I-IV-A-RH | Fabric | 204 Million | 219 Thousand |

## MATERIALS ANALYTICAL SERVICES, INC.
## BULK ASBESTOS ANALYSIS

roject # - Spl #:  __M18857  - 001__   Analyst :  __W.B. Egeland__                   Date :  __1 /12/98__

Project Name :  __Bendix Brakes for Chrysler Vehicles__                   Client Spl #:  __BX-MN-FF__

ID/Location : _____

Visual Description :  __Gray.  Abundant fiber bundles throughout fine matrix.__

_____

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | | | |
|---|---|---|---|
| Morphology | Wavy | | |
| Pleochroism | None | | |
| Refractive Index II / ⊥ | 1.555 / 1.548 | | |
| Sign of Elongation | Positive | | |
| Extinction | Parallel | | |
| Birefringence | Low | | |
| Melt | No | | |
| Fiber Name | Chrysotile | | |

ASBESTOS MINERALS :                          EST. VOL. %

| | |
|---|---|
| ~ysotile | 33 |
| ,site | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS :

| | |
|---|---|
| Mineral/Rock Wool | |
| Fibrous glass | |
| Cellulose | |
| Synthetic | |

NON FIBROUS COMPONENTS :

| | |
|---|---|
| Vermiculite | |
| | |
| | |

BINDERS :                          67

Fine granular aggregate.

EFFERVESCENCE : _____

JENTS : _____

### Bendix Brakes for Ford Vehicles
### Filing Demonstration
### Asbestos Air Analysis Results

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Structures/cc | TEM ≥ 5.0µm Fibers/cc |
|---|---|---|---|---|
| I-I-A | IWA  Background | <0.002 | <0.026 | N/A |
| I-I-B | IWA  Background | 0.003 | <0.026 | N/A |
| 1-II-A | IWA  Area | overloaded | 9,535 | 482 |
| 1-II-B | IWA  Area | 2.92 | 1,156 | 96 |
| I-III-A | RHL - Personnel | 5.47 | 3,042 | 285 |
| I-III-B | RHR - Personnel | 6.89 | 10,561 | 1,162 |
| I-III-C | WLL - Personnel | 6.22 | 3,318 | <98 |
| I-III-D | WLR - Personnel | 6.01 | 4,087 | 475 |

| | | Structures/sq.ft | Structures/cm$^2$ |
|---|---|---|---|
| I-IV-A-RH | Fabric | 177 Million | 190 Thousand |
| I-IV-B-WL | Fabric | 3.0 Billion | 3.2 Million |
| M18837-1 | Dust from Inside Brake Box | 2.9 Billion | 3.1 Million |



### Bendix Brakes for Ford Vehicles
### Clean-up After Filing Demonstration
### Asbestos Air Analysis Results

| Sample # | Sample Description | PCM Fibers/cc | TEM (All) Structures/cc | TEM ≥ 5.0μm Fibers/cc |
|---|---|---|---|---|
| II-I-A | IWA Background | <0.003 | <0.03 | N/A |
| II-I-B | IWA Background | 0.003 | <0.03 | N/A |
| | | | | |
| II-II-A | IWA Area | 4.14 | 42,312 | 3,193 |
| II-II-B | IWA Area | 3.65 | 14,897 | 2,573 |
| | | | | |
| II-III-A | RHR - Personnel | 12.26 | 29,114 | 3,957 |
| II-III-B | RHL - Personnel | 12.20 | 14,967 | 2,225 |
| II-III-C | WLR - Personnel | 12.67 | 13,454 | 2,374 |
| II-III-D | WLL - Personnel | 8.26 | 3,792 | 798 |

| Sample # | Sample Description | Structures/sq.ft | Structures/cm² |
|---|---|---|---|
| II-IV-A-RH | Fabric | 100 Million | 108 Thousand |
| II-IV-B-WL | Fabric | 149 Million | 161 Thousand |

MATERIALS ANALYTICAL SERVICES, INC.
CHAIN-OF-CUSTODY

CLIENT :David M. Lipman, P.A.

CONTACT :David M. Lipman

PHONE :(305) 662-2600          FAX # : (305) 667-3361

CLIENT JOB NAME :Ford / Bendix Brake Set (4 Shoes)

CLIENT JOB #

CLIENT DOC'S :FedEx paperwork

MAS JOB :M18577

DATE REC'D :11/15/97

SUBMITTED BY :Erik Carlsson

MODE OF TRANSPORT :FEDEX

REC'D BY :denise mazzaferro

CONDITION OF SAMPLE(S) :1 Box

| MAS | CLIENT SAMPLE | MAS | CLIENT SAMPLE | MAS | CLIENT SAMPLE |
|-----|---------------|-----|---------------|-----|---------------|
| 001 ) | Ford / Bendix Brake Set (4 Shoes) | | | | |

INITIAL FILE _____    DATE _____

SAMPLE PREP _____    DATE _____

SAMPLE ANALYSIS _____    DATE _____

COMMENT

## MATERIALS ANALYTICAL SERVICES, INC.
## BULK ASBESTOS ANALYSIS

oject # - Spl #:  M18577 - 001   Analyst :  W.B. Egeland                    Date :  1 /12/98

Project Name :  Ford / Bendix Brake Set (4 Shoes)                Client Spl #:  BENDIX-MY-GF

ID/Location :

Visual Description :   Light gray with black mottling.  Abundant fiber bundles throughout fine matrix.

### OPTICAL DATA FOR ASBESTOS IDENTIFICATION

| | |
|---|---|
| Morphology | Wavy |
| Pleochroism | None |
| Refractive Index ‖ / ⊥ | 1.555 / 1.548 |
| Sign of Elongation | Positive |
| Extinction | Parallel |
| Birefringence | Low |
| Melt | No |
| Fiber Name | Chrysotile |

ASBESTOS MINERALS :                              EST. VOL. %

| | |
|---|---|
| ysotile | 25 |
| site | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS :

Mineral/Rock Wool
Fibrous glass
Cellulose
Synthetic

NON FIBROUS COMPONENTS :

Vermiculite

BINDERS :                              75

   Fine granular minerals

EFFERVESCENCE :

   MENTS :

# EXHIBIT Q

1

```
 1                    Volume_____of_____

 2         In the Sixth District Court of Lamar County

 3                       State of Texas

 4

 5

 6

 7

 8      IN RE:  LAMAR COUNTY ASBESTOS LITIGATION

 9

10

11

12      Appearances:

13
        Mr. Kraus
14      Ms. Mortolla
        Mr. Coy Johnson
15      Mr. Clay Johnson
        Mr. Raymond Harris
16      Ms. Phifer
        Ms. Seigert
17      Mr. Truncale
        Mr. Edwardds
18      Mr. Miltonburger
        Mr. Roy
19      Mr. Whitney
        Ms. Wolf
20      Mr. Pranske
        Mr. Litzler
21

22

23          On June 20, 2001, the above entitled and numbered

24      cause came on to be heard before the Honorable Jim Lovett,

25      and the following proceedings were had:
```

{ASBTOS01:1}

55

1       order of 50 to 60 thousand different asbestos samples. This
2       would include bulk samples. A bulk sample is say these
3       ceiling tiles in this courtroom. If they were suspected of
4       having asbestos in it, you could send a sample of that to
5       our laboratory and we could tell you what kind of asbestos
6       and how much. And then there is air samples --
7           Q.    Tell the judge how you do that. How do you tell
8       them what kind of asbestos and how much?
9           A.    Well, typically we would analyze that sample by
10      polarized light microscopy and stereo microscopy. We are
11      using a light microscope to visualize the fibers, to make a
12      volume estimate of how many fibers are present. Then we
13      would go on to use polarized light to determine the crystal
14      and nature of the fibers, if they were asbestos. Using a
15      set of rules that are used by everybody, EPA's protocol
16      essentially, we could then determine what type of asbestos
17      it was.
18          Q.    And is it possible, separate and apart beyond
19      asbestos, since the judge raised the issue during the
20      argument about the similar behavior of different materials,
21      is it possible when you do these various tests for you to
22      actually determine what's in products?
23          A.    Yes, sir.
24          Q.    What other besides the bulk samples? You
25      mentioned air samples.

56

1      A.    Back to the bulk samples.  One of the things we

2   do is we determine all the other ingredients.  In fact, the

3   State of Texas is a very large client of ours in which we

4   were their expert in property damage lawsuits in which we

5   analyzed samples all over the State of Texas, including

6   Paris, to determine who manufactured the product.

7           As for air samples, we analyze air samples for

8   clearance and for ambience or a determination if asbestos

9   fibers in the air.

10     Q.    What's clearance and ambient?

11     A.    Well, an ambient sample would be say we wanted to

12  determine while we were in this courtroom if there are

13  asbestos fibers floating around.  We would take a background

14  or an ambient air sample.

15          The Environmental Protection Agency has what's

16  known as clearance samples in which they get in this

17  courtroom. It's been sealed off. If these ceiling tiles had

18  asbestos in them, they were cleaned out and before we could

19  let people back in here to put the new ceiling tiles out

20  there, take a clearance sample to analyze if there were any

21  asbestos fiber present to a certain concentration.  And you

22  would do that by electron microscopy

23     Q.    And has your lab performed those sort of

24  clearance sampling tests for the EPA?

25     A.    Well, the EPA technique, we have done thousands

65

1    this blue light. So we are using a technique that's been

2    around for 140 some years.

3             If you go to almost any college chemistry book,

4    they talk about Tyndal Lighting. Everybody has seen Tyndal

5    Lighting. If you have seen a light beam coming in a window

6    and see particles appear and disappear, that's Tyndal

7    Lighting.

8             Here we are using Tyndal Lighting to determine

9    the pathway of exposure, how do these materials release

10   particles, is one activity more dusty than another activity.

11       Q.    How do you decide what activities to simulate in

12   these work practice studies?

13       A.    We try to simulate activities that were common

14   work practices from individuals who used to use these

15   products. If it was a thermal insulator who used to be on

16   jobs cutting thermal insulation, we do a work practice study

17   with thermal insulation with a saw cutting it.

18             In this case -- if it's a pipe fitter or

19   machinist who talks about having to go in and remove gaskets

20   off the flanges, we then simulate that activity.

21             How we determine what activity to use, this is by

22   reading sworn testimony from these former individuals, by

23   talking to them, finding out what former pipe fitters and

24   journeymen pipe fitters used to do, what machinists used to

25   do, and then use the same tools and the same techniques that

67

1    the cloud.

2              THE COURT:  I did not get that impression, Mr.

3    Harris.  I'm certainly not considering it that way.

4    Certainly I think you're on a point here so let's get with

5    this witness and see what he says about that.

6    BY MR. HARRIS:

7        Q.    Doctor Longo, do you intend to offer the opinion

8    to the jury that the percentage of asbestos seen in the

9    cloud under the Tyndal Lighting approximates or is equal to

10   the percentage of asbestos in the gasket being removed?

11       A.    No.  What I can tell the jury is that there is

12   some percentage of asbestos in the cloud.  We know that

13   because we make the measurements.  We haven't made the

14   measurements to know exactly how much is asbestos and how

15   much is nonasbestos.  I would tell the jury I don't think

16   that's a hundred percent asbestos, but there is asbestos in

17   that cloud and it's evenly distributed -- well, particles

18   have a hard time being totally evenly distributed.  We have

19   measurements and this is what we measured.  But during the

20   grinding of that gasket that contains 75 percent asbestos,

21   you are generating product into the air.  Mr. Hatfield's

22   opinion that since we haven't measured it, he can't think of

23   a scientific reason why when you start with something that's

24   70 percent and you grind it up into a powder and you throw

25   it in the air, why isn't it 70 percent.  I don't really know

68

1   exactly what the concentration is.  I certainly would think

2   it was more than one percent.  And I don't think it's a

3   hundred percent.  But we don't know where that range is.

4   What we do know is there is asbestos in that cloud and we

5   have measured that asbestos.

6       Q.    But you're not going to -- you don't intend to

7   express an opinion on how much asbestos is seen in that

8   cloud?  Is that a fair statement?

9       A.    Nothing more than what I have said, if it will

10  help move this along.

11      Q.    Well --

12      A.    Until we make the measurement -- and we will have

13  that for you next time.  Until we make the measurements to

14  know exactly how much is there, I won't say.

15      Q.    Doctor Longo, let me ask you a little bit about

16  the orientation on the videotape.  On the Tyndal Lighting,

17  where the breathing zone of the worker is, it's actually the

18  area kind of in front of him that's being lit up by the

19  Tyndal Lighting.

20      A.    That's correct.

21      Q.    So when you see the Tyndal Lighting beam and a

22  lot of dust, that's not actually the dust that he's

23  breathing.  Is that fair to say?

24      A.    That's not fair, because if you think about it,

25  why would the dust that he's generating only concentrate

(ASBTOS02:1)

# EXHIBIT R

7/13/2001 Newton, Larry (Colletti)

```
1        SALVATORE COLLETTI      :   COURT OF COMMON PLEAS
         and KATHLEEN COLLETTI,:   MONTGOMERY COUNTY
2        h/w,                    :
                     Plaintiffs :
3                                :
                     vs.        :   CIVIL ACTION
4                                :    ASBESTOS
         CARLISLE CORPORATION, :
5        et al,                  :
                     Defendants :   NO. 98-12268
6
                              -  . -
7
8                    Oral Deposition of LARRY NEWTON,

9        was taken pursuant to notice, held at the

10       offices of Kelley, Jasons, McGuire & Spinelli,

11       1500 Market Street, Suite 1500, Philadelphia,

12       Pennsylvania, on Friday, July 13, 2001,

13       beginning at or about 10:25 a.m., before

14       Jeanne Christian, Court Reporter-Notary

15       Public, there being present:

16                             -  . -

17       APPEARANCES:

18                    HAMBURG, RUBIN, MULLIN, MAXWELL &
                      LUPIN
19                    BY:  EDWARD RUBIN, ESQUIRE
                      ACTS Center, Blue Bell
20                    375 Morris Road
                      Lansdale, Pennsylvania 19446
21                    Phone:  (215) 661-0400
                       Representing the Plaintiffs
22                    KELLEY, JASONS, McGUIRE &
                      SPINELLI
23                    BY:  JOSEPH W. McGUIRE, ESQUIRE
                      1500 Market Street, Suite 1500
24                    Philadelphia, Pennsylvania  19102
                      Phone:  (215) 854-0658
25                     Representing the Defendant
```

1

7/13/2001 Newton, Larry (Colletti)

1    the protocol outlined in the asbestos standard

2    for sampling personnel.  And the area samples

3    were set up basically similar to what's done

4    for EPA clearance testing.

5    Q.     Did you follow any other protocol that

6    you can think of in the conduct of this

7    particular test?

8    A.     General good industrial hygiene

9    practices for the sampling of the personnel.

10   Q.     Let me ask you this.  As an industrial

11   hygienist, of course, you are familiar with

12   the concept of ventilation, are you not?

13   A.     Yes.

14   Q.     And as an industrial hygienist, you

15   would -- as you are looking at anybody with

16   exposure to some potentially harmful material

17   in the air, one of the questions you would

18   want to know is, what is the ventilation

19   that's available at the worker's breathing

20   zone, would you not?

21   A.     Well, I'd first of all want to know what

22   the exposure is, and then if there is

23   definitely ventilation, whether the

24   ventilation is on or off.

25   Q.     Ventilation can come from a number of

105

7/13/2001 Newton, Larry (Colletti)

1    different sources, can it not?

2    A.    Yes.

3    Q.    Of course, mechanical ventilation, such

4    as fans or suction devices, could be worn?

5    A.    Yes.

6              MR. RUBIN:  Just note my

7    objection again.  I think you are way beyond

8    the agreed scope of the deposition of this

9    witness as a fact witness to two specific

10   studies.  Thank you.

11   BY MR. McGUIRE:

12   Q.    The natural flow of air outdoors would

13   also constitute ventilation, would it not?

14   A.    Yes.

15   Q.    The same would also be true indoors,

16   would it not?

17   A.    That's called general ventilation.

18   Q.    General ventilation, okay.

19              Did you -- well, let's look

20   at the report.  The report describes the size

21   of the chamber as 20 feet by 15 feet by 8

22   feet.

23              Do you see that?

24   A.    Yes.

25   Q.    And it also says that there was

7/13/2001 Newton, Larry (Colletti)

1    ventilation at the rate of 200 cubic feet per

2    minute.

3                    Do you see that?

4    A.    Yes.

5    Q.    That was true, was it not?

6    A.    Yes.

7    Q.    How did you know that?  Did you look at

8    the machinery and determine that it had that

9    capacity?

10    A.    I used a rotating anemometer to check

11    it.

12    Q.    In other words, you confirmed its

13    capacity?

14    A.    Yes.

15    Q.    Now, did you make any investigation to

16    determine whether and to what extent -- let me

17    back up a second.

18                    At the rate of 200 -- at

19    the rate of 200 cubic feet per minute, how

20    many times an hour would the air in this room

21    be exchanged?

22    A.    Five.

23    Q.    Do you know of any standards or

24    protocols in the field of industrial hygiene

25    that relate to the frequency of air changes in

107

7/13/2001 Newton, Larry (Colletti)

1    any work place or rooms that are ancillary to

2    a work place?

3                    MR. RUBIN:  Same

4    objection.

5                    THE WITNESS:  It depends

6    upon the activity going on in that area.

7    BY MR. McGUIRE:

8    Q.    Have you ever had occasion as an

9    industrial hygienist to consider what the

10   actual rate of air change was in a worker

11   environment?

12   A.    I have done some calculations in that

13   area, yes.

14   Q.    Would this have been during your years

15   with Georgia-Pacific?

16   A.    Yes.

17   Q.    I don't mean to inquire into the details

18   of any of that.

19                    In the Brake Blow-Out

20   Number II study, did you make any

21   determination as to whether five air changes

22   an hour inside this test chamber had any

23   real-world correspondence to the work

24   environment of a mechanic working on cars and

25   trucks?

7/13/2001 Newton, Larry (Colletti)

1          MR. RUBIN:  Same

2     objection.

3          THE WITNESS:  Just based on

4     some of my experience, my experience I have

5     seen, it looked reasonable.  It depends on,

6     again, a number of factors, but this air

7     exchange rate was to me somewhat reasonable.

8     BY MR. McGUIRE:

9     Q.    In the present case, Mr. Colletti worked

10    in a garage where he and his sons who worked

11    there explained that there was space for

12    working on at least four cars and trucks at

13    the same time, and that there was at least one

14    large garage type door that they could bring

15    the cars in and out of in order to get them in

16    there and that there were various windows

17    around.

18          Did you make any

19    determination as to whether five changes an

20    hour in that test chamber during the Brake

21    Blow-Out study had any correspondence to the

22    work environment that would have space for

23    four cars or trucks to be worked on, plus a

24    garage door and windows that furthermore were

25    probably opened during fair weather?

109

7/13/2001 Newton, Larry (Colletti)

1          MR. RUBIN:  I'm going to

2     object.  I'm going to object for a number of

3     reasons.  One, I think your hypothetical and

4     the facts you state in your hypothetical were

5     not totally correct.

6              Two, you are definitely now

7     asking the person expert opinion based on the

8     facts of this case, and we have agreed he is

9     not an expert, I have not listed him as an

10    expert, he was simply supposed to be examined

11    with regard to what he did with regard to

12    these two studies.

13              I would suggest to the

14    witness that this is totally improper, totally

15    beyond the agreement, beyond the Court Order,

16    he doesn't have to answer the question, but

17    again, I'm not representing the witness, and

18    the witness can do what he feels is best.

19    BY MR. McGUIRE:

20    Q.    Did you make any such determination?

21    A.    No.

22    Q.    The report itself, looking at the first

23    page, the one that has the phrase, this study

24    was designed and conducted -- do you see

25    that?  Do you have that in front of you?

110

7/13/2001 Newton, Larry (Colletti)

1    Q.    Why would it be they were doing their

2    brake service work while you guys were trying

3    to fill up their trucks?

4    A.    Basically, we would take the truck out

5    of service and have it repaired.

6    Q.    Was it your trucks?

7    A.    Yes.

8    Q.    Okay, so it wasn't contractors just

9    coming in, and while they are hanging around,

10   they are servicing their own vehicles?

11   A.    No, working on our trucks.

12   Q.    Would that be if they found some problem

13   there, and they had to fix it?

14   A.    Yes.

15                    MR. RUBIN:  Can we take a

16   break?

17                         - - -

18                    (Whereupon a short break

19   was taken at this time.)

20                         - - -

21   BY MR. McGUIRE:

22   Q.    Now, the actual blow-out study that was

23   shown on the video tape or that you actually

24   physically observed since you were there, the

25   two guys who were in there doing that had on

150

7/13/2001 Newton, Larry (Colletti)

1    some type of space suits of some sort, what

2    we, as lay people, call space suits, breathing

3    apparatuses and that sort of thing?

4    A.    Yes.

5    Q.    What's the technical term for that?

6    A.    They had on air supply positive

7    pressure, full face respirators, they had a

8    tyvex suit on underneath, which they wore

9    standard clothing on top of it, which was

10   uniform.

11   Q.    Now, have you ever seen any mechanics in

12   any garages wearing equipment like that, the

13   respirator, the tyvex suit and that sort of

14   thing?

15   A.    No.

16   Q.    Did you ever see any mechanics wearing

17   equipment like that while you worked at

18   Georgia-Pacific?

19   A.    No.

20   Q.    And when you were at Georgia-Pacific,

21   you were manager of industrial hygiene and

22   product safety.

23          Did you ever offer any

24   criticism for mechanics who might not have

25   been wearing the same sort of equipment that

151.

7/13/2001 Newton, Larry (Colletti)

1    Doctor Longo and Doctor Hatfield were wearing

2    in either of these two simulations?

3           MR. RUBIN:  Objection, way

4    outside the scope of this deposition, which is

5    supposed to be limited to the tests that were

6    done at MAS in January and March of 2001.

7           You don't have to answer

8    that, I don't believe.  Do as you please.

9           THE WITNESS:  If they had

10    potential -- if they would have had potential

11    to over-exposure or there was a potential,

12    then, yes, I would have been concerned about

13    it.

14    BY MR. McGUIRE:

15    Q.    You would have gotten concerned, but the

16    question was actually a little different.

17    Let's regroup.

18           I had asked you, and you

19    said that you had never seen mechanics at

20    Georgia-Pacific wearing full respirators of

21    the sort that you saw Doctor Longo and Doctor

22    Hatfield wearing in these two simulations; am

23    I correct?

24    A.    That's correct.

25    Q.    And as the manager of industrial hygiene

152

7/13/2001 Newton, Larry (Colletti)

1    answer it, because like I said, I haven't read

2    the full report, but I don't know.

3    BY MR. McGUIRE:

4    Q.    From looking at the Tyndall light

5    showing of dust in the air during either of

6    those studies, and particularly, as we would

7    see it on a video, do you know of any way as

8    an industrial hygienist to determine what

9    portion of the actual airborne dust is

10   respirable asbestos fibers?

11   A.    No.

12   Q.    Now, have you yourself ever actually

13   used a phase contrast microscope to analyze

14   air samples for respirable asbestos?

15   A.    Absolutely not.

16   Q.    Never have?

17   A.    Never have.

18   Q.    Ever seen an asbestos fiber under a

19   microscope?

20   A.    Yes, I believe I have, yes.

21   Q.    I use the term respirable fiber.  That's

22   a term of art, isn't it, in the industrial

23   hygiene field?

24   A.    Yes.

25   Q.    I had asked whether a respirable fiber

163

# EXHIBIT S

Page 26

[1] A: No, I don't recall any particular
[2] incident.
[3] MR. McGUIRE: Tom, can we get a
[4] clarification on the record of these
[5] abbreviations? I think we all know what
[6] they are. Whether the record shows it —
[7] MR. RADCLIFFE: Sure.
[8] Q: (By Mr. Radcliffe) Just for the record,
[9] TEM stands for transmission electron microscopy?
[10] A: Correct.
[11] Q: Also the record, PCM, phase contrast
[12] microscopy, correct?
[13] A: Correct.
[14] And we might as well put PLM on there
[15] because it will possibly come up, and that's
[16] polarized light microscopy.
[17] Q: Okay. So let's go to 1982 to 1987 at
[18] McCrone. Do you recall any instance during that
[19] time when you used TEM to analyze worker exposure?
[20] A: I don't know, sitting here today. There
[21] was — again, I would say the primary uses for TEM
[22] during that time period would have been ambient
[23] settings and clearance sampling. But if I were to
[24] go back and look through all the records, I
[25] would — I am certain that I would find on occasion

Page 27

[1] — if that there was some TEM work done related to a work
[2] activity.
[3] Q: You don't recall any right now?
[4] A: I don't recall any, but we did hundreds
[5] of projects.
[6] Q: Let me ask you, from 1982 to 1987, let's
[7] assume that there was a situation where you used
[8] TEM to analyze exposures in a workplace setting.
[9] What are you going to compare the results to?
[10] A: What am I going to compare the results
[11] to?
[12] Q: Yeah.
[13] A: I may or may not compare them to
[14] anything. I may just use them on their face value.
[15] Q: All right. So what do the results —
[16] from 1982 to 1987 you've done an analysis of a
[17] worker who's working around a product and you use
[18] TEM to get the results. What do they mean? How do
[19] you interpret them?
[20] A: Well, I would look simply at the value of
[21] those and see if they — what level they were at.
[22] Q: All the risk estimates by Dr. Nicholson,
[23] by EPA, by OSHA, by NIOSH, all the risk estimates
[24] are in terms of exposures determined by PCM,
[25] correct?

Page 28

[1] A: Generally, yes.
[2] Q: All of these standards of exposure,
[3] OSHA's standards, NIOSH's recommended standard,
[4] they're all in terms of PCM, correct?
[5] A: Generally, yes.
[6] Q: So if you did TEM analysis of a worker
[7] exposure from 1982 to 1987, you can't compare it to
[8] any of the standards that are mandated or
[9] recommended by government agencies and you can't
[10] compare it to any of the risk estimates. What can
[11] you do with that data other than say there was
[12] asbestos there?
[13] A: Well, in addition to saying that there
[14] was some asbestos there, that it was elevated as
[15] compared to what we would generally find as a
[16] background.
[17] Q: All right. So what you could say is
[18] there was asbestos there, it's elevated over
[19] background ambient air levels, but we don't know
[20] whether or not there's any risk associated with
[21] that?
[22] A: No, sir. I wouldn't say that. I'd say
[23] there would be a risk associated with it. It was
[24] elevated.
[25] Q: You would say there's a risk associated

Page 29

[1] simply because it was elevated over background?
[2] A: That's correct.
[3] Q: You would not be able to quantify that
[4] risk, correct?
[5] A: No, I wouldn't attempt to quantify it.
[6] Q: That risk could be one in ten billion,
[7] one in one million, one in ten thousand, you don't
[8] know what it is, correct?
[9] A: That's correct.
[10] Q: Since you don't know what the risk is,
[11] you're unable to tell whether or not those
[12] exposures are significant, correct?
[13] A: Well, I would think that while there
[14] might be certainly a gray area, if you were
[15] measuring substantial levels, they're — in a
[16] setting of some sort, I don't think it would be too
[17] difficult to conclude they were significant.
[18] Q: And what basis would you use to conclude
[19] if it's significant?
[20] A: Well, I might look at some of the earlier
[21] TEM studies that have been done or utilize the TEM
[22] data and utilize the — a phase contrast
[23] equivalency in examining only the fibers greater
[24] than five microns and then compare it to other PCM
[25] data or studies or standards.

# EXHIBIT T

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,

PENNSYLVANIA

RICHARD DUNHOFF and                    CIVIL DIVISION
ESTHER MAE DUNHOFF, his wife,
                                       GD No. 00-11894

    Plaintiffs,                        PROCEEDINGS:
                                       Jury Trial

    vs.
                                       Date:
                                       January 31, 2002

A-BEST PRODUCTS COMPANY, INC.,
et al.,
                                       TAKEN BY:
                                       Denise Zwick, RPR
    Defendants                         Official Court Reporter

                                       HELD BEFORE:
                                       HON. ROBERT P. HORGOS

        (Excerpt testimony of Dr. Longo)

64

1           Microscope.

2     Q.   When you use those different protocols do you

3           get different magnifications when you look at

4           something?

5     A.   Absolutely.  The electron microscope is much

6           more powerful, allows you to see every size

7           fiber that is generated.  Because we typically

8           look at the sample at a magnification of between

9           20 and 25 thousand times.  To give you an idea

10         what that means, if you took a basketball and

11         magnified it 25 times, it would be almost five

12         miles in diameter.

13    Q.   That is a big difference.

14    A.   Well, that is why one method is so different

15         from another method.

16              The PCM method which is the federal

17         standard -- if you are going to measure an

18         occupational exposure in the workplace you can

19         only use PCM.  The TEM is not recognized by the

20         federal government for measuring occupational

21         exposures.  We know the severe limitations of

22         that technique because it has size ranges of

23         asbestos fibers that it can not see.

24    Q.   The TEM allows you to see all of those sizes and

25         all of those individual fibers?

66

1         standard so to speak?

2    A.   It depends on who you talk to.  To me as an

3         electron microscopist and as somebody who is

4         really interested in everything that is present,

5         not just a small fraction of what is present, I

6         believe TEM is the best.  If you talk to OSHA

7         and you want to compare to their standards you

8         have to use PCM.

9    Q.   I understand.  And in the work that you do you

10        employ both of these methods?

11    A.   Correct.  And what I do is if I am comparing it

12        to an occupational standard, I use the PCM data.

13        The TEM data is for our internal research and to

14        compare product.

15    Q.   You have described the protocols that go along

16        with these and you have told us that you have

17        looked at asbestos under the microscope and you

18        have used these two type of microscopes to do

19        it.  Are there also protocols or standards using

20        these microscopes that you have to follow to

21        perform an analysis?

22    A.   Yes.  As we mentioned earlier, the PCM for air

23        samples is the NIOSH 7400 method.

24    Q.   In performing an air sample analysis for

25        asbestos fibers, give me an example, explain to

# EXHIBIT U

Page 1

```
 1            IN THE CIRCUIT COURT
             THIRD JUDICIAL CIRCUIT
 2           MADISON COUNTY, ILLINOIS

 3

WALTER ZIMMERMAN,          )
 4                         )
            Plaintiff,     )
 5                         )
       vs.                 )  NO. 01-L 764
 6                         )
GARLOCK, INC., et al.,     )
 7                         )
            Defendants.    )

 8

 9

10

11            DEPOSITION OF
12      WILLIAM EDWARD LONGO, Ph.D.

13

14

              January 28, 2002
15
              10:15 a.m.
16

17

18        1740 Peachtree Street
            Atlanta, Georgia
19

20

21   John P. Payne, CCR-B-1006, RPR, CRR

22

23

          BROWN REPORTING, INC.
24      1740 PEACHTREE STREET, N.W.
         ATLANTA, GEORGIA  30309
25            (404) 876-8979
```

Page 73

1          A.      The ambient exposures that I'm comparing
2      to is our own exposures inside the ECL.    What I can't
3      do is draw any conclusion on ambient PCM levels only
4      because without having TEM there to determine if
5      there really is asbestos or not, you can't make any
6      conclusion on PCM.
7          Q.      So are you suggesting that if you do a
8      bulk sampling where you know that the product
9      contains asbestos and get detectable PCM numbers, you
10     can then conclude that there is a significant
11     exposure to asbestos based on your bulk sampling and
12     your PCM numbers?
13         A.      I could do that.    I never do because I
14     always have the TEM data.    I can't unring that bell.
15     I know that the fibers we're finding are all asbestos
16     because I have TEM data.    Even though I don't rely on
17     that TEM data to compare to any occupational
18     exposure, I still have it.    I mean, I can't ever just
19     ignore it.
20         Q.      So you never take your TEM numbers and try
21     to convert them to a PEL analysis?
22         A.      No.    And I never try to convert to PCM,
23     either, never have.
24         Q.      And why don't you try to do that?
25         A.      There is no conversion that anybody has

Page 74

1    ever agreed upon, so you cannot take TEM and then say

2    this is what PCM should be.  You just can't do it.

3         Q.    How about take TEM and compare it to PEL?

4    Is there a mechanism to do that?

5         A.    No, not that I'm aware of.

6         Q.    And you've never tried to do it yourself?

7         A.    Well, it's not that you can try.  I don't

8    know if there's enough data or not.  Probably we have

9    more TEM/PCM data than anybody in the world, I would

10   think, at this point.  I don't know if we can sit

11   down and come up with a conversion or not that makes

12   sense.  EPA tried to do that in a paper published in

13   the eighties, and they said there was no correlation,

14   and that was with direct TEM and PCM, and we

15   certainly haven't tried to do it.

16        Q.    So let's go back to my question with

17   respect to the significance of PCM numbers and you

18   concluding that there was a significant exposure

19   setting aside TEM results.

20        A.    I can't set it aside, though, because I

21   know the TEM is there and I've looked at it.  I just

22   can't unring that bell.

23        Q.    But you have concluded on PCM numbers

24   alone during the course of doing this work?

25        A.    I have looked at other studies, say, other

# EXHIBIT V

1  SUPERIOR COURT FOR THE    TE OF CALIFORNIA
   COUNTY OF LOS ANGEL

2

3

4

5  MARK A. HAMRE,        )
                         )
6     Plaintiff,         )
                         ) Civil Action
      vs.                )
7                        ) File No. BC 126 838
   FIBREBOARD CORPORATION,  )
8  etc, et al.,          )
                         )
9     Defendants.        )

10  _____

11  IN THE CIRCUIT COURT OF MONOGALIA COUNTY
              WEST VIRGINIA

12

13  IN RE: MONOGALIA MASS II

14
15
16     Deposition of WILLIAM EDWARD LONGO, taken on
17  behalf of Georgia Pacific, pursuant to the
18  stipulations contained herein, before Teresa Bishop,
19  RPR, RMR, CCR No. B-307, at Suite 4000, 303 Peachtree
20  Street, Atlanta, Georgia, on Wednesday, November 9,
21  1997, commencing at the hour of 11:23 a.m.
22
23       Shugart & Bishop
         Certified Court Reporters
24       Suite 390, 6520 Powers Ferry Road
         Atlanta, Georgia 30339
25       (770) 955-5252

---

2

1  INDEX
2
3  Exhibit No.    Description        Page No.
4
5
6     1    summary sheet of mixing
           experiments on joint compound......20:22
7     2    results of sanding analyses on
           joint compound......................20:25
8     3    chain of custody documents.........21:4
      4    two photographs of the Kaiser Gypsum
9          joint compounds....................21:12
      5    bulk asbestos analysis.............22
10    6    project log M 18134 and M 18135 ... 21:19
      7    project log M 18135................22:7
11    8    project log M 18137................22:15
      9    project log M 18143................22:21
12   10    project log M 18144................23:2
     11    copies of photomicrographs.........23:6
13

14

15

16  INDEX TO EXAMINATIONS
17
18
19  EXAMINATION by Ms. Jagger..............9
20  EXAMINATION by Mr. Valenza.............137

---

21  FURTHER EXAMINATIONS by Ms. Jagger.........154  ✓
22
23
24
25

SHUGART & BISHOP

---

3

1  APPEARANCES OF COUNSEL:
2  FOR THE PLAINTIFF:    STEVEN E. CRICK,
3                        ATTORNEY AT LAW.
4  FOR U.S. GYPSUM:      DENNIS J. VALENZA,
5                        VICTOR R. ANDERSON, III,
6                        ATTORNEYS AT LAW.
7  FOR GEORGIA PACIFIC:  JULIA BENNETT JAGGER,
8                        ATTORNEY AT LAW.
9
10     MS. JAGGER:  Just to begin, for the
11  record, my name is Julia Jagger and I'm
12  here today on behalf of Georgia Pacific
13  Corporation and in the Monongalia County,
14  West Virginia litigation.
15     Mr. Crick and I have agreed that
16  Georgia Pacific would go ahead and depose
17  Dr. Longo today in the Monongalia
18  litigation and that the testimony or
19  questioning would be limited to joint
20  compound.  Is that a fair statement?
21     MR. CRICK:  Yeah.  Generally that's
22  true.  But the only other understanding
23  that I thought was because U.S. Gypsum
24  was here today and your office also
25  represents them that we're not going to

SHUGART & BISHOP

---

4

1  have a redeposition in the Mon Mass case
2  by USG on the same thing.  That's what I
3  thought.  So that that part of Longo's
4  deposition is finished.
5     MS. JAGGER:  I'm here only for
6  Georgia Pacific.  And I represent Georgia
7  Pacific only in the Monongalia litigation
8  and that's been true throughout.
9     My office represents the CCR
10  defendants which includes U.S. Gypsum and
11  National Gypsum and quite a few others.
12  My understanding is that U.S. Gypsum is
13  here today in the Hamre case, not
14  necessarily in the Monongalia case.
15     I don't know that there would be any
16  repetition, but I can't vouch for that
17  because I don't represent them.
18     MR. ANDERSON:  We're only here in the
19  Hamre case.
20     MR. VALENZA:  I can tell you we're
21  here on behalf of U.S. Gypsum in the
22  Hamre case, I don't represent USG in the
23  Mon Mass case.  CCR counsel will be -
24  representing U.S. Gypsum in that case, in
25  any event, I would assume.  And I

SHUGART & BISHOP

---

5

1  wouldn't want to limit CCR's ability to
2  do any questioning on behalf of its other
3  clients.  I mean, I don't intend to
4  duplicate whatever Julia is going to do
5  today.
6     MR. CRICK:  Right.  Your firm took
7  Mr. Hatfield's deposition yesterday on
8  behalf of USG.

- 13    A.  Well, it depends.  An indirect technique
- 14    versus a direct technique may affect the lab versus
15    the other if the samples are overloaded, yes.
16    Q.  In what way.
17    A.  If the sample are overloaded, the direct
18    technique is a problem.  You are not going to get
19    reproducible results and you have to go to the
20    indirect technique because you have too many
21    structures piled on top of each other.
22        If one lab is trying to do an overloaded
23    sample by direct and another one by indirect, you'll
24    have differences in it.  But if the labs use the same
25    protocol, they should be close and if they're

                    SHUGART & BISHOP

                         130

1    experienced in that area.
2    Q.  Have you done any studies which compare the
3    analytical results between the same sample prepared
4    by direct technique versus indirect?
5    A.  I would say we have done that in the past,
6    but we knew that the direct was going to be -- it was
7    not going to be very representative of the sample.
8    The primary study done by direct and indirect would
9    be the EPA, essentially the study called direct
10    versus indirect where they took direct samples and
11    reanalyzed them by indirect.
12    Q.  Is your laboratory an American Industrial
13    Hygiene accredited laboratory?
14    A.  No.
15    Q.  Have you participated in the proficiency
16    analytical testing program?
17    A.  Yes.
18    Q.  That's sponsored by the American Industrial
19    Hygiene Association?
20    A.  Yes.
21    Q.  For asbestos?
22    A.  Yes, probably five, almost eight, nine years
23    now.
24    Q.  Dr. Longo, is there any way to correlate or
25    equate PCM numbers with TEM numbers?

                    SHUGART & BISHOP

                         131

1    A.  No.
2    Q.  So there isn't any way that one can say one
3    fiber per cc by PCM equals X by TEM?
4    A.  No.
5    Q.  Humor me here for a minute.  The difficulty
6    in trying to correlate the two it seems to me is
7    illustrated by the data that you have here.  For
8    example, with sample 1-5-A you have a PCM of 4.07
9    fibers and your TEM for essentially the same greater
10    than five micron fibers is 298.3.  And if you go down
11    and look another sample 1-5-F, the PCM is 4.11, which
12    is very close to the sample 1-5-A?  You agree those
13    numbers are very close?
14    A.  Very close.
15    Q.  But the TEM number for that same PCM is
16    double what the one was on 1-5-A?
17    A.  That's correct.
18    Q.  So the only thing you could really say is
19    that for this sample 1-5-A out of your lab 4.07
20    fibers per cc by PCM equals 298 fibers per cc by TEM?
21    A.  You can't really say it equals.  I mean,
22    there is no equal, this equals that.
23        In this particular sample, the ratio of
24    greater than five microns is a little different for
25    that sample than the other.

                    SHUGART & BISHOP

                         132

1    You've got to understand, the PCM can only see
2    the very large bundles.  It can't see single fibers
3    of chrysotile.  So even though you are saying you are
4    analyzing a fiber, all you are really seeing is very
5    large fibers that have a diameter.  But the TEM can
6    see everything.  So this type of distribution, these
7    four samples doesn't really surprise me at all.  You
8    can't say it really equals.
9    Q.  But the distribution that you see is exactly
10    why you can't correlate --
11    A.  Right.
12    Q.  -- PCM to TEM?
13    A.  Correct.  Because you're going to have more
14    fibers -- you are going to have by PCM, you are not
15    going to have the big distribution in fibers.  You
16    are only seeing the large ones and there's only so
17    many of those.
18    Q.  Are you aware of any studies published or
19    unpublished which attempt to correlate TEM levels
20    with disease in humans?
21    A.  I'm not aware of any, no.
22    Q.  Would you agree that no one really knows what
23    TEM air levels correlate with disease, meaning in
24    terms of human disease?
25    A.  I don't know what other individuals can

                    SHUGART & BISHOP

                         133

1    correlate with or not.  I don't correlate TEM levels
2    with disease.
3    Q.  But there are studies published where people
4    have attempted to and have correlated PCM levels with
5    human disease incidence, correct?
6    A.  I believe so.
7    Q.  If an individual was mixing or sanding joint
8    compound in the same or roughly the same manner used
9    in your simulation and wearing a respirator, that
10    would decrease significantly, wouldn't it the fiber
11    levels to which that person was exposed?
12        MR. CRICK:  Object to the form.  What
13    type and was he tested and too broad,
14    calls for speculation.
15    BY MS. JAGGER:
16    Q.  The answer?
17    A.  Well, it depends on the type of respirator he
18    wore.  If he wore the respirators that Mr. Hatfield
19    and I wore, I would hope he would have zero exposure.
20    If he wore a paper mask, I've seen anywhere that
21    people have said that it can decrease 50 to 50
22    percent, depending on how long he wore it or changed
23    it or what have you.
24    Q.  I'll ask you a question and what I want you
25    to tell me is whether you consider this to be within

                    SHUGART & BISHOP

                         134

1    your expertise at all and if you do, whether you
2    expect to comment.
3        Assuming your results to be accurate for
4    mixing and sanding of joint compounds, do you have
5    any knowledge as to how many cases of disease or
6    death would be expected in persons who used these
7    products 20 to 40 years ago?
8    A.  I've no intention of testifying about that.
9    Q.  That's not within your expertise, either?
10    A.  That is not in my expertise.
11    Q.  Have you discussed this joint compound
12    experiment with any other of your professional
13    colleagues or other experts in the asbestos
14    litigation?
15    A.  Briefly with Bill Ewing.  I don't think I've
16    really discussed it with anybody else.
17    Q.  When did you have the discussion with Bill

EFiled: Jan 4 2007 3:41PM EST
Transaction ID 13347710

# EXHIBIT W

In The Matter Of:

*HARRY COOK, et al.   v.*
*ACandS, INC., et al.*

*RICHARD L. HATFIELD*
*Vol. 1, January 20, 2000*

*BROWN REPORTING, INC.*
*ATLANTA, AUGUSTA, CARROLLTON, LaGRANGE, ROME*
*1740 PEACHTREE STREET, N.W.*
*ATLANTA, GA  USA  30309*
*(404) 876-8979   or   (800) 637-0293*

Original File 0120HATEASC, 140 Pages
Min-U-Script® File ID: 2689821558

**Word Index included with this Min-U-Script®**

AC and S, INC., et al.

Page 102

[1] moment — which will be blowing air into the room,
[2] and — let's see. There's actually three of them in
[3] here, four of them in here, I'm not sure whether
[4] they're all supplies or not, but there will be a way
[5] for the air to return so there can be some pass to
[6] the air. And it also depends on whether there's
[7] movement in the room. If you get up and walk
[8] around, you will actually move the air around
[9] yourself.
[10] Q: Assuming that the ventilation is on in
[11] this room, what's the typical air exchange rate for
[12] a room like this?
[13] MR. VANSANT: Objection.
[14] THE WITNESS: Most buildings are
[15] designed at about four air changes an hour,
[16] give or take.
[17] Q: (By Mr. Radcliffe) Do you know how many
[18] cubic feet a minute that works out to be?
[19] A: That would depend on the size of the
[20] room. That's why they design it that way. The
[21] bigger the room, the more the vents, the more air
[22] that's going to flow in, so you get the four air
[23] changes an hour, you see.
[24] Q: Do you know how many cubic feet per
[25] minute per vent that works out to be?

Page

[1] A: Correct.
[2] Q: When you show dust under high intensity
[3] light, not all of that dust is respirable, correct?
[4] A: No, not every bit of it is respirable,
[5] no.
[6] Q: Have you made any determination in any of
[7] the simulations to determine of the dust that is
[8] shown under the high intensity light, what
[9] percentage of that dust would actually be counted
[10] under PCM counting rules?
[11] A: I haven't done it as a percentage of what
[12] you see. That, we have not calculated. I'm not
[13] sure I know how to calculate that.
[14] Q: If you had the high intensity lights on
[15] for a simulation but were able to somehow remove all
[16] of the nonasbestos material and all of the asbestos
[17] fibers that were not at least 5 microns in length
[18] and at least .25 microns in diameter, would you be
[19] able to see anything?
[20] MR. VANSANT: Objection.
[21] THE WITNESS: I would certainly believe
[22] that you would.
[23] Q: (By Mr. Radcliffe) And what's your basis
[24] for that opinion?
[25] A: Because there's still a substantial

Page 103

[1] A: No, and that's usually — that usually
[2] varies depending upon the design of the system.
[3] Sometimes the design people will want, let's say,
[4] more air coming out of the registers that are closer
[5] to the exterior walls than the interior walls, so
[6] some may blow, let's say, 200 cubic feet per minute,
[7] and another one may flow at 150. But what you do is
[8] you calculate the total as compared to the volume of
[9] the room, and you want to put in there roughly four
[10] times enough air to fill the room four times in an
[11] hour.
[12] Q: What's the purpose of using the high
[13] intensity lights in your simulations?
[14] A: To allow you to see — better see the
[15] dust that's generated.
[16] Q: All the dust that's being generated is
[17] not asbestos-containing dust, correct?
[18] A: No, that's not correct. I believe all
[19] the dust that you see is asbestos-containing dust.
[20] Q: All the dust that is generated is not
[21] asbestos, correct?
[22] A: That is correct.
[23] Q: When you show dust under a high intensity
[24] light, not all of that dust would be counted under
[25] PCM counting rules, correct?

Page

[1] amount of particulate in the air.
[2] Q: But you don't know what percentage of the
[3] particulate that would be?
[4] A: That's right, I couldn't tell you the
[5] percentage.
[6] MR. VANSANT: I thought you said you
[7] remove anything but the — all the
[8] nonasbestos fibers, all the asbestos fibers
[9] shorter than 5 microns and .25 diameter.
[10] MR. RADCLIFFE: That's right.
[11] MR. VANSANT: So what's left is the
[12] asbestos. Wasn't that part of your
[13] question?
[14] MR. RADCLIFFE: Greater than a certain
[15] size, that's right.
[16] MR. VANSANT: Okay.
[17] Q: (By Mr. Radcliffe) You understood that?
[18] A: I understood it, I thought.
[19] Q: And you did, right?
[20] A: I believe I did. And I said I believe
[21] you'd still see it. I don't know how miraculously
[22] you could do that, but I believe you'd still be able
[23] to see dust.
[24] Q: You did a simulation on a carborundum
[25] grinding wheel, correct?

Page 170

[1] any work with gaskets, and I would also draw on time
[2] that has been reported in some of the other studies
[3] about removing gaskets and the overall length of
[4] time that it takes to remove a gasket.
[5]   Q: What studies are you referring to?
[6]   A: I'm trying to remember now, but one
[7] sticks in my mind that they were talking about the
[8] typical length of time to scrape and remove a gasket
[9] was 30 minutes or so.
[10]   Q: And you can't now sitting here identify
[11] which study it was or when?
[12]   A: I can't remember which one it was, but I
[13] do remember reading one that the comment was that
[14] the workmen took approximately 30 minutes to
[15] remove. It may have even been 30 to 45 minutes. I
[16] just remember reading that.
[17]   Q: And in any event, you have no specific
[18] information relating to Mr. Gallagher, how long he
[19] may have taken to remove the gasket residue from the
[20] face of a flange?
[21]   A: That's correct.
[22]   Q: Okay. Let me ask you a few questions
[23] about the lighting that was used during the course
[24] of the study. I think I have read from other
[25] depositions that the lighting was designed to

Page 171

[1] demonstrate the movement of particulate matter
[2] within the chamber, correct?
[3]   A: To be able to view it, see it.
[4]   Q: Okay. You would agree with me that that
[5] light demonstration does not show how much of the
[6] dust that is visible is asbestos dust?
[7]   A: No, it does not identify asbestos from
[8] nonasbestos.
[9]   Q: Okay. And it does not identify, even if
[10] there is asbestos there, how much of that asbestos
[11] may be respirable?
[12]   A: The lighting itself doesn't size
[13] particles. However, particles that you see that are
[14] floating in the air are certainly potential
[15] particles to be respirable size particles, and the
[16] lighting allows you to see respirable size
[17] particles.
[18]   Q: Okay. My question to you was the
[19] lighting demonstration does not permit you to
[20] determine how much of the particulate matter that's
[21] observable is respirable asbestos fibers?
[22]   A: That is correct, it doesn't size the
[23] particles.
[24]   Q: Are you familiar with the NIOSH testing
[25] method 0600?

Pag[e 172?]

[1]   A: No, I'm not.
[2]   Q: In other studies that you've conducted,
[3] have you ever blank tested the equipment used to
[4] determine that it was not contaminated in any way?
[5]   A: I think the only time we did that was
[6] with a valve testing, I think we did that on one
[7] valve testing project. I can't think of any others
[8] that we've done that on.
[9]   Q: Why did you choose to do it in that
[10] instance?
[11]   A: Well, because the valve may have at one
[12] time had asbestos materials on it or near it, and we
[13] had cleaned it up and wanted to just make sure that
[14] that was cleaned up.
[15]   Q: And you did no such — other than the
[16] background tests of the chamber, you did no blank
[17] testing of the equipment used in this test?
[18]   A: That's correct.
[19]   Q: Okay.
[20]   A: I mean, the equipment was brand new.
[21]   Q: Okay. Let me direct you to the air
[22] results, please. Have you got those in front of
[23] you?
[24]   A: I have them.
[25]   Q: Okay. The air samples that were taken

Page [173?]

[1] are reported on this table that's contained in the
[2] report, correct?
[3]   A: Correct.
[4]   Q: These are not time-weighted averages, are
[5] they?
[6]   A: No. They are the measurements made
[7] during the testing time.
[8]   Q: And they represent a snapshot of whatever
[9] the period of time was for the duration of the
[10] test — duration of the sampling?
[11]   A: Well, they represent — they were
[12] collected for 15 minutes, and they measured the
[13] concentration in the air at that time.
[14]   Q: Okay. And the filters were removed and
[15] then were analyzed by means of an indirect
[16] preparation for TEM analysis?
[17]   A: Correct.
[18]   Q: Okay.
[19]   A: For the TEM, yes.
[20]   Q: You would agree with me, would you not,
[21] that the NIOSH procedures require a direct
[22] preparation method?
[23]   MR. VANSANT: Objection. Are you
[24] referring to method 0600?
[25]   MR. TRUFFER: No, 7400 and 7402.

# EXHIBIT X

167

```
 1

 2              IN THE COURT OF COMMON PLEAS
                FOR THE COUNTY OF NORTHAMPTON
 3
                      - - -
 4
     ARMITT GILBERT AND        : NO.  1996-C-3489
 5   M. DORIS GILBERT
                               :
 6          v.
                               :
 7   BENDIX CORPORATION,
     RAPID-AMERICAN CORP.,     :
 8   ABEX CORPORATION,
     OWENS-CORNING FIBERGLAS   :
 9   CORPORATION,
     GEORGIA-PACIFIC           :
10   CORPORATION, CONGOLEUM
     CORP., UNIROYAL, INC.,    :
11   BORG WARNER CORPORATION,
     CHRYSLER CORPORATION,     :
12   FORD MOTOR COMPANY,
     GENERAL MOTORS            :
13   CORPORATION AND AMERICAN
     MOTORS SALES CORPORATION  :
14
            v.                 :
15
     MACK TRUCKS, INC.         :
16   INTERNATIONAL HARVESTER
     COMPANY, AND THE BABCOCK  :
17   AND WILCOX COMPANY

18                    - - -

19            Philadelphia, Pennsylvania
                 August 11, 1998
20
                      - - -
21
           DEPOSITION OF WILLIAM LONGO, Ph.D.
22
                      - - -
23
                 Frank Frontino
24          Court Reporting Service
              133 North 4th Street
25          Philadelphia, Pennsylvania 19106
       (215) 922-2133        (609) 268-3114

            Frank Frontino Court Reporting Service
```

{LONGO:1}

216

1                    W. E. Longo

2    freely as the very thin fibers.

3        Q.    Those are the very thin fibers that

4    resulted after the indirect preparation

5    techniques using acid dissolution, sonication

6    and plasma-ashing?

7        A.    That is the procedure we used for air

8    samples, yes, sir.

9        Q.    The same discrepancy exists,

10   apparently, on station A --

11              MS. WALSH:  I'd just like to

12   object to the characterization of "discrepancy"

13   there.

14              MR. FRIESTEDT:  I'm sorry.

15              I'll phrase it in the form of

16   a question.

17   BY MR. FRIESTEDT:

18       Q.    Well, I guess it's the last entry

19   before the fabric analyses that your personnel

20   sampler picked up 9.91 fibers by PCM and 1,114

21   fibers by TEM.

22       A.    Yes, sir.

23       Q.    The PCM count is higher than that for

24   Mr. Hatfield's right personnel sampler of 9.02

25   by PCM and, yet, his TEM analysis results in a

              Frank Frontino Court Reporting Service

259

```
 1                    W. E. Longo

 2   BY MR. FRIESTEDT:

 3        Q.    I don't think I have all that more to

 4   discuss with you before passing.

 5        A.    Yes, sir.

 6        Q.    The Tyndall light videography, is it

 7   your opinion, shows brake dust suspended in the

 8   air?

 9        A.    Yes.

10        Q.    Do you agree that the high-wattage

11   bulbs or the bulbs that you used, which you

12   described the wattage of in your Fuller

13   deposition, produced heat?

14        A.    They do.

15        Q.    And you would agree that hot air

16   rises?

17        A.    I would agree.

18        Q.    And that particles suspended in hot

19   air rising would be wafted upward?

20        A.    Yes, sir.

21        Q.    When the brakes that were sent to you

22   for purposes of use in the simulation arrived,

23   were they wrapped in a plastic wrap?

24        A.    No.  They were not wrapped inside the

25   box.
```

Frank Frontino Court Reporting Service

(LONGO:1)

# EXHIBIT Y

Jones and Highsmith vs. OCF, et al.                                    3/12/01 – Richard L. Hatfield

1                    IN THE SUPERIOR COURT OF FULTON COUNTY
                              STATE OF GEORGIA

2

3      LAILA A. JONES, Individually )
       and as Executrix of the ESTATE)
4      of ROBERT H. JONES, Deceased,  )
                                      )
5              Plaintiff,            )        CIVIL ACTION FILE
                                      )
6      vs.                            )        NO. E-53257
                                      )
7      OWENS-CORNING FIBERGLAS        )
       CORPORATION, et al.,           )
8                                     )
               Defendants.            )
9      _____)
                                      )
10     JAMES P. HIGHSMITH,            )
                                      )
11             Plaintiff,            )        CIVIL ACTION FILE
                                      )
12     vs.                            )        NO. E-56394
                                      )
13     OWENS-CORNING FIBERGLAS        )
       CORPORATION, et al.,           )
14                                    )
               Defendants.            )
15

16

17             The deposition of RICHARD HATFIELD, taken on
18     behalf of the Defendant John Crane, Incorporated,
       pursuant to Notice and agreement of Counsel, in
19     accordance with the Georgia Civil Practice Act before
       Daniel M. Gershwin, Certified Court Reporter and
20     Notary Public, at 1600 Northside Drive, Suite 250,
       Atlanta, Georgia, on the 12th day of March, 2001,
21     commencing at the hour of 1:26 p.m.

22

23

24                   WHEELER REPORTING COMPANY, INC.
                       1600 Northside Drive, Suite 250
25                        Atlanta, Georgia  30318
                             (404) 351-4577


WHEELER REPORTING COMPANY, INC.

Jones and Highsmith vs. OCF, et al.                    3/12/01 - Richard L. Hatfield

Page 26

1  of airborne -- strike that.
2      Has there been any quantification of the level
3  of respirable asbestos fiber seen in the airborne
4  particulate matter shown in the Tyndall beam videotapes of
5  those studies?
6      A.  No.  There's been no additional analysis other
7  than what we've already talked about.
8      (Discussion held off the record.)
9      Q.  (By Mr. Byron)  So even though you didn't bring
10 all your gasket and packing tests what I'll do just so you
11 know what I'm doing organizationally here is when we get
12 to talking about Mr. Jones specifically and Mr. Highsmith
13 specifically, you can tell me what your understanding of
14 their exposures are and which particular M/AS studies you
15 believe would apply to them.
16     A.  Okay.
17     Q.  All right.
18     A.  That's fine.
19     Q.  All right.  So there's nothing else new --
20     A.  Right.
21     Q.  -- in the world of gasket or packing that we
22 haven't already discussed; right?
23     A.  Right.
24     Q.  All right.  In response to request No. 2,
25 documents reviewed regarding these lawsuits provided to

Page 28

1  mark that as Exhibit No. 3.  I'm going to ask you a few
2  questions then.
3      A.  Sure.
4      Q.  Did you receive all the materials outlined in
5  this letter?
6      A.  Yes.
7      THE WITNESS:  I just want to make a copy
8  of this before we mark it.
9      (A brief recess was had.)
10     (Defendant's Exhibit No. 3 marked for
11 identification.)
12     A.  So we received No. 2.
13     Q.  (By Mr. Byron)  Okay.  So No. 2, you brought
14 the stuff with you that you read, the deposition
15 transcripts and --
16     A.  That's right.
17     Q.  Did you even review medical expert reports?
18     A.  I did.
19     Q.  And does that have any bearing on your opinion?
20     A.  It depends on the question.  It could.
21     Q.  Well, you're not holding yourself out as an
22 expert in health effects of asbestos; correct?
23     A.  No.  It was just observations I made about the
24 fibers and fiber types that were found in the lungs.
25     Q.  So specifically which experts reports did you

Page 27

1  you by plaintiffs' counsel or otherwise and your notes
2  regarding the review, did you bring any documents in that
3  regard?
4      A.  Yes.
5      Q.  And what did you bring?
6      A.  And here is a correspondence from Mr. Gossett
7  that lists these so that it's probably easier than me
8  having to thumb through them.
9      Q.  All right.  And what we will mark as Deposition
10 Exhibit No. 3 is a letter dated January 22nd to
11 Mr. Hatfield from Mr. Gossett requiring information that
12 is enclosed with this letter, the discovery and video
13 depositions of Robert Jones, the co-worker depositions of
14 Raleigh Johnson and Otis Roberson in the Jones case, and
15 the medical expert reports.  Then in the Highsmith case
16 the discovery and videotape depositions of Mr. Highsmith
17 as well as the Johnson and Roberson depositions in that
18 case.
19     It says also enclosed are copies of several
20 tests we have from John Crane witnesses Matteson and
21 Buccigross.  He expects that John Crane will use Frederick
22 Toca and maybe others.  And it also states that John
23 Crane is the only defendant.  And he asks you to read the
24 materials and discuss your opinions as to Mr. -- as to the
25 plaintiffs' exposure to John Crane products.  So well

Page 29

1  receive?  Suzuki and Roggli?
2      A.  Correct.
3      Q.  Do you have them with you just in case --
4      A.  Yes.
5      Q.  -- we want to ask if they have any --
6      A.  Yes, I do.  I have everything that was sent to
7  me here.
8      Q.  All right.  If you have Dr. -- so you only got
9  the medical expert reports in Jones.  You didn't get them
10 in Highsmith; is that correct?
11     A.  I think that's correct.
12     Q.  Why don't you just take out what you saw in
13 Jones on the medical expert reports just so I can ask you.
14     A.  Okay.
15     Q.  Well, Dr. Darrat is a radiologist.  I assume
16 there's nothing in his report that's going to have any
17 bearing --
18     A.  No.
19     Q.  -- on your opinion?
20     A.  Unh-unh.
21     Q.  Dr. Frank again is an occupational medicine
22 specialist.  His report does not have bearing on your
23 opinion; is that correct?
24     A.  I don't believe so.
25     Q.  All right.  So you have reports from Dr. Suzuki

# EXHIBIT Z



## U.S. Department of Labor
Occupational Safety & Health Administration



**www.osha.gov**  Search [          ] GO Advanced Search | /



**Asbestos:**
# Evaluating Exposure

Safety
Topics

Asbe
OS
Sta
Ha:
Ev:
Ex
Co
Tra
Ad
As:
Cre

Determinations of employee exposure shall be made from breathing zone air samples that are representative of the 8-hour TWA and 30-minute short-term exposures of each employee.

- The Asbestos Advisor 2.0. The Asbestos Advisor software is an interactive compliance assistance tool. Once installed on your PC, it can interview you about buildings and worksites, and the kinds of tasks workers perform there. It will produce guidance on how the Asbestos Standard may apply to those buildings.
- *Medical surveillance* guidance is provided in the appendices to the OSHA Standards:
  - Medical questionnaires. OSHA Regulation 1910.1001 App D, and 1915.1001 App D. Mandatory appendices.
  - Interpretation and classification of chest roentgenograms. OSHA Regulation 1910.1001 App E, and 1915.1001 App E. Mandatory appendices.
  - Medical surveillance guidelines for asbestos. OSHA Regulation 1910.1001 App H, and 1915.1001 App I. Non-Mandatory appendices.

- *Exposure monitoring* samples must be analyzed by Phase Contrast Microscopy (PCM) for OSHA purposes. PCM methods accurately assess fiber exposure levels, but PCM can not differentiate between asbestos and non-asbestos fibers. Transmission Electron Microscopy (TEM) methods can be used to identify fibers, but may not be used to quantify air concentrations for occupational exposure.
  - OSHA (Sampling) Reference Method. OSHA Regulation 1910.1001 App A, and 1915.1001 App A. Mandatory appendices. Asbestos exposure sampling and analysis must meet these minimal requirements.
  - Asbestos in Air. OSHA Analytical Method ID-160 (1997), 12 pages.
  - Detailed procedure for asbestos sampling and analysis. OSHA Regulation 1910.1001 App B, and 1915.1001 App B. Non-Mandatory appendices.
  - NIOSH Manual of Analytical Methods (NMAM) 4th Ed. NIOSH (1994, August), 1 page. This document includes asbestos methods 7400 and 7402. Method 7400 is a PCM procedure, equivalent to the OSHA methods. Method 7402 uses TEM to identify fibers (OSHA will accept this TEM procedure, as it uses PCM to determine exposure).
    - NIOSH 7400, Asbestos and other fibers by PCM, (1994, August), 137 KB PDF, 15 pages.
    - NIOSH 7402, Asbestos fibers by TEM, (1994, August), 40 KB PDF, 7 pages.

- *Bulk sample analysis* should be done by Polarized Light Microscopy (PLM). Bulk analysis results will likely apply to both OSHA and EPA regulations.
  - Asbestos (Bulks) – Polarized Light Microscopy of Asbestos. OSHA Analytical Method ID-191 (1992). This method describes the collection and analysis of asbestos bulk materials by light microscopy techniques including phase-polar illumination and central-stop dispersion microscopy.
  - Polarized Light Microscopy of Asbestos. OSHA Regulation 1910.1001 App J, and 1915.1001 App K. Non-mandatory analytical methods.
  - NIOSH has published two methods for the determination of asbestos in bulk materials.

- - NIOSH 9000, Asbestos, Chrysotile by XRD, (1994, August), 44 KB PDF, 6 pages.
  - NIOSH 9002, Asbestos (bulk) by PLM, (1994, August), 176 KB PDF, 9 pages.
- Directory of Accredited Laboratories. National Voluntary Laboratory Accreditation Program (NVLAP) (2003), 1 page. This accreditation is required for analyses being performed in compliance with AHERA regulations
- Asbestos NESHAP Clarification Regarding Analysis of Multi-Layered Systems. EPA, Federal Register (1995, December 19), 3 pages. Multi-Layer Analysis is required for all samples except "wall systems."
- ANSI/ASTM E1368-96A Practice for Visual Inspection of Asbestos Abatement Projects This standard establishes accepted practices for evaluating asbestos abatement projects. This standard is available from ANSI.

**Revised: 07 July 2003**

---

Ⓐ Back to Top                    www.osha.gov                    www.dol.gov

Contact Us | Freedom of Information Act | Customer Survey
Privacy and Security Statement | Disclaimers

Occupational Safety & Health Administration
200 Constitution Avenue, NW
Washington, DC 20210

# EXHIBIT AA

ENVIRONMENTAL RESEARCH 12, 110–128 (1976)

# Asbestos Exposure during Brake Lining Maintenance and Repair[1]

ARTHUR N. ROHL, ARTHUR M. LANGER, MARY S. WOLFF, AND
IRVING WEISMAN

*Environmental Sciences Laboratory, Mount Sinai School of Medicine of the City University of New York, New York, New York 10029*

Received December 10, 1975

Data obtained on asbestos exposure of garage mechanics during brake lining maintenance and repair work show that fiber concentrations frequently in excess of regulated limits are common. The presence of chrysotile, ranging from 2 to 15%, in brake drum dusts, was demonstrated by X-ray diffraction, transmission electron microscopy, selected area electron diffraction, and electron microprobe analyses. Unaltered chrysotile was found, both in fiber and fibril form, in air and brake drum dust samples. The chrysotile asbestos content of personal air samples, taken during automobile brake repair work, was measured both by optical and electron microscopic techniques. While a positive correlation exists between the types of measurements, the present technique of optically counting asbestos fibers may considerably underestimate the levels of total asbestos exposure.

During the past decade, significant disease risk has been found associated with the inhalation of asbestos fibers in a number of occupational and environmental circumstances other than in asbestos mining, milling and manufacturing, where serious hazard was already known (Wagner *et al.*, 1960; Newhouse and Thompson, 1965; Selikoff *et al.*, 1964, 1965; Harries, 1968).

Such exposures were found in the construction industry and in shipbuilding, as well as in other industrial settings where asbestos products were used. More recently, asbestos exposure has been suggested to occur during automotive brake lining repair and installation work, and measurable concentrations of asbestos fiber were observed in the work environment of workmen involved in these operations (Hickish and Knight, 1970; Hatch, 1970; Boillat and Lob, 1973). With limited data available, however, uncertainty remained regarding the type and extent of asbestos exposure during this work. Some investigators have questioned whether free asbestos fibers survive the high temperatures produced during braking action (Lynch, 1968; Hickish and Knight, 1970; Hatch, 1970) contending that asbestos decomposes as a result of the high point contact temperatures produced at the interface of the brake drum or disc and brake lining.

We have sought to obtain information concerning asbestos exposure of workmen engaged in brake lining maintenance and brake shoe installation by analysis of residual dusts recovered from brake linings and by direct measurement of the

[1] This research was supported by Center Grant ES 00928 of the National Institute of Environmental Health Sciences of the U S Department of Health, Education and Welfare. Assistance was also provided in part by the Health Research Council of the City of New York HRC U 2375 and by the Ford Motor Company

Copyright © 1976 by Academic Press, Inc.
All rights of reproduction in any form reserved

ASBESTOS EXPOSURE                                        111

free asbestos fiber content of workroom air in areas where these operations take place. In the United States, an estimated work force of at least 900,000 auto mechanics and garage workers is potentially exposed to asbestos in the servicing of both brake and clutch linings. Furthermore, much brake dust enters the general environment during automobile use (Jacko and DuCharme, 1973), to add more to the burden of asbestos air pollution (Selikoff, Nicholson, and Langer, 1972).

*Asbestos in Friction Materials*

In the United States, an estimated 118 million pounds of asbestos is used annually for the production of brake friction materials (Jacko and DuCharme, 1973): After processing (cutting, grinding, punching), the asbestos in the material sold is approximately 103 million pounds per year. In addition, asbestos contained in automotive clutch friction materials amounts to 4.5 million pounds annually.

*Major Constituents of Brake Linings*

A number of materials is commonly used in the manufacture of the three major automotive brake lining components (binder, fiber reinforcer, and property modifier). These are listed in Table 1.

*Binder.* The binders used in the automotive industry today are primarily phenolic-type resins, which are noted for high binding efficiency and ability to withstand pyrolytic breakdown. Other materials have been used, in varying proportions and in addition to resins, for binder improvement (Table 1).

TABLE 1
COMMON COMPONENTS OF AUTOMOTIVE BRAKE LININGS[a]

| Binder and organic friction modifiers | Fiber reinforcer | Property modifier |
|---|---|---|
| Phenolic-type resin | Chrysotile asbestos[b] | Lead compounds |
| Rubber | (grades 4–7) | Zinc compounds |
| Tire scrap | Unaltered | Antimony oxide |
| Pitch | Calcined | Iron oxide |
| Cork | Mixed fiber | Copper metal |
| Gilsonite | | Brass chips |
| Cashew nutshell resin | | Clay minerals |
| and particles | | Barite ($BaSO_4$) |
| Drying oils | | Wollastonite ($CaSiO_3$) |
| | | Quartz ($SiO_2$) |
| | | Cryolite ($Na_3AlF_6$) |
| | | Rottenstone ($SiO_2$) |
| | | Coke (C) |
| | | Coal (C) |
| | | Gilsonite (C) |
| | | Graphite (C) |
| | | Carbon black (C) |
| | | Molybdenum sulfide $MoS_2$ |
| | | Fluorspar ($CaF_2$) |

[a] See Carroll, 1962; Anderson and Anderson, 1971; Jacko and DuCharme, 1973; Bark et al., 1975.
[b] Chrysotile fiber constitutes about 50% by weight of most automotive brakes currently manufactured in the United States.

112                                    ROHL *ET AL.*

*Fiber.* For fiber reinforcement of the friction product, chrysotile asbestos is used almost exclusively. The mineral typically comprises from 40 to 50% of the brake product. Fiber grades 4 through 7 are used, and occasionally, several sizes are admixed or even calcined to improve performance characteristics.

*Modifiers.* Perhaps the widest range of materials used in friction products are the property modifiers. Nineteen representative compounds are listed in Table 1. Modifiers are used for a number of purposes: they are included to increase brake shoe "density," making the brake surface able to withstand high pressures (e.g., barite); they are included as "lubricants" to reduce the coefficient of friction along the brake surface, and thereby prevent "grabbing" (e.g., lead compounds); they act as "friction agents" increasing the coefficient of friction and enhancing the braking action of the shoe (e.g., brass chips); they act as internal "abrasives," which help to "recondition" the braking surface and remove deposited decomposition products (e.g., rottenstone, quartz); they act as "heat sinks," reducing binder pyrolysis and fiber decomposition thereby extending the useful life of the lining (e.g., brass chips, metals, etc.).

It is important to note that one major purpose of the reconditioning agents is to retard the formation of forsterite (a mineral not originally present in the brake material, but created by dehydroxylation and recrystallization of chrysotile asbestos at high temperatures) which may accumulate on the surface of the brake lining. The hardness of the forsterite (hardness 6.5–7.0) is such that it tends to score and gouge brake drums and discs (hardness 2–3.5), degrading them prematurely. Therefore, recrystallization of chrysotile to forsterite is an unwanted and undesired insofar as possible by the modifiers present in the matrix.

*Materials of Biological Interest*

Asbestos, quartz, and heavy metals are constituents of automotive brake linings, each warranting special consideration from the viewpoint of biological activity. The focus of this report is limited to the problem of chrysotile asbestos exposure.

*Mechanisms of Degradation of Brake Linings during Use*

Brake wear is dependent upon many factors, such as the temperature generated at the surface of the brake shoe during braking operations. At any one time, only a small percentage of the rubbing area is in contact with the wheel, with "hot spots" generated, ranging up to 800 to 1000°C (Carroll, 1962; Anderson, 1969). It is not uncommon during moderate braking action, to attain temperatures as high as 500°C (Carroll, 1962). Some investigators have suggested that, in addition to binder pyrolysis, chrysotile completely dehydroxylates under these conditions and "reduces to powder" where it is swept off the brake facing (Carroll, 1962). However, this hypothesis is oversimplified, in that other important processes, besides thermal wear, contribute to shoe breakdown, and brake shoe degradation (Burwell, 1957). For example, the effects of abrasive wear and macroshear have been investigated. When monitored by X-ray diffraction, chrysotile in brake materials displays structural strain and substructure fragmentation, caused by shear during braking processes (Mizutani *et al.*, 1973). This shear strain produces material fatigue which, with binder pyrolysis, can cause brake linings deterioration in

*temperatures far below those required for chrysotile dehydroxylation. Therefore, brake lining disintegration may liberate partially altered, or unaltered, chrysotile fibers.*

### Thermal Decomposition of Chrysotile

Differential thermal analysis indicates that chrysotile undergoes dehydroxylation at 650 to 680°C and recrystallizes (anhydrous magnesium silicate to forsterite) ($Mg_2SiO_4$) at about 810 to 820°C (e.g., Martinez, 1966; Daykin, 1971; Berry, 1971; Monkman, 1971; Harris, 1971). These temperature ranges are subject to great variation as a function of the chemistry of the fiber, particle size, instrumental variations, sample packing, etc. Also, forsterite has been noted to form, during prolonged static heating, at considerably lower temperatures (Bates and Comer, 1957; Martinez, 1966; Brindley and Hayami, 1965; Naumann and Dresher, 1966). In general, temperatures in excess of 570°C are required for dehydroxylation and incipient forsterite formation in chrysotile. Extensive study of both the thermal behavior of chrysotile and brake lining composition and design indicates that chrysotile fiber may survive in the decomposed lining dust.

### METHODS

#### Analysis of Brake Drum Dust (Decomposed Lining)

Ten samples of automobile brake drum dusts were collected and examined by optical microscopy, X-ray diffraction, transmission electron microscopy and scanning electron microscopy with microchemical capability, for the purpose of determining the presence or absence of chrysotile.

Optical microscopy, employing polarized light, was generally not useful for detecting asbestos in brake drum dust. A number of factors are considered responsible for this phenomenon, including the low relief and birefringence of chrysotile and the nature of the matrix, consisting largely of road dust, resin binder, and pyrolyzed residue, which, in optical microscopic preparations, readily obscures the smaller asbestos fibers.

X-ray diffractometry, in the continuous and step-scan mode, was performed on all dusts. Chrysotile reflections (hkl = 002; 020; 004) were observed in all ten samples. Quantitative determination of chrysotile content was made by comparison of unknowns with calibrations of chrysotile dilution standards. The weight occurrence ranged from about 2–15%, with an average ranging from 3–6%. Lead compounds, quartz, calcite, mica, clays, barite, graphite, and alpha-iron particles were identified as well. In several samples, weak, diffuse reflections suggested the presence of forsterite, but positive identification could not be made using this technique.

#### Identification of Chrysotile by Electron Microscopy

Transmission electron microscopy, selected area electron diffraction, and elec-

[1] We acknowledge the cooperation of the United Automobile Workers, Local Union No. 259 and the Automobile Dealers Industrial Relations Association in helping us obtain these samples in automobile maintenance shops in the New York area. Each sample was taken from a typical oil under way at the time.

114                                    ROHL ET AL.

tron microprobe analysis of the brake dusts were carried out on each of the ten samples after preparation by a technique which disperses the dust particles in a nitrocellulose film without altering particle size distribution. Free chrysotile fiber bundles and fibrils were observed in all ten samples (Fig. 1). Selected area electron diffraction analysis of representative fibers demonstrated the preservation of the chrysotile structure (Figs. 2A, B). Some patterns displayed arcuate reflections suggestive of interfibril rotation and intrafibril displacement (Figs. 2A, B). Occasionally, fibers were observed without characteristic chrysotile morphology, with mottled surfaces and obliterated fibrils, indicating partial or complete recrystallization. Electron diffraction patterns obtained from these particles displayed



Fig. 1 Electronphotomicrograph of large chrysotile bundle in brake drum dust (38 000 × magnification). Other particles include phenol resin binder and road dust debris.

ASBESTOS EXPOSURE                                                115



Fig. 2. Selected area electron diffraction patterns obtained on fibers of chrysotile obtained during air sampling at brake repair shops. In A, the reciprocal a axis is marked a* as are the layer lines in the (0kl) series. Indexing of upper right quadrant yielded 16 reflections corresponding to single crystal X-ray ... ... ... ... ... Pattern in (B) displays "smearing" of reflections in a "clockwise" manner suggesting interplanar rotation.

polycrystalline characteristics of multiple random reflections or Debye-Scherrer rings rather than the distinctive single fiber chrysotile pattern (Fig. 2B). Microchemical analysis with a probe technique on the unaltered fibers showed them to possess the usual Mg:Si ratio of chrysotile. In addition to free chrysotile fiber bundles and fibrils, chrysotile was also frequently observed projecting from the margins of binder fragments (Fig. 3).

Free asbestos fibers present in the decomposed lining dusts were sized at 42,000× magnification. The results, seen in Table 2, show that most fibers are too small to be seen by optical microscopy; almost all of them are shorter than 0.4 $\mu$m in length; virtually all are of respirable size (-5 $\mu$m). Hatch (1970) in reporting on optical fiber counts obtained from brake cleaning operations with compressed air jet, found that 94% of the fibers fell in the 2–5 $\mu$m length category, while only 6% were longer than 5 $\mu$m. Jacko and DuCharme (1973) made size distribution measurements of asbestos fibers in brake dusts generated during dynomometer tests, using both optical and electron microscopy. They found, at magnifications of 22,000× that 30% of the fibers were from 0.25 to 0.50 $\mu$m in length and that 60% were longer than 0.5 $\mu$m. Some discrepancies between our data and those of Jacko and DuCharme may be attributed to their use of the lower magnification (22,000× vs 42,000×), at which fibers shorter than 0.20 $\mu$m may not be easily seen or identified on the electron microscopic screen. Thus, both the optical fiber count data in other studies, and the electron microscopic fiber size distribution data



Fig. 3. Electron photomicrographs of brake drum dusts. Chrysotile is present in both free fiber and fibril form. Opaque granular material is road dust or phenolic binder. a. ×10,800; b. ×9300; c. ×30,000; d. ×30,000.

indicate that the chrysotile fiber population generated by brake wear is a strongly skewed one, with almost all fibers concentrated in the smaller than 5 μm region. No attempt was made to size the asbestos-binder particulates.

### Personal Air Sampling during Brake Repair Work

Personal air sampling for asbestos exposure during brake lining maintenance and repair was carried out at franchised auto dealer garages, taxi fleet repair shops, and a municipal truck repair shop all located in New York City.[*] Personal

[*] Assistance in providing opportunity for sampling was given by the Department of Air Resources, New York City.

ASBESTOS EXPOSURE                                                    117

TABLE 2

Length Distribution of Chrysotile Fibers in Brake Drum Dust[a]

| Sample | 750–1500Å (%) | 1500–2250Å (%) | 2250–3000Å (%) | 3000–3750Å (%) | Total (%) |
|--------|---------------|----------------|----------------|----------------|-----------|
| 1 | 40 | 34 | 11 | 11 | 96 |
| 2 | 32 | 23 | 32 | — | 87 |
| 3 | 20 | 25 | 25 | — | 70 |
| 4 | 26 | 37 | 26 | 7 | 96 |
| 5 | 57 | 17 | 4 | — | 78 |
| 6 | 23 | 9 | 12 | 12 | 56 |
| 7 | 50 | 26 | 21 | 2 | 99 |
| 8 | 29 | 30 | 21 | 17 | 97 |
| 9 | 6 | 41 | 18 | 10 | 75 |
| 10 | 11 | 6 | 31 | 31 | 79 |

[a] Fibers counted and sized at 42,000×; all fibers have diameters from 250 to 500Å.

air samples were taken during and after brake repair work and at varying distances from the work sites in other areas of the garages and shops. The latter samples were intended to provide information concerning levels of asbestos exposure which garage employees other than those doing brake work might experience.

*Asbestos Exposure during Automobile Brake Repair Work*

Air samples were first taken in the breathing zone of mechanics doing brake repair work. These peak exposure measurements were taken over periods of 3–8 minutes during which the workers were cleaning dust from brake drums. The air samples, taken on membrane filters, were processed, and fiber counts made in accordance with the procedures which have been adopted by the Occupational Safety and Health Administration (OSHA) of the U.S. Department of Labor (Bayer, Brown, and Zumwalde, 1975). Essentially, the analysis consists of counting fibers 5 to 100 $\mu$m, in a fixed area of a Porton graticule, using phase contrast microscopy at a magnification of 400×. This microscopic method enhances image contrast and allows large asbestos fibers to be readily seen and counted.

When a vehicle is brought into a repair shop for brake lining inspection or replacement, the wheel is removed and loose dust is removed from the drums and back plates, generally by means of a compressed air jet. A recent survey of brake repair establishments in Baltimore and Washington revealed that this is the standard method in those cities (Castleman *et al.*, 1975). A similar situation exists in New York City. The cloud of dust that is produced is visible for several minutes afterwards (Fig. 4). Table 3 shows that fiber concentrations are high in the operator's area under these conditions (an average concentration of 16 fibers/ml), and that there are significant concentrations at least 20 ft away. Background or area sampling during the same operation shows that, at least 14 minutes after jet air blowing and up to 75 ft away, asbestos concentrations are still measurable even by optical microscopy. The data in Table 3 indicate that an asbestos concentration gradient, dependent on distance and time, is associated with this operation. It is evident that any person 65–75 ft away can be exposed. Current interim regulations of OSHA prohibit concentrations of 5 fibers/ml or more, longer than 5 $\mu$m, as

118                              ROHL ET AL.



Fig. 4. Removal of dust from brake drum and back plate by pneumatic air blowing at automobile garage.

a time-weighted average for workers, and concentrations above 2 fibers/ml will be illegal after 1976. Regulations set a peak concentration (maximum excursion) of 10 fibers/ml of air. Newly proposed standards are designed to set a limit of 0.5 fibers/ml (500,000 fibers/m³), with a maximum excursion of 5 fibers/ml.

It was generally found that there was minimal, if any, effort to control dust in most garages. Workmen do not use respiratory protection. There was little awareness of the potential hazard of brake dust.

In a single instance, brake drum cleaning was not done with a compressed air jet, but with a dry hand brush. Fiber concentrations were somewhat less (2.5 fibers/ml) at the operator level, but background levels 12 ft away were the same as with air jet cleaning.

*Asbestos Exposure during Truck Brake Repair and Installation Work*

Personal air sampling was also conducted at the New York Department of Sanitation truck repair shop, where various kinds of brake application and repair work are performed. Used truck brake linings are salvaged by grinding the surface to remove grease and dirt, and new linings are ground to expedite break-in. The edges of new linings are beveled on a grinding wheel or arcing machine to avoid noise problems (Fig. 5). Holes are drilled or punched into the brake lining, which

ASBESTOS EXPOSURE                                                    119

TABLE 3

ASBESTOS CONCENTRATIONS DURING AUTOMOBILE BRAKE SERVICE[a,b]

| Operation | Distance (ft) | Number of samples | Fiber concentration (fibers/ml) | |
|---|---|---|---|---|
| | | | Mean | Range |
| Blowing dust out of brake drums with compressed air jet | 3–5 | 4 | 16.0 | 6.6–29.8 |
| | 5–10 | 3 | 3.3 | 2.0–4.2 |
| | 10–20 | 2 | 2.6 | 0.4–4.8 |

| | Distance from operation (ft) | Time lapse (min) | Concentration (fibers/ml) |
|---|---|---|---|
| Background samples taken at varying distance and lapsed times, after brake drum blowing | 10 | 0 | 0.3 |
| | 20 | 0 | 0.8 |
| | 12 | 5 | 0.2 |
| | 50 | 5 | 0.1 |
| | 65 | 7 | 0.1 |
| | 75 | 14 | 0.1 |

| | Distance (ft) | Number of samples | Fiber concentration (fibers/ml) | |
|---|---|---|---|---|
| | | | Mean | Range |
| Cleaning brake drums with dry brush | 1–3 | 2 | 2.5 | 1.3–3.6 |
| Background samples taken 3 minutes after cleaning brake drums with dry brush | 12 | 3 | 0.1 | 0–0.2 |

[a] Fibers 5–100 μm in length, counted by optical microscopy.

[b] The new proposed Asbestos Standard of the U. S. Department of Labor records asbestos exposure in fibers/m³, noting that a workman might respire approximately 8 m³ of air per working day, retaining an unstudied proportion of inhaled fibers. The above table omits reference to air content of fibers < 5 μm in length.

is then riveted onto a steel plate. Some of these operations are similar to those done during the manufacture of brake shoes. Table 4 summarizes the results of personal air sampling in the course of this work. During light grinding of truck brake shoes (Fig. 6), an average peak concentration of about 4 fibers/ml was found in the breathing zone of the operator. The data show that measurable fiber concentrations are found 25 ft or more away. At a distance of 25 ft, for example, a concentration of 1 fiber/ml (1,000,000 fibers/m³) was found. Much larger numbers of shorter fibers would simultaneously be inhaled. During the beveling of truck brake shoes on a grinding machine, very high concentrations of fibers were found in the vicinity of the operator. The average of five air samples was about 27 fibers/ml. Area samples, taken up to 30 ft away from this operation, demonstrated the presence of airborne fibers. It was of interest to note that, at the time of this sampling, from eight to 15 other garage mechanics were working within this

120                                    ROHL *ET AL.*



*Fig. 5* Beveling of truck brake linings at municipal garage. Arrow indicates accumulation of asbestos dust

perimeter and were exposed to asbestos. Fiber levels for other kinds of operations at the truck garage are given in Table 4

Boillat and Lob (1973) have reported fiber concentrations measured during drilling holes for rivets and grinding. They found values ranging from 0.3 to 29.2 fibers/ml; four of the nine values exceeded 3 fibers/ml.

*A Comparison of Fiber Levels Visible by Light Microscopy and Electron Microscopy*

In the ten brake drum dust samples examined, it was found that asbestos fibers shorter than 0.4 $\mu$m predominated (Table 2). The OSHA Asbestos Standard does not require that short fibers (< 5 $\mu$m in length) be counted or controlled. This oversight may have considerable biological significance in that small chrysotile fibers readily produce asbestos disease (Holt, Mills, and Young 1964 1965; Davis, 1965 Pott, Huth, and Friedrichs, 1972; Wagner, Berry and Timbrell, 1973;



Fig. 6. Renewing of municipal truck brake linings by light grinding to remove grease and dirt

Hilscher *et al.*, 1970). Attention has recently been again called to the potential importance of this question (Bouhuys, 1975).

There is little published information on the numbers of, and sizes of, submicroscopic asbestos fibers in occupational exposures. The present study afforded an opportunity to collect data on the relationship between submicroscopically- and optically-visible fibers for this specific industrial exposure. Eight air samples were selected for both light and electron microscopic examination. Six of these were taken during brake drum dust removal operations with optical fiber counts recorded from 0.1 to 3.6 fibers/ml. The other two samples were taken during light grinding of automobile brake shoes.

*Preparation and Analysis of Air Samples*

One square centimeter sections of the eight membrane filters were mounted, dust side down, on microscopic slides and ashed in low temperature activated

122                        ROHL *ET AL.*



TABLE 4

ASBESTOS CONCENTRATION DURING TRUCK BRAKE SERVICE[a]

| Operation | Distance (ft) | Number of samples | Fiber concentration (fibers/ml) | |
|---|---|---|---|---|
| | | | Mean | Range |
| Renewing used linings by grinding | 3–5 | 10 | 3.8 | 1.7–7.0 |
| Background to grinding used linings | 10 | 2 | 1.5 | 1.2–1.7 |
| | 25 | 2 | 0.8 | 0.6–1.0 |
| | 60 | 1 | 0.2 | — |
| Beveling new linings | 3–5 | 5 | 37.3 | 23.7–72.0 |
| Background to beveling new linings | 8 | 1 | 0.6 | — |
| | 12 | 2 | 0.4 | 0.3–0.5 |
| | 30 | 1 | 0.3 | — |
| Punching rivets into brake linings | 3–5 | 2 | 1.5 | 1.9–3.0 |
| Chipping rust off used brake linings | 3–5 | 1 | 2.4 | — |
| Sweeping floor around grinder | 3–5 | 1 | 3.6 | — |
| Background to sweeping floor around grinder | 15 | 1 | 3.1 | — |

[a] Fibers 5–100 μm in length, counted by optical microscopy.

oxygen to remove organic materials. The ashed residue was dispersed in a drop of nitrocellulose solution. The dispersal was accomplished by a "rubout" technique using the edge of a watch glass (Nicholson, Rohl and Ferrand, 1971). By this method large asbestos fiber bundles are broken into their constituent smaller fibrils and large agglomerates of inorganic materials, which normally obscure the presence of asbestos fibers, are broken into particles small enough to allow virtually all asbestos to be seen. By placing a second slide over the ground residue and nitrocellulose solution and then gliding the two slides apart, a thin film is produced. The dried film is cut into segments which are then floated off in water. The film is mounted onto Formvar-coated electron microscopic grids. Typically, four grids are prepared from each sample and one square on each grid is scanned in the electron microscope at 42,000× magnification to determine the quantity of chrysotile present. By estimating the length and diameter of each fiber, and assuming a cylindrical fiber geometry, the mass of chrysotile per grid square is determined. Representative electron photomicrographs of chrysotile fibers and fibrils are shown in Figs. 7 and 8.

## RESULTS

A comparison of the optical microscopic fiber counts and the electron microscope total asbestos mass calculations obtained from the eight samples is shown in Table 5. Figure 9, showing the same data, is plotted on logarithmic paper and visual inspection indicates that a positive correlation exists between the optical and electron microscopic results, although the data are limited and the amount of

ASBESTOS EXPOSURE                                    123



FIG. 7 Electron photomicrograph of air sample taken during brake drum blowing (see sample No. 4, Table 5). Large numbers (70-100] of chrysotile, some of which are masked by granular particulates, presumably road dust (65 000 total magnification).

scattering precludes a regression analysis. For example, from these data it may be possible to predict that, during the grinding of new brake linings (Sample No. 8, Table 5). a worker could be exposed to about 0.5 mg of asbestos daily in circumstances in which the time-weighted TLV of 5 fibers/ml would not have been exceeded. Similarly, Fig. 9 shows that, since a microgram of asbestos represents on the order of 1 million fibers per cubic meter of air (of greatly varying diameters and lengths), extremely high concentrations of submicroscopic fibers are present up to 65 ft away from brake repair work (e.g., Sample No. 5, Table 5). even though fiber levels in such a case are barely detected, if at all, by the standard optical counting technique. These limited data indicate that the standard (OSHA) optical fiber counting method may be only a fractional indicator of total asbestos exposure at least in the case of automobile repair work. They also indicate that the total exposure is much higher than the OSHA technique records, in terms of

124                                ROHL *ET AL.*



0.5 µ

Fig. 8  Electronmicrograph of air sample of cluster of chrysotile fibrils in background sample (see sample No. 3, Table 5) (83 000× magnification)

asbestos fiber number, mass, and surface area. Additional studies relevant to this and other kinds of asbestos exposure are needed to confirm and extend these findings. It is important to note that particles of asbestos-containing pulverized brake lining were not included in this mass determination. Their importance, in terms of biologic potential, is presently unknown.

### SUMMARY AND CONCLUSIONS

(1) Chrysotile asbestos fiber is a major component of brake lining materials. Degradation of the lining is brought about by a combination of factors which

ASBESTOS EXPOSURE                                      125

### TABLE 5
#### COMPARISON OF OPTICAL AND ELECTRON MICROSCOPIC FIBER COUNTS

| Operation | Optical microscopy (fibers/ml) | Electron microscopy (μg/m³) |
|---|---|---|
| 1. Blowing dust off drum with air jet (10 ft away) | 2.0 | 1.27 |
| 2. Background to blowing out brake drum (10 ft away) | 0.3 | 0.2 |
| 3. Blowing dust off drum with air jet (20 ft away) | 0.4 | 1.1 |
| 4. Background to blowing out brake drum (20 ft away) | 0.8 | 0.1 |
| 5. Background to blowing out brake drum (65 ft away—7 minutes after blowing stopped) | 1 | 0.2 |
| 6. Cleaning brake drum with hand brush | 3.6 | 6.5 |
| 7. Light grindings of new linings before installation | 4.7 | 55.0 |
| 8. Light grinding new linings before installation | 2.7 | 66.0 |

include thermal stress, material fatigue, and shearing. Modifying agents are included in brake linings which lower the contact temperature between the lining and wheel interface; this, in turn, prevents binder pyrolysis and chrysotile fiber dehydroxylation. The amount of chrysotile fiber which survives the braking operation is related to a number of additional factors, including some which are external to the properties and quality of the lining itself. As a consequence, degradation may occur at temperatures significantly lower than the required for the dehydroxylation of chrysotile, with the persistence of fibers.

(2) Ten samples of dust were taken from automobile brake drums in New York City, and analyzed. Optical microscopy was of limited usefulness. X-ray diffraction analysis using both continuous and step-scan modes demonstrated the presence of chrysotile in all dust samples. The proportion of chrysotile ranged from about 2–15%, and averaged about 5–6%. This included both free fibers and chrysotile which survived in pulverized binder as particulates. Forsterite, the



FIG. 2. Comparison of optical and electron microscopic fiber counts.

thermal transformation product of chrysotile could not be unequivocally identified by continuous scan X-ray diffraction.

(3) The presence of chrysotile asbestos in the ten dust samples was further verified by transmission electron microscopy, selected area electron diffraction and electron microprobe analyses. Chrysotile was found, both in fiber and fibril form, with unaltered structure and chemical composition. Its frequency of occurrence was consistent with, but lower than the quantitative determination made by X-ray diffraction analysis. However, it should be noted that X-ray diffraction analysis is based on both free fibers and fibers present in clumps; the latter would obscure the presence of discrete fibers on electron microscopic study. In addition to unaltered fiber, partially altered and completely recrystallized fibers were also seen.

(4) Size distribution analysis at 42,000× magnification in the ten samples indicate that about four-fifths of all chrysotile, in fiber form, is shorter than $0.4\ \mu m$ in length. These fibers are too small to be seen by optical microscopic techniques.

(5) Personal air sampling was conducted during brake repair work in automobile garages in New York City. Standard optical microscopic procedures for fiber counting were used. In samples taken in the vicinity of repairmen blowing dust from automobile brake drums with compressed air, an average concentration of 16 fibers/ml was measured. Background and time-lapse samples indicate that measurable concentrations exist at least 75 ft from the work site and for at least 14 minutes after jet air blowing.

(6) Personal air samples were taken at a municipal truck repair facility where various brake fabrication and application operations are performed. Grinding of truck brake shoes resulted in an average concentration of about 4 fibers/ml (4,000,000/m³). During beveling, an average fiber count of 37 fibers/ml was measured. Exposure levels during drilling, punching rivets, and cleanup were also measured. Background measurements show that fiber concentration gradients are produced during truck brake repair and application work. During light grinding of truck brake shoes, measurable fiber concentrations were found 25 ft or more away, as well as up to 30 ft from brake beveling operations. The background measurements, during both automobile and truck brake work, indicate that many employees in garages other than brake lining workers are potentially exposed to asbestos, including other mechanics and shop management.

(7) Eight air samples taken during automobile brake repair work were analyzed by other optical and electron microscopy. A positive correlation was found to exist between optical fiber counts ($> 5\ \mu m$) and the total chrysotile mass calculations based on sizing all fibers at 42,000× magnification. These data indicate that standard (OSHA) optical fiber counts may be a useful index of total free asbestos exposure during brake repair work. They also demonstrate that the total free asbestos exposure in terms of fiber number, mass, and surface area is much greater than the optical counting techniques indicate.

(8) Attention is called to the fact that in addition to asbestos, other biologically active substances, including free silica and lead compounds, have been identified in brake lining dusts. Their concentrations in brake work environments are not known, and warrant investigation.

(9) Potentially hazardous asbestos exposure exists during automotive brake servicing. It has been reported that approximately 900,000 persons are employed in such work in the United States. It is recommended that stringent industrial hygiene measures to control exposure be implemented as rapidly as possible.

## ACKNOWLEDGEMENT

We thank Drs A. E. Anderson, R. L. Gealer, and E. Eichen of The Ford Motor Company for their valuable comments in reviewing the manuscript.

## REFERENCES

Anderson, A. E. (1969). Wear in brake materials. In Proc. Amer. Soc. Metals Wear Conference.

Anderson, A. E., Gealer, R. L., McCune, R. C., and Sprys, J. W. (1973). Asbestos emissions from brake dynamometer tests. Soc. Auto Engin. Meeting. Detroit. Michigan. 14–18 May, 1973. Paper No. 730549.

Bark, L. S., Moran, D., and Percival, S. J. (1975). Chemical changes in asbestos-based friction materials during performance—a review. Wear 34, 131–139.

Bates, T. F., and Comer, J J. (1957). In Proc. 6th Nat'l Conf. Clays and Clay Mineralogy. Int. Monog Sec. 6, 237–248.

Bayer, S. G., Brown, T. A., and Zumwalde, R. D. (1975). Document TR-84. U.S. Department of Health, Education and Welfare, Public Health Service. National Institute for Occupational Safety and Health. Cincinnati, Ohio.

Berry, E. E. (1971). Thermal analysis of various chrysotiles using evolved water analysis techniques. In Proc. 2nd Intl Conf. Physical-Chemical Asbestos Minerals. Louvain Univ. 6-9 September, 1971, paper 2:7 15 pp

B.... .... .... ... ... ... brake linings Schweizerische Medizinische Wochenschrift 103. (39). 1354–1359

Bouhuys, A. (1975) Fibers and fibresis. Ann. Intern. Med. 83(6). 898–899.

Brindley, G. W., and Hayami, R. (1965). Mechanism of formation of forsterite and enstatite from serpentine. Min. Mag. 35, 189–195.

Burkeit, J. T. (1957) Survey of possible mechanisms. Wear 1, 119–121

Carroll, W G. (1963). The manufacture of brake linings Brit. Plastics August. 414–417

Castleman, B., Camarota, L. A., Frisch, A. J., Mazzocchi, S., and Crawley, R. G. (1975). The hazards of asbestos for brake mechanics. Public Health Rep. 90 (No. 3) 254–256

Daytin, C. W. (1971). A study of the infrared spectra of chrysotile and related minerals. In Proc. 2nd Intl. Conf. Physical-Chemical Asbestos Minerals. Louvain Univ. 6-9 September. 1971. paper No. 2:6. 7 pp.

Davis J. M J. (1963). Electron-microscope studies of asbestosis in man and animals. Ann. N. Y. Acad. Sci. 132, 98–411.

Harries. P. G. (1968) Asbestos hazards in naval shipyards. Ann. Occup. Hyg. 11. 135–145

Harris. A. M. (1971). The effects of grinding on the structural and thermal properties of chrysotile asbestos fibers. In Proc 2nd Intl. Conf. Physical-Chemical Asbestos Minerals. Louvain Univ. 6–9 September. 1971. paper No. 3:2A. 6 pp.

Hatch. D. (1970). Possible alternatives to asbestos as a friction material. Ann. Occup. Hyg 13. 25–39.

Hickish. D. E., and Knight K. L. (1970) Exposure to asbestos during brake maintenance Ann. Occup. Hyg. 13. 17–21.

Hilscher W., Sethi, S., Friedrichs, K. H. and Pott, F. (1970) Zusammenhange zwischen Asbestose and Fasertange. Naturwissenschaften 57. 356

Holt. P F., Mills J and Young, D K. (1964) The early effects of chrysotile asbestos dust on the rat lung J Path Bact 87 15–23

Holt P F Mills J and Young D K (1966) Experimental asbestosis with four types of fibers Importance of small fibers Ann N Y Acad Sci 32 80–97

Jacko M G and DuChaume R T (1973) Brake emissions. Emission measurements from brake and clutch linings from selected mobile sources EPA Report 68-04-0020

Langer, A. M. and Pooley, F. D. (1973). Identification of single asbestos fibers in human tissues. *In* Proc. Intl. Conf. of Biological Effects of Asbestos (P. Bogovski, *et al.* Eds.) pp. 19–25. I.A.R.C., Lyon, France.

Langer, A. M., Mackler, A. D., and Pooley, F. D. (1973). Electron microscopical investigation of asbestos fibers. *Envir. Health Persp.* 9, 63–80.

Lynch, J. R. (1968). Brake lining decomposition products. *J. Air Pollution Control Assoc.* 18, 824–826

McConnell, J. D. C. (1967). Electron microscopy and electron diffraction. *In* "Physical Methods in Determinative Mineralogy" (J. Zussman, Ed.). pp. 335–370. Academic Press, New York.

Martinez, E. (1966). Chrysotile asbestos: Relationship of the surface and thermal properties to the crystal structure. *Canadian Mining and Metall. Bull.* 69, 414–420.

Mizutani, Y., Obara, H., and Nakajima, K. (1973). X-ray study of friction and wear of resin-bonded asbestos. *Wear* 23, 387–392.

Moukman, T. J. (1971). Some chemical and mineralogical aspects of the acid decomposition of chrysotile. *In* Proc. 2nd Intl. Conf. Physical-Chemical Asbestos Minerals. Louvain Univ. 6–9 September, 1971, paper No. 3:3, 9 pp.

Naumann, A. W., and Dresher, W. H. (1966). The influence of sample texture on chrysotile dehydration. *Amer. Mineral.* 51, 1200–1211.

Newhouse, M. L. (1965). Epidemiology of mesothelial tumors in the London area. *Ann. N. Y. Acad Sci.* 132, 579–602.

Nicholson, W. J., Rohl, A. N., and Ferrand, E. F. (1971). Air pollution in New York City. *In* Proceedings of the Second International Clean Air Congress. (H. M. Englund and W. T. Berry, Eds.), pp. 136–139. Academic Press, New York.

Pott, F., Huth, F., and Friedrichs, K. H. (1972). Tumors of rats after i.p. injection of powdered chrysotile and benz[a]pyrene. *Zbl. Bakt. I. Abt. Orig.* 155, 463.

Selikoff, I. J., Churg, J., and Hammond, E. C. (1964). Asbestos exposure and neoplasia. *JAMA* 188, 22–38.

Selikoff, I. J., Hammond, E. C., and Churg, J. (1968). Asbestos exposure, smoking and neoplasia. *JAMA* 204:22, 106–112.

Selikoff, I. J., Nicholson, W. J., and Langer, A. M. (1973). Asbestos air pollution. *Arch. Envir. Health.* 25, 1–13

Wagner, J. C., Berry, G., and Timbrell, V. (1972). Mesotheliomata in rats after inoculation with asbestos and other materials. *Brit. J. Cancer* 28, 173.

Whitaker, E. J. W., and Zussman, J. 1956. The characterization of serpentine minerals by X-ray diffraction. *Min. Mag.* 31, 107.

# EXHIBIT BB

irregular or nodular interstitial opacities of limited extent and intensity on their films Silica or asbestos exposure had occurred in 22% of the work force examined Such exposures had occurred in various job categories in the titanium facility as well as in prior occupations. Eight of the 26 workers with abnormal X-rays had had silica or asbestos exposure. No clear pattern of restrictive disease in relation to X-ray findings could be seen.

### Summary and Conclusions

Clinically significant or symptomatic pulmonary disease was infrequent in a survey of 207 currently employed production workers in a plant producing titanium dioxide from ilmenite ore. Evidence of airways obstruction was found in 41% of all workers (including 38% of workers who had never smoked regularly). This abnormality was not frequently accompanied by disabling shortness of breath. Despite the fact that approximately 90% of the group of workers examined had worked for 20 years or more, radiological changes consistent with pneumoconiosis were relatively few, and unrelated to the respiratory abnormalities observed.

We conclude (with the caveats inherent in a prevalence study in which only half of the eligible long-term workers were examined) that occupational exposure associated with titanium production by the sulphate process may commonly cause undesirable irritation of the upper and lower respiratory tract and functional abnormalities of the lung, but does not result in an important incidence of serious occupational lung disease. Individual workers may, however, suffer unwanted abnormalities. These findings, of course, do not speak to the presence or absence of increased risk of malignant pulmonary disease. This is being separately studied.

*Acknowledgment:* This research study was supported in part by National Institute for Occupational Safety and Health Contract CDC-99-74-91.

REFERENCE
Miller A, Chuang M & Selikoff I J
(1976) *American Review of Respiratory Diseases* 113, Suppl.,
p 19 (abstract)

## Asbestos Content of Dust Encountered in Brake Maintenance and Repair

by A N Rohl PhD, A M Langer PhD,
R Klimentidis BA, M S Wolff PhD
and I J Selikoff MD
(*Environmental Sciences Laboratory,
Mount Sinai School of Medicine
of the City University of New York,
New York, NY 10029*)

### Asbestos in Brake Linings

The composition of automotive brake linings includes chrysotile asbestos fibre which about 50% of the friction material. The exposure of garage workers to asbestos during brake maintenance and repair has recently been investigated (Rohl *et al.* 1976). This important because a large labour force is potentially exposed (over one million per United States alone). Consequently it is essential to determine if chrysotile fibre survives braking, and to measure the amounts of asbestos aerosol during maintenance and repair operations.

Investigators in the past have expressed concern as to whether chrysotile fibres can survive the temperatures generated during braking (Lynch 1968, Hickish & Knight 1970, Hatch 1970). Chrysotile is alleged to be subjected to temperatures in excess of 600°C, which would cause its transformation to forsterite or to a magnesium silicate phase. While 'hot spots' of 1000°C may be attained (Carroll 1962) the distribution is nonuniform, and other processes in addition to thermal wear, contribute to the gradation of brake linings. For example, wear and macroshear may also cause physical breakdown (Burwell 1957, Mizutani *et al.*). Accordingly, brake lining disintegration mechanisms may liberate partially altered and unaltered chrysotile fibres.

### Analysis of Brake Drum Dust

Initially, ten samples of automobile brake dusts from brake repair shops in New York were collected and examined by optical microscopy, X-ray diffraction, transmission electron microscopy and energy dispersive X-ray spectroscopy to determine the presence of chrysotile.

*Optical microscopy:* The detection of chrysotile in brake drum dust by optical microscopy is difficult by the nature of the debris matrix, composed largely of opaque pyrolyzed phenolic resin binders and road dust. Chrysotile, particularly in small fibres, has low optical relief and low birefringence, which further hinder its identification. Only in rare instances have large fibres, with their

ntent of Dust
d in Brake
e and Repair

D. A M Langer PhD,
A, M S Wolff PhD

Sciences Laboratory,
ool of Medicine
rity of New York,
0029)

**e Linings**

Table I appears here (largely illegible).

| | No. of samples | No. positive | Weight percent Mean | Weight percent Range | Transmission electron microscopy No. positive |
|---|---|---|---|---|---|
| Britain | 8 | | 1.1 | 0.7-2.5 | 1 |
| Germany | 8 | 5a | 2.4 | 0.5-3.2 | 1 |
| | 3 | 1 | 3.5 | | 1 |
| United States of | 10 | 10 | 4.5 | 2.0-45.1 | 10 |
| | 5 | 3 | 1.4 | 0.8-2.5 | 5 |
| | 5 | 1 | 1.4 | 0.5-2.3 | 1 |
| New Australia | | | | | |
| | 39 | 29 | *= 2.4 | | 39 |
| | | | ± 1.1 | | |

The remainder of the two-column body text is too faded/degraded to transcribe reliably.

fibre counts and the electron microscopic asbestos mass calculations indicates that a positive correlation exists between the two sets of data. These results show that the standard (OSHA) optical fibre counts may be only indicative of the total asbestos exposure.

*Asbestos Exposure of Workmen*

After the identification of chrysotile in the brake drum dusts, asbestos fibre exposure during maintenance and repair was determined by personal air sampling carried out at automobile repair shops.

ta ti fleet repair shops and a municipal truck shop in New York City. Air sampling and analytical methods for the determination of fibre concentrations were in accordance with the OSHA techniques (Bayer *et al.* 1975). Present regulations of OSHA prohibit asbestos concentrations of 5 fibres per millilitre (f/ml) or greater, longer than 5 µm as a time-weighted average, and concentrations above 2 f/ml will be illegal after 1976. Peak concentrations or maximum excursions of 10 f/ml are permitted by the regulations.

In brake lining inspection and repair, the



Fig 1 *Electron photomicrographs of brake drum dust, taken at various magnifications. A, the numerous chrysotile fibres have average lengths of 0.4 µm or less (×30 000). B, large numbers of chrysotile fibres embedded in, and protruding from, an opaque particle, probably pyrolized phenolic resin binder (×30 000). C, large chrysotile fibre bundle (×45 000). D, the particle in left centre of photograph is the same as in C, but cannot be identified at low magnification (×5400)*

... air shops and a municipal truck ... ... York City. Air sampling and ... thods for the determination of fibre ... ions were in accordance with the ... ues (Bayer et al. 1975) Present regula... ... prohibit asbestos concentration... ... er millilitre (f/ml) or greater, long... ... a time-weighted average, and ... ons above 2 f/ml will be illegal after... ... concentrations or maximum exc... ... are permitted by the regulations... ... lining inspection and repair, there...

... from the axle and loose dust is com... ... removed from the drum and back plates by ... of a jet of compressed air A survey of 220 ... in Baltimore and Washington, DC has ... that this is the method of choice in 80% of ... shops ... (Castleman et al. 1975). A similar ... ... in New York City. The data in ... show that fibre concentrations are high in ... breathing zone of the operator during com... ... air blowing. An asbestos concentration ... ... diminishing with time and distance away ... the operation. appears to occur. Persons up ... m from such activity are exposed to measur... ... concentrations of asbestos.

Personal air sampling was also conducted at New York City Department of Sanitation where truck brakes are repaired Used linings are salvaged from the surface. New linings are bevelled by grinding to reduce noise and improve break-in. Accordingly, these studies relate to levels of as- bestos exposure which may be experienced by workers engaged in brake lining manufacturing. Table 2 shows that fibre concentrations experi- enced during grinding ranged from 1.7 to 7.0 f/ml of air in the breathing zone of the operator. The background or area samples for this operation ranged from 1.2 to 0.2 f/ml, with a general decrease



... magnifications. *a*, the numerous chrysotile ... tile fibers imbedded in, and protruding ... r chrysotile fibre bundle (× ×5 000). ... d at low magnification (× 5400).

... 2 El... photomicrographs of personal air samples taken during brake repair work. Clumps of chrysotile are ... opaque particles of road dust and resin binders. *a*, *b*, × 60 000, *c*, *d*, × 11 000

*Table 2*

Personal air samples, automobile and truck brake repair

| | No. of samples | Peak fibre concentration (fibres per ml) Mean | Range |
|---|---|---|---|
| **Automobile brake repair** | | | |
| Blowing dust from brake drums: | | | |
| Distance 1-1.5 m | 4 | 15.0 | 6.4-29.4 |
| Distance 1.5-3 m | 3 | 3.3 | 2.0-4.2 |
| Distance 3-6 m | 2 | 1.6 | 0.3-4.5 |
| Background (5 min after air jet blowing, distance 3.6-16 m) | 2 | 0.2 | 0.1-0.2 |
| Background (7-14 min after air jet blowing, distance 19.6-22.6 m) | 2 | 0.1 | 0.1 |
| | 13 | | |
| | | | |
| **Truck brake repair** | | | |
| Repairing used linings by grinding (distance 1-1.5 m) | 10 | 4.5 | 1.7-7.0 |
| Background to grinding used linings: | | | |
| Distance 3.3 m | 2 | 1.5 | 1.2-1.7 |
| Distance 5.3 m | 2 | 0.2 | 0.6-1.5 |
| Distance 20.0 m | 1 | | 0.2 |
| Bevelling new linings | 4 | 57.3 | 23.7-72.0 |
| Background to bevelling new linings: | | | |
| Distance 2.4 m | 2 | | 0.6 |
| Distance 3.6 m | 2 | 0.4 | 0.3-0.5 |
| Distance 9.1 m | 1 | | 0.1 |
| | 13 | | |

away from the operator. From six to ten other mechanics work within an area up to 20 m from this operation are exposed to asbestos as well. Since a person breathes about one cubic metre of air an hour, multiplication of the fibre concentrations by one million gives the number of fibres inhaled during this period. Fibre concentrations measured during bevelling of truck linings were as high as 72 f/ml and averaged about 57 f/ml. Background counts were measured up to 9.1 m away from this operation (0.1 f/ml). Fibre concentrations measured during drilling holes for rivets and grinding ranged from 0.3 to 29.2 f/ml, as reported by Boillat & Lob (1973). Four of the nine values exceeded 5 f/ml.

*Conclusions*
The existence of significant exposure during brake servicing operations necessitates the following measures:

(1) Implementation of industrial hygiene procedures to control exposure.
(2) Clinical studies of garage mechanics to determine evidence of asbestos-related disease.
(3) Epidemiological studies of the mortality experience of exposed workers.

In addition, the entire variety of dusts and other materials present in brake repair work should be characterized in order to determine its disease potential, especially silica and lead compounds.

*Acknowledgment:* The authors wish to acknowledge support under a grant from the National Institute of Environmental Health Sciences 00928 and support by the Ford Motor Company. MSW wishes to acknowledge support under a post-doctoral fellowship from the NIH ES2565.

We are grateful to the following for assistance obtaining brake dust samples: Professor D Bower, University of Glasgow, Scotland; Mr Bower, Department of Labour and Industry, side, South Australia; Dr Trevor Turner, side, South Australia; Professor Jean Bi Hospital Laennec, Paris, France; Mme H Geological Survey of Finland, Otaniemi, Fi Dr G. Gråsi, Helsinki University of Technol Helsinki, Finland; Dr K. Robock and D Klösterkotter, Institut für Hygiene und Arbeit dizin des Klinikum der Universität Essen, Germany.

REFERENCES
Beyer S C, Rowe T A & Zumwalte E D
(1973) Document TR-64, US Public Health Service, Ci Ohio
Boillat M A & Lob M
(1973) Schweizerische medizinische Wochenschrift 103, 29
Zumwalte A
(1973) Annals of Internal Medicine 83, 576
Burwell J T
(1957) Wear 1, 119
Carroll W G
(1962) British Master 25, 414
Castleman B, Commoville L A, Frisch A J, Mazzucchi S A
Crowley R G
(1973) Public Health Reports 94, 154
Doyle J M J
(1965) Annals of the New York Academy of Sciences 132,

Section of Occupational Medicine

several species of experimental animal (Duckett et al. 1974, Mendell et al. 1974, Spencer, Schaumburg, Raleigh & Terhaar 1975). These studies demonstrated that prolonged intoxication by inhalation or subcutaneous injection caused the insidious development of symmetrical weakness first in the hindlimbs and later in the forelimbs. The first signs of peripheral neuropathy developed after 4 to 12 weeks of continuous inhalation of 200–600 parts/$10^6$ of MBK, and after 12 to 16 weeks of intermittent inhalation of 1300 parts/$10^6$ of MBK. The onset of MBK neuropathy was associated with a reduction in the sciatic nerve conduction velocity (Mendell et al. 1974), an indication of nerve damage also found in rats and monkeys inhaling 1000 or 100 parts/$10^6$ MBK intermittently for periods of 3 and 8 months respectively (Johnson 1975), the figure of 100 parts/$10^6$ being the recommended Threshold Limit Value in the United States. Recent studies have suggested that concurrent exposure to MEK and MBK will produce neuropathy more rapidly than in animals exposed to MBK alone (Saida et al. 1976). Methylethylketone alone or MBK alone produce no neurotoxic effects (Spencer & Schaumburg 1976).

The purpose of the present paper is to emphasize the importance of chronic testing of potentially neurotoxic compounds in experimental animals, to describe the range of hexacarbon compounds which have been identified as neurotoxic agents and, finally, to characterize and illustrate the pathological basis for the onset of the nervous system disease. A total of seven hexacarbon compounds have been tested in this study (Table 1)

Table 1

Hexacarbon compounds tested

(1) n-hexane CH₃CH₂CH₂CH₂CH₂CH₃
(2) methyl-n-butylketone CH₃COCH₂CH₂CH₂CH₃
(3) 2,5-hexanedione CH₃COCH₂CH₂COCH₃
(4) 2,5-hexanediol CH₃CHOH(CH₂)₂CHOHCH₃
(5) 2,5-hexanedione CH₃COCH₂COCH₃
(6) 2,5-hexanediol CH₃COCH₂CH₂CH₂CH₃
(7) 1,6-hexanediol HOCH₂CH₂CH₂CH₂CH₂CH₂OH

The first compound, n-hexane, an important solvent and a minor component of petrol, was indicated in several reports as a possible neurotoxic agent (Herskowitz et al 1971, Korobkin et al. 1975) Rats were exposed continuously to atmospheric levels of 400 to 600 parts/$10^6$ of n-hexane for up to five months, 500 parts/$10^6$ being the US Threshold Limit Value for n-hexane (see also Schaumburg & Spencer 1976). The second compound, methyl-n-butylketone, the solvent implicated in the outbreak of neuropathy, was administered to cats by subcutaneous injection of 150 mg/kg twice daily for periods up to six months (see also Spencer & Schaumburg 1976) The third compound, 2,5-

## Neurotoxic Properties of Certain Aliphatic Hexacarbons

by Peter S Spencer PhD
and Herbert H Schaumburg MD
Department of Pathology and Neuroscience.
and R Kacey Department of Neurology.
Saul F Kennedy Center.
Albert Einstein College of Medicine.
Bronx. New York 10461. USA)

During the summer of 1973 an outbreak of peripheral neuropathy developed among a large group of employees of a fabric manufacturing plant in Ohio. USA (Billmaier et al. 1974). The disease was characterized by distal weakness and sensory loss symmetrically in both the hands and the feet (Allen et al. 1975). The most severely afflicted individuals worked in the printing department where colouring inks, dissolved in volatile solvents, were applied to the surfaces of plastic coated fabrics. For several years the printing process required the use of a 9:1 solvent mixture containing methylethylketone (MEK) and methyl-n-butylketone (MIBK). Methyl-n-butylketone (MBK) was gradually introduced in the summer of 1972 to replace the MIBK. Methyl-n-butylketone was its maximal use by December 1972 and the first case of peripheral neuropathy occurred shortly thereafter. The recent introduction of MBK into the printing department of the plant, coupled with other isolated outbreaks of neuropathy in workers chronically exposed to MBK, suggested that this compound had neurotoxic properties. MBK produced peripheral neuropathy in

support under a grant from the National Environmental Health Science ... support by the Ford Motor Company wishes to acknowledge support ... doctoral fellowship from the National ...

grateful to the following for assistance ... brake dust samples: Professor ... University of Glasgow, Scotland; Department of Labour and Industry, South Australia; Dr Trevor Turner, South Australia: Professor Jean B ... Laennec, Paris, France; Miunu Hospital Survey of Finland, Otaniemi, Finland, Helsinki University of Technology, Finland; Dr K Robock and Arbeit ... otter, Institut für Hygiene und Arbeit ... Klinikum der Universität Essen.

CES
Brown T A & Zawerwalde R D
... TR-44. US Public Health Service, Ci ...

& Lob M
... erliche medizinische Wochenschrift 102, 19 ...
... of Internal Medicine 83, 194

... 119

... Plastics 35, 414
... Claessens L A, Princk A J, Majnovski S &
... 1
... Reports 90, 254
... of the New York Academy of Sciences 132, 89 ...

... y of Occupational Hygiene 13, 15
... D E & Kehl K L
... y of Occupational Hygiene 13, 17
... W, Solct & Friedricks K H & Peel F
... Knowaorkerfaren 23, 356
... E F & Miles J & Young D K
... h Journal of Pathology and Bacteriology 87, 15
... J E J
... gy of the Air Pollution Control Association 18, 824
... mand V, Obers H A & Nakajima E
... H Foot 21, 367
... N J, Bail A N & Ferrand E F
... ngs: Proceedings of the Second International Clean Air
... SA. H N England & W T Berry. Academic Press,
... York pp 136–139
... z H & Friedricks K H
... ... Zentralblatt für Bakteriologie, Abt. I, Originale, 155, 463
... A K, Lineev A M, Woltf M S & Weisman I
... Otto Environmental Research 12, 110
... opol J C Berry, H & Thakeral V
... h British Journal of Cancer 22, 173

EFiled: Jan  4 2007  3:41PM EST
Transaction ID 13347710

# EXHIBIT CC

Am. Ind. Hyg. Assoc. J. 48(5):499-504 (1987)

# Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods

TIMO KAUPPINEN[A] and KARI KORHONEN[B]

[A]Institute of Occupational Health. Topeliuksenkatu 41aA. SF-00250 Helsinki, Finland; [B]Regional Institute of Occupational Health. PL 175. SF-53101 Lappeenranta, Finland

Asbestos concentrations were measured during the different operations of brake maintenance of passenger cars, trucks and buses in 24 Finnish workplaces. The estimated average asbestos exposure during the workday (8-hr time-weighted average) was 0.1-0.2 fibers/cm³ during brake repair of trucks or buses, and under 0.05 f/cm³ during repair of passenger car brakes when the background concentration was not included in the calculations. The background concentration was estimated to be less than 0.1 f/cm². During brake maintenance of buses and trucks, heavy exposure, 0.3-125 (mean 56) f/cm³, was observed during machine grinding of new brake linings if local exhaust was not in use. Other short-term operations during which the concentration exceeded 1 f/cm³ were the cleaning of brakes with a brush, wet cloth or compressed air jet. During brake servicing of passenger cars, the concentration of asbestos exceeded 1 f/cm³ only during compressed air blowing without local exhaust. The different methods of decreasing the exposure and the risk of asbestos-related diseases among car mechanics are discussed.

## Introduction

Brake maintenance and repair is carried out in most garages and service stations in Finland. Although substitute materials not containing asbestos are used increasingly, the brake and clutch linings of many cars, as well as the brake drum dust, still contain chrysotile asbestos. Therefore, car mechanics and other garage workers potentially are exposed to asbestos fibers emitted during brake servicing.

According to the Finnish Register of Employees Occupationally Exposed to Carcinogens,[1] about 1400 car mechanics are exposed to asbestos in Finland, most of them during brake maintenance of trucks and buses.[2] The registration, however, is based on the notifications made by the employers, and this value does not include every worker who maintains or repairs brakes. If those persons who deal with passenger car brakes or who service brakes infrequently are included also, the number of exposed workers approaches the total number of car mechanics, which is about 20 000 (nearly 1% of the employed population).

During 1977-1983, the concentrations of asbestos fibers were measured by the occupational hygienists of the Finnish Institute of Occupational Health in 24 workplaces to study the exposure of car mechanics to asbestos during different operations and brake maintenance procedures. This article is a summary of these measurements.

## Friction Materials and Brake Maintenance Procedures

Drum brake linings usually contain 30-70% (by wt.) and disc brake pads 10-30% of chrysotile asbestos. In addition to asbestos, the brake linings contain phenolic type resins lubricants and metal oxides.[3-7] The typical composition of asbestos-free, "semi-metallic," drum brake linings or disc brake pads is as follows: metals (Fe) 60-70%, graphite 15-25%, filling agents 7-10% and binders 0-5%.[4] Other types of asbestos-free friction materials also have been developed.

During braking, most asbestos fibers lose their fibrous character, but the brake drum dust still contains some chrysotile asbestos. Several investigators have analyzed brake drum dust and found 0.1-1 wt-%[3,8-11] or 1-15 wt-% of chrysotile fibers.[14,8,12,13] Besides drum dust, the brake repair workers may be exposed to unaltered asbestos fibers during grinding, beveling or riveting of new brake linings.

The procedure of brake maintenance depends on the type of vehicle and brakes. Trucks and buses usually have drum brakes. After removing the wheel and brake drum, the cleaning of the brakes may be carried out by blowing with a compressed air jet, by brushing, by wiping with a wet cloth by sucking with a vacuum cleaner, or by washing with water. A vacuum funnel is commonly used during compressed air cleaning because of heavy dust emission, but it is less common during other procedures. If the brake linings are worn out, they are removed and new linings are riveted to the brake shoes. If needed, the new linings are ground to fit the shoes. Finally, the brake shoes, brake drum and the wheel are assembled.

The brakes of passenger cars are either of disc or drum type. The disc brakes gather less debris than the drum brakes

*Correspondence to Timo Kauppinen. Ph.D. Institute of Occupational Health. Department of Epidemiology and Biometry Topeliuksenkatu 41aA. SF-00250 Helsinki, Finland

Copyright 1987 American Industrial Hygiene Association

because of more open structure. The maintenance of disc brakes usually consists of the removal of old pads, cleaning of the brakes with compressed air, and attaching of new brake pads. The maintenance of drum brakes is basically similar to that of heavy vehicles.

## Methods

The authors carried out measurements in 7 out of 24 work-places under study. The other results were collected from the measurement reports that include a description of sampling and analytical methods used, remarks on the prevailing circumstances during the measurements, data on sampling sites and times, and the results with pertinent comments. The sampling procedures and the analytical methods were the same in all measurements.

Asbestos was measured in the breathing zones of car mechanics or within the working areas. Dust samples were collected on Millipore membrane filters. A sampling rate of 2 L/min and a sampling time of 1-60 min (air volume 2-120 L) was used depending on the duration of the operation and the expected dust concentration to get a proper fiber density on the filter for microscopic counting.

Asbestos fibers (length over 5 μm, diameter under 3 μm and the aspect ratio over 3:1) were counted by a phase contrast-optical microscope according to the standardized method (Finnish Standard SFS 3668).[14] A similar method is used in many countries (e.g., Sweden, Norway, Denmark, Great Britain, the Federal Republic of Germany and the United States). This method has been tested in international quality control analyses.[15]

In addition, respirable dust containing asbestos was measured in some workplaces. Leitz tyndallometer (TM Digital) that measures dust with particle diameters up to 3 μm was used with xy-plotter to monitor the dust concentration by time, and for the comparison of the relative dust concentrations produced by different working procedures.

Eight-hour time-weighted average (TWA) concentrations of asbestos were estimated for different work procedures. The estimates were calculated by using the measured mean and maximum concentrations, as well as the mean durations of the operations. It was assumed that the brake maintenance of four wheels was carried out during the workday. Other less common operations — such as grinding of brake linings, turning of brake drums and clutch repair — were assumed to take 1 hr of the workday. The calculated concentrations do not include the background concentration of asbestos, because only very few data were available

## Results

The results are presented by operation and type of vehicle. As to buses and trucks, the results were similar, and they are combined in Table 1. The highest concentrations were measured during grinding of brake linings when local exhaust was not used. Other operations during which the mean concentration exceeded 1 fiber/cm³ (f/cm³) were the brushing of brakes, the cleaning of brakes with a wet cloth, compressed

air blowing, and grinding of brake linings, ev vacuum funnel or local exhaust was in use. Dur operations, the mean concentration was under

The results on passenger cars are presented The mean concentration of asbestos exceeded during compressed air blowing without exhaus

The estimated asbestos concentrations duri hypothetical 8-hr workdays are shown in Figure to these calculations, the average exposure to a ing the workday was usually 0.1-0.2 f/cm³ duri pair of trucks or buses, and under 0.05 f/cm³ dur passenger car brakes. The heaviest exposure, a b was due to grinding of brake linings for 1 hr with

Three examples of the variation of the dust co by time as measured by Leitz tyndallometer a Figure 2. The concentration remained at a low washing of the brakes, but during brushing and air blowing, the concentration of dust — and p that of asbestos — was characterized by high concentration, however, decreased to the back rapidly, usually in 1-2 min.

Also the interday variation in the concentrati noting because the frequency of brake maint varies with workplace. According to the data of Register of Employees Occupationally Exposed gens, a car mechanic maintains on average the t trucks or buses in a year (range 1-45, sample places). The corresponding figure for workplaces mainly passenger car brakes is 41 (range 3-150, 23 Therefore, it is likely that the annual mean expo less than that shown in Figure 1. In addition th in exposure between the heavy vehicles and pass diminished to some extent. When the daily expo brake repair of heavy vehicles is on average higher than during brake repair of passenger cars mean exposure is only 3-5 times higher.

## Discussion

The occupational exposure limit for asbestos is (8-hr TWA) in most countries. The Threshold L (TLVs®) adopted by the American Conference mental Industrial Hygienists (ACGIH) are 2 chrysotile, 0.5 f/cm³ for amosite, 0.2 f/cm³ for and 2 f/cm³ for other forms of asbestos fibers[1] maintenance of trucks and buses, the ACGIH chrysotile asbestos was exceeded only when new ings were ground without local exhaust (Figure other procedures, the estimated mean concentrati than 10% of the TLV. The unestimated backgrou tration of asbestos in the brake maintenance w however, gives rise to the possibility of underesi the TWA concentrations. The background conce asbestos measured in this study was, at its highes as the detection limit of the method (0.1 f/cm³). slightly higher short-term background concentra been found also in other studies.[1,8,17,18] It is not infer exactly the magnitude of the 8-hr TWA b

TABLE I
Asbestos Fiber Concentrations by Operation in Brake Maintenance of Trucks and Buses

| Operation | Asbestos Fiber Concentration (f/cm³) | | | Samples | Workplaces | Range of Sampling Time (min) |
| --- | --- | --- | --- | --- | --- | --- |
| | Range | Median | Mean | | | |
| Opening of brakes | <0.1-1.9 | 0.1 | 0.4 | 25 | 13 | 2-25 |
| Opening and brushing of brakes | <0.1-1.0 | 0.1 | 0.3 | 6 | 4 | 1-12 |
| Cleaning of brakes by brushing | 0.1-4.5 | 0.9 | 1.3 | 8 | 3 | 2-12 |
| Cleaning of brakes with compressed air jet, enclosure and exhaust in use | 0.2-3.0 | 0.7 | 1.2 | 9 | 5 | 1-14 |
| Cleaning of brakes with damp cloth | 1.1-3.3 | 1.3 | 1.9 | 3 | 2 | 2-5 |
| Opening of brakes and cleaning of brakes by washing | <0.1-0.3 | 0.2 | 0.2 | 6 | 4 | 2-10 |
| Cleaning of brakes by washing with water | <0.1-0.2 | 0.2 | 0.1 | 6 | 5 | 4-18 |
| Loosening rivets from brake linings | <0.1-1.6 | 0.2 | 0.3 | 12 | 9 | 5-29 |
| Cleaning of brake shoes | 0.3-0.4 | · | · | 2 | 1 | 3-5 |
| Punching rivets into brake linings | 0.1-3.5 | 0.4 | 0.7 | 28 | 9 | 3-50 |
| Grinding of brake linings with machine, no exhaust | 0.3-125 | 67 | 56 | 5 | 2 | 4-27 |
| Grinding of brake linings with machine, exhaust in use | 0.1-5.9 | 0.6 | 1.5 | 30 | 4 | 4-33 |
| Bevelling edges of brake linings with file | 0.1-0.9 | 0.3 | 0.4 | 7 | 3 | 2-5 |
| Cleaning of brake drums by brushing | 0.5-0.7 | · | · | 2 | 1 | 3-6 |
| Grinding of brake drums | 0.1-0.3 | 0.2 | 0.2 | 6 | 4 | 3-56 |
| Assembling of brakes | <0.1-0.4 | 0.1 | 0.2 | 9 | 6 | 6-41 |
| Sweeping floor of garage | <0.1-1.7 | 0.3 | 0.6 | 4 | 3 | 2-4 |
| Other, rare operations | <0.1-0.6 | <0.1 | 0.2 | 5 | 2 | 2-30 |
| Background to brake maintenance | <0.1-0.1 | 0.1 | <0.1 | 3 | 3 | 3-58 |

concentration based on these data, but it is likely to be less than 0.1 f/cm³ in the present Finnish garages. Even though this concentration is low when compared with the occupational exposure limits. It is considerably more than in the urban atmosphere. According to electron microscopic studies. 1 ng of asbestos corresponds approximately to 400 fibers of asbestos as counted by a phase contrast microscope.[19] If this conversion factor is applied to the concentrations measured by electron microscopic methods, the mean concentration of asbestos fibers in urban air has been reported to be below 0.001-0.003 f/cm³ in Great Britain[20] and about 0.002 f/cm² in 46 cities in the U.S[21] The concentrations measured near busy road junctions in New York City were 0.004-0.02 f/cm².[22]

Reports on asbestos exposure during brake maintenance have been published earlier by Rohl et al.[4] Lorimer et al.[6]

Hickish & Knight[6,7] and Rödelsperger et al.[8] The exposure estimates of this study (8-hr TWA: below 0.01-0.5 f/cm³; annual mean: below 0.01-0.03 f/cm³) are compatible with the results of the recent German study.[23] Hickish and Knight,[6] however, reported the 8-hr TWA of 1.8 f/cm³ for a truck brake service worker and of 0.7 f/cm² for a worker who maintained the brakes of eleven passenger cars during the workday. These values are higher than those reported in this study. The difference may be due to the different work procedures used during the measurements. The data of Hickish and Knight[6] were published in 1970 and the procedure used was the compressed air blowing without exhaust, whereas the authors' data are mainly from the 1980s when a vacuum funnel is nearly always used during blowing of truck brakes in Finland. Furthermore, in the servicing of passenger cars, the air jet blowing without exhaust is nowadays

TABLE II
Asbestos Fiber Concentrations by Operation in Brake Maintenance of Passenger Cars

| Operation | Asbestos Fiber Concentration (f/cm³) | | | Samples | Workplaces | Range of Sampling Time (min) |
|---|---|---|---|---|---|---|
| | Range | Median | Mean | | | |
| Opening and brushing of drum brakes | 0.3-0.6 | 0.4 | 0.4 | 4 | 2 | 2-13 |
| Cleaning of drum brakes with compressed air jet, no exhaust | <0.1-8.2 | 0.4 | 1.5 | 9 | 3 | 1-10 |
| Cleaning of drum brakes with compressed air jet, exhaust in use | <0.1-0.2 | 0.1 | 0.1 | 5 | 2 | 2-15 |
| Cleaning of brake drum by brushing | 0.1 | - | - | 1 | 1 | 1 |
| Grinding of brake drums | 0.5 | - | - | 1 | 1 | 3 |
| Cleaning of disc brakes and changing of brake pads | <0.1-0.2 | <0.1 | <0.1 | 8 | 1 | 7-38 |
| Changing of brake discs | <0.1 | - | - | 2 | 1 | 23-23 |
| Grinding of brake discs | <0.1-0.2 | - | - | 2 | 1 | 10-10 |
| Changing of clutch linings | <0.1-0.1 | <0.1 | <0.1 | 3 | 2 | 8-12 |
| Background to brake maintenance | 0.1 | - | - | 1 | 1 | 44 |

used only during cleaning of disc brakes that are not as dusty as drum brakes. The TWA estimates in the present study, and those in the study by Hickish and Knight[8], are thus actually based on different work procedures

Measurable concentrations of asbestos fibers have been reported to exist up to a distance of 25-30 m from a repairman blowing dust from the brakes with compressed air. According to these results, it takes 15-20 min until the background level of about 0.1 f/cm³ is reached again.[4,5] The present study indicates a more rapid decrease in concentration, but the lower initial concentration and indirect measuring method (tyndallometry) probably explain the difference.

During the grinding of new linings the asbestos concentration has been reported to be 24-72 f/cm² near the workplace and 0.3 f/cm³ at a distance of 10 m.[4] These concentrations are compatible with the results of the present study. The results demonstrate that the grinding of new linings is an operation that may cause heavy exposure unless the enclosure and the local ventilation are efficient.

The vacuum brush method has been preferred to compressed air blowing with a vacuum funnel, in the servicing of truck brakes.[17] The authors' results indicate that the most preferable method of cleaning brakes is by washing with water. The concentration of asbestos during washing was considerably lower than during brushing, vacuum funnel blowing or wiping with a damp cloth. The concentration during vacuum brush cleaning was not measured because it was not used in any of the 24 workplaces under study.

The likelihood of contracting asbestos-related disease because of brake repair cannot be inferred accurately from the

exposure data of this study. Six verified cases of asbe... among car repair workers, however, have been repor... the Finnish Register of Occupational Diseases during 1984. Four of them were car mechanics, one was a t... and one a garage supervisor. In addition, two car mech... in the garage of an asbestos quarry have been affected asbestosis, but their exposure mainly may have orig... from contaminated mine vehicles. It is noteworthy, ... ever, that the past exposures during brake mainte... probably have been heavier that the concentrations rep... in this study. Thus the present exposure may indic... lowered risk of asbestosis in the future.

It is well-established that exposure to asbestos may ... cancer — especially mesothelioma and lung cancer.[24] ... are only few epidemiological data on the cancer morbid... mortality among car mechanics. Nicholson[20] has refer... the data of McDonald and McDonald, according to ... at least eleven cases of mesothelioma were diagnosed a... automobile maintenance workers in Canada during ... 1972 and in the U.S. in 1972. In the Federal Repub... Germany, four cases of mesothelioma have been obs... among car mechanics.[21] One case of mesothelioma ... brake repair worker has been reported in detail.[25] Bas... exposure and x-ray data, Nicholson has estimated th... probability of contracting asbestos-related cancer a... automobile maintenance workers is over tenfold less ... among insulators and manufacturing workers expos... asbestos.[25] Additional epidemiological studies are n... theless required to obtain more accurate information o... cancer risks among car mechanics, and to evaluate the ... sible contribution of smoking and other chemical expo... to the risks in car repair work.





Figure 1 — Estimated mean (bar) and maximal (T-length) exposures to asbestos during a hypothetical workday with different cleaning procedures of brakes; four wheels of a truck, bus or a passenger car are maintained. The background concentration of asbestos is not included in the calculations.

Figure 2 — Variations in respirable dust concentration as measured by Leitz tyndallometer during different cleaning procedures of bus brakes; a) cleaning of brakes by brushing; b) cleaning of brakes with compressed air jet, vacuum funnel in use; and c) cleaning of brakes by washing with water

### Acknowledgments

We wish to thank our colleagues in the Regional Institutes of Occupational Health, especially Mr. Berndt Engström and Ms. Salme Rantanen have been extremely kind in providing information. The help of Ms. Marja Vasama and Dr. Matti Huuskonen in providing the data from the Register of Occupational Diseases also is gratefully acknowledged.

### References

1. Herva, A. and T. Partanen: Computerizing Occupational Carcinogenic Data in Finland *Am. Ind. Hyg. Assoc. J.* 42:529-533 (1981)
2. Institute of Occupational Health: *ASA 1983. Data on Employees Occupationally Exposed to Carcinogens* Helsinki, Finland: Institute of Occupational Health, 1985 [In Finnish]
3. Heidermanns, G. G. Kuhnen, A. Schütz and R. Prochazka: Dust Concentrations During Production of Asbestos Containing Friction Materials and Brake Repair in Truck Maintenance Workplaces *Staub Reinhalt. Luft* 35:433-436 (1975). [In German]
4. Rohl, A.N., A.M. Langer, M.S. Wolf and I. Weisman: Asbestos Exposure During Brake Lining Maintenance and Repair *Environ. Res.* 12:110-128 (1976)
5. Lorimer, W.V., A.N. Rohl, A. Miller, W.J. Nicholson and I. Selikoff: Asbestos Exposure of Brake Repair Workers in the United States *Mount Sinai J. Med.* 43:207-218 (1976).
6. Hickish, D.E. and K.L. Knight: Exposure to Asbestos During Brake Maintenance *Ann. Occup. Hyg.* 13:17-21 (1970)
7. Lohrer, W. and M. Berlin: Substitution of Asbestos in Friction Linings - Problems and Trends *Staub Reinhalt. Luft* 43:78-85 (1983). [In German]
8. Lynch, J.R.: Brake Lining Decomposition Products *J. Air Pollut. Control Assoc.* 18:824-826 (1968)
9. Hatch, D.: Possible Alternatives to Asbestos as a Friction Materials. *Ann. Occup. Hyg.* 13:25-29 (1970)
10. Rowson, D.M.: The Chrysotile Content of the Wear Debris of Brake Linings. *Wear* 47:315-321 (1978)
11. Alste, J., D. Watson and J. Bagg: Airborne Asbestos in the Vicinity of a Freeway *Atmos. Environ.* 10:583-586 (1976)
12. Seshan, K.: On the Utility of Dark-Field Electron Microscopy in the Determination of the Degree of Deformation in Chrysotile Asbestos: An Environmental Research Application *Environ. Res.* 16 383-392 (1978)
13. Bolltai, M.A. and M. Lob: Risk of Asbestosis in Workers Employed in Replacing Automobile Brake Linings *Schweiz Med. Wochenschr.* 103:1354-1359 (1973) [In German]
14. Finnish Federation of Standards: *Air Control Workplace Atmosphere. Counting Criteria for Asbestos Fibers.* A Finnish Standard SFS 3868. Helsinki, Finland: Finnish Federation of Standards, 1981. [In Finnish]

15. Becket, T., B. Gylseth, S. Krantz, I.M. Paris and T. Schneider: An Exchange of Membrane Filter Samples of Airborne Asbestos Between One U.K. and Three Scandinavian Laboratories. *Scand. J. Work Environ. Health* 5:42-49 (1979).

16. American Conference of Governmental Industrial Hygienists: *TLVs® — Threshold Limit Values and Biological Exposure Indices for 1985-86*. Cincinnati, Ohio: ACGIH, 1986.

17. Knight, K.L. and D.E. Hickish: Investigations into Alternative Forms of Control for Dust Generated During the Cleaning of Brake Assemblies and Drums. *Ann. Occup. Hyg.* 13:37-39 (1970).

18. Wambugu, A.W., A.S. Mubishi, W.D. Sakari, K. Kurppa, T. Kousela and A. Zitting: A Study of Workers Exposed to Asbestos During Brake and Clutch Lining Maintenance in a Kenian Workshop. A Radiological Survey. In *Proceedings of the Second Finnish-Kenian Symposium on Occupational Safety and Health*, edited by L. Saarinen, K. Kurppa and H. Koivunen. Nairobi, Kenya and Tampere and Helsinki, Finland: Institute of Occupational Health, 1983.

19. Dement, J.M., R.D. Zumwalde and K.M. Wallingford: Discussion Paper: Asbestos Fiber Exposures in a Hard Rock Gold Mine. *Ann. N.Y. Acad. Sci.* 271:345-352 (1976).

20. Burdett, G.J., J.N. Le Geen and A.P. Rood: Concentrations of Airborne Asbestos in the Non-occupational Environment — A Preliminary Report of U.K. Measurements. *Ann. Occup. Hyg.* 28:31-38 (1984).

21. National Institute for Occupational Safety and Revised Recommended Asbestos Standard (NIOSH No. 77-169). Washington D.C.: NIOSH, 1976.

22. Selikoff, I.J., W.J. Nicholson and A.M. Langer: Asbestos Pollution. *Arch. Environ. Health* 25:1-13 (1972).

23. Rödelsperger, K., H. Jahn, B. Bruckel, J. Manke, and H.-J. Woltowitz: Asbestos Dust Exposure Durin Repair. *Am. J. Ind. Med.* 10:63-72 (1986).

24. International Agency for Research on Cancer: The Industrial Processes and Industries Associated with in Humans. In *IARC Monographs Supplement 4*. France: IARC, 1982.

25. Nicholson, W.J.: Estimates of Occupational Mortal Past and Projected Exposure to Asbestos. In *Proc of the World Symposium on Asbestos May 20-27, 19 196-149*. Montreal, Canada: Canadian Asbestos In tion Centre, 1982.

26. Langer, A.M. and W.T. McCaughey: Mesothelioma Brake Repair Worker. *Lancet* i: 1101-1103 (1982). 16 June 1986; Revised 3 January 1987

---

# PETITION FOR CONTRACT AGREEMENT
# FOR THE GENERATION OF REFERENCE SAMPLES
# TO SUPPORT THE
# AIHA PROFICIENCY ANALYTICAL TESTING (PAT) PROGRAM

The Proficiency Analytical Testing (PAT) Program is an inter-laboratory, round-robin testing program where industrial hygiene reference samples are sent quarterly to participating laboratories. The program currently provides reference samples of lead, cadmium, zinc, silica, asbestos and organic solvents (benzene, carbon tetrachloride, cellosolve acetate, 1,2-dichloroethane, hexane, methylene chloride, methyl chloroform, methyl ethyl ketone, methyl isobutyl ketone, octane, chloroform, p-dioxane, toluene, trichloroethylene and O-xylene) to over 670 public and private laboratories on a quarterly basis.

The American Industrial Hygiene Association is accepting proposals for the Proficiency Analytical Testing Program until June 30, 1987. Companies which feel they are capable of preparing reference materials on various air sampling media by aerosol generation and filtration means should request a proposal which states the specifics of such work. The awardee of this contract will prepare variable quantities of PAT reference samples in accordance with AIHA specifications including shipping samples to participating laboratories on a quarterly basis.

The quantities of each contaminant sample set (metals, silica, asbestos and organic solvents), in addition to the quantity of sample kits to be delivered to the participants are variable to match sample production as closely as possible with participant analytical needs and the number of laboratories participating in the program.

Requests for proposals should be directed to:

American Industrial Hygiene Association
c o Rebecca S. Boyes, Manager
Member Services
475 Wolf Ledges Parkway
Akron OH 44311-1087
(216) 762-7294

504                                                                          Am Ind Hyg Assoc J (48)

EXHIBIT DD



y to science. firm in our
blimated compassion and
tion of science that we gain
to live and to live mini
unworthy of the name is

Mount Sinai Journal of Medicine
Vol. 43, No 3, May–June. 1976
Printed in U.S.A.

# Asbestos Exposure of Brake Repair Workers in the United States*†

WILLIAM V. LORIMER, M.D., ARTHUR N. ROHL, Ph.D., ALBERT MILLER, M.D.,
WILLIAM J. NICHOLSON, Ph.D., and IRVING J. SELIKOFF, M.D.

## Introduction

At least 900,000 people in the United States are employed as auto mechanics or garage workers (1). An unknown but large percentage of these workers regularly service brake linings. Brake linings pose a potential hazard for asbestos exposure because they contain 53–73% asbestos (2–4). Jacko and Ducharme (2) have estimated that 70 million pounds of asbestos (32 million Kg) are worn away from brake linings each year in the United States. Much of the asbestos worn away (around 80%–90%) drops to the road or is emitted into the atmosphere.

The wearing of asbestos linings is complex and for brief periods of time local areas in the lining surface have temperatures exceeding 630°C. the temperature at which chrysotile asbestos loses the major portion of its water of hydroxylation and loses its characteristic morphology The bulk temperature cannot exceed 350–400°C for any length of time without decomposition of the organic polymer binder material

Several investigators (2–4) have analyzed bulk brake-drum dust for chrysotile and have found weight percentages of between 0.3% (2) to "at most 1%" (3). Lynch (4) reported percentages of 10% and 15% free fiber in two of fifteen samples. Most of the rest were below 1%

Personal and background sampling of workers engaged in brake maintenance work at the job site gives a more direct estimate of exposure.

During brake-lining servicing the wheel is removed and all loose dust is removed from the drums and backplates. Compressed air jets are usually used (Fig. 1). In a two-city survey in the USA, Castleman et al (5) found that 175 out of 220 establishments used this procedure Alternates include vacuuming and wet brushing The brake lining itself may require grinding to remove irregularities or removal and replacement. The new lining may require considerable manipulation to fit the brake shoe—beveling edges and punching holes in the material. for example. As an alternative, the brake shoe and lining

From the Department of Community Medicine and the Department of Medicine Mount Sinai School of Medicine of The City University of New York, N Y 10029
* Presented at the XVIII International Congress on Occupational Health, Brighton England September 16 1975
† This work was supported by New York City Health Research Council L.2007 (EHS Grant ES 00928 and NIH Research Training Fellowship National Heart and Lung Institute Grant HL 05561 Dr Lorimer) and by The Ford Motor Company
Requests for reprints should be sent to Dr. William Lorimer Environmental Sciences Laboratory Mount Sinai School of Medicine of The City University of New York N Y 10029

208                    WILLIAM V. LORIMER ET AL



FIG. 1. Auto worker cleaning brake drum with compressed air jet. Note personal sampler on the right side of worker's chest.

may be replaced as a unit. A number of studies have measured exposure in such work, and fiber counts reported are summarized in Table I.

In addition, Boillat and Lob (6) reported values for various manipulations of the brake-lining material including punching holes for rivets, and grinding. Sampling interval is not given. Fiber counts ranged from 0.3 to 29.2 fibers/ml; four of the nine values were over 5 fibers/ml (5,000,000/m³)

*Asbestos disease*. Asbestosis in brake liners has been recognized and compensated in Great Britain for many years (9), and instances of mesothelioma in garage workers have also been identified (10-12). Boillat and Lob (8) examined 39 vehicular maintenance workers who had performed brake-lining service for about ½-2 hours a day for a mean of 8± years. They found two men who may have had mild cases of asbestosis. The study, however, provided no information as to the risk with longer exposures.

### Present Investigation

In order to provide additional information on this subject, we have investigated asbestos exposure among brake repair maintenance workers in New York City and have initiated a clinical survey of workers employed in the workshops studied

## ASBESTOS EXPOSURE

### Materials and methods

Personal air samples were taken during brake-lining maintenance work both on automobiles and trucks. These were peak samples taken over 2-10 minutes



ASBESTOS EXPOSURE OF BRAKE REPAIR WORKERS 209

TABLE 1

*Asbestos Fiber Measurements in Brake Maintenance Service*

| Reference | Operation | Sampling method | Sampling interval (min) | Fibers/ml | Peak or TWA* | Comments |
|---|---|---|---|---|---|---|
| Hickish and Knight (4) | blowing out dust | static samples by side of car-2 | 90 | 1.25 | TWA* | Four brake blowouts during this time |
| | | static samples, in dust cloud during blowing, 2 | 90 | 2.05 | | |
| | mechanic employed on brake cleaning, blowing, personal sampling (2 men) | 460 | 0.68 | TWA | —Eight hour shift |
| | | | 100 | 7.09 | | —Work on brakes |
| | | | 300 | 0.08 | | —Not working on brakes |
| | background — adjacent bay 2 bays away, garage center | peak static samples (mimicing said situation) | 180 | 0.28 | TWA | Brakes blown in morning but not in afternoon |
| | | | 180 | 0.07 | | |
| | | | 180 | 0.17 | | |
| | | | 180 | 0.07 | | |
| | | | 180 | 0.40 | | |
| | | | 180 | 0.11 | | |
| Hatch (10) | blowing out dust | peak samples over a few sets, 7 samples from a dust clouds | few seconds | 43 ± 2.1 | Peak | Hand-held pump |
| Kresge and Hickish (12) | blowing dust | personal (two men) | 60 | 5.55 | | Taken over hose during which brake work done |
| | | | | 0.84 | | pump in breathing zone |
| | | from breathing zone (2 men) | 2 acts | 87 | Peak | |
| | | | | 87 | | |
| | | static sampler adjacent bay | 180 | 0.52 | | |
| | | | | 0.16 | | |

* TWA — Time weighted average



210                         WILLIAM V. LORIMER ET AL

during which the workers were performing certain tasks, such as blowing dust
from drum brakes, renewing used linings by grinding, and beveling new
linings. Background samples were also taken at varying distances and times.
The standard techniques for filter processing and fiber counting which have
been adopted by the Occupational Safety and Health Administration of the
US Department of Labor were used (13). Samples of dust collected in the
standard manner were examined both by standard optical techniques (fi-
bers/ml > 5μ) and by electron microscopy to give μg/m³ of air, and the results
compared. Bulk samples of brake-drum dust were collected and analyzed by
electron microscopy. One hundred fibers were sized in each sample. Qualita-
tive morphologic comparisons of the fibers with standard chrysotile morphol-
ogy were made.

*Results*

Fiber concentrations for personal and background samples during blowing
dust from drum brakes on automobiles are presented in Table II. The values
show extensive variation, but the values at 3–5 feet are by far the highest, with
a mean of 15.9 fibers/ml.

Fiber concentrations for personal and background samples during renewing
used linings by grinding truck brakes are presented in Table III. The mean
concentration for the personal sampler was 3.8 fibers/ml. Fiber concentrations

TABLE II

*Personal Samples—Automobile Brake Service*

| Operation | Distance | Concentration fibers/ml* |
|---|---|---|
| Blowing dust out of drum brakes | 3–5 ft | 15.8 |
| Blowing dust out of drum brakes | 3–5 ft. | 29.4 |
| Blowing dust out of drum brakes | 3–5 ft | 6.6 |
| Blowing dust out of drum brakes | 3–5 ft | 13.6 |
| Blowing dust out of drum brakes | 5–10 | 3.5 |
| Blowing dust out of drum brakes | 5–10 | 2.0 |
| Blowing dust out of drum brakes | 6–10 | 4.2 |
| Blowing dust out of drum brakes | 10–20 ft | 0.4 |
| Blowing dust out of drum brakes | 19–20 ft | 1.5 |

*Background Samples—Automobile Brake Service*

| Operation | Distance from Operation | Time Lapse | Concentration fibers/ml* |
|---|---|---|---|
| Blowing dust out of drum brakes | 10 ft | 0 min | 0.3 |
| Blowing dust out of drum brakes | 25 ft | 0 min | 0.3 |
| Blowing dust out of drum brakes | 12 ft | 5 min | 0.5 |
| Blowing dust out of drum brakes | 30 ft | 5 min | 0.5 |
| Blowing dust out of drum brakes | 48 ft | 7 min | 0.5 |
| Blowing dust out of drum brakes | 75 ft | 14 min | 0.5 |

* Only fibers longer than 5 μ were counted by phase microscopy at 400×.



ASBESTOS EXPOSURE OF BRAKE REPAIR WORKERS                    211

**TABLE III**
*Personal Samples—Truck Brake Service*

| Operation | Concentration (fibers/ml) |
|---|---|
| Renewing used linings by grinding | 2.7 |
| Renewing used linings by grinding | 7.0 |
| Renewing used linings by grinding | 2.2 |
| Renewing used linings by grinding | 4.1 |
| Renewing used linings by grinding | 5.0 |
| Renewing used linings by grinding | 4.7 |
| Renewing used linings by grinding | 5.6 |
| Renewing used linings by grinding | 1.7 |
| Renewing used linings by grinding | 2.5 |
| Renewing used linings by grinding | 2.0 |

*Background Samples—Truck Brake Service*

| Operation | Distance | Concentration (fibers/ml) |
|---|---|---|
| Background to grinding used linings | 10 ft. | 1.2 |
| Background to grinding used linings | 10 ft. | 1.7 |
| Background to grinding used linings | 25 ft. | 1.0 |
| Background to grinding used linings | 25 ft. | 0.6 |
| Background to grinding used linings | 60 ft. | 0.9 |

for personal and background samples during beveling new linings for trucks are given in Table IV. The mean concentrations were 37.5 fibers/ml.

To determine the correlation between optical fiber counts and mass of chrysotile, sections of filters collected as above were analyzed both by phase contrast optical microscopy and transmission electron microscopy. The results are given in Table V. Ten samples of bulk brake-drum dust were analyzed to determine the percentage of short fibrils, defined as 250–500 Å × 750–3750 Å. A mean of 83% of all chrysotile fibers were in this category. A mean of about 20% of the total mass of the ten samples was chrysotile by electron diffraction. Throughout the examination by electron microscopy, attention was given to the morphology of the fibers. A majority of fibers showed little alteration in the typical chrysotile fiber (see Figure 2). Some fibrous and granular particles, when analyzed by electron microscope-electron microprobe techniques, had structural and chemical characteristics of fosterite, a thermal alteration product of chrysotile (Fig. 3). Amorphous material with magnesium silicate composition was also found along with the fibrous particles (Fig. 4).

## CLINICAL STUDY

### Materials and methods

104 men, members of a union of vehicular maintenance workers, were examined in a preliminary study of brake-maintenance workers in New York City. All were volunteers. The examination included a detailed occupational and environmental history, medical history, physical examination, chest

212                    WILLIAM V. LORIMER ET AL

### TABLE IV
*Personal Samples—Truck Brake Service*

| Operation | Concentration (fibers/ml) |
|---|---|
| Beveling new linings | 31.7 |
| Beveling new linings | 23.7 |
| Beveling new linings | 32.7 |
| Beveling new linings | 52.0 |
| Beveling new linings | 26.3 |

### Background Samples—Truck Brake Service

| Operation | Distance | Concentration (fibers/ml) |
|---|---|---|
| Background to beveling linings | 5 ft. | 0.6 |
| Background to beveling linings | 12 ft | 0.5 |
| Background to beveling linings | 12 ft | 0.3 |
| Background to beveling linings | 30 ft. | 0.3 |

### TABLE V
*Automobile Brake-Lining Service*

| Operation | Comparison of Optical and E M Fiber Counts | |
|---|---|---|
| | Optical Microscopy | Electron Microscopy |
| | *fibers ml* | *_c m³* |
| Light grinding of new linings before installation | 4.5 | 53.0 |
| Grinding new linings before installation | 3.7 | 65.0 |
| Blowing dust off drum with air jet | 3.4 | .. |
| Cleaning brake drum with hand brush | 3.6 | 6.5 |
| Background to blowing out brake drum (10 feet away) | 0.3 | 0.3 |
| Background to blowing out brake drum (20 feet away) | 0.9 | 0.3 |
| Background to blowing out brake drum (65 feet away) | 1 | 0.3 |

x-ray, and pulmonary studies. Three men were excluded from analysis because they had worked in a shop for less than 10 years. Also excluded from analysis were nine men whose occupational history raised the possibility of other asbestos exposure. Two men were excluded because of known chest disease. The remaining 90 believed themselves to be healthy; all either were currently working (84) or had retired because of age (6).

### Occupational Categories

| | |
|---|---|
| General mechanics | 67 |
| Body workers | 7 |
| Undercoaters | 5 |
| Lubrication | 4 |
| Painters | 2 |
| Miscellaneous other crafts | 5 |
| | 90 |

ASBESTOS EXPOSURE OF BRAKE REPAIR WORKERS

213



0.5 μ

Fig. 2  Chrysotile fibers from brake-drum dust.

0.25 μ

Fig. 3  A fosterite fiber from brake-drum dust.

Concentration
(fibers/ml)
0.6
0.5
0.3
0.3

Specimen and
Fiber Counts

Electron
Microscopy
μg/m²
33 0
36 0
: 1
6 5
0 2
0 1
0 2

d from analysis
so excluded from
the possibility of
of known chest
y: all either were

214                          WILLIAM V. LORIMER ET AL



0.5 μ

FIG. 4. Amorphous material mixed with chrysotile fibers from brake-drum dust.

Sixty-one of the sixty-seven general mechanics did brake lining more than once a week for ten years or more. The workers had a mean age of 48 ± 12 years with 26 ± 8 years on the job.

*Results*

*Clinical examination:* Findings on pulmonary examination were minimal. There were five cases of clubbing and four instances in which fine rales were heard.

*Pulmonary function:* Standard spirometry was performed on a Systems Research Laboratory screener. The measurements used were FVC/VC predicted, $FEV_1/FVC$, and, as a more sensitive measure of obstruction in small airways, the $FEF_{75}/FVC$ ratio ($FEF_{75}$ is the forced expiratory flow rate with 25% of the vital capacity remaining to be expired). The results were classified into either restrictive, obstructive, combined, or normal according to the schema given in Table VI; the results are detailed in Table VII. 29% had decreased vital capacity, the percentage increasing with age and most markedly after 20 years from onset on auto work (Table VIII). The differences are statistically significant $.05 > p > .02$.

*Effect of smoking:* Significantly more smokers and ex-smokers than non-smokers were obstructed (Table IX $X^2 = 5.48, .01 > p > .001$) (See note at end of the Table.) There was no significant difference, however, among smokers, non-smokers and ex-smokers with respect to restriction ($X^2 = .01$, not significant).



ASBESTOS EXPOSURE OF BRAKE REPAIR WORKERS          215

### TABLE VI
*Classification of Pulmonary Function in Vehicular Maintenance Workers*

| | FEV₁/FVC ≥ 75 | | $50 < FEV_1/FVC < 75^*$ | $59 > FEV_1/FVC^*$ |
|---|---|---|---|---|
| | $FEF_{25}/FVC \geq 30$ | $FEF_{25}/FVC < 30$ | | |
| FVC/VC pred ≥ 80 | Normal | Obstructive | Obstructive | Obstructive |
| FVC/VC pred = 70–79 | Restrictive | Combined | Combined | Obstructive |
| FVC/VC pred ≤ 69 | Restrictive | Combined | Combined | Combined |

* Note: all those with $FEV_1/FVC < 75$ also had $FEF_{25}/FVC < 30$

### TABLE VII
*Pulmonary Function Abnormalities in 87 Vehicular Maintenance Workers with over 10 Years Experience*

| | Number | Percent |
|---|---|---|
| Restrictive | 14 | 16% |
| Obstructive | 32 | 37% |
| Combined | 11 | 13% |
| Any abnormalities | 57 | 66% |

### TABLE VIII
*Restriction of Pulmonary Function by Year of Onset at Work in 90 Vehicular Maintenance Workers*

| Total restrictive and combined | Abnormal | | | | | |
|---|---|---|---|---|---|---|
| | 1956–65 | | 1946–55 | | Before 1946 | |
| | Yes | No | Yes | No | Yes | No |
| 25 | 1 (6%) | 15 | 14 (35%) | 26 | 10 (34%) | 19 |

For before 1956 compared with 1956 and after: $X^2 = 4.54$  .05 > p > .02

### TABLE IX
*Relationship between Obstruction or Restriction and Smoking in Vehicular Maintenance Workers*

| | Number of Subjects | Current Smokers | Never Smoked | Ex-Smokers |
|---|---|---|---|---|
| Normal | 31 | 10 | 13 | 8 |
| Obstructive | 31 | 15 | 5 | 11 |
| Restrictive | 14 | 3 | 6 | 5 |
| Combined | 11 | 5 | : | 5 |
| Total | 87 | 33 | 25 | 29 |

For restriction $X^2$ .. N.S.  smokers and ex-smokers compared with never smokers
For obstruction $X^2 = 6.25$  .01  p  .001
Those in the combined group counted as being both obstructive and restrictive

216                    WILLIAM V. LORIMER ET AL

The relationship between pulmonary function signs of restriction and abnormal x-rays was investigated. No significant association was found (Table X).

*Chest x-ray:* The chest x-rays were read twice by consensus reading, using at least three experienced readers, and categorized according to the ILO/U/C classification. An x-ray was read as abnormal if fine or moderately thin irregular linear opacities were present (s or t $\geq$ 1/0) and/or pleural thickening was present (a-1 or more). The prevalence of abnormal readings is given in Table XI. Parenchymal abnormalities were present in 19 instances, nine 1/0, six 1/1, two 1/2 and two 2/2. X-ray findings consistent with asbestosis increased with time; such a trend is evident in Table XII. This trend is statistically significant.

TABLE X

*Relationship between X-Ray Reading and Pulmonary Function Tests in 87 Vehicular Maintenance Workers*

| Pulmonary function | Number of Subjects | X-ray reading | | Percent |
|---|---|---|---|---|
| Restriction | 25 | Abnormal* | 5 | 20% |
| | | Normal | 20 | 80% |
| Obstruction | 43 | Abnormal* | 15 | 35% |
| | | Normal | 28 | 65% |
| Normal | 30 | Abnormal* | 8 | 27% |
| | | Normal | 22 | 73% |

* parenchymal fibrosis and/or pleural thickening
For overall pattern $X^2 = 1.75$   $.50 > p > .30$
For restriction alone $X^2 = 1.21$   $.30 > p > .20$
For obstruction alone $X^2 = 1.50$   $.30 > p > .20$
For obstruction and restriction compared to normal: $X^2 = .05$  $.50 > p > .70$

TABLE XI

*X-Ray Changes in 90 Vehicular Maintenance Workers with over 10 Years Experience*

| | Number | Percent |
|---|---|---|
| Parenchymal fibrosis | 18 | 20% |
| Pleural thickening or calcification | 5 | 6% |
| Both parenchymal and pleural changes | 1 | 1% |
| Any changes | 24 | 27% |

TABLE XII

*X-Ray of Vehicular Maintenance Workers by Year at Onset of Work*

| Abnormal* | | | | | |
|---|---|---|---|---|---|
| 1956–65 | | 1946–55 | | Before 1946 | |
| Yes | No | Yes | No | Yes | No |
| 2 | 14 | 10 | 23 | 4 | 16 |
| 15% | | 23% | | 47% | |

* Parenchymal fibrosis ILO/UC s : t 1/0 and/or pleural thickening
$X^2$ for before 1956 compared with 1956 and after: $X^2 = 5.95$  $.02 : p > .01$

## Discussion

The amount of asbestos brake material worn away each year is enormous, and even if only a small percentage is morphologically unaltered, then hundreds of thousands of kilograms remain. Fiber counts in various operations in brake maintenance work show wide variations. Certainly, they indicate that these operations need more systematic evaluation, both as to peak and time-weighted values. Peak values frequently exceed the 10 fiber/ml legal limit for peak values in the United States.

Much of the chrysotile is altered to other phases, which may be fibrous or granular. The biologic activity of these materials has not been studied. Detailed classification and quantification of these changes has not been reported. However, even the incomplete correlations presented above between optical fiber counts and electron microscopic volumes of morphologically intact chrysotile is evidence that fiber counts are useful measures of asbestos exposure in brake repair work.

Many of the vehicular maintenance workers examined showed signs of asbestosis. The prevalence both of chest x-ray changes and restrictive function results was significantly higher after 20 years of exposure than before. a result expected after occupational exposure to asbestos (14, 15).

## Summary and Conclusion

Measurements were made by optical microscopy of asbestos levels during brake repair and maintenance work in New York City. Both time-weighted averages and peak levels showed significant asbestos exposure. Over four-fifths of the total number of chrysotile fibers in brake-drum dust were below 0.4u in length and not visible by optical microscopy. Over one-quarter of a group of experienced vehicular maintenance workers examined had evidence of x-ray abnormalities consistent with asbestosis; one-quarter also had restrictive pulmonary function test findings. While this preliminary study was limited in scope and was restricted to volunteers. and its results cannot therefore readily be generalized to all brake maintenance workers in the United States. the findings suggest that asbestos disease will be present among such workers and that appropriate control measures should be urgently instituted.

## Acknowledgments

We are indebted to the United Automobile Workers Local 259. New York City and to the Automobile Dealers Industrial Relations Association of New York City for their valuable cooperation in the conduct of the field studies in this research

We wish to acknowledge the assistance of Dr Ruth Lilis. Dr Susan Daum. Dr Henry Anderson. and Dr S Alf Fischbein for their cooperation in the clinical and radiologic studies. We also wish to express our appreciation for the valuable assistance of Ann Testelbaum and Raphael Warshaw in our laboratory studies and to Mrs Frances Perez. Mrs Marcia Lorimer R.N. and Mrs Diane Monagan in our field investigations

Case 1:07-cv-00149-***-MPT    Document 4-3    Filed 03/14/2007    Page 42 of 44



218    WILLIAM V. LORIMER ET AL

### References

1. Department of Commerce. Bureau of Census: 1972 Census of Manufacturers. 1972 County Business Patterns, Census of Population: 1970 Occupation by Industry (adapted by J. William Lloyd).
2. Jacko. M. G. and DuCharme, R. T.: Brake Emissions: Emission Measurements from Brake and Clutch Linings from Selected Mobile Sources. EPA Report 65–04–0020. 1972.
3. Hickish, D. E. and Knight, K. L.: Exposure to Asbestos during Brake Maintenance. Ann Occup Hyg 13:17–21. 1970.
4. Lynch, J. R.: Brake Lining Decomposition Products. J Air Pollution Cont Ass 18:824–826. 1968.
5. Castleman, B., Camarota, L. A., Fritsch, A. J., Mazzocchi, S., and Crawley, R. G.: The Hazards of Asbestos for Brake Mechanics. Public Health Reports. Vol. 90 No 3:254–256, 1975.
6. Hatch, D.: Possible Alternatives to Asbestos as a Friction Material. Ann Occup Hyg 13:25–29. 1970.
7. Knight K. L. and Hickish. D. E.: Investigations and Alternative Forms of Control for Dust Generated during the Cleaning of Brake Assemblies and Drums. Ann Occup Hyg 13:26–39. 1970.
8. Boillat. M. A. and Lob. M.: Risk of Asbestosis in Workers Employed in Replacing Automobile Brake Linings. Schweiz Med Wschr 103 (39):1354–1359. 1973.
9. McVittie, J. C.: Asbestosis in Great Britain, Ann NY Acad Sci 132:128–138. 1965.
10. Newhouse. M. L. and Thompson. H.: Mesotheliomas of Pleura and Peritoneum following Exposure to Asbestos in the London Area. Brit J Ind Med 22:261–269. 1955.
11. McDonald. A. D., Harper. A., El Attar. O. A., and McDonald. J. C.: Epidemiology of Primary Malignant Mesothelial Tumors in Canada Cancer 26:914–19. 1970
12. Greenberg. M. and Lloyd Davies. T. A.: Mesothelioma Register 1967–1968. Brit J Ind Med 31:91–104. 1974.
13. National Institute for Occupational Safety and Health: Occupational Exposure to Asbestos 1972.
14. Bader. M. E., Bader. R. A., Teirstein. A S., Miller, A. and Selikoff. I. J.: Pulmonary Function and Radiographic Changes in 598 Workers with Varying Duration of Exposure to Asbestos Mount Sinai J Med 38:492–500. 1970
15. Selikoff. I. J., Churg, J., and Hammond, E. C.: The Occurrence of Asbestosis among Insulation Workers in the United States. Ann NY Acad Sci 132:139–155 1965

*Received for publication January 23. 1976*

SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)

EFiled: Dec 12 2006 10:15 ...EST

COUNTY:    N̲    K    S                CIVIL ACTION NUMBER̲Transaction ID 13164595

CIVIL CASE CODE:   CASB̲                    CIVIL CASE TYPE:   Asbestos̲

(SEE REVERSE SIDE FOR CODE AND TYPE)

| | |
|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE<br><br>COMPANY, INC., *et al.*<br><br>Defendants. | NAME AND STATUS OF PARTY FILING DOCUMENT:<br><br> Defendants, General Motors Corporation and Ford Motor Company <br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br> Response in Opposition to Plaintiff's Motion to Substitute Parties and Add Wrongful Death and Survival Claims <br><br>NON-ARBITRATION  X <br><br>(CERTIFICATE OF VALUE MAY BE REQUIRED)<br><br>Arbitration __    Mediation __    Neutral Assessment __<br>DEFENDANT (CIRCLE ONE)    ACCEPT    REJECT<br><br>JURY DEMAND    X    YES _____ NO<br><br>TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE)<br><br>**EXPEDITED    STANDARD    COMPLEX** |

ATTORNEY NAME(S):

  Christian J. Singewald (#3542)

ATTORNEY ID(S):

  White and Williams LLP

FIRM NAME:

ADDRESS:

824 N. Market Street, Suite 902,
P.O. Box 709, Wilmington, DE 19899-0709

TELEPHONE NUMBER:  (302) 654-0424

FAX NUMBER:   (302) 467-4547

E-MAIL ADDRESS:

singewaldc@whiteandwilliams.com

IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS

_____
_____
_____

EXPLAIN THE RELATIONSHIP(S): _____
_____
_____
_____
_____
_____
_____
_____
_____

OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:__
_____
_____
_____

(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES)

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

WILDMS 138489v.1

EFiled: Dec 12 2006 10:15...
Transaction ID 13164595

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : |
| | :    CIVIL ACTION NO. 06C-02-281 ASB |
|        Plaintiffs, | : |
| | :    ASBESTOS CASE |
|    v. | : |
| | :    TRIAL BY JURY OF TWELVE |
| | :    DEMANDED |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., *et al.,* | : |
| | : |
| | : |
|        Defendants. | : |

### DEFENDANTS, GENERAL MOTORS CORPORATION AND FORD MOTOR COMPANY'S, RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO SUBSTITUTE PARTIES AND ADD WRONGFUL DEATH CLAIM

Defendants, General Motors Corporation ("GM") and Ford Motor Company ("Ford"), by and through their counsel, oppose Plaintiffs' Motion to Substitute Parties and Add Wrongful Death Claim. In support of their position, GM and Ford assert the following:

1.     Plaintiff, James Daniel Collins ("the decedent"), has died.

2.     The decedent's wife, Mary M. Collins, was appointed the Personal Representative of the Estate of James Daniel Collins.

3.     In light of the decedent's death, Plaintiffs now move this Court to substitute Mary M. Collins for the decedent. Plaintiffs also request leave of the Court to allow several parties to assert a wrongful death claim, specifically Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen.[2] Finally, Plaintiffs intend to recover damages under the survival statute.

---

[2] Christopher Scott Collins and Cynthia Rae Martin are the decedent's children. The relationship between the decedent and Lenore Collins, Gloria Serhan, Thomas Collins and Richard Allen, respectively, is not currently known.

WILDMS 138966v.1

4.    Plaintiffs' motion does not assert under what state's substantive law that the Plaintiffs are attempting to amend the Complaint to add additional plaintiffs. Since Plaintiffs have previously indicated that the laws of the State of Washington should apply to this case, Defendants presume that this request is also being set forth on the basis of Washington law.

5.    While Ford and GM do not oppose the substitution of the personal representative of the estate for the decedent himself, these defendants take issue with Plaintiffs' efforts to expand the scope of recovery as a result of the decedent's death. Under the laws of the State of Washington, any rights that flow from the Survival statute belong to the decedent's personal representative alone.[3] Mary M. Collins, as the personal representative of the decedent's estate, is the only party who may assert a Survival claim. While this claim is brought on behalf of and for the benefit of the decedent's family,[4] all other individuals sought to be included in this litigation[5] lack legal standing and are precluded from becoming a party to this cause of action as a matter of law.

6.    Likewise, the Wrongful Death statute permits the personal representative "to maintain an action for damages against the person causing the death ... ."[6] Mary M. Collins, as the personal representative of the decedent's estate, is the only party who may assert the Wrongful Death claim. While this claim is brought on behalf of and for the benefit of the decedent's immediate family,[7] all other individuals sought to be included in this litigation[8] lack legal standing to bring a separate and distinct wrongful death action against the defendants.

---

[3] RCWA § 4.20.046 ("All causes of action by a person or persons against another person or persons shall survive to the personal representatives of the former ... .").
[4] See RWCA § 4.20.020 ("Every such action shall be for the benefit of the wife, husband, child or children, including stepchildren, of the person whose death shall have been caused.").
[5] Plaintiffs' Motion seeks to add the following individuals as plaintiffs: Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen.
[6] RCWA § 4.20.010. See also Solesski v. Oregon Auto. Ins. Co., 526 P.2d 68 (Wash. App. 1974).
[7] See RWCA § 4.20.020.
[8] Plaintiffs' Motion seeks to add the following individuals as plaintiffs: Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen.

- 3 -

WILDMS 138966v.1

**WHEREFORE,** Defendants, General Motors Corporation and Ford Motor Company, respectfully request that this Court allow for the substitution of the Personal Representative, Mary M. Collins, in place of the decedent, James Daniel Collins, yet deny Plaintiffs' request to allow Lenore Collins, Christopher Scott Collins, Cynthia Rae Martin, Gloria Serhan, Thomas Collins and Richard Allen to assert a separate wrongful death and survival claims.

WHITE AND WILLIAMS LLP

By:_____
**CHRISTIAN J. SINGEWALD (DE# 3542)**
824 Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 654-0424
Attorneys for Defendants,
Ford Motor Company and General Motors
Corporation

Dated:  December 12, 2006

EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | C.A. No. 06C-02-281 ASB |
| | : | |
| Plaintiffs, | : | COMPLAINT |
| | : | |
| | : | "FIRST AMENDED COMPLAINT - |
| v. | : | UNDERSCORED LANGUAGE |
| | : | REPRESENTS CHANGES MADE FROM |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | THE FIRST AMENDED COMPLAINT |
| | : | AND BRACKETS INDICATE |
| | : | DELETION FROM THE ORIGINAL |
| FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a | : | COMPLAINT" |
| FOSTER WHEELER ENERGY CORPORATION); | : | NON-ARBITRATION |
| | : | |
| | : | ASBESTOS |
| GEORGIA-PACIFIC CORPORATION (individually and as successor to | : | JURY TRIAL DEMANDED |
| BESTWALL GYPSUM COMPANY); | : | |
| | : | |
| KELLY-MOORE PAINT COMPANY, INC.; | : | |
| | : | |
| AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION); | : | |
| | : | |
| CERTAINTEED CORPORATION; | : | |
| | : | |
| OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I); | : | |
| | : | |
| ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS); | : | |
| | : | |
| GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.); | : | |
| | : | |
| AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION); | : | |

CHAMPLAIN CABLE CORPORATION          :
(individually, and as successor-in-interest   :
to AMERICAN SUPER                    :
TEMPERATURE WIRE, and successor-   :
in-interest to HAVEG INDUSTRIES,     :
INC. successor-by-merger to HAVEG    :
CORPORATION);                        :
                                     :
HERCULES INC. (individually, and as  :
successor-in-interest to HAVEG       :
INDUSTRIES, INC. successor-be-merger :
to HAVEG CORPORATION);               :
                                     :
RILEY POWER, INC. (f/k/a BABCOCK     :
BORSIG POWER, INC., f/k/a D.B.       :
RILEY, INC., f/k/a RILEY STOKER      :
CORPORATION);                        :
                                     :
UNION CARBIDE CORPORATION;           :
                                     :
DANA CORPORATION;                    :
                                     :
CRANE COMPANY;                       :
                                     :
INGERSOLL-RAND COMPANY;              :
                                     :
CROWN CORK & SEAL COMPANY,           :
INC. (individually and as successor-in-  :
interest to MUNDET CORK              :
COMPANY);                            :
                                     :
3M COMPANY (individually and f/k/a   :
MINNESOTA, MINING, AND               :
MANUFACTURING COMPANY, a/k/a        :
"3M");                               :
                                     :
T.H. AGRICULTURE & NUTRITION,        :
LLC (individually and f/k/a T.H.     :
AGRICULTURE & NUTRITION              :
COMPANY, INC. f/k/a THOMPSON-        :
HAYWARD CHEMICAL COMPANY);          :
                                     :
PHILIPS ELECTRONICS NORTH            :
AMERICA CORP. (individually and as   :
successor-in-interest to T H         :
AGRICULTURE & NUTRITION, LLC);       :
                                     :
KAISER GYPSUM COMPANY, INC.;         :
                                     :

KAISER CEMENT CORPORATION     :
(individually, and as successor-in-interest     :
to KAISER GYPSUM COMPANY,     :
INC.);     :
     :
HANSON PERMANENTE CEMENT,     :
INC. (f/k/a KAISER CEMENT     :
CORPORATION, individually and as     :
successor-in-interest to KAISER     :
GYPSUM COMPANY, INC.);     :
     :
BONDEX INTERNATIONAL, INC.;     :
     :
RPM, INC. (individually, and as     :
successor-in-interest to BONDEX     :
INTERNATIONAL, INC.);     :
     :
RPM INTERNATIONAL, INC.     :
(individually and as successor-in-interest     :
to RPM, INC., and BONDEX     :
INTERNATIONAL, INC.);     :
     :
VIACOM, INC. (individually and as     :
successor-by-merger to CBS     :
CORPORATION, successor-by-merger     :
to WESTINGHOUSE ELECTRIC     :
CORPORATION);     :
     :
THE GOODYEAR TIRE & RUBBER     :
COMPANY;     :
     :
BORGWARNER MORSE TEC, INC.,     :
(individually and successor in interest to     :
BORG-WARNER CORPORATION);     :
     :
BORGWARNER, INC.,(individually and     :
successor in interest to BORG-WARNER     :
CORPORATION);     :
     :
HONEYWELL INTERNATIONAL,     :
INC. (individually and as successor-in-     :
interest to ALLIED-SIGNAL, INC. and     :
THE BENDIX CORPORATION);     :
     :
DAIMLERCHRYSLER     :
CORPORATION (f/k/a CHRYSLER     :
CORPORATION);     :
     :
GENERAL MOTORS CORPORATION;     :

FORD MOTOR COMPANY;                          :

PNEUMO ABEX, LLC (individually and           :
as successor-by-merger to PNEUMO             :
ABEX CORPORATION, successor-in-              :
interest to ABEX CORPORATION f/k/a           :
AMERICAN BRAKE SHOE                          :
COMPANY, f/k/a AMERICAN BRAKE                :
SHOE and FOUNDRY COMPANY                     :
including the AMERICAN                        :
BRAKEBLOK DIVISION, successor-by-            :
merger to the AMERICAN BRAKE                 :
SHOE and FOUNDRY COMPANY and                 :
THE AMERICAN BRAKEBLOK                       :
CORPORATION, f/k/a THE                       :
AMERICAN BRAKE MATERIALS                     :
CORPORATION);                                :
                                             :
MAREMONT CORPORATION (a                      :
subsidiary of ARVIN INDUSTRIES,              :
INC., individually and as                    :
successor-in-interest to GRIZZLY             :
MANUFACTURING CO.);                          :
                                             :
HENNESSY INDUSTRIES, INC.,                   :
(individually and as successor by merger     :
to AMMCO TOOLS, INC. and AMMCO               :
TOOLS, CO., d/b/a AMMCO TOOLS);              :
                                             :
A.W. CHESTERTON, INC.;                       :
                                             :
DURABLA MANUFACTURING                        :
COMPANY, INC.;                               :
                                             :
VOLKSWAGEN OF AMERICA, INC.;                 :
                                             :
        Defendants.                          :
                                             :

## COUNT I

1.    Plaintiff, JAMES DANIEL COLLINS, was wrongfully exposed to asbestos, an

inherently dangerous toxic substance while employed at the following places:

        (a)    Plaintiff JAMES DANIEL COLLINS was exposed thru his father, James

               Collins, from his father's work at Fort Lewis  where he worked from

1947-1965; and 1967-1967 as a heating and cooling specialist in Fort Lewis, WA.

(b)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at personal residences from 1950-1952.

(c)    Plaintiff JAMES DANIEL COLLINS performed mechanic jobs at personal residences from 1964-2005.

(d)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at residential sites in Olympia, Washington in 1977.

(e)    Plaintiff JAMES DANIEL COLLINS worked at a salvage yard in Tumwater, Washington in1965.

(f)    Plaintiff JAMES DANIEL COLLINS attended Clover Park Vocational School in Tacoma, Washington from 1967-1969 as a student.

(g)    Plaintiff JAMES DANIEL COLLINS worked at America Oil Service Station in Tacoma, Washington from 1968-1969 as a laborer and light mechanic.

(h)    Plaintiff JAMES DANIEL COLLINS worked at Brewington Motors in Olympia, Washington as a mechanic from 1971-1976.

(i)    Plaintiff JAMES DANIEL COLLINS worked at South Puget Sound Community College in Olympia, Washington from 1985-2005 as an instructor.

(j)    Plaintiff JAMES DANIEL COLLINS worked at Hanson Motors in Olympia, Washington from 1976-1985 as a mechanic.

(k)    Plaintiff JAMES DANIEL COLLINS was employed by Collins Automotive Enterprises where he worked at personal residences in Olympia, Washington from 1975-1976 as a mechanic.

Plaintiff was exposed to asbestos and/or asbestos-containing products which were mixed, mined, manufactured, distributed, sold, removed, installed and/or used by the Defendants.

2.    As a result of the Defendants' wrongful conduct, Plaintiff, JAMES DANIEL COLLINS developed the following asbestos related diseases and health problems:

Mesothelioma;

and other asbestos-related injuries and diseases.

3.    As a result of Defendants wrongful conduct which caused Plaintiff, JAMES DANIEL COLLINS's asbestos related diseases and health problems, Plaintiffs, JAMES DANIEL COLLINS and MARY M. COLLINS suffer extensive mental anguish, pain and suffering, medical bills, physical impairment, permanent disability, loss of earning capacity, loss of consortium and loss of enjoyment of life, all of which are recoverable under applicable law. In addition, Plaintiff(s) MARY M. COLLINS has suffered extensive mental anguish and has been and will continue to be deprived of pecuniary benefits, contributions of support and household services, all of which are recoverable under applicable law.

4.    The above injuries have or will in the future result in a decrease of past or future earnings and various other past and future expenses Plaintiff would not have otherwise incurred.

## COUNT II

5.    The allegations in paragraph one (1) through four (4) are realleged and incorporated by reference within this Count.

6.    FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);

ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS);

GARLOCK SEALING TECHNOLOGIES, LLC (individually and as a successor-in-interest to GARLOCK, INC.);

AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION);

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY);

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC);

KAISER GYPSUM COMPANY, INC.;

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION);

THE GOODYEAR TIRE & RUBBER COMPANY;

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION);

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNEUMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.;

VOLKSWAGEN OF AMERICA, INC.;

were at all times pertinent directly or indirectly engaged in the mining, manufacturing,

distribution, sales, licensing, leasing, installation, removal and/or use of asbestos and asbestos-

containing products. They were also engaged in the development, manufacture, distribution,

sales, licensing or leasing of equipment procedures and/or technology necessary to mine,

manufacture, sell, distribute, install, remove and the use of asbestos and asbestos-containing

products.

      7.     Defendant Metropolitan Life Insurance Company, as well as other members of

the asbestos industry, including but not limited to Defendants listed herein, engaged in

investigations and research as to the hazards of asbestos and often edited out material harmful to

the asbestos industry and only published certain portions of their findings and/or refrained from

publishing anything. Furthermore, Metropolitan Life financially aided the asbestos industry in its

endeavors.

      8.     The illnesses and disabilities of Plaintiff is a direct and proximate result of 3M's

negligence in placing into the stream of commerce respiratory devices defective in design and

inadequate for the purposes for which they were intended, namely preventing the inhalation of

dust, including asbestos dust, generated from construction and/or insulation activities.

      9.     3M knew or should have known that workers would use and rely upon 3M's

respiratory devices at sites where asbestos materials were commonly and extensively used which

created substantial and constant quantities of dust and that 3M's respiratory devices would

provide inadequate protection against the inhalation of asbestos dust.

      10.    Furthermore, 3M was negligent for failing to warn and/or properly instruct

workers regarding the inadequacies of its respiratory devices for preventing the inhalation of

asbestos dust.

11.    As a direct and proximate result of the above wrongful activities of the

Defendants, Plaintiff was exposed to asbestos and the Plaintiff developed the asbestos-related

diseases discussed and sustained the injuries described herein.

## COUNT III

12.    The allegations in paragraphs One (1) through Eleven (11) are realleged and

incorporated by reference within this Count.

13.    The Defendants were negligent in conducting the above activities and/or in the

safety conditions at their plants and facilities in that despite the fact that the Defendants knew or

should have known that asbestos exposure could result in serious injury, disease and/or death

they:

(a)    Failed to substitute, suggest, promote or require the substitution of materials other

than asbestos;

(b)    Failed to adequately warn all the potential victims of asbestos including the

Plaintiff as well as other users, bystanders, household members and members of the general

public of the risks of asbestos;

(c)    Failed to adequately test, research investigate asbestos and/or its effects prior to

sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d)    Failed to adequately package, distribute and/or use asbestos in a manner which

would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff

and others similarly situated;

(e)    Failed to take adequate steps to remedy the above failure, including but not

limited to recall of asbestos, abatement of asbestos on their property, recall of asbestos products,

to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to

render it safe or safely remove the asbestos now in place.

14.     As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT IV**

15.     The allegations in paragraphs one (1) through Fourteen (14) are realleged and incorporated by reference within this Count.

16.     The Defendants willfully and wantonly for their own economic gain and with reckless indifference to the health and safety of the Plaintiff and others similarly situated:

(a)     Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;

(b)     Failed to adequately warn all the potential victims of asbestos including the Plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos exposure;

(c)     Failed to adequately test, research and investigate asbestos and/or its effects prior to sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d)     Failed to adequately package, distribute and use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff and others similarly situated;

(e)     Failed to take adequate steps to remedy the above failure, including but not limited to recall asbestos and asbestos products, to abate asbestos on their property, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

17.     As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

## COUNT V

18.    The allegations in paragraphs one (1) through Seventeen (17) are realleged and incorporated by reference within this Count.

19.    Asbestos and asbestos-containing products are inherently dangerous and as such all Defendants who made or sold asbestos or the equipment, processes or other things necessary for its use, are strictly liable to the Plaintiff for all injuries and damages which were contracted thereby.

20.    All Defendants who assisted, directly or indirectly, in the leasing or licensing of asbestos and all equipment necessary for its use are strictly liable to the Plaintiff for all the injuries and damages which were contracted thereby.

21.    The handling of asbestos packages, installation, removal and use of asbestos is an ultrahazardous activity and all Defendants who assisted directly or indirectly in this are strictly liable for the Plaintiff injuries which were caused thereby.

22.    The Defendant manufacturers and suppliers warranted the asbestos products for their intended purpose and use. Defendants violated this warranty as the product was neither packaged nor provided in a method proper for its intended use and are strictly liable to the Plaintiff for all injuries caused thereby.

23.    As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

## COUNT VI

24.    The allegations in paragraphs One (1) through Twenty-three (23) are realleged and incorporated by reference within this Count.

25.    The Defendants knowing of significant risks of health hazards resulting from exposure to asbestos, did willfully, wantonly, recklessly and/or intentionally;

(a)    Conceal the existence, nature and extent of that risk; and,

(b)    Failed to disclose the existence, nature and extent of that risk to Plaintiff and those similarly situated.

26.    The Defendants had reason to expect that Plaintiff, whose injuries were caused by his exposure, was within the class of persons whose actions or inaction would-be materially affected by the aforementioned concealment and nondisclosure.

27.    As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

### COUNT VII

28.    The allegations in paragraphs one (1) through Twenty-seven (27) are realleged and incorporated by reference within this Count.

29.    The Defendant directly and indirectly materially misrepresented that asbestos was not hazardous and/or could be used safely when they:

(a)    Had no adequate basis for such representations;

(b)    Knew that a significant health hazard to human life existed from asbestos.

30.    Defendants had reason to expect that as a result of such representation, Plaintiff and others similarly situated would be exposed to asbestos.

31.    As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

### COUNT VIII

32.    The allegations in paragraphs One (1) through Thirty-one (31) are realleged and incorporated by reference within this Count.

33.    The Defendants knowingly and wilfully conspired among themselves to perpetuate the actions and omissions referred to herein as well as aided and abided their co-Defendants and manufacturers of asbestos products in keeping the Plaintiff and others similarly situated ignorant of the risks they faced when exposed to asbestos and asbestos containing products.

34.    As a result of this conspiracy, the Plaintiff was exposed to asbestos and suffered the injuries complained of herein.

## COUNT IX

35.    The allegations in paragraphs One (1) through Thirty-four (34) are realleged and incorporated by reference within this Count.

36.    Even after the dangers of asbestos finally began to be known to Plaintiff or others similarly situated, Defendants continued to act wrongfully both individually and together in a conspiracy to mislead and misrepresent the extent of the past wrongful actions and omissions and to destroy records and hide witnesses and other evidence and to such other wrongful and unnecessary action so as to:

(a)    Prevent and delay Plaintiff and others similarly situated from filing legal action to recover for these injuries and/or;

(b)    Defeat and/or delay such legal actions and the final collection of any judgment.

37.    Similarly, Defendants aided and abided the manufacturers, miners, suppliers, and users of asbestos and asbestos products in keeping the true dangers of asbestos exposure secret and/or misrepresented.

38.    As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

## COUNT X

39.    The allegations in paragraphs One (1) through Thirty-eight (38) are realleged and incorporated by reference within this Count.

40.    Plaintiff used a respiratory device designed and manufactured by 3M, commonly known as a "dust mask." Plaintiff would show that the defective condition of such respiratory devices rendered them unreasonably dangerous for use as devices for protection against the

inhalation of asbestos dust and fibers. Plaintiff would further show that the respiratory devices were in a defective condition at the time that they left the hands of the Defendant, 3M.

41.    Defendant 3M was engaged in the business of manufacturing and selling respiratory devices, commonly known as dust masks, and these products, without substantial change in the condition in which they were sold, were a proximate cause of the injuries of Plaintiff.

42.    Defendant 3M knew that its respiratory device would be used without inspection for defects and, by placing them on the market, represented that they would safely preclude the inhalation of asbestos fibers.

43.    Plaintiff was unaware of the defects in the 3M respiratory devices which rendered them ineffective as protection against the inhalation of asbestos dust.

44.    During the periods Plaintiff used and relied upon Defendant's respiratory devices, the devices were utilized in a manner for which they were intended to be used.

45.    As a direct and proximate result of the above acts and omissions of Defendants, Plaintiff was injured as described herein.

### COUNT XI

46.    The allegations in paragraphs One (1) through Forty- five (45) are realleged and incorporated by reference within this Count.

47.    Plaintiff, JAMES DANIEL COLLINS, would show that for a period of many years, he worked with and/or was exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products in the household setting as a result of Plaintiff, JAMES DANIEL COLLINS', father working in various shipyards, steel mills, refineries, paper mills, chemical plants and/or other facilities in the United States. Plaintiff, JAMES DANIEL COLLINS, would show that he has been exposed, on numerous occasions, to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products produced and/or sold by Defendants and, in so doing, has inhaled great

quantities of asbestos fibers.  Further, Plaintiff, JAMES DANIEL COLLINS, alleges, as more specifically set out below, that he has suffered injuries proximately caused by his  exposure to asbestos-containing products designed, manufactured and sold by Defendants.

48.    Plaintiff, JAMES DANIEL COLLINS, alleges that he was exposed to asbestos fibers and dust emanating from the work clothing, body and hair of Plaintiff, JAMES DANIEL COLLINS' father originated from the asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products manufactured, sold, and/or distributed by Defendants. Plaintiff, JAMES DANIEL COLLINS, was exposed to the asbestos dust and fibers brought home by Plaintiff, JAMES DANIEL COLLINS', father in the normal course of performing household activities, such as shaking out and laundering work clothing.  In that each exposure to such products caused or contributed to Plaintiff, JAMES DANIEL COLLINS' injuries, Plaintiff, JAMES DANIEL COLLINS, says that the doctrine of joint and several liability should be extended to apply to each Defendant herein.

WHEREFORE, Plaintiffs demand judgment against each of the Defendants jointly and severally for such sums, including, but not limited to prejudgment and postjudement interest, as would be necessary to compensate the Plaintiffs for the injuries they have and will suffer.

Plaintiffs further demand judgment against each of the Defendants for punitive damages.

Plaintiffs further demand payment by each of the Defendants jointly and severally of the costs and attorney fees of this action.

Plaintiffs further demand payment by each Defendant jointly and severally of interest on the above and such other relief as the Court deems just.

**WEISS & SAVILLE, P.A.**

By: /s/ Yvonne Takvorian Saville
      Yvonne Takvorian Saville, #3430
      Weiss & Saville, P.A.
      1220 North Market Street, Suite 604
      P.O. Box 370
      Wilmington, DE 19899
      Phone (302)656-0400
      Fax (302)656-5011
      Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date:  October 17, 2006

**SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

COUNTY : N  K  S CIVIL ACTION NUMBER:  _06C-02-281 ASB_

CIVIL CASE CODE:  _ASB_      CIVIL CASE TYPE:  _Asbestos_
(SEE REVERSE SIDE FOR CODE AND TYPE)

| | |
|---|---|
| Caption: <br><br> JAMES DANIEL COLLINS and MARY M. <br><br> COLLINS <br><br><br> Plaintiffs, <br><br> v. <br><br> METROPOLITAN LIFE INSURANCE <br><br> COMPANY, INC., et al., <br><br><br><br> Defendants. | Name and Status of Party filing document: <br><br> Plaintiff <br> Document Type: (E.G. COMPLAINT; ANSWER WITH COUNTERCLAIM) <br><br> FIRST AMENDED COMPLAINT <br><br> Non-Arbitration _x_          eFile _x_ <br> (CERTIFICATE OF VALUE MAY BE REQUIRED) <br><br> Arbitration ___  Mediation ___  Neutral Assessment ___ <br><br> DEFENDANT (Circle one) **ACCEPT    REJECT** <br><br> JURY DEMAND ___x___  YES ___  NO <br><br> TRACK ASSIGNMENT REQUESTED:  (CIRCLE ONE) <br><br> EXPEDITED     STANDARD     **COMPLEX** |
| ATTORNEY NAME(S): <br><br> Yvonne Takvorian Saville <br><br> ATTORNEY ID(S): <br> DE BAR ID#3430 <br><br> FIRM NAME: <br><br> Weiss & Saville, P.A. <br> ADDRESS: <br><br> 1220 North Market Street, Suite 604 <br><br> P. O. Box 370 <br><br> Wilmington, DE  19899 <br> TELEPHONE NUMBER: <br><br> (302) 656-0400 <br> FAX NUMBER: <br><br> (302) 656-5011 <br> E-MAIL ADDRESS: | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS <br><br><br><br> EXPLAIN THE RELATIONSHIP(S): <br><br><br><br><br> OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT: <br><br><br><br> (IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

REVISED 9/2003

EFiled: Jan 16 2007 9:50AM EST
Transaction ID 13463365

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARY M. COLLINS, Individually and as Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS, and LENORE COLLINS, CHRISTOPHER SCOTT COLLINS, CYNTHIA RAE MARTIN, GLORIA SERHAN, THOMAS COLLINS, and RICHARD ALLEN COLLINS, | : : : : : : : : : | C.A. No. 06C-02-281 ASB |
| Plaintiffs, | : | |
| v. | : | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., et al.; | : : | |
| Defendants. | : | |

## ENTRY OF APPEARANCE

**WITHOUT WAIVER** of any affirmative defenses, including but not limited to, insufficiency of process, lack of personal jurisdiction, failure to state a claim upon which relief can be granted and/or statute of limitations, and reserving all rights;

**PLEASE ENTER THE APPEARANCE** of Steven T. Davis, Esquire, on behalf of the defendant, Volkswagen of America, Inc.

BY:   /s/ Steven T. Davis
Steven T. Davis, Esquire (#2731)
Obermayer Rebmann Maxwell & Hippel, LLP
3 Mill Road, Suite 306A
Wilmington, DE 19806
(302) 655-9094

Counsel for Defendant,
Volkswagen of America, Inc.

Dated: January 16, 2007

4120291

EFiled:  Feb 22 2007  3:54PM EST
Transaction ID 13893514
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARY M. COLLINS, Individually and as: | C.A. No. 06C-02-281 ASB | |
| Personal Representative of the Heirs and : | | |
| Estate of JAMES DANIEL COLLINS, : | | |
| Deceased, : | | |
| : | | |
| Plaintiff(s), : | | |
| : | | |
| v. : | | |
| : | | |
| METROPOLITAN LIFE INSURANCE : | | |
| COMPANY, INC., et al., : | | |
| : | | |
| Defendants. : | | |

## NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE that Defendant Volkswagen Of America, Inc.'s Motion

To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted And For

Failure To Plead Negligence And Fraud With Particularity And For Ancillary Relief with

Supporting Brief will be heard at the convenience of the Court.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

By:  /s/ Steven T. Davis
　　　Steven T. Davis, Esquire
　　　Del. Bar No. 2731
　　　3 Mill Road, Suite 306A
　　　Wilmington, DE 19806
　　　(215) 665-3128

　　　Counsel for Defendant,
　　　Volkswagen of America, Inc.

Dated: February 22, 2007

EFiled: Feb 22 2007 3:54PM EST
Transaction ID 13893514
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARY M. COLLINS, Individually and as: | | C.A. No. 06C-02-281 ASB |
| Personal Representative of the Heirs and : | | |
| Estate of JAMES DANIEL COLLINS, | : | |
| Deceased, | : | |
| | : | |
| Plaintiff(s), | : | |
| | : | |
| v. | : | |
| | : | |
| METROPOLITAN LIFE INSURANCE | : | |
| COMPANY, INC., et al., | : | |
| | : | |
| Defendants. | : | |

### ORDER

AND NOW, upon consideration of Defendant Volkswagen Of America, Inc.'s

Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

And For Failure To Plead Negligence And Fraud With Particularity And For Ancillary

Relief with Supporting Brief, and good cause for the Motion having been shown,

   IT IS HEREBY ORDERED this _____ day of _____, 2007 that the

aforesaid Motion is GRANTED and the depositions of Mr. Collins taken prior to

VWoA's joinder in this case are inadmissible as to VWoA.

_____
                                                                                                              J.

EFiled: Feb 22 2007 3:13PM EST
Transaction ID 13892798
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| MARY M. COLLINS, Individually and as: Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS, Deceased, <br>            **Plaintiff,** <br><br>            **v.** <br><br> METROPOLITAN LIFE INSURANCE COMPANY, INC., et al., <br>            **Defendants.** | ASBESTOS <br><br> C.A. No. 06C-02-281 ASB <br><br><br> TRIAL BY JURY OF TWELVE DEMANDED |

## DEFENDANT VOLKSWAGEN OF AMERICA, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND ON THE BASIS OF FORUM NON CONVENIENS

OBERMAYER REBMANN MAXWELL
& HIPPEL, LLP

BY:   /s/ Steven T. Davis
Steven T. Davis, Esquire (#2731)
Obermayer Rebmann Maxwell & Hippel, LLP
3 Mill Road, Suite 306A
Wilmington, DE 19806
(302) 655-9094
                     AND

OF COUNSEL:
Alice S. Johnston
Obermayer Rebmann Maxwell & Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219
(412) 288-2459
                     AND

Robert E. Thackston
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205
(214) 780-5101

Counsel for Defendant,
Volkswagen of America, Inc.

Dated: February 22, 2007

3

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...................................................................................ii

NATURE OF PROCEEDINGS.............................................................................1

STATEMENT OF FACTS.................................................................................2-3

SUMMARY OF ARGUMENT................................................................................4

ARGUMENT..........................................................................................................5.

I.     **Motion to Dismiss for Lack of Personal Jurisdiction**

    A.     The Court should dismiss Plaintiff's Second Amended Complaint As Against VWoA Because Exercising Personal Jurisdiction over VWoA In This Case Could Violate "Traditional Notions of Fair Play and Substantial Justice." ...............5

    B.     Traditional Notions of Fair Play, Substantial Justice and Reasonableness Weigh Against the Exercise of Jurisdiction Over VWoA.     ...................................6-9

    C.     The Due Process Reasonableness Factors, As Reviewed In The Context Of This Case, Reveal That The Exercise Of Jurisdiction Over VWoA Is Unreasonable...9

        1.     The Burden on the Defendant:  Forcing VWoA to Litigate Washington Claims in Delaware Imposes a Heavy Burden. ......................................9-10

        2.     Interests of the Forum State: The Claims in This Case Do Not Implicate Any Interest of Delaware.............................................................. 10-11

        3.     Plaintiff's Interest In Obtaining Effective Relief:  The Interests of A Washington Plaintiff With Washington-Based Claims Are Not Served By Litigating Against A New Jersey/Michigan Defendant in Delaware......11-12

        4.     The Interstate Judicial System's Interest in the Efficient Resolution of Controversies:  Delaware Is Not The Forum That Will Lead To The Most Efficient Resolution of Controversies Involving Events and Witnesses In Washington.................................................................................12

        5.     The Shared Interest of the Several States in Furthering Social Policies: Washington Is An Equally Available Forum and Has More Interest In Adjudicating This Case. ............................................................13

II.     **Motion to Dismiss on the Basis of Forum Non Conveniens**.....................13-15

III.     **Conclusion**............................................................................ .....15

i

**TABLE OF AUTHORITIES**

**CASES**

**Pages**

*Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 n. 2 (9th Cir. 1993)..............9

*Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113 (1987)............................7

*Bearry v. Beech Aircraft Corporation*, 818 F.2d 370, 377 (5th Cir. 1987)..........................9

*Blue Ball Properties, Inc. v McGlain*, 658 F.Supp. 1320 (D. Del. 1987)..........................8, 9

*Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787  (Del. 2006).............................13

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)………………………………..7

*Donatelli v. National Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)…….…………….9

*In re Asbestos Litigation*, C.A. No. 05C-05-246-JRS, 2006 WL 1175219 (Del. Super. March 8, 2006)…………………………………………………………………………….13

*Ison v. E.I. DuPont deNemours & Co.*, 729 A.2d 832 (Del. 1999)…………………….13

*Mobilificio San Giacomo,  S.P.A. v.  Stoffi*, No. 96-415-LON, 1996 WL 924508 (D. Del. Oct. 29, 1996)…………………………………………………………………………6, 7, 8

*Metropolitan Life Insurance Company v. Robertson-Ceco Corp.*, 84 F.3d 560, 573 (2nd Cir. 1996)…………………………………………………………………………9, 11

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)………………….7

**STATUES**

10 *Del. C.* § 3104…………………………………………………………………..1, 6

## NATURE OF PROCEEDINGS

Plaintiffs initially filed their lawsuit on February 28, 2006 against numerous defendants, not including VWoA.  Plaintiffs filed a motion to add VWoA as a defendant, which was granted on October 6, 2006.  VWoA was served with Plaintiffs' Amended Complaint on December 11, 2006.  Thereafter, Plaintiffs filed a motion to substitute the parties and add a wrongful death claim.  The Court granted their motion, and Plaintiff Mary M. Collins filed a Second Amended Complaint on February 5, 2007.

Plaintiff contends that the deceased, James Daniel Collins, suffered from mesothelioma as a result of exposure to asbestos.  The numerous defendants in this case include Delaware corporations, foreign corporations registered to do business in Delaware, and foreign corporations over whom Plaintiff is asserting jurisdiction under Delaware's long arm statute.[1]  Specifically, VWoA is incorporated in the state of New Jersey with its principal place of business in Michigan.  Mary and James Daniel Collins are also not Delaware residents and Mr. Collins' alleged exposure to asbestos-containing products did not occur in Delaware, but in Washington.

VWoA has filed a Motion to Dismiss Plaintiff's Second Amended Complaint for lack of personal jurisdiction and *forum non conveniens*.

---

[1] 10 *Del C.* § 3104.

1

## STATEMENT OF FACTS

On February 28, 2006, Plaintiffs James Daniel Collins and Mary M. Collins filed a

Complaint (E-filing ID No. 10675089), against 40 Defendants, not including VWoA.  Plaintiffs'

initial discovery responses were served in May, 2006.   On information and belief, James Daniel

Collins was deposed on August 10, 2006, at which time he testified regarding, inter alia, working

on "Volkswagen vehicles" and with other "Volkswagen parts".  VWoA had no notice of these

depositions, and was not a party to the action at the time of the depositions.  Thus, of course,

VWoA was not present at the depositions and had no opportunity to cross-examine Mr. Collins.

On August 17, 2006, Plaintiffs filed a motion to amend the Complaint to add VWoA as a

party to the lawsuit (E-filing ID No. 12109224), but the motion was not immediately presented

to this Court.  The Court granted the motion to amend on October 6, 2006 (E-filing ID No.

12566951).  Plaintiffs filed an Amended Complaint adding VWoA as a party to the lawsuit on

October 17, 2006 (E-filing ID No.  12649530).  VWoA was served with original process on

December 11, 2006, after the close of discovery in the case.  Plaintiff James Daniel Collins died

on or about September 25, 2006, after the filing of the motion to amend the Complaint[2], but

before the motion was granted.  VWoA was not served with original process in this action until

nearly three months after the death of Mr. Collins.  By the time VWoA became a party to the

action, the opportunity to cross-examine Mr. Collins was lost forever.

On December 9, 2006, an initial Motion to Substitute Parties and Add Wrongful Death

Claim was filed (E-filing ID No. 13149159).  Thereafter, on January 24, 2007, a second Motion

---

[2]   The motion to amend was not served on VWoA; there are no rules which require such service.

2

to Substitute Parties and Add a Wrongful Death Claim was filed  (E-filing ID No. 13582246)[3].

The Court granted the second  Motion to Substitute Parties and Add Wrongful Death Claim on

February 2, 2007 (E-filing ID No. 13680789).  Plaintiff Mary M. Collins then filed a Second

Amended Complaint on February 5, 2007 (E-filing ID No. 13694201).  Plaintiff alleges in the

Second Amended Complaint that Mr. Collins developed mesothelioma and other asbestos-

related pulmonary injuries and diseases (¶ 2, Second Amended Complaint) as a result, inter alia,

of indirect asbestos exposure through his father's occupation (¶1(a), Second Amended

Complaint) and direct exposure through Mr. Collins' own employment and activities at various

locations between 1950 and 2005. (¶1(b-k), Second Amended Complaint).  There is no allegation

that Mr. Collins encountered any asbestos-containing products sold, distributed or provided by

VWoA.

---

[3]  The principal difference between the first and second Motion to Substitute Parties appears to be the identities of
the individuals to be substituted in as Plaintiffs.

## SUMMARY OF ARGUMENT

Plaintiff's Second Amended Complaint should be dismissed as against VWoA for lack of personal jurisdiction and on the basis of *forum non conveniens*.   Exercising personal jurisdiction over VWoA in this case violates traditional notions of fair play and substantial justice.   The due process reasonableness factors, as reviewed in the context of this case, reveal that the exercise of jurisdiction over VWoA is unreasonable.   More specifically, forcing VWoA to litigate Washington claims in Delaware imposes a heavy burden.   In addition, the claims in this case do not implicate any interest in the state of Delaware.   The interests of a Washington Plaintiff with Washington-based claims are not served by litigating against a New Jersey/Michigan defendant in Delaware.   Delaware is not the forum that will lead to the most efficient resolution of this case  involving events and witnesses in Washington, which is an equally available forum and has more interest in adjudicating this case.

**ARGUMENT**

I.     **Motion to Dismiss for Lack of Personal Jurisdiction**

    A.     **The Court should dismiss Plaintiff's Second Amended Complaint As Against VWoA Because Exercising personal jurisdiction over VWoA In This Case Could Violate "Traditional Notions of Fair Play and Substantial Justice."**

Mr. Collins was a lifelong resident of the State of Washington. He never worked in Delaware and never lived in Delaware. Neither the Complaint, nor the First or Second Amended Complaint filed in this action even suggest that any of the events giving rise to the causes of action occurred in Delaware. Nevertheless, on February 28, 2006, Plaintiffs filed the present action in the Superior Court of Delaware for New Castle County against forty (40) defendants (not including VWoA), claiming liability arising from Mr. Collins' illness allegedly caused by exposure to asbestos-containing products. Mr. Collins' asbestos exposure was alleged to have occurred in his parents' home in Olympia, Washington during his childhood and during his employment in Washington by a number of different employers in a number of capacities between 1967 and 2005.

It should be noted that this claim against VWoA has absolutely no nexus to the State of Delaware. Not only, as stated above, did Mr. Collins never live or work in Delaware, but he was never exposed to asbestos in Delaware, and probably never even visited Delaware. All of the events relevant to this action occurred elsewhere – almost entirely in the State of Washington where Collins was born, worked and resided. Substituted Plaintiff has since conceded that Washington law should apply to these claims.[4] Finally, VWoA is **not** a Delaware corporation. VWoA was organized and exists under the laws of New Jersey, and maintains its principal place of business in Auburn Hills, Michigan. VWoA has no corporate connections to Delaware.

---

[4] VWoA agrees with Plaintiff's position, as set forth in Plaintiff's responses to motions for summary judgment pertaining to other defendants, that Washington law applies in this case. See footnote 12, *infra*.

**B.    Traditional Notions of Fair Play, Substantial Justice and Reasonableness Weigh Against the Exercise of Jurisdiction Over VWoA.**

Determining whether personal jurisdiction over VWoA in this case is appropriate requires a two-step analysis. First, this Court must determine whether Delaware's Long-Arm statute applies to VWoA.[5] If it does, the Court must then decide if exercising jurisdiction over VWoA in this case comports with due process.[6]

The due process analysis, in turn, has two components. It requires not only that a defendant have certain minimum contacts with the forum, but also that the exercise of jurisdiction over the defendant be reasonable under the circumstances.[7] In an ordinary case, where a plaintiff sues in tort either in the forum where he resides or in one of the fora where events giving rise to his injuries occurred, a court will not generally even address the reasonableness of the exercise of jurisdiction over a nonresident defendant. In such a case, the reasonableness of exercising jurisdiction is virtually assured by considerations of the resident plaintiff's convenience and the forum state's interest in providing redress to its residents and in applying its tort law. But, this is not an ordinary case. Mr. Collins was at all times a nonresident, with no connection at all to Delaware. The substituted Plaintiff, Mrs. Collins, is also a nonresident of Delaware. Accordingly, Plaintiff cannot reasonably invoke this Court's jurisdiction over VWoA, a nonresident defendant, based on causes of action and events that are

---

[5] For purposes of the present Motion, it is assumed that VWoA falls within the purview of Delaware's Long-Arm statute, 10 *Del. C.*§3104.

[6] *See Mobilificio San Giacomo, S.P.A. v. Stoffi,* No. 96-415-LON, 1996 WL 924508, at *3 (D. Del. Oct. 29, 1996) ("When a plaintiff asserts that personal jurisdiction is appropriate under the Delaware Long-arm Statute, 10 *Del. C.* 3104, the resolution of that issue entails an analysis comprised of two parts. The first step is to ascertain whether the forum state's long-arm statute applies to the defendant....If the Delaware Long-arm Statute applies, this Court must then determine whether exercising jurisdiction under the circumstances of this case comports with due process").

[7] *Id.* ("Once it has been established that the defendant has minimum contacts with the forum state, the Court must then determine whether the exercise of personal jurisdiction would comport with traditional notions of 'fair play and substantial justice.'").

6

completely unrelated to Delaware. Even if VWoA is found to have non-case-specific contacts with Delaware, the exercise of jurisdiction over VWoA in this case would be unreasonable, and the requirements of Due Process preclude such an exercise of jurisdiction.

The U.S. Supreme Court has held that the *reasonableness* inquiry requires evaluation of several factors. Those factors are: 1) the burden on the defendant, 2) the interests of the forum State, 3) the plaintiff's interest in obtaining convenient and effective relief, 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and 5) the shared interest of the several states in furthering fundamental substantive social policies.[8]

It is in cases like the instant one, in which the plaintiff is a nonresident with no ties whatsoever to the forum, and his lawsuit is based on claims that similarly have no connection to the forum, that serious concerns about the *reasonableness* of exercising jurisdiction over a nonresident defendant compel a court to address these five *reasonableness* factors in detail. As set forth below, the exercise of jurisdiction over a nonresident defendant is patently unreasonable where neither the plaintiff nor the alleged tort claims have *any* connection with the State of Delaware.

In *Mobilifico San Giacomo S.P.A. v. Stoffi,*[9] the United States District Court for the District of Delaware considered whether it could exercise jurisdiction over a nonresident New Jersey corporation in a suit based on out-of-state breach of contract claims brought by a nonresident plaintiff. Although the court was not persuaded that the defendant's contacts with Delaware were sufficient to satisfy the "minimum contacts" prong of the due process analysis, it nevertheless continued and analyzed the reasonableness prong:

> Moreover, the evaluation of the facts of this case under the

---

[8] *See Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 113 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980).
[9] No. 96-415-LON, 1996 WL 924508 (D. Del. Oct. 29, 1996).

7

reasonableness factors compel [sic] the conclusion that the exercise of jurisdiction would not comport with "traditional notions of fair play and substantial justice." Delaware's interest in adjudicating this dispute premised on the act of incorporating [defendant's subsidiary] is not substantial. None of the acts giving rise to plaintiff's claims were directed at Delaware residents. None of [the defendant]'s alleged wrongful activities occurred in Delaware. There is also no allegation that any activity committed by [the defendant] in Delaware gave rise to a violation of Delaware law. . . Finally, plaintiff's interest in obtaining relief in Delaware is not substantial given the availability of an alternative forum.[10]

Aside from the unimportant distinction that the present case is a tort action, rather than a breach of contract/breach of fiduciary duty action, the case at bar is on all fours with *Mobilifico*, and the foregoing reasoning is equally applicable here.

*Blue Ball Properties, Inc. v McGlain*,[11] further buttresses VWoA's position. In that case, three Delaware corporations sued a Maryland resident in the U.S. District Court for the District of Delaware, alleging breach of contract, fraud and negligence in connection with a contract to construct a pier in Maryland. After completing its minimum contacts analysis, the court went on to consider the *reasonableness* factors, focusing on the first.

McClain will need to call a number of witnesses. These witnesses would include the contractors McClain contacted to see if they could drive the pilings for the pier and representatives of the companies or the persons from whom he attempted to rent a barge. These potential witnesses are located either in Maryland or even further down the Atlantic Coast in Virginia. McClain would probably find it difficult and expensive to have these people testify voluntarily in Delaware. On the other hand, the plaintiffs did not present any evidence that they would need to call a number of witnesses who live in Delaware. This case does not need to be heard in Delaware to satisfy the interests of the State or the plaintiffs. Delaware at best has a minimal interest in this case.[12]

The relevance of this discussion to the present case is obvious. The witnesses to, and evidence of, Mr. Collin's alleged asbestos exposure are all in Washington, not Delaware. The foregoing

---

[10] *Id.* at 9-10.

[11] 658 F.Supp. 1310 (D. Del. 1987).

[12] *Id.* at 1320-21.

8

conclusion in *Blue Ball* is, therefore, also apropos to the case at bar. Just as in *Blue Ball,* due process would be offended by the exercise of personal jurisdiction over the non-resident defendant in this case.[13]

Thus, there is abundant case law that would support this Court's refusal, for Due Process reasons, to exercise personal jurisdiction over VWoA.

## C.    The Due Process Reasonableness Factors, As Reviewed In The Context Of This Case, Reveal That The Exercise Of Jurisdiction Over VWoA Is Unreasonable.

A closer examination of the individual *reasonableness* factors, as they apply to the facts of the case at bar, confirms that this Court's exercise of jurisdiction over VWoA would be unreasonable.

### 1.    The Burden on the Defendant:  Forcing VWoA to Litigate Washington Claims in Delaware Imposes a Heavy Burden.

VWoA is a New Jersey corporation with its principal place of business in Michigan. Obviously, a non-resident entity faces difficulties when it is called to defend a lawsuit in Delaware. Although one might suggest that Washington is also not VWoA's residence, unlike Washington, none of the records, files or witnesses are located in Delaware. Regardless whether this lawsuit against VWoA proceeds in Delaware or not, Washington would be the location where substantial discovery, investigative efforts and trial preparation would logically occur. Thus, Plaintiffs' choice of forum means that VWoA must conduct discovery at one end of the

---

[13] Courts addressing this issue have uniformly held that the reasonableness inquiry is applicable to both types of personal jurisdiction, general and specific. *See Metropolitan Life Insurance Company v. Robertson-Ceco Corp.,* 84 F.3d 560, 573 (2nd Cir. 1996) ("we see no basis for distinguishing between general jurisdiction and specific jurisdiction cases for the purposes of the reasonableness inquiry, and there is no indication that the Court intended to limit the inquiry to specific jurisdiction cases"), *Amoco Egypt Oil Co. v. Leonis Navigation Co.,* 1 F.3d 848, 851 n. 2 (9th Cir. 1993) ("*Asahi's* interpretation of *International Shoe* as entailing separate contacts and reasonableness inquiries is not limited to the specific jurisdiction context."), *Donatelli v. National Hockey League,* 893 F.2d 459, 465 (1st Cir. 1990) (discussing application of minimum contacts and reasonableness analysis in general jurisdiction case), *Bearry v. Beech Aircraft Corporation,* 818 F.2d 370, 377 (5th Cir. 1987) ("Even if [the defendant's] connections with the [forum state] could be said to be continuous and systematic, we are persuaded that the exercise of general jurisdiction in this case would not be fair and reasonable").

country, and go to trial at the other.

VWoA is being asked to litigate not in one, but in two foreign jurisdictions, on opposite ends of the continent. Mr. Collins resided nearly his whole life in Washington; his alleged asbestos occurred exposure in Washington; he fell ill and was treated in Washington. The suit involves events and claims of injury, regarding which all the medical records and all witnesses are in Washington. All investigation and discovery must occur in Washington. If the jury is to be permitted a view of the locations where alleged exposures occurred, that view will have to take place in Washington. Delaware's only contact with the dispute is that the Collins' Texas counsel chose to file suit here. Such a burden on a non-resident defendant should not be taken lightly, especially when coupled with the possibility that this litigation will be part of an *ad hoc* consolidation of dozens of other, entirely unrelated cases involving the distinctly different facts, different legal issues, and different laws of other states. The added burden of litigating in Delaware while engaging in investigation and discovery in Washington serves no reasonable objective.

This factor weighs heavily against the reasonableness of this Court's exercise of jurisdiction over VWoA.

## 2. Interests of the Forum State: The Claims in This Case Do Not Implicate Any Interest of Delaware.

This case involves absolutely no interest of Delaware. Mr. Collins was never a resident of Delaware, and the Second Amended Complaint is devoid of any facts relating to Delaware. None of the alleged wrongful activities or injury-causing events occurred in Delaware, and none are even alleged to give rise to a violation of Delaware law.[14]

---

[14] In pleadings filed in this case, Plaintiff has conceded that Washington law applies to this case. *See* Brief In Support of Plaintiffs James Daniel Collins and Mary Martha Collins' Response to Defendants Borg-Warner Corporation By Its Successor-In-Interest Borgwarner Morse Tec, Inc.; General Motors Corporation; and Hennessy

10

Plaintiff may argue that VWoA's injection of commerce into Delaware gives Delaware a general interest in VWoA's conduct. However, the Second Circuit has rejected this argument, stating in *Metropolitan Life Insurance Company v. Robertson-Ceco Corp.*,[15] that "[t]he concerns that injuries might occur in the state or might somehow implicate [citizens of the forum State] are adequately protected. [The defendant] is subject to the *specific jurisdiction [of forum State] courts* when its product causes injuries or when it breached a contract [in the forum State]."[16]

Accordingly, this factor weighs heavily against the reasonableness of this Court's exercise of jurisdiction over VWoA.

### 3. Plaintiff's Interest In Obtaining Effective Relief: The Interests of A Washington Plaintiff With Washington-Based Claims Are Not Served By Litigating Against A New Jersey/Michigan Defendant in Delaware.

It is a mystery why the interests of Washington Plaintiffs in a convenient forum would lead their Texas counsel to file suit in Delaware. The fact that the alleged injury-causing events occurred in the Collins' home state of Washington completely refutes the notion that Plaintiff's interest in a convenient forum is best served by suing VWoA in Delaware. All witnesses who are likely to be identified reside in Washington. All pertinent evidence relating to the causes of action is located in Washington. All worksites implicated by the claims are located in Washington. Mr. Collins lived and received medical treatment in Washington. Substituted Plaintiff Mrs. Collins, and other family members, could easily attend the trial if this lawsuit were in Washington. Because Mr. Collins spent virtually his entire life in Washington, virtually the entirety of his alleged asbestos exposure must have occurred there. This, of course, undercuts any argument that there is any degree of convenience to the Plaintiff in litigating her claims

---

Industries, Inc., as Successor-In-Interest to Ammco Tools, Inc.'s Motion for Summary Judgment. VWoA does not disagree.

[15] 84 F. 3d 560, 573 (2nd Cir. 1996).

[16] *Id.* at 574, *quoting Bearry*, 818 F.2d at 377.

against VWoA in Delaware.

Therefore, this factor weighs substantially against the reasonableness of this Court's exercise of jurisdiction over VWoA.

4. **The Interstate Judicial System's Interest in the Efficient Resolution of Controversies: Delaware Is Not The Forum That Will Lead To The Most Efficient Resolution of Controversies Involving Events and Witnesses In Washington.**

Common sense dictates that the place where the injury-causing events occurred and where evidence is located will be the most efficient forum in which to litigate a dispute. There are no witnesses residing in Delaware and no evidence pertinent to alleged injury-causing events is located in Delaware. Mr. Collins never resided in Delaware, nor does VWoA. Therefore, Delaware cannot be the most efficient forum, as Washington is the forum where events giving rise to Plaintiffs' causes of action against VWoA occurred and where the witnesses and documents are located. Moreover, Plaintiff has admitted that Delaware's choice of law rules require the application of Washington, not Delaware law. *See* footnote 12, *supra*. While this Court is certainly able to decide a case under Washington law, it is also able to decide when a case belongs in a different forum. When coupled with all the other reasons why this case should proceed in Washington, the choice-of-law issue becomes significant. Thus, this factor, as well, weighs heavily against the reasonableness of this Court's exercise of jurisdiction over VWoA.

5. **The Shared Interest of the Several States in Furthering Social Policies: Washington Is An Equally Available Forum and Has More Interest In Adjudicating This Case.**

Mr. Collins was a lifelong Washington resident, and Washington has a greater interest in providing redress to its own residents. Washington is also the State where the alleged injury-causing events gave rise to causes of action that arose within its borders. Washington and its courts have a very strong interest in how its substantive law is interpreted and applied. Because

12

this case will inevitably involve the application of Washington law, the interest of Washington in adjudicating this claim is far more significant than is the interest of Delaware. This is yet another factor that very heavily weighs against reasonableness of this Court's exercise of jurisdiction over VWoA.

Thus the evaluation of the facts of this case under the *reasonableness* factors compels the conclusion that the exercise of jurisdiction would not comport with "traditional notions of fair play and substantial justice." All of the five factors weigh heavily against the exercise of jurisdiction over VWoA in this particular case.

**II.    Motion to Dismiss on the Basis of Forum Non Conveniens**

As recently as September of last year, the Delaware Supreme Court again confirmed that the standard for dismissal on grounds of *forum non conveniens* is that the defendant must demonstrate "overwhelming hardship."[17] VWoA is also aware that this Court has recently held that, as a general matter, *forum non conveniens* is not an adequate basis for a defendant in asbestos litigation, such as this case, to seek dismissal.[18] However, at that time, this Court made clear that "[t]his burden is intended to be substantial but not preclusive."[19] The geographic exigencies of this case create overwhelming hardship for this non-resident defendant.

As this Court has explained, in order to obtain a dismissal for *forum non conveniens*:

> The defendant's burden is to show "with particularity" that the so-called *Cryo-Maid* factors, individually or together, demonstrate that litigating in Delaware would impose an "overwhelming hardship" on the defendant. These factors are:
>
> (1) the relative ease of access to proof;

---

[17] *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787 (Del. 2006), citing *Ison v. E.I. DuPont deNemours & Co.*, 729 A.2d 832 (Del. 1999).
[18] *In re Asbestos Litigation*, C.A. No. 05C-05-246-JRS, 2006 WL 1175219 (Del. Super. March 8, 2006).
[19] *Id.* at*3.

(2) availability of compulsory process for witnesses;

(3) the possibility of the view of the premises;

(4) whether the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;

(5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and

(6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[20]

As set forth above, if this case is litigated in Delaware, access to proof will be a nightmare. Documents, witnesses, physical evidence, *everything* is in Washington. It must also be borne in mind that the sheer distance involved exacerbates the difficulties. The proof is not just across the Maryland border. For example, it will take two full days merely to travel to the west coast to interview a witness and return. The geography of the situation will create an overwhelming hardship for VWoA. This factor weighs in favor of *forum non conveniens* dismissal.

It is the final *Cryo-Maid* factor that truly demands that this case be dismissed on *forum non conveniens* grounds. The practical problems that would prevent the trial of this case in Delaware from being easy, expeditious and inexpensive are genuinely overwhelming. As set forth above, every interview and deposition involves a cross-continental trip for VWoA counsel. Additionally, because the fact witnesses are not within the subpoena power of this Court, all trial testimony will have to be taken by deposition in Washington.[21]

---

[20] *Id.*

[21] This is a logistical difficulty and unnecessary expense, but also a tactical advantage for Plaintiffs. By filing suit at such a great distance from the fact witnesses, Plaintiff has increased the likelihood that VWoA's fact witness

14

VWoA submits that in the circumstances of the present case it would be an overwhelming hardship for it to litigate this case in Delaware and that the doctrine of forum *non conveniens* demands dismissal.

**III.     Conclusion**

For all of the foregoing reasons, VWoA respectfully submits that it would be improper for this Court to exercise personal jurisdiction over it in this case and requests that the Second Amended Complaint be dismissed as against VWoA.  In the alternative, VWoA respectfully requests that the Court dismiss this action as against VWoA on the basis of the doctrine of *forum non conveniens.*

OBERMAYER REBMANN MAXWELL
& HIPPEL, LLP


BY:     /s/ Steven T. Davis
Steven T. Davis, Esquire (#2731)
Obermayer Rebmann Maxwell & Hippel, LLP
3 Mill Road, Suite 306A
Wilmington, DE  19806
(302) 655-9094

AND

OF COUNSEL:
Alice S. Johnston
Obermayer Rebmann Maxwell & Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219
(412) 288-2459

AND

---

testimony will have to be presented to the jury by video or transcript, whereas Plaintiff and other family members will surely provide live fact testimony.

Robert E. Thackston
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205
(214) 780-5101

Counsel for Defendant,
Volkswagen of America, Inc.

Dated:  February 22, 2007

16

EFiled: Feb 22 2007 3:13PM EST
Transaction ID 13892798
Case No. 06C-02-281 ASB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

MARY M. COLLINS, Individually and as:    C.A. No. 06C-02-281 ASB
Personal Representative of the Heirs and :
Estate of JAMES DANIEL COLLINS,   :
Deceased,    :
     :
     **Plaintiff,**    :
       v.    :
METROPOLITAN LIFE INSURANCE :
COMPANY, INC., et al.,    :
     :
     **Defendants.**    :

### ORDER

Upon consideration of the Defendant Volkswagen Of America, Inc.'s Motion to Dismiss For Lack Of Personal Jurisdiction And On The Basis Of Forum Non Conveniens, and all Responses thereto, and after oral argument,

**IT IS HEREBY ORDERED** that on this _____ day of _____, 2007, Defendant Volkswagen of America, Inc.'s Motion is **GRANTED**. There being no cause for delay, the Court enters this Order as a final judgment pursuant to Superior Court Civil Rule 54(b).

**IT IS SO ORDERED.**

_____
                                  J.

EFiled: Dec 21 2006 12:24 M.EST
Transaction ID 13258142

December 12,

OFFICE OF THE SHERIFF

Served: VOLKSWAGEN OF AMERICA INC

By serving their *RJA* CORPORATION TRUST COMPANY, by delivering a copy of the within writ together with a copy of the Summons and Complaint AMENDED to SCOTT LA SCALA, , of the said registered agent on 12/11/2006 at 11 :45AM.

Fees Paid: $30.00

Civil Action # 06C-02-281AM
Per: Deputy Sheriff, Burnell Bevenour

~~~

WRIT RET. 12-13-06

PER Doreen Simmons

Document # 06020700

EFiled: Feb 22 2007 3:13PM EST
Transaction ID 13892798
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

MARY M. COLLINS, Individually and as :       C.A. No. 06C-02-281 ASB
Personal Representative of the Heirs and :
Estate of JAMES DANIEL COLLINS,   :
Deceased,                          :
                                     :
       Plaintiff,                   :
             v.               :
METROPOLITAN LIFE INSURANCE   :
COMPANY, INC., et al.,           :
                                     :
       Defendants.             :

## NOTICE OF MOTION TO DISMISS

**PLEASE TAKE NOTICE** that the Defendant Volkswagen Of America, Inc.'s Motion

to Dismiss For Lack Of Personal Jurisdiction And On The Basis Of Forum Non Conveniens with

Supporting Brief will be heard at the convenience of the Court.

OBERMAYER REBMANN MAXWELL
& HIPPEL, LLP

BY:    /s/ Steven T. Davis
Steven T. Davis, Esquire (#2731)
Obermayer Rebmann Maxwell & Hippel, LLP
3 Mill Road, Suite 306A
Wilmington, DE  19806
(302) 655-9094

Counsel for Defendant,
Volkswagen of America, Inc.

Dated: February 22, 2007

EFiled: Feb 22 2007 3:13PM EST
Transaction ID 13892798
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARY M. COLLINS, Individually and as: | ASBESTOS | |
| Personal Representative of the Heirs and : | | |
| Estate of JAMES DANIEL COLLINS, : | C.A. No. 06C-02-281 ASB | |
| Deceased, : | | |
| : | | |
| Plaintiff(s), : | | |
| : | | |
| : | TRIAL BY JURY OF TWELVE | |
| v. : | | |
| : | DEMANDED | |
| : | | |
| METROPOLITAN LIFE INSURANCE : | | |
| COMPANY, INC., et al., : | | |
| : | | |
| Defendants. : | | |

### DEFENDANT VOLKSWAGEN OF AMERICA, INC.'S
### MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
### AND ON THE BASIS OF FORUM NON CONVENIENS

Volkswagen of America, Inc. (hereinafter "VWoA "), by and through its attorney,

Obermayer Rebmann Maxwell & Hippel, LLP, respectfully moves to dismiss Plaintiff's Second

Amended Complaint in the above-referenced action pursuant to Superior Court Civil Rules

12(b)(2) as follows:

- VWoA seeks an Order dismissing the entire Second Amended Complaint for lack of

  personal jurisdiction and on the basis of *forum non conveniens* pursuant to Rule 12(b)(2).

4131173

For the reasons set forth in VWoA's Supporting Brief, which is incorporated in this Motion by reference, the Court should dismiss Plaintiff's Second Amended Complaint against VWoA for lack of personal jurisdiction and on the basis of *forum non conveniens*.

**OBERMAYER REBMANN MAXWELL & HIPPEL, LLP**

BY:   /s/ Steven T. Davis
Steven T. Davis, Esquire (#2731)
Obermayer Rebmann Maxwell & Hippel, LLP
3 Mill Road, Suite 306A
Wilmington, DE  19806
(302) 655-9094

AND

OF COUNSEL:
Alice S. Johnston
Obermayer Rebmann Maxwell & Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA  15219
(412) 288-2459

AND

Robert E. Thackston
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX  75205
(214) 780-5101

Counsel for Defendant,
Volkswagen of America, Inc.

Dated:  February 22, 2007

2

EFiled:  Jan 18 2007 10:11___M EST
Transaction ID 13494601

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| MARY M. COLLINS, Individually and as : | C.A. No. 06C-02-281 ASB |
| Personal Representative of the Heirs and : | |
| Estate of JAMES DANIEL COLLINS, and : | |
| LENORE COLLINS, CHRISTOPHER : | |
| SCOTT COLLINS, CYNTHIA RAE : | |
| MARTIN, GLORIA SERHAN, THOMAS : | |
| COLLINS, and RICHARD ALLEN : | |
| COLLINS, : | |
|      Plaintiffs, : | |
|           v. : | |
| METROPOLITAN LIFE INSURANCE : | |
| COMPANY, INC., et al.; : | |
|      Defendants. : | |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that the Motion for Admission Pro Hac Vice of Robert E.

Thackston is being presented to the Court on 10 days Negative Notice.


BY:   /s/ Steven T. Davis_____
       Steven T. Davis, Esquire (#2731)
       Obermayer Rebmann Maxwell & Hippel, LLP
       3 Mill Road, Suite 306A
       Wilmington, DE  19806
       (302) 655-9094

       Counsel for Defendant,
       Volkswagen of America, Inc.

DATED:     January 18, 2007

4080153

EFiled: Jan 10 2007 11:37?M EST
Transaction ID 13421114

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

<u>IN RE ASBESTOS LITIGATION</u>

<u>Cote Trial Group</u>

Limited to:

| | | |
|---|---|---|
| WILLIAM GILBERT COTE | : | C.A. No. 05C-09-268 ASB |
| VIRGIL LLOYD BRAUER | : | C.A. No. 05C-08-049 ASB |
| ROLLIN JAMES OVERSTREET | : | C.A. No. 05C-09-037 ASB |
| JOHN WALLACE SHELDON | : | C.A. No. 05C-08-206 ASB |
| HUGO GEORGE ENGEL | : | C.A. No. 05C-09-083 ASB |
| ARNOLD CHARLES EUDY | : | C.A. No. 05C-10-323 ASB |
| MOSCOE JACKSON KING, JR. | : | C.A. No. 05C-11-125 ASB |
| OLIVER EDWARD SANDAHL | : | C.A. No. 05C-11-057 ASB |
| KENNETH RUDELL BEARD | : | C.A. No. 05C-11-158 ASB |
| LYLE DAVIS FOLTZ | : | C.A. No. 05C-10-325 ASB |
| EUSTACHICO LUPONE | : | C.A. No. 05C-11-063 ASB |
| CHARLES CHRISTOPHER LENTILE | : | C.A. No. 05C-11-256 ASB |
| ROLAND LEO GRENIER, SR. | : | C.A. No. 05C-11-257 ASB |
| WILLIAM JOSEPH KOUNTZ | : | C.A. No. 06C-02-223 ASB |
| MARLON CLARENCE OWENS | : | C.A. No. 06C-02-241 ASB |
| JAMES DANIEL COLLINS | : | C.A. No. 06C-02-281 ASB |

## <u>NOTICE OF ADOPTION OF PLAINTIFF'S RESPONSE</u>

Plaintiffs hereby adopt and incorporate by reference PLAINTIFF'S CONSOLIDATED

RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* CONCERNING EVIDENCE THAT A

SINGLE FIBER CAN CAUSE MESOTHELIOMA and any exhibits thereto at Filing ID

11606128 in response to Motions *in Limine* Concerning Evidence that a Single Fiber Can Cause

Mesothelioma filed by the following Defendants:

•    Buffalo Pumps, Inc.

•    DaimlerChrysler Corporation

•    Maremont

- Garlock Sealing Technologies, LLC

- General Motors Corporation

- Georgia Pacific

- Sepco Corporation

- Weil-McLain

Respectfully submitted,

**WEISS & SAVILLE, P.A.**
1220 North Market Street, Suite 604
P.O. Box 370
Wilmington, DE 19899
Phone: 302/656-0400
Fax: 302/656-5011

By:    /s/ Yvonne Takvorian Saville
       Yvonne Takvorian Saville, #3430

~ and ~

BARON & BUDD, P.C.
The Centrum, Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
Phone: 214/521-3605
Fax: 214/520-1181

*Attorneys for Plaintiffs*

Date:    January 10, 2007

EFiled: Mar 1 2007 8:07P*
Transaction ID 13983147
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

MARY M. COLLINS,                    :
Individually and as Personal        :
Representative of the Heirs         :
and Estate of JAMES DANIEL          :
COLLINS, Deceased,                  :
                                    :
        Plaintiffs,                 :
                                    :
            v.                      :    C.A. No. 06C-02-281 ASB
                                    :
METROPOLITAN LIFE INSURANCE          :
COMPANY, et al.,                    :
                                    :
        Defendants.                 :

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES
DIRECTED TO PLAINTIFFS BY ALL
<u>DEFENDANTS AND RESPONSE TO REQUEST FOR PRODUCTION</u>

**<u>Preamble</u>**

Counsel for Plaintiffs has provided and/or will provide all
Documents and Exhibits to lead defense counsel pursuant to
Standing Order No. 1. These Documents and Exhibits are also
available for review at Plaintiffs' Counsel's office.

        6.   If you have ever been a member of the Armed Forces of
the United States, state the following:
            (a)  The branch of the service, serial number, and
highest rank held;
            (b)  The beginning and ending dates of your military
services;
            (c)  The type of discharge that you received;
            (d)  Whether you were given a physical examination
which included x-rays prior to the time you entered the service;
            (e)  Whether you received any injury while in the
military services; and
            (f)  Whether you have claimed disability for any injury
or physical condition arising out of your military service.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiffs' military records, attached hereto as Exhibit S.

Respectfully submitted,

**WEISS & SAVILLE, P.A.**

By: s/ Yvonne Takvorian Saville
     Yvonne Takvorian Saville,#3430
     Weiss & Saville, P.A.
     1220 North Market Street,
     Suite 604
     P.O. Box 370
     Wilmington, DE 19899
     Phone (302)656-0400
     Fax (302)656-5011
     Attorney for Plaintiff
and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas  75219
(214) 521-3605

Date:     March 1, 2007



**SO ORDERED**: Feb 15 2007  9:29AM EST
Transaction ID 13815491
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | C.A. No. 06C-02-281 ASB |
| | : | |
| Plaintiffs, | : | |
| | : | NON-ARBITRATION |
| | : | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC. et al., | : | |
| | : | JURY TRIAL OF TWELVE |
| Defendants. | : | DEMANDED |

**ORDER**

    WHEREFORE, Defendant Crane Company's Motion to Dismiss all Claims and

Crossclaims **IS HEREBY GRANTED**.

_____

J.

Dated:

**SO ORDERED**

Court: DE Superior Court-New Castle County

Judge: Judge, Asbestos

Alternate judge: N/A

File & Serve reviewed Transaction ID: 13409637

Current date: 2/15/2007

Case number: 06C-02-281 ASB

Case name: Collins, James Daniel vs Metropolitan Life Insurance Co

EFiled: Jan 26 2007 9:18_EST
Transaction ID 13612782
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

CHARLES CHRISTOPHER LENTILE                  C.A. No. 05C-11-256 ASB
and SUSIE DUNN-LENTILE,

      Plaintiffs,

                           v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and                     C.A. No. 06C-02-281 ASB
MARY M. COLLINS,

      Plaintiffs,

                           v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE, DELAWARE

ROLLIN JAMES OVERSTREET and                  C.A. No.  05C-09-037
CRYSTAL J. OVERSTREET,

      Plaintiffs,

                           v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.
      Defendants.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

OLIVER EDWARD SANDAHL, and　　　　　　　　C.A. No. 05C-11–057-ASB
ANNE M. SANDAHL,

　　　　Plaintiffs,

　　　　　　　　　　　　　　　　v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

ROLAND LEO GRENIER, SR.,　　　　　　:　　　C.A. No. 05C-11-257 ASB
　　　　　　　　　　　　　　　　　:
　　　　Plaintiff(s)　　　　　　　　:　　　ASBESTOS
　　　　　　　　　　　　　　　　　:
　　　　vs.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
METROPOLITAN LIFE INSURANCE　　　:
COMPANY, INC., et al.,　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　Defendant(s).　　　　　　　　:


**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF WILLIAM TRAVIS AND SUBPOENA DUCES TECUM - Page 2**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARLON CLARENCE OWENS and LYNN OWENS, | : | C.A. No. 06C-02-241 ASB |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| METROPOLITAN LIFE INSURANCE COMPANY, et al. | : | |
| | : | |
| Defendants. | : | |

---

**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC
DEPOSITION OF WILLIAM TRAVIS
AND SUBPOENA DUCES TECUM**

---

TO:    ALL COUNSEL OF RECORD

PLEASE TAKE NOTICE that at the below-stated date, hour, and place we shall cause the *telephonic*

deposition of the below-described deponent before an official court reporter, a notary public duly authorized

to administer the oaths or his duly designated representative. The deposition will continue day to day until

completed. Any party or their attorney may appear and participate as they see fit.

| | |
|---|---|
| DEPONENT: | William Travis |
| DATE & HOUR: | January 31, 2007 |
| | 5:00 p.m. (EST) |
| PLACE: | New York LaGuardia Airport Marriott |
| | 102-05 Ditmars Blvd. |
| | East Elmhurst, NY, 11369 |
| | 718-565-8900 |
| COURT REPORTER: | Henjum Goucher Reporting Company |

PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF WILLIAM TRAVIS AND SUBPOENA
DUCES TECUM - Page 3

DIAL-IN INFORMATION:        1-800-640-5128, Code: 1689 4134

     *At or before the date specified above, the deponent is requested to produce all the items requested on the attached Exhibit "A."*

Date:    January 26, 2007

                        Respectfully submitted,


                        **WEISS & SAVILLE, P.A.**


By:    /s/ Yvonne Takvorian Saville
         Yvonne Takvorian Saville, Esq., #3430
         1220 North Market Street, Suite 604
         P.O. Box 370
         Wilmington, DE  19899
         Telephone:    (302) 656-0400
         Facsimile:    (302) 656-5011
         Attorney for Plaintiff


         and

         BARON & BUDD
         A PROFESSIONAL CORPORATION
         The Centrum
         Suite 1100
         3102 Oak Lawn Avenue
         Dallas, Texas  75219
         (214) 521-3605

EXHIBIT "A"

## I.     DEFINITIONS AND INSTRUCTIONS

### A.     Instructions

The following instructions apply to the production of documents as required pursuant to this Notice:

1.     Documents produced shall be segregated and labeled according to the Request in response to which they are produced.

2.     Identify each document or set of documents being produced.

3.     Identify each document in this Request which is withheld based on any claim of privilege and also state (a) the basis of that claim; (b) the name of any and all persons who have seen the document; and (c) the date and subject matter of the document.

4.     With respect to any category of documents which you contend is in some way "burdensome" or "oppressive," state the specific reasons for such objection, and produce examples of the documents in question.

5.     These Requests, unless otherwise indicated, relate to documents and other things created, written, or produced at any time to the present.

### B.     Definitions

1.     The terms "you" and "your" shall mean you, your attorneys, officers, directors, employees, agents, and all other persons or entities acting or purporting to act on your behalf, whether authorized or not.

2.     The term "person" and "persons" shall include individuals and every type of entity, whether formed for business purposes or not.

3.   The terms "document," "documentation," and "documents" including any written, printed, recorded or graphic matter, photographic or videographic matter or sound reproductions or computer input or output, or other tangible things, including but not limited to: Papers, books, pamphlets, guidebooks, handbooks, instruction and/or safety manuals, articles, letters, correspondence, electronic or videotape recordings, contracts, notes, rough drafts, interoffice memoranda, reports, research materials, logs, diaries, calendars, bank statements, tax invoices, diagrams, studies, manuals, minutes, by-laws, articles of incorporation, resolutions, shareholder endorsements, or partnership documents however produced or reproduced, that are now or were formerly in your possession, custody, or control (including documents at any time in the possession, custody, or control of your subsidiaries, whether domestic or international, or merged or acquired predecessors).

4.   The term "product" shall include any material used or present at any of the work sites as defined above, regardless of asbestos content.

5.   At the deposition, you will be asked to produce individual documents in response to each of the numbered requests.  Please be prepared to do so.

6.   If you claim a privilege or exemption from discovery for any of the materials requested below, please be prepared to state the specific ground for each privilege or immunity claimed, in order that Plaintiff's counsel may determine the merit of the objection.  In this event, the parties may discuss the merits of the objection and decide whether a court determination on the objection is necessary.  Please also provide this information on or before the deposition.

7.   The term "Defense Counsel" shall mean all attorneys, agents of attorneys, law firms, persons working with the law firms or for the law firms who represent Defendant in this litigation.

*C.*    ***Request for Documents***

1.    Please produce all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for you in anticipation of your testimony at deposition or the trial of this case.

2.    Please produce all documents, tangible things, reports, models, or data compilation that you reviewed or relied on to form any opinions to be offered in this litigation.

3.    Please produce all reports, studies, tests, and other demonstrative evidence including, but not limited to, videotaped demonstrations, to be used or intended to be used during your deposition or trial testimony in this case.

4.    Please produce your complete file and all documents that you have been provided, reviewed, received, written or prepared relating to any aspect of this lawsuit, to include pleadings, depositions, correspondence, time records or time sheets, billing statements, handwritten notes, telephone call slips, and e-mails.

5.    Please produce all information, materials, documents, or reports by Defendant's other experts or medical providers that were provided to you.

6.    Please produce all publications you relied upon in formulating any opinions to be offered in this litigation.

7.    Please produce all publications you reviewed in preparation of your testimony at deposition or the trial of this case.

8.    Please produce a listing of all scientific literature, medical literature, treatises, periodicals, pamphlets, other authority or any other source of information upon which you have relied in rendering your opinion in this case.

9.    Please produce a listing of all scientific literature, medical literature, treatises, periodicals, pamphlets, other authority or any other source of information you reviewed in preparation of your testimony at deposition or the trial of this case.

10.    Please produce copies of any demonstrative aides you may use at the trial of this case.

11.    Please produce all versions of any reports you have prepared relating to this lawsuit, together with all documents or data that you relied upon in forming those opinions.

12.    Please produce your current resume, curriculum vitae, bibliography, and all billing records transmitted to Defense counsel.

13.    Please produce all documents or information received from any lawyers, representatives, employees or agents of Defense counsel relating to this case.

14.    Please produce all documents relating to or memorializing any contact or communication you have had with any lawyers, representatives, employees or agents of Defense counsel relating to this case.

15.    Please produce all documents, photographs, videotapes or other recordings in your possession or that you have reviewed relating to Defendant in this case or the presence of or, anyone's exposure to asbestos-containing products manufactured by defendant.

16.    Please produce a list of all cases in which you have testified at trial or by deposition ion the last four years.

17.    Please produce a list of all cases in which you have testified at trial or by deposition on behalf of any manufacturer of asbestos containing products, premises owner or contractor in the last four years.

18.    Please produce all information you have reviewed relating to Plaintiff's exposure to products manufactured by Defendant(s).

19.    Please produce all information in your possession that you have reviewed relating to any place that Plaintiff may have resided or worked.

20.    Please produce a copy of all publications, books, articles, etc., you have authored, alone or in collaboration.   Only if copies are not available, deponent then shall produce a bibliographic listing of all such publications, books, and articles.

21.    Please produce all reports, summaries, forecasts, narratives, charts, tables, video or audio records, photos, etc., you have prepared as a result of any tests, investigations, or analyses conducted concerning the subject matter of this lawsuit.

22.    Please produce all books, guidelines, checklists, articles, publications or other materials you have consulted during any such tests, investigations, or analyses or in the preparation of any reports, summaries, forecasts, narratives, charts, tables, video or audio records, etc.

23.    Please produce your report stating the subject matter on which you may testify, all facts known by you, your mental impressions, and all of your opinions in this case.

24.    Please produce any photographs or video recordings relating to the subject matter of this lawsuit that you have taken, been provided or reviewed.

25.    Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

26.    Please produce all documents you have or have reviewed or are aware of regarding any asbestos manufacturer's use of asbestos or any information received from any asbestos manufacturer discussing any issue relating to asbestos.

27.    Please produce all statutes, OSHA, NIOSH or other state or federal government regulations that you may rely upon or to which you may refer.

28.    Please produce copies of any trade organization documents that relate in any way to your opinions in this case.

29.    Please produce all articles or materials of which you are aware that relate to the amount of asbestos necessary to cause asbestosis.

30.    Please produce all articles or materials of which you are aware regarding non-asbestos causes of lung injuries.

31.    Please produce all epidemiological materials of which you are aware that relate to a person substantially similar to Plaintiff in this case or a person's work in the heating and plumbing industry.

32.    Please produce all documents, x-rays, MRI films, CT scan films, other diagnostic tests or other tangible items in any way related to Plaintiff.

33.    Please produce all documents, slides, stains, pathology, reports, or any other materials that you prepared or reviewed relating to your opinions regarding Plaintiff.

EFiled: Jan 26 2007 9:20PM EST
Transaction ID 13612785
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

CHARLES CHRISTOPHER LENTILE                    C.A. No. 05C-11-256 ASB
and SUSIE DUNN-LENTILE,

     Plaintiffs,

v.


METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and                       C.A. No. 06C-02-281 ASB
MARY M. COLLINS,

     Plaintiffs,

v.


METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE, DELAWARE

ROLLIN JAMES OVERSTREET and                    C.A. No.  05C-09-037
CRYSTAL J. OVERSTREET,

     Plaintiffs,

v.


METROPOLITAN LIFE
INSURANCE COMPANY; et al.
     Defendants.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

OLIVER EDWARD SANDAHL, and                          C.A. No. 05C-11–057-ASB
ANNE M. SANDAHL,

    Plaintiffs,

                           v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

ROLAND LEO GRENIER, SR.,              :        C.A. No. 05C-11-257 ASB
                                      :
    Plaintiff(s)                      :        ASBESTOS
                                      :
      vs.                           :
                                      :
METROPOLITAN LIFE INSURANCE           :
COMPANY, INC., et al.,                :
                                      :
    Defendant(s).                     :

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

MARLON CLARENCE OWENS and             :        C.A. No. 06C-02-241 ASB
LYNN OWENS,                           :
                                      :
    Plaintiffs,                       :
                                      :
      v.                            :
                                      :
METROPOLITAN LIFE INSURANCE           :
COMPANY, et al.                       :
                                      :
    Defendants.                       :

**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF FRED TOCA AND SUBPOENA DUCES TECUM - Page 2**

## PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC
## DEPOSITION OF FRED TOCA
## AND SUBPOENA DUCES TECUM

TO:    ALL COUNSEL OF RECORD

    PLEASE TAKE NOTICE that at the below-stated date, hour, and place we shall cause the *telephonic*

deposition of the below-described deponent before an official court reporter, a notary public duly authorized

to administer the oaths or his duly designated representative.  The deposition will continue day to day until

completed.  Any party or their attorney may appear and participate as they see fit.

| | |
|---|---|
| DEPONENT: | Fred Toca |
| DATE & HOUR: | January 30, 2007 |
| | 10:00 a.m. (EST) |
| PLACE: | Atlanta Airport Marriott |
| | 4711 Best Road |
| | Atlanta, GA 30337 |
| | 404-766-7900 |
| COURT REPORTER: | Henjum Goucher Reporting Company |
| DIAL-IN INFORMATION: | 1-866-825-3967, Code: 1689 4132 |

    *At or before the date specified above, the deponent is requested to produce all the items requested on the attached Exhibit "A."*

Date:    January 26, 2007

        Respectfully submitted,

        **WEISS & SAVILLE, P.A.**

    By:    <u>/s/ Yvonne Takvorian Saville</u>
        Yvonne Takvorian Saville, Esq., #3430
        1220 North Market Street, Suite 604
        P.O. Box 370
        Wilmington, DE  19899
        Telephone:    (302) 656-0400
        Facsimile:    (302) 656-5011
        Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

EXHIBIT "A"

## I.    *DEFINITIONS AND INSTRUCTIONS*

### A.    *Instructions*

The following instructions apply to the production of documents as required pursuant to this Notice:

1.    Documents produced shall be segregated and labeled according to the Request in response to which they are produced.

2.    Identify each document or set of documents being produced.

3.    Identify each document in this Request which is withheld based on any claim of privilege and also state (a) the basis of that claim; (b) the name of any and all persons who have seen the document; and (c) the date and subject matter of the document.

4.    With respect to any category of documents which you contend is in some way "burdensome" or "oppressive," state the specific reasons for such objection, and produce examples of the documents in question.

5.    These Requests, unless otherwise indicated, relate to documents and other things created, written, or produced at any time to the present.

### B.    *Definitions*

1.    The terms "you" and "your" shall mean you, your attorneys, officers, directors, employees, agents, and all other persons or entities acting or purporting to act on your behalf, whether authorized or not.

2.    The term "person" and "persons" shall include individuals and every type of entity, whether formed for business purposes or not.

3.  The terms "document," "documentation," and "documents" including any written, printed, recorded or graphic matter, photographic or videographic matter or sound reproductions or computer input or output, or other tangible things, including but not limited to: Papers, books, pamphlets, guidebooks, handbooks, instruction and/or safety manuals, articles, letters, correspondence, electronic or videotape recordings, contracts, notes, rough drafts, interoffice memoranda, reports, research materials, logs, diaries, calendars, bank statements, tax invoices, diagrams, studies, manuals, minutes, by-laws, articles of incorporation, resolutions, shareholder endorsements, or partnership documents however produced or reproduced, that are now or were formerly in your possession, custody, or control (including documents at any time in the possession, custody, or control of your subsidiaries, whether domestic or international, or merged or acquired predecessors).

4.  The term "product" shall include any material used or present at any of the work sites as defined above, regardless of asbestos content.

5.  At the deposition, you will be asked to produce individual documents in response to each of the numbered requests. Please be prepared to do so.

6.  If you claim a privilege or exemption from discovery for any of the materials requested below, please be prepared to state the specific ground for each privilege or immunity claimed, in order that Plaintiffs' counsel may determine the merit of the objection. In this event, the parties may discuss the merits of the objection and decide whether a court determination on the objection is necessary. Please also provide this information on or before the deposition.

7.  The term "Defense Counsel" shall mean all attorneys, agents of attorneys, law firms, persons working with the law firms or for the law firms who represent Defendant in this litigation.

*Subpoena Duces Tecum*

1. Please produce all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for you in anticipation of your testimony in this case.

2. Please produce all documents, tangible things, reports, models, or data compilation that you reviewed or relied on to form any opinions to be offered in this litigation.

3. Please produce your complete file and all documents that you have been provided, reviewed, received, written or prepared relating to any aspect of this lawsuit, to include pleadings, depositions, correspondence, time records or time sheets, billing statements, handwritten notes, telephone call slips, and emails.

4. Please produce all publications you relied upon in formulating any opinions to be offered in this litigation.

5. Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case.

6. Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case that relate specifically to asbestos exposure of workers in the carpentry or sheetrock business or workers whose exposure you allege is similar to that of workers in these industries, either occupationally or in a household context.

7. Please produce copies of any demonstrative aides you may use at the trial of this case.

8. Please produce all versions of any reports you have prepared relating to this lawsuit, together with all documents or data that you relied upon in forming those opinions.

9. Please produce your current resume, curriculum vitae, bibliography, and all billing records transmitted to Defense counsel.

10. Please produce all documents or information received from any lawyers, representatives, employees or agents of Defense counsel relating to this case.

11. Please produce all documents relating to or memorializing any contact or communication you have had with any lawyers, representatives, employees or agents of Defense counsel relating to this case.

12. Please produce a list of all cases in which you have testified at trial or by deposition.

13.   Please produce copies of all reports previously issued in asbestos cases.

14.   Please produce copies of transcripts of all past testimony you have given in asbestos-related cases.

15.   Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

16.   Please produce a copy of all publications, books, articles, etc., you have authored, alone or in collaboration. Only if copies are not available, deponent then shall produce a bibliographic listing of all such publications, books, and articles.

17.   Please produce all reports, summaries, forecasts, narratives, charts, tables, video or audio records, photos, etc., you have prepared as a result of any tests, investigations, or analyses conducted concerning the subject matter of this lawsuit.

18.   Please produce all books, guidelines, checklists, articles, publications or other materials you have consulted during any such tests, investigations, or analyses or in the preparation of any reports, summaries, forecasts, narratives, charts, tables, video or audio records, etc.

19.   Please produce your reporting stating the subject matter on which you may testify, all facts known by you, your mental impressions, and all of your opinions in this case

20.   Please produce any photographs or video recordings relating to the subject matter of this lawsuit that you have taken, been provided or reviewed.

21.   Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

22.   Please produce all documents you have or have reviewed or are aware of regarding any industrial company's use of asbestos or any information received from any industrial company discussing any issue relating to asbestos.

23.   Please produce all statutes, OSHA, NIOSH or other state or federal government regulations that you may rely upon or to which you may refer.

24.   Please produce copies of any trade organization documents that relate in any way to your opinions in this case.

25.   Please produce all articles or materials of which you are aware that relate to the amount of asbestos necessary to cause asbestosis, lung cancer, or mesothelioma.

26.   Please produce all articles or materials of which you are aware regarding non-asbestos causes of lung injuries.

27.    Please produce all epidemiological materials of which you are aware that relate to a person substantially similar to Plaintiff in this case.

28.    Please produce all documents, x-rays, CT scans, or other tangible items in any way related to Plaintiff.

29.    Please produce all documents, slides, stains, pathology, reports, or any other materials that you prepared or reviewed relating to your opinions regarding Plaintiff.

EFiled: Jan 26 2007 9:14...
Transaction ID 13612776
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

CHARLES CHRISTOPHER LENTILE                    C.A. No. 05C-11-256 ASB
and SUSIE DUNN-LENTILE,

     Plaintiffs,

                        v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and                       C.A. No. 06C-02-281 ASB
MARY M. COLLINS,

     Plaintiffs,

                        v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE, DELAWARE

ROLLIN JAMES OVERSTREET and                    C.A. No.  05C-09-037
CRYSTAL J. OVERSTREET,

     Plaintiffs,

                        v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.
     Defendants.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

OLIVER EDWARD SANDAHL, and                    C.A. No. 05C-11–057-ASB
ANNE M. SANDAHL,

     Plaintiffs,

                                    v.


METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

ROLAND LEO GRENIER, SR.,                :        C.A. No. 05C-11-257 ASB
                                        :
     Plaintiff(s)                     :        ASBESTOS
                                        :
     vs.                              :
                                        :
METROPOLITAN LIFE INSURANCE             :
COMPANY, INC., et al.,                  :
                                        :
     Defendant(s).                    :


**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF SHELDON RABINOVITZ AND SUBPOENA DUCES TECUM - Page 2**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

MARLON CLARENCE OWENS and     :     C.A. No. 06C-02-241 ASB
LYNN OWENS,     :
    :
      Plaintiffs,     :
    :
             v.     :
    :
METROPOLITAN LIFE INSURANCE     :
COMPANY, et al.     :
    :
      Defendants.     :

---

**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC
DEPOSITION OF SHELDON RABINOVITZ
AND SUBPOENA DUCES TECUM**

---

TO:    ALL COUNSEL OF RECORD

      PLEASE TAKE NOTICE that at the below-stated date, hour, and place we shall cause the *telephonic*

deposition of the below-described deponent before an official court reporter, a notary public duly authorized

to administer the oaths or his duly designated representative. The deposition will continue day to day until

completed. Any party or their attorney may appear and participate as they see fit.

           DEPONENT:            Sheldon Rabinovitz
           DATE & HOUR:            February 8, 2007
                                  1:00 p.m. (ET)
           PLACE:                  White & Williams, LLP
                                  824 N.Market Street, Suite 902
                                  P.O. Box 709

|  |  |
|---|---|
| COURT REPORTER: | Wilmington, DE 19899-0709 |
| DIAL-IN INFORMATION: | Henjum Goucher Reporting Company |
|  | 1-866-297-6394, Code: 1689 4175 |

*At or before the date specified above, the deponent is requested to produce all the items requested on the attached Exhibit "A."*

Date:    January 26, 2007

Respectfully submitted,


**WEISS & SAVILLE, P.A.**


By:    /s/ Yvonne Takvorian Saville
        Yvonne Takvorian Saville, Esq., #3430
        1220 North Market Street, Suite 604
        P.O. Box 370
        Wilmington, DE  19899
        Telephone:    (302) 656-0400
        Facsimile:    (302) 656-5011
        Attorney for Plaintiff



and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas  75219
(214) 521-3605



PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF SHELDON RABINOVITZ AND SUBPOENA DUCES TECUM - Page 4

EXHIBIT "A"

## I.    DEFINITIONS AND INSTRUCTIONS

### A.    Instructions

The following instructions apply to the production of documents as required pursuant to this Notice:

1.    Documents produced shall be segregated and labeled according to the Request in response to which they are produced.

2.    Identify each document or set of documents being produced.

3.    Identify each document in this Request which is withheld based on any claim of privilege and also state (a) the basis of that claim; (b) the name of any and all persons who have seen the document; and (c) the date and subject matter of the document.

4.    With respect to any category of documents which you contend is in some way "burdensome" or "oppressive," state the specific reasons for such objection, and produce examples of the documents in question.

5.    These Requests, unless otherwise indicated, relate to documents and other things created, written, or produced at any time to the present.

### B.    Definitions

1.    The terms "you" and "your" shall mean you, your attorneys, officers, directors, employees, agents, and all other persons or entities acting or purporting to act on your behalf, whether authorized or not.

2.    The term "person" and "persons" shall include individuals and every type of entity, whether formed for business purposes or not.

3.  The terms "document," "documentation," and "documents" including any written, printed, recorded or graphic matter, photographic or videographic matter or sound reproductions or computer input or output, or other tangible things, including but not limited to: Papers, books, pamphlets, guidebooks, handbooks, instruction and/or safety manuals, articles, letters, correspondence, electronic or videotape recordings, contracts, notes, rough drafts, interoffice memoranda, reports, research materials, logs, diaries, calendars, bank statements, tax invoices, diagrams, studies, manuals, minutes, by-laws, articles of incorporation, resolutions, shareholder endorsements, or partnership documents however produced or reproduced, that are now or were formerly in your possession, custody, or control (including documents at any time in the possession, custody, or control of your subsidiaries, whether domestic or international, or merged or acquired predecessors).

4.  The term "product" shall include any material used or present at any of the work sites as defined above, regardless of asbestos content.

5.  At the deposition, you will be asked to produce individual documents in response to each of the numbered requests.  Please be prepared to do so.

6.  If you claim a privilege or exemption from discovery for any of the materials requested below, please be prepared to state the specific ground for each privilege or immunity claimed, in order that Plaintiffs' counsel may determine the merit of the objection.  In this event, the parties may discuss the merits of the objection and decide whether a court determination on the objection is necessary.  Please also provide this information on or before the deposition.

7.  The term "Defense Counsel" shall mean all attorneys, agents of attorneys, law firms, persons working with the law firms or for the law firms who represent Defendant in this litigation.

*Subpoena Duces Tecum*

1.    Please produce all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for you in anticipation of your testimony in this case.

2.    Please produce all documents, tangible things, reports, models, or data compilation that you reviewed or relied on to form any opinions to be offered in this litigation.

3.    Please produce your complete file and all documents that you have been provided, reviewed, received, written or prepared relating to any aspect of this lawsuit, to include pleadings, depositions, correspondence, time records or time sheets, billing statements, handwritten notes, telephone call slips, and emails.

4.    Please produce all publications you relied upon in formulating any opinions to be offered in this litigation.

5.    Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case.

6.    Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case that relate specifically to asbestos exposure of workers in the carpentry or sheetrock business or workers whose exposure you allege is similar to that of workers in these industries, either occupationally or in a household context.

7.    Please produce copies of any demonstrative aides you may use at the trial of this case.

8.    Please produce all versions of any reports you have prepared relating to this lawsuit, together with all documents or data that you relied upon in forming those opinions.

9.    Please produce your current resume, curriculum vitae, bibliography, and all billing records transmitted to Defense counsel.

10.    Please produce all documents or information received from any lawyers, representatives, employees or agents of Defense counsel relating to this case.

11.    Please produce all documents relating to or memorializing any contact or communication you have had with any lawyers, representatives, employees or agents of Defense counsel relating to this case.

12.    Please produce a list of all cases in which you have testified at trial or by deposition.

13.    Please produce copies of all reports previously issued in asbestos cases.

14.    Please produce copies of transcripts of all past testimony you have given in asbestos-related cases.

15.    Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

16.    Please produce a copy of all publications, books, articles, etc., you have authored, alone or in collaboration.  Only if copies are not available, deponent then shall produce a bibliographic listing of all such publications, books, and articles.

17.    Please produce all reports, summaries, forecasts, narratives, charts, tables, video or audio records, photos, etc., you have prepared as a result of any tests, investigations, or analyses conducted concerning the subject matter of this lawsuit.

18.    Please produce all books, guidelines, checklists, articles, publications or other materials you have consulted during any such tests, investigations, or analyses or in the preparation of any reports, summaries, forecasts, narratives, charts, tables, video or audio records, etc.

19.    Please produce your reporting stating the subject matter on which you may testify, all facts known by you, your mental impressions, and all of your opinions in this case

20.    Please produce any photographs or video recordings relating to the subject matter of this lawsuit that you have taken, been provided or reviewed.

21.    Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

22.    Please produce all documents you have or have reviewed or are aware of regarding any industrial company's use of asbestos or any information received from any industrial company discussing any issue relating to asbestos.

23.  Please produce all statutes, OSHA, NIOSH or other state or federal government regulations that you may rely upon or to which you may refer.

24.  Please produce copies of any trade organization documents that relate in any way to your opinions in this case.

25.  Please produce all articles or materials of which you are aware that relate to the amount of asbestos necessary to cause asbestosis, lung cancer, or mesothelioma.

26.  Please produce all articles or materials of which you are aware regarding non-asbestos causes of lung injuries.

27.  Please produce all epidemiological materials of which you are aware that relate to a person substantially similar to Plaintiff in this case.

28.  Please produce all documents, x-rays, CT scans, or other tangible items in any way related to Plaintiff.

29.  Please produce all documents, slides, stains, pathology, reports, or any other materials that you prepared or reviewed relating to your opinions regarding Plaintiff.

**EFiled: Jan 26 2007  9:12 EST**
**Transaction ID 13612773**
**Case No. Multi-case**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

CHARLES CHRISTOPHER LENTILE                    C.A. No. 05C-11-256 ASB
and SUSIE DUNN-LENTILE,

     Plaintiffs,

                   v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and                    C.A. No. 06C-02-281 ASB
MARY M. COLLINS,

     Plaintiffs,

                   v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE, DELAWARE

ROLLIN JAMES OVERSTREET and                    C.A. No. 05C-09-037
CRYSTAL J. OVERSTREET,

     Plaintiffs,

                   v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.
     Defendants.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

OLIVER EDWARD SANDAHL, and          C.A. No. 05C-11–057-ASB
 ANNE M. SANDAHL,

      Plaintiffs,


v.


METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| ROLAND LEO GRENIER, SR., | : | C.A. No. 05C-11-257 ASB |
| | : | |
| Plaintiff(s) | : | ASBESTOS |
| | : | |
| vs. | : | |
| | : | |
| METROPOLITAN LIFE INSURANCE | : | |
| COMPANY, INC., et al., | : | |
| | : | |
| Defendant(s). | : | |

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

MARLON CLARENCE OWENS and          :          C.A. No. 06C-02-241 ASB
LYNN OWENS,                        :
                                   :
        Plaintiffs,                :
                                   :
                v.                 :
                                   :
METROPOLITAN LIFE INSURANCE        :
COMPANY, et al.                    :
                                   :
        Defendants.                :

---

## PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF STEVEN MLYNAREK AND SUBPOENA DUCES TECUM

---

TO:    ALL COUNSEL OF RECORD

        PLEASE TAKE NOTICE that at the below-stated date, hour, and place we shall cause the *telephonic*

deposition of the below-described deponent before an official court reporter, a notary public duly authorized

to administer the oaths or his duly designated representative. The deposition will continue day to day until

completed. Any party or their attorney may appear and participate as they see fit.

DEPONENT:              Steven Mlyranek
DATE & HOUR:           February 2, 2007
                       2:00 p.m. (EST)
PLACE:                 Tampa Airport Marriott
                       Tampa International Airport
                       Tampa, FL 33607

**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF STEVEN MLYNAREK AND SUBPOENA DUCES TECUM - Page 3**

|                          | 813-879-5151 |
|--------------------------|---------------------------------|
| COURT REPORTER:          | Henjum Goucher Reporting Company |
| DIAL-IN INFORMATION:     | 1-800-640-0097, 1689 4137 |

*At or before the date specified above, the deponent is requested to produce all the items requested on the attached Exhibit "A."*

Date:    January 26, 2007

Respectfully submitted,


**WEISS & SAVILLE, P.A.**


By:    /s/ Yvonne Takvorian Saville
        Yvonne Takvorian Saville, Esq., #3430
        1220 North Market Street, Suite 604
        P.O. Box 370
        Wilmington, DE  19899
        Telephone:    (302) 656-0400
        Facsimile:    (302) 656-5011
        Attorney for Plaintiff



and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas  75219
(214) 521-3605



**PLAINTIFF'S NOTICE OF INTENTION TO TAKE THE TELEPHONIC DEPOSITION OF STEVEN MLYNAREK AND SUBPOENA DUCES TECUM - Page 4**

EXHIBIT "A"

*I.*    ***DEFINITIONS AND INSTRUCTIONS***

*A.*    ***Instructions***

The following instructions apply to the production of documents as required pursuant to this Notice:

1.    Documents produced shall be segregated and labeled according to the Request in response to which they are produced.

2.    Identify each document or set of documents being produced.

3.    Identify each document in this Request which is withheld based on any claim of privilege and also state (a) the basis of that claim; (b) the name of any and all persons who have seen the document; and (c) the date and subject matter of the document.

4.    With respect to any category of documents which you contend is in some way "burdensome" or "oppressive," state the specific reasons for such objection, and produce examples of the documents in question.

5.    These Requests, unless otherwise indicated, relate to documents and other things created, written, or produced at any time to the present.

*B.*    ***Definitions***

1.    The terms "you" and "your" shall mean you, your attorneys, officers, directors, employees, agents, and all other persons or entities acting or purporting to act on your behalf, whether authorized or not.

2.    The term "person" and "persons" shall include individuals and every type of entity, whether formed for business purposes or not.

3.   The terms "document," "documentation," and "documents" including any written, printed, recorded or graphic matter, photographic or videographic matter or sound reproductions or computer input or output, or other tangible things, including but not limited to: Papers, books, pamphlets, guidebooks, handbooks, instruction and/or safety manuals, articles, letters, correspondence, electronic or videotape recordings, contracts, notes, rough drafts, interoffice memoranda, reports, research materials, logs, diaries, calendars, bank statements, tax invoices, diagrams, studies, manuals, minutes, by-laws, articles of incorporation, resolutions, shareholder endorsements, or partnership documents however produced or reproduced, that are now or were formerly in your possession, custody, or control (including documents at any time in the possession, custody, or control of your subsidiaries, whether domestic or international, or merged or acquired predecessors).

4.   The term "product" shall include any material used or present at any of the work sites as defined above, regardless of asbestos content.

5.   At the deposition, you will be asked to produce individual documents in response to each of the numbered requests. Please be prepared to do so.

6.   If you claim a privilege or exemption from discovery for any of the materials requested below, please be prepared to state the specific ground for each privilege or immunity claimed, in order that Plaintiffs' counsel may determine the merit of the objection. In this event, the parties may discuss the merits of the objection and decide whether a court determination on the objection is necessary. Please also provide this information on or before the deposition.

7.   The term "Defense Counsel" shall mean all attorneys, agents of attorneys, law firms, persons working with the law firms or for the law firms who represent Defendant in this litigation.

*Subpoena Duces Tecum*

1.  Please produce all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for you in anticipation of your testimony in this case.

2.  Please produce all documents, tangible things, reports, models, or data compilation that you reviewed or relied on to form any opinions to be offered in this litigation.

3.  Please produce your complete file and all documents that you have been provided, reviewed, received, written or prepared relating to any aspect of this lawsuit, to include pleadings, depositions, correspondence, time records or time sheets, billing statements, handwritten notes, telephone call slips, and emails.

4.  Please produce all publications you relied upon in formulating any opinions to be offered in this litigation.

5.  Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case.

6.  Please produce a listing of all scientific literature, medical literature and other sources of information upon which you have relied in rendering your opinion in this case that relate specifically to asbestos exposure of workers in the carpentry or sheetrock business or workers whose exposure you allege is similar to that of workers in these industries, either occupationally or in a household context.

7.  Please produce copies of any demonstrative aides you may use at the trial of this case.

8.  Please produce all versions of any reports you have prepared relating to this lawsuit, together with all documents or data that you relied upon in forming those opinions.

9.  Please produce your current resume, curriculum vitae, bibliography, and all billing records transmitted to Defense counsel.

10. Please produce all documents or information received from any lawyers, representatives, employees or agents of Defense counsel relating to this case.

11.  Please produce all documents relating to or memorializing any contact or communication you have had with any lawyers, representatives, employees or agents of Defense counsel relating to this case.

12.  Please produce a list of all cases in which you have testified at trial or by deposition.

13.  Please produce copies of all reports previously issued in asbestos cases.

14.  Please produce copies of transcripts of all past testimony you have given in asbestos-related cases.

15.  Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

16.  Please produce a copy of all publications, books, articles, etc., you have authored, alone or in collaboration.  Only if copies are not available, deponent then shall produce a bibliographic listing of all such publications, books, and articles.

17.  Please produce all reports, summaries, forecasts, narratives, charts, tables, video or audio records, photos, etc., you have prepared as a result of any tests, investigations, or analyses conducted concerning the subject matter of this lawsuit.

18.  Please produce all books, guidelines, checklists, articles, publications or other materials you have consulted during any such tests, investigations, or analyses or in the preparation of any reports, summaries, forecasts, narratives, charts, tables, video or audio records, etc.

19.  Please produce your reporting stating the subject matter on which you may testify, all facts known by you, your mental impressions, and all of your opinions in this case

20.  Please produce any photographs or video recordings relating to the subject matter of this lawsuit that you have taken, been provided or reviewed.

21.  Please produce all information in your possession that you have reviewed relating to any place that Plaintiff worked.

22.  Please produce all documents you have or have reviewed or are aware of regarding any industrial company's use of asbestos or any information received from any industrial company discussing any issue relating to asbestos.

23.     Please produce all statutes, OSHA, NIOSH or other state or federal government regulations that you may rely upon or to which you may refer.

24.     Please produce copies of any trade organization documents that relate in any way to your opinions in this case.

25.     Please produce all articles or materials of which you are aware that relate to the amount of asbestos necessary to cause asbestosis, lung cancer, or mesothelioma.

26.     Please produce all articles or materials of which you are aware regarding non-asbestos causes of lung injuries.

27.     Please produce all epidemiological materials of which you are aware that relate to a person substantially similar to Plaintiff in this case.

28.     Please produce all documents, x-rays, CT scans, or other tangible items in any way related to Plaintiff.

29.     Please produce all documents, slides, stains, pathology, reports, or any other materials that you prepared or reviewed relating to your opinions regarding Plaintiff.

EFiled: Jan 9 2007 4:04PM EST
Transaction ID 13396272

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE : ASBESTOS LITIGATION | : | |
| | : | |
| COTE  TRIAL GROUP | : | |
| Moscoe King | : | C.A. No. : 05C-11-125 |
| Hugo Engel | : | C.A. No. : 05C-09-083 |
| Virgil Brauer | : | C.A. No. : 05C-08-049 |
| Kenneth Beard | : | C.A. No. : 05C-11-158 |
| John Bassett | : | C.A. No. : 05C-07-122 |
| Eustachico Lupone | : | C.A. No. : 05C-11-063 |
| Horace Durham | : | C.A. No. : 05C-07-136 |
| Lyle Foltz | : | C.A. No. : 05C-10-325 |
| James Collins | : | C.A. No. : 05C-02-281 |

### DEFENSE COORDINATING COUNSEL'S
### NOTICE OF DEPOSITION OF STEVEN H. DIKMAN, MD

TO    :    All Counsel

**PLEASE TAKE NOTICE** that the undersigned, or another Delaware Asbestos Litigation Defense Counsel designated to do so by the undersigned, will take the deposition of STEVEN H. DIKMAN, MD on January 15, 2007 at 5:30 pm at the Hotel Wales, 1295 Madison Avenue, New York, New York.  The deposition will continue, if not completed, on January 16, 2007 at 5:30 pm at the same location.  The deposition will be recorded stenographically.

### _Duces Tecum_

The witness is instructed to produce the following materials to the undersigned at least two full business days prior to the deposition:

I.    All documents reviewed in preparation for your testimony in these cases.

2.    All documents, records and materials relating to said plaintiffs which you have reviewed at any time including, but not limited to, correspondence, statements, reports, questionnaires, handwritten notes, medical and hospital records,

deposition transcripts, work history and any other such document, record or tangible material relating to the above referenced plaintiffs.

3. All documents, materials, records, reports, correspondence, photographs or any other written or tangible items prepared by or at your request or by or at the request of any of your agents, employees or associates concerning these cases or your expected testimony.

4. Copies of all materials and documents of any kind which you have received concerning these cases including, but not limited to, all records, reports, correspondence and memorandum (if correspondence or documents requested in this duces tecum are claimed as "privileged", it should be brought to the deposition for identification).

5. Copies of all books, records, translations, articles, writing, publications, correspondence, notes, documents or any other written materials upon which you rely or will rely or have ill the past relied in preparation for presentation of your testimony in an asbestos case and for these particular cases.

6. Copies of any notes or outline used by you presently or in the past to give lectures, classes, presentations to any entity or group, including any litigation group which are related to your expected areas of testimony in these cases.

7. All documents and materials including, but not limited to, photographs, photographic slides, charts, diagrams, graphs or any other tangible item which you have reviewed or which you intend to show or utilize at the time of trial during your direct testimony.

8. A list of any and all of your prior testimony in any public proceeding or litigation including, but not limited to, testimony at deposition, workers' compensation bearing, trial, governmental or municipal proceeding, or any other type of proceeding concerning asbestos exposure. Regarding said testimony, please provide the following as applicable:

a.    Plaintiff's name;

b.    Date of testimony;

c.    Court, committee, agency or body before whom said testimony was given;

d.    Names and addresses of attorneys representing all parties involved, and

e.    Produce a copy of each transcript.

9.    All expert reports you have prepared within the last 5 years in asbestos cases or, in the alternative, a listing of the cases for which you have prepared reports.

10.    A list of all articles, textbooks, or other sources information or data upon which you base the opinions you expect to give.

11.    A list of or copies of any writing, publication, document, report, correspondence, article, book, notes and/or material related to asbestos, asbestos exposure and/or asbestos-related diseases which you have reviewed, consider relied on or may rely on to support your expected testimony or that you used for preparation of your report or your testimony in this lawsuit.

12.    Copies of any correspondence that you have sent to or received from any other experts in this litigation regarding your or their testimony in this case, or on any topic related to this case or asbestos litigation.

13.    All documents concerning your gross earnings from testimony at deposition or trial, or meetings with attorneys and/or litigation groups or non-litigation work related to an asbestos exposure, including consultation and including, but not limited to, ledgers, accounts receivables, receipt books, receipts, books, invoices, bills, correspondence, and/or any other material relating to gross income or gross earnings, present or potential, participating as an expert witness in litigation related to asbestos litigation. (For the purpose of this deposition, provide a list for the five previous calendar years, which would include the following: gross

income, percentage of gross income related to asbestos litigation earnings,

percentage with respect to consultation related to any asbestos related matter.)

14.   Copies of any and all documents and correspondence between you and
        Plaintiffs' Counsel and all documents sent to you by Plaintiffs' Counsel.

15.   All reports or documents you prepared containing your expected testimony,
        including all drafts of reports.

16.   The most up-to-date curriculum vitae on your background, training, education,
        and bibliography of articles written by you and copies of articles, pamphlets, parts
        of books, or books written by you or to which you contributed, which are related
        to your expected testimony, whether actually published or not.

Dated : January 9, 2007                          **RUFO ASSOCIATES, PA.**

                                                By :   /S/  Loreto P. Rufo
                                                        Loreto P. Rufo (# 2534)
                                                        Hockessin Village Center
                                                        7217 Lancaster Pike, Suite F
                                                        Hockessin, Delaware 19707
                                                        Telephone : 302-234-5900
                                                        Defense Coordinating Counsel

Dikman 011507Renotice

EFiled: Jan 9 2007 4:04P
Transaction ID 13396272



## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE : ASBESTOS LITIGATION | : | |
| | : | |
| COTE  TRIAL GROUP | : | |
| Moscoe King | : | C.A. No. : 05C-11-125 |
| Hugo Engel | : | C.A. No. : 05C-09-083 |
| Virgil Brauer | : | C.A. No. : 05C-08-049 |
| Kenneth Beard | : | C.A. No. : 05C-11-158 |
| John Bassett | : | C.A. No. : 05C-07-122 |
| Eustachico Lupone | : | C.A. No. : 05C-11-063 |
| Horace Durham | : | C.A. No. : 05C-07-136 |
| Lyle Foltz | : | C.A. No. : 05C-10-325 |
| James Collins | : | C.A. No. : 05C-02-281 |

### DEFENSE COORDINATING COUNSEL'S
### NOTICE OF DEPOSITION OF STEVEN H. DIKMAN, MD

TO    :    All Counsel

**PLEASE TAKE NOTICE** that the undersigned, or another Delaware Asbestos Litigation
Defense Counsel designated to do so by the undersigned, will take the deposition of
STEVEN H. DIKMAN, MD on January 15, 2007 at 5:30 pm at the Hotel Wales, 1295
Madison Avenue, New York, New York.  The deposition will continue, if not completed,
on January 16, 2007 at 5:30 pm at the same location.  The deposition will be recorded
stenographically.

## _Duces Tecum_

The witness is instructed to produce the following materials to the undersigned at least
two full business days prior to the deposition:

I.     All documents reviewed in preparation for your testimony in these cases.

2.     All documents, records and materials relating to said plaintiffs which you have

        reviewed at any time including, but not limited to, correspondence, statements,

        reports, questionnaires, handwritten notes, medical and hospital records,

deposition transcripts, work history and any other such document, record or tangible material relating to the above referenced plaintiffs.

3.    All documents, materials, records, reports, correspondence, photographs or any other written or tangible items prepared by or at your request or by or at the request of any of your agents, employees or associates concerning these cases or your expected testimony.

4.    Copies of all materials and documents of any kind which you have received concerning these cases including, but not limited to, all records, reports, correspondence and memorandum (if correspondence or documents requested in this duces tecum are claimed as "privileged", it should be brought to the deposition for identification).

5.    Copies of all books, records, translations, articles, writing, publications, correspondence, notes, documents or any other written materials upon which you rely or will rely or have ill the past relied in preparation for presentation of your testimony in an asbestos case and for these particular cases.

6.    Copies of any notes or outline used by you presently or in the past to give lectures, classes, presentations to any entity or group, including any litigation group which are related to your expected areas of testimony in these cases.

7.    All documents and materials including, but not limited to, photographs, photographic slides, charts, diagrams, graphs or any other tangible item which you have reviewed or which you intend to show or utilize at the time of trial during your direct testimony.

8.    A list of any and all of your prior testimony in any public proceeding or litigation including, but not limited to, testimony at deposition, workers' compensation bearing, trial, governmental or municipal proceeding, or any other type of proceeding concerning asbestos exposure. Regarding said testimony, please provide the following as applicable:

    a.     Plaintiff's name;

    b.     Date of testimony;

    c.     Court, committee, agency or body before whom said testimony was given;

    d.     Names and addresses of attorneys representing all parties involved, and

    e.     Produce a copy of each transcript.

9.    All expert reports you have prepared within the last 5 years in asbestos cases or, in the alternative, a listing of the cases for which you have prepared reports.

10.    A list of all articles, textbooks, or other sources information or data upon which you base the opinions you expect to give.

11.    A list of or copies of any writing, publication, document, report, correspondence, article, book, notes and/or material related to asbestos, asbestos exposure and/or asbestos-related diseases which you have reviewed, consider relied on or may rely on to support your expected testimony or that you used for preparation of your report or your testimony in this lawsuit.

12.    Copies of any correspondence that you have sent to or received from any other experts in this litigation regarding your or their testimony in this case, or on any topic related to this case or asbestos litigation.

13.    All documents concerning your gross earnings from testimony at deposition or trial, or meetings with attorneys and/or litigation groups or non-litigation work related to an asbestos exposure, including consultation and including, but not limited to, ledgers, accounts receivables, receipt books, receipts, books, invoices, bills, correspondence, and/or any other material relating to gross income or gross earnings, present or potential, participating as an expert witness in litigation related to asbestos litigation. (For the purpose of this deposition, provide a list for the five previous calendar years, which would include the following: gross

income, percentage of gross income related to asbestos litigation earnings,

percentage with respect to consultation related to any asbestos related matter.)

14.   Copies of any and all documents and correspondence between you and

Plaintiffs' Counsel and all documents sent to you by Plaintiffs' Counsel.

15.   All reports or documents you prepared containing your expected testimony,

including all drafts of reports.

16.   The most up-to-date curriculum vitae on your background, training, education,

and bibliography of articles written by you and copies of articles, pamphlets, parts

of books, or books written by you or to which you contributed, which are related

to your expected testimony, whether actually published or not.

Dated : January 9, 2007                          **RUFO ASSOCIATES, PA.**

                                    By :    <u>/S/  Loreto P. Rufo</u>
                                            Loreto P. Rufo (# 2534)
                                            Hockessin Village Center
                                            7217 Lancaster Pike, Suite F
                                            Hockessin, Delaware 19707
                                            Telephone : 302-234-5900
                                            Defense Coordinating Counsel

Dikman 011507Renotice

EFiled: Mar 2 2007 10:56 [WEST]
Transaction ID 14000140
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE: ASBESTOS LITIGATION: | ) | |
| | ) | |
| **Limited To:** | ) | |
| | ) | |
| LEROY RAYMOND ABBOTT, | ) | C.A. No. 06C-08-183 |
| | ) | |
| RAYMOND ADEMSKI, and JOANNE ADEMSKI, | ) | C.A. No. 05C-03-185 |
| | ) | |
| CHARLES AIKEN and VICKIE AIKEN, | ) | C.A. No. 04C-10-143 |
| | ) | |
| GERALD L. ALLEN and HELEN WILMA ALLEN, | ) | C.A. No. 06C-09-248 |
| | ) | |
| VIRGINIA L. ALLEN, et al., | ) | C.A. No. 05C-11-161 |
| | ) | |
| DELORES ALVARADO, et al., | ) | C.A. No. 06C-04-229 |
| | ) | |
| KEMBERLY SEMENIUK, et al., | ) | C.A. No. 06C-05-223 |
| | ) | |
| SCOTT ARTERBRIDGE, as Executor) of the Estate of WILLIAM ARTERBRIDGE, and SCOTT ARTERBRIDGE, PAULINE BRANNOCK, and ESTHER MEADOWS, as surviving children of WILLIAM ARTERBRIDGE, deceased, | ) | C.A. No. 03C-05-031 |
| | ) | |
| BRENDA CLARK, et al., | ) | C.A. No. 06C-12-252 |
| | ) | |
| DERRICK BAILEY, | ) | C.A. No. 06C-05-174 |
| | ) | |
| PHYLLIS BAILEY, | ) | C.A. No. 06C-03-294 |
| | ) | |
| RUFUS RANDOLPH BARNES and GILDA BARNES, | ) | C.A. No. 06C-02-096 |
| | ) | |
| GEORGE VICTOR BARRA and ELIZABETH ANN BARRA, | ) | C.A. No. 06C-10-130 |
| | ) | |
| EVELYN BARRY, et al., | ) | C.A. No. 06C-03-100 |

| | | |
|---|---|---|
| EDWIN LARMAUR BAXTER and<br>JUDY BAXTER, | ) ) ) | C.A. No. 06C-11-183 |
| | ) | |
| KENNETH RUDELL BEARD and<br>CATHERYN SUE BEARD, | ) ) ) | C.A. No. 05C-11-158 |
| | ) | |
| RAYMOND ONEIL BELL, | ) ) | C.A. No. 06C-06-333 |
| JUANITA ESTER BELLMIRE, et al., | ) ) | C.A. No. 07C-01-256 |
| BARRY B. BOGART,<br>and KATHY BOGART, | ) ) ) | C.A. No. 04C-03-352 |
| | ) | |
| ELEANOR DIANA POPOOLA, et al., | ) ) | C.A. No. 06C-04-057 |
| GLENN ROY BOURKE and<br>NATALIE BOURKE, | ) ) ) | C.A. No. 05C-11-266 |
| | ) | |
| DONALD KEITH BOWLIN and<br>JOYCE KAY BOWLIN, | ) ) ) | C.A. No. 06C-09-197 |
| | ) | |
| NICK BROKOVICH , JR. et al., | ) ) | C.A. No. 07C-01-057 |
| WILLIAM R. BROWN, | ) ) | C.A. No. 05C-11-258 |
| GEORGE BUCKMAN and<br>FLORENE CARTER BUCKMAN, | ) ) ) | C.A. No. 02C-12-081 |
| | ) | |
| MAX BUSH and<br>PATRICIA BUSH, | ) ) ) | C.A. No. 03C-11-117 |
| | ) | |
| JOHN BYER, JR., et al., | ) ) | C.A. No. 06C-10-348 |
| ETHEL CAMPBELL, et al., | ) ) | C.A. No. 06C-04-153 |
| MARY CAMPBELL, | ) ) | C.A. No. 04C-10-153 |
| BRUCE A. CAMPBELL et al., | ) ) | C.A. No. 05C-10-061 |
| FRANK ALLEN CARTER and<br>JUNE CARTER, | ) ) ) ) | C.A. No. 05C-11-126 |

-2-

ALAN R. CEPHAS and )            C.A. No. 04C-10-124
CATHERINE CEPHAS, )
)
DANIEL THOMAS CHINNERY, )            C.A. No. 06C-09-268
)
L. CARRIE CHOY DEANE, et al., )            C.A. No. 06C-08-182
)
JOHN COLE and RUTH COLE, )            C.A. No. 07C-01-235
)
JAMES DANIEAL COLLINS and )            C.A. No. 06C-02-281
MARY M. COLLINS )
)
LARRY J. COMBS, et al., )            C.A. No. 06C-11-185
)
FRANCIS L. CONLEY, )            C.A. No. 06C-02-118
)
WILLIAM GILBERY COTE and )            C.A. No. 05C-09-268
ETHEL MAE COTE, )
)
CARL CRADIC, SR., et al., )            C.A. No. 06C-10-074
)
FRED MARVIN CREWS and )            C.A. No. 06C-03-026
FRANCES ELIZABETH CREWS, )
)
JOHN P. CROWLEY, JR., )            C.A. No. 03C-05-190
)
RUTH E. CUMMINGS, et al., )            C.A. No. 06C-01-148
)
DAVID M. DARDI, et al., )            C.A. No. 05C-09-282
)
EVERETTE L. DEAKYNE III and )            C.A. No. 04C-05-197
BETTY ANN DEAKYNE, )
)
GLADYS JEAN DE MARS and )            C.A. No. 06C-11-189
ARTHUR F. DE MARS )
)
TERESA DENTON, et al., )            C.A. No. 06C-10-320
)
JOHN A. DEVLIN JR., et al., )            C.A. No. 05C-09-281
)
MELVIN A. DRAKE, )            C.A. No. 04C-06-183
)
ALICE L. DUMSTORFF, et al., )            C.A. No. 06C-12-146

-3-

| | | |
|---|---|---|
| STEPHEN M. DUNDON, and ROSEANN DUNDON, | ) ) ) | C.A. No. 04C-06-307 |
| THOMAS HARVEY DUNLAP and SHIRLEY MAE DUNLAP, | ) ) ) | C.A. No. 06C-11-236 |
| ROSWELL G. EDGECOMB and MYRNA EDGECOMB | ) ) ) | C.A. No. 06C-12-136 |
| SHIRLEY L. EDRINGTON, et al., | ) ) | C.A. No. 07C-01-236 |
| DEBORAH ENENBACH, | ) ) | C.A. No. 05C-10-261 |
| ARNOLD CHARLES EUDY and SHIRLEY ARNETTE EUDY, | ) ) ) | C.A. No. 05C-10-323 |
| WILLIAM HARRY FANCER, SR. and JUDITH ANNE FANCER, | ) ) ) | C.A. No. 06C-11-237 |
| PRESTON H. FARRAR, | ) ) | C.A. No. 05C-12-046 |
| DOUGLAS FAVILLE, | ) ) | C.A. No. 06C-02-097 |
| THE ESTATE OF MITCHELL R. FAWCETT and ERMA FAWCETT, | ) ) ) | C.A. No. 05C-10-322 |
| ROGER EUGENE FIELD and ARLENE MAE FIELD, | ) ) ) | C.A. No. 06C-10-231 |
| MABEL FLAIGG, et al., | ) ) | C.A. No. 06C-12-071 |
| GREGORY A. FLETCHER, SR. and CLOTILDE J. FLETCHER, | ) ) ) | C.A. No. 06C-09-309 |
| LYLE DAVIS FOLTZ and LAWANDA FOLTZ, | ) ) ) | C.A. No. 05C-10-325 |
| MICHAEL FORAKER and BETH FORAKER, | ) ) ) | C.A. No. 06C-08-120 |
| JOSEPH E. FORESST JR., | ) ) | C.A. No. 04C-06-304 |
| JANET A. FRASER, et al., | ) | C.A. No. 06C-01-015 |

-4-

| | | |
|---|---|---|
| ROBERT FREDERICK and<br>ARLINE FREDERICK, | ) ) ) | C.A. No. 04C-08-087 |
| GENA MICHELE POE, et al., | ) ) | C.A. No. 06C-12-141 |
| ADA JEAN GILES, | ) ) | C.A. No. 06C-05-259 |
| THEODORE GILLIS, | ) ) | C.A. No. 05C-02-097 |
| MILDRED M. GRAY, et al., | ) ) | C.A. No. 05C-10-087 |
| RONALD LEO GRANIER, SR. | ) ) | C.A. No. 05C-11-257 |
| MELANIE LARGIN HALL, individually<br>and as Executrix of the Estate of<br>PAULINE LARGIN, deceased, and<br>MELANIE LARGIN HALL, STERLING<br>LARGIN and CLARA L. LARGIN<br>AIONO, Individually and as surviving<br>children of PAULINE LARGIN,<br>deceased, | ) ) ) ) ) ) ) ) | C.A. No. 04C-01-153 |
| KATHERINE LOUISE HANSON and<br>LLOYD L. HANSON, | ) ) ) | C.A. No. 06C-10-189 |
| WILLIAM M. HARMON, | ) ) | C.A. No. 05C-07-320 |
| CATHERINE HART Personal<br>Representative of the Estate of<br>John P. Hart, Deceased, | ) ) ) ) | C.A. No. 06C-01-237 |
| RAYMOND L. HARVEY, et al., | ) ) | C.A. No. 06C-03-164 |
| GLORIA A. HAWKS, et al., | ) ) | C.A. No. 05C-10-009 |
| EMMIT E. HAYES, | ) ) | C.A. No. 05C-05-245 |
| JOHN J. HEALY and<br>PATRICIA HEALY, | ) ) ) | C.A. No. 02C-07-264 |
| BETTYE G. BRADLEY, et al., | ) ) | C.A. No. 06C-09-258 |
| EDWIN B. HOFFMAN, JR., | ) | C.A. No. 04C-03-086 |

-5-

| | | |
|---|---|---|
| MARIAN KATHRYN HOLMBERG, et al., | ) ) ) | C.A. No. 05-10-188 |
| RICHARD HOLMES and BARBARA HOLMES, | ) ) ) | C.A. No. 05C-08-245 |
| MUHAMMED IQBAL, | ) ) | C.A. No. 03C-04-267 |
| CLARICE JEFFERIES, et al., | ) ) | C.A. No. 06C-08-047 |
| ERNEST EUGENE JONES and JOYCE B. JONES, | ) ) ) | C.A. No. 06C-11-188 |
| GEORGE T. JONES, | ) ) | C.A. No. 06C-09-244 |
| LARRE M. JONES, | ) ) | C.A. No. 02C-04-075 |
| EDWARD J. KAMINSKI, | ) ) | C.A. No.07C-01-123 |
| JOHN KASIANOWICZ, | ) ) | C.A. No. 07C-01-257 |
| MARSHA KEELER, et al., | ) ) | C.A. No. 07C-01-058 |
| REGINALD KERSEY and LOIS KERSEY, | ) ) ) | C.A. No. 07C-01-137 |
| LORETTA C. KILBY, as Surviving Spouse of DELMER T. KILBY, SR., Deceased, and LORETTA C. KILBY, Personal Representative of the Estate of DELMER T. KILBY, SR., Deceased, | ) ) ) ) ) ) | C.A. No. 02C-06-110 |
| MOSCOE JASCKON KING, JR. and BARBARA HASSEN KING, | ) ) ) | C.A. No. 05C-11-125 |
| KURT M. KLINE, | ) ) | C.A. No. 02C-10-220 |
| EDWARD J. KLINE, et al., | ) ) | C.A. No. 06C-04-217 |
| WILLIAM JOSEPH KOUNTZ, | ) ) | C.A. No. 06C-02-223 |
| LEON DAVID KREBS, | ) ) | C.A. No. 05C-10-177 |

-6-

| | | |
|---|---|---|
| AGNES C. KRITZER, | ) | C.A. No. 05C-11-032 |
| | ) | |
| CHARLES P. KWOLEK, JR. et al., | ) | C.A. No. 06C-01-354 |
| | ) | |
| FLORENCE LANE, | ) | C.A. No. 06C-11-186 |
| | ) | |
| RAYMOND J. LAUBENSTEIN and | ) | C.A. No. 06C-09-214 |
| JUDY LAUBENSTEIN, | ) | |
| | ) | |
| STEVEN LEDFORD, et al., | ) | C.A. No. 07C-01-010 |
| | ) | |
| MARTHA C. LEE, et al., | ) | C.A. No. 05C-08-022 |
| | ) | |
| JOHNNY LEEDY and | ) | C.A. No. 06C-11-238 |
| PATRICIA LEEDY, | ) | |
| | ) | |
| CHARLES CHRISTOPHER LENTILE | ) | C.A. No. 05C-11-256 |
| and SUSAN DUNN-LENTILE, | ) | |
| | ) | |
| PAUL JOSEPH LOUGHREY, | ) | C.A. No. 04C-03-365 |
| | ) | |
| JOHN JAMES LOWER. and | ) | C.A. No. 05C-11-073 |
| CATHERINE LOUISE LOWER, | ) | |
| | ) | |
| E. BRIAN LUCAS, et al., | ) | C.A. No. 06C-07-201 |
| | ) | |
| EUSTACHICO LUPONE, | ) | C.A. No. 02C-07-249 |
| | ) | |
| LARRY S. MARSHALL and | ) | C.A. No. 02C-07-249 |
| BARBARA A. MARSHALL, | ) | |
| | ) | |
| BERNADINE M. MATZKE, et al., | ) | C.A. No. 06C-01-029 |
| | ) | |
| PATRICIA MCCARTHY, et al., | ) | C.A. No. 06C-12-137 |
| | ) | |
| DARRELL KEITH MCKINNIS and | ) | C.A. No. 05C-11-007 |
| MARY CAROL MCKINNIS, | ) | |
| | ) | |
| MAUREEN ANN MCCLELLAN, et al., | ) | C.A. No. 05C-12-061 |
| | ) | |
| EMILY MCNAIR, et al., | ) | C.A. No. 06C-12-072 |
| | ) | |
| THOMAS D. MCNAMARA and | ) | C.A. No. 06C-03-090 |
| MARGARET MCNAMARA, | ) | |

-7-

DORRIS MELLINGER, et al.,                    )          C.A. No. 06C-09-247
                                             )
ALICE MENYHARTH, et al.,                     )          C.A. No. 06C-01-352
JOSEPH R. MESSICK and                        )          C.A. No. 05C-11-062
ANN S. MESSICK,                              )
                                             )
CHARLES S. MEYERS, et al.,                   )          C.A. No. 06C-07-138
                                             )
TALMADGE JESSE MILLER and                    )          C.A. No. 06C-10-146
HELEN MARIE MILLER,                          )
                                             )
KATHERINE VIRGINIA LANDERS                   )          C.A. No. 06C-05-175
MONTEMAYOR,                                  )
                                             )
ROY MORISSETTE,                              )          C.A. No. 06C-12-140
                                             )
CLIFFORD JOHN MORRIS, JR.,                   )          C.A. No. 04C-02-174
and JOANN MORRIS,                            )
                                             )
DONALD PAUL MORRIS, et al.,                  )          C.A. No. 05C-12-026
                                             )
COLUMBUS A. NACCHIA, JR.,                    )          C.A. No. 02C-08-240
                                             )
MARLON CLARENCE OWENS and                    )          C.A. No. 06C-02-241
LYNN OWENS,                                  )
                                             )
DEWEY L. PIERCE,                             )          C.A. No. 02C-04-128
                                             )
BARBARA W. PIERSON,                          )          C.A. No. 05C-06-328
and WAYNE PIERSON,                           )
                                             )
ALEXANDER A. PIETKA and                      )          C.A. No. 06C-08-302
ALFREDA PIETKA,                              )
                                             )
ALICE PORTER, et al.,                        )          C.A. No. 07C-01-283
                                             )
JAMES WILLIAM PRAG                           )          C.A. No. 05C-11-174
and MARGARET PRAG,                           )
                                             )
ROBERT PROVOST, et al.,                      )          C.A. No. 07C-01-104
                                             )
ROBERT REYNOLDS and                          )          C.A. No. 04C-03-125
KATHLEEN REYNOLDS,                           )

-8-

|  |  |  |
|---|---|---|
| ANDARA RICH, et al., | ) | C.A. No. 06C-07-010 |
| | ) | |
| CHERYL ANN RICHARDSON, et al., | ) | C.A. No. 05C-12-186 |
| | ) | |
| LILLIAN RIEDEL, | ) | C.A. No. 04C-07-099 |
| | ) | |
| WILLIAM OSCAR RIZER, SR. and | ) | C.A. No. 06C-10-110 |
| VIRGINIA LEAH RIZER, | ) | |
| | ) | |
| NORMAN A. ROBISON, | ) | C.A. No. 04C-06-035 |
| and SHARON ROBISON, | ) | |
| | ) | |
| GERALDINE ROMAN, et al., | ) | C.A. No. 06C-08-239 |
| | ) | |
| LARRY D. ROULLARD and | ) | C.A. No. 06C-11-184 |
| JUDY ROULLARD, | ) | |
| | ) | |
| ROBERT ROZENKO, | ) | C.A. No. 02C-11-010 |
| | ) | |
| RALPH RYAN and | ) | C.A. No. 04C-05-108 |
| JOANNE RYAN, | ) | |
| | ) | |
| OLIVER EDWARD SANDAHL and | ) | C.A. No. 05C-11-057 |
| ANNE M. SANDAHL, | ) | |
| | ) | |
| ROBERT SANFORD, et al., | ) | C.A. No. 06C-03-213 |
| | ) | |
| EDWARD MICHAEL SCHAEFER and | ) | C.A. No. 05C-10-099 |
| LINDA KAY SCHAEFER, | ) | |
| | ) | |
| ALTHEA M. SCHAMP, et al., | ) | C.A. No. 05C-11-150 |
| | ) | |
| BARBARA ANN SENG, et al., | ) | C.A. No. 06C-02-014 |
| | ) | |
| JAMES BRIAN SHANAHAN and | ) | C.A. No. 06C-12-073 |
| JANICE KAY SHANAHAN, | ) | |
| | ) | |
| PAUL A. SHANNON, | ) | C.A. No. 02C-09-006 |
| | ) | |
| DIANA SLAVIN and | ) | C.A. No. 02C-09-243 |
| EDWARD A. SLAVIN, JR., | ) | |
| | ) | |

-9-

| | | |
|---|---|---|
| EDWARD A. SLAVIN, JR. and DIANA SLAVIN, | ) ) ) | C.A. No. 02C-08-042 |
| LUCILE SMALARZ, et al., | ) ) | C.A. No. 07C-01-217 |
| BARRY GORDON SMITH and ALLEGRA SMITH, | ) ) ) | C.A. No. 06C-02-265 |
| EVELYN M. SMITH, | ) ) | C.A. No. 04C-10-117 |
| JOHN W. STRAIGHT and MARY ANN STRAIGHT, | ) ) ) | C.A. No. 05C-08-097 |
| STEVEN M. SWEARINGEN, et al., | ) ) | C.A. No. 06C-08-303 |
| ROBERT SWEETMAN and NANCY SWEETMAN, | ) ) ) | C.A. No. 04C-01-303 |
| CAROL SWITA, et al., | ) ) | C.A. No. 06C-02-087 |
| CHESTER JOSEPH SZWED and VIOLA MARY SZWED, | ) ) ) | C.A. No. 06C-08-175 |
| MONTE TABOR and CAROL TABOR, | ) ) ) | C.A. No. 03C-01-250 |
| SARAH TANSLEY, as Executrix of the Estate of RICHARD TANSLEY, deceased, | ) ) ) ) | C.A. No. 05C-02-096 |
| DONALD ROBERT TAYLOR and DOROTHY R. TAYLOR, | ) ) ) | C.A. No. 06C-02-196 |
| GEORGE LEROY THOMAS and HELEN K. THOMAS, | ) ) ) | C.A. No. 05C-11-106 |
| MARCIA THOMSON, et al., | ) ) | C.A. No.05C-10-155 |
| MELVIN DOUGLAS TJADEN and CAROLE SUE TJADEN, | ) ) ) | C.A. No. 04C-03-353 |
| DORIS TRAHAN, et al., | ) ) | C.A. No. 06C-02-159 |

| | | |
|---|---|---|
| JOHN H. VAN HOUTEN, II and<br>DONNA VAN HOUTEN, | ) )<br>) | C.A. No. 06C-11-239 |
| MARY JANE VILONE and<br>FRANCIS W. BAILEY, JR., | ) )<br>) | C.A. No. 03C-06-039 |
| RALPH WALSH, JR.<br>and MARIETTA WALSH, | ) )<br>) | C.A. No. 05C-09-035 |
| LOUIS EDWARD WHEELER and<br>ELIZABETH WHEELER, | ) )<br>) | C.A. No. 06C-11-187 |
| EVERETTE C. WHITE and,<br>ORA MAE WHITE, | ) )<br>) | C.A. No. 07C-01-056 |
| GEORGE T. WILFONG JR., | ) ) | C.A. No. 06C-04-013 |
| MARGARET E. WILFONG and<br>GEORGE T. WILFONG, SR., | ) )<br>) | C.A. No. 03C-09-002 |
| DEBORAH KENNEDY WILLMAN, et<br>al., | ) )<br>) | C.A. No. 06C-04-143 |
| SANDRA MCKAY GREGORY, et al., | ) ) | C.A. No. 06C-07-031 |
| THOMAS S. WILSON and<br>CONNIE KRAMER WILSON, | ) )<br>) | C.A. No. 06C-11-235 |
| MARY DOERR WINTER, et al., | ) ) | C.A. No. 06C-04-154 |
| MARGARET PARISH WOODS, et al., | ) )<br>) | C.A. No. 05C-11-190 |

## <u>NOTICE OF ADOPTION</u>

Defendant Hercules Incorporated hereby adopts and incorporates herein by reference its

Objections and Responses to Standing Order No. 1 Interrogatories as deposited with the Defense

Coordinating Counsel on December 8, 2006.

-11-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


_____

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
   Attorneys for Defendant
   Hercules Incorporated

March 2, 2007

754587.1

-12-

EFiled: Jan 5 2007 2:55PM EST
Transaction ID 13362845

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

IN RE:  ASBESTOS LITIGATION           :
Limited to:                          :
                                     :
James Collins                        :        C.A. No.: 06C-02-281
                                     :

DEFENDANT HENNESSY INDUSTRIES MOTION IN LIMINE TO EXCLUDE
TESTIMONY, ALLEGATION, OR MENTION OF AMMCO'S
TOOLS AS BEING "FRICTION PRODUCTS"

Defendant Hennessy Industries, Inc., as successor-in-interest to Ammco Tools, Inc.,
(hereafter "Hennessy"), by its below-signed counsel, moves this Court for an Order in Limine to
exclude testimony, allegation, or mention of Ammco Tools, Inc.'s brake shoe grinder as being a
"friction product."  In support thereof, it states:

1. Ammco brake shoe grinders never contained asbestos; they were not asbestos-
   containing products.

2. Ammco brake shoe grinders did not depend upon asbestos-containing products in
   order to function.

3. Ammco brake shoe grinders did not have asbestos-containing component parts.

4. Ammco did not place brakes into the stream of commerce.

5. Ammco brake shoe grinders were never a part of an automobile.

6. Pursuant to D.R.E. 403, the value of any testimony or mention of Ammco's tool
   as being a "friction product" would be substantially outweighed by the prejudice
   to Hennessy.  The Ammco brake shoe grinder was never an asbestos-containing
   component part of an automobile.    To present testimony or even mention an
   Ammco tool as being in the category of "friction products" such as brakes and

clutches prejudicially groups a **non**-asbestos-containing tool with asbestos-containing friction products. This baseless association will unduly confuse the jury and will not assist them in their role as fact-finder.

7. Further, testimony attempting to somehow link an asbestos-free tool with an entirely different clutch or brake product manufactured for an entirely different purpose would unduly confuse and mislead the jury.

8. Such a manufactured and misleading link between two entirely different classes of products would necessarily prejudice Hennessy beyond repair under D.R.E. 403.

WHEREFORE, the Defendant Hennessy Industries, Inc., as successor-in-interest to Ammco Tools, Inc., respectfully requests that this Honorable Court enter an Order in limine prohibiting the Plaintiff and his counsel from offering before the jury any allegation, argument, or mention that Ammco tools were "friction products."

Respectfully submitted,

ELZUFON, AUSTIN, REARDON, TARLOV AND MONDELL, P.A.

/s/ Penelope B. O'Connell
PENELOPE B. O'CONNELL (#4898)
300 Delaware Avenue, 17th Floor
P. O. Box 1630
Wilmington, DE 19899
(302) 428-3181
Attorney for Defendant
Hennessy Industries, Inc.,
As Successor-in-Interest to
Ammco Tools, Inc.

January 5, 2007
G:\Docs\CLIENT\80514\16914\motions\00375427.DOC

EFiled: Jan 5 2007 3:00P
Transaction ID 13362950

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

IN RE ASBESTOS LITIGATION:      :

                                :

James Collins                  :     C.A. No.: 06C-02-281

                                :

                                :

                                :

## DEFENDANT HENNESSY INDUSTRIES, INC.'S MOTION *IN LIMINE* TO EXCLUDE VIDEOTAPES AND EVIDENCE AND TESTIMONY OF MR. RICHARD L. HATFIELD AND DR. WILLIAM LONGO

Defendant Hennessy Industries, Inc., as successor-in-interest to Ammco Tools, Inc., (hereafter "Hennessy") hereby objects to and moves *in limine* to exclude from the Plaintiff's case the inherently unreliable and misleading videotapes, evidence and testimony of Mr. Richard L. Hatfield and Dr. William Longo.

1.    First and foremost, Defendant objects to Plaintiff's use of the Longo videotapes because Ammco's product was not even remotely a subject of the studies. The Ammco brake shoe grinder to which Plaintiff alleges asbestos exposure is not an asbestos-containing product.  It is not a friction product.   It is not a brake shoe.

2.    Plaintiff proffers Dr. William Longo, who has no formal training in industrial hygiene, or any practical automotive experience, to provide his "expert" opinion as to Plaintiff's alleged occupational exposure to asbestos during work involving a brake shoe arcing tool allegedly associated with Defendant.  Dr. Longo is expected to proffer a quantitative analysis of Plaintiff's purported exposure to asbestos during his work with Defendant's grinding tool, based principally on videotaped "demonstrative" studies he conducted with his partner, Dr. Richard L. Hatfield.

3.    The videotaped studies Dr. Longo proffers were performed on parts not supplied by Defendant and do not remotely resemble Plaintiffs' workplaces or the

circumstances of their alleged exposure. Despite these fatal flaws, Plaintiffs proffer Dr. Longo (and his video-partner, Mr. Hatfield) to inform and "demonstrate" Plaintiff's alleged exposure to asbestos for the jury.

4.    Dr. Longo's litigation-driven videotapes and testimony fail to meet the requisite standards of "fit" and reliability mandated by the courts Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); M.G. Bancorp., Inc. v. Le Beau, Del. Supr., 737 A.2d 513, 521-22 (1999) (adopting Daubert standard as Delaware law).

5.    Dr. Longo's proffered videotaped demonstrations bear no relation to the circumstances of Plaintiff's alleged exposure. The demonstrations are no more than staged theatrics, complete with costume (moon suits and respirators), deliberately deceptive stage lighting, and drama, which Courts across the country have precluded as either not sufficiently similar to the circumstances of the case they are being offered to prove, thus failing Daubert's "fit" requirement, or so inflammatory that the undue prejudice they will work on the jury far outweighs any probative value they might have.

6.    Neither Dr. Longo nor his colleagues who designed and performed the videotaped tests, in which the "space men," in a tiny dark chamber, blow out a dusty old brake shoe of unknown origin with an air hose, and file a brake shoe with a hand file they no longer even have, have any formal training or practical experience in automobile mechanics or brake repair practices. Neither Dr. Longo nor his associate Mr. Hatfield is qualified to testify regarding the normal procedures for brake shoe arcing and neither has the requisite training, background or experience to create a simulation of such practices. They did not use a brake shoe arcing machine in their studies.

7.    The demonstration offers no probative evidence because Dr. Longo does not measure the quantity of asbestos or non-asbestos airborne particles that are

dramatically illuminated by 300 watts of theater lights. He admits that it is impossible to discern from the video how much, if any, of the dust shown in the magnifying stage lights and deceptively focused lens is asbestos. The brakes in the principal "Blowout II" video, relied on by Dr. Longo and Mr. Hatfield, are not even asbestos-containing brakes. There is therefore no scientific connection, nor the prerequisite "fit" under <u>Daubert</u>, between Dr. Longo's and Mr. Hatfield's demonstrations and the opinions Dr. Longo has formulated from them and the issues the jury must decide.

8.     Dr. Longo's studies fail to meet any of the <u>Daubert</u> factors for reliability: (1) they were designed specifically and exclusively for advocacy in litigation; (2) they have never been peer reviewed or published; (3) have no measurable rate of error; (4) cannot be replicated; and (5) employed a method of measurement that allows no statistical or logical correlation between their results and epidemiological data generated by generally accepted practices. <u>See</u> <u>In re Armstrong World Industries, Inc.</u>, 285 B.R. 864 (Bankr. D. Del. 2002).

9.     Scientifically-accepted procedures for collecting and measuring air samples to quantify exposure to airborne asbestos fibers have been codified in federal regulations for more than ten years. Dr. Longo and Mr. Hatfield did not comply with that protocol and failed in staged demonstrations to comply with government-mandated quality control procedures.

10.     Mr. Hatfield admits that the analysis he conducted is not only contrary to the government-approved method, but has actually been rejected both by the United States Government and by the courts as inherently unreliable under <u>Daubert</u> as a means of measuring workplace asbestos exposure. <u>In re: Armstrong World Industries.</u>, 285 B.R. 864 at 870-71. The nebulous "ranges" of exposure to asbestos fibers that Mr. Hatfield

claims Plaintiffs may have experienced, the crux of the opinion Dr. Longo intends to offer at trial, cannot be determined from the results of his demonstrations.

11.    The Court must not allow Plaintiff's improper attempt to unduly prejudice the jury with Dr. Longo's foundationless testimony, misleading and highly prejudiced videotapes and faulty analysis masquerading as expert opinion. As Plaintiffs cannot meet their burden of establishing that Dr. Longo's and Mr. Hatfield's testimony and methods are both relevant and reliable under Delaware law, or that the probative value of the advocacy in the staged videotapes substantially outweighs the undue prejudice to Defendant they will work on the jury, this Court should, as have many other tribunals, exclude Dr. Longo's (and Mr. Hatfield's) testimony and proffered video demonstrations.

WHEREFORE, Moving Defendant Hennessy requests that the Court preclude Dr. Longo's and Mr. Hatfield's testimony and proffered evidence. The testimony does not satisfy the requirements of the Delaware Rules of Evidence or the criteria for admitting expert testimony established by <u>Daubert</u> and <u>M.G. Bancorporation</u>.

Respectfully submitted,

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.

*/s/ Penelope B. O'Connell*

PENELOPE B. O'CONNELL (#4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899
(302) 428-3181
Attorney for Defendant Hennessy Industries, Inc.

Dated: January 5, 2007
G:\Docs\CLIENT\80514\16914\motions\00375445.DOC

EFiled: Dec 22 2006 10:10 EST
Transaction ID 13262864

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE: ASBESTOS LITIGATION | : | |
| Limited to: | : | |
| | : | |
| James Collins | : | C.A. No.: 06C-02-281 |
| | : | |

DEFENDANT HENNESSY INDUSTRIES, INC. AS SUCCESSOR-IN-INTEREST TO
AMMCO TOOLS, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

Defendant Hennessy Industries, Inc., as successor-in-interest to Ammco Tools, Inc. (hereafter "Hennessy"), by and through its undersigned counsel, hereby submits this Reply Memorandum in support of its Motion for Summary Judgment. While Hennessy does not waive any issues it raised in its Opening Brief, it limits its reply to the issue of Hennessy's lack of a duty to warn of the dangerous nature of another company's product, as this issue is dispositive. In support thereof it states:

Ammco's brake shoe grinder was not an asbestos-containing product; it did not contain asbestos components; it did not rely on asbestos components to operate. Under Washington law, a manufacturer bears no duty to warn of the dangerous nature of another company's product. Bich v. General Electric Company, 614 P.2d 1323, 1328 (Wash. App. 1980). Plaintiff concedes this point in his Answering Brief. (AB at 13)("[T]he Washington Court of Appeals agreed with the defendant manufacturer that it had no duty to warn of a defect in the other company's fuses....").

Plaintiff relies on a California case, <u>Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger</u> <u>Co.</u>, 28 Cal. Rptr.3d 744 (Cal.App. 2004), in an attempt to thrust such a duty to warn of another company's product upon Hennessy.  This attempt must fail.  Plaintiff brought his case in Delaware and has selected to apply Washington substantive law to his case; California law is irrelevant.

Hennessy respectfully posits that it is not Delaware's role to develop Washington law or to create a duty in Washington law where one did not and does not exist.  Because Ammco Tools did not bear a duty to warn of the dangerous nature of another company's product, Hennessy is entitled to summary judgment as a matter of law.

WHEREFORE, Hennessy Industries, In., as successor-in-interest to Ammco Tools, Inc., respectfully asks that this Court grant its Motion for Summary Judgment.

Respectfully submitted,

ELZUFON, AUSTIN, REARDON,
TARLOV AND MONDELL, P.A.

*/s/  Penelope B. O'Connell*
PENELOPE B. O'CONNELL (#4898)
300 Delaware Avenue, 17th Floor
P. O. Box 1630
Wilmington, DE 19899
(302) 428-3181
Attorney for Defendant
Hennessy Industries, Inc.,
As Successor-in-Interest to
Ammco Tools, Inc.

Dated: December 22, 2006

G:\Docs\CLIENT\80514\16914\brief\00374407.DOC

EFiled: Mar 2 2007 11:51PM EST
Transaction ID 14000163
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE: ASBESTOS LITIGATION: | ) | |
| | ) | |
| **Limited To:** | ) | |
| | ) | |
| LEROY RAYMOND ABBOTT, | ) | C.A. No. 06C-08-183 |
| | ) | |
| BETTY AGEE, Individually and as Representative of the Estate of RICHARD L. AGEE, et al., | ) ) ) | C.A. No. 06-668 (Dist. Ct.) |
| | ) | |
| BARBARA ANN ALEXANDER, | ) | C.A. No. 05C-09-269 |
| | ) | |
| GERALD L. ALLEN and HELEN WILMA ALLEN, | ) ) | C.A. No. 06C-09-248 |
| | ) | |
| VIRGINIA L. ALLEN, et al., | ) | C.A. No. 05C-11-161 |
| | ) | |
| DELORES ALVARADO, et al., | ) | C.A. No. 06C-04-229 |
| | ) | |
| KEMBERLY SEMENIUK, et al., | ) | C.A. No. 06C-05-223 |
| | ) | |
| CLINTON H. ATKINS, | ) | C.A. No. 06C-01-040 |
| | ) | |
| DAVID BARNHILL BARKER and CORRIE Q. BARKER, | ) ) | C.A. No. 05C-08-219 |
| | ) | |
| BRENDA CLARK, et al., | ) | C.A. No. 06C-12-252 |
| | ) | |
| RUFUS RANDOLPH BARNES and GILDA BARNES, | ) ) | C.A. No. 06C-02-096 |
| | ) | |
| GEORGE VICTOR BARRA and ELIZABETH ANN BARRA, | ) ) | C.A. No. 06C-10-130 |
| | ) | |
| EVELYN BARRY, et al., | ) | C.A. No. 06C-03-100 |
| | ) | |
| JOHN EVANS BRYAN, et al., | ) | C.A. No. 06C-05-279 |
| | ) | |
| JOHN MILLER BASSETT, | ) | C.A. No. 05C-07-122 |
| | ) | |

| | | |
|---|---|---|
| EDWIN LARMAUR BAXTER and<br>JUDY BAXTER | ) | C.A. No. 06C-11-183 |
| | ) | |
| KENNETH RUDELL BEARD and<br>CATHERYN SUE BEARD, | ) | C.A. No. 05C-11-158 |
| | ) | |
| ERNEST L. BERNHARDT, | ) | C.A. No. 06C-06-307 |
| | ) | |
| ELEANOR DIANA POPOOLA, et al., | ) | C.A. No. 06C-04-057 |
| | ) | |
| GLEN ROY BOURKE and<br>DELORES NATALIE BOURKE, | ) | C.A. No. 05C-11-266 |
| | ) | |
| DONALD KEITH BOWLIN and<br>JOYCE KAY BOWLIN, | ) | C.A. No. 06C-09-197 |
| | ) | |
| VIRGIL LLOYD BRAUER, | ) | C.A. No. 05C-08-049 |
| | ) | |
| NICK BROKOVICH , JR. et al., | ) | C.A. No. 07C-01-057 |
| | ) | |
| GEORGE RILEY BUCK, et al., | ) | C.A. No. 06C-05-280 |
| | ) | |
| RAYMOND BUNTING and<br>LOUISE BUNTING, | ) | C.A. No. 05C-11-255 |
| | ) | |
| MARY PATRICIA CAMPBELL et al., | ) | C.A. No. 05C-07-271 |
| | ) | |
| ETHESL CAMPBELL et al., | ) | C.A. No. 06C-04-153 |
| | ) | |
| BRUCE A. CAMPBELL et al., | ) | C.A. No. 05C-10-061 |
| | ) | |
| FRANK ALLEN CARTER and<br>JUNE CARTER, | ) | C.A. No. 05C-11-126 |
| | ) | |
| PAUL RAY CHAPMAN and<br>PHYLLIS JEAN CHAPMAN, | ) | C.A. No. 05C-09-030 |
| | ) | |
| DANIEL THOMAS CHINNERY, | ) | C.A. No. 06C-09-268 |
| | ) | |
| L. CARRIE CHOY DEANE, et al., | ) | C.A. No. 06C-08-182 |
| | ) | |
| GEORGE RAYMOND CLARK and<br>JULIAMARY CLARK, | ) | C.A. No. 05C-08-071 |

| | | |
|---|---|---|
| CHERYL CLEMENT, | ) | C.A. No. 05C-09-237 |
| | ) | |
| JAMES DANIEAL COLLINS and | ) | C.A. No. 06C-02-281 |
| MARY M. COLLINS | ) | |
| | ) | |
| LARRY J. COMBS, et al., | ) | C.A. No. 06C-11-185 |
| FRANCIS L. CONLEY, | ) | C.A. No. 06C-02-118 |
| | ) | |
| DONNIE COPE, et al., | ) | C.A. No. 05C-04-099 |
| | ) | |
| BETTY GARNER CORNETT, et al., | ) | C.A. No. 05C-09-119 |
| | ) | |
| WILLIAM GILBERY COTE and | ) | C.A. No. 05C-09-268 |
| ETHEL MAE COTE, | ) | |
| | ) | |
| CHERYL LOGAN COTTON, et al., | ) | C.A. No. 05C-09-180 |
| | ) | |
| FRED MARVIN CREWS and | ) | C.A. No. 06C-03-026 |
| FRANCES ELIZABETH CREWS, | ) | |
| | ) | |
| RUTH E. CUMMINGS, et al., | ) | C.A. No. 06C-01-148 |
| | ) | |
| DAVID M. DARDI, et al., | ) | C.A. No. 05C-09-282 |
| | ) | |
| RICHARD EUGENE DAVIS and | ) | C.A. No. 05C-09-033 |
| SUSAN JANE DAVIS, | ) | |
| | ) | |
| GLADYS JEAN DE MARS and | ) | C.A. No. 06C-11-189 |
| ARTHUR F. DE MARS, | ) | |
| | ) | |
| GALEN DEAN DEUTSCH and | ) | C.A. No. 05C-08-023 |
| STACEY DELENE DEUTSCH, | ) | |
| | ) | |
| JOHN A. DEVLIN JR., et al., | ) | C.A. No. 05C-09-281 |
| | ) | |
| EDWARD DORRIN, | ) | C.A. No. 04C-07-059 |
| | ) | |
| THOMAS HARVEY DUNLAP and | ) | C.A. No. 06C-11-236 |
| SHIRLEY MAE DUNLAP, | ) | |
| | ) | |
| HORACE A. DURHAM, SR. and | ) | C.A. No. 05C-07-136 |
| DOLORES JANE DURHAM, | ) | |
| | ) | |

-3-

ROSWELL G. EDGECOMB and          )          C.A. No. 06C-12-136
MYRNA EDGECOMB                   )
                                )
DOROTHY EFFLER, Individually and )          C.A. No. 06C-10-332
as Representative of the Estate of )
TOBIAS EFFLER,                   )
                                )
DEBORAH ENENBACH,                )          C.A. No. 05C-10-261
                                )
HUGO GEORGE ENGEL and            )          C.A. No. 05C-09-083
INGEBORG ENGEL,                  )
                                )
GRACE ERATH, et al.,             )          C.A. No. 06C-12-189
                                )
ARNOLD CHARLES EUDY and          )          C.A. No. 05C-10-323
SHIRLEY ARNETTE EUDY,            )
                                )
WILLIAM HARRY FANCER, SR. and    )          C.A. No. 06C-11-237
JUDITH ANNE FANCER,              )
                                )
PRESTON H. FARRAR,               )          C.A. No. 05C-12-046
                                )
ROGER EUGENE FIELD and           )          C.A. No. 06C-10-231
ARLENE MAE FIELD,                )
                                )
JOLINE WRIGHT FINCHER,           )          C.A. No. 05C-07-204
                                )
MABEL FLAIGG, et al.,            )          C.A. No. 06C-12-071
                                )
LYLE DAVIS FOLTZ and LAWANDA     )          C.A. No. 05C-10-325
FOLTZ,                           )
                                )
JANET A. FRASER, et al.,         )          C.A. No. 06C-01-015
                                )
GENA MICHELE POE, et al.,        )          C.A. No. 06C-12-141
                                )
CHARLES A. GANDY, Individually and )        C.A. No. 06C-01-334
as Representative of the Estate of )
CAROLYN I. GANDY,                )
                                )
JOHN HUGO GERLACH and            )          C.A. No. 05C-09-179
YVONNE MARION GERLACH,           )
                                )
JENNIFER LYNN GIVAN, et al.,     )          C.A. No. 05C-07-321
                                )

-4-

WILLIAM EARL GOAD and                )          C.A. No. 06C-10-336
CYNTHIA L. NOBLES, Individually       )
and as Co-Personal Representatives of )
the Estate of EARL NELSON GOAD,       )

RICHARD EDWARD GRASSO and            )          C.A. No. 05C-08-313
VALERIE J. VIOLA GRASSO,              )
                                      )
LILLIAN GRAY, et al.,                 )          C.A. No. 06C-04-230
                                      )
MILDRED M. GRAY, et al.,              )          C.A. No. 05C-10-087
                                      )
RITA GREEN, et al.,                   )          C.A. No. 05C-06-296
                                      )
RONALD LEO GRANIER, SR.               )          C.A. No. 05C-11-257
                                      )
KATHERINE LOUISE HANSON and          )          C.A. No. 06C-10-189
LLOYD L. HANSON,                      )
                                      )
RAYMOND L. HARVEY, et al.,            )          C.A. No. 06C-03-164
                                      )
JUNE SYNAN HASH,                      )          C.A. No. 05C-06-293
                                      )
GLORIA A. HAWKS, et al.,              )          C.A. No. 05C-10-009
                                      )
EMMIT E. HAYES,                       )          C.A. No. 05C-05-245
                                      )
LARRY HELTON, et al.,                 )          C.A. No. 06C-05-278
                                      )
THEODORE HERBIN and                   )          C.A. No. 02C-02-051
MARTHA HERBIN,                        )
                                      )
DONALD HAYWOOD and                    )          C.A. No. 05C-07-248
BARABARA HAYWOOD,                     )
                                      )
BETTYE G. BRADLEY, et al.,            )          C.A. No. 06C-09-258
                                      )
DONNIE LEONA HODGES, et al.,          )          C.A. No. 05C-05-243
                                      )
MARIAN KATHRYN HOLMBERG, et          )          C.A. No. 05-10-188
al.,                                  )
                                      )
JUNE ROSE HOLMES and                  )          C.A. No. 05C-09-095
ARTHUR R HOLMES,                      )
                                      )

-5-

| | | |
|---|---|---|
| CONNIE JUNE HOUSEMAN-RILEY, | ) | C.A. No. 05C-06-295 |
| | ) | |
| CLARICE JEFFERIES, et al., | ) | C.A. No. 06C-08-047 |
| | ) | |
| CARL BOWERS, Individually and as | ) | C.A. No. 06C-10-338 |
| Representative of the Estate of | ) | |
| DEBORAH JOFFS, | ) | |
| | ) | |
| ERNEST EUGENE JONES and | ) | C.A. No. 06C-11-188 |
| JOYCE B. JONES, | ) | |
| | ) | |
| EDWARD J. KAMINSKI, | ) | C.A. No.07C-01-123 |
| | ) | |
| MARSHA KEELER, et al., | ) | C.A. No. 07C-01-058 |
| | ) | |
| MOSCOE JASCKON KING, JR. and | ) | C.A. No. 05C-11-125 |
| BARBARA HASSEN KING, | ) | |
| | ) | |
| WILLIAM JOSEPH KOUNTZ, | ) | C.A. No. 06C-02-223 |
| | ) | |
| LEON DAVID KREBS, | ) | C.A. No. 05C-10-177 |
| | ) | |
| AGNES C. KRITZER, | ) | C.A. No. 05C-11-032 |
| | ) | |
| CHARLES P. KWOLEK, JR. et al., | ) | C.A. No. 06C-01-354 |
| | ) | |
| VAL GENE LANDIS, | ) | C.A. No. 05C-09-018 |
| | ) | |
| FLORENCE LANE, | ) | C.A. No. 06C-11-186 |
| | ) | |
| RAYMOND J. LAUBENSTEIN and | ) | C.A. No. 06C-09-214 |
| JUDY LAUBENSTEIN, | ) | |
| | ) | |
| STEVEN LEDFORD, et al., | ) | C.A. No. 07C-01-010 |
| | ) | |
| MARTHA C. LEE, et al., | ) | C.A. No. 05C-08-022 |
| | ) | |
| JOHNNY LEEDY and | ) | C.A. No. 06C-11-238 |
| PATRICIA LEEDY, | ) | |
| | ) | |
| CHARLES CHRISTOPHER LENTILE | ) | C.A. No. 05C-11-256 |
| and SUSAN DUNN-LENTILE, | ) | |
| | ) | |
| MARIE MCMANUS, et al., | ) | C.A. No. 05C-09-044 |

-6-

| | | |
|---|---|---|
| STANLEY LAWRENCE LIBBY, SR.<br>and MARION S. LIBBY, | ) ) ) | C.A. No. 05C-08-259 |
| ROSEMARY LINDSAY, et al., | ) ) | C.A. No. 05C-09-177 |
| JOHN JAMES LOWER and<br>CATHERINE LOUISE LOWER, | ) ) ) | C.A. No. 05C-11-073 |
| E. BRIAN LUCAS, et al., | ) ) | C.A. No. 06C-07-201 |
| EUSTACHICO LUPONE, | ) ) | C.A. No. 05C-11-063 |
| VIRGINIA MARTIN, et al., | ) ) | C.A. No. 06C-05-281 |
| BERNADINE M. MATZKE, et al., | ) ) | C.A. No. 06C-01-029 |
| PATRICIA MCCARTHY, et al., | ) ) | C.A. No. 06C-12-137 |
| MICHAEL JAMES MCGUIRE<br>and RITA CHARLENE MCGUIRE, | ) ) ) | C.A. No. 05C-08-222 |
| DARRELL KEITH MCKINNIS and<br>MARY CAROL MCKINNIS, | ) ) ) | C.A. No. 05C-11-007 |
| MAUREEN ANN MCCLELLAN, et al., | ) ) | C.A. No. 05C-12-061 |
| EMILY MCNAIR, et al., | ) ) | C.A. No. 06C-12-072 |
| DORRIS MELLINGER, et al., | ) ) | C.A. No. 06C-09-247 |
| ALICE MENYHARTH, et al., | ) ) | C.A. No. 06C-01-352 |
| FREDERICK MERGENTHALER<br>and HELEN MERGENTHALER, | ) ) ) | C.A. No. 02C-01-056 |
| CHARLES S. MEYERS, et al., | ) ) | C.A. No. 06C-07-138 |
| TALMADGE JESSE MILLER and<br>HELEN MARIE MILLER, | ) ) ) | C.A. No. 06C-10-146 |
| RICHARD JARVIS MINSHALL, JR.<br>and SUSAN D. MINSHALL | ) ) ) | C.A. No. 05C-07-273 |

| | | |
|---|---|---|
| EVELYN MOBILIA, et al., | ) | C.A. No. 06C-05-282 |
| | ) | |
| WILLIAM JOSEPH MODELEWSKI and JEANETTE MODELEWSKI, | ) | C.A. No. 05C-09-192 |
| | ) | |
| KATHERINE VIRGINIA LANDERS MONTEMAYOR, | ) | C.A. No. 06C-05-175 |
| | ) | |
| ROY MORISSETTE, | ) | C.A. No. 06C-12-140 |
| | ) | |
| MARTHA JEAN MORRIONE, Individually and as Representative of the Estate of ANTHONY MORRIONE, | ) | C.A No 06C-10-339 |
| | ) | |
| DONALD PAUL MORRIS, et al., | ) | C.A. No. 05C-12-026 |
| | ) | |
| SAMUEL L.C. MOSES and PATSY NELL MOSES, | ) | C.A. No. 05C-08-207 |
| | ) | |
| JAMES NOREM and GAIL NOREM, | ) | C.A. No. 06C-10-345 |
| | ) | |
| ROLLIN J. OVERSTREET and CRYSTAL J. OVERSTREET, | ) | C.A. No. 05C-09-037 |
| | ) | |
| MARLON CLARENCE OWENS and LYNN OWENS, | ) | C.A. No. 06C-02-241 |
| | ) | |
| BONNIE P. HALENDA, et al., | ) | C.A. No. 05C-09-066 |
| | ) | |
| DELORES PALMER, et al., | ) | C.A. No. 05C-06-294 |
| | ) | |
| ROBERT ALLEN PEREGRINE and ELEANOR M. PEREGRINE, | ) | C.A. No. 05C-09-096 |
| | ) | |
| ALEXANDER A. PIETKA and ALFREDA PIETKA, | ) | C.A. No. 06C-08-302 |
| | ) | |
| MARY H. PLAXICO, | ) | C.A. No. 05C-06-069 |
| | ) | |
| JAMES WILLIAM PRAG and MARGARET PRAG, | ) | C.A. No. 05C-11-174 |
| | ) | |
| ROBERT PROVOST, et al., | ) | C.A. No. 07C-01-104 |
| | ) | |

-8-

| | | |
|---|---|---|
| JOAN SALVESON, et al., | ) | C.A. No. 05C-08-185 |
| | ) | |
| PAUL PRITCHETT, Individually and | ) | C.A. No. 06C-10-335 |
| as Representative of the Estate of ELLA | ) | |
| MAE PRITCHETT, | ) | |
| | ) | |
| ROBERT EDWARD RICE and | ) | C.A. No. 05C-09-034 |
| LINDA M. RICE, | ) | |
| | ) | |
| ANDARA RICH, et al., | ) | C.A. No. 06C-07-010 |
| | ) | |
| CHERYL ANN RICHARDSON, et al., | ) | C.A. No. 05C-12-186 |
| | ) | |
| WILLIAM OSCAR RIZER, SR. and | ) | C.A. No. 06C-10-110 |
| VIRGINIA LEAH RIZER, | ) | |
| | ) | |
| WILLIAM ROGERS, | ) | C.A. No. 05C-09-057 |
| | ) | |
| GERALDINE ROMAN, et al., | ) | C.A. No. 06C-08-239 |
| | ) | |
| LARRY D. ROULLARD and | ) | C.A. No. 06C-11-184 |
| JUDY ROULLARD, | ) | |
| | ) | |
| OLIVER EDWARD SANDAHL and | ) | C.A. No. 05C-11-057 |
| ANNE M. SANDAHL, | ) | |
| | ) | |
| RUSSELL MARK SANDERS and | ) | C.A. No. 05C-07-176 |
| JOYCE ELLEN SANDERS, | ) | |
| | ) | |
| ROBERT SANFORD, et al., | ) | C.A. No. 06C-03-213 |
| | ) | |
| EDWARD MICHAEL SCHAEFER and | ) | C.A. No. 05C-10-009 |
| LINDA KAY SCHAEFER, | ) | |
| | ) | |
| ALTHEA M. SCHAMP, et al., | ) | C.A. No. 05C-11-150 |
| | ) | |
| MARTY E. CHRISTENSEN, et al., | ) | C.A. No. 05C-09-178 |
| | ) | |
| BARBARA ANN SENG, et al., | ) | C.A. No. 06C-02-014 |
| | ) | |
| MARJORIE ELLEN SEYMOUR, et al., | ) | C.A. No. 05C-07-160 |

| | | |
|---|---|---|
| JAMES BRIAN SHANAHAN and<br>JANICE KAY SHANAHAN, | ) | C.A. No. 06C-12-073 |
| JOHN WALLACE SHELDON and,<br>GERALDINE PEARL SHELDON, | ) | C.A. No. 05C-08-206 |
| DEBORAH LYNN SIEBERT, et al., | ) | C.A. No. 05C-09-152 |
| EDWARD SMACK and<br>IVA SMACK, his wife, | ) | C.A. No. 4C-03-053 |
| BARRY GORDON SMITH and<br>ALLEGRA SMITH, | ) | C.A. No. 06C-02-265 |
| LINDA ANN GIBSON, et al., | ) | C.A. No. 06C-005-277 |
| STEVEN M. SWEARINGEN, et al., | ) | C.A. No. 06C-08-303 |
| STEVE SWEATT, Individually and<br>as Representative of the Estate of<br>HUBERT MALONE SWEATT, | ) | C.A. No. 06C-10-337 |
| CAROL SWITA, et al., | ) | C.A. No. 06C-02-087 |
| DOROTHY M. SWITZER, et al., | ) | C.A. No. 05C-08-039 |
| CHESTER JOSEPH SZWED and<br>VIOLA MARY SZWED, | ) | C.A. No. 06C-08-175 |
| DONALD ROBERT TAYLOR and<br>DOROTHY R. TAYLOR, | ) | C.A. No. 06C-02-196 |
| GEORGE LEROY THOMAS and<br>HELEN K. THOMAS, | ) | C.A. No. 05C-11-106 |
| MARCIA THOMSON, et al., | ) | C.A. No.05C-10-155 |
| DAVID EDWIN TIMMONS, | ) | C.A. No. 06C-10-108 |
| DORIS TRAHAN, et al., | ) | C.A. No. 06C-02-159 |
| WILLIAM TREML<br>and MARIE TREML | ) | C.A. No. 04C-03-183 |

| | | |
|---|---|---|
| KAREN ANN TUCKER, et al., | ) | C.A. No. 05C-09-151 |
| | ) | |
| JOHN H. VAN HOUTEN, II and | ) | C.A. No. 06C-11-239 |
| DONNA VAN HOUTEN, | ) | |
| | ) | |
| DOUGLAS LEE WALLS, et al. | ) | C.A. No. 05C-08-010 |
| | ) | |
| LOUIS EDWARD WHEELER and | ) | C.A. No. 06C-11-187 |
| ELIZABETH WHEELER, | ) | |
| | ) | |
| EVERETTE C. WHITE and, | ) | C.A. No. 07C-01-056 |
| ORA MAE WHITE, | ) | |
| | ) | |
| LUCILLE M. WILLIAMS, et al., | ) | C.A. No. 05C-08-312 |
| | ) | |
| DEBORAH KENNEDY WILLMAN, et | ) | C.A. No. 06C-04-143 |
| al., | ) | |
| | ) | |
| SANDRA MCKAY GREGORY, et al., | ) | C.A. No. 06C-07-031 |
| | ) | |
| THOMAS S. WILSON and | ) | C.A. No.06C-11-235 |
| CONNIE KRAMER WILSON, | ) | |
| | ) | |
| MARY DOERR WINTER, et al., | ) | C.A. No. 06C-04-154 |
| | ) | |
| VIOLET LA FERN WOMACK, et al., | ) | C.A. No. 05C-09-202 |
| | ) | |
| MARGARET PARISH WOODS, et al., | ) | C.A. No. 05C-11-190 |

## NOTICE OF ADOPTION

Defendant Georgia-Pacific LLC, f/k/a Georgia-Pacific Corporation hereby adopts

and incorporates herein by reference its Objections and Responses to Standing Order No.1

Interrogatories as deposited with the Defense Coordinating Counsel on December 1, 2006.

-11-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
  Attorneys for Defendant
  Georgia-Pacific LLC, f/k/a
  Georgia-Pacific Corporation

March 2, 2007

754058.1

-12-

**Blash, Lori**

| | |
|---|---|
| **From:** | Cohen, Fred |
| **Sent:** | Tuesday, March 13, 2007 1:41 PM |
| **To:** | Donohue, Mary |
| **Subject:** | Happy Birthday! |

Hi Mary,
        My best wishes for a very happy birthday,  Fred

EFiled: Jan 30 2007 4:32PM EST
Transaction ID 13640611
Case No. Multi-case

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

CHARLES CHRISTOPHER LENTILE          C.A. No. 05C-11-256 ASB
and SUSIE DUNN-LENTILE,

     Plaintiffs,

               v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and          C.A. No. 06C-02-281 ASB
MARY M. COLLINS,

     Plaintiffs,

               v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE, DELAWARE

ROLLIN JAMES OVERSTREET and          C.A. No.  05C-09-037
CRYSTAL J. OVERSTREET,

     Plaintiffs,

               v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.
     Defendants.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

OLIVER EDWARD SANDAHL, and               C.A. No. 05C-11–057-ASB
ANNE M. SANDAHL,

    Plaintiffs,

                                 v.

METROPOLITAN LIFE
INSURANCE COMPANY; et al.


IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

ROLAND LEO GRENIER, SR.,                 C.A. No. 05C-11-257 ASB

    Plaintiff(s)                               ASBESTOS

                                 v.

METROPOLITAN LIFE INSURANCE
COMPANY, INC., et al.,

    Defendant(s).

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

MARLON CLARENCE OWENS and          C.A. No. 06C-02-241 ASB
LYNN OWENS,

     Plaintiffs,

                                   .v.

METROPOLITAN LIFE INSURANCE
COMPANY, et al.

     Defendants.

---

### PLAINTIFF'S VACATION OF NOTICES OF DEPOSITION OF ALBERTO MARCHEVSKY AND WILLIAM TRAVIS

---

TO:    ALL COUNSEL OF RECORD

      PLEASE TAKE NOTICE that the depositions of Alberto Marchevsky (noticed to take place on January 30, 2007 at 5:30 p.m. Pacific Time) and William Travis (noticed to take place on January 31, 2007 at 5:00 p.m. Eastern Time) are hereby **vacated**.

Date:   January 30, 2007

Respectfully submitted,


**WEISS & SAVILLE, P.A.**


By:    /s/ Yvonne Takvorian Saville
        Yvonne Takvorian Saville, Esq., #3430
        1220 North Market Street, Suite 604
        P.O. Box 370
        Wilmington, DE  19899
        Telephone:    (302) 656-0400
        Facsimile:     (302) 656-5011
        Attorney for Plaintiff



and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas  75219
(214) 521-3605

EFiled: Jan 5 2007 4:29P
Transaction ID 13365406

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

IN RE ASBESTOS LITIGATION:            :
                                      :
James Collins                         :    C.A. No.: 06C-02-281
Roland Grenier                        :    C.A. No.: 05C-11-257
Rollin Overstreet                     :    C.A. No.: 05C-09-037
Marlon Owens                          :    C.A. No.: 06C-02-241
Barry Smith                           :    C.A. No.: 06C-02-265
                                      :

### DEFENDANT BORG-WARNER CORPORATION'S MOTION *IN LIMINE* TO EXCLUDE VIDEOTAPES AND EVIDENCE AND TESTIMONY OF MR. RICHARD L. HATFIELD AND DR. WILLIAM LONGO

Defendant Borg-Warner Corporation, by its Successor in Interest BorgWarner Morse TEC Inc. ("Borg-Warner") hereby objects to and moves *in limine* to exclude from the Plaintiffs' cases the inherently unreliable and misleading videotapes, evidence and testimony of Mr. Richard L. Hatfield and Dr. William Longo.

1.      Plaintiffs proffer Dr. William Longo, who has no formal training in industrial hygiene, or any practical automotive experience, to provide his "expert" opinion as to each individual Plaintiff's alleged occupational exposure to asbestos during their brief and sporadic work involving automotive clutches allegedly associated with Defendant. Dr. Longo is expected to proffer a quantitative analysis of Plaintiffs' purported exposure to asbestos during their work with Defendant's clutch products, based principally on videotaped "demonstrative" studies he conducted with his partner, Dr. Richard L. Hatfield.

2.      Mr. Hatfield has never performed a clutch job, much less worked with parts manufactured or supplied by Defendant. The videotaped studies Dr. Longo proffers were performed on parts not supplied by Defendant and do not remotely resemble Plaintiffs' workplaces or the circumstances of their alleged exposure. Despite these fatal

flaws, Plaintiffs proffer Dr. Longo (and his video-partner, Mr. Hatfield) to inform and "demonstrate" Plaintiffs' alleged exposure to asbestos for the jury.

3.    Dr. Longo's litigation-driven videotapes and testimony fail to meet the requisite standards of "fit" and reliability mandated by the courts <u>Daubert v. Merrill Dow Pharmeceuticals, Inc.</u>, 509 U.S. 579 (1993); <u>M.G. Bancorp., Inc. v. Le Beau</u>, Del. Supr., 737 A.2d 513, 521-22 (1999) (adopting <u>Daubert</u> standard as Delaware law).

4.    Dr. Longo's proffered videotaped demonstrations bear no relation to the circumstances of Plaintiffs' alleged exposure.  The demonstrations are no more than staged theatrics, complete with costume (moon suits and respirators), deliberately deceptive stage lighting, and drama, which Courts across the country have precluded as either not sufficiently similar to the circumstances of the case they are being offered to prove, thus failing <u>Daubert's</u> "fit" requirement, or so inflammatory that the undue prejudice they will work on the jury far outweighs any probative value they might have.

5.    Neither Dr. Longo nor his colleagues who designed and performed the videotaped tests, in which the "space men," in a tiny dark chamber, blow out a dusty old brake shoe of unknown origin with an air hose, and file a brake shoe with a hand file they no longer even have, have any formal training or practical experience in automobile mechanics or brake repair practices.  Neither Dr. Longo nor his associate Mr. Hatfield are qualified to testify regarding the normal procedures for repairing automobile clutch assemblies and do not have the requisite training, background or experience to create a simulation of such practices.

6.    The demonstration offers no probative evidence because Dr. Longo does not measure the quantity of asbestos or non-asbestos airborne particles that are dramatically illuminated by 300 watts of theater lights.  He admits that it is impossible to

discern from the video how much, if any, of the dust shown in the magnifying stage lights and deceptively focused lens is asbestos. The brakes in the principal "Blowout II" video, relied on by Dr. Longo and Mr. Hatfield, are not even asbestos-containing brakes. There is therefore no scientific connection, nor the prerequisite "fit" under <u>Daubert</u>, between Dr. Longo's and Mr. Hatfield's demonstrations and the opinions Dr. Longo has formulated from them and the issues the jury must decide.

7.    Dr. Longo's studies fail to meet any of the <u>Daubert</u> factors for reliability: (1) they were designed specifically and exclusively for advocacy in litigation; (2) they have never been peer reviewed or published; (3) have no measureable rate of error; (4) cannot be replicated; and (5) employed a method of measurement that allows no statistical or logical correlation between their results and epidemiological data generated by generally accepted practices. <u>See</u> <u>In re Armstrong World Industries, Inc.</u>, 285 B.R. 864 (Bankr. D. Del. 2002).

8.    Scientifically-accepted procedures for collecting and measuring air samples to quantify exposure to airborne asbestos fibers have been codified in federal regulations for more than ten years. Dr. Longo and Mr. Hatfield did not comply with that protocol and failed in staged demonstrations to comply with government-mandated quality control procedures.

9.    Mr. Hatfield admits that the analysis he conducted is not only contrary to the government-approved method, but has actually been rejected both by the United States Government and by the courts as inherently unreliable under <u>Daubert</u> as a means of measuring workplace asbestos exposure. <u>In re: Armstrong World Industries.</u>, 285 B.R. 864 at 870-71. The nebulous "ranges" of exposure to asbestos fibers that Mr. Hatfield

claims Plaintiffs may have experienced, the crux of the opinion Dr. Longo intends to offer at trial, cannot be determined from the results of his demonstrations.

10.    The Court must not allow Plaintiffs' improper attempt to unduly prejudice the jury with Dr. Longo's foundationless testimony, misleading and highly prejudiced videotapes and faulty analysis masquerading as expert opinion.  As Plaintiffs cannot meet their burden of establishing that Dr. Longo's and Mr. Hatfield's testimony and methods are both relevant and reliable under Delaware law, or that the probative value of the advocacy in the staged videotapes substantially outweighs the undue prejudice to Defendant they will work on the jury, this Court should, as have many other tribunals, exclude Dr. Longo's (and Mr. Hatfield's) testimony and proffered video demonstrations.

WHEREFORE, Moving Defendant Borg-Warner requests that the Court preclude Dr. Longo's and Mr. Hatfield's testimony and proffered evidence.  The testimony does not satisfy the requirements of the Delaware Rules of Evidence or the criteria for admitting expert testimony established by Daubert and M.G. Bancorporation.

Respectfully submitted,

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.

/s/ Matthew P. Donelson

MATTHEW P. DONELSON (#4243)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899
(302) 428-3181
Attorney for Defendant Borg-Warner
Corporation

Dated: January 5, 2007
G:\Docs\CLIENT\223\02222\motions\00372437.DOC

EFiled: Jan 5 2007 4:20P
Transaction ID 13364649



### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
### IN AND FOR NEW CASTLE COUNTY

IN RE ASBESTOS LITIGATION:               :
                                         :
James Collins                            :    C.A. No.: 06C-02-281
Roland Grenier                           :    C.A. No.: 05C-11-257
Rollin Overstreet                        :    C.A. No.: 05C-09-037
Marlon Owens                             :    C.A. No.: 06C-02-241
Barry Smith                              :    C.A. No.: 06C-02-265
                                         :

### BORG-WARNER CORPORATION BY ITS SUCCESSOR
### IN INTEREST, BORGWARNER MORSE TEC, INC.'S
### MOTION IN LIMINE TO LIMIT OR EXCLUDE DOCUMENTS
### OF THE FRICTION MATERIALS STANDARD INSTITUTE

Defendant, Borg-Warner Corporation by its successor in interest, BorgWarner

Morse TEC, Inc. ("Borg-Warner"), by and through its attorneys, file the within Motion

and in support thereof aver as follows:

1.      Borg-Warner, hereby moves this Honorable Court to preclude Plaintiffs'

use of documents of from the Friction Materials Standard Institute. As grounds for this

Motion, Borg-Warner relies upon the Brief in Support of this Motion in Limine which is

incorporated herein by reference.

WHEREFORE, for the reasons set forth in the supporting Brief in Support being

served simultaneously herewith, Borg-Warner respectfully requests the Court to grant its

Motion in Limine.

ELZUFON, AUSTIN, REARDON
TARLOV & MONDELL


/s/ Matthew P. Donelson
MATTHEW P. DONELSON, ESQ.
Del. Id. No. 4243
300 Delaware Avenue, Suite 1700
Wilmington, DE 19801
(302) 428-3181
Attorney for Defendant Borg-Warner

Dated:  January 5, 2007
G:\Docs\CLIENT\223\02222\motions\00372434.DOC

2

EFiled: Jan 5 2007 4:32P
Transaction ID 13365361



## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

IN RE ASBESTOS LITIGATION:          :
                                    :
James Collins                       :    C.A. No.: 06C-02-281
Roland Grenier                      :    C.A. No.: 05C-11-257
Rollin Overstreet                   :    C.A. No.: 05C-09-037
Marlon Owens                        :    C.A. No.: 06C-02-241
Barry Smith                         :    C.A. No.: 06C-02-265
                                    :

### BORG-WARNER CORPORATION BY ITS SUCCESSOR
### IN INTEREST, BORGWARNER MORSE TEC, INC.'S
### MOTION IN LIMINE TO LIMIT OR EXCLUDE DOCUMENTS
### OF CERTAIN TRADE ASSOCIATIONS AND RELATED TESTIMONY

Defendant, Borg-Warner Corporation by its successor in interest, BorgWarner Morse

TEC, Inc. ("Borg-Warner"), by and through its attorneys, files the within Motion and in support

thereof aver as follows:

1.      Borg-Warner, hereby moves this Honorable Court to preclude or limit Plaintiffs'

use of documents of various trade associations affiliated with the asbestos mining or

manufacturing industry, as well as related testimony. As grounds for this Motion, Borg-Warner

relies upon the Brief in Support of this Motion in Limine, which is incorporated herein by

reference.

WHEREFORE, for the reasons set forth in the supporting Brief in Support being served

simultaneously herewith, Borg-Warner respectfully requests the Court to grant its Motion in

Limine.

ELZUFON, AUSTIN, REARDON
TARLOV & MONDELL

/s/ Matthew P. Donelson

MATTHEW P. DONELSON, ESQ.
Del. Id. No. 4243
300 Delaware Avenue, Suite 1700
Wilmington, DE 19801
(302) 428-3181
Attorney for Defendant Borg-Warner

Dated:  January 5, 2007

G:\Docs\CLIENT\223\02222\motions\00372435.DOC

EFiled: Jan 5 2007 4:39PM EST
Transaction ID 13365741

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

IN RE ASBESTOS LITIGATION:                    :
                                              :
James Collins                                 :     C.A. No.: 06C-02-281
Roland Grenier                                :     C.A. No.: 05C-11-257
Rollin Overstreet                             :     C.A. No.: 05C-09-037
Marlon Owens                                  :     C.A. No.: 06C-02-241
Barry Smith                                   :     C.A. No.: 06C-02-265
                                              :

### DEFENDANT BORG-WARNER CORPORATION, BY ITS SUCCESSOR IN INTEREST BORGWARNER MORSE TEC, INC.'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OR EVIDENCE REGARDING BORG-WARNER'S USE OF CROCIDOLITE ASBESTOS FIBERS IN AUTOMATIC TRANSMISSION PARTS

Defendant, Borg-Warner Corporation by its Successor –in-Interest, BorgWarner Morse TEC, Inc. ("Borg-Warner") hereby moves this Honorable Court, pursuant to Delaware Rules of Evidence 402 and 403, to preclude testimony or evidence regarding the use of crocidolite asbestos fibers in automatic transmission parts. In support of its motion, defendant states as follows:

1.     Rule 402 would preclude the introduction of the Borg-Warner's Interrogatory responses on the ground that they are irrelevant to the present litigation. The record reflects no reference whatsoever to Plaintiffs' claims that they were exposed to crocidolite fibers from automatic transmission parts. The record reflects only Plaintiffs' alleged exposure to chrysotile fibers in clutches; clutches are not components of automatic transmissions. No Plaintiff to date has testified to alleged exposure to asbestos from automatic transmission parts.

2.     Rule 403 also precludes the introduction of testimony or evidence of crocdiolite in automatic transmission on the grounds that introducing such evidence will confuse the jury as to what product these Plaintiffs allege exposed them to asbestos. Plaintiffs allege exposure to clutch parts, not automatic transmission parts. There is no reason to permit the jury to hear about

Borg-Warner products that are not the subject of this litigation; to allow such testimony or evidence would not assist the jury in its fact-finding duties.

2.      Plaintiffs are aware that automatic transmissions differ from manual transmissions.  Any asbestos in an automatic transmission is enclosed in a "wet" environment and would then not release any dust.

3.      Any Borg-Warner manufactured "dry" product was manufactured in a separate area from any Borg-Warner manufactured "wet" product.

4.      Any alleged chrysotile asbestos was not mixed with any crocidolite asbestos.  Furthermore, any Borg-Warner product that was manufactured with crocidolite asbestos was not manufactured in the same area as any product made with chrysotile asbestos.  Thus, it is highly prejudicial to Borg-Warner to permit plaintiffs to testify about crocidolite and automatic transmissions.

WHEREFORE, Borg-Warner requests that this Court preclude the introduction of testimony or evidence regarding defendant's use of crocidolite fibers in automatic transmission parts, as well as any testimony about the use of crocidolite fibers in any automatic transmissions.  It is not relevant to this litigation, and its use in trial would unduly prejudice the defendant by its tendency to confuse the jury.

2

Respectfully submitted,

ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.


/s/ Matthew P. Donelson .
MATTHEW P. DONELSON (4243)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899
(302) 428-3181
Attorney for Borg-Warner Corporation by
its Successor-in-Interest, BorgWarner Morse
TEC, Inc.

Dated: January 5, 2007

G:\Docs\CLIENT\223\02222\motions\00372436.DOC

3

EFiled: Feb 22 2007 3:54... EST
Transaction ID 13893514
Case No. 06C-02-281 ASB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| MARY M. COLLINS, Individually and | ) | |
| as Personal Representative of the Heirs | ) | |
| and Estate of JAMES DANIEL | ) | **ASBESTOS** |
| COLLINS, Deceased, | ) | |
| Plaintiff, | ) | **C.A. No. 06C-02-281 ASB** |
| | ) | |
| v. | ) | **TRIAL BY JURY OF** |
| | ) | **TWELVE DEMANDED** |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, et al., | ) | |
| Defendants. | ) | |

### DEFENDANT VOLKSWAGEN OF AMERICA, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR FAILURE TO PLEAD NEGLIGENCE AND FRAUD WITH PARTICULARITY AND FOR ANCILLARY RELIEF

Volkswagen of America, Inc. (hereinafter "VWoA "), by and through its attorney,

Obermayer Rebmann Maxwell & Hippel, LLP, respectfully moves to dismiss Plaintiff's Second

Amended Complaint in the above-referenced action pursuant to Superior Court Civil Rules 9(b)

and 12(b)(6)[1], and for ancillary relief as follows:

- VWoA seeks an **Order dismissing Counts I, II, III, IV, VI, VII, VIII and IX** for

  failure to plead in compliance with Rule 9(b);

- VWoA seeks an **Order dismissing the entire Second Amended Complaint** for failure

  to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), insofar as it

  pleads only generic, conclusory allegations; and

- VWoA seeks a **ruling that the depositions of decedent Mr. Collins cannot be used**

  against VWoA in this action, because VWoA was not a party to the earlier proceeding;

---

[1] VWoA does not waive its defenses pursuant to Rule 12(b)(2) or its defense of *forum non conveniens.* Those defenses are raised under separate cover, in a motion filed simultaneously herewith.

was not present at those depositions, and had no opportunity to cross-examine, and no

other party who was present at that deposition had a similar motive to that of VWoA.

For the reasons set forth in VWoA's Supporting Brief, which is incorporated in this

Motion by reference, the Court should dismiss Plaintiff's Second Amended Complaint against

VWoA pursuant to Delaware Superior Court Civil Rules 9(b) and 12(b)(6), and grant ancillary

relief, as requested.

OBERMAYER REBMANN MAXWELL
& HIPPEL, LLP


By: /s/ Steven T. Davis
Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806
(215) 665-3128

AND

OF COUNSEL:
Alice S. Johnston
Obermayer Rebmann Maxwell & Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219
(412) 288-2459

AND

Robert E. Thackston
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205
(214) 780-5101

Counsel for Defendant,
Volkswagen of America, Inc.

Dated: February 22, 2007

2

EFiled: Feb 22 2007 3:54PM EST
Transaction ID 13893514
Case No. 06C-02-281 ASB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| MARY M. COLLINS, Individually and as: Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS, Deceased, | C.A. No. 06C-02-281 ASB |
| Plaintiff(s), | |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., et al., | |
| Defendants. | |

### CERTIFICATE OF SERVICE

I, Steven Davis, Esquire, hereby certify that on February 22, 2007, I caused a copy of Defendant Volkswagen of America, Inc.'s Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted And For Failure To Plead Negligence And Fraud With Particularity And For Ancillary Relief with Supporting Brief to be served by regular mail upon Plaintiff's counsel and upon all counsel of record via the LEXIS NEXIS Efile and Serve system.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

By: /s/ Steven T. Davis
       Steven T. Davis, Esquire
       Del. Bar No. 2731
       3 Mill Road, Suite 306A
       Wilmington, DE 19806
       (215) 665-3128

       Counsel for Defendant,
       Volkswagen of America, Inc.

EFiled: Feb 22 2007 3:54▉ ▉ST
Transaction ID 13893514
Case No. 06C-02-281 ASB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MARY M. COLLINS, Individually and as | : | |
| Personal Representative of the Heirs and | : | ASBESTOS |
| Estate of JAMES DANIEL COLLINS, | : | |
| Deceased, | : | C.A. No. 06C-02-281 ASB |
| Plaintiff(s), | : | |
| | : | |
| | : | TRIAL BY JURY OF TWELVE |
| v. | : | DEMANDED |
| | : | |
| METROPOLITAN LIFE INSURANCE | : | |
| COMPANY, INC., et al., | : | |
| Defendants. | : | |

## DEFENDANT VOLKSWAGEN OF AMERICA, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR FAILURE TO PLEAD NEGLIGENCE AND FRAUD WITH PARTICULARITY AND FOR ANCILLARY RELIEF

Volkswagen of America, Inc. (hereinafter "VWoA "), by and through its attorney, Obermayer Rebmann Maxwell & Hippel, LLP, respectfully submits its Supporting Brief to its Motion to Dismiss Plaintiffs' Second Amended Complaint in the above-referenced action pursuant to Superior Court Civil Rules 9(b) and 12(b)(6)[1], and for ancillary relief as follows:

- VWoA seeks an **Order dismissing Counts I, II, III, IV, VI, VII, VIII and IX** for failure to plead in compliance with Rule 9(b);

- VWoA seeks an **Order dismissing the entire Second Amended Complaint** for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), insofar as it pleads only generic, conclusory allegations; and

---

[1] VWoA does not waive its defenses pursuant to Rule 12(b)(2) or its defense of *forum non conveniens*. Those defenses are raised under separate cover, in a motion filed simultaneously herewith.

- VWoA seeks a **ruling that the depositions of decedent Mr. Collins cannot be used against VWoA** in this action, because VWoA was not a party to the earlier proceeding, was not present at those depositions, and had no opportunity to cross-examine, and no other party who was present at that deposition had a similar motive to that of VWoA.

For the reasons set forth in VWoA's Supporting Brief, the Court should dismiss Plaintiff's Second Amended Complaint against VWoA pursuant to Delaware Superior Court Civil Rules 9(b) and 12(b)(6), and grant ancillary relief, as requested.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

By: /s/ Steven T. Davis
  Steven T. Davis, Esquire
  Del. Bar No. 2731
  3 Mill Road, Suite 306A
  Wilmington, DE 19806
  (215) 665-3128
    AND
  OF COUNSEL:
  Alice S. Johnston, Esquire
  Obermayer Rebmann Maxwell &
  Hippel, LLP
  One Mellon Center
  500 Grant Street, Suite 5240
  Pittsburgh, PA 15219
  (412) 288-2459
    AND
  Robert E. Thackston, Esquire
  Hawkins Parnell & Thackston, LLP
  4514 Cole Avenue, Suite 550
  Dallas, TX 75205
  (214) 780-5101

  Counsel for Defendant,
  Volkswagen of America, Inc.

Dated: February 22, 2007

2

## TABLE OF CONTENTS

<div align="right">**Page**</div>

TABLE OF AUTHORITIES...................................................................................ii

NATURE OF PROCEEDINGS............................................................................1

STATEMENT OF FACTS.............................................................................2-3

SUMMARY OF ARGUMENT...........................................................................4

ARGUMENT................................................................................................5

    I.      Counts I, II, III, IV, VI, VII, VIII and IX of Plaintiff's Second Amended Complaint Should be Dismissed For Failure to Plead in Compliance with Rule 9(b)......................................................................................5-8

    II.     Plaintiff's Second Amended Complaint Should Be Dismissed for failure to state a claim upon which relief can be Granted Pursuant to Rule 12(b)(6), insofar as it pleads Only Generic, Conclusory Allegations....................8-10

    III.    The depositions of decedent Mr. Collins cannot be used against VWoA in this action, because VWoA was not a party to the earlier proceeding, was not present at those depositions, and had no opportunity to cross-examine, and no other party who was present at that deposition had a similar motive to that of VWoA...................................................................................8-12

    IV.    Conclusion.............................................................................12

**TABLE OF AUTHORITIES**

## CASES

**Page**

*Archie v. 4520 Corp.,* Del. Super., C.A. 02C-08-204 ASB, Babiarz, J. (September 25, 2003)..................................................................................................5

*Archie v. 4520 Corp., Inc.,* 2003 WL 832549 (Del. Super. March 3, 2003) .................8

*Anderson v. Airco, Inc.,* 2004 WL 1551484 (Del. Super. 2004). ...........................7

*E .I. DuPont de Nemours and Co. v. Florida Evergreen Foliage,* 744 A.2d 457, 462 (Del. 1999)....................................................................................7

*Harold's Auto Parts, Inc. v. Mangialardi,* 889 So.2d 493, 494 (Miss. 2004)...............9

*In Re Asbestos Litigation: Carter,* 1992 Del. Super. LEXIS 488 (1992). ............... . 12

*Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 595 F. Supp. 1385 (D. Del. 1984)...... ..8

*Loftus v. Southeastern Pennsylvania Transportation Authority,* 843 F. Supp. 981, 986 (E. D. Pa. 1994)..................................................................................8

*Peter R. Stille v. Joshua S. Layton,* 2 Del. 149, *2 (Del. Super. 1837)....................11

*Temple v. Raymark Industries, Inc.,* 551 A.2d 67 (Del. Super. 1988) .....................12

## STATUES

10 *Del. C.* § 3104..............................................................................1

## OTHER STATUES

Delaware Superior Court Civil Rule 9(b)............................................1, 4,5

Delaware Superior Court Civil Rule 12(b)(2)..........................................4

Delaware Superior Court Civil Rule 12(b)(6)..........................................1, 4,9

## NATURE OF PROCEEDINGS

Plaintiffs initially filed their lawsuit on February 28, 2006 against numerous defendants, <u>not including</u> VWoA. Plaintiffs filed a motion to add VWoA as a defendant, which was granted on October 6, 2006. VWoA was served with Plaintiffs' Amended Complaint on December 11, 2006. Thereafter, Plaintiff filed a motion to substitute the parties and add a wrongful death claim. The Court granted the motion, and Plaintiff Mary M. Collins filed a Second Amended Complaint on February 5, 2007.

Plaintiff contends that the deceased, James Daniel Collins, suffered from mesothelioma as a result of exposure to asbestos in Washington. The numerous defendants in this case include Delaware corporations, foreign corporations registered to do business in Delaware, and foreign corporations over whom Plaintiff is asserting jurisdiction under Delaware's long arm statute.[2] Specifically, VWoA is incorporated in the state of New Jersey with its principal place of business in Michigan.

VWoA files its Motion to Dismiss the Second Complaint with supporting brief pursuant Superior Court Civil Rules 9(b) and 12(b)(6)[3], and for ancillary relief.

---

[2] 10 *Del C.* § 3104.
[3] VWoA does not waive its defenses pursuant to Rule 12(b)(2) or its defense of *forum non conveniens.* Those defenses are raised under separate cover, in a motion filed simultaneously herewith.

1

## STATEMENT OF FACTS

On February 28, 2006, Plaintiffs James Daniel Collins and Mary M. Collins filed a Complaint (E-filing ID No. 10675089), against 40 Defendants, not including VWoA. Plaintiffs' initial discovery responses were served in May, 2006.   On information and belief, James Daniel Collins was deposed on August 10, 2006, at which time he testified regarding, inter alia, working on "Volkswagen vehicles" and with other "Volkswagen parts".   VWoA had no notice of these depositions, and was not a party to the action at the time of the depositions.  Thus, of course, VWoA was not present at the depositions and had no opportunity to cross-examine Mr. Collins.

On August 17, 2006, Plaintiffs filed a motion to amend the Complaint to add VWoA as a party to the lawsuit (E-filing ID No. 12109224), but the motion was not immediately presented to this Court.  The Court granted the motion to amend on October 6, 2006 (E-filing ID No. 12566951).  Plaintiffs filed an Amended Complaint adding VWoA as a party to the lawsuit on October 17, 2006 (E-filing ID No.  12649530 (Exhibit A)).  VWoA was served with original process on December 11, 2006, after the close of discovery in the case.  Plaintiff James Daniel Collins died on or about September 25, 2006, after the filing of the motion to amend the Complaint[4], but before the motion was granted.  VWoA was not served with original process in this action until nearly three months after the death of Mr. Collins.  By the time VWoA became a party to the action, the opportunity to cross-examine Mr. Collins was lost forever.

On December 9, 2006, an initial Motion to Substitute Parties and Add Wrongful Death Claim was filed (E-filing ID No. 13149159).  Thereafter, on January 24, 2007, a second Motion to Substitute Parties and Add a Wrongful Death Claim was filed  (E-filing

---

[4]  The motion to amend was not served on VWoA; there are no rules which require such service.

ID No. 13582246)[5]. The Court granted the second Motion to Substitute Parties and Add Wrongful Death Claim on February 2, 2007 (E-filing ID No. 13680789). Plaintiff Mary M. Collins then filed a Second Amended Complaint on February 5, 2007 (E-filing ID No. 13694201 (Exhibit B)). Plaintiff alleges in the Second Amended Complaint that Mr. Collins developed mesothelioma and other asbestos-related pulmonary injuries and diseases (¶ 2, Second Amended Complaint) as a result, inter alia, of indirect asbestos exposure through his father's occupation (¶1(a), Second Amended Complaint) and direct exposure through Mr. Collins' own employment and activities at various locations between 1950 and 2005. (¶1(b-k), Second Amended Complaint). There is no allegation that Mr. Collins encountered any asbestos-containing products sold, distributed or provided by VWoA.

---

[5] The principal difference between the first and second Motion to Substitute Parties appears to be the identities of the individuals to be substituted in as Plaintiffs.

3

## SUMMARY OF ARGUMENT

VWoA respectfully moves to dismiss Plaintiff's Second Amended Complaint in the above-referenced action pursuant to Superior Court Civil Rules 9(b) and 12(b)(6), and for ancillary relief as follows:

- VWoA seeks an **Order dismissing Counts I, II, III, IV, VI, VII, VIII and IX** for failure to plead in compliance with Rule 9(b);

- VWoA seeks an **Order dismissing the entire Second Amended Complaint** for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), insofar as it pleads only generic, conclusory allegations; and

- VWoA seeks a **ruling that the depositions of decedent Mr. Collins cannot be used against VWoA** in this action, because VWoA was not a party to the earlier proceeding, was not present at those depositions, and had no opportunity to cross-examine, and no other party who was present at that deposition had a similar motive to that of VWoA.

## ARGUMENT

I.    **Counts I, II, III, IV, VI, VII, VIII and IX of Plaintiff's Second Amended Complaint Should be Dismissed For Failure to Plead in Compliance with Rule 9(b).**

On March 2, 2006, this Court held that pursuant to Superior Court Civil Rule 9(b), a negligence claim that does not plead the time, place, and manner of the alleged injury cannot stand. (March 2, 2006 Tr. at 4-5) (Exhibit C). Plaintiff's Counts I and II fail this test. Count I alleges that the Defendants, as a group, are guilty of "wrongful conduct" (¶¶4, 5, Second Amended Complaint), but identifies no specific conduct whatsoever by any Defendant - - certainly no conduct on the part of VWoA, in particular. Count II alleges certain specific behavior on the part of Defendant 3M (¶¶ 11 – 13, Second Amended Complaint) and then alleges that certain unspecified "wrongful activities" of all Defendants caused Plaintiff's injuries. (¶14, Second Amended Complaint). Conspicuously absent from either of these Counts is any factual allegation as to what Defendant VWoA is alleged to have done, or failed to do, or how these generic "wrongful activities" caused or contributed to Plaintiff's injuries.

As noted above, there is no clear allegation that Mr. Collins even encountered asbestos-containing products associated with VWoA. Plaintiff may argue that, because she has sued VWoA, it must be inferred that the unidentified mechanics' work Mr. Collins allegedly performed involved vehicles and parts associated with each of the friction defendants sued (¶1(c), (g), (h), (j) and (k), Second Amended Complaint), and that the particulars will be described in the course of discovery. However, Delaware law does not permit such speculative and inferential pleading, nor does it permit plaintiffs to bolster their complaints with discovery. See *Archie v. 4520 Corp.,* Del. Super., C.A.

5

02C-08-204 ASB, Babiarz, J. (September 25, 2003) ("*Archie II*") (Exhibit D) at 6-7, 13) (holding that "the plaintiff is to specifically state what actions the defendant did or failed to," and may not rely upon discovery responses to bolster the pleadings). Additionally, though, it must be recognized that the Second Amended Complaint was filed after the close of initial discovery in this case, and nevertheless it fails to include even the most basic required factual averments.[6]

Count III is a premises liability claim vaguely alleging that unidentified "[d]efendants were negligent in conducting the [unidentified] above activities *and/or* in [unidentified] safety conditions at their [unidentified] plants and facilities." (¶16, Second Amended Complaint). Nowhere does the Second Amended Complaint identify the "safety conditions" or the "plants and facilities" at issue, or even allege that Mr. Collins ever encountered asbestos in any form on *any* property owned or controlled by VWoA. As with Counts I and II, Plaintiff may argue that because she has sued VWoA it must be inferred that such exposure occurred, and that the specifics will be made clear in discovery. Such an argument is no more appropriate here than it is for Counts I and II.

Count IV appears to assert aggravated negligence claims related to both products and premises-related exposures. It asserts that unidentified defendants "willfully and wantonly ... and with reckless indifference failed to substitute materials, adequately warn of the risks of asbestos exposure, adequately test or package their products, or remedy these purported failures by recalling their products, "abat[ing] asbestos on their property," finding a cure for asbestos injuries, "to distribute asbestos so as to render it safe," or "remove the asbestos now in place". (¶19, Second Amended Complaint).

---

[6] As set forth in greater detail herein, the late joinder of VWoA in this action has created complications beyond the inadequacy of the pleadings.

6

Plaintiff does not, however, allege that any of these purported acts or omissions caused or contributed in any way to her injuries.

Plaintiff's fraud claims (Counts II,[7] VI and VII) fail because they do not plead all elements of fraud; and fail to plead fraud with particularity. The Supreme Court has held that fraud claims must plead: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *E .I. DuPont de Nemours and Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999). "Failure to allege any of the elements warrants dismissal of the claim." *Anderson v. Airco, Inc.*, 2004 WL 1551484 *7 (Del. Super. 2004). As this Court has already ruled, plaintiffs must specifically plead the allegedly fraudulent or misrepresented statements "either in a general way or if the plaintiffs have them, in specific terms". (3/2/06 Tr. at 7). Plaintiffs are not excused from the remaining pleading requirements set forth in *Florida Evergreen Foliage*. Not only does Plaintiff fail to identify VWoA's purportedly fraudulent statements as required by this Court's March 2, 2006 ruling, she also does not allege that VWoA *intended* Mr. Collins to act or refrain from acting, does not allege that he actually and reasonably *relied* on that representation, or that his claimed injuries resulted from his reliance, all as required by the *Florida Evergreen Foliage* decision. These flaws alone are sufficient to warrant dismissal of Counts II, VI and VII.

Finally, Plaintiff's conspiracy claims (Counts VIII and IX ) must be dismissed

---

[7] Count II appears to include a claim for fraudulent concealment. (¶10, Second Amended Complaint). Importantly, in addition to the other deficiencies discussed herein, it should be noted that Count II also fails to allege deliberate concealment. *Anderson v. Airco, Inc.*, 2004 WL 1551484 *7 (attached as Exhibit E).

because they fail to particularly plead: (1) the period of the conspiracy, (2) the object of

the conspiracy, (3) the actions of the alleged conspirators taken to achieve that purpose,

and (4) the identity of the conspiring individuals. *Loftus v. Southeastern Pennsylvania*

*Transportation Authority,* 843 F. Supp. 981, 986 (E. D. Pa. 1994) (citing *Kalmanovitz v.*

*G. Heileman Brewing Co., Inc.,* 595 F. Supp. 1385 (D. Del. 1984). "[A] complaint

alleging a conspiracy must contain sufficient information for the court to determine

whether or not a valid claim for relief has been stated and enable the opposing side to

prepare an adequate responsive pleading." *Id.* "[M]ere incantation of the words

'conspiracy' or 'acted in concert' does not talismanically satisfy the [pleading] Rule's

requirements." *Id.* Because Plaintiff's Second Amended Complaint fails to give VWoA

fair notice of Plaintiff's conspiracy allegations, Counts VIII and IX must also be

dismissed.

**II.      Plaintiff's Second Amended Complaint Should Be Dismissed For Failure To
State A Claim Upon Which Relief Can Be Granted Pursuant to Rule 12(b)(6),
Insofar As It Pleads Only Generic, Conclusory Allegations.**

Plaintiff's Second Amended Complaint also fails to state a claim upon which

relief can be granted because it contains nothing more than unsupported, conclusory

allegations. All of the Counts, and the claim for punitive damages, are subject to this

shortcoming. This Court has held that "[i]t is not sufficient to state the result or

conclusion of fact arising from circumstances not set forth in the declaration, nor to make

a general statement of the facts which admits of almost any proof to sustain it." *Archie v.*

*4520 Corp., Inc.,* 2003 WL 832549 *1 (Del. Super. March 3, 2003) ("*Archie I*")

(citations, quotation: and alterations omitted) (Exhibit F). Beyond pleading 55 years of

non-specific exposure to unidentified products, at unidentified times, and under

8

unidentified circumstances (¶1, Second Amended Complaint), Plaintiff pleads nothing more than the conclusions she wishes the Court to reach.

Plaintiff does not make clear her allegations as to when Mr. Collins was exposed, where he was exposed, by what routes he was exposed, to what he was exposed, or even if he was exposed to asbestos-containing products associated with VWoA or on property associated with VWoA, or any other defendant. This basic information "should [have been] known to Plaintiff's counsel *prior* to filing the complaint, not information to be developed in discovery or disclosure." *Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493, 494 (Miss. 2004) (emphasis in original). These sorts of fundamental factual allegations belong in the Complaint. Plaintiff has utterly failed in her obligation to set forth the basic factual allegations necessary to put Defendants on notice of the basis for the Second Amended Complaint. Absent any well-pleaded (*i.e.* non-conclusory) allegations, the Court cannot assume the truthfulness of any of the allegations, and Plaintiff's Second Amended Complaint should be dismissed in its entirety pursuant to Rule 12(b)(6).

Plaintiff may argue that discovery taken to date in the case,[8] prior to the joinder of VWoA, somehow supplements and fills the factual gaps in the Second Amended Complaint. **At least with respect to this Defendant, that argument cannot be permitted to stand.** Delaware law requires counsel to know the essential facts at the outset, and to plead those simple, basic facts in the Complaint.[9] Had this been done in the

---

[8] Counsel for VWoA is informed that Mr. Collins was deposed on August 10, 2006 and several co-worker witnesses were deposed in early November, 2006. VWoA was not a party to the action at that time, and thus had no opportunity or right to attend and cross-examine.

[9] Every version of the Complaint to date, and the answers to interrogatories, allege that Mr. Collins was employed as a mechanic at Brewington Motors and Hanson Motors in Olympia, Washington from 1971 through 1985. Brewington Motors was, and Hanson Motors still is, an independently owned Volkswagen dealership. Having worked there for 14 years, Mr. Collins obviously knew this. At his deposition Mr. Collins

9

case at bar, VWoA likely would have been included as a defendant in the original

Complaint, and would thus have had an opportunity to participate in the discovery taken

to date.  However, for reasons and circumstances entirely under the control of Plaintiff

and her counsel, that did not occur.  The original Complaint was filed without the

necessary factual allegations, and VWoA was excluded from essential discovery in the

case.

**III.    The Depositions of Decedent James Daniel Collins Cannot Be Used Against VWoA In This Action Because VWoA Was Not A Party To The Earlier Proceeding, Was Not Present At The Depositions, And Had No Opportunity To Cross-Examine, And No Other Party Who Was Present At The Depositions Had A Similar Motive To That Of VWoA.**

There is no logical reason why VWoA was omitted from the originally-filed

Complaint in this action, was not joined and served until discovery was completed, nor

why it was denied the opportunity to participate in this litigation in a normal manner.  As

it is, VWoA has forever lost the chance to cross-examine Mr. Collins, who was the most

important and knowledgeable witness in this case.  Mr. Collins' deposition was taken on

August 10, 2006, at a time when he and his counsel clearly already knew[10] of his alleged

exposures, but VWoA was not a party to the action.  Thus, while he was actively

identifying VWoA parts and materials as among those to which he had been exposed –

and which no other defendant had any motivation to challenge -- VWoA, which was

uniquely qualified to cross-examine on these product identification issues, was deprived

of the opportunity to inquire and make a record to protect its interests.  Had VWoA

---

Collins apparently testified that he was exposed to VWoA products during this employment.  Nevertheless, the original Complaint did not name VWoA as a defendant, VWoA had no opportunity to participate in the depositions of Mr. Collins and his VW dealership co-workers, and VWoA was not joined until nearly a year after the filing of the Complaint, and after Mr. Collins' death.

[10]  Indeed, it would seem apparent that Mr. Collins knew of the alleged exposures from the outset, and his counsel knew of the alleged claims against VWoA at least from the time that Mr. Collins' work history was obtained and initial discovery responses were prepared.

thereafter been expeditiously joined, rather than the Motion to Amend being presented seven weeks later and service of process occurring another nine weeks after that, VWoA might still have had the opportunity to take a limited, supplemental deposition of Collins. Because of Mr. Collins' passing in late September, however, VWoA will never have that opportunity.

Now that VWoA has been joined in this action, it will have an opportunity to engage in discovery. That will not, however, entirely cure the prejudice suffered by VWoA in not having been present at Mr. Collins' own deposition. It only gives VWoA the opportunity to obtain indirectly some of the information that it might have gotten from Mr. Collins directly – and from lesser sources, without the firsthand knowledge and observation of Mr. Collins. Discovery now will have to navigate through hearsay, and the filter of other people's different frames of observation and reference. Discovery now will not mitigate VWoA's inability to cross-examine Mr. Collins on any of his testimony that might be detrimental to VWoA. The loss of that opportunity cannot be cured, and the only way to prevent VWoA from being unfairly prejudiced is by ordering that the deposition testimony of Mr. Collins is inadmissible as against VWoA.

It is a venerable principle of Delaware law that "[d]epositions cannot be read against those who have not had a cross examination." *See also, Peter R. Stille v. Joshua S. Layton,* 2 Del. 149, *2 (Del. Super. 1837) ("[y]ou cannot give depositions in evidence, unless the party against whom they are offered, had an opportunity to cross examine, which here he had not."). The mere fact that other defendants attended and questioned at the deposition of Mr. Collins is no substitute for VWoA being present, and having an opportunity to conduct its own cross-examination as to the allegations against VWoA and

11

VWoA's products.  See *Temple v. Raymark Industries, Inc.*, 551 A.2d 67 (Del. Super. 1988); *In Re Asbestos Litigation: Carter*, 1992 Del. Super. LEXIS 488 (1992).  No other defendant had an interest or motivation to defend VWoA at Mr. Collins' deposition.  **In fact, the motives of the co-defendants regarding product identification were adverse to the interests of VWoA.**  Accordingly, Plaintiff cannot argue that discovery taken to date in the case somehow ameliorates the flaws in her pleading, and VWoA respectfully seeks, as additional ancillary relief and in addition to the Motions to Dismiss set forth herein, an Order preventing the use of the deposition testimony of Mr. Collins, taken prior to VWoA's joinder in the case, as evidence against VWoA.[11]

## IV.    Conclusion

For all of the foregoing reasons, VWoA respectfully requests that this Honorable Court grant it relief as follows:  enter an Order dismissing all counts of Plaintiff's Second Amended Complaint against VWoA; enter an Order that the depositions of Mr. Collins taken prior to VWoA's joinder in this case are inadmissible as to VWoA; and granting any other additional relief that this Court deems just.

RESPECTFULLY SUBMITTED,

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

By:  /s/ Steven T. Davis
       Steven T. Davis, Esquire
       Del. Bar No. 2731
       3 Mill Road, Suite 306A
       Wilmington, DE 19806
       (215) 665-3128

---

[11] Presumably, VWoA will now be permitted to re-open the depositions of the co-workers who were previously deposed and will be given a full and fair opportunity to cross-examine those witnesses. Accordingly, no relief is requested with respect to those depositions at this time.