**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and as Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS,

Plaintiff,

vs.

VOLKSWAGEN OF AMERICA, INC.,

Defendant.

1:07-cv-00149-***

**DEFENDANT VOLKSWAGEN OF AMERICA, INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

Steven T. Davis, Esquire (DE # 2731)
Obermayer Rebmann Maxwell & Hippel, LLP
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

Of Counsel:

Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

Attorneys for Defendant Volkswagen of America, Inc.

April 26, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

I. INTRODUCTION ........................................................................................ 1

II. STATEMENT AND NATURE OF PROCEEDINGS ................................................... 2

III. SUMMARY OF ARGUMENT ......................................................................... 2

IV. STATEMENT OF FACTS ............................................................................ 3

V. ARGUMENT ............................................................................................ 5

*A. The Amount in Controversy is not in Question for Purposes oF Removal ..................... 6*

*B. Diversity of Citizenship Exists ........................................................................ 6*

1. There is Complete Diversity Between Plaintiff and VWoA ...................................... 7

2. Counsel for Plaintiff Conceded VWoA is the Last Defendant in the Case ................ 7

*C. Timing of the Removal was Proper -- VWoA Was Joined Late in the Action Due to Plaintiff's Own Actions ........................................................................................ 7*

1. The Case Was Removed Within 30 Days After it Became Removable ..................... 8

2. The One Year Bar Has Not Expired With Respect to VWoA ................................... 9

(a) This Case Was Removed Well Within 1 Year After The Case Against VWoA Commenced ........................................................................................ 10

(1) Recent Third Circuit and Other Case Law Indicates a More Fluid Analysis ... 10

(2) Relevant State Law Demonstrates That This Action Did Not "Commence" As to VWoA Until VWoA Was Added as a Party ....................................................... 11

(3) Plaintiff's Conduct Bolsters VWoA's Commencement Argument ................... 16

(b) If This Court Finds That One Year Has Passed Since Commencement of the Action, VWoA is Entitled to a 17 Day Equitable Exception Because of Plaintiff's Inequitable Conduct ........................................................................................ 19

VI. CONCLUSION ........................................................................................ 21

# TABLE OF AUTHORITIES

**CASES**

Angus v. Shiley, Inc., 989 F.2d 142 (3d Cir. 1993)........ 6

Ardoine v. Stine Lumber Co., 298 F.Supp.2d 422 (W.D. La. 2003)........ 18

Ariel Land Owners, Inc. v. Dring, 351 F.3d 611 (3d Cir. 2003) ........ 19

Barnes v. Westinghouse Elec. Corp., 962 F.2d 513 (5th Cir. 1992)........ 19

Barnett v. Sylacauga Autoplex, 973 F. Supp. 1358 (N.D. Ala. 1997)........ 10

Braud v. Transport Service Co. of Illinois, 445 F.3d 801 (5th Cir. 2006)........ 10, 11

Carborundum Co. v. Electric Smelting & Aluminum Co., 203 F. 976 (3d Cir. 1913)........ 21

Chaplake Holdings, Ltd. v. Chrysler Corp., 766 A.2d 1 (Del. 2001) ........ 12

Chrysler Corp. v. New Castle County, 464 A.2d 75 (Del. Super. Ct. 1983) ........ 15

Criswell v. McFadden, No. Civ. A. 05-321, 2006 WL 435717 (D. Del., Feb. 23, 2006) ........ 15

Dimet Proprietary, Limited v. Industrial Metal Protectives, 109 F. Supp. 472 (D. Del. 1952)........ 21

Gasperini v. Center for Humanities, Inc., 518 U.S. 415 (1996) ........ 10

Haberman v. Wash. Pub. Power Supply System, 109 Wash.2d 107, 744 P.2d 1032, 750 P.2d 254 (1997)........ 13

Haywood v. Tribeca Lending Corp., No. 2:06CV108-P-A, 2006 WL 2708578 (N.D. Miss., Sept. 20, 2006) ........ 10, 11

Hess v. Carmine, 396 A.2d 173 (Del. Super. Ct. 1978)........ 15, 16

Ingersoll-Rand Co. v. Barnett, No. 05-1636 (DRD), 2005 WL 2175461 (D.N.J., Sept. 7, 2005) ........ 10

Int'l Fleet Auto Sales, Inc. v. Nat'l Auto Credit and Agency Rent-a-Car, No. No. CIV. A. 97-CV-1675, 1999 WL 95258,(E.D. Pa. Feb. 22, 1999) ........ 6

Lafferty v. St. Riel, 397 F. Supp.2d 602 (E.D. Pa. 2005) .......................................................... 10

Lee v. Carter-Reed Co., No. 06-CV-1173 (DMC), 2006 WL 3511160 (D.N.J., Dec. 5, 2006), reconsideration denied, 2007 WL 81893 (D.N.J., Jan. 9, 2007)............................................. 20

Mergenthaler v. Asbestos Corp. of North America, 500 A.2d 1357 (Del. Super. Ct. 1985)........ 14

Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214 (3d Cir. 1999) ................................... 6

Nicola Products Corp. v. Showart Kitchens, Inc., 682 F. Supp 171 (E.D.N.Y. 1988) .................. 9

Patterson v. American Bosch Corp., 914 F.2d 384 (3d Cir. 1990) ............................................. 10

Pierson v. Scott, No. C06-6503 PJH, 2007 WL 160924 (N.D. Cal., Jan. 17, 2007) .............. 10, 11

Provenza v. Yamaha Motor Co., Ltd., 295 F. Supp.2d 1175 (D. Nev. 2003) ............................. 10

Pub. Util. Dist. No. 1 v. Walbrook Ins. Co., 115 Wash.2d 339, 349, 797 P.2d 504 (1990)......... 13

Rauch v. Rauch, 446 F. Supp. 432 (D. So. Car. 2006) ............................................................... 20

Russell v. Olmedo, 275 A.2d 249 (Del. 1971)................................................................................ 15

Sasser v. Ford Motor Co., 126 F. Supp.2d 1333 (M.D. Ala.2001)............................................. 10

Schott v. Hechinger Co., No. Civ. A. 96C-06-012, 1997 WL 358306 (Del. Super. Ct., Mar. 20, 1997) ........................................................................................................................... 14

South Hollywood Hills Citizen Ass'n v. King County, 101 Wash.2d 68, 677 P.2d 114 (1984)........................................................................................................................... 12, 13

Stansfield v. Douglas County, 107 Wash. App. 20, 26 P.3d 935 (2001), *aff'd*, 146 Wash.2d 116, 43 P.3d 498 (2002)................................................................................................................ 12

Stein v. Bayer Corp., No. Civ. 05-2476 (AET), 2005 WL 2000143 (D.N.J., Aug. 18, 2005) ..... 20

Tedford v. Warner-Lambert Co., 327 F.3d 423 (5th Cir. 2003) ................................................ 19

Teller v. APM Terminals, Inc., 134 Wash. App. 696, 142 P.3d 179 (2006) ............................... 13

Tellinghuisen v. King County Council, 103 Wash.2d 221, 691 P.2d 575 (1984) ....................... 13

Walker v. Armco Steel Corp., 446 U.S. 740 (1980) ... 10

**STATUTES**

28 U.S.C. § 1332 (c) ... 7

28 U.S.C. § 1441 (a) ... 6

28 U.S.C. § 1446 (b) ... passim

28 U.S.C. §1332 (a) ... 5, 6

28 U.S.C. §1441(a) ... 5

**RULES**

Del. R. Civ. Pro. 15 ... 15

Del. R. Civ. Pro. 15 (c) ... 15

Fed. R. Civ. Pro. 61 ... 19

**OTHER AUTHORITIES**

H.R.Rep. No. 889, at 72(1988), reprinted in 1988 U.S.C.C.A.N. 5982, 6032 ... 16

# I. INTRODUCTION

At issue before the Court in this case is a very simple question: whether a Washington plaintiff can have her case remanded to a Delaware state court (thwarting a defendant's right to remove it) because she argues that the diverse defendant did not timely remove the case while simultaneously manipulating the judicial process in the following ways:

- intentionally failing to include Volkswagen of America, Inc. ("VWoA"), a known "target defendant," in the initial action;
- completing substantive discovery in the case, including the taking of video trial testimony of the plaintiff while VWoA was not a party;
- intentionally continuing with a factual investigation of the case, designed to elicit VWoA-specific testimony, before adding VWoA as a defendant, serving it with process, or alerting it to the proceeding;
- delaying its motion seeking Court permission to amend the complaint to join the "target defendant" until after the death of the main plaintiff cut off any chance of discovery from him as a key witness;
- serving the late-joined defendant VWoA with original process approximately 10 months after commencement of the action against the other defendants;
- resolving the action against all other defendants but not formally marking the docket to reflect such resolutions; and
- attempting to force a remand of the diverse "target defendant" to state court less than three months after it was served merely because the removal occurred one year and 17 days after commencement of the initial action against the other defendants, and just one day after the "target defendant" learned of the existence of the grounds for removal.

Plaintiff intentionally manipulated the Delaware state court system to suit her own ends. By waiting as long as possible to add VWoA as a defendant, she has deprived VWoA of meaningful discovery. As an added benefit, Plaintiff's intentional delays have also served to create an additional opportunity to manipulate the federal courts as well. Now that Plaintiff has created this untenable situation, she argues that VWoA "waited too long" to remove this case and

demands a remand. First, of course, Plaintiff's argument is incorrect as a matter of law -- the one year bar did not commence until VWoA was added as a defendant.

Further, when viewed for what it is, Plaintiff's scheme must fall apart under its own weight. Plaintiff cannot game the system to create a pattern of delay, and then seek remand arguing that VWoA is the party who delayed. This is more than unclean hands or inequitable conduct; it is a calculated attempt to deprive VWoA of its rights to prepare its case in chief and its federally-granted forum. This matter should not be remanded, as to do so would serve to reward Plaintiff's conduct.

## II. STATEMENT AND NATURE OF PROCEEDINGS

This case was originated in this Court by a Notice of Removal filed by VWoA on March 14, 2007, after learning it was the sole remaining defendant and that complete diversity therefore existed. Plaintiff has filed a Motion to Remand, alleging a violation of the "one year bar" on removal set forth in 28 U.S.C. § 1446 (b). This case will be transferred to the asbestos MDL in the Eastern District of Pennsylvania if it is not remanded.

## III. SUMMARY OF ARGUMENT

The following facts are not disputed:

- Plaintiff's decedent, James Collins, was domiciled in the state of Washington;
- VWoA is domiciled in the states of New Jersey and Michigan;
- Plaintiff is claiming more than $75,000 in damages;
- VWoA is the last remaining defendant in this case, and removed it less than 30 days after being notified of that fact in writing; and
- This action was commenced against VWoA less than one year ago.

Plaintiff's arguments in favor of remand amount to empty semantics regarding an alleged 17 day delay in removing the case to federal court. Plaintiff has acted in a fashion that should

deprive her of the benefit of any semantic argument. In an attempt to deprive VWoA of its federally-granted right to remove this case, Plaintiff engaged in a series of intentional delays and deliberate stall tactics to wind her purported "removal clock" down as far as she could, and then proceed against VWoA alone without the impediment of a possible removal (or any other parties). Under legal and equitable principles, this cannot be tolerated, and this Court should deny Plaintiff's Motion to Remand based on the law, the facts of record and her course of conduct. In summary:

1. VWoA demonstrated the requirements of a diversity action, and removed the action less than 30 days after the action became removable.

2. The one year bar has not been violated, as this action did not commence as to VWoA until it was belatedly joined as a new defendant.

3. The Third Circuit has held that the one-year period for removal is a procedural bar, not a jurisdictional one. Therefore, even if commencement of the one year bar were to be measured by the filing of the initial complaint in this matter, Plaintiff's improper conduct demands an equitable exception of 17 days to the one year procedural bar.

## IV. STATEMENT OF FACTS

Plaintiff's action, as amended, seeks relief for injuries allegedly suffered by decedent James Collins as a result of exposure to asbestos, including asbestos fibers allegedly shed from products supplied by VWoA. But when Plaintiff filed suit in the Superior Court of New Castle County, Delaware on or about February 28, 2006, VWoA was not named as a defendant in the action. The New Castle County docket and the record of the case reveals the following:

- James Daniel Collins and Mary M. Collins filed their action on February 28, 2006. VWoA was not named in the lawsuit, was not served with a copy of it, and was not otherwise notified of the action. See Plaintiff’s Complaint attached hereto as Exhibit A.

- Plaintiff provided Answers to Interrogatories Directed to Plaintiff by all Defendants and Responses to Request for Production of Documents on May 26, 2006, which included Mr. Collins’ employment history (which made no reference

to any VWoA product but did reference employment at Brewington Motors and Hanson Motors, known to Plaintiff as a Volkswagen dealership) and records from the Social Security Administration confirming his employment at those dealerships. This discovery was not served on VWoA. See Plaintiff's Answers to Interrogatories and Responses to Request for Production of Documents attached hereto as Exhibit B.

- Plaintiff provided supplemental Answers to Interrogatories from June 7, 2006 until March 1, 2007, all of which included references to Mr. Collins' employment history. See Plaintiffs Supplemental Answers to Interrogatories attached hereto as Exhibit C.

- On August 10, 2006, Plaintiff James Daniel Collins was deposed, at which time VWoA was not a party to the lawsuit. VWoA was not provided with a copy of this transcript, but has since acquired a copy. For the first time, allegations relating to VWoA were made, as Mr. Collins testified regarding work on "Volkswagen vehicles" and with other "Volkswagen parts." See Notice of Deposition and Deposition Transcript of James Daniel Collins attached hereto as Exhibit D.

- Also in August 2006, Plaintiff's counsel began interviewing co-workers of Mr. Collins who also identified alleged VWoA exposures. This interview process included an initial phone call and follow-up personal interviews in Washington State by Baron & Budd employees. See selected portions of the depositions of Harold Foshaug, Richard Stewart, and Michael Matthews attached hereto as Exhibit E.

- On August 17, 2006, Plaintiffs filed a motion to amend their Complaint to add VWoA as a defendant, but did not present it to the Superior Court. This Motion was not served on VWoA. See Plaintiff's Motion to Amend the Complaint attached hereto as Exhibit F.

- The factual and non-medical discovery deadline in New Castle County, Delaware expired on or about September 10, 2006.

- On September 25, 2006, Mr. Collins passed away.[1]

- Plaintiff's Motion to Amend the Complaint to add VWoA as a defendant was finally presented to the Superior Court and granted on October 6, 2006. See Order Granting Plaintiff's Motion to Amend the Complaint attached hereto as Exhibit G.

---

[1] After Mr. Collins died, he was immediately cremated without an autopsy being performed. See Certificate of Death attached hereto as Exhibit J. Therefore, his lungs were not analyzed regarding what type and amount of asbestos fibers, if any, were present.

- On October 17, 2006, Plaintiff filed an Amended Complaint for the first time naming VWoA as a defendant in the action. See Plaintiff's Amended Complaint attached hereto as Exhibit H.
- Depositions of co-workers of Mr. Collins took place on November 7 and 8, 2006, but VWoA had not yet been served with the suit (VWoA has since acquired copies). See Exhibit E.
- VWoA was finally served with Plaintiff's Amended Complaint on December 11, 2006, after the close of discovery, nearly three months after the Plaintiff died. See Sheriff's Return of Service upon VWoA attached hereto as Exhibit I.

## V. ARGUMENT

According to 28 U.S.C. §1441(a), removal of a state civil action is proper where an action is brought in state court although the federal court would have had original jurisdiction of the matter. Diversity of citizenship exists when the action involves citizens of different states and an amount in controversy that exceeds $75,000. 28 U.S.C. §1332 (a). Removal must take place within 30 days after the case becomes removable. There is also a procedural bar on removing actions one year after "commencement" of the action if the case was not initially removable. 28 U.S.C. § 1446 (b). Only this final element is in dispute.

The timeline described in the Statement of Facts above demonstrates that Plaintiff has intentionally "hidden the ball" from VWoA since the time that the initial Complaint was filed in February of 2006. This course of improper and deliberate conduct has severely prejudiced VWoA and is of direct relevance to her Motion to Remand. Plaintiff and her counsel knew from the outset of this action that Mr. Collins worked at Brewington Motors and Hanson Motors, a Volkswagen dealership, and did nothing to add VWoA as a party. This was confirmed by the records of the Social Security Administration detailing this employment, but Plaintiff did nothing to add VWoA as a party. Plaintiff confirmed his alleged exposure to VWoA products in his own deposition, and Plaintiff did nothing to add VWoA as a party. Plaintiff's counsel went to the

additional effort and expense to locate and interview Mr. Collin's co-workers at this dealership in the summer of 2006, and did nothing to add VWoA as a party. By not acting to join VWoA to the lawsuit, Plaintiffs and counsel allowed time to pass, Mr. Collins to die, and the discovery period to expire, before VWoA was made a party. Now, Plaintiff wishes to benefit from these intentional delays and deprive VWoA of its removal by clinging to an expiration of a one-year bar that she instigated. Even if the one year bar has expired (it has not), Plaintiff cannot profit from her own inequitable conduct.

### A.    THE AMOUNT IN CONTROVERSY IS NOT IN QUESTION FOR PURPOSES OF REMOVAL

A case "should be remanded only if the court determines that a reasonable jury could not return a verdict in excess of the jurisdictional amount." Int'l Fleet Auto Sales, Inc. v. Nat'l Auto Credit and Agency Rent-a-Car, No. CIV. A. 97-CV-1675, 1999 WL 95258, *4 (E.D. Pa. Feb. 22, 1999), citing Angus v. Shiley, Inc., 989 F.2d 142, 145 (3d Cir. 1993) and Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 223 (3d Cir. 1999). Plaintiff does not contend that she is seeking less than $75,000 for her claims. VWoA does not challenge the amount of those claims at this time.

### B.    DIVERSITY OF CITIZENSHIP EXISTS

The removal statute authorizes removal of cases which originally might have been brought in federal court. 28 U.S.C. § 1441 (a). Assuming that, as here, the amount in controversy exceeds $75,000, diversity jurisdiction focuses on whether the parties are "citizens of different states." 28 U.S.C. § 1332 (a) (1). While the citizenship for an individual usually is relatively easy to determine by his domicile, a "corporation shall be deemed to be a citizen of any state by which it has been incorporated and of the state where it has its principal place of

business . . . ." 28 U.S.C. § 1332 (c) (1).

**1. There is Complete Diversity Between Plaintiff and VWoA**

It is undisputed that Volkswagen of America, Inc. is incorporated in New Jersey and its principal place of business is located at its corporate headquarters in Michigan. Further, Mr. Collins was a resident of the State of Washington. Where the plaintiff is a legal representative of the estate, citizenship is determined by the citizenship of the decedent, and not by his legal representative. 28 U.S.C. §1332 (c). Therefore, diversity of citizenship exists between Plaintiff and VWoA.[2]

**2. Counsel for Plaintiff Conceded VWoA is the Last Defendant in the Case**

There is no doubt that VWoA is the last remaining defendant in this case because the Plaintiff herself has conceded that fact in writing. See Exhibit C to VWoA's Notice of Removal; Motion for Remand and Opening Brief. Any defendants who technically remain parties to this matter are nominal defendants who should be voluntarily dismissed or have settled with the Plaintiff, and their presence is merely due to a backlog in the completion of paperwork and execution of the voluntary dismissals and settlements. Any such irregularities can be cured well in advance of trial if they persist in any meaningful way. Plaintiff does not challenge the removal on this basis.

**C. TIMING OF THE REMOVAL WAS PROPER -- VWOA WAS JOINED LATE IN THE ACTION DUE TO PLAINTIFF'S OWN ACTIONS**

VWoA removed this matter as soon as it had the opportunity to do so, several months

[2] On information and belief, however, Mrs. Collins, the current named Plaintiff, is also a citizen of Washington.

after it was made a defendant, but one year and 17 days after the first complaint was filed against the other defendants. Plaintiff's reliance on a one-year bar misses the mark, however, because VWoA was not a part of the lawsuit initiated in February 2006. Under the applicable law (discussed in detail below), this action "commenced" as to VWoA when it was added as a new defendant.

Even if the action "commenced" in February 2006, however, this case should not be remanded on equitable grounds. To permit an alleged delay of 17 days against VWoA to act as an arbitrary and absolute bar to removal would violate the spirit of the removal statute and the Third Circuit's interpretation of that statute, particularly in light of the Plaintiff's unacceptable delay tactics. VWoA took no discovery in the case, and was in fact not joined as a party until after factual discovery had closed and Mr. Collins was deceased. Once VWoA was joined as a party defendant in the case (which was essentially over at that point for the bulk of the original defendants), all that VWoA shared with the initial action was a docket number. This was entirely due to Plaintiff's own intentional actions in delaying VWoA's entry into the matter (despite Mr. Collins' own knowledge of his work history and Plaintiff's counsel own additional factual investigation in the summer of 2006). Equity should act to bar remand.

**1. The Case Was Removed Within 30 Days After it Became Removable**

28 U.S.C. § 1446 (b) provides that:

> the notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after … the case … has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 [diversity of citizenship] of this title more than 1 year after **commencement** of the action."

(Emphasis added). The thirty-day period for removal is not jurisdictional, but failure to comply

with it will defeat a defendant's removal petition. Nicola Products Corp. v. Showart Kitchens, Inc., 682 F. Supp 171, 172 (E.D.N.Y. 1988). Accordingly, VWoA acted to quickly remove this matter within one week after learning informally that it was the last remaining defendant (because several parties settled the case), and one day after receiving written notice of that fact.

### 2. The One Year Bar Has Not Expired With Respect to VWoA

Plaintiff claims that VWoA has violated the removal statute's one-year bar by filing its Notice of Removal on March 14, 2007 only because she claims this action was "commenced" on February 26, 2006 and the one year bar on removal has passed. This Court should reject this argument.

Plaintiff is not seeking a remand because VWoA missed its deadline by a large margin such as two years. Nor is she seeking remand because VWoA removed more than a year after it was added to the action and served. Instead, Plaintiff is seeking remand because VWoA's removal came one year and 17 days after an action was commenced against 40 other defendants and only three months after VWoA was served with the Complaint. Under these circumstances, even if Plaintiff's argument was correct, 17 days is not the sort of delay Congress intended to prevent.

Plaintiff misstates when an action "commences" as to a new defendant under the applicable law. A more reasoned analysis of applicable case law confirms that **this action did not commence as to VWoA until it was actually made a party**. Even if Plaintiff were correct (she is not), her pattern of conduct in intentionally delaying this case demands that an equitable exception be made for that 17-day delay.

**(a) This Case Was Removed Well Within 1 Year After The Case Against VWoA Commenced**

**(1) Recent Third Circuit and Other Case Law Indicates a More Fluid Analysis**

The analysis and interpretation of "commencement" of the action is not as black-and-white as Plaintiff suggests, especially given the procedural nature of the bar. Plaintiff cites Sasser v. Ford Motor Co., 126 F. Supp.2d 1333 (M.D. Ala. 2001), for the proposition that "commencement" for purposes of the one-year period of removal under 28 U.S.C. § 1446 (b) is defined solely as the initiation of the original complaint, and not the addition of any new parties.[3] The federal courts, including the United States Supreme Court and courts within the Third Circuit are in agreement that the question of "commencement" is governed by the applicable state's law, not any general rule. See, e.g., Gasperini v. Center for Humanities, Inc., 518 U.S. 415 (1996); Walker v. Armco Steel Corp., 446 U.S. 740 (1980); Patterson v. American Bosch Corp., 914 F.2d 384 (3d Cir. 1990); Lafferty v. St. Riel, 397 F. Supp.2d 602 (E.D. Pa. 2005); Ingersoll-Rand Co. v. Barnett, No. 05-1636 (DRD), 2005 WL 2175461 (D.N.J., Sept. 7, 2005); see also Braud v. Transport Service Co. of Illinois, 445 F.3d 801 (5th Cir. 2006); Pierson v. Scott, No. C06-6503 PJH, 2007 WL 160924 (N.D. Cal., Jan. 17, 2007); Haywood v. Tribeca Lending Corp., No. 2:06CV108-P-A, 2006 WL 2708578 (N.D. Miss., Sept. 20, 2006); Provenza v. Yamaha Motor Co., Ltd., 295 F. Supp.2d 1175 (D. Nev. 2003); Barnett v. Sylacauga Autoplex, 973 F. Supp. 1358 (N.D. Ala. 1997).

Proper usage of the applicable statue law standards results in a far different analysis than Plaintiff acknowledges when an entirely new defendant is added to an existing case. In Braud v.

[3] Sasser has never been cited in the Third Circuit. Further, it is not on point here, where the added defendant is the one who removed.

Transport Service Co., 445 F.3d 801 (5th Cir. 2006), the Fifth Circuit employed a Rule 15-equivalent "relation back" standard to analyze "commencement" under Louisiana law. In doing so, the Court determined that an amendment that results in the addition of a new party (rather than the correction of a misnomer) **does not relate back** to the original complaint, and thus "commencement" was measured by the introduction of the new party. Id. at 806-07 (analyzed under the Class Action Fairness Act). Specifically, the Fifth Circuit observed that the addition of a new defendant "changes the character of the litigation so as to make it a substantially new suit," and therefore "the addition of the new defendant commences the lawsuit as to it." Id. at 806; see also Pierson v. Scott, No. C06-6503 PJH, 2007 WL 160924 (N.D. Cal., Jan. 17, 2007) (no relation back under California law when action brought against new defendant; thus one-year removal bar began when new parties were added to existing complaint); Haywood v. Tribeca Lending Corp, No. 2:06CV108-P-A, 2006 WL 2708578 (N.D. Miss., Sept. 20, 2006) (addition of new defendant recommenced the action as to that defendant).

Under the circumstances presented here, a reevaluation of the applicable standards is warranted; commencement is not defined as simply as Plaintiff claims. Moreover, the facts and circumstances in this case dramatically demonstrate that the joinder of VWoA did in fact, in this case, change the character and nature of the action so as to make it a substantially new suit.

**(2) Relevant State Law Demonstrates That This Action Did Not "Commence" As to VWoA Until VWoA Was Added as a Party**

(i) Washington Law

Mr. Collins was domiciled in Washington during all relevant periods of his working life. There is no question that Washington law applies to this action despite Plaintiffs' curious choice

of Delaware as a forum (none of the transactions or occurrences giving rise to the suit took place in Delaware, and none of the relevant fact or other witnesses reside in Delaware).[4]  As part of its choice of law analysis, Delaware will apply the procedural law of a foreign state when those procedures are inseparable from the substantive law in question.  Chaplake Holdings, Ltd. v. Chrysler Corp., 766 A.2d 1 (Del. 2001).  Given that VWoA's very right to remove the case and proceed in federal court is implicated by Plaintiff's Motion, the question of commencement should be determined by Washington law.

Under Washington law, an amended pleading adding a new party relates back only if the new claim arises out of the same transaction set forth in the original pleading and the plaintiff is able to show the new defendant (i) received notice of the action within the statute of limitations such that he or she is not prejudiced in defending on the merits, and (ii) knew or should have known that, but for mistaken identity[5], the plaintiff would have brought the action against him or her in the first instance.  If the complaint does not relate back, the lawsuit is deemed to have "commenced" when the new party is added.  In addition, the plaintiff must show the delay in adding the new party is not due to inexcusable neglect or a conscious decision, strategy, or tactic.  Stansfield v. Douglas County, 107 Wash. App. 20, 28-29, 26 P.3d 935 (2001), aff'd, 146 Wash.2d 116, 43 P.3d 498 (2002).  The inexcusable neglect rule must be satisfied in addition to the two requirements set forth above.  South Hollywood Hills Citizen Ass'n v. King County, 101 Wash.2d 68, 677 P.2d 114 (1984).

The Supreme Court of Washington has repeatedly adhered to the judicially imposed rule

---

[4] In pleadings filed in the Delaware Superior Court, Plaintiff has admitted that Washington law applies to this action.

[5] It should be noted that none of the 40 original defendants to the action are related to VWoA, or have confusingly similar names.  "Mistaken identity" is not an issue in this case.

that relation back is not allowed if the failure to include a party was due to inexcusable neglect if the identity of the late-joined party was readily ascertainable and the plaintiff nevertheless did not make them a defendant.  See, e.g., Teller v. APM Terminals, Inc., 134 Wash. App. 696, 142 P.3d 179 (2006).  For example, plaintiffs' neglect was held to be inexcusable in North Street Ass'n v. Olympia, 96 Wash.2d 359, 635 P.2d 721 (1981) because the plaintiffs were at all relevant times aware of the parties who should have been named in the initial lawsuit and yet still failed to name them  Id. at 368-69, 635 P.2d 721.  Similarly, in South Hollywood Hills Citizen Ass'n v. King County, 101 Wash.2d 68, 677 P.2d 114 (1984), the Court again found plaintiffs' failure to name proper parties in their initial Complaint was inexcusable due to the fact that the identity of the proper parties was readily available to the plaintiffs upon filing the Complaint.  Id. at 78, 677 P.2d at 120.  Likewise, in Tellinghuisen v. King County Council, 103 Wash.2d 221, 691 P.2d 575 (1984)  the Court again held that plaintiff's neglect in omitting the indispensable party parties was inexcusable (the identity of the omitted parties was a matter of public record and amendment relating back to date of original pleading was not permissible).

Inexcusable neglect exists when no reason for the initial failure to name the party exists.  Under Washington law, improper motives, bad faith, or an obvious "strategy" of delay are **not** required showings.  If the proper defendants are apparent, or are ascertainable upon a reasonable investigation, the failure to name them in the original complaint will be held inexcusable, and prevent the relation back of an amendment adding a new defendant (thus commencing a new action against that new defendant).  See Haberman v. Wash. Pub. Power Supply System, 109 Wash.2d 107, 744 P.2d 1032, 750 P.2d 254 (1997); Pub. Util. Dist. No. 1 v. Walbrook Ins. Co., 115 Wash.2d 339, 349, 797 P.2d 504 (1990).

Under these standards, Plaintiff's failure to name VWoA originally as a defendant was

**indisputably** the result of inexcusable neglect. Mr. and Mrs. Collins were the only parties to the initial lawsuit who knew (or should have known) that VWoA was a target of their claims. The record clearly shows that Plaintiffs knew the identity of VWoA as a potential party (and in fact, a "target defendant") prior to filing the initial Complaint (since Mr. Collins worked at a business that was a VWoA dealership). Plaintiff had in her possession Social Security Administration records that confirmed Mr. Collins' employment, and her counsel even marked them up to relate them to the "work history sheet" ("WHS") ***alleging asbestos exposure at that location***. See Exhibit B.

VWoA has already set forth a timeline demonstrating that the Plaintiff engaged in an intentional pattern of conduct designed to delay VWoA's entry into the lawsuit; certainly the legal standard of "inexcusable neglect" is satisfied by Plaintiff's deliberate actions. There can be no serious debate that failure to include VWoA when the original suit was filed was a conscious delay tactic by Plaintiff constituting "inexcusable neglect." Plaintiff should not be permitted to benefit any further from her tactics. Thus, Plaintiff's Amended Complaint does not relate back under Washington law.

(ii) Delaware Law

Even if Washington law is not applied, Delaware law also supports "commencement of the action" being measured from the date VWoA was added to the case. Like Washington, Delaware employs a "relation back" analysis to determine when an action "commences" against a party. See, e.g., Schott v. Hechinger Co., No. Civ. A. 96C-06-012, 1997 WL 358306 (Del. Super. Ct., Mar. 20, 1997) (commencement of an action is defined by use of the Rule 15 "relation back" standard); Mergenthaler v. Asbestos Corp. of North America, 500 A.2d 1357 (Del. Super. Ct. 1985) (same). Delaware Courts also recognize that inexcusable delay and

improper motives such as bad faith or dilatory tactics are appropriate factors to consider in

determining relation back or commencement of an action under Del. R. Civ. Pro. 15.  See Hess

v. Carmine, 396 A.2d 173, 177 (Del. Super. Ct. 1978) and Chrysler Corp. v. New Castle County,

464 A.2d 75 (Del. Super. Ct. 1983)

     Under Delaware law, an action will commence as of the filing of an amendment to add a

new party unless the amendment relates back to the original filing.   An amended pleading

adding a new party relates back only if the new claim arises out of the same transaction set forth

in the original pleading and the plaintiff is able to show the new defendant (i) has received such

notice of the action that the party will not be prejudiced in maintaining a defense on the merits

and (ii) knew or should have known that, but for a mistake concerning the identity of the proper

party, the action would have been brought against the party.  Del. R. Civ. Pro. 15 (c).  VWoA

was prejudiced in defending on the merits, as Mr. Collins was deceased and all discovery in the

case was conducted prior to VWoA being served with Plaintiff's Amended Complaint.  Mr.

Collins was deposed and died before VWoA was joined or served, so that VWoA never had, and

never will have, an opportunity to cross-examine him.  Furthermore, as there is no evidence that

there was some sort of mistake (as Mr. Collins certainly testified about alleged exposure to

VWoA products at his deposition), Plaintiff's Amended Complaint does not relate back under

Delaware law.

     Further, under Delaware law, an action is commenced only when "a plaintiff diligently

seeks to bring a defendant into court and subject him to jurisdiction."  Russell v. Olmedo, 275

A.2d 249 (Del. 1971); Criswell v. McFadden, No. Civ. A. 05-321, 2006 WL 435717 (D. Del.,

Feb. 23, 2006).  Here, the earliest Plaintiff made any efforts at all to pursue VWoA in court was

August of 2006 when the Motion to Amend was filed (although in fact the Plaintiff never

presented the Motion to a judge until two months later). However, this does not demonstrate diligence -- instead, it is further evidence of Plaintiff's pattern of delays and sharp practice. The general rule is that a motion to amend should be made as soon as the necessity for altering the pleading becomes apparent. Hess v. Carmine, 396 A.2d at 177. At the time the original Complaint was drafted, Plaintiff knew (and certainly should have known) that VWoA was a proper defendant. At the time of Mr. Collins' deposition, any doubts regarding actual knowledge versus neglect were moot. Thus, Plaintiffs and counsel strategically and deliberately waited until the close of discovery to serve VWoA with the Amended Complaint.

**(3) Plaintiff's Conduct Bolsters VWoA's Commencement Argument**

Plaintiff refers to the legislative history of the passage of the one-year bar, noting the House Report emphasized that it would prevent "removal after substantial progress has been made in state court." H.R.Rep. No. 889, at 72(1988), reprinted in 1988 U.S.C.C.A.N. 5982, 6032. However, substantial progress has **not** been made in state court: on the contrary, the late addition of VWoA has started the case anew, and Plaintiff's conduct therefore supports denial of her Motion for Remand; **no** progress has been made in this case. See, e.g., Saunders v. Wire Rope Corp., 777 F. Supp. 1281, 1285 (E.D. Va. 1991) ("[t]he purpose of the one year bar is to prevent removal where substantial progress on the case has been made in state court. It was not intended to destroy the right of removal for out of state defendants, which the Supreme Court has said is an important statutory right . . . . [Ruling that commencement starts with filing when plaintiff deliberately delayed service] is at odds with the intent of section 1446(b), which was designed to discourage delays and inefficiencies in litigation, not to promote them").

Plaintiff's tactic of not naming VWoA as an original defendant in the initial state action is, to put it mildly, curious. Every version of the Complaint, the answers to interrogatories and

Mr. Collins' own employment records allege that Mr. Collins was employed as a mechanic at Brewington Motors and Hanson Motors in Olympia, Washington from 1971 through 1085. Brewington Motors was, and Hanson Motors still is, an independently-owned Volkswagen dealership. Because Mr. Collins worked there for 14 years, Mr. and Mrs. Collins obviously knew this. Mr. Collins was in the best position to know the suppliers of the asbestos products he might have been exposed to over the course of his working career, including at the Volkswagen dealership. VWoA was not present at Mr. Collins' deposition because it was not a party to the case due to Plaintiff's own actions. VWoA was not made a party to the case until <u>3 months</u> after Mr. Collins died and the discovery period had elapsed, and was not served until <u>10 months</u> after the case against the other defendants had commenced. These delays made it impossible for VWoA to question Mr. Collins before his death, and have served to inordinately complicate this matter.

VWoA has forever lost the chance to cross-examine Mr. Collins, the most important and knowledgeable witness in this case. Mr. Collins' deposition was taken on August 10, 2006, at a time when he and his counsel clearly already knew[6] of his alleged exposures, but VWoA was not a party to the action. Thus, while he was actively identifying VWoA parts and materials as among those to which he had been exposed, VWoA was deprived of the opportunity to inquire and make a record to protect its interests. Plaintiff's counsel was even engaged in its own investigation of the dealership in Washington during the summer of 2006, interviewing co-workers to allegedly substantiate Mr. Collins' testimony -- nevertheless, VWoA was not added.

---

[6] Indeed, Mr. Collins knew of the alleged exposures from the outset, and his counsel knew of the alleged claims against VWoA at least from the time that Mr. Collins' work history was obtained and initial discovery responses were prepared. Further, the social security printouts obtained and provided with Supplemental Answers to Interrogatories demonstrate that Mr. Collins was employed by Brewington and Hanson, and this was additional information available to Plaintiff and not to defendants.

Now Plaintiff seeks to deprive VWoA of its right to remove the case to federal court.

Had VWoA been expeditiously joined in the state action, it might have had the opportunity to take a limited, supplemental deposition of Mr. Collins.  Because of Mr. Collins' death in late September of 2006, however, VWoA never had that opportunity.  Nor was VWoA given the opportunity to depose Mr. Collins' co-workers unearthed by Plaintiff's counsel in the summer of 2006.  This pattern of conduct by Plaintiff is significant; Plaintiff is now seeking a remand despite her own intentional delays, delays that may fairly be deemed an effort to prevent removal.  Plaintiff's delays have resulted in this case essentially "starting fresh" with VWoA as the sole remaining defendant – there has been no "substantial progress" as to VWoA.  This is made clearer by the fact that Plaintiff agreed to remove this case from the Delaware Superior Court's trial list expressly because of her own delays.  As a result, Congress' express purpose in creating the one year bar cannot be served by remanding this case, as no substantial progress with respect to litigation between Plaintiff and VWoA has been (or can be) stymied by the removal.  See Ardoine v. Stine Lumber Co., 298 F.Supp.2d 422 (W.D. La. 2003) ("Section 1446(b)'s one year bar on removal was enacted to prevent removal of a case wherein substantial progress had been made in state court.  Here, discovery has been proceeding apace in the state court (and here following removal), and numerous discovery rulings have been issued.  Yet, merit discovery has not commenced, the case has not been set for trial, and the class certification hearing has not been held.  Any discovery that has been conducted thus far, would be transferable here.  In sum, the congressional concerns behind the one year bar are not at issue here.  On the other hand, Plaintiffs' efforts to avoid removal to federal court, if successful, would undermine the purpose of diversity jurisdiction") (citations omitted).

**(b) If This Court Finds That One Year Has Passed Since Commencement of the Action, VWoA is Entitled to a 17 Day Equitable Exception Because of Plaintiff's Inequitable Conduct**

The analysis of state law discussed above, especially viewed in light of the Plaintiff's conduct, should end this Court's analysis. Nonetheless, if this Court determines that the one-year bar should begin upon filing of the initial action not naming VWoA, VWoA asserts that it is entitled to an equitable extension of 17 days.

The Third Circuit disagrees with Plaintiff's characterization of the one year bar set forth in 28 U.S.C. § 1446 (b) as "mandatory." In Ariel Land Owners, Inc. v. Dring, 351 F.3d 611 (3d Cir. 2003), the Court in fact held that the one-year requirement is procedural, not jurisdictional, and must be timely raised or the alleged defect is waived. Thus, the analysis is not as simple as reference to a "mandatory" provision; principles of equity and fairness must enter the analysis. See, e.g., Fed. R. Civ. Pro. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties").

Like the Third Circuit, the Fifth Circuit has held that the one-year bar of 28 U.S.C. § 1446 (b) is procedural, not jurisdictional. See, e.g., Barnes v. Westinghouse Elec. Corp., 962 F.2d 513, 516 (5th Cir. 1992). As a result, the Fifth Circuit has also recognized that, like any procedural ruling, the one-year bar is subject to equitable exceptions if the proper circumstances present themselves. See, e.g., Tedford v. Warner-Lambert Co., 327 F.3d 423, 426-27 (5th Cir. 2003) ("Congress may have intended to limit diversity jurisdiction, but it did not intend to allow plaintiffs to circumvent it altogether. Strict application of the one-year limit would encourage plaintiffs to join nondiverse defendants for 366 days simply to avoid federal court, thereby undermining the very purpose of diversity jurisdiction . . . . Where a plaintiff has attempted to manipulate the statutory rules for determining federal removal jurisdiction, thereby preventing the defendant from exercising its rights, equity may require that the one-year limit in § 1446(b)

be extended. The facts of this case present just such a circumstance"). As Plaintiff has clearly manipulated the court system for her own benefit and created the delays that are at issue here, equity should act to prevent her from arguing that a one year bar applies in this case.

While the Third Circuit has not yet addressed the issue of an equitable exception to the one-year bar, district courts within the Third Circuit have allowed for the possibility that an equitable exception could be granted under the right circumstances. See, e.g., Lee v. Carter-Reed Co., No. 06-CV-1173 (DMC), 2006 WL 3511160 (D.N.J., Dec. 5, 2006), reconsideration denied, 2007 WL 81893 (D.N.J., Jan. 9, 2007) ("Flowing from [the Ariel] decision, it appears that taking equitable exceptions to the one-year bar may be appropriate because, unlike jurisdictional bars, courts are free to take equitable exceptions to procedural bars;" equitable exception not warranted in the case because defendants failed to show any inequitable conduct); Stein v. Bayer Corp., No. Civ. 05-2476 (AET), 2005 WL 2000143 (D.N.J., Aug. 18, 2005) (although plaintiff deliberately modified his damages award after the one-year bar had passed, defendants were not entitled to an equitable exception because they could have determined the damages claim as soon as the case began under applicable New Jersey law).

Courts that have allowed for an equitable exception have done so when the delays are not the result of action taken by the removing defendant, and when in fact they are the result of the plaintiff's own manipulations of the system: See, e.g., Rauch v. Rauch, 446 F. Supp. 432 (D. So. Car. 2006) (plaintiff "hid the ball" to avoid removal by denying twice in removal proceedings that two diversity-destroying defendants were "sham defendants," and then voluntarily dismissing those same defendants after a year had lapsed; equitable exception was warranted). No Third Circuit district court has addressed the situation present here – a defendant being added in a case filed in an inconvenient forum, after discovery had been completed and the testifying

witness had died, even though the Plaintiff knew that the new defendant was going to be identified in his case-in-chief.  Simply put, the reason the removal of this case falls 1 year and 17 days after the original complaint was filed is due entirely to delays orchestrated by the Plaintiff and her counsel.  It is a long-standing principle in the Third Circuit and this Court that a party will not be permitted by a court of equity to take advantage of his own wrong. Carborundum Co. v. Electric Smelting & Aluminum Co., 203 F. 976 (3d Cir. 1913); Dimet Proprietary, Limited v. Industrial Metal Protectives, 109 F. Supp. 472 (D. Del. 1952).

Plaintiff's actions in this case are the **definition** of inequitable conduct and justify this Court in applying an equitable exception to prevent her from profiting from her improper conduct.

## VI.    CONCLUSION

In considering the equities of this case, this Court should recognize that the Plaintiff herself is the sole cause for any delays in the removal of this case.  That fact is indisputable and should form the basis of this Court's denial of Plaintiff's Motion.  Plaintiff has gamed the system by filing her case in an inconvenient forum, adding VWoA three months after her chief witness had died and discovery had concluded, and then settling with or dismissing all other defendants just after one year had passed.  VWoA has already been severely prejudiced by the loss of discovery of the decedent – VWoA should not be further prejudiced by allowing a 17 day lapse over one year when the case has not substantially progressed as to VWoA due to Plaintiff's own machinations of the system.

For all of the foregoing reasons, VWoA respectfully requests that Plaintiff's Motion to Remand be denied in all respects.

Dated: April 26, 2007

Respectfully submitted,

OBERMAYER REBMANN MAXWELL
& HIPPEL LLP

By: ___/s/ Steven T. Davis_______________

Steven T. Davis, Esquire (DE # 2731)
Obermayer Rebmann Maxwell &
Hippel, LLP
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806

Of Counsel:

Alice S. Johnston, Esquire
Obermayer Rebmann Maxwell &
Hippel, LLP
One Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

Robert E. Thackston, Esquire
Hawkins Parnell & Thackston, LLP
4514 Cole Avenue, Suite 550
Dallas, TX 75205

Attorneys for Defendant Volkswagen of
America, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MARY M. COLLINS, Individually and as Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS,

Plaintiff,

vs.

VOLKSWAGEN OF AMERICA, INC.,

Defendant.

1:07-cv-00149-***

**ORDER OF COURT**

On the ____ day of _______________, 2007, came before the Court Plaintiff's Motion to Remand. After reviewing the submissions and argument of the parties, the Court rules that Plaintiff's Motion to Remand is DENIED.

BY THE COURT:

_________________________________J.

**CERTIFICATE OF SERVICE**

I, Steven Davis, Esquire, hereby certify that on April 26, 2007, I caused a copy of Defendant Volkswagen of America, Inc.'s Answering Brief In Opposition to Plaintiff's Motion to Remand to be served upon Plaintiff's counsel.

OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

By: /s/ Steven T. Davis

Steven T. Davis, Esquire
Del. Bar No. 2731
3 Mill Road, Suite 306A
Wilmington, DE 19806
(215) 665-3128

Counsel for Defendant,
Volkswagen of America, Inc.

# EXHIBIT "A"

EFiled: Feb 28 2006 10:49AM EST
Transaction ID 10675089

**SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY : N K S CIVIL ACTION NUMBER:

CIVIL CASE CODE: ASB CIVIL CASE TYPE: Asbestos
(SEE REVERSE SIDE FOR CODE AND TYPE)

| | |
|---|---|
| Caption:<br>JAMES DANIEL COLLINS and MARY M. COLLINS<br><br>Plaintiffs,<br>v.<br>METROPOLITAN LIFE INSURANCE COMPANY, et al.<br><br>Defendants. | Name and Status of Party filing document:<br>Plaintiff<br>Document Type: (E.G. COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>ORIGINAL COMPLAINT<br>Non-Arbitration x eFile x<br>(CERTIFICATE OF VALUE MAY BE REQUIRED)<br>Arbitration ___ Mediation ___ Neutral Assessment ___<br>DEFENDANT (Circle one) **ACCEPT** **REJECT**<br>JURY DEMAND x YES ___ NO<br>TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE)<br>EXPEDITED STANDARD **COMPLEX** |
| ATTORNEY NAME(S):<br>Thomas C. Crumplar<br>ATTORNEY ID(S):<br>DE BAR ID#0942<br>FIRM NAME:<br>Jacobs & Crumplar, P.A.<br>ADDRESS:<br>2 East 7th Street<br>P. O. Box 1271<br>Wilmington, DE 19899<br>TELEPHONE NUMBER:<br>(302) 656-5445<br>FAX NUMBER:<br>(302) 656-5875<br>E-MAIL ADDRESS: | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS<br><br>EXPLAIN THE RELATIONSHIP(S):<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

EFiled: Feb 28 2006 10:49AM EST
Transaction ID 10675089

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY;<br><br>FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);<br><br>GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);<br><br>KELLY-MOORE PAINT COMPANY, INC.;<br><br>AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);<br><br>CERTAINTEED CORPORATION;<br><br>OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);<br><br>ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS);<br><br>GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.);<br><br>AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION); | : | C.A. No.<br><br>COMPLAINT<br><br>NON-ARBITRATION<br><br>ASBESTOS<br><br>JURY TRIAL DEMANDED |

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION); :

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION); :

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION); :

UNION CARBIDE CORPORATION; :

DANA CORPORATION; :

CRANE COMPANY; :

INGERSOLL-RAND COMPANY; :

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY); :

3M COMPANY (individually and f/k/a MINNESOTA, MINING, AND MANUFACTURING COMPANY, a/k/a "3M"); :

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY); :

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC); :

KAISER GYPSUM COMPANY, INC.; :

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION);

THE GOODYEAR TIRE & RUBBER COMPANY;

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION);

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNUEMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.;

Defendants.

**COUNT I**

1. Plaintiff, JAMES DANIEL COLLINS, was wrongfully exposed to asbestos, an inherently dangerous toxic substance while employed at the following places:

(a) Plaintiff JAMES DANIEL COLLINS was exposed thru his father, James Collins, from his father's work at Fort Lewis where he worked from

1947-1965; and 1967-1967 as a heating and cooling specialist in Fort Lewis, WA.

(b)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at personal residences from 1950-1952.

(c)    Plaintiff JAMES DANIEL COLLINS performed mechanic jobs at personal residences from 1964-2005.

(d)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at residential sites in Olympia, Washington in 1977.

(e)    Plaintiff JAMES DANIEL COLLINS worked at a salvage yard in Tumwater, Washington in1965.

(f)    Plaintiff JAMES DANIEL COLLINS attended Clover Park Vocational School in Tacoma, Washington from 1967-1969 as a student.

(g)    Plaintiff JAMES DANIEL COLLINS worked at America Oil Service Station in Tacoma, Washington from 1968-1969 as a laborer and light mechanic.

(h)    Plaintiff JAMES DANIEL COLLINS worked at Brewington Motors in Olympia, Washington as a mechanic from 1971-1976.

(i)    Plaintiff JAMES DANIEL COLLINS worked at South Puget Sound Community College in Olympia, Washington from 1985-2005 as an instructor.

(j)    Plaintiff JAMES DANIEL COLLINS worked at Hanson Motors in Olympia, Washington from 1976-1985 as a mechanic.

(k)    Plaintiff JAMES DANIEL COLLINS was employed by Collins Automotive Enterprises where he worked at personal residences in Olympia, Washington from 1975-1976 as a mechanic.

Plaintiff was exposed to asbestos and/or asbestos-containing products which were mixed, mined, manufactured, distributed, sold, removed, installed and/or used by the Defendants.

2. As a result of the Defendants' wrongful conduct, Plaintiff, JAMES DANIEL COLLINS developed the following asbestos related diseases and health problems:

Mesothelioma;

and other asbestos-related injuries and diseases.

3. As a result of Defendants wrongful conduct which caused Plaintiff, JAMES DANIEL COLLINS's asbestos related diseases and health problems, Plaintiffs, JAMES DANIEL COLLINS and MARY M. COLLINS suffer extensive mental anguish, pain and suffering, medical bills, physical impairment, permanent disability, loss of earning capacity, loss of consortium and loss of enjoyment of life, all of which are recoverable under applicable law. In addition, Plaintiff(s) MARY M. COLLINS has suffered extensive mental anguish and has been and will continue to be deprived of pecuniary benefits, contributions of support and household services, all of which are recoverable under applicable law.

4. The above injuries have or will in the future result in a decrease of past or future earnings and various other past and future expenses Plaintiff would not have otherwise incurred.

**COUNT II**

5. The allegations in paragraph one (1) through four (4) are realleged and incorporated by reference within this Count.

6. FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);

ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS);

GARLOCK SEALING TECHNOLOGIES, LLC (individually and as a successor-in-interest to GARLOCK, INC.);

AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION);

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY);

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC);

KAISER GYPSUM COMPANY, INC.;

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION);

THE GOODYEAR TIRE & RUBBER COMPANY;

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION);

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNUEMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.;

were at all times pertinent directly or indirectly engaged in the mining, manufacturing, distribution, sales, licensing, leasing, installation, removal and/or use of asbestos and asbestos-containing products. They were also engaged in the development, manufacture, distribution, sales, licensing or leasing of equipment procedures and/or technology necessary to mine, manufacture, sell, distribute, install, remove and the use of asbestos and asbestos-containing products.

7. Defendant Metropolitan Life Insurance Company, as well as other members of the asbestos industry, including but not limited to Defendants listed herein, engaged in investigations and research as to the hazards of asbestos and often edited out material harmful to the asbestos industry and only published certain portions of their findings and/or refrained from publishing anything. Furthermore, Metropolitan Life financially aided the asbestos industry in its endeavors.

8. The illnesses and disabilities of Plaintiff is a direct and proximate result of 3M's negligence in placing into the stream of commerce respiratory devices defective in design and inadequate for the purposes for which they were intended, namely preventing the inhalation of dust, including asbestos dust, generated from construction and/or insulation activities.

9. 3M knew or should have known that workers would use and rely upon 3M's respiratory devices at sites where asbestos materials were commonly and extensively used which created substantial and constant quantities of dust and that 3M's respiratory devices would provide inadequate protection against the inhalation of asbestos dust.

10. Furthermore, 3M was negligent for failing to warn and/or properly instruct workers regarding the inadequacies of its respiratory devices for preventing the inhalation of asbestos dust.

11. As a direct and proximate result of the above wrongful activities of the Defendants, Plaintiff was exposed to asbestos and the Plaintiff developed the asbestos-related diseases discussed and sustained the injuries described herein.

**COUNT III**

12. The allegations in paragraphs One (1) through Eleven (11) are realleged and incorporated by reference within this Count.

13. The Defendants were negligent in conducting the above activities and/or in the safety conditions at their plants and facilities in that despite the fact that the Defendants knew or should have known that asbestos exposure could result in serious injury, disease and/or death they:

(a) Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;

(b) Failed to adequately warn all the potential victims of asbestos including the Plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos;

(c) Failed to adequately test, research investigate asbestos and/or its effects prior to sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d) Failed to adequately package, distribute and/or use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff and others similarly situated;

(e) Failed to take adequate steps to remedy the above failure, including but not limited to recall of asbestos, abatement of asbestos on their property, recall of asbestos products, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

14. As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT IV**

15. The allegations in paragraphs one (1) through Fourteen (14) are realleged and incorporated by reference within this Count.

16. The Defendants willfully and wantonly for their own economic gain and with reckless indifference to the health and safety of the Plaintiff and others similarly situated:

(a) Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;

(b) Failed to adequately warn all the potential victims of asbestos including the Plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos exposure;

(c) Failed to adequately test, research and investigate asbestos and/or its effects prior to sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d) Failed to adequately package, distribute and use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff and others similarly situated;

(e) Failed to take adequate steps to remedy the above failure, including but not limited to recall asbestos and asbestos products, to abate asbestos on their property, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

17. As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT V**

18. The allegations in paragraphs one (1) through Seventeen (17) are realleged and incorporated by reference within this Count.

19. Asbestos and asbestos-containing products are inherently dangerous and as such all Defendants who made or sold asbestos or the equipment, processes or other things necessary for its use, are strictly liable to the Plaintiff for all injuries and damages which were contracted thereby.

20. All Defendants who assisted, directly or indirectly, in the leasing or licensing of asbestos and all equipment necessary for its use are strictly liable to the Plaintiff for all the injuries and damages which were contracted thereby.

21. The handling of asbestos packages, installation, removal and use of asbestos is an ultrahazardous activity and all Defendants who assisted directly or indirectly in this are strictly liable for the Plaintiff injuries which were caused thereby.

22. The Defendant manufacturers and suppliers warranted the asbestos products for their intended purpose and use. Defendants violated this warranty as the product was neither packaged nor provided in a method proper for its intended use and are strictly liable to the Plaintiff for all injuries caused thereby.

23. As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT VI**

24. The allegations in paragraphs One (1) through Twenty-three (23) are realleged and incorporated by reference within this Count.

25. The Defendants knowing of significant risks of health hazards resulting from exposure to asbestos, did willfully, wantonly, recklessly and/or intentionally;

(a) Conceal the existence, nature and extent of that risk; and,

(b) Failed to disclose the existence, nature and extent of that risk to Plaintiff and those similarly situated.

26. The Defendants had reason to expect that Plaintiff, whose injuries were caused by his exposure, was within the class of persons whose actions or inaction would-be materially affected by the aforementioned concealment and nondisclosure.

27. As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT VII**

28. The allegations in paragraphs one (1) through Twenty-seven (27) are realleged and incorporated by reference within this Count.

29. The Defendant directly and indirectly materially misrepresented that asbestos was not hazardous and/or could be used safely when they:

(a) Had no adequate basis for such representations;

(b) Knew that a significant health hazard to human life existed from asbestos.

30. Defendants had reason to expect that as a result of such representation, Plaintiff and others similarly situated would be exposed to asbestos.

31. As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

**COUNT VIII**

32. The allegations in paragraphs One (1) through Thirty-one (31) are realleged and incorporated by reference within this Count.

33. The Defendants knowingly and wilfully conspired among themselves to perpetuate the actions and omissions referred to herein as well as aided and abided their co-Defendants and manufacturers of asbestos products in keeping the Plaintiff and others similarly situated ignorant of the risks they faced when exposed to asbestos and asbestos containing products.

34.    As a result of this conspiracy, the Plaintiff was exposed to asbestos and suffered the injuries complained of herein.

## COUNT IX

35.    The allegations in paragraphs One (1) through Thirty-four (34) are realleged and incorporated by reference within this Count.

36.    Even after the dangers of asbestos finally began to be known to Plaintiff or others similarly situated, Defendants continued to act wrongfully both individually and together in a conspiracy to mislead and misrepresent the extent of the past wrongful actions and omissions and to destroy records and hide witnesses and other evidence and to such other wrongful and unnecessary action so as to:

(a)    Prevent and delay Plaintiff and others similarly situated from filing legal action to recover for these injuries and/or;

(b)    Defeat and/or delay such legal actions and the final collection of any judgment.

37.    Similarly, Defendants aided and abided the manufacturers, miners, suppliers, and users of asbestos and asbestos products in keeping the true dangers of asbestos exposure secret and/or misrepresented.

38.    As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

## COUNT X

39.    The allegations in paragraphs One (1) through Thirty-eight (38) are realleged and incorporated by reference within this Count.

40.    Plaintiff used a respiratory device designed and manufactured by 3M, commonly known as a "dust mask." Plaintiff would show that the defective condition of such respiratory devices rendered them unreasonably dangerous for use as devices for protection against the

inhalation of asbestos dust and fibers. Plaintiff would further show that the respiratory devices were in a defective condition at the time that they left the hands of the Defendant, 3M.

41. Defendant 3M was engaged in the business of manufacturing and selling respiratory devices, commonly known as dust masks, and these products, without substantial change in the condition in which they were sold, were a proximate cause of the injuries of Plaintiff.

42. Defendant 3M knew that its respiratory device would be used without inspection for defects and, by placing them on the market, represented that they would safely preclude the inhalation of asbestos fibers.

43. Plaintiff was unaware of the defects in the 3M respiratory devices which rendered them ineffective as protection against the inhalation of asbestos dust.

44. During the periods Plaintiff used and relied upon Defendant's respiratory devices, the devices were utilized in a manner for which they were intended to be used.

45. As a direct and proximate result of the above acts and omissions of Defendants, Plainitiff was injured as described herein.

**COUNT XI**

46. The allegations in paragraphs One (1) through Forty- five (45) are realleged and incorporated by reference within this Count.

47. Plaintiff, JAMES DANIEL COLLINS, would show that for a period of many years, **(he/she)** worked with and/or was exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products in the household setting as a result of Plaintiff, JAMES DANIEL COLLINS', father working in various shipyards, steel mills, refineries, paper mills, chemical plants and/or other facilities in the United States. Plaintiff, JAMES DANIEL COLLINS, would show that he has been exposed, on numerous occasions, to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products produced and/or sold by Defendants and, in so doing, has inhaled great

quantities of asbestos fibers. Further, Plaintiff, JAMES DANIEL COLLINS, alleges, as more specifically set out below, that he has suffered injuries proximately caused by his exposure to asbestos-containing products designed, manufactured and sold by Defendants.

48.    Plaintiff, JAMES DANIEL COLLINS, alleges that he was exposed to asbestos fibers and dust emanating from the work clothing, body and hair of Plaintiff, JAMES DANIEL COLLINS' father originated from the asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products manufactured, sold, and/or distributed by Defendants. Plaintiff, JAMES DANIEL COLLINS, was exposed to the asbestos dust and fibers brought home by Plaintiff, JAMES DANIEL COLLINS', father in the normal course of performing household activities, such as shaking out and laundering work clothing. In that each exposure to such products caused or contributed to Plaintiff, JAMES DANIEL COLLINS' injuries, Plaintiff, JAMES DANIEL COLLINS, says that the doctrine of joint and several liability should be extended to apply to each Defendant herein.

WHEREFORE, Plaintiffs demand judgment against each of the Defendants jointly and severally for such sums, including, but not limited to prejudgment and postjudement interest, as would be necessary to compensate the Plaintiffs for the injuries they have and will suffer.

Plaintiffs further demand judgment against each of the Defendants for punitive damages.

Plaintiffs further demand payment by each of the Defendants jointly and severally of the costs and attorney fees of this action.

Plaintiffs further demand payment by each Defendant jointly and severally of interest on the above and such other relief as the Court deems just.

**JACOBS & CRUMPLAR, P.A.**

By: */s/ David A. Arndt, Esquire*
David A. Arndt #3925
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date: February 27, 2006

# EXHIBIT "B"

EFiled: May 26 2006 3:55PM EDT
Transaction ID 11387064

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS, :
Plaintiffs, :
v. : C.A. No. 06C-02-281 ASB
METROPOLITAN LIFE INSURANCE COMPANY; :
Defendants. :

PLAINTIFFS' ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS
BY ALL DEFENDANTS AND RESPONSE TO REQUEST FOR PRODUCTION

**Preamble**

Counsel for Plaintiffs has provided and/or will provide all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are also available for review at Plaintiffs' Counsel's office.

**A. Personal History**

1. State all names by which you have been known; the date and place of your birth; occupation; social security number; height; weight; color of hair and eyes; and the number of any motor vehicle operator's license held in the State of Delaware or any other state.

ANSWER:

| | |
|---|---|
| Name: | James Daniel Collins |
| Date of Birth: | April 2, 1947 |
| Place of Birth: | Olympia, Washington |
| Occupation: | Professor and Automotive Technology |
| Social Security No.: | 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 |
| Height: | 6' |
| Weight: | 145 lbs. |
| Hair: | Brown |
| Eyes: | Hazel |
| Driver's License: | COLLIJD538JB |

2. State the address of each place of residence that you have occupied from 1936 to date.

| ANSWER: | 1975 to present: | 1904 Yew Avenue, Northeast<br>Olympia, Washington 98506 |
|---|---|---|
| | 1972 to 1975: | Detrays Mobile Home Park<br>Olympia, Washington |
| | 1969 to 1972: | 8903 Lawndale Avenue<br>Pierce, Washington |
| | 1954 to 1969: | 3650 Pacific Avenue<br>Olympia, Washington |
| | 1947 to 1954: | Olympia, Washington |

3. Are you married? If yes, please state the name and present address of your spouse.

ANSWER: Mary Collins, 1904 Yew Avenue, Northeast, Olympia, Washington 98506

4. If you have had any previous marriages, please state the name of any former spouse, and state the date, place and circumstances under which the marriage or marriages were dissolved or terminated.

ANSWER: Not applicable.

5. Please state the name, ages and present address of your children.

Name: Christopher Scott Collins
Age: 31
Address: 1824 Cadborogh Lane
Dupont, Washington 98327

Name: Cynthia Roe Martin
Age: 30
Address: 2306 State Avenue Northeast
Olympia, Washington

6. If you have ever been a member of the Armed Forces of the United States, state the following:

(a) The branch of the service, serial number, and highest rank held;

(b) The beginning and ending dates of your military services;

(c) The type of discharge that you received;

(d) Whether you were given a physical examination which included x-rays prior to the time you entered the service;

        (e)  Whether you received any injury while in the
military services; and
        (f)  Whether you have claimed disability for any injury
or physical condition arising out of your military service.

ANSWER:    (a)  United States Army, 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, E-4

           (b)  1969 to 1971

           (c)  Honorable

           (d)  Yes

           (e)  No

           (f)  No

    7.    If you have had a claim arising out of your military
service, state the date on which the claim was made, the nature
of the claim, the claimed disability and the disability rating,
if any, which you were given.

ANSWER:    Not applicable.

    8.    If you have ever been convicted of a felony or a crime
involving dishonesty, state fully and in detail the date, place
and nature of each such felony conviction.

ANSWER:    Plaintiff objects to this interrogatory as being beyond
the scope of discovery, irrelevant and not reasonably calculated
to lead to the discovery of admissible evidence.  Without waiver
of, and subject to, such objections, Plaintiff states he has not
been convicted of a felony or crime involving moral turpitude
within the last ten years.

    9.    Give a brief summary of your education, including
schools attended and the last year completed.

ANSWER:    Plaintiff completed the twelfth (12th) grade in 1965.
Plaintiff also attended Clover Park Trade School from 1967 to
1968 where he received his certificate and Walla Walla College
from 1965 to 1966 for predental.

**B.    Employment Background**

    10.    State the names and address of each employer for whom
you worked during the years 1936 to date, stating as to each such
employer the beginning and ending dates of employment, the nature
of the business, the name and address of your direct supervisor,
and your particular job function.

ANSWER: Plaintiff objects to providing the name and address of every direct supervisor at each site where Plaintiff worked as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving that objection, see Plaintiff's Work History Sheets, Exhibit K, provided to lead defense counsel, and Plaintiff's Social Security Printout, Exhibit L, provided to lead defense counsel. See also Exhibit R, which will be provided to lead defense counsel. Plaintiff advised that due to the lengthy time he was exposed to asbestos, the information contained herein may not be complete. Plaintiff at this time, however, reserves the right to amend or supplement these Answers to Interrogatories at a later date.

**C. Product I.D. and Exposure History**

11. With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each defendant.

(a) The name of the product or products;

(b) The name of your employer at the time you worked with or around such product;

(c) The name and address of the plant where you worked with or around such products;

(d) The name and last known address of your immediate supervisor or job superintendent on such job;

(e) The name and last known address of all persons with whom you worked on such jobs; and,

(f) The approximate length of time that you worked on each such job.

ANSWER: (a) Plaintiff objects to providing the name and address of every direct supervisor at each site where Plaintiff worked as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving that objection, see Plaintiff's Work History Sheets, Exhibit K, provided to lead defense counsel, and Plaintiff's Social Security Printout, Exhibit L, provided to lead defense counsel. Plaintiff advised that due to the lengthy time he was exposed to asbestos, the information contained herein may not be complete. Plaintiff at this time, however, reserves the right to amend or supplement these Answers to Interrogatories at a later date.

Plaintiff may have used and/or been exposed to the asbestos products identified by co-workers as detailed in Exhibit R, which will be provided to lead defense counsel. Additionally, the information contained in the following exhibits which indicate products that may have been at Plaintiff's worksite and to which Plaintiff may have been exposed may be

relevant in this case.  These exhibits are incorporated into this
answer: Exhibits A, E-1, E-2, and E-3 for Haveg and Exhibits A-1
and E attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB-2,
Exhibits Attached To The Answers To Standard Interrogatory No. 12
Directed To All Plaintiffs By All Defendants, filed on 5/09/91
and all subsequent and/or future amendments and supplements filed
thereafter.  Additional copies of the above Exhibits will be
provided upon specific request.

        (b)-(d)    See answer to Interrogatory Nos. 10 and
11(a);

        (e)    There were many people who worked with Plaintiff
at his job sites.  At this time, Plaintiff specifically recalls
working with the individuals listed on Plaintiff's Work History
Sheet, Exhibit K, provided to lead defense counsel.  Plaintiff
also worked with and/or around the co-workers identified in
Exhibit R, which will be provided to lead defense counsel.

        (f)    See answer to Interrogatory Nos. 10 and 11(a).

    12.    State fully and in detail each and every evidentiary
fact upon which the alleged negligence or alleged liability of
each defendant is based.  As to each such fact, state:
        (a)    The identities, including names, business
addresses, residential address, of each individual having
knowledge of those facts;
        (b)    Identify each document which supports or tends to
support the existence of such fact.  Identify the document by
briefly describing it, and by stating its present location and
the name and full business address of the present custodian of
the document.

ANSWER:    Plaintiff objects to this interrogatory as overly broad
and burdensome.  Without waiver of, and subject to, said
objection, Plaintiff provides the following: Plaintiff does not
undertake to list "each and every evidentiary fact" but only
those ascertained to date, and even those only can be given in
general.

        Evidence will be given by Plaintiff and parties,
including defendants' employees previously identified, as to the
conditions of the work areas where Plaintiff was employed, the
lack of safety or respiratory devices for asbestos at Plaintiff's
work sites and the types of work performed by Plaintiff.  Facts
will be introduced through testimony as well as through the use
of prior Court decisions with regard to the state of knowledge
available to the defendants concerning asbestos.  Facts will be
introduced concerning lack of warning to Plaintiff by any
defendant although each defendant had knowledge of the dangers of

exposure to asbestos.  Facts will be introduced on the ability of
defendants to manufacture non-asbestos products for insulation
use.  Exhibits and testimony regarding the safety precautions and
the treatment by defendants of their own plants, work sites and
employees will be relied upon.  Invoices showing the delivery and
sale of asbestos products and insulation to and by the various
defendants will be used to prove Plaintiff's exposure to
asbestos.  Testimony of his co-workers will be used by his
attorneys to further prove product use and his exposure to these
products.

        For additional facts and identification of witnesses
and documents, Plaintiff refers and incorporates into the answers
herein the following Exhibits attached to IN RE: ASBESTOS
LITIGATION, C.A. NO. 77C-ASB-2, Exhibits Attached To The Answers
To Standard Interrogatory No. 12 Directed To All Plaintiffs By
All Defendants, filed on 5/09/91 and supplemented on 1/14/93 and
all subsequent and/or future amendments and supplements filed
thereafter, including but not limited to the Amendment to
Exhibit C filed on December 6, 1994 and Exhibit C supplemented on
2/20/96 and all supplements; and Updated Exhibit D filed on
March 27, 1996 and supplemented on March 13, 1997 and all
supplements.

Exh. A    Not applicable

Exh. A-1  Not applicable

Exh. B    Not applicable

Exh. C    List of depositions

Exh. D    List of experts

Exh. E    Not applicable.

Exh. E-1  Not applicable.

Exh. E-2  Not applicable.

Exh. E-3  Not applicable.

Exh. G    Facts Regarding Conspiracy and Punitive Damages will be
          provided to lead defense counsel.

          Additionally, please refer to the following Exhibits
which are attached hereto or will be provided:

Exh. J    Copy of Plaintiff's Worker's Compensation Petition -
          Not applicable.

Exh. K    Work History Sheet(s) have been provided to lead
          defense counsel.

Exh. L    Social Security Printout has been provided to lead
          defense counsel.

Exh. M    Tobacco Questionnaire has been provided to lead defense
          counsel.

Exh. N    List of Physicians has been provided to lead defense
          counsel.

Exh. O    List of Hospitalizations has been provided to lead
          defense counsel.

Exh. P    Medical Expert Report(s) have been provided to lead
          defense counsel.

Exh. Q    Authorization(s) have been provided to lead defense
          counsel.

Exh. R    Pretrial-Identification of products by co-workers at
          Plaintiff's jobsites and loss of consortium witnesses
          will be provided to lead defense counsel.

          (Additional copies of the above Exhibits will be
provided upon request)

          In addition, please refer to Plaintiffs' Master Exhibit
List updated in September, 1990 and all subsequent amendments and
supplements thereto and Plaintiffs' Updated Trial Exhibit List
filed on December 5, 1994 and all supplements filed or to be
filed.

          (a)  Please refer to Interrogatory No. 63.

          (b)  Medical records have been produced.  Invoices
showing delivery of products to work sites have been made
available for inspection and copying.  The Master Exhibit List
updated in September, 1990 and all supplements have been provided
to all defendants.  Plaintiff also will use all items provided by
Hercules/Haveg in boxes by their attorney.  Additional exhibits
will continue to be added to the existing list of documents as
they may be provided by various defendants.  Plaintiff's counsel
intends to use all the documents filed in-the past, as well as
subsequent new documents that will be filed in all other cases,
against the defendants in this case, unless advised otherwise
prior to trial.  For discovery purposes, defendants should be
aware of all documents.

Plaintiff also will show that each defendant is liable for the tortious injury to Plaintiff caused by its co-conspirators' products.  See Exhibit G, which will be provided to lead defense counsel.

13.  For each asbestos containing product, material or mineral, manufactured, produced, prepared, distributed or sold by each defendant, state in detail for each such defendant:
(a)  Which such product, material compound, etc. (hereinafter referred to as "product") you claimed to have come into contact with at any time from 1936 to the present;
(b)  Describe separately and in detail each such product as fully as possible including the trade name, product type and product contents;
(c)  The dates on which you came into contact with each such product, as listed in your answer to subpart (a) of this interrogatory, and state with which product or products you came into contact with on each such date;
(d)  The name, address and telephone number of your employer and each date listed in subpart (c) above;
(e)  The name, address and location of your place of employment or job site on each date listed in subpart (c) above;
(f)  The address of your residence on each date listed in subpart (c) above;
(g)  The type of work you were performing on each such date set forth in subpart (c) above;
(h)  The present name, business address and telephone number, and residence address and telephone number of each person who witnessed your work on each date set forth in subpart (c) above;
(i)  All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instruction sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;
(j)  Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;
(k)  For what purpose you used each such product listed in your answer to subpart (a) above; and,
(l)  All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory.  Include in your answer the subject matter, document title and publication date of all such literature.

ANSWER:    (a)  See the answers to Interrogatory Nos. 10, 11(a) and 12;

(b)   See (a) above;

(c)-(e)   See answer to Interrogatory Nos. 10 and 11(a), and any depositions taken or to be taken in this matter;

(f)   See answer to Interrogatory Nos. 2 and 11(a);

(g)   See answer to Interrogatory Nos. 10 and 11(a), and any depositions taken or to be taken in this matter;

(h)   See answers to Interrogatory Nos. 10, 11 and 12;

(i)   Plaintiff recalls seeing warnings on or about 1976;

(j)   Plaintiff does not recall any instructions or warnings given by employer(s) concerning specific asbestos products;

(k)   See answer to Interrogatory Nos. 10 and 11(a), and any depositions taken or to be taken in this matter; and,

(l)   Objected to as being an invasion of attorney work-product doctrine, unduly burdensome, overly vague and not intended to lead to the discovery of admissible evidence. Without waiving, and subject to, these objections, Plaintiff states that brochures in the possession of Plaintiff's attorney can be viewed at his attorney's office at a mutually agreed upon time.  Please see Plaintiff's Exhibit List and any supplements thereto for each defendant.

14.  In regard to each and every other defendant named or to be named in this lawsuit, answer and provide all the information requested in Interrogatory No. 13 accordingly.

ANSWER:   See answer to Interrogatory No. 13.

15.  Did you ever work with or come in contact with asbestos products manufactured, sold, etc., by any other entity not named as a defendant in this lawsuit? If yes, identify each such entity and, with regard to same, answer fully and provide the information requested in Interrogatory No. 13 accordingly.

ANSWER:   See answer to Interrogatory No. 17.

16.  With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:
(a)   The name and address of the employer for whom you worked;

      (b)  The location of each job (stating the plant site, city, county and state);
      (c)  The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

ANSWER:  See answers to Interrogatory Nos. 10 and 11, and any and all depositions taken or to be taken in this matter.

    17.  Are you able to state that you have not worked with or around asbestos products manufactured by companies who are not named defendants in this suit?

ANSWER:  To the best of Plaintiff's knowledge and belief, Plaintiff has not worked with or around asbestos products manufactured by companies who are not named as defendants in this suit, other than those entities that have sought protection under the United States Bankruptcy Laws.  Plaintiff understands his attorneys may be able to prove exposure to products of certain companies which have sought the protection of the United States Bankruptcy laws which Plaintiff's attorneys inform him include Johns Manville, Keene, 48 Insulations, Amatex, Pacor, Unarco, Raybestos Manhattan, Delaware Insulation, Nicolet, Carey Canada, Eagle Picher, Celotex, H.K.Porter/Southern, Owens Corning, W. R. Grace, Pittsburgh Corning, and Armstrong World Industries. Additionally, Fibreboard Corporation has not been named as a defendant, due to the Court's Order granting injunctive relief in the Ahern class action, Ahern v. Fibreboard Corporation, C.A. No. 6:93CV526, U.S. District Court for the Eastern District of Texas.

    Also, see list of products Plaintiff recalls in Interrogatory Nos. 10 and 11(a) and the list identified by Plaintiff's attorneys as exhibits prepared by the attorneys.

    18.  Please list all past employers in whose employ you came into contact with asbestos or asbestos-containing materials. Include in your answer for each such employer:
      (a)  Name, address and telephone number;
      (b)  Job title and work description;
      (c)  Type and identity of each such asbestos material with which you had contact;
      (d)  Whether employer provided safety equipment so as to reduce or prevent harmful exposure to asbestos materials;
      (e)  Whether employer required that employees use safety equipment of the type referred to in subpart (d) above;
      (f)  Whether employer ever recommended that such safety equipment be used by its employees;
      (g)  Whether employer provided showers for employees;
      (h)  Whether employer provided separate lockers for both work and personal clothing; and,

       (i) If company-sponsored physical examinations were required or made available. If so, please state:

(i) Whether required or optional;

(ii) Frequency of examination;

(iii) Nature and extent of examination;

(iv) Whether x-ray examination or respiratory or pulmonary examinations were included;

(v) Frequency with which you submitted to such examination when required or made available;

(vi) Your detailed reason for failing to submit to such examination when required or made available;

(vii) Results of each such examination; and,

(viii) Name, address and telephone number of examining physician, nurse or technician.

ANSWER: (a)-(b)See answer to Interrogatory No. 10.

(c) See answers to Interrogatory Nos. 10, 11(a) and 12, and any and all depositions taken or to be taken in this matter.

(d) No

(e) No

(f) No

(g) No

(h) No

(i) No

(i) Not applicable

(ii) Not applicable

(iii) Not applicable

(iv) Not applicable

(v) Not applicable

(vi) Not applicable

(vii) Not applicable

(viii) Not applicable

19. Were you ever employed where your duties involved the tearing out of insulation which contained asbestos? If your answer is in the affirmative, please state for each such employment:

(a) Name, address and telephone number of employer;
(b) Name and location of job site;
(c) Dates of such employment period;
(d) Detailed job description and description of work methods and techniques; and,
(e) Whether or not respiratory safety equipment was:
(i) Required;
(ii) Made available to you; or
(iii) Recommended by employer.

ANSWER: (a) Plaintiff does not recall

(b) Plaintiff does not recall

(c) Plaintiff does not recall

(d) Plaintiff does not recall

(e) Plaintiff does not recall

(i) Plaintiff does not recall

(ii) Plaintiff does not recall

(iii) Plaintiff does not recall

20. Have you at any time during your lifetime ever used any device to reduce your possible exposure to, or inhalation of, asbestos dust or fiber? If your answer is in the affirmative, please state for each such device:

(a) The make, model and type;
(b) From whom it was received;
(c) Company or employer requirements regarding use of such device;
(d) Company or employer recommendations regarding use of such device;
(e) Name, address and telephone number of document title, date and description of the source of such requirement or recommendation;
(f) Date and time of each period of use of such device; and,
(g) If you will do so without a motion to produce, please attach a copy of each writing which evidences the requirements or recommendations referred to in subparts (c) and (d) of this interrogatory.

ANSWER:    (a)  Paper mask

            (b)  Personal

            (c)  No

            (d)  No

            (e)  Plaintiff does not recall

            (f)  Late 1970's to 1985

            (g)  Not applicable

21. Did any of your employers ever suggest or recommend that you might or should use any device to reduce your possible exposure to or inhalation of asbestos dust or fibers? If your answer is in the affirmative, please state for each and every such employer:
(a) Name, address and telephone number;
(b) The date, time and place when each such suggestion or recommendation was made;
(c) The name, address and telephone number of each person present when such suggestion or recommendation was made to or received by you;
(d) The name, address and telephone number of each person receiving same or similar suggestion or recommendation;
(e) The exact wording and content of such suggestion or recommendation;
(f) Whether such suggestion or-recommendation was written or oral, and;
(i) If written, please identify in detail each such writing; and,
(ii) If oral, please set forth all persons involved and details as to the manner in which each such suggestion or recommendation was presented.
(g) The type, make and model of-each device referred to in each such suggestion or recommendation;
(h) The nature of any action, if any, taken by you in response to each such suggestion; and,
(i) Describe in detail your reasons for any response to such suggestions or recommendations other than full compliance thereto.

ANSWER:  No.

22. At any time, did you receive, have knowledge of, or possess any advice, publication, warning, order, directive, requirement or recommendation, written or oral, which purported to:

(a) Warn or advise you of the possible harmful effects of exposure to, or inhalation of, asbestos or asbestos-containing products; or

(b) Advise or recommend as to techniques, methods or equipment which would serve to reduce or guard against such potentially harmful exposure?

ANSWER: Plaintiff learned that asbestos is dangerous to your health from foreign car publications in the late 1970's.

23. If your answer to any part of Interrogatory No. 22 is in the affirmative, please state:

(a) The nature and exact wording of such advice, warning or recommendation;

(b) The complete identity of each source of such advice, warning or recommendation;

(c) The date, time, place, manner and circumstances when each such advice, warning or recommendation was given;

(d) The name, business address and telephone number, job title, residence address and telephone number of each and every witness to the plaintiff's reception of such advice, warning or recommendation; and,

(e) The name, business address and telephone number, job title, residence address and telephone number of each and every co-worker or similar member of your trade and occupation who also received the same or similar advice, warning or recommendation.

ANSWER: Plaintiff does not recall.

**D. Smoking History**

24. Do you smoke cigarettes, cigars or a pipe?

ANSWER: Please see Plaintiff’s Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

25. Have you ever smoked tobacco products of any type?

ANSWER: Please see Plaintiff’s Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

26. If your answer to Interrogatory No. 24 and/or 25 is in the affirmative, please state fully and in detail:

(a) The type of tobacco products which you smoke or have smoked, that is, cigarettes, cigars, pipes, etc., stating whether you inhaled the smoke or not;

(b) The daily frequency with which you smoke or have smoked same, e.g., two packages of cigarette daily, two pipefuls daily, etc.;

(c)  The dates and time periods during which you have smoked;
(d)  For any time periods during which you have ceased smoking tobacco products, your reasons for stopping;
(e)  For any time period when you have commenced smoking tobacco products after a period of having stopped smoking, your reasons for restarting;
(f)  If you smoke cigarettes, please state the average number of packs per day so consumed in each of the following five year periods of 1935 to the present time:

       (i)      1935 - 1940;
       (ii)     1941 - 1945;
       (iii)    1946 - 1950;
       (iv)     1951 - 1955;
       (v)      1956 - 1960;
       (vi)     1961 - 1965;
       (vii)    1966 - 1970;
       (viii)   1971 - 1975;
       (ix)     1976 - present;

(g)  Whether you were ever advised by any physician to stop smoking.  If your answer is yes, give the date and name and address of each physician who gave you any such advice, and also state whether you followed that advice; and,
(h)  State the brand of tobacco used by plaintiff.

ANSWER:  (a)-(f) Please see Plaintiff's Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

(g)  No

(h)  See Plaintiff's Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

27.  Are you aware of the United States Surgeon General's warning placed on all cigarette packages and advertisements?

ANSWER:  Plaintiff objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff also objects as this interrogatory as overly vague.

28.  Have you ever read the warning referred to in Interrogatory No. 27.  If so, state the date you first read it.

ANSWER:  Plaintiff objects to this interrogatory on the basis that it is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff also objects to this interrogatory as it is overly vague.

29. Have you ever smoked cigarettes subsequent to being aware of or reading the warning referred to in Interrogatory No. 27.

ANSWER: Plaintiff objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this interrogatory as it is overly vague. Without waiving, and subject to, said objections, please see Plaintiff's Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

30. Have you ever smoked tobacco products other than cigarettes subsequent to being aware of or reading the warning referred to in Interrogatory No. 27? If so, what products and when?

ANSWER: Plaintiff objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this interrogatory as it is overly vague. Without waiving and subject to said objections, please see Plaintiff's Tobacco Questionnaire identified as Exhibit M, provided to lead defense counsel.

31. Have you ever been discharged or voluntarily left a position or changed residence due to health reasons? If yes, please state in detail the times, places and circumstances.

ANSWER: No.

32. Have you ever been hospitalized, operated upon, or confined to an institution? If yes, please state:

(a) The names and address of all hospitals or institutions involved;

(b) The beginning and ending dates of each period of hospitalization;

(c) The nature of the illness, injury or complaint for which you were admitted to the hospital;

(d) The names, addresses and relationships to you of all persons who treated or examined you;

(e) The nature and extent of any permanent disabilities or residual effects; and,

(f) The nature, source, and amount of any disability benefits, pensions or other remunerations received.

ANSWER: Plaintiff objects to this Interrogatory on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and attorney work product privileges. Without waiving this objection, please see Plaintiff's List of Hospitalizations, Exhibit O, provided to lead defense counsel; Plaintiff's medical

expert reports, Exhibit P, provided to lead defense counsel; and Plaintiff's medical records for which the requested authorizations have been provided to lead defense counsel.

    33.  If you have ever suffered any personal injuries or illness other than those involved in this lawsuit, state for each such injury or illness:

        (a)  The date, place, names of persons involved, and circumstances surrounding each such injury or illness;

        (b)  The nature and extent of the injuries or illnesses, including all ill effects or disabilities remaining at the time of the last treatment or examination;

        (c)  The nature and extent of the injuries or illnesses including all ill effects or disabilities remaining at the time of answering these interrogatories;

        (d)  The names and addresses of all persons who treated or examined you, together with the date of the last treatment or examination; and,

        (e)  The nature, source, and amount of any disability benefits, pensions, or other remunerations for such injuries or illnesses.

ANSWER:   None other than those detailed in answers to Interrogatory Nos. 32 and 34.

    34.  With respect to each doctor who has examined or treated you from the year 1936 to date, state the following:

        (a)  The name and address of each such doctor;

        (b)  The complaint that you had which caused you to see the particular doctor;

        (c)  The type of examination and treatment that each doctor gave you; and,

        (d)  The date or dates on which you were examined and treated by each particular doctor.

ANSWER:   Plaintiff objects to this Interrogatory on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and attorney work product privileges.  Without waiving this objection, please see Plaintiff's List of Physicians, Exhibit N, provided to lead defense counsel; Plaintiff's medical expert reports, identified as Exhibit P, provided to lead defense counsel; and authorizations to obtain medical records, identified as Exhibit Q, provided to lead defense counsel.

    (Authorization will not be provided to obtain medical records from Plaintiff's expert.  Any expert reports Plaintiff intends to rely upon, Exhibit P, have been provided to lead defense counsel.)

35.  Have you ever had chest x-rays taken? If so, state the
following for each set of x-rays taken:
        (a)  The name and address of the office or hospital
where the x-rays were taken;
        (b)  The reason why such x-rays were taken;
        (c)  The date or dates on which the x-rays were taken;
        (d)  The x-ray diagnosis that was reported to you.

ANSWER:  Plaintiff incorporates the objections stated in
response to Interrogatory No. 32.  In addition, Plaintiff objects
to this request as being overly broad, unduly burdensome and not
reasonably calculated to lead to the discovery of admissible
evidence.  Without waiving these objections, please see
Plaintiff's List of Physicians, Exhibit N, provided to lead
defense counsel; and Plaintiff's List of Hospitalizations,
Exhibit O, provided to lead defense counsel.

        (Authorization will not be provided to obtain medical
records from Plaintiff's expert.  Any expert reports Plaintiff
intends to rely upon, Exhibit P, have been provided to lead
defense counsel.)

36.  Do you or your attorneys have any medical reports from
any persons, hospitals, doctors or medical practitioners, or
institutions that have ever treated or examined you at any time?
If so, please attach copies of the reports to your answers to
these interrogatories.  If you will not voluntarily attach copies
of the reports to your answers to these interrogatories, then
please state fully and in detail:
        (a)  The identity of the report or reports by date,
subject matter, name, address, job title or capacity of the
person(s) to whom addressed or directed, and the job title or
capacity of the person or persons who prepared these same; and,
        (b)  The name, address, and present whereabouts of the
person who has custody or control of the medical records and the
purpose of said preparation.

ANSWER:  Plaintiff has provided authorizations which should
enable defendants to obtain all records, receipts and invoices,
as long as they are not expert-related.  Plaintiff's medical
authorizations have been provided to lead defense counsel
(defense medical coordinator) to obtain medical records pursuant
to Del. Super. Ct. Rule 13 and 34 and Standing Order No. 1.

37.  Have you ever received any nursing care or housekeeping
services for or because of any injury sustained or any other
physical condition? If yes, please state fully and in detail:
        (a)  The names, addresses and the relationship to you
of the person(s) administering such care or services;

        (b)   The dates during which such care or services were received; and,
        (c)   The injury or illness or physical condition necessitating such care or services.

ANSWER:  Plaintiff objects to this interrogatory with respect to its seeking of information which is neither relevant nor material to the illness involved in this litigation.  With respect to the illness complained of herein:

        (a)   No
        (b)   No
        (c)   No

        However, Plaintiff's condition may progress. Accordingly, Plaintiff reserves the right to supplement this answer.

    38.  Have you ever been confined to bed or home as a result of any illness, injury, or emotional or psychological illness or distress you may have sustained at any time? If yes, please state fully and in detail:
        (a)   The dates during which you were confined to your bed or home; and,
        (b)   The address where each confinement took place.

ANSWER:  Plaintiff objects to this interrogatory with respect to its seeking of information which is neither relevant nor material to the illness involved in this litigation.  With respect to the illness complained of herein:

        (a-b)   No.

        However, Plaintiff's condition may progress. Accordingly, Plaintiff reserves the right to supplement this answer.

    39.  Have you ever had to wear any medical support, cast, brace, or other device or garment, or use any other type of medical aid at any time? If yes, please state fully and in detail:
        (a)   A description of the item;
        (b)   Whether it was rented or purchased;
        (c)   The name and address of the supplier;
        (d)   The cost of the item; and,
        (e)   The period of time it was used.

ANSWER:  Plaintiff objects to this interrogatory with respect to its seeking of information which is neither relevant nor material

to the illness involved in this litigation. With respect to the illness complained of herein:

(a-e) No.

40. State the dates, places and circumstances and results including any interpretative or diagnostic conclusions or possibilities of each and every x-ray or radiological examination of your body during your lifetime. Please include in your answer for each such examination, in addition to the above requested information:

(a) Name, address, and telephone number of each prescribing physician of each examination;

(b) Name, address, and telephone number of each examining physician in each examination;

(c) Name, address, and telephone number of the medical institution or laboratory, public or private, in which such examination was performed;

(d) The number of x-rays taken;

(e) Name, address, and telephone number of the present or last known custodian of each such x-ray;

(f) The specific areas of the body of which the x-ray examination was made;

(g) The interpretative or diagnostic results, conclusions, or possibilities derived from each such examination. Include in your answer the date, time, place, source and nature of each such result, conclusion or possibility at the time same was made known to you, or anyone related to you or acting in your behalf; and,

(h) Any treatment, recommendation or prescribed therapy resulting from such examination. Include in your answer

(i) Purpose and objective of same;

(ii) Success or failure of same;

(iii) Date, time, and duration of each such course of treatment or therapy; dosage;

(iv) Name of medication and the prescribed

(v) Accomplishments or degree of success of such treatment, therapy, or combination thereof; and,

(vi) Whether you cooperated completely, or in part, or ignored any such treatment, recommendation, prescription, or course of therapy or treatment, and the reasons for any such behavior on your part other than complete cooperation.

ANSWER: Plaintiff objects to this interrogatory on the grounds that it is unduly broad and seeks information that is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence, nor material to the issues involved in this litigation, i.e., Plaintiff's asbestos-related illness. By its terminology, "each and every x-ray... of your body during your lifetime," defendant is requesting information which has nothing

to do with Plaintiff's alleged illness. Plaintiff will not supply
any information herein unless it deals with Plaintiff's chest or
with a radiographic examination of a portion of his body, which
also may include the chest area, which is related to his asbestos
illness.  Without waiving and subject to, said objections,
Plaintiff states: see the answer to Interrogatory No. 35 for
information related to Plaintiff's chest x-rays.  Plaintiff's
medical authorizations have been provided to the discovery
coordinator (defense medical coordinator) to obtain medical
records pursuant to Del. Super. Ct. Rule 33 and 34 and Standing
Order No. 1.

    41.  State the dates, places, and circumstances of each and
every cardiology examination, or examination related to the
circulatory system in any fashion, conducted upon you during your
lifetime.  In addition, include in your answer for each and every
such examination:
        (a)  Name, address and telephone number of each
prescribing physician;
        (b)  Name, address and telephone number of each
examining physician;
        (c)  Name, address and telephone number of each medical
institution, office or laboratory, public or private, in which
such examination was conducted;
        (d)  Name, address and telephone number of the present
or last known custodian of any results of such examination;
        (e)  The interpretative or diagnostic results,
conclusions or possibilities derived from each such examination.
Include in your answer the date, time, place, source and nature
of each such result, conclusion or possibility at the time that
same was made known to you or anyone related to you or acting in
your behalf; and,
        (f)  Any treatment, recommendation or prescribed
therapy resulting from such examination.  Include in your answer:
            (i)    Purpose and objective of same;
            (ii)   Success or failure of same;
            (iii)  Date, time, and duration of each such
course of treatment or therapy, dosage;
            (iv)   Name of medication and the prescribed
            (v)    Accomplishments or degree of success of
such treatment, therapy, or combination thereof; and,
            (vi)   Whether you cooperated completely, or in
part, or ignored any such treatment, recommendation,
prescription, or course of therapy or treatment, and the reasons
for any such behavior on your part other than complete
cooperation.

ANSWER:  Plaintiff objects to this interrogatory on the grounds
that it is unduly broad and seeks information that is neither
relevant nor leading to relevant information.  Without waiver,

Plaintiff provides the following: See answer to interrogatory
numbers 32 and 34.

    42.  State the dates, places and every pulmonary or
respiratory system-related examination conducted upon you during
your lifetime.  In addition, include in your answer for each and
every such examination the following:
            (a)  Name, address and telephone number of each
examining physician;
            (b)  Name, address and telephone number of each medical
institution, office, or laboratory, public-or private, in which
such examination was made;
            (c)  Name, address and telephone number of the present
or last known custodian of any results of such examination;
            (d)  The interpretative or diagnostic results,
conclusions, or possibilities derived from each such examination.
Include in your answer the date, time, place, source and nature
of each such result, conclusion or possibility at the time that
same was made known to you or anyone related to you or acting in
your behalf; and,
            (e)  Any treatment, recommendation or prescribed
therapy resulting from such examination.  Include in your answer:
                (i)     Name, address and telephone number of
each prescribing physician;
                (ii)    Purpose or objective of same;
                (iii)   Success or failure of same;
                (iv)    Date, time and duration of same;
                (v)     Name and dosage of prescribed medication;
                (vi)    Accomplishments or degree of success of
such treatment or therapy or combination thereof; and,
                (vii)   Whether you cooperated completely or only
in part or ignored each such recommendation, prescribed
treatment, or therapy, and the reasons for any such behavior on
your part other than complete cooperation.

ANSWER:  Plaintiff objects to this Interrogatory on the ground
that the identity of any and all consulting experts are protected
from disclosure by the consulting expert and attorney work
product privileges.  Without waiving these objections, Plaintiff
answers as follows:

            (a)  Please see Plaintiff's List of Physicians,
Exhibit N, provided to lead defense counsel; and Plaintiff's List
of Hospitalizations, Exhibit O, provided to lead defense counsel.
Defendants have been provided with authorizations to obtain
medical records.
            (b)  Please see Plaintiff's List of Physicians,
Exhibit N, provided to lead defense counsel; and Plaintiff's List
of Hospitalizations, Exhibit O, provided to lead defense counsel.

Defendants have been provided with authorizations to obtain medical records.

       (c)  Plaintiff's attorneys and/or custodian of records for doctor and/or facility where examination took place.

       (d)  Please see Plaintiff's List of Physicians, Exhibit N, provided to lead defense counsel; and Plaintiff's List of Hospitalizations, Exhibit O, provided to lead defense counsel. Defendants have been provided with authorizations to obtain medical records.

      (Authorization will not be provided to obtain medical records from Plaintiff's expert.  Any expert reports Plaintiff intends to rely upon, Exhibit P, have been provided to lead defense counsel.)

      43.  If you will do so without a motion to produce, please attach copies of any records, receipts or invoices related in any fashion to any or all of your answers to the above three interrogatories.

ANSWER:  Plaintiff has provided authorizations which should enable defendants to obtain all records, receipts and invoices, as long as they are neither expert related nor work product. Plaintiff's medical authorizations have been provided to the discovery coordinator (defense medical coordinator) to obtain medical records pursuant to Del. Super. Ct. Rule 33 and 34 and Standing Order No. 1.

      44.  For each and every present or past symptom, indication, malaise or effects which you contend to be directly or indirectly related to any disease, disability or physical condition or state of your body or health, and which you contend is relevant to this lawsuit, please state:

       (a)  Nature and description of such symptoms;

       (b)  The disease, disability or physical condition to which said symptom is related and the nature and extent of such relationship;

       (c)  The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge;

       (d)  Whether you contend such symptom is related in any fashion to asbestosis or pleuritis, or any other condition from which you allegedly suffer, and the nature and extent of such relationship;

       (e)  Whether you contend that such symptom is related in any fashion to the use or effect of any product manifested, sold or distributed, in whole or in part, by defendant or any subdivision or affiliate thereof.  Include in your answer the

nature and extent of said relationship and the name, description and identity of the product referred to in your answer;

(f) The facts, writings and publications, etc., upon which you base all or part of any of your above-stated contentions. If you will do so without a motion to produce, please attach copies of all such writings or publications; and,

(g) The name, business address and telephone number, job title, and resident address and telephone number of each and every witness who can testify in support of any or part of any of your above-stated contentions.

ANSWER: (a) Shortness of breath, chest pains, fatigue and cough.

(b) Plaintiff believes that inasmuch as Plaintiff now knows that asbestos affects the lungs, his breathing difficulties are attributable to these lung diseases;

(c) The current extent of Plaintiff's symptoms are recent; Plaintiff does not recall the exact date the symptoms first manifested themselves;

(d) Plaintiff feels that his current symptoms are related.

(e) Yes. Plaintiff has come to understand that it was through contact at work with various asbestos products the Plaintiff has recalled in Responses to Interrogatories or in his/her deposition that were present at his workplace(s) or which have been or will be identified by co-workers, which contributed to these illnesses.

(f) Objected to as this is unduly burdensome and an invasion of the work-product doctrine. Moreover, Plaintiff understands his attorney already has provided defendants with a list of medical articles describing all manners of asbestos-related diseases.

(g) Plaintiff objects to this interrogatory as overly broad and burdensome. Without waiving, and subject to, said objections, see Exhibit B and the answers to Interrogatory Nos. 10, 11 and 12. In addition, please see Plaintiff's Expert Witness List. Additionally, see answer to Interrogatory No. 34 for the names of Plaintiff's treating physicians.

During their testimony, the above physicians may rely upon Dr. Greenberg's slides (Master Exhibit No. 1851) as a visual aid for describing the diseases to the jury.

45.  Do you contend that you are suffering from pleuritis?

ANSWER:  Objection to the extent this interrogatory is vague. Subject thereto, see Plaintiff's medical records.  Plaintiff has been diagnosed with malignant mesothelioma.

46.  If your answer to Interrogatory No. 45 is in the affirmative, please state:

(a)  Date and time of such diagnosis;
(b)  Name, address and telephone number of diagnosing physician and any concurring physicians;
(c)  Method and information upon which such diagnosis was based;
(d)  Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;
(e)  Name, address and telephone number of each and every person, including your relatives, employer, or anyone acting in your behalf to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing such revelation;
(f)  Describe in detail the specific course of treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;
(g)  Name, address and telephone number of plaintiff's employer at time of diagnosis; and,
(h)  If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:
(i)  Nature, extent and exact content of such prescription or recommendation;
(ii)  Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,
(iii)  State all facts upon which you rely to support a contention that such pleuritis is related to exposure to asbestos.

ANSWER:  Objection to the extent this interrogatory is vague. Subject thereto, see Plaintiff's medical records, Plaintiff's List of Physicians, Exhibit N, provided to lead defense counsel; and Plaintiff's List of Hospitalizations, Exhibit O, provided to lead defense counsel to lead defense counsel.  Please also see Plaintiff's deposition testimony and the testimony of his/her treating physician for the course of his/her treatment for mesothelioma and the progression of Plaintiff's mesothelioma.

47. Do you contend that you are suffering from asbestosis?

ANSWER: No. Plaintiff is suffering from malignant mesothelioma.

48. If your answer to Interrogatory No. 47 is in the affirmative, please state:

(a) Date and time of such diagnosis;

(b) Name, address and telephone number of diagnosing physician and any concurring physicians;
was based;

(c) Method and information upon which such diagnosis

(d) Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;

(e) Name, address and telephone number of each and every person, including your relatives, employer or anyone acting in your behalf, to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing said revelation;

(f) Describe in detail the specific course of treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;

(g) Name, address and telephone number of plaintiff's employer at the time of diagnosis; and,

(h) If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:

(i) Nature, extent and exact content of such prescription or recommendation; and,

(ii) Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations.

ANSWER: Not applicable.

49. Do you contend you are suffering from any other pulmonary disease?

ANSWER: Plaintiff is bringing this action against the defendants for the diseases described in Interrogatory Nos. 45 through 48. Plaintiff is also bringing this action against the Defendants for Plaintiff's mesothelioma. Presently, Plaintiff is not contending that he has any other pulmonary problem related to the exposure for which the defendants are responsible. Finally, to the extent Plaintiff is suffering, has suffered or may suffer in the future from a medical problem which was not caused initially by asbestos exposure, his asbestos related problem

interfaces with the non-asbestos related medical problem by putting extra strain on the lungs and by making treatment of all pulmonary problems more difficult.

In addition to his mesothelioma, Plaintiff suffers from emotional distress and fear regarding the future developments in his asbestos-related condition. Specifically, Plaintiff is concerned about further progression and deterioration of his present condition. In addition, Plaintiff has experienced further emotional distress and fear from the fact that his life-expectancy due has been decreased due to his asbestos-related problems.

50. If your answer to Interrogatory No. 49 is in the affirmative, please state:

(a) Date and time of such diagnosis;

(b) Name, address and telephone number of diagnosing physician and any concurring physicians;

(c) Method and information upon which such diagnosis was based;

(d) Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;

(e) Name, address and telephone number of each and every person, including your relatives, employer or anyone acting in your behalf, to whom such diagnosis was made known, including the date, time and place of such revelation and the name, address and telephone number of anyone witnessing said revelation;

(f) Describe in detail the specific course of the treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;

(g) Name, address and telephone number of plaintiff's employer at time of diagnosis; and,

(h) If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:

(i) Nature, extent and exact content of such prescription or recommendation;

(ii) Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,

(iii) State all facts upon which you rely to support a contention that such pulmonary disease is related to exposure to asbestos.

ANSWER: See the answer to Interrogatories No. 51 and 52.

51.  Do you contend that you are suffering from any cancer, "incipient cancer", carcinoma or sarcoma?

ANSWER:  Yes.

52.  If your answer to Interrogatory No. 51 is in the affirmative, please state:
    (a)  Date and time of such diagnosis;
    (b)  Name, address and telephone number of diagnosing physician and any concurring physicians;
    (c)  Method or information upon which such diagnosis was based including biopsies, histological or cytology studies;
    (d)  Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;
    (e)  Name, address and telephone number of each and every person, including any relatives, employer or anyone acting in your behalf to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing said revelation;
    (f)  Describe in detail the specific course of therapy or treatment, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;
    (g)  Name, address and telephone number of plaintiff's employer at time of diagnosis; and,
    (h)  If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:
        (i)  Nature, extent and exact content of such prescription or recommendation;
        (ii)  Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,
        (iii)  State all facts upon which you rely to support a contention that such pulmonary disease is related to exposure to asbestos.

ANSWER:  (a)  Plaintiff was diagnosed with malignant mesothelioma in 2005 by Dr. Kevin Touney.

(b)-(h)  See Plaintiff's List of Physicians, Exhibit N, provided to lead defense counsel to lead defense counsel; and Plaintiff's List of Hospitalizations, Exhibit O, provided to lead defense counsel to lead defense counsel.

53.  Are you aware that any adverse effects of exposure to asbestos and asbestos products may be cumulative in nature and

that continued exposure to such materials by one suffering from asbestosis or a related illness might have significant adverse effects upon the extent and severity of such illness? If your answer is in the affirmative, please state:

(a) The date, time and place that you first acquired such awareness;

(b) Specific identity of such source of information providing or leading to such awareness; and,

(c) Any change in your behavior, life-style, occupation, work habits, etc., prescribed by such awareness.

ANSWER: (a)-(c) Plaintiff was not aware that asbestos was harmful to humans until the late 1970's and was not aware he was working with products containing asbestos without proper protection after that point.

54. After being informed that you were suffering from asbestosis, pleuritis, or any alleged asbestos-related illness, did you continue to engage in any activity or occupation in which you encountered subsequent exposure to asbestos or asbestos-containing materials? If your answer is in the affirmative, please state:

(a) Nature and description of such activity or occupation;

(b) Name, address and telephone number of your employer at the time and subsequent to the diagnosis of any of the ailments referred to in the above interrogatory. Include in your answer:

(i) Your job title and description of work and activities and duties; and,

(ii) Manner and extent of resulting exposure to asbestos or asbestos-containing materials.

(c) Your detailed reasons for engaging in such activity or occupation; and,

(d) Whether your participation in such activity or occupation and consequential exposure to asbestos or asbestos-containing materials was contrary to competent medical or professional advice (including such advice from employers, union representatives, publications, etc.). If so, please state in detail:

(i) The identity, description, address, etc., of each source of such advice;

(ii) The date, time and place such advice was given;

(iii) The name, address and telephone number of each and every person present when such advice was given to you; and,

(iv) Your response to such advice and the reasons therefor.

ANSWER: No.

55. Please list in chronological order by date of admission all hospitals, extended care centers or nursing homes in which you have been a patient or an out-patient during your lifetime. Please include in your answer the dates of admission and discharge.

ANSWER: See answer to Interrogatory No. 32.

56. For each such confinement or out-patient period listed in your answer to Interrogatory No. 55, please state separately:

(a) Condition treated for;

(b) Name, address and telephone number of each treating or prescribing physician;

(c) Type and date of any diagnostic or operating procedure;

(d) The date of recovery from such condition referred to in subpart (a) of this interrogatory; and,

(e) Extent and duration of any disability resulting from such condition referred to in subpart (a) of this interrogatory.

ANSWER: See answer to the preceding interrogatory.

57. State in detail such injuries, illnesses or types of ill health which you allege that you have suffered from during the one-year period immediately preceding the diagnosis of asbestosis, pleuritis and/or any other illness or disease alleged to be related to asbestos exposure. Set forth in detail such symptoms as were evident to you during that period, the date of their appearance, and the identity of all diagnosing and treating physicians.

ANSWER: Please see the answers to interrogatory numbers 32 and 34.

58. State the name and address of your personal physician at the time of the incident(s) of which you complain in this law suit.

ANSWER: Please see Plaintiff's List of Physicians, Exhibit N, provided to lead defense counsel.

**G. Claims History**

59. Have you, at any time, ever made a claim for or received any health or accident insurance benefits, workmen's compensation payments, disability benefits, pensions, accident

compensation payments or veterans' disability compensation awards? If so, state for each:

      (a)  The circumstances under which you received the benefits or awards or payments;

      (b)  The illness or injury for which you received the benefits or awards or payments;

      (c)  The names and addresses of your employer at the time of each injury or illness;

      (d)  The names and addresses of the examining doctors for each injury or illness;

      (e)  The names of the superiors or officers or boards or tribunals before which or to whom the claim or claims were made or filed; the dates made or filed;

      (f)  The amount of the benefits or awards or payments;

      (g)  The dates covering the times during which you received the benefits or awards or payments; and,

      (h)  The agencies or insurance companies from whom you received the benefits or awards or payments.

ANSWER:  Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome.  Additionally, Plaintiff objects to providing the amount of the benefit as this question seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Without waiving, and subject to, said objections, Plaintiff states the following: None in relation to injuries pertaining to the claims made in this litigation other than health insurance coverage of medical bills.

    60.  On what date did you first become aware that asbestosis was a compensable occupational disease under the State Workmen's Compensation Act?

ANSWER:  Plaintiff has no knowledge.

    61.  Have you ever filed a suit for damages for any personal injury? If yes, please state:

      (a)  The names and addresses of all plaintiffs, defendants, and other parties and their attorneys;

      (b)  The court and place where each suit was filed and the date of filing; and,

      (c)  The nature and extent of the injuries claimed;

      (d)  The present status of each suit; and, if concluded, the final result including the amount of any settlement or judgment.

ANSWER:  (a)-(c) Plaintiff objects as this question is not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving, and subject to, said objections, Plaintiff states: Plaintiff objects to this interrogatory on the

ground that it is overly broad and irrelevant. Without waiving and subject to, said objections, Plaintiff provides the following: Plaintiff has never filed a suit for damages for any personal injury.

(d) Plaintiff objects to this interrogatory as it is beyond the Superior Court Civil Rule 26. Plaintiff further objects as this question is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

62. Have you ever been a party to any other litigation? If so, describe:

(a) The nature of the suit; and,

(b) The date, court and place where the suit was filed.

ANSWER: Plaintiff objects as this question is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving, and subject to, said objections, Plaintiff states: No. Plaintiff has never been a party to any other litigation.

**H. Witnesses/Investigation**

63. Do you or your attorneys know of any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including witnesses to the injury, illnesses, etc. in question? If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you, the present whereabouts of all such persons.

ANSWER: Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Without waiving and subject to, said objections, please refer to Exhibit B, Exhibit C, Exhibit D, attached to IN RE: ASBESTOS LITIGATION, C .A. NO. 77C-ASB-2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, filed on 5/09/91, and all subsequent and/or future amendments and supplements filed thereafter, including but not limited to, the Amendment to Exhibit C filed on December 6, 1994 and Exhibit C supplemented on 2/20/96, and Updated Exhibit D filed on March 27, 1996 and supplemented on March 13, 1997. Please also refer to answers to Interrogatory Nos. 10, 11, and 12 to this set which were prepared by my attorney based on information gathered from people other than Plaintiff. Plaintiff's family members may also have knowledge of facts relevant to this matter, as well as individuals listed as co-workers on Plaintiff's Work History sheet, Exhibit K, provided to lead defense counsel.

64.  Do you or your attorneys have any written statements from any persons having knowledge of facts relevant to the subject matter of this lawsuit, including witnesses to the accident, injury, illnesses, etc. in question?  If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you and the present whereabouts of all such persons.

ANSWER:    Plaintiff objects to this interrogatory as overly broad and unduly burdensome, and to the extent it requests material protected by the attorney work product privilege.  Without waiving and subject to, said objections, Plaintiff provides the following information:  Plaintiff's counsel have depositions of co-workers and defendants to this lawsuit taken in this case and other Delaware cases, as well as other asbestos cases.  They can be reviewed at Plaintiff's attorney's office.  See Exhibit C attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB-2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, filed on 5/09/91, updated on December 6, 1994 and supplemented on 2/20/96, and all subsequent and/or future amendments and supplements filed thereafter.  Please see Plaintiff's Exhibit Lists and any supplement thereto and Plaintiff's Deposition Testimony list.

65.  Do you or your attorneys have any written statements or oral transcriptions of the statements of any defendant or agent, servant or employee of any defendant to this action? If yes, state the name of such person, where and when the statement or statements were obtained, and who has custody of the statements or transcriptions.

ANSWER:    See answer to Interrogatory No. 64.

66.  As a result of the illnesses, relevant working conditions or other circumstances complained of in this action, or related to the subject matter of this lawsuit, were any photographs, charts, drawings, diagrams or other graphic representation made by you or in your behalf? If yes, state fully and in detail:
    (a)  How many pictures were taken or documents prepared;
    (b)  On what dates they were taken or prepared;
    (c)  What views, scenes or objects they depict;
    (d)  What is the name, address, telephone number, job title, or capacity and present whereabouts of the persons who have custody and control thereof;
    (e)  Will the plaintiffs permit the defendants, through authorized representatives, to inspect the said photographs or other documents without the necessity of a motion for their production; and,

(f) Will the plaintiffs furnish copies of designated photographs or other documents to the defendants at defendants' expense?

ANSWER: Plaintiff objects to this interrogatory as overly broad, unduly burdensome, violative of the attorney-client privilege and work-product doctrine. Without waiving, and subject to, said objections, Plaintiff provides the following: Plaintiff understands his counsel have tables concerning "state-of-the-art" and drawings of lungs, epidemiological studies, product pictures, samples of insulation, boxes of insulation, medical slides (Dr. Greenberg's slides), a videotape on the application of insulation for use at trial, and other documents identified in Plaintiff's Exhibit Lists and any supplements thereto.

67. If your claim is based to any extent or nature upon expert opinion other than medical experts, please state the name, address, home telephone number, place of employment, relationship to you, and present whereabouts of all such experts.

ANSWER: See Exhibit D attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB-2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, filed on 5/09/91 and all subsequent and/or future amendments and supplements filed thereafter, including but not limited to, Updated Exhibit D filed on March 27, 1996 and supplemented on March 13, 1997. In addition, please see Plaintiff's Exhibit Lists and any supplements thereto.

68. Have you made any statement which was reduced to writing concerning the facts of this lawsuit and the damages claimed to any police or law officer, insurance company representative, investigator, state or federal agent or employee of any kind, or anyone else? If yes, state the name and address of each and every such person or organization to whom these statements or reports were made and the purpose for which they were made.

ANSWER: Plaintiff objects to this interrogatory as it is violative of the attorney-client privilege and work-product doctrine and is beyond the scope of Superior Court Civil Rule 26. Without waiving, and subject to, said objections, Plaintiff provides the following: Not to Plaintiff's knowledge except information given to his attorney which is confidential and protected by the attorney-client privilege and work-product doctrine.

69. Have any investigations or other reports been prepared, compiled, submitted or made by you or on your behalf in this

action? If yes, state fully and in detail as to each such investigation or report:

(a) The identity of same by date, subject matter, name, address, job title or capacity of the person or persons to whom addressed or directed;

(b) The name, address, job title or capacity of the person or persons to whom addressed or directed; and,

(c) The name, address, and present whereabouts of the person who has present custody or control thereof and the purpose of such preparation.

ANSWER: To the extent that this interrogatory requests information protected by the attorney-client privilege and work-product doctrine, Plaintiff objects to this interrogatory. Without waiving, and subject to, said objections, Plaintiff states that investigations and reports were done by Plaintiff's attorneys only.

70. Do you have any health, accident or life insurance policies which are currently in effect? If yes, state the name, type, address of the insurance company, dates of commencement and expiration of coverage, policy limits, etc.

ANSWER: Plaintiff objects to this interrogatory as it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

71. List the names, addresses and relationship to plaintiff of all persons who were witnesses to the accident, injuries or illnesses which are the subject matter of this lawsuit.

ANSWER: Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Without waiving, and subject to, said objections, Plaintiff provides the following: see Exhibit B and D attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB-2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, filed on 5/09/91 and all subsequent and/or future amendments and supplements filed thereafter, including Updated Exhibit D filed on March 27, 1996 and supplemented on March 13, 1997. Also, see Interrogatory Nos. 10, 11 and 12 to this set. Other names will be provided as they become available.

72. Do your agents, employees and representatives know of any statement having been made by the defendants pertaining to any circumstances of the injuries or illnesses which are the subject of this lawsuit?

ANSWER: Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Without waiving, and subject to, said

objections, Plaintiff provides the following: Yes, if asbestos illness is within this answer.

73. If your answer to Interrogatory No. 72 is in the affirmative, was any such statement in writing and, if so, in whose possession is such statement and when and where may it be inspected by defendants?

ANSWER: Depositions of defendant's employees, documents of trade associations, letters between defendants and each other, written discovery answers of defendants, and Asbestos Magazine. Also, see answer to Interrogatory No. 64. Also, see Plaintiff's Exhibit Lists and any supplements thereto and Plaintiff's Deposition Testimony list.

74. If your answer to Interrogatory No. 72 is in the affirmative, and any such statement was oral, when and where was any such statement made, in whose presence was such statement made, and what was the substance of such statement?

ANSWER: See answer to Interrogatory No. 73.

75. Give the names and present addresses of all witnesses you intend to use at the trial of this case with respect to the occurrence and/or cause of your illness or with respect to claimed damages or with respect to the liability of these defendants.

ANSWER: Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Without waiving, and subject to, said objections, Plaintiff states that no definite decision has been made as to which individuals will be called as witnesses at trial. Please refer to persons identified in Exhibits B, C and D attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB-2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, filed on 05/09/91, and all subsequent and/or future amendments and supplements filed thereafter, including but not limited to the Amendment to Exhibit C filed on December 6, 1994, supplement to Exhibit C filed on 2/20/96, and Updated Exhibit D filed on March 27, 1996 and supplemented on March 13, 1997 and all supplements. Please see Plaintiff's Work History Sheet, Exhibit K, provided to lead defense counsel; Exhibit R, which will be provided to lead defense counsel; and Plaintiff's Expert Witness List filed or to be filed in this matter. Plaintiff may also call family members (and/or persons with knowledge regarding Plaintiff's pain and suffering and other relevant facts) to testify at the time of trial.

76. With reference to any expert you expect to call to testify as a witness at the trial, state the name and address of such expert and, as to each expert named, state:

      (a)  The subject matter on which the expert is expected to testify;

      (b)  The substance of the facts and opinions to which the expert is expected to testify; and,

      (c)  A summary of the grounds for each such opinion.

ANSWER:  Please see Plaintiff's Expert Witness List and any supplements thereto.

Also for the names of Plaintiff's other experts see Exh. D attached to IN RE: ASBESTOS LITIGATION, C.A. NO. 77C-ASB2, Exhibits Attached To The Answers To Standard Interrogatory No. 12 Directed To All Plaintiffs By All Defendants, updated on March 27, 1996, and all subsequent and/or future amendments and supplements filed thereafter.

77. State the name and present address of any expert witness who has been retained or specially employed by you or your attorneys in anticipation of litigation or preparation for trial but who is not expected to testify as a witness at the trial.

ANSWER:  Objection, to the extent that this interrogatory requests information violative of the attorney-client privilege, work-product doctrine and is beyond the scope of Superior Court Civil Rule 26.  Without waiving, and subject to, said objections: The experts identified in Plaintiff's Expert Witness List and any supplements thereto, and Plaintiff's treating physicians stated in answer to Interrogatory No. 34 may testify for Plaintiff. No decision of who should testify or the exact area of testimony has been made.

78. Give an accurate statement of all medical, hospital and drug or other related costs incurred by you or on your behalf as a result of the illness alleged in the Complaint.

ANSWER:  Plaintiff incurred medical expenses as a result of his asbestos-related illnesses.  Plaintiff's attorney will provide a total sum as soon as one is ascertained.

79. If you claim the right to recover any "out-of-pocket" expenses, including, but not limited to, medical expenses, itemize each such expense and state:

      (a)  A specific description of each such expense;

      (b)  The date when such expense was incurred;

      (c)  To whom it was incurred; and,

      (d)  For what it was incurred.

ANSWER:   A decision has not yet been made as counsel is in the
process of gathering the necessary information.

**I.   Union Activity**

    80.  Were you a member of any labor union at any time from
1936 to the present? If your answer is in the affirmative, state
for each such union membership:
          (a)  The name, address and telephone number; and,
          (b)  The dates and time periods during which you
maintained membership in such union.

ANSWER:   Plaintiff has never been a member of any labor union.

    81.  If you were a member of the International Association
of Heat and Frost Insulators and Asbestos Workers, did you
receive the publication known as The Asbestos Worker?

ANSWER:   Not applicable.

    82.  If your answer to Interrogatory 81 is in the
affirmative, state in detail:
          (a)  The manner of receipt, e.g., subscription,
provided by union or employer, purchase, etc;
          (b)  Frequency of receipt, e.g., regularly,
occasionally, rarely, etc.;
          (c)  The name, address and telephone number of each and
every person or entity which provided this publication to you;
          (d)  Pertinent dates and time periods during which you
received any issues of said publication;
          (e)  Publication date, issue and volume number of each
issue of said publication received by you in any fashion; and,
          (f)  Whether you read such publication.

ANSWER:   Not applicable.

    83.  Did any of your employers or any union or other labor
organization, group, representative or officer ever provide or
make any copies of the publication The Asbestos Worker available
to you at any time?

ANSWER:   Not applicable.

    84.  If your answer to Interrogatory 83 is in the
affirmative, please state in detail:
          (a)  The name, address, telephone number and title of
each and every such employer, union, representative, or officer
referred to in your answer to the above interrogatory;
          (b)  The dates and time periods during which the
publication was so provided or made available to you;

          (c)  The publication date, issue and volume of each
issue of said publication so provided or made available; and,
          (d)  The terms, circumstances or requirements of such
availability or provision or requirements of said publication,
e.g., free, by subscription, mailed, to be picked up, distributed
at meetings, etc.

ANSWER:    (a)  Not applicable

           (b)  Not applicable

           (c)  Not applicable

           (d)  Not applicable

     85.  If you were a member of a labor union other than the
International Association of Heat and Frost Insulators and
Asbestos Workers, did you receive any newspapers, newsletters or
other publications from such union?

ANSWER:    Not applicable.

     86.  If your answer to Interrogatory 85 is in the
affirmative, please state:
          (a)  The type of each publication received;
          (b)  The frequency with which such publications were
received; and,
          (c)  Whether you read such publications.

ANSWER:    (a)  Not applicable
           (b)  Not applicable
           (c)  Not applicable

     87.  Have you ever attended any international or local union
meetings, seminars, conferences or conventions where the subjects
of occupational health and exposure to asbestos were discussed?

ANSWER:    Not applicable.

     88.  If your answer to Interrogatory 87 is in the
affirmative, please state:
          (a)  The date and place of such meeting, seminar,
conference or convention;
          (b)  The name and address of each speaker; and,
          (c)  A summary of such speech, presentation or
discussion.

ANSWER:    (a)  Not applicable
           (b)  Not applicable
           (c)  Not applicable

89. Please list together with places and dates all offices you have held or committees on which you have served in both your local and international union.

ANSWER:   Not applicable.

90. Have you ever been informed by any person in an official capacity in your local or international union of any possible hazards associated with the exposure to asbestos dust?

ANSWER:   Not applicable.

91. If your answer to Interrogatory 90 is in the affirmative, please state:
        (a)  The name, address and official capacity of the individual or individuals who furnished you with such information;
        (b)  The date and place such information was furnished;
        (c)  The manner in which such information was communicated;
        (d)  The nature of the information furnished; and,
        (e)  What action, if any, you took in response to such information.

ANSWER:   (a)  Not applicable

          (b)  Not applicable

          (c)  Not applicable

          (d)  Not applicable

          (e)  Not applicable

92. For what time periods, including dates, were you an apprentice in the insulation materials installation trade (or a related trade) hereinafter referred to as "the trade"?

ANSWER:   Not applicable.

93. For what time periods, including dates, were you a journeyman, or its equivalent, in the trade?

ANSWER:   Not applicable.

94. State the date, times and places during which you were:
        (a)  A member of the National Insulation Contractors Association (N.I.C.A.);
        (b)  Employed by an employer who is a member of the National Insulation Contractors Association (N.I.C.A.).  If so,

please state the name, address and telephone number of said
employer.
        (c)  Employed by an employer who is a member of the
N.I.M.A.  If so, please state the name, address and telephone
number of said employer.

ANSWER:    (a)   Not applicable

           (b)   Not applicable

           (c)   Not applicable

     95.  Were you ever aware of, informed of, or advised in any
fashion by the informational and educational campaigns conducted
by N.I.C.A. and N.I.M.A., the purpose and goals of which were to
promote awareness among asbestos materials workers as to
potential hazards of asbestos exposure and to reduce such harmful
exposure through recommendations regarding protective respiratory
safety equipment and engineering and methods controls during the
manufacture and fabrication of asbestos products?

ANSWER:    Not applicable.

     96.  If your answer to the foregoing interrogatory is in the
affirmative, state the date, times, places, names and
circumstances under which such awareness, information or advice
was received, and the name, address and telephone number of
anyone present at the time you received such advice and/or who
received the same or similar advice, information or awareness.

ANSWER:    Not applicable.

     97.  State your average weekly or monthly earnings at the
time of your last full-time employment.

ANSWER:    To be provided.  Please also see Plaintiff's Social
Security Printout, Exhibit L, provided to lead defense counsel.

     98.  State fully and in detail your annual earnings for the
past ten years:
        (a)  Do you or your attorneys have your W-2 forms
and/or income tax returns (or copies thereof) for any of the past
ten years? If so, please state for which years you have such W-2
forms and/or income tax returns and/or copies thereof; and,
        (b)  If you will do so without a motion to produce,
please attach copies of said W-2 forms and/or income tax returns
to your answers to these interrogatories.

ANSWER:    Plaintiff objects to this interrogatory as it is unduly
burdensome, not reasonably calculated to lead to the discovery of

admissible evidence, and is beyond the scope of Superior Court Civil Rule 26. Without waiving, and subject to, said objections, Plaintiff's Income Tax Authorization has been provided to the discovery coordinator pursuant to Standing Order No. 1.

99. If you claim that you have sustained any loss of income or earning power as a result of the incident which is the subject of this lawsuit, either in the past, present or in the future, state:

(a) The total value of the loss you claim was sustained;

(b) The inclusive dates when you claim you were unable to work as a result of the incident and the reason why you were unable to work on such dates;

(c) A specific description of the type or types of work you would have been performing or would have ben able to perform during the period stated;

(d) The rate of income you would have been able to receive had the alleged incident not occurred, e.g., $1.00 per hour, $50.00 per week, etc.; and,

(e) The name and address of the person, corporation or other entity which would have been your employer.

ANSWER: (a) Plaintiff will supplement this answer, either through a calculation or through the report of an expert.

(b)-(e) Plaintiff objects to this Interrogatory as it is unduly burdensome. Without waiving this objection, Plaintiff refers the Defendant to Plaintiff's Petition filed in this case and Plaintiff's deposition testimony given or to be given in this case. Please also see Plaintiff's economic loss report which will be provided.

100. Insofar as you intend to introduce into evidence any expert testimony concerning part of future loss or earning power or the present value of a sum of money concerning a future loss of expense and such evidence will be introduced through an expert economist or actuary, state the name and address of such expert and, as to each such person named, state:

(a) A specific description of the losses for which such of future earnings, present value of the loss of future earnings, present value of second job earnings, present value of future medical expenses, etc.;

(b) Describe in detail precisely the manner in which the person reached his conclusions showing the mathematical calculations involved; and,

(c) Insofar as such person has prepared any report or memoranda showing in whole or in part his conclusions or the facts on which such conclusions were based, state the date of such writing and the names and addresses of persons having copies

of it. If you will do so without a motion to produce, please attach a copy of any such report to these answers.

ANSWER: See answer to Interrogatory No. 99.

101. State all facts upon which you base your claim concerning your potential earnings or earning power.

ANSWER: See answer to Interrogatory No. 99.

102. If your claim that, as a result of the negligence alleged in the Complaint, you experienced any conscious pain and suffering for which you claim the right to recover damages in this lawsuit, state:

(a) The inclusive times or dates when you claim such conscious pain and suffering was experienced;

(b) The name and address of any person having knowledge that it was, in fact, experienced;

(c) The specific acts which you claim the defendants performed which resulted in such pain and suffering; and,

(d) A description of the pain and suffering and the areas of the body effected so far as you are aware.

ANSWER: (a) See answer to Interrogatory No. 44(c);

(b) Mary Collins
1904 Yew Avenue
Olympia, Washington

Christopher Collins
1824 Cadborough Lane
Dupont, Washington 98327

Cynthia Martin
2306 State Avenue, Northeast
Olympia, Washington 98506

Norm Chapman
703 East Street
Centralia, Washington 98531-4746

Thomas Witt
20044 Jowsey Court, Southwest
Rochester, Washington 98579-8631

David Casebier
4747 89th Avenue, Southeast
Olympia, Washington 98501-9629

Gloria Serhan
23535, Southeast
Blue Ridge Drive
Boring, Oregon   97009-8204

(c)     Please see Plaintiff's complaint and any amendments thereto.

(d)     See the answer to Interrogatory No. 44(a) as well as the deposition testimony of Plaintiff and his/her family members.  Please also see Plaintiff's medical records.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By:     _/s/ Thomas Crumplar_
        Thomas Crumplar, #0942
        2 East 7th Street
        P.O. Box 1271
        Wilmington, DE 19899
        (302) 656-5445
        Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas   75219
(214) 521-3605

Date:   May 26, 2006

SSA-1826 ITEMIZED STATEMENT OF EARNINGS JOB:
VERSION 1984.002 * * * FOR SSN 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 * * *

WHS = SEE WORK HISTORY SHEET
NR = NO RECOLLECTION OF JOB
NE = NO EXPOSURE

FROM: SOCIAL SECURITY ADMINISTRATION
OFFICE OF CENTRAL OPERATIONS
300 N. GREENE STREET
BALTIMORE, MARYLAND 21290-0300

BARON & BUDD PC

3102 OAK LAWN AVE
STE 1100

DALLAS TX 75219

NUMBER HOLDER NAME:
JAMES D COLLINS

PERIOD REQUESTED JANUARY 1953 THRU DECEMBER 2005

EMPLOYER NUMBER: 69-0910001
UNIVERSITY OF WASHINGTON
PAYROLL OFFICER
3903 BROOKLYN AVE NE
SEATTLE WA 98105-0000

NE

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1965 | | | 428.75 | | $ | 428.75 |
| 1966 | | 85.50 | 812.90 | | $ | 898.40 |
| 1967 | | 291.76 | 646.10 | 166.72 | $ | 1,104.58 |
| 1968 | | 66.18 | 816.36 | | $ | 882.54 |
| 1976 | | 630.00 | | 357.00 | $ | 987.00 |
| 1977 | 660.00 | | | | $ | 660.00 |
| 1980 | | 507.50 | | 503.25 | $ | 1,010.75 |
| 1981 | - | - | - | - | $ | 15.25 |
| 1985 | - | - | - | - | $ | 7,172.35 |
| 1986 | - | - | - | - | $ | 24,119.32 |

EMPLOYER NUMBER: 91-0564060
LESTER M FAUVER
LES FAUVER JUNK CO
602 N AINSWORTH
TACOMA WA 98403-0000

NE

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1967 | | 378.00 | | | $ | 378.00 |

SSA-1826 ITEMIZED STATEMENT OF EARNINGS JOB:
VERSION 1984.002 * * * FOR SSN 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 * * *

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|

EMPLOYER NUMBER: 91-0826897
WILLIAM E LANGFORD
BRIDGEPORT AMERICAN SERVICE
10801 BRIDGEPORT WAY
TACOMA WA 98499-0000

WHS

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1968 | | 831.44 | 389.00 | 1,200.00 | $ | 2,420.44 |
| 1969 | 934.00 | | | | $ | 934.00 |

EMPLOYER NUMBER: 36-2440313
BP PRODUCTS NORTH AMERICA INC
% NANCY SOTO
PO BOX 941912
HOUSTON TX 77094-8912

WHS

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1969 | | 769.90 | | | $ | 769.90 |

EMPLOYER NUMBER: 35-9990000
DFAS ATTN DFASIN ADIMB
% CHARLES SHAW
8899 E 56TH ST
INDIANAPOLIS IN 46249-0002

NE

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1969 | | | 288.00 | 382.70 | $ | 670.70 |
| 1970 | 465.30 | 540.90 | 503.10 | 831.12 | $ | 2,340.42 |
| 1971 | 749.70 | 749.70 | 124.95 | | $ | 1,624.35 |

EMPLOYER NUMBER: 91-0840577
HANSON MOTORS INC
2300 CARRIAGE LOOP SW
OLYMPIA WA 98502-1018

WHS

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1971 | | | 1,319.25 | 1,542.75 | $ | 2,862.00 |
| 1972 | 1,577.81 | 1,747.73 | 1,771.25 | 1,877.80 | $ | 6,974.59 |
| 1973 | 2,101.25 | 2,164.33 | 2,334.93 | 2,766.14 | $ | 9,366.65 |
| 1974 | 2,808.08 | 2,866.34 | 3,152.50 | 3,110.89 | $ | 11,937.81 |
| 1975 | 3,176.33 | 3,137.39 | 3,294.76 | 3,581.27 | $ | 13,189.75 |
| 1976 | 3,312.16 | 3,537.52 | 3,616.32 | 3,578.06 | $ | 14,044.06 |
| 1977 | 3,755.46 | 3,892.60 | 4,442.22 | 4,226.24 | $ | 16,316.52 |

SSA-1826 ITEMIZED STATEMENT OF EARNINGS JOB:
VERSION 1984.002 * * * FOR SSN 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 * * *

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1978 | - | - | - | - | $ | 17,639.55 |
| 1979 | - | - | - | - | $ | 20,248.66 |
| 1980 | - | - | - | - | $ | 24,472.99 |
| 1981 | - | - | - | - | $ | 26,139.16 |
| 1982 | - | - | - | - | $ | 27,872.63 |
| 1983 | - | - | - | - | $ | 28,061.70 |
| 1984 | - | - | - | - | $ | 28,695.86 |
| 1985 | - | - | - | - | $ | 21,202.51 |
| 1986 | - | - | - | - | $ | 1,758.42 |
| 1987 | - | - | - | - | $ | 1,946.85 |
| 1989 | - | - | - | - | $ | 1,984.07 |

EMPLOYER NUMBER: 91-6072664
CENTRALIA COLLEGE NE
600 W LOCUST ST
CENTRALIA WA 98531-4035

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1987 | - | - | - | - | $ | 25,304.26 |
| 1988 | - | - | - | - | $ | 19,062.13 |

EMPLOYER NUMBER: 91-1409321
SOUTH PUGET SOUND COMMUNITY COLLEGE WHS
2011 MOTTMAN RD SW
TUMWATER WA 98512-6218

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | | TOTAL |
|---|---|---|---|---|---|---|
| 1988 | - | - | - | - | $ | 11,053.24 |
| 1989 | - | - | - | - | $ | 29,039.49 |
| 1990 | - | - | - | - | $ | 31,467.44 |
| 1991 | - | - | - | - | $ | 34,257.00 |
| 1992 | - | - | - | - | $ | 36,576.37 |
| 1993 | - | - | - | - | $ | 38,261.07 |
| 1994 | - | - | - | - | $ | 38,811.14 |
| 1995 | - | - | - | - | $ | 40,530.83 |
| 1996 | - | - | - | - | $ | 43,912.91 |
| 1997 | - | - | - | - | $ | 43,067.90 |
| 1998 | - | - | - | - | $ | 45,877.22 |
| 1999 | - | - | - | - | $ | 45,462.02 |
| 2000 | - | - | - | - | $ | 47,060.25 |
| 2001 | - | - | - | - | $ | 53,165.55 |
| 2002 | - | - | - | - | $ | 53,406.38 |

SSA-1826 ITEMIZED STATEMENT OF EARNINGS JOB:
VERSION 1984.002 * * * FOR SSN 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 * * *

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|---|---|---|---|---|---|
| 2003 | - | - | - | - | $ 54,070.83 |
| 2004 | - | - | - | - | $ 55,222.33 |
| 2005 | - | - | - | - | $ 59,201.12 |

EMPLOYER NUMBER: 91-1459003
WARDEN JOHNSON
FOREIGN AUTOWORKS NE
3044 PACIFIC AVE SE
OLYMPIA WA 98501-2043

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|---|---|---|---|---|---|
| 1991 | - | - | - | - | $ 1,275.00 |
| 1992 | - | - | - | - | $ 1,044.00 |
| 1994 | - | - | - | - | $ 1,053.00 |

THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER 2004 MAY NOT BE SHOWN, OR ONLY PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

VERIFICATION

STATE OF Washington
COUNTY OF Thurston

I, the undersigned, state under oath that I am the Plaintiff in the above-entitled and numbered cause and that the Work History Sheets are within my personal knowledge, and are true and correct to the best of my knowledge.

James Daniel Collins

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this 21 day of December, 2005, to which witness my official hand and seal of office.

My Commission expires:
8/9/2008

Notary Public in and for
the State of Washington

- PID

NAME: JAMES DANIEL COLLINS
NICKNAME: ____
GROUP NAME: COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

EMPLOYER: NOT APPLICABLE - - HOUSEHOLD EXPOSURE THROUGH FATHER: JAMES COLLINS

JOB SITE: FORT LEWIS

CITY, STATE: FORT LEWIS, WA

DATE OF EXPOSURE: 1947-1965; 1967-1969

LENGTH OF EXPOSURE: APPROXIMATELY 20 YEARS

HOUSEHOLD EXPOSURE WITNESS DUTIES AT THIS JOBSITE: HEATING/COOLING SPECIALIST

WAS JOB NEW CONSTRUCTION ____; REPAIR WORK ____; or BOTH X

WAS JOB INDOORS? ____; OUTDOORS? ____; or BOTH X

REASON FOR LEAVING: LEFT HOME

WAGE RATE/HOUR: STANDARD

AVERAGE HOURS WORKED/WEEK: ____

SUPERVISOR: ____

NAMES OF COWORKERS & JOB TITLES: ____

ON THIS JOB SITE WERE YOU EXPOSED TO ANY OF THE FOLLOWING:

| | YES | NO |
|---|---|---|
| CHEMICALS | | X |
| FUMES | | X |
| GASES | | X |
| CHROMIUM | | X |
| CADMIUM | | X |
| ANY OTHER PRODUCT | | X |

LIST: ____

DID YOU WEAR A RESPIRATOR, MASK OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES: ____ NO: X

COMMENTS:

| ASBESTOS MATERIALS USED ON THESE JOBS: | | WORKED WITH | AROUND |
|---|---|---|---|
| MISC. ASBESTOS PRODUCTS: | UNKNOWN | | X |

NAME: JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME: COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

EMPLOYER: SEE ATTACHED LIST

JOB SITE: SEE ATTACHED LIST

CITY, STATE: SEE ATTACHED LIST

DATE OF JOB: 1950s; 1967-2005

LENGTH OF JOB: LESS THAN 1 YEAR

MY DUTIES AT THIS JOBSITE: CONSTRUCTION, MECHANIC

WAS JOB NEW CONSTRUCTION ______; REPAIR WORK ______; or BOTH X

WAS JOB INDOORS? ____; OUTDOORS? ______; or BOTH X

REASON FOR LEAVING: JOB COMPLETE

WAGE RATE/HOUR: NONE

AVERAGE HOURS WORKED/WEEK: ______

SUPERVISOR: ______

NAMES OF COWORKERS & JOB TITLES:

ON THIS JOB SITE WERE YOU EXPOSED TO ANY OF THE FOLLOWING:

| | YES | NO |
|---|---|---|
| CHEMICALS | X | |
| FUMES | X | |
| GASES | | X |
| CHROMIUM | | X |
| CADMIUM | | X |
| ANY OTHER PRODUCT | | X |

LIST: ______

DID YOU WEAR A RESPIRATOR, MASK OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES: ____ NO: X

COMMENTS:

ASBESTOS MATERIALS USED ON THESE JOBS: WORKED WITH AROUND

NAME: JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME: COLLINS, JAMES DANIEL

WORK HISTORY SHEET

NOT APPLICABLE - - HOUSEHOLD EXPOSURE

PERSONAL RESIDENCE (S)
1950-1952
CONSTRUCTION

PERSONAL RESIDENCE (S)
1964-2005
MECHANIC

RESIDENTIAL SITE (S)
OLYMPIA, WA
1977
CONSTRUCTION

NAME: JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME: COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

EMPLOYER: UNKNOWN

SUPERVISOR:

JOB SITE: SALVAGE YARD

NAMES OF COWORKERS & JOB TITLES:

CITY, STATE: TUMWATER, WA

DATE OF JOB: 1965

LENGTH OF JOB: LESS THAN 3 MONTHS

MY DUTIES AT THIS JOBSITE:

WAS JOB NEW CONSTRUCTION ______; REPAIR WORK ______; or BOTH ______

WAS JOB INDOORS? ______; OUTDOORS? X; or BOTH ______

REASON FOR LEAVING: JOB COMPLETE

WAGE RATE/HOUR: STANDARD

AVERAGE HOURS WORKED/WEEK: 40+

ON THIS JOB SITE WERE YOU EXPOSED TO ANY OF THE FOLLOWING:

| | YES | NO |
|---|---|---|
| CHEMICALS | X | |
| FUMES | X | |
| GASES | | X |
| CHROMIUM | | X |
| CADMIUM | | X |
| ANY OTHER PRODUCT | | X |

LIST:

DID YOU WEAR A RESPIRATOR, MASK OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES: ____ NO: X

COMMENTS:

**ASBESTOS MATERIALS USED ON THESE JOBS:**

| | | WORKED WITH | WORKED AROUND |
|---|---|---|---|
| CABLE/WIRE: | UNKNOWN | X | X |

NAME: JAMES DANIEL COLLINS
NICKNAME: ____
GROUP NAME: COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

EMPLOYER: SEE ATTACHED LIST

JOB SITE: SEE ATTACHED LIST

CITY, STATE: SEE ATTACHED LIST

DATE OF JOB: 1967-1969; 1971-2005

LENGTH OF JOB: APPROXIMATELY 31 YEARS

MY DUTIES AT THIS JOBSITE: INSTRUCTOR, LABORER, LIGHT MECHANIC, MECHANIC, STUDENT

WAS JOB NEW CONSTRUCTION ____; REPAIR WORK ____; or BOTH ____

WAS JOB INDOORS? ____; OUTDOORS? ____; or BOTH X

REASON FOR LEAVING: RETIRED

WAGE RATE/HOUR: STANDARD

AVERAGE HOURS WORKED/WEEK: 40+

SUPERVISOR: ____

NAMES OF COWORKERS & JOB TITLES:

SEE ATTACHED LIST

ON THIS JOB SITE WERE YOU EXPOSED TO ANY OF THE FOLLOWING:

| | YES | NO |
|---|---|---|
| CHEMICALS | X | |
| FUMES | X | |
| GASES | | X |
| CHROMIUM | | X |
| CADMIUM | | X |
| ANY OTHER PRODUCT | | X |

LIST: ____

DID YOU WEAR A RESPIRATOR, MASK OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES: ____ NO: X

COMMENTS:

ASBESTOS MATERIALS USED ON THESE JOBS: WORKED WITH AROUND

**SEE ATTACHED LIST**

NAME: JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME: COLLINS, JAMES DANIEL

WORK HISTORY SHEET

UNKNOWN

AMERICAN OIL SERVICE STATION
TACOMA, WA
1968-1969
LABORER, LIGHT MECHANIC

CLOVER PARK VOCATIONAL SCHOOL
TACOMA, WA
1967-1969
STUDENT

BREWINGTON MOTORS
OLYMPIA, WA
1971-1976
MECHANIC

SOUTH PUGET SOUND COMMUNITY COLLEGE
OLYMPIA, WA
1985-2005
INSTRUCTOR

HANSON MOTORS
OLYMPIA, WA
1976-1985
MECHANIC

NAME: JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME: COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

CO-WORKERS:

JAMES BECKFORD
HAROLD FOSHAUG
FRED KAST
JERRY LANDERS
MAC RICHARDS
STEVE SMITH
SWEDE TURNQUIST
ROLAND VORONE
DICK STEWART
JOSE "PEPPY" HERRERA
RICHARD KLOOZ

NAME: JAMES DANIEL COLLINS
NICKNAME: ____
GROUP NAME: COLLINS, JAMES DANIEL

WORK HISTORY SHEET

EMPLOYER: COLLINS AUTOMOTIVE ENTERPRISES

JOB SITE: PERSONAL RESIDENCE (S)

CITY, STATE: OLYMPIA, WA

DATE OF JOB: 1975-1976

LENGTH OF JOB: APPROXIMATELY 2 YEARS

MY DUTIES AT THIS JOBSITE: MECHANIC

WAS JOB NEW CONSTRUCTION ____; REPAIR WORK X; or BOTH ____

WAS JOB INDOORS? ____; OUTDOORS? ____; or BOTH X

REASON FOR LEAVING: NEW JOB

WAGE RATE/HOUR: STANDARD

AVERAGE HOURS WORKED/WEEK: ____

SUPERVISOR: ____

NAMES OF COWORKERS & JOB TITLES:

ON THIS JOB SITE WERE YOU EXPOSED TO ANY OF THE FOLLOWING:

| | YES | NO |
|---|---|---|
| CHEMICALS | X | |
| FUMES | X | |
| GASES | X | |
| CHROMIUM | | X |
| CADMIUM | | X |
| ANY OTHER PRODUCT | | X |

LIST: ____

DID YOU WEAR A RESPIRATOR, MASK OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES: ____ NO: X

COMMENTS:

ASBESTOS MATERIALS USED ON THESE JOBS: WORKED WITH AROUND

**SEE ATTACHED LIST**

NAME:          JAMES DANIEL COLLINS
NICKNAME:
GROUP NAME:    COLLINS, JAMES DANIEL

## WORK HISTORY SHEET

| | | | |
|---|---|---|---|
| GASKETS & SHEET PACKING: | MCCORD | X | X |
| | VICTOR | X | X |
| ROPE PACKING & SEALS: | UNKNOWN | X | X |
| JOINT COMPOUND: | UNKNOWN | X | X |
| BRAKE LININGS: | BENDIX | X | X |
| | DELCO | X | X |
| | GENERAL MOTORS/DELCO | X | X |
| | GREY-ROCK | X | X |
| | WAGNER | X | X |
| CLUTCH LININGS: | BORG-WARNER | X | X |
| AUTOMOTIVE PRODUCTS: | AMMCO BRAKE LATHE | X | X |

# EXHIBIT “C”

EFiled: Jun 7 2006 10:28AM EDT
Transaction ID 11464107

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY;

Defendants.

C.A. No. 06C-02-281 ASB

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs has already produced all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are available for review at Plaintiffs' counsel's office.

12. State fully and in detail each and every evidentiary fact upon which the alleged negligence or alleged liability of each defendant is based. As to each such fact, state:

(a) The identities, including names, business addresses, residential address, of each individual having knowledge of those facts;

(b) Identify each document which supports or tends to support the existence of such fact. Identify the document by briefly describing it, and by stating its present location and the name and full business address of the present custodian of the document.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

32. Have you ever been hospitalized, operated upon, or confined to an institution? If yes, please state:

(a) The names and address of all hospitals or institutions involved;

(b)   The beginning and ending dates of each period of hospitalization;
(c)   The nature of the illness, injury or complaint for which you were admitted to the hospital;
(d)   The names, addresses and relationships to you of all persons who treated or examined you;
(e)   The nature and extent of any permanent disabilities or residual effects; and,
(f)   The nature, source, and amount of any disability benefits, pensions or other remunerations received.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.   Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

33.   If you have ever suffered any personal injuries or illness other than those involved in this lawsuit, state for each such injury or illness:
(a)   The date, place, names of persons involved, and circumstances surrounding each such injury or illness;
(b)   The nature and extent of the injuries or illnesses, including all ill effects or disabilities remaining at the time of the last treatment or examination;
(c)   The nature and extent of the injuries or illnesses including all ill effects or disabilities remaining at the time of answering these interrogatories;
(d)   The names and addresses of all persons who treated or examined you, together with the date of the last treatment or examination; and,
(e)   The nature, source, and amount of any disability benefits, pensions, or other remunerations for such injuries or illnesses.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.   Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

34.   With respect to each doctor who has examined or treated you from the year 1936 to date, state the following:
(a)   The name and address of each such doctor;
(b)   The complaint that you had which caused you to see the particular doctor;
(c)   The type of examination and treatment that each doctor gave you; and,
(d)   The date or dates on which you were examined and treated by each particular doctor.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.   Subject to and without waiving any objections, see
also Plaintiff's Medical Expert Reports provided to lead defense
counsel as Exhibit P.

      35.  Have you ever had chest x-rays taken? If so, state the
following for each set of x-rays taken:
            (a)  The name and address of the office or hospital
where the x-rays were taken;
            (b)  The reason why such x-rays were taken;
            (c)  The date or dates on which the x-rays were taken;
            (d)  The x-ray diagnosis that was reported to you.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.   Subject to and without waiving any objections, see
also Plaintiff's Medical Expert Reports provided to lead defense
counsel as Exhibit P.

      41.  State the dates, places, and circumstances of each and
every cardiology examination, or examination related to the
circulatory system in any fashion, conducted upon you during your
lifetime.   In addition, include in your answer for each and every
such examination:
            (a)  Name, address and telephone number of each
prescribing physician;
            (b)  Name, address and telephone number of each
examining physician;
            (c)  Name, address and telephone number of each medical
institution, office or laboratory, public or private, in which
such examination was conducted;
            (d)  Name, address and telephone number of the present
or last known custodian of any results of such examination;
            (e)  The interpretative or diagnostic results,
conclusions or possibilities derived from each such examination.
Include in your answer the date, time, place, source and nature
of each such result, conclusion or possibility at the time that
same was made known to you or anyone related to you or acting in
your behalf; and,
            (f)  Any treatment, recommendation or prescribed
therapy resulting from such examination.  Include in your answer:
                  (i)  Purpose and objective of same;
                  (ii) Success or failure of same;
                  (iii)    Date, time, and duration of each such
course of treatment or therapy, dosage;
                  (iv) Name of medication and the prescribed
                  (v)  Accomplishments or degree of success of such
treatment, therapy, or combination thereof; and,

(vi) Whether you cooperated completely, or in part, or ignored any such treatment, recommendation, prescription, or course of therapy or treatment, and the reasons for any such behavior on your part other than complete cooperation.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

42.   State the dates, places and every pulmonary or respiratory system-related examination conducted upon you during your lifetime.  In addition, include in your answer for each and every such examination the following:
(a)   Name, address and telephone number of each examining physician;
(b)   Name, address and telephone number of each medical institution, office, or laboratory, public-or private, in which such examination was made;
(c)   Name, address and telephone number of the present or last known custodian of any results of such examination;
(d)   The interpretative or diagnostic results, conclusions, or possibilities derived from each such examination. Include in your answer the date, time, place, source and nature of each such result, conclusion or possibility at the time that same was made known to you or anyone related to you or acting in your behalf; and,
(e)   Any treatment, recommendation or prescribed therapy resulting from such examination.  Include in your answer:
(i)   Name, address and telephone number of each prescribing physician;
(ii) Purpose or objective of same;
(iii)       Success or failure of same;
(iv) Date, time and duration of same;
(v)   Name and dosage of prescribed medication;
(vi) Accomplishments or degree of success of such treatment or therapy or combination thereof; and,
(vii)       Whether you cooperated completely or only in part or ignored each such recommendation, prescribed treatment, or therapy, and the reasons for any such behavior on your part other than complete cooperation.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

57.  State in detail such injuries, illnesses or types of ill health which you allege that you have suffered from during the one-year period immediately preceding the diagnosis of asbestosis, pleuritis and/or any other illness or disease alleged to be related to asbestos exposure.  Set forth in detail such symptoms as were evident to you during that period, the date of their appearance, and the identity of all diagnosing and treating physicians.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Plaintiff's Medical Expert Reports provided to lead defense counsel as Exhibit P.

                        Respectfully submitted,

                        **JACOBS & CRUMPLAR, P.A.**

                        By:  /s/ Thomas Crumplar
                             Thomas Crumplar, #0942
                             2 East 7th Street
                             P.O. Box 1271
                             Wilmington, DE 19899
                             (302) 656-5445
                             Attorney for Plaintiff

                        and

                        BARON & BUDD
                        A PROFESSIONAL CORPORATION
                        The Centrum
                        Suite 1100
                        3102 Oak Lawn Avenue
                        Dallas, Texas  75219
                        (214) 521-3605

Date:    June 7, 2006

EFiled: Aug 4 2006 5:56PM EDT
Transaction ID 11989876

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 06C-02-281 ASB |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | |
| Defendants. | : | |

PLAINTIFF'S ANSWERS TO DEFENDANTS FIRST SET OF OVERALL INTERROGATORIES AND REQUESTS FOR PRODUCTION

COMES NOW JAMES DANIEL COLLINS, Plaintiff, herein and by and through his counsel of record, files this his Answers to Defendants' First Set of Overall Interrogatories and Requests for Production Directed to Plaintiffs, in accordance with the Delaware Rules of Civil Procedure.

**INTERROGATORIES**

1. Please update your response to Interrogatory No. 32 of Standing Order Number 1 Interrogatories by identifying each and every hospital admission or hospital treatment you have undergone and, as to each, provide;

(a) The names and address of all hospitals or institutions involved;

(b) The beginning and ending dates of each period of hospitalization;

(c) The nature of the illness, injury or complaint for which you were admitted to the hospital;

(d) The names, addresses and relationships to you of all persons who treated or examined you;

(e) The nature and extent of any permanent disabilities or residual effects; and,

**ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see**

**also Plaintiff's Supplemental List of Hospitalizations provided to defense coordinator as Exhibit O.**

2. Please update your response to Interrogatory No. 34 of Standing Order Number 1 Interrogatories by providing the following information as to each doctor, chiropractor, clinic, or other health care provider that has examined, cared for, treated, diagnosed, consulted, or otherwise seen you or been involved in your health care at any time and for any reason since the date of your birth to date and as to each state the following:

(a) The name and address of each such health care provider;

(b) The reason or reasons that lead the health care provider to become involved with your health care;

(c) The dates on which or time frame during which the health care provider was involved with your health care.

**ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Supplemental List of Physicians provided to defense coordinator as Exhibit N.**

3. Please update your response to Interrogatory No. 35 of Standing Order Number 1 Interrogatories with regard to chest x-rays and for each chest x-ray taken, provide:

(a) The dates when chest x-rays were taken;

(b) The name and address of the office or hospital or similar facility where the x-rays were taken;

(c) The health care provider who requested or ordered the chest x-rays.

**ANSWER: Please see Plaintiff's Answers to Interrogatories Directed to Plaintiff by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Supplemental List of Physicians provided to defense coordinator as Exhibit N and Plaintiff's Supplemental List of Hospitalizations provided to defense coordinator as Exhibit O.**

4. Please provide the full name and address of each and every hospital, clinic, physician's office, laboratory, or other health care provider and/or health care diagnostic facility where you have given or supplied or where you have allowed, suffered, or permitted the taking of any specimen (from any part of your body or body function (i.e, pathology materials) at any time over the past five years and, as to each, provide:

(a) The date or dates when such specimen(s) were given or taken;

(b) A description of such specimen(s);

(c) The name and address of the physician who requested or ordered the giving or taking of such specimen and the reason or reasons why such request or order was made, and;

(d) Whether you believe that any part or portion of the specimen still exists and, if so, the full name and mailing address of the custodian of such specimen(s).

ANSWER: **Plaintiff objects to this Interrogatory with respect to its seeking of information which is neither relevant nor material to the illness involved in this litigation. Plaintiff further objects to this Interrogatory on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and attorney work product privileges. Without waiving this objection and with respect to the illness complained of herein, please see Plaintiff's List(s) of Physicians, Exhibit N, provided to defense coordinator; Plaintiff's List(s)of Hospitalizations, Exhibit O, provided to defense coordinator; Plaintiff's medical expert reports, Exhibit P, provided to defense coordinator; and Plaintiff's medical records for which the requested authorizations have been provided to defense coordinator. Plaintiff further states the following:**

**(a) October 7, 2005 and November 3, 2005**

**(b) Slides -05-273516 and blocks-00SP05016413**

**(c) Dr. Lee A. Coslow-Hutton**
**700 Lilly Road Northeast**
**Olympia, Washington 98506**

**Dr. Ronald Graff**
**209 Martin Luther King Jr. Way**
**Tacoma, Washington 98405**

**(d) All pathology material in Plaintiff's possession and/or authorizations to obtain pathology material have been provided to defense coordinator.**

5. If you claim the right to recover any "out-of-pocket" expenses, including, but not limited to, medical expenses, please update your response to Interrogatory No. 79 of Standing Order No. 1 Interrogatories by itemizing each such expense and stating:

(a) A specific description of each such expense;

(b) The date when such expense was incurred;

(c) To whom it was incurred; and,

(d) For what it was incurred.

ANSWER: **Plaintiff will seek to recover all damages to which Plaintiff is entitled under applicable law. Documents that may detail the exact amounts of "out of pocket" expenses**

**Plaintiff is claiming will be provided no later than the date the Court orders that Final Exhibit Lists be exchanged.**

6.    Please update your response to Interrogatory No. 68 of Standing Order No. 1 Interrogatories by stating whether any statement made by you to any person, entity, agency, or facility, including but not limited to law enforcement officers, insurance company representatives or investigators, government officials, and claims representatives concerning your exposure to asbestos and/or asbestos-containing products and the damages and/or injuries and illnesses claimed as a result thereof was reduced to writing and, as to each, state the name and address of each and every such person or organization to whom such statements or reports were made and the purpose for which they were made.

**ANSWER:    Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. There are no further updates at this time.**

7.    Please update your response to Interrogatory No. 59 of Standing Order No. 1 Interrogatories by advising whether you, at any time, ever made a claim for or received any health or accident insurance benefits, workmen's compensation payments, disability benefits, pensions, accident compensation payments or veterans' disability compensation awards and, if so, stating:

(a)    The circumstances under which you received the benefits or awards or payments;

(b)    The illness or injury for which you received the benefits or awards or payments;

(c)    The names and addresses of your employer at the time of each injury or illness;

(d)    The names and addresses of the examining doctors for each injury or illness;

(e)    The names of the superiors or officers or boards or tribunals before which or to whom the claim or claims were made or filed; the dates made or filed;

(f)    The amount of the benefits or awards or payments;

(g)    The dates covering the times during which you received the benefits or awards or payments; and,

(h)    The agencies or insurance companies from whom you received the benefits or awards or payments.

**ANSWER:    Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. There are no further updates at this time.**

8.    Have you, or has anyone or your behalf, ever claimed, applied for or inquired into the possibility of entitlement to benefits or compensation for your alleged asbestos-related damages, injuries, and/or illnesses from any trust, claims facility, claims organization, insurance carrier, or representative of any person, entity, or facility which ever mined, manufactured, sold, distributed,

or was otherwise in any involved with asbestos, asbestos-containing products, or the asbestos and/or asbestos products industry?

If your answer is in the affirmative, state the full name and address of the trust, claims facility, claims organization, insurance carrier, or representative of any person, entity, or facility which ever mined, manufactured, sold, distributed, or was otherwise in any involved with asbestos, asbestos-containing products, or the asbestos and/or asbestos products industry and, as to each, state:

(a) Whether you or anyone on your behalf applied for compensation or benefits or simply inquired into the possibility of entitlement;

(b) If the application or inquiry was made by someone on your behalf, identify all such individuals by full name, address, and telephone number;

(c) If inquiry only was made, state what information you received and the reasons why you did not pursue a claim or application;

(d) If a claim or application was made, state the outcome of such claim or application.

**ANSWER: Plaintiff objects to this Interrogatory as vague and overly broad. Subject to and without waiving these objections, Plaintiff agrees to provide the amount of all out of court settlements as soon as practical prior to the date of trial.**

9. Please update your response to Interrogatory No. 69 of Standing Order No. 1 Interrogatories by advising whether any investigations or other reports have been prepared, compiled, submitted or made by you or on your behalf in this action and, if so, state fully and in detail as to each such investigation or report:

(a) The identity of same by date, subject matter, name, address, job title or capacity of the person or persons to whom addressed or directed;

(b) The name, address, job title or capacity of the person or persons to whom addressed or directed; and,

(c) The name, address, and present whereabouts of the person who has present custody or control thereof and the purpose of such preparation.

**ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. There are no further updates at this time.**

10. Please update your response to Interrogatory No. 76 of Standing Order No. 1 Interrogatories by, with reference to any expert you expect to call to testify as a witness at the trial, providing full names and addresses and stating:

(a) The subject matter on which the expert is expected to testify;

(b)     The substance of the facts and opinions to which the expert is expected to testify; and,

(c)     A summary of the grounds for each such opinion.

**ANSWER:    Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Please also see Plaintiff's List of Expert Witnesses filed in IN RE ASBESTOS LITIGATION, C.A. No. 77C-ASB-2 (Transaction ID: 10577054) and any supplements thereto.**

11.     Other than in the action in which these interrogatories are filed, have you ever filed, or has anyone ever filed on your behalf, any claim or lawsuit wherein it was alleged that you have suffered any injuries, illnesses, or damages related to asbestos or silicosis?  If your answer is in the affirmative, please state:

(a)     When the claim or lawsuit was filed;

(b)     The state, county and court or agency, carrier, trust, claims facility, or governmental body where the lawsuit was filed and/or the claim was made;

(c)     The current status of the claim or lawsuit or its current status if it has not yet been fully resolved;

(i)     If the claim or lawsuit was dismissed, voluntarily or otherwise, the reasons for such dismissal;

(d)     The names and addresses of all persons Are you or your attorney in possession of documents evidencing or referring to the lawsuit or claim.

**ANSWER:    Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome.  Additionally, Plaintiff objects that this interrogatory seeks information which is neither relevant to the illness complained of herein nor reasonably calculated to lead to the discovery of admissible evidence.**

12.     Other than in the action in which these interrogatories are filed were you ever deposed? If yes, please state:

(a)     Nature of the matter in which you were deposed;

(b)     The date of the deposition;

(c)     The location of the deposition;

(d)     The names and addresses of all persons in possession of the transcript(s) of the deposition.

**ANSWER:   Plaintiff objects as this question is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory on the ground that it is overly broad and irrelevant. Without waiving, and subject to, said objections, Plaintiff states the following:  None in relation to injuries pertaining to the claims made in this litigation.**

13.     Were you ever invited to, was it ever recommended that, or did you ever participate in any way in any medical investigation, screening or evaluation process wherein the possibility of you having contacted any asbestos or silica-related illness or disease was investigated, screened, or evaluated?  If your answer is in the affirmative, please state:

(a)     Where the investigation, screening or evaluation process was conducted;

(b)     Who conducted the investigation, screening or evaluation process;

(c)     When the investigation, screening or evaluation process was conducted;

(d)     Why you were invited to participate in the investigation, screening or evaluation process and the name and address of any person or entity which invited you to do so;

(e)     Why it was recommended that you participate in the investigation, screening or evaluation process and the name and address of any person or entity which recommended that you do so;

(f)     Why you participated in the investigation, screening or evaluation process and the name and address of any person or entity which may have documents illustrating or referring to the process, your participation therein, or the outcome thereof;

(i)     Describe the process and your participation;

(ii)    How often did you participate;

(iii)   What was the outcome of the process; .

**ANSWER:   Plaintiff objects that this interrogatory  seeks information which is neither relevant to the illness complained of herein nor reasonably calculated to lead to the discovery of admissible evidence.**

14.     Please update your response to Interrogatory No. 63 of Standing Order No. 1 Interrogatories by identifying by full name, address, and telephone number, any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including individuals who may have knowledge of your alleged exposure to asbestos and asbestos-containing products and, as to each, please set forth a brief statement as to the knowledge possessed by such persons.

**ANSWER:    Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. There are no further updates at this time.**

15. Please update your response to Interrogatory No. 64 of Standing Order No. 1 Interrogatories by advising if you or your attorneys have any written statements from any persons having knowledge of facts relevant to the subject matter of this lawsuit, including individuals who may have knowledge of your alleged exposure to asbestos and asbestos-containing products and, if so:

(a) Identify by full name, address, and telephone number the persons from whom such statements were obtained, and;

(b) Provide a brief description/summary of such statement.

ANSWER: **Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject and without waiving any objections, Please see Plaintiff's Master Exhibit Lists, previously provided to defense coordinator and Plaintiff's Master Lists of Deposition Testimony, previously provided to defense coordinator, and any supplements thereto.**

16. Please update your response to Interrogatory No. 75 of Standing Order No. 1 Interrogatories by providing the names, telephone numbers, and present addresses of all witnesses you intend to use at the trial of this case and, as to each, provide a brief summary of the expected testimony to be elicited from such witnesses.

ANSWER: **Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject and without waiving any objections, please see Exhibit R, to be provided to defense coordinator in accordance with the courts order. Plaintiff's List of Expert Witnesses filed in IN RE ASBESTOS LITIGATION, C.A. No. 77C-ASB-2 (Transaction ID: 10577054) and any supplements thereto; and Plaintiff's Master Lists of Deposition Testimony, previously provided to defense coordinator and any supplements thereto.**

17. Have you or any of your attorneys, legal representatives, or other persons acting at your request or on your behalf ever prepared a document serving as a listing of your work/occupational history? If so, as to each listing, please identify:

(a) When such document was prepared;
(b) Who prepared it;
(c) Why it was prepared;
(d) The full name and address of all persons shown the document as the reason or reasons why it was shown to such person:

ANSWER: **Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the extent that this interrogatory requests information protected by the attorney-client and work-product privileges. Subject to and without waiving these objections, see Plaintiff's Work History Sheet, previously provided to defense coordinator as Exhibit K.**

**REQUESTS FOR PRODUCTION**

1.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 1 above.

**RESPONSE:** Plaintiffs' List of Hospitalizations were previously provided to defense coordinator as Exhibit O.

2.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 2 above.

**RESPONSE:** Plaintiffs' Supplemental List of Hospitalizations are provided to defense coordinator as supplements to Exhibit N.

3.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 3 above.

**RESPONSE:** Plaintiffs' Supplemental List of Hospitalizations are provided to defense coordinator as supplements to Exhibit N.

4.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 4 above.

**RESPONSE:** Plaintiffs' Supplemental List of Physicians are provided to defense coordinator as supplements to Exhibit N and Plaintiffs' Supplemental List of Hospitalizations are provided to defense coordinator as supplements Exhibit O. Any and all pathology materials have previously been provided to defense coordinator.

5.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 5 above.

**RESPONSE:** There are no responsive documents at this time. However, discovery is ongoing and Plaintiff reserves the right to supplement.

6.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 6 above.

**RESPONSE:** There are no responsive documents.

7.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 7 above.

**RESPONSE:** There are no responsive documents.

8.    Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 8 above.

**RESPONSE**: There are no documents responsive to this request at this time. However, Plaintiff reserves the right to supplement.

9. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 9 above.

**RESPONSE**: There are no responsive documents.

10. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 10 above.

**RESPONSE**: Any and all responsive documents were previously provided to defense coordinator or are available via E-file.

11. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 11 above.

**RESPONSE**: There are no responsive documents.

12. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 12 above.

**RESPONSE**: There are no responsive documents.

13. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 13 above.

**RESPONSE**: There are no responsive documents.

14. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 14 above.

**RESPONSE**: There are no responsive documents.

15. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 15 above.

**RESPONSE**: Any and all responsive documents were previously provided to defense coordinator.

16. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 16 above.

**RESPONSE**: Any and all responsive documents were previously provided to defense coordinator or are available via E-file.

17. Produce all documents and materials referenced or relied upon in your answer to Interrogatory No. 17 above.

**RESPONSE**: Plaintiff's Work History Sheets were previously provided to defense coordinator as Exhibit K.

Dated: August 4, 2006

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By: /s/ Thomas Crumplar
Thomas Crumplar, #0942
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

EFiled: Aug 7 2006 5:31PM EDT
Transaction ID 12001503

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 06C-02-281 ASB |
| METROPOLITAN LIFE INSURANCE COMPANY et. al.; | : | |
| Defendants. | : | |

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs has provided and/or will provide all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are available for review at Plaintiffs' Counsel's office.

**B. Employment Background**

10. State the names and address of each employer for whom you worked during the years 1936 to date, stating as to each such employer the beginning and ending dates of employment, the nature of the business, the name and address of your direct supervisor, and your particular job function.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's Jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

**C. Product I.D. and Exposure History**

11. With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each defendant.

(a) The name of the product or products;

(e)  The name and last known address of all persons with whom you worked on such jobs; and,

ANSWER:  (a)  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

(e)  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

12.  State fully and in detail each and every evidentiary fact upon which the alleged negligence or alleged liability of each defendant is based.  As to each such fact, state:
     (a)  The identities, including names, business addresses, residential address, of each individual having knowledge of those facts;
     (b)  Identify each document which supports or tends to support the existence of such fact.  Identify the document by briefly describing it, and by stating its present location and the name and full business address of the present custodian of the document.

ANSWER:  (a)-(b) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

13.  For each asbestos containing product, material or mineral, manufactured, produced, prepared, distributed or sold by each defendant, state in detail for each such defendant:
     (a)  Which such product, material compound, etc. (hereinafter referred to as "product") you claimed to have come into contact with at any time from 1936 to the present;
     (b)  Describe separately and in detail each such product as fully as possible including the trade name, product type and product contents;
     (c)  The dates on which you came into contact with each such product, as listed in your answer to subpart (a) of this interrogatory, and state with which product or products you came into contact with on each such date;

(d)  The name, address and telephone number of your employer and each date listed in subpart (c) above;

(e)  The name, address and location of your place of employment or job site on each date listed in subpart (c) above;

(f)  The address of your residence on each date listed in subpart (c) above;

(g)  The type of work you were performing on each such date set forth in subpart (c) above;

(h)  The present name, business address and telephone number, and residence address and telephone number of each person who witnessed your work on each date set forth in subpart (c) above;

(i)  All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instruction sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;

(j)  Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;

(k)  For what purpose you used each such product listed in your answer to subpart (a) above; and,

(l)  All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory.  Include in your answer the subject matter, document title and publication date of all such literature.

ANSWER:  (a)-(l) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

14.  In regard to each and every other defendant named or to be named in this lawsuit, answer and provide all the information requested in Interrogatory No. 13 accordingly.

ANSWER:  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

16.  With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:

(a)   The name and address of the employer for whom you worked;
(b)   The location of each job (stating the plant site, city, county and state);
(c)   The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

ANSWER:   (a)-(c)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

    18.   Please list all past employers in whose employ you came into contact with asbestos or asbestos-containing materials. Include in your answer for each such employer:
(a)   Name, address and telephone number;
(b)   Job title and work description;
(c)   Type and identity of each such asbestos material with which you had contact;
(d)   Whether employer provided safety equipment so as to reduce or prevent harmful exposure to asbestos materials;
(e)   Whether employer required that employees use safety equipment of the type referred to in subpart (d) above;
(f)   Whether employer ever recommended that such safety equipment be used by its employees;
(g)   Whether employer provided showers for employees;
(h)   Whether employer provided separate lockers for both work and personal clothing; and,
(i)   If company-sponsored physical examinations were required or made available.   If so, please state:
        (i)   Whether required or optional;
        (ii) Frequency of examination;
        (iii)    Nature and extent of examination;
        (iv) Whether x-ray examination or respiratory or pulmonary examinations were included;
        (v)   Frequency with which you submitted to such examination when required or made available;
        (vi) Your detailed reason for failing to submit to such examination when required or made available;
        (vii)    Results of each such examination; and,
        (viii)   Name, address and telephone number of examining physician, nurse or technician.

ANSWER:   (a)-(i)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers

at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

44. For each and every present or past symptom, indication, malaise or effects which you contend to be directly or indirectly related to any disease, disability or physical condition or state of your body or health, and which you contend is relevant to this lawsuit, please state:

(a) Nature and description of such symptoms;

(b) The disease, disability or physical condition to which said symptom is related and the nature and extent of such relationship;

(c) The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge;

(d) Whether you contend such symptom is related in any fashion to asbestosis or pleuritis, or any other condition from which you allegedly suffer, and the nature and extent of such relationship;

(e) Whether you contend that such symptom is related in any fashion to the use or effect of any product manifested, sold or distributed, in whole or in part, by defendant or any subdivision or affiliate thereof. Include in your answer the nature and extent of said relationship and the name, description and identity of the product referred to in your answer;

(f) The facts, writings and publications, etc., upon which you base all or part of any of your above-stated contentions. If you will do so without a motion to produce, please attach copies of all such writings or publications; and,

(g) The name, business address and telephone number, job title, and resident address and telephone number of each and every witness who can testify in support of any or part of any of your above-stated contentions.

ANSWER: (a)-(g) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

63. Do you or your attorneys know of any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including witnesses to the injury, illnesses, etc. in question? If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you, the present whereabouts of all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

64.  Do you or your attorneys have any written statements from any persons having knowledge of facts relevant to the subject matter of this lawsuit, including witnesses to the accident, injury, illnesses, etc. in question?  If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you and the present whereabouts of all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

67.  If your claim is based to any extent or nature upon expert opinion other than medical experts, please state the name, address, home telephone number, place of employment, relationship to you, and present whereabouts of all such experts.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.  See also Plaintiff's Expert Witness List filed in 77C-ASB-2 and any supplements thereto.

71.  List the names, addresses and relationship to plaintiff of all persons who were witnesses to the accident, injuries or illnesses which are the subject matter of this lawsuit.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

73.  If your answer to Interrogatory No. 72 is in the affirmative, was any such statement in writing and, if so, in whose possession is such statement and when and where may it be inspected by defendants?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     74.  If your answer to Interrogatory No. 72 is in the
affirmative, and any such statement was oral, when and where was
any such statement made, in whose presence was such statement
made, and what was the substance of such statement?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     75.  Give the names and present addresses of all witnesses
you intend to use at the trial of this case with respect to the
occurrence and/or cause of your illness or with respect to
claimed damages or with respect to the liability of these
defendants.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     76.  With reference to any expert you expect to call to
testify as a witness at the trial, state the name and address of
such expert and, as to each expert named, state:
          (a)  The subject matter on which the expert is expected
to testify;
          (b)  The substance of the facts and opinions to which
the expert is expected to testify; and,
          (c)  A summary of the grounds for each such opinion.


ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections,

1.   Dr. Steven Dikman
     One Gustave Place
     Annenberg Building 15/58
     Department of Pathology
     New York, New York  10029
     (212) 241-7343
     (212) 241-8014

Dr. Dikman may testify, live or by deposition, concerning his
review of the medical records, pathology and work history of
Plaintiff and his diagnosis of mesothelioma in this case.
Additionally, Dr. Dikman may testify Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Dikman may testify concerning the clinical course
and progression of Plaintiff's asbestos-related mesothelioma.
Dr. Dikman may also testify that Plaintiff has incurred in the
past and will incur in the future, medical expenses as a result
of his exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Dikman may testify that Plaintiff will require
medical monitoring and may require treatment and/or
hospitalizations as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma. Dr. Dikman will also
testify as to Plaintiff's prognosis generally. Further,
Dr. Dikman may testify concerning the increased risk of cancer
faced by asbestos exposed workers and the epidemiological link
between asbestos and cancer.  More specifically, Dr. Dikman may
testify as to Plaintiff's increased risk of developing an
asbestos-related cancer during his lifetime as a result of his
exposure to Defendant's asbestos-containing products.  Dr. Dikman
may testify as to the hazardous nature of asbestos and/or
asbestos-containing products and as a result, that such asbestos
and/or asbestos-containing products are unreasonably dangerous.
Defense counsel are in possession of numerous transcripts within
which Dr. Dikman's opinions have been fully explored.  A copy of
Dr. Dikman's report has been previously forwarded to all
Defendants.

2.   Dr. Dabe
     770 Lilly Road, Northeast
     Olympia, Washington  98506
     (800) 858-9996

Dr. Dabe may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Dabe may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Dabe  may testify that Plaintiff's mesothelioma was caused by

his exposure to Defendants' asbestos-containing products.
Dr. Dabe may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Dabe may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Dabe may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Dabe may testify
that Plaintiff will require medical monitoring and may require
treatment and/or hospitalizations as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Dabe will also testify as to Plaintiff's prognosis generally.
A copy of Dr. Dabe's records may be obtained by Defendants with
the medical authorization previously provided to Defendants by
Plaintiff.

3.    Dr. Naseer Ahmad
      770 Lilly Road, Northeast
      Olympia, Washington  98506
      (800) 858-9996

Dr. Ahmad may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Ahmad may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Ahmad  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Ahmad may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Ahmad may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Ahmad may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Ahmad may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Ahmad will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Ahmad's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

4.    Dr. Ronald Graff
      209 Martin Luther King, Jr. Way
      Tacoma, Washington  58405
      (253) 596-3390

Dr. Graff may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Graff may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Graff  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Graff may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Graff may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Graff may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Graff may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Graff will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Graff's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

5.    Dr. Dean Mastras
      314 Martin Luther King, Jr. Way
      Tacoma, Washington  98405
      (253) 627-6172

Dr. Mastras may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Mastras may testify concerning his review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Mastras  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Mastras may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Mastras may also testify that more probably than

not, Plaintiff's death will be caused and/or precipitated by his mesothelioma arising from exposure to Defendants' asbestos-containing products. Dr. Mastras may also testify that Plaintiff has incurred in the past and will incur in the future medical expenses as a result of his exposure to asbestos, his asbestos-related disease, and mesothelioma. Dr. Mastras may testify that Plaintiff will require medical monitoring and may require treatment and/or hospitalizations as a result of his exposure to asbestos, his asbestos-related disease, and mesothelioma. Dr. Mastras will also testify as to Plaintiff's prognosis generally. A copy of Dr. Mastras's records may be obtained by Defendants with the medical authorization previously provided to Defendants by Plaintiff.

6.    Dr. Kevin Touney
      770 Lilly Road, Northeast
      Olympia, Washington  98513
      (800) 858-9996

Dr. Touney may testify, live or by deposition, concerning his examination and treatment of Plaintiff and his diagnosis of mesothelioma in this case. He may testify concerning asbestos, the effects of asbestos on the body and any other topics related thereto. Dr. Touney may testify concerning his review of medical records and as to the clinical course and progression of Plaintiff's asbestos-related mesothelioma. Additionally, Dr. Touney may testify that Plaintiff's mesothelioma was caused by his exposure to Defendants' asbestos-containing products. Dr. Touney may testify as to the hazardous nature of asbestos and/or asbestos-containing products and as a result, that such asbestos and/or asbestos-containing products are unreasonably dangerous. Dr. Touney may also testify that more probably than not, Plaintiff's death will be caused and/or precipitated by his mesothelioma arising from exposure to Defendants' asbestos-containing products. Dr. Touney may also testify that Plaintiff has incurred in the past and will incur in the future medical expenses as a result of his exposure to asbestos, his asbestos-related disease, and mesothelioma. Dr. Touney may testify that Plaintiff will require medical monitoring and may require treatment and/or hospitalizations as a result of his exposure to asbestos, his asbestos-related disease, and mesothelioma. Dr. Touney will also testify as to Plaintiff's prognosis generally. A copy of Dr. Touney's records may be obtained by Defendants with the medical authorization previously provided to Defendants by Plaintiff.

7.    Dr. Ann Williams
      700 Lilly Road, Northeast
      Olympia, Washington  98506
      (360) 923-7000

Dr. Williams may testify, live or by deposition, concerning her
examination and treatment of Plaintiff and her diagnosis of
mesothelioma in this case.  She may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Williams may testify concerning her review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Williams  may testify that Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Williams may testify as to the hazardous nature of
asbestos and/or asbestos-containing products and as a result,
that such asbestos and/or asbestos-containing products are
unreasonably dangerous.  Dr. Williams may also testify that more
probably than not, Plaintiff's death will be caused and/or
precipitated by his mesothelioma arising from exposure to
Defendants' asbestos-containing products.  Dr. Williams may also
testify that Plaintiff has incurred in the past and will incur in
the future medical expenses as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Williams may testify that Plaintiff will require medical
monitoring and may require treatment and/or hospitalizations as a
result of his exposure to asbestos, his asbestos-related disease,
and mesothelioma.  Dr. Williams will also testify as to
Plaintiff's prognosis generally.  A copy of Dr. Williams's
records may be obtained by Defendants with the medical
authorization previously provided to Defendants by Plaintiff.

See also Plaintiff's List of Expert Witnesses filed in 77C-ASB-2
and any supplements thereto.

All witnesses listed by all Defendants.

All witnesses listed in Plaintiff's Answers to Interrogatories.

All witnesses listed in Plaintiff's Standard List of Deposition
Testimony.

All witnesses deposed in this case.

All witnesses listed by Plaintiff in deposition.

Any physician who has examined and/or treated Plaintiff.

Any and all records custodians, live or by deposition upon
written questions, for any physicians or institutions listed

herein or revealed in Plaintiffs' Answers to Interrogatories or any other pleading on file in this case.

102. If your claim that, as a result of the negligence alleged in the Complaint, you experienced any conscious pain and suffering for which you claim the right to recover damages in this lawsuit, state:

(b) The name and address of any person having knowledge that it was, in fact, experienced;

ANSWER: (b) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By: /s/ Thomas Crumplar
Thomas Crumplar, #0942
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date: August 7, 2006

EFiled: Aug 11 2006 9:58AM EDT
Transaction ID 12049569

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 06C-02-281 ASB |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | |
| Defendants. | : | |

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES
DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs have provided and/or will provide all Documents and Exhibits to defense coordinator pursuant to Standing Order No. 1. These Documents and Exhibits are also available for review at Plaintiff's Counsel's office.

99. If you claim that you have sustained any loss of income or earning power as a result of the incident which is the subject of this lawsuit, either in the past, present or in the future, state:

(a) The total value of the loss you claim was sustained;

(b) The inclusive dates when you claim you were unable to work as a result of the incident and the reason why you were unable to work on such dates;

(c) A specific description of the type or types of work you would have been performing or would have been able to perform during the period stated;

(d) The rate of income you would have been able to receive had the alleged incident not occurred, e.g., $1.00 per hour, $50.00 per week, etc.; and,

(e) The name and address of the person, corporation or other entity which would have been your employer.

ANSWER: (a) See Economic Analysis provided to defense coordinator as Exhibit S.

(b)-(e) Plaintiff objects to this Interrogatory as it is unduly burdensome. Without waiving this objection, Plaintiff

refers the Defendant to Plaintiff's Petition filed in this case and Plaintiff's deposition testimony given or to be given in this case.  Please also see Plaintiff's economic loss report which will be provided.

100. Insofar as you intend to introduce into evidence any expert testimony concerning part of future loss or earning power or the present value of a sum of money concerning a future loss of expense and such evidence will be introduced through an expert economist or actuary, state the name and address of such expert and, as to each such person named, state:

(a)     A specific description of the losses for which such of future earnings, present value of the loss of future earnings, present value of second job earnings, present value of future medical expenses, etc.;

(b)     Describe in detail precisely the manner in which the person reached his conclusions showing the mathematical calculations involved; and,

(c)     Insofar as such person has prepared any report or memoranda showing in whole or in part his conclusions or the facts on which such conclusions were based, state the date of such writing and the names and addresses of persons having copies of it.  If you will do so without a motion to produce, please attach a copy of any such report to these answers.

ANSWER:   See answer to Interrogatory No. 99.

101. State all facts upon which you base your claim concerning your potential earnings or earning power.

ANSWER:   See answer to Interrogatory No. 99.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By:  /s/ Thomas Crumplar
     Thomas Crumplar, #0942
     2 East 7th Street
     P.O. Box 1271
     Wilmington, DE 19899
     (302) 656-5445
     Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas  75219
(214) 521-3605


Date:     August 11, 2006

EFiled: Aug 18 2006 2:57PM EDT
Transaction ID 12119544

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY et. al.;

Defendants.

C.A. No. 06C-02-281 ASB

PLAINTIFFS' SECOND SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs has provided and/or will provide all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are available for review at Plaintiffs' Counsel's office.

**B. Employment Background**

10. State the names and address of each employer for whom you worked during the years 1936 to date, stating as to each such employer the beginning and ending dates of employment, the nature of the business, the name and address of your direct supervisor, and your particular job function.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's Jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

**C. Product I.D. and Exposure History**

11. With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each defendant.

(a) The name of the product or products;

(e)   The name and last known address of all persons with whom you worked on such jobs; and,

ANSWER:   (a)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

(e)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

12.   State fully and in detail each and every evidentiary fact upon which the alleged negligence or alleged liability of each defendant is based.  As to each such fact, state:
        (a)   The identities, including names, business addresses, residential address, of each individual having knowledge of those facts;
        (b)   Identify each document which supports or tends to support the existence of such fact.  Identify the document by briefly describing it, and by stating its present location and the name and full business address of the present custodian of the document.

ANSWER:   (a)-(b) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

13.   For each asbestos containing product, material or mineral, manufactured, produced, prepared, distributed or sold by each defendant, state in detail for each such defendant:
        (a)   Which such product, material compound, etc. (hereinafter referred to as "product") you claimed to have come into contact with at any time from 1936 to the present;
        (b)   Describe separately and in detail each such product as fully as possible including the trade name, product type and product contents;
        (c)   The dates on which you came into contact with each such product, as listed in your answer to subpart (a) of this interrogatory, and state with which product or products you came into contact with on each such date;

(d)   The name, address and telephone number of your employer and each date listed in subpart (c) above;

(e)   The name, address and location of your place of employment or job site on each date listed in subpart (c) above;

(f)   The address of your residence on each date listed in subpart (c) above;

(g)   The type of work you were performing on each such date set forth in subpart (c) above;

(h)   The present name, business address and telephone number, and residence address and telephone number of each person who witnessed your work on each date set forth in subpart (c) above;

(i)   All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instruction sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;

(j)   Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;

(k)   For what purpose you used each such product listed in your answer to subpart (a) above; and,

(l)   All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory.  Include in your answer the subject matter, document title and publication date of all such literature.

ANSWER:  (a)-(l) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

14.   In regard to each and every other defendant named or to be named in this lawsuit, answer and provide all the information requested in Interrogatory No. 13 accordingly.

ANSWER:  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

16.   With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:

       (a)   The name and address of the employer for whom you worked;
       (b)   The location of each job (stating the plant site, city, county and state);
       (c)   The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

ANSWER:  (a)-(c)  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

   18.  Please list all past employers in whose employ you came into contact with asbestos or asbestos-containing materials. Include in your answer for each such employer:
       (a)   Name, address and telephone number;
       (b)   Job title and work description;
       (c)   Type and identity of each such asbestos material with which you had contact;
       (d)   Whether employer provided safety equipment so as to reduce or prevent harmful exposure to asbestos materials;
       (e)   Whether employer required that employees use safety equipment of the type referred to in subpart (d) above;
       (f)   Whether employer ever recommended that such safety equipment be used by its employees;
       (g)   Whether employer provided showers for employees;
       (h)   Whether employer provided separate lockers for both work and personal clothing; and,
       (i)   If company-sponsored physical examinations were required or made available.  If so, please state:
          (i)   Whether required or optional;
          (ii) Frequency of examination;
          (iii)   Nature and extent of examination;
          (iv) Whether x-ray examination or respiratory or pulmonary examinations were included;
          (v)   Frequency with which you submitted to such examination when required or made available;
          (vi) Your detailed reason for failing to submit to such examination when required or made available;
          (vii)   Results of each such examination; and,
          (viii)   Name, address and telephone number of examining physician, nurse or technician.

ANSWER:  (a)-(i)  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers

at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

44. For each and every present or past symptom, indication, malaise or effects which you contend to be directly or indirectly related to any disease, disability or physical condition or state of your body or health, and which you contend is relevant to this lawsuit, please state:

(a)  Nature and description of such symptoms;

(b)  The disease, disability or physical condition to which said symptom is related and the nature and extent of such relationship;

(c)  The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge;

(d)  Whether you contend such symptom is related in any fashion to asbestosis or pleuritis, or any other condition from which you allegedly suffer, and the nature and extent of such relationship;

(e)  Whether you contend that such symptom is related in any fashion to the use or effect of any product manifested, sold or distributed, in whole or in part, by defendant or any subdivision or affiliate thereof.  Include in your answer the nature and extent of said relationship and the name, description and identity of the product referred to in your answer;

(f)  The facts, writings and publications, etc., upon which you base all or part of any of your above-stated contentions.  If you will do so without a motion to produce, please attach copies of all such writings or publications; and,

(g)  The name, business address and telephone number, job title, and resident address and telephone number of each and every witness who can testify in support of any or part of any of your above-stated contentions.

ANSWER:  (a)-(g)  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

63. Do you or your attorneys know of any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including witnesses to the injury, illnesses, etc. in question? If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you, the present whereabouts of all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

64.   Do you or your attorneys have any written statements
from any persons having knowledge of facts relevant to the
subject matter of this lawsuit, including witnesses to the
accident, injury, illnesses, etc. in question?  If yes, please
state the names, addresses, home telephone numbers, places of
employment, relationship to you and the present whereabouts of
all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

67.   If your claim is based to any extent or nature upon
expert opinion other than medical experts, please state the name,
address, home telephone number, place of employment, relationship
to you, and present whereabouts of all such experts.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.  See also Plaintiff's Expert
Witness List filed in 77C-ASB-2 and any supplements thereto.

71.   List the names, addresses and relationship to plaintiff
of all persons who were witnesses to the accident, injuries or
illnesses which are the subject matter of this lawsuit.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

73.   If your answer to Interrogatory No. 72 is in the
affirmative, was any such statement in writing and, if so, in
whose possession is such statement and when and where may it be
inspected by defendants?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

    74.  If your answer to Interrogatory No. 72 is in the
affirmative, and any such statement was oral, when and where was
any such statement made, in whose presence was such statement
made, and what was the substance of such statement?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

    75.  Give the names and present addresses of all witnesses
you intend to use at the trial of this case with respect to the
occurrence and/or cause of your illness or with respect to
claimed damages or with respect to the liability of these
defendants.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

    76.  With reference to any expert you expect to call to
testify as a witness at the trial, state the name and address of
such expert and, as to each expert named, state:
         (a)  The subject matter on which the expert is expected
to testify;
         (b)  The substance of the facts and opinions to which
the expert is expected to testify; and,
         (c)  A summary of the grounds for each such opinion.


ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections,

1.    Dr. Steven Dikman
      One Gustave Place
      Annenberg Building 15/58
      Department of Pathology
      New York, New York  10029
      (212) 241-7343
      (212) 241-8014

Dr. Dikman may testify, live or by deposition, concerning his
review of the medical records, pathology and work history of
Plaintiff and his diagnosis of mesothelioma in this case.
Additionally, Dr. Dikman may testify Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Dikman may testify concerning the clinical course
and progression of Plaintiff's asbestos-related mesothelioma.
Dr. Dikman may also testify that Plaintiff has incurred in the
past and will incur in the future, medical expenses as a result
of his exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Dikman may testify that Plaintiff will require
medical monitoring and may require treatment and/or
hospitalizations as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma. Dr. Dikman will also
testify as to Plaintiff's prognosis generally. Further,
Dr. Dikman may testify concerning the increased risk of cancer
faced by asbestos exposed workers and the epidemiological link
between asbestos and cancer.  More specifically, Dr. Dikman may
testify as to Plaintiff's increased risk of developing an
asbestos-related cancer during his lifetime as a result of his
exposure to Defendant's asbestos-containing products.  Dr. Dikman
may testify as to the hazardous nature of asbestos and/or
asbestos-containing products and as a result, that such asbestos
and/or asbestos-containing products are unreasonably dangerous.
Defense counsel are in possession of numerous transcripts within
which Dr. Dikman's opinions have been fully explored.  A copy of
Dr. Dikman's report has been previously forwarded to all
Defendants.

2.    Dr. Dabe
      770 Lilly Road, Northeast
      Olympia, Washington  98506
      (800) 858-9996

Dr. Dabe may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case. He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Dabe may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Dabe  may testify that Plaintiff's mesothelioma was caused by

his exposure to Defendants' asbestos-containing products.
Dr. Dabe may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Dabe may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Dabe may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Dabe may testify
that Plaintiff will require medical monitoring and may require
treatment and/or hospitalizations as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Dabe will also testify as to Plaintiff's prognosis generally.
A copy of Dr. Dabe's records may be obtained by Defendants with
the medical authorization previously provided to Defendants by
Plaintiff.

3.    Dr. Naseer Ahmad
      770 Lilly Road, Northeast
      Olympia, Washington  98506
      (800) 858-9996

Dr. Ahmad may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Ahmad may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Ahmad  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Ahmad may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Ahmad may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Ahmad may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Ahmad may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Ahmad will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Ahmad's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

4.    Dr. Ronald Graff
      209 Martin Luther King, Jr. Way
      Tacoma, Washington  58405
      (253) 596-3390

Dr. Graff may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Graff may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Graff  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Graff may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Graff may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Graff may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Graff may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Graff will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Graff's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

5.    Dr. Dean Mastras
      314 Martin Luther King, Jr. Way
      Tacoma, Washington  98405
      (253) 627-6172

Dr. Mastras may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Mastras may testify concerning his review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Mastras  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Mastras may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Mastras may also testify that more probably than

not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Mastras may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Mastras may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Mastras will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Mastras's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

6.    Dr. Kevin Touney
      770 Lilly Road, Northeast
      Olympia, Washington  98513
      (800) 858-9996

Dr. Touney may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Touney may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Touney  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Touney may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Touney may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Touney may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Touney may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Touney will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Touney's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

7.    Dr. Ann Williams
      700 Lilly Road, Northeast
      Olympia, Washington  98506
      (360) 923-7000

Dr. Williams may testify, live or by deposition, concerning her
examination and treatment of Plaintiff and her diagnosis of
mesothelioma in this case.  She may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Williams may testify concerning her review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Williams  may testify that Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Williams may testify as to the hazardous nature of
asbestos and/or asbestos-containing products and as a result,
that such asbestos and/or asbestos-containing products are
unreasonably dangerous.  Dr. Williams may also testify that more
probably than not, Plaintiff's death will be caused and/or
precipitated by his mesothelioma arising from exposure to
Defendants' asbestos-containing products.  Dr. Williams may also
testify that Plaintiff has incurred in the past and will incur in
the future medical expenses as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Williams may testify that Plaintiff will require medical
monitoring and may require treatment and/or hospitalizations as a
result of his exposure to asbestos, his asbestos-related disease,
and mesothelioma.  Dr. Williams will also testify as to
Plaintiff's prognosis generally.  A copy of Dr. Williams's
records may be obtained by Defendants with the medical
authorization previously provided to Defendants by Plaintiff.

See also Plaintiff's List of Expert Witnesses filed in 77C-ASB-2
and any supplements thereto.

All witnesses listed by all Defendants.

All witnesses listed in Plaintiff's Answers to Interrogatories.

All witnesses listed in Plaintiff's Standard List of Deposition
Testimony.

All witnesses deposed in this case.

All witnesses listed by Plaintiff in deposition.

Any physician who has examined and/or treated Plaintiff.

Any and all records custodians, live or by deposition upon
written questions, for any physicians or institutions listed

herein or revealed in Plaintiffs' Answers to Interrogatories or any other pleading on file in this case.

102. If your claim that, as a result of the negligence alleged in the Complaint, you experienced any conscious pain and suffering for which you claim the right to recover damages in this lawsuit, state:

(b) The name and address of any person having knowledge that it was, in fact, experienced;

ANSWER: (b) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By: /s/ Robert Jacobs Esquire
Robert Jacobs Esquire, #0244
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date: August 18,2006

EFiled: Aug 18 2006 3:11PM EDT
Transaction ID 12119725

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 06C-02-281 ASB |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | |
| Defendants. | : | |

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs has already produced all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are available for review at Plaintiffs' counsel's office.

10. State the names and address of each employer for whom you worked during the years 1936 to date, stating as to each such employer the beginning and ending dates of employment, the nature of the business, the name and address of your direct supervisor, and your particular job function.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Second Amended Work History Sheet(s) provided to lead defense counsel as Exhibit K.

11. With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each. defendant.

(a) The name of the product or products;

(b) The name of your employer at the time you worked with or around such product;

(c) The name and address of the plant where you worked with or around such products;

(d) The name and last known address of your immediate supervisor or job superintendent on such job;

      (e)  The name and last known address of all persons with whom you worked on such jobs; and,

      (f)  The approximate length of time that you worked on each such job.

ANSWER:  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Plaintiff's Second Amended Work History Sheet(s) provided to lead defense counsel as Exhibit K.

    12.  State fully and in detail each and every evidentiary fact upon which the alleged negligence or alleged liability of each defendant is based.  As to each such fact, state:

      (a)  The identities, including names, business addresses, residential address, of each individual having knowledge of those facts;

      (b)  Identify each document which supports or tends to support the existence of such fact.  Identify the document by briefly describing it, and by stating its present location and the name and full business address of the present custodian of the document.

ANSWER:  Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Plaintiff's Second Amended Work History Sheet(s) provided to lead defense counsel as Exhibit K.

    13.  For each asbestos containing product, material or mineral, manufactured, produced, prepared, distributed or sold by each defendant, state in detail for each such defendant:

      (a)  Which such product, material compound, etc. (hereinafter referred to as "product") you claimed to have come into contact with at any time from 1936 to the present;

      (b)  Describe separately and in detail each such product as fully as possible including the trade name, product type and product contents;

      (c)  The dates on which you came into contact with each such product, as listed in your answer to subpart (a) of this interrogatory, and state with which product or products you came into contact with on each such date;

      (d)  The name, address and telephone number of your employer and each date listed in subpart (c) above;

      (e)  The name, address and location of your place of employment or job site on each date listed in subpart (c) above;

      (f)  The address of your residence on each date listed in subpart (c) above;

      (g)  The type of work you were performing on each such date set forth in subpart (c) above;

(h) The present name, business address and telephone number, and residence address and telephone number of each person who witnessed your work on each date set forth in subpart (c) above;

(i) All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instruction sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;

(j) Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;

(k) For what purpose you used each such product listed in your answer to subpart (a) above; and,

(l) All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory. Include in your answer the subject matter, document title and publication date of all such literature.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Second Amended Work History Sheet(s) provided to lead defense counsel as Exhibit K.

16. With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:

(a) The name and address of the employer for whom you worked;

(b) The location of each job (stating the plant site, city, county and state);

(c) The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiff's Second Amended Work History Sheet(s) provided to lead defense counsel as Exhibit K.

17. Are you able to state that you have not worked with or around asbestos products manufactured by companies who are not named defendants in this suit?

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in

this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    18.  Please list all past employers in whose employ you came
into contact with asbestos or asbestos-containing materials.
Include in your answer for each such employer:
        (a)  Name, address and telephone number;
        (b)  Job title and work description;
        (c)  Type and identity of each such asbestos material
with which you had contact;
        (d)  Whether employer provided safety equipment so as
to reduce or prevent harmful exposure to asbestos materials;
        (e)  Whether employer required that employees use
safety equipment of the type referred to in subpart (d) above;
        (f)  Whether employer ever recommended that such safety
equipment be used by its employees;
        (g)  Whether employer provided showers for employees;
        (h)  Whether employer provided separate lockers for
both work and personal clothing; and,
        (i)  If company-sponsored physical examinations were
required or made available.   If so, please state:
            (i)  Whether required or optional;
            (ii) Frequency of examination;
            (iii)    Nature and extent of examination;
            (iv) Whether x-ray examination or respiratory or
pulmonary examinations were included;
            (v)  Frequency with which you submitted to such
examination when required or made available;
            (vi) Your detailed reason for failing to submit to
such examination when required or made available;
            (vii)    Results of each such examination; and,
            (viii)   Name, address and telephone number of
examining physician, nurse or technician.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    44.  For each and every present or past symptom, indication,
malaise or effects which you contend to be directly or indirectly
related to any disease, disability or physical condition or state
of your body or health, and which you contend is relevant to this
lawsuit, please state:
            (g)  The name, business address and telephone number,
job title, and resident address and telephone number of each and
every witness who can testify in support of any or part of any of
your above-stated contentions.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    63.  Do you or your attorneys know of any person or persons
having knowledge of facts relevant to the allegations in this
lawsuit, including witnesses to the injury, illnesses, etc. in
question? If yes, please state the names, addresses, home
telephone numbers, places of employment, relationship to you, the
present whereabouts of all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    64.  Do you or your attorneys have any written statements
from any persons having knowledge of facts relevant to the
subject matter of this lawsuit, including witnesses to the
accident, injury, illnesses, etc. in question?  If yes, please
state the names, addresses, home telephone numbers, places of
employment, relationship to you and the present whereabouts of
all such persons.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    67.  If your claim is based to any extent or nature upon
expert opinion other than medical experts, please state the name,
address, home telephone number, place of employment, relationship
to you, and present whereabouts of all such experts.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

    71.  List the names, addresses and relationship to plaintiff
of all persons who were witnesses to the accident, injuries or
illnesses which are the subject matter of this lawsuit.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in

this case.   Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

      75.  Give the names and present addresses of all witnesses
you intend to use at the trial of this case with respect to the
occurrence and/or cause of your illness or with respect to
claimed damages or with respect to the liability of these
defendants.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.   Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

      76.  With reference to any expert you expect to call to
testify as a witness at the trial, state the name and address of
such expert and, as to each expert named, state:
            (a)   The subject matter on which the expert is expected
to testify;
            (b)   The substance of the facts and opinions to which
the expert is expected to testify; and,
            (c)   A summary of the grounds for each such opinion.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.   Subject to and without waiving any objections, see
also Plaintiff's Second Amended Work History Sheet(s) provided to
lead defense counsel as Exhibit K.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By: /s/ Robert Jacobs Esquire
Robert Jacobs Esquire #0244
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date: August 18, 2006

EFiled: Sep 8 2006 11:30AM EDT
Transaction ID 12305287

1IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY et. al.;

Defendants.

C.A. No. 06C-02-281 ASB

PLAINTIFFS' THIRD SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS

**Preamble**

Counsel for Plaintiffs has provided and/or will provide all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are available for review at Plaintiffs' Counsel's office.

**B. Employment Background**

10. State the names and address of each employer for whom you worked during the years 1936 to date, stating as to each such employer the beginning and ending dates of employment, the nature of the business, the name and address of your direct supervisor, and your particular job function.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's Jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

**C. Product I.D. and Exposure History**

11. With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each defendant.

(a) The name of the product or products;

        (e)  The name and last known address of all persons
with whom you worked on such jobs; and,

ANSWER:   (a)  Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

        (e)  Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

12.  State fully and in detail each and every evidentiary fact
upon which the alleged negligence or alleged liability of each
defendant is based.  As to each such fact, state:
        (a)  The identities, including names, business
addresses, residential address, of each individual having
knowledge of those facts;
        (b)  Identify each document which supports or tends to
support the existence of such fact.  Identify the document by
briefly describing it, and by stating its present location and
the name and full business address of the present custodian of
the document.

ANSWER:   (a)-(b) Please see Plaintiffs' Answers to
Interrogatories Directed to Plaintiffs by all Defendants,
previously filed in this case.  Subject to and without waiving
any objections, see also Identification of Products by Co-Workers
at Plaintiff's jobsites and Loss of Consortium Witnesses,
provided to lead defense counsel as Exhibit R.

    13.  For each asbestos containing product, material or
mineral, manufactured, produced, prepared, distributed or sold by
each defendant, state in detail for each such defendant:
        (a)  Which such product, material compound, etc.
(hereinafter referred to as "product") you claimed to have come
into contact with at any time from 1936 to the present;
        (b)  Describe separately and in detail each such
product as fully as possible including the trade name, product
type and product contents;
        (c)  The dates on which you came into contact with each
such product, as listed in your answer to subpart (a) of this
interrogatory, and state with which product or products you came
into contact with on each such date;

(d)   The name, address and telephone number of your employer and each date listed in subpart (c) above;

(e)   The name, address and location of your place of employment or job site on each date listed in subpart (c) above;

(f)   The address of your residence on each date listed in subpart (c) above;

(g)   The type of work you were performing on each such date set forth in subpart (c) above;

(h)   The present name, business address and telephone number, and residence address and telephone number of each person who witnessed your work on each date set forth in subpart (c) above;

(i)   All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instruction sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;

(j)   Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;

(k)   For what purpose you used each such product listed in your answer to subpart (a) above; and,

(l)   All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory.  Include in your answer the subject matter, document title and publication date of all such literature.

ANSWER:   (a)-(l) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

14.   In regard to each and every other defendant named or to be named in this lawsuit, answer and provide all the information requested in Interrogatory No. 13 accordingly.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

16.   With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:

(a)   The name and address of the employer for whom you worked;
(b)   The location of each job (stating the plant site, city, county and state);
(c)   The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

ANSWER:   (a)-(c)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

   18.   Please list all past employers in whose employ you came into contact with asbestos or asbestos-containing materials. Include in your answer for each such employer:
(a)   Name, address and telephone number;
(b)   Job title and work description;
(c)   Type and identity of each such asbestos material with which you had contact;
(d)   Whether employer provided safety equipment so as to reduce or prevent harmful exposure to asbestos materials;
(e)   Whether employer required that employees use safety equipment of the type referred to in subpart (d) above;
(f)   Whether employer ever recommended that such safety equipment be used by its employees;
(g)   Whether employer provided showers for employees;
(h)   Whether employer provided separate lockers for both work and personal clothing; and,
(i)   If company-sponsored physical examinations were required or made available.  If so, please state:
      (i)   Whether required or optional;
      (ii)  Frequency of examination;
      (iii)      Nature and extent of examination;
      (iv)  Whether x-ray examination or respiratory or pulmonary examinations were included;
      (v)   Frequency with which you submitted to such examination when required or made available;
      (vi)  Your detailed reason for failing to submit to such examination when required or made available;
      (vii)      Results of each such examination; and,
      (viii)     Name, address and telephone number of examining physician, nurse or technician.

ANSWER:   (a)-(i)   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers

at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

44.    For each and every present or past symptom, indication, malaise or effects which you contend to be directly or indirectly related to any disease, disability or physical condition or state of your body or health, and which you contend is relevant to this lawsuit, please state:
          (a)    Nature and description of such symptoms;
          (b)    The disease, disability or physical condition to which said symptom is related and the nature and extent of such relationship;
          (c)    The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge;
          (d)    Whether you contend such symptom is related in any fashion to asbestosis or pleuritis, or any other condition from which you allegedly suffer, and the nature and extent of such relationship;
          (e)    Whether you contend that such symptom is related in any fashion to the use or effect of any product manifested, sold or distributed, in whole or in part, by defendant or any subdivision or affiliate thereof.  Include in your answer the nature and extent of said relationship and the name, description and identity of the product referred to in your answer;
          (f)    The facts, writings and publications, etc., upon which you base all or part of any of your above-stated contentions.  If you will do so without a motion to produce, please attach copies of all such writings or publications; and,
          (g)    The name, business address and telephone number, job title, and resident address and telephone number of each and every witness who can testify in support of any or part of any of your above-stated contentions.

ANSWER:    (a)-(g)    Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

63.    Do you or your attorneys know of any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including witnesses to the injury, illnesses, etc. in question? If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you, the present whereabouts of all such persons.

ANSWER:    Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     64.  Do you or your attorneys have any written statements
from any persons having knowledge of facts relevant to the
subject matter of this lawsuit, including witnesses to the
accident, injury, illnesses, etc. in question?  If yes, please
state the names, addresses, home telephone numbers, places of
employment, relationship to you and the present whereabouts of
all such persons.

ANSWER:    Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     67.  If your claim is based to any extent or nature upon
expert opinion other than medical experts, please state the name,
address, home telephone number, place of employment, relationship
to you, and present whereabouts of all such experts.

ANSWER:    Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.  See also Plaintiff's Expert
Witness List filed in 77C-ASB-2 and any supplements thereto.

     71.  List the names, addresses and relationship to plaintiff
of all persons who were witnesses to the accident, injuries or
illnesses which are the subject matter of this lawsuit.

ANSWER:    Please see Plaintiffs' Answers to Interrogatories
Directed to Plaintiffs by all Defendants, previously filed in
this case.  Subject to and without waiving any objections, see
also Identification of Products by Co-Workers at Plaintiff's
jobsites and Loss of Consortium Witnesses, provided to lead
defense counsel as Exhibit R.

     73.  If your answer to Interrogatory No. 72 is in the
affirmative, was any such statement in writing and, if so, in
whose possession is such statement and when and where may it be
inspected by defendants?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

74.  If your answer to Interrogatory No. 72 is in the affirmative, and any such statement was oral, when and where was any such statement made, in whose presence was such statement made, and what was the substance of such statement?

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

75.  Give the names and present addresses of all witnesses you intend to use at the trial of this case with respect to the occurrence and/or cause of your illness or with respect to claimed damages or with respect to the liability of these defendants.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

76.  With reference to any expert you expect to call to testify as a witness at the trial, state the name and address of such expert and, as to each expert named, state:
          (a)  The subject matter on which the expert is expected to testify;
          (b)  The substance of the facts and opinions to which the expert is expected to testify; and,
          (c)  A summary of the grounds for each such opinion.

ANSWER:   Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case.  Subject to and without waiving any objections,

1.   Dr. Steven Dikman
     One Gustave Place
     Annenberg Building 15/58
     Department of Pathology
     New York, New York  10029
     (212) 241-7343
     (212) 241-8014

Dr. Dikman may testify, live or by deposition, concerning his
review of the medical records, pathology and work history of
Plaintiff and his diagnosis of mesothelioma in this case.
Additionally, Dr. Dikman may testify Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Dikman may testify concerning the clinical course
and progression of Plaintiff's asbestos-related mesothelioma.
Dr. Dikman may also testify that Plaintiff has incurred in the
past and will incur in the future, medical expenses as a result
of his exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Dikman may testify that Plaintiff will require
medical monitoring and may require treatment and/or
hospitalizations as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma. Dr. Dikman will also
testify as to Plaintiff's prognosis generally. Further,
Dr. Dikman may testify concerning the increased risk of cancer
faced by asbestos exposed workers and the epidemiological link
between asbestos and cancer.  More specifically, Dr. Dikman may
testify as to Plaintiff's increased risk of developing an
asbestos-related cancer during his lifetime as a result of his
exposure to Defendant's asbestos-containing products.  Dr. Dikman
may testify as to the hazardous nature of asbestos and/or
asbestos-containing products and as a result, that such asbestos
and/or asbestos-containing products are unreasonably dangerous.
Defense counsel are in possession of numerous transcripts within
which Dr. Dikman's opinions have been fully explored.  A copy of
Dr. Dikman's report has been previously forwarded to all
Defendants.

2.   Dr. Dabe
     770 Lilly Road, Northeast
     Olympia, Washington  98506
     (800) 858-9996

Dr. Dabe may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Dabe may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Dabe  may testify that Plaintiff's mesothelioma was caused by

his exposure to Defendants' asbestos-containing products.
Dr. Dabe may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Dabe may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Dabe may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Dabe may testify
that Plaintiff will require medical monitoring and may require
treatment and/or hospitalizations as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Dabe will also testify as to Plaintiff's prognosis generally.
A copy of Dr. Dabe's records may be obtained by Defendants with
the medical authorization previously provided to Defendants by
Plaintiff.

3.    Dr. Naseer Ahmad
      770 Lilly Road, Northeast
      Olympia, Washington  98506
      (800) 858-9996

Dr. Ahmad may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Ahmad may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Ahmad  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Ahmad may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Ahmad may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Ahmad may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Ahmad may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Ahmad will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Ahmad's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

4.   Dr. Ronald Graff
     209 Martin Luther King, Jr. Way
     Tacoma, Washington  58405
     (253) 596-3390

Dr. Graff may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Graff may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Graff  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Graff may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Graff may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Graff may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Graff may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Graff will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Graff's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

5.   Dr. Dean Mastras
     314 Martin Luther King, Jr. Way
     Tacoma, Washington  98405
     (253) 627-6172

Dr. Mastras may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Mastras may testify concerning his review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Mastras  may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Mastras may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Mastras may also testify that more probably than

not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Mastras may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Mastras may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Mastras will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Mastras's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

6.    Dr. Kevin Touney
      770 Lilly Road, Northeast
      Olympia, Washington  98513
      (800) 858-9996

Dr. Touney may testify, live or by deposition, concerning his
examination and treatment of Plaintiff and his diagnosis of
mesothelioma in this case.  He may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Touney may testify concerning his review of medical
records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Touney may testify that Plaintiff's mesothelioma was caused
by his exposure to Defendants' asbestos-containing products.
Dr. Touney may testify as to the hazardous nature of asbestos
and/or asbestos-containing products and as a result, that such
asbestos and/or asbestos-containing products are unreasonably
dangerous.  Dr. Touney may also testify that more probably than
not, Plaintiff's death will be caused and/or precipitated by his
mesothelioma arising from exposure to Defendants'
asbestos-containing products.  Dr. Touney may also testify that
Plaintiff has incurred in the past and will incur in the future
medical expenses as a result of his exposure to asbestos, his
asbestos-related disease, and mesothelioma.  Dr. Touney may
testify that Plaintiff will require medical monitoring and may
require treatment and/or hospitalizations as a result of his
exposure to asbestos, his asbestos-related disease, and
mesothelioma.  Dr. Touney will also testify as to Plaintiff's
prognosis generally.  A copy of Dr. Touney's records may be
obtained by Defendants with the medical authorization previously
provided to Defendants by Plaintiff.

7.   Dr. Ann Williams
     700 Lilly Road, Northeast
     Olympia, Washington  98506
     (360) 923-7000

Dr. Williams may testify, live or by deposition, concerning her
examination and treatment of Plaintiff and her diagnosis of
mesothelioma in this case.  She may testify concerning asbestos,
the effects of asbestos on the body and any other topics related
thereto.  Dr. Williams may testify concerning her review of
medical records and as to the clinical course and progression of
Plaintiff's asbestos-related mesothelioma.  Additionally,
Dr. Williams  may testify that Plaintiff's mesothelioma was
caused by his exposure to Defendants' asbestos-containing
products.  Dr. Williams may testify as to the hazardous nature of
asbestos and/or asbestos-containing products and as a result,
that such asbestos and/or asbestos-containing products are
unreasonably dangerous.  Dr. Williams may also testify that more
probably than not, Plaintiff's death will be caused and/or
precipitated by his mesothelioma arising from exposure to
Defendants' asbestos-containing products.  Dr. Williams may also
testify that Plaintiff has incurred in the past and will incur in
the future medical expenses as a result of his exposure to
asbestos, his asbestos-related disease, and mesothelioma.
Dr. Williams may testify that Plaintiff will require medical
monitoring and may require treatment and/or hospitalizations as a
result of his exposure to asbestos, his asbestos-related disease,
and mesothelioma.  Dr. Williams will also testify as to
Plaintiff's prognosis generally.  A copy of Dr. Williams's
records may be obtained by Defendants with the medical
authorization previously provided to Defendants by Plaintiff.

See also Plaintiff's List of Expert Witnesses filed in 77C-ASB-2
and any supplements thereto.

All witnesses listed by all Defendants.

All witnesses listed in Plaintiff's Answers to Interrogatories.

All witnesses listed in Plaintiff's Standard List of Deposition
Testimony.

All witnesses deposed in this case.

All witnesses listed by Plaintiff in deposition.

Any physician who has examined and/or treated Plaintiff.

Any and all records custodians, live or by deposition upon
written questions, for any physicians or institutions listed

herein or revealed in Plaintiffs' Answers to Interrogatories or any other pleading on file in this case.

102. If your claim that, as a result of the negligence alleged in the Complaint, you experienced any conscious pain and suffering for which you claim the right to recover damages in this lawsuit, state:

(b) The name and address of any person having knowledge that it was, in fact, experienced;

ANSWER: (b) Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Identification of Products by Co-Workers at Plaintiff's jobsites and Loss of Consortium Witnesses, provided to lead defense counsel as Exhibit R.

Respectfully submitted,

**JACOBS & CRUMPLAR, P.A.**

By: /s/ Thomas Crumplar
Thomas Crumplar, #0942
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date: September 8,2006

EFiled: Mar 1 2007 8:07PM EST
Transaction ID 13983147
Case No. 06C-02-281 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

MARY M. COLLINS, Individually and as Personal Representative of the Heirs and Estate of JAMES DANIEL COLLINS, Deceased,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY, et al.,

Defendants.

C.A. No. 06C-02-281 ASB

PLAINTIFFS' SUPPLEMENTAL ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS AND RESPONSE TO REQUEST FOR PRODUCTION

**Preamble**

Counsel for Plaintiffs has provided and/or will provide all Documents and Exhibits to lead defense counsel pursuant to Standing Order No. 1. These Documents and Exhibits are also available for review at Plaintiffs' Counsel's office.

6. If you have ever been a member of the Armed Forces of the United States, state the following:

(a) The branch of the service, serial number, and highest rank held;

(b) The beginning and ending dates of your military services;

(c) The type of discharge that you received;

(d) Whether you were given a physical examination which included x-rays prior to the time you entered the service;

(e) Whether you received any injury while in the military services; and

(f) Whether you have claimed disability for any injury or physical condition arising out of your military service.

ANSWER: Please see Plaintiffs' Answers to Interrogatories Directed to Plaintiffs by all Defendants, previously filed in this case. Subject to and without waiving any objections, see also Plaintiffs' military records, attached hereto as Exhibit S.

Respectfully submitted,

**WEISS & SAVILLE, P.A.**

By: s/ Yvonne Takvorian Saville
    Yvonne Takvorian Saville,#3430
    Weiss & Saville, P.A.
    1220 North Market Street,
    Suite 604
    P.O. Box 370
    Wilmington, DE 19899
    Phone (302)656-0400
    Fax (302)656-5011
    Attorney for Plaintiff
and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas   75219
(214) 521-3605

Date:       March 1, 2007

# EXHIBIT "D"

EFiled: Jul 28 2006 10:18AM EDT
Transaction ID 11918471

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS, | : | C.A. No. 06C-02-281 ASB |
| Plaintiff(s) | : | ASBESTOS |
| vs. | : | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., ET AL., | : | |
| Defendant(s). | : | |

**NOTICE OF DEPOSITION DE BENE ESSE**
**OF JAMES DANIEL COLLINS**

PLEASE TAKE NOTICE that the undersigned counsel shall take the oral deposition de bene esse of ***James Daniel Collins on Thursday, August 10, 2006 at 9:00 a.m. PST***. The discovery deposition will commence immediately following the oral deposition de bene esse of ***James Daniel Collins***. The deposition will take place at Ramada Inn Governors House Hotel, 621 Capital Way S., Olympia WA; 360-352-7700.**(directions attached)**. The deposition will continue day to day until completed.

The videotape deposition will be taken before a videotape operator and stenographer from Henjum Goucher Reporting, 2501 Oak Lawn Avenue, Suite 435, Dallas, Texas 75219-4045, (214) 521-1188.

**JACOBS & CRUMPLAR, P.A.**

By:     /s/ Thomas C. Crumplar
        Thomas C. Crumplar, #0942
        2 East 7th Street
        P.O. Box 1271
        Wilmington, DE 19899
        (302) 656-5445
        Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

DIRECTIONS TO THE DEPOSITION OF
JAMES DANIEL COLLINS

Olympia Airport to
Ramada Inn Governor House Hotel
621 Capital Way S.
Olympia Washington

1. Start going toward the **AIRPORT EXIT** on **TERMINAL ST SW** - go **0.3** mi

2. Turn Left on **TUMWATER BLVD SW** - go **0.7** mi

3. Turn Right onto **I-5 NORTH** toward **SEATTLE** - go **3.9** mi

4. Take exit **#105** onto **HENDERSON BLVD SE** toward **CITY CENTER/STATE CAPITOL**
- go **0.3** mi

5. Continue on **14TH AVE SE** - go **0.6** mi

6. Turn Right on **CAPITOL WAY S** - go **0.5** mi

7. Arrive at **621 CAPITOL WAY S, OLYMPIA,** on the Left

6.2 miles  - Approximate driving time 9 minutes

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 06C-02-281 ASB |
| | ) | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORAL, TELEPHONIC AND VIDEOTAPED DEPOSITION OF

JAMES DANIEL COLLINS

* * *

August 10th, 2006

ORAL, TELEPHONIC, AND VIDEOTAPED DEPOSITION OF JAMES DANIEL COLLINS, produced as a witness duly sworn by me at the instance of the Plaintiff, taken in the above-styled and -numbered cause on the 10th day of August, 2006, from 9:00 a.m. to 11:04 a.m., before MARCIA MAY, Certified Shorthand Reporter No. 2480 in and for the State of Washington, at the Ramada Inn Governors House Hotel, 621 Capitol Way South, Olympia, Washington pursuant to the Delaware Rules of Civil Procedure and the provisions stated on the record or attached therein.

A P P E A R A N C E S

BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
BY: SCOTT MORRISON, ESQUIRE
Attorney for Plaintiffs

WHITE and WILLIAMS, LLP
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, Delaware 19899-0709
BY: CHRISTIAN J. SINGEWALD, ESQUIRE
Attorney for Ford Motor Company and
General Motors Corporation

PRESTON GATES ELLIS, LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
BY: KEVIN A. ROSENFIELD, ESQUIRE
Attorney for GARLOCK

THELEN REID & PRIEST, LLP
101 Second Street, Suite 1800
San Francisco, California 94105-3606
BY: ROBERTA R. RENDAHL, ESQUIRE
Attorney for DaimlerChrysler Corporation

GORDON THOMAS HONEYWELL
1201 Pacific Avenue, Suite 2100
Tacoma, Washington 98402
BY: ELIZABETH MARTIN, ESQUIRE
Attorney for Union Carbide and Certainteed

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
BY: SEAN MALCOLM, ESQUIRE
Attorney for Ingersoll-Rand Company

BULLIVANT HOUSER BAILEY, PC
333 SW Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
BY: STEPHEN F. DEATHERAGE, ESQUIRE
Attorney for Bondex International

WILLIAMS, KASTNER & GIBBS, PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
BY: JEFFREY M. ODOM, ESQUIRE
Attorney for Kaiser Gypsum and CBS

SCHWARTZ CAMPBELL, LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, Delaware 19899
BY: NICHOLAS E. SKILES, ESQUIRE
Attorney for Craneco and Aqua-Chem

ELZUFON AUSTIN REARDON TARLOV & MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899-1630
BY: MATTHEW P. DONELSON, ESQUIRE
Attorney for Borg-Warner, Hennessey and DB Riley

COOCH and TAYLOR
824 Market Street Mall, Suite 1000
P.O. Box 1680
Wilmington, Delaware 19899-1680
BY: NORISS E. COSGROVE, ESQUIRE
Attorney for Pneumo Abex Corp.

COSMICH & SIMMONS, PLLC
733 North State Street
P.O. Box 22626 (39225-2626)
Jackson, Mississippi 39202
BY: M. JAMES DEMPSEY, ESQUIRE
Attorney for Owens-Illinois

LAW OFFICES OF MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
1800 John F. Kennedy Blvd., Suite 1800
Philadelphia, Pennsylvania 19103
BY: STEVEN A. STOEHR, ESQUIRE
Attorney for Foster Wheeler

HACKETT, BEECHER & HART
1601 Fifth Avenue, Suite 2200
Seattle, Washington 98101-1651
BY: STEVEN A. BRANOM, ESQUIRE
Attorney for AW Chesterton

ATTENDING VIA TELEPHONE:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
1201 North Market Street
Wilmington, Delaware 19801
BY: KEVIN M. COEN, ESQUIRE
Attorney for Georgia-Pacific Corporation; Ametek, Inc.; Champlain Cable Corporation; Hercules, Inc.

JOSEPH W. BENSON, P.A.
1701 North Market Street
P.O. Box 248
Wilmington, Delaware 19899
BY: ANDREW G. AHERN III, ESQUIRE
Attorney for Crown Cork & Seal Company, Inc.

WILBRAHAM LAWLER & BUBA
901 North Market Street, Suite 800 & 815
Wilmington, Delaware 19801
BY: TIMOTHY A. SULLIVAN III, ESQUIRE
Attorney for Maremont Corporation; and T.H. Agriculture & Nutrition, LLC

CLEMENTE, MUELLER & TOBIA, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, New Jersey 07962-1296
BY: WILLIAM HARVEY, ESQUIRE
Attorney for Durabla Manufacturing Co.

Also present:

Ms. Lindsay Fulmer, videographer

Prolumina Trial Technologies

# I N D E X

| JAMES DANIEL COLLINS | PAGE |
| --- | --- |
| Appearances........................... | |
| Examination by Mr. Morrison | 7 |
| Corrigenda | 83 |
| Reporter's Certificate | 84 |

## EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
| --- | --- | --- |

(No Exhibits marked.)

P R O C E E D I N G S

MR. MORRISON: This is Scott Morrison here on behalf of Mr. and Mrs. Collins. We're getting ready to begin his deposition today, first the video deposition and then the discovery deposition.

The deposition will be taken according to the rules in Delaware that oversee and govern these matters. An objection by one defendant is certainly good for all defendants present here physically or by telephone.

All objections except for those that go to the form and the responsiveness of a question or an answer are reserved until time of trial.

This is an exigent situation, I'm not sure of the exact situation with the service, but no defendant is waiving any issues or any rights they may have by appearing here and asking questions or just by appearing at this deposition.

And I guess do you have anything else, Chris, or does anybody else?

MR. SINGEWALD: Chris Singewald, on behalf of the Delaware defense coordinator. No further stipulations at this time.

I appreciate you making those comments on

the record, Scott.

MR. MORRISON: Okay. With that being said, let's go ahead and start the video.

Go on the video.

VIDEOGRAPHER: Stand by, please.

We are on the record in the case of James Daniel Collins versus Metropolitan Life Insurance. The time is approximately 9:12.

JAMES COLLINS,

having been sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. MORRISON:

Q. Good morning, Mr. Collins.

A. Good morning.

Q. I'm going to be asking you a series of questions today and I'm going to try to keep my voice up --

A. Okay.

Q. -- not only for your benefit, but for the benefit of the people appearing by telephone. If I ever ask you a question that you do not understand, let me know, and I'll restate it. Many times I

phrase things very poorly and if I ask you a question that does not make any sense, please let me know.

A. Okay.

Q. Also, if you need a break at any point in time, we will be taking some breaks today, but if you need one at any specific time, you let us know.

A. Okay.

Q. Would you tell the jury your full name?

A. James Daniel Collins.

Q. And Mr. Collins, how old are you?

A. I'm 59.

Q. And currently, where do you live?

A. 1904 Yew Avenue Northeast in Olympia.

Q. And that would be Olympia, Washington?

A. Correct.

Q. And today we're in a hotel here, near your home; is that true?

A. Correct.

Q. Where were you born?

A. I was born here.

Q. In Olympia?

A. In Olympia, yes.

Q. And would it be true that I guess except for the time that you were in the military you've basically lived in the Olympia area your whole life?

A. That's correct.

Q. And Olympia is the state capital of Washington?

A. Right.

Q. And it's probably about an hour south of Seattle?

A. Correct.

Q. Are you married?

A. I am.

Q. And what is your wife's name?

A. Mary Martha Collins.

Q. And have you ever been married to anybody else?

A. No.

Q. Has that been a good marriage?

A. It has.

Q. Has your wife been supportive of you in what you've been going through?

A. Yes, very much.

Q. What year were you all married?

A. June of '69.

Q. Put you on the spot there.

A. Yeah.

Q. Kids? Do you have children?

A. I have two children.

Q. And what are their names?

A. Christopher Scott and Cynthia Rae.

Q. And it's my understanding they're both out of the home?

A. Correct, yeah. Scott's been married for five years, Cindy got married a year ago in September.

Q. They're, I think, they're both in their early 30's?

A. Correct. Yeah.

Q. Can you give us an idea a little bit about your education?

A. High school, a year and two quarters college, and two years of vocational training.

Q. Okay.

A. And many, many, many, many, many factory schools, aftermarket schools in the automotive industry.

Q. Okay. What year did you graduate high school?

A. '65.

Q. And the year and a half of college, did you have any specific course of study or was it general studies?

A. I was going in thinking that predental might

be my thing, and I found out very quickly it was not.

Q. The vocational education you had, what type of vocational education was that?

A. Automotive at Clover Park. It's north of here, in Tacoma. And loved every second of it.

Q. The factory training, what are you referring to there?

A. When I went to different manufacturers, worked for different manufacturers and, you know, specifically my first major job was with Volkswagen. I went to many of their factory schools.

Q. This would be ongoing mechanic training through the dealership you worked with?

A. Correct.

Q. You're not working right now; is that right?

A. Correct.

Q. When did you stop working?

A. I believe my last date of teaching was November 18th, as I recall.

Q. And that was of '05?

A. Of '05, yes.

Q. And did you have some health problems that caused you to stop working?

A. I did.

Q. What were you diagnosed with?

A. I was diagnosed with mesothelioma and just shortly before that date had gone through a surgery where they biopsied and tried to reattach my right lung to my right chest wall, and I never did really regain stamina enough to keep going.

Q. Have you been able to work since that period of time?

A. No.

Q. And where were you teaching at that time?

A. In South Puget Sound Community College in their automotive program.

Q. And do you know when you started teaching there?

A. I started there in the fall of 1985, in September.

Q. And I think in part you just answered this, but specifically what were you teaching?

A. My first two years I was teaching the basics, you know, tools and procedures and basic electrical and that sort of stuff.

Q. This is for automotive, automotive work?

A. Correct.

And then after that suddenly I became the senior person in each department and hired two other fellows, and then after that we split up duties

differently and I taught, after that, electrical, steering suspension and brakes.

Q. Did you enjoy that work?

A. Loved it.

Q. I'm going to talk to you a little bit further about some of that work and the impact of leaving that job, but I kind of want to move on.

You mentioned you were diagnosed with mesothelioma?

A. Correct.

Q. Do you remember, you don't have to give us an exact date, there's medical records, but do you remember approximately when you were told you had mesothelioma?

A. I believe it was the first part of October.

Q. And that would be of '05?

A. Yes.

Q. And did the doctors tell you, or what was your understanding, what did the doctors tell you in what part of the body they felt the mesothelioma was?

A. It was in my lungs and upper airway.

Q. Did the doctors or any doctor tell you what they felt was the cause or potential cause of your mesothelioma?

A. They indicated that it was asbestos based.

Q. You've gone through some treatment related to your illness?

A. I have.

Q. I'm going to talk to you a little bit later about that.

A. Okay.

Q. Looking back on your work history and your life, have there been times when you have worked with and around asbestos-containing products?

A. Yes.

Q. And you've, as part of this lawsuit, you've provided some information to us as far as what's called your work history.

You've had a chance to look at some of that discovery, have you not, that we've sent out?

A. Yes, I have.

Q. What I'd like to do now is just kind of go through that and ask you a series of questions regarding any potential work with asbestos.

I want to start really talking about your dad first. He's passed away?

A. He has.

Q. And what was his name?

A. James Collins, no middle name.

Q. What year were you born?

A. I was born in April of '47.
Q. And did you grow up in your dad's household?
A. I did, yes.
Q. When would have been the last time you, you can give us approximation, when would have been the last time you lived under the same roof as your father?
A. It would have been middle '69.
Q. During that time period, between '47 and '69, did your dad work?
A. Yes. Oh, yes.
Q. Where did he work?
A. He worked at Fort Lewis as a civilian working in heating and air conditioning.
Q. And Fort Lewis, where is that located?
A. That's north of here between Olympia and Tacoma.
Q. Did he have, or you may not be aware, do you know if he had any other specific classification other than heating and cooling?
A. Not really, that I recall.
He basically did a lot of work in mess halls and private residences there at Fort Lewis, doing both commercial and household type heating and air conditioning.

Q. Let me just ask you this.

Did you ever go along and go to work with your dad?

A. I did, when he worked overtime on weekends.

Q. Can you tell us, at least from your memory, any of the specific types of things he did at Fort Lewis, at least from what you observed?

A. I was kind of, you know, most of those were like emergency calls to mess halls when their refrigeration was down, so, I was lucky enough to get spoiled by all the mess hall sergeants while he worked, so --

Q. Do you believe that your father, based on what you know, do you believe your father worked with any or was exposed to any asbestos-containing products?

A. That's really hard to tell, you know, definitively, but one would only assume so because it was prevalent.

Q. What do you base that assumption on?

A. Just the times and what I've heard since.

Q. Did your dad, to your knowledge, ever bring any asbestos-containing products home from Fort Lewis?

A. He did. I remember one time he brought some

home that actually they used as a wall protection for a wood stove, and I recall him saying it was asbestos. It seemed very hard material to me.

Q. Can you describe that material physically, any more than you have?

A. It was about, I don't know, I'd say a quarter inch thick and probably three feet by three feet, thereabouts, and lined the wall, put it right against the wall.

Q. Did he install that in your house?

A. It was actually in my grandfather's house, yeah.

Q. Are you aware, are you able to provide any information of the manufacturer or the distributor of that specific product?

A. No.

Q. Did your dad -- was your dad ever dirty or dusty when he came home from work?

A. Many times, yeah.

Q. Did you ever have occasion to be, to have physical contact with his work clothes when he came home?

A. Yeah, in the utility room, we'd throw our clothes on top of his, yeah, where the washer and dryer was at, yeah.

Q. Did you have any specific washing and drying duties regarding his work clothing?

A. No.

Q. Would it just be normal contact as far as a young boy seeing his dad when he came home from work and such?

A. Correct, yeah.

Q. Do you believe you could have been exposed to asbestos from his clothing?

A. It's hard to tell.

Q. Do you believe that is a possibility?

A. I believe it is a possibility, yeah.

Q. I want to take you up to what I believe is 1967, and did you ever attend the Clover Park Vocational School?

A. I did.

Q. And is 1967 the correct date of when you began going to school there?

A. Yes.

Q. And do you remember how long you went to school at Clover Park?

A. Two years.

Q. And where was it located?

A. It's just south of Tacoma. It's between, actually, between Fort Lewis and Tacoma.

Q. And what was the nature of your education at that location?

A. It was vocational automotive training.

Q. Was it classroom work, was it hands-on work, describe how it was, how it went down, I guess.

A. It was basically a couple hours of classroom gathering, you know, technical data, discussing what we were supposed to have studied and read previous to that, and then about four hours of live lab work a day.

Q. And was all this work and classroom study automotive related?

A. Correct.

Q. Do you believe that you were exposed to asbestos while you went to school there?

A. I do.

Q. And through what types of products?

A. Mostly brakes and clutch type applications.

Q. Did you, yourself, do any brake jobs when you worked, or when you went to school at Clover Park?

A. I did.

Q. Did you, yourself, do any clutch jobs while you worked at, or you went to school and worked, I guess you could characterize it as both, at Clover

Park?

A. I did, yes, as part of the training.

Q. Is there any way for you to characterize or give us an idea of the number of brake jobs you did when you worked there, or how often you did that?

A. The study was broken up into sections, so there was a section on brakes and there was a section on drive trains, which was clutches and transmissions and that sort.

We had to complete two brake jobs and do at least one clutch job, and that was a minimum requirement.

Q. Did you do more than two brake jobs when you went to school?

A. I did.

Q. Are you able to estimate how many you did?

A. I recall three clutch jobs, specifically.

Whether I did more, I don't recall.

Q. Okay.

A. And I did do my two minimum complete brake jobs and then helped other guys with theirs.

Q. Do you remember any of the brand names of any of the brakes that you used at Clover Park?

A. Yeah. Bendex, Delco, Labner, Lockheed, and later I believe that was just Wagner.

Q. Okay.

A. There was a Raybestos I recall seeing on a box of material --

Q. So --

A. -- which are the most common.

Q. Who ordered these products when you were at school?

A. The instructors there.

Q. Do you remember any of the instructors' names?

A. Harold Foshaug was the one who did that particular section. There was another instructor there, Swede Tournquist, but his area was automatic transmissions and air conditioning.

Q. How would you know that you used, let's say a Bendex brake at that location?

A. We were basically told what car lines had what type, you know, as a matter of information in the textbook, and we can obviously see the brand name on the boxes.

Q. Do you believe that you would have been exposed to asbestos by using a Bendex brake shoe while at Clover Park?

A. Quite probably, yes.

Q. And in what way?

A. Typically the shoes were arced to fit what they figured was a median wear factory, factor in a drum, and so even when you pulled them out of a box sometimes they had dust on them.

And there were times when we put new drums on vehicles and the shoes wouldn't fit right, so there was machinery there to arc the shoe to fit the drum, which was a grinding process.

Q. Did you believe that you were exposed to dust associated with your use of Bendex brake shoes at that location?

A. I believe so, yes.

Q. Did you physically ever have to take a Bendex brake shoe out of a box at that location?

A. Mm-hm (affirmative response).

Q. And for the record, is that a yes?

A. That's a yes, excuse me. Yeah.

Q. And that's fine, it's just that we have a court reporter here that actually types down what's said.

A. I see.

Q. And we have to have a spoken word.

When you installed a brake shoe, did you ever have to disturb the brake shoe itself as far as hitting or hammering or touching it?

A. To remove it?
Q. To install it.
A. To install it? That was usually a pretty benign procedure because you had everything cleaned up before you installed it.
Q. Did you all have a grinding or arcing machine at Clover Park?
A. Yes, we did.
Q. Did you also have a drum lathe at Clover Park?
A. Yes, we did.
MR. DONELSON: Objection.
Q. (By Mr. Morrison) So you all had both types of machinery at that location?
A. Correct.
Q. Do you remember who manufactured the brake grinder at Clover Park?
A. The brand name on it was AAMCO.
Q. And how could you tell that?
A. It was stenciled on it.
Q. The lathe, the drum lathe?
A. Was the same.
Q. And how would you tell that?
A. The same way.
Q. And this is at Clover Park?

A. Correct.
Q. Was the AAMCO brake grinder and the AAMCO drum lathe mounted on the same table?
A. There they were separate.
Q. They were separate?
A. Yeah.
Q. Did you physically ever have to grind a brake shoe using the AAMCO brake grinder at that location?
A. Yes.
Q. Did that create dust?
A. Yes.
Q. Do you believe you breathed that dust?
A. Yes.
Q. And why, for people who might not know anything about brakes, why would you have to grind brakes on occasion?
A. So that they would fit the drum. There was a certain clearance at both ends of the brake shoe that needed to be met, and friction material taken from the boxes is usually pre-arced to a set, you know, 30 over, or 40 over, or something, and if you put new drums on, well, then it hit only a small area, so that would be arced to fit.
Q. How close would your face be to the brake

lining that you were grinding with the AAMCO brake grinder?

MR. DONELSON: Objection.

THE WITNESS: There's an objection.

Q. (By Mr. Morrison) You can answer.

A. I guess depending on how curious you were, but I would say an average of eight, ten inches to two feet.

Q. Did that machine have any type of dust collection system on it?

A. Yes. It had a cloth bag that when you turned on the arcer would balloon out, and I recall puffs of dust, whatever it was, every time that occurred. It wasn't what you would call an airtight bag.

Q. How was that grinder powered?

A. Electrically.

Q. If I understand what you're saying, when you turned it on, this bag would release dust?

A. Yes. As it inflated, yeah.

Q. Do you believe a component of that dust would have been brake shoe dust?

A. Pretty sure, yes.

Q. Do you believe you would have been exposed to that?

A. Oh, yes.

Q. Were you ever in the shop when others used the AAMCO brake liner at that location?

A. Yeah, we were in the same environment, yeah.

Q. And do you believe you would have been exposed to dust when they used the AAMCO brake grinder on brake shoes?

A. If I was in close proximity, yes.

Q. How big of a shop did you all have at Clover Park?

A. It was fairly long. I would have to say it was probably about in excess of a hundred feet long and probably about 60, 70 feet wide.

Q. You mentioned using Delco brake products at that location?

A. Correct.

Q. And how would you know they were Delco brake products?

A. They were on the box.

Q. Did you use the Delco brake products in any different fashion than you used let's say Bendex or Wagner or Raybestos?

A. No.

Q. Do you believe you were exposed to asbestos fibers from your work with Delco brake linings at

Clover Park?

A. Yes.

Q. In what way?

A. The usual way, you know, as we already mentioned.

Q. And in what ways do you believe you would have been specifically exposed to Delco brake shoe dust?

A. Through arcing, removal from the box with residual dust on them. On removal it was hard to tell, you know, specifically what was there, but --

Q. Do you recall if when you worked at Clover Park, did you all work on what you knew to be any new vehicles, or were they used vehicles that were brought in?

A. They were mostly used, faculty and staff, students.

Q. Now it appears, and we've got some information on your work history sheet in the Social Security's that you did work at a couple of service stations during this time you were going to Clover Park?

A. One service station.

Q. Do you remember what the name of that service station was?

A. It was Bridgeport American. It was just a little ways from the Clover Park School there on Bridgeport Avenue, and it was an American Oil service station.

Q. And this was in Tacoma, Washington?

A. I believe it's actually called Lakewood, yeah.

Q. And do you remember approximately how long you worked at that location?

A. To the best of my recollection, it was one school year, it might have been part of another.

Q. What were your job duties at that location?

A. Basically to pump gas and clean up the facility. There was no mechanical work done at night, but a lot of times we had to clean up after the guys that worked during the day.

Q. Did you do any mechanical work yourself there?

A. No.

Q. Do you believe you had any exposure to asbestos while you were working there?

A. Again, hard to tell. Possible, because they did brake work there.

Q. Okay.

A. And we swept up the floors, you know.

Q. Do you believe a component of that dust on the floor would have been from brake shoes?
A. Quite possibly, yeah.
Q. Are you able to identify any of the brand names or manufacturer names of any of the brake products used by other mechanics at that location?
A. Not conclusively, because they usually, you know, there's a core charge on them and they basically boxed them up and turned them back in.
Q. There is listed on your Social Security a -- and this, it may be the same location, but it's under BP Products, and you've got listed American Oil service station. Is this --
A. BP.
Q. Did you work at any other service station during that time period?
A. No.
Q. There was just one?
A. Yeah. BP.
Q. BP?
A. They were very proud of the American Oil title there.
Q. Fair enough.
Now, in '69 your life changed a little bit. What happened in 1969?

A. '69? Got married and was drafted in the Army.
Q. And what branch of the Army did you go -- what branch -- you went into the Army; is that correct?
A. Correct, yeah.
Q. And how long were you in the Army?
A. Two years.
Q. And do you remember when your discharge was?
A. I believe it was July '71.
Q. Where did you do your basic training?
A. Basic training, in a God-awful place called Texas. San Antonio, Texas, I took my basic training and AIT.
Q. And what time of year were you there?
A. July, August, September, October.
Q. I got it, would guess that's why --
A. The garden months, from what I understand.
Q. I would have guessed that was why your response was as it was.
After basic where did you go?
A. AIT. After AIT, I was sent to Vietnam.
Q. And where was AIT at?
A. Fort Sam Houston, yeah.
Q. And what was your training in?

A. Combat medic.

Q. Did you do any type of mechanic work or maintenance work in the military?

A. No.

Q. Were you involved in any combat during your time in the military?

A. Yes.

Q. Did you receive any physical injuries during the military?

A. Small shrapnel wounds, perforated eardrums from large explosions nearby.

Q. After your tour, how long was your tour over in Vietnam?

A. One year.

Q. And after that where did you finish out your service at?

A. At Madigan General Hospital, Fort Lewis.

Q. And were you a medic there?

A. Correct.

Q. Are you aware of any asbestos exposure from your time in the military?

A. Not that I'm specifically aware of.

Q. After the military what did you do after that? Where did you go?

A. Towards the end of my military time they had

a program called Project Transition to help you transition from military back to civilian, and I joined that program, and so the last few weeks that I was actually still in the military I came down here to Olympia and worked for Brewington Motor, or worked at their facility, not for them, but -- and at end of my military time they offered me a job.

Q. When did you first start working at Brewington?

A. Under Project Transition, or --

Q. When were you first physically located there?

A. Boy, I would say like a month and a half before I was discharged.

Q. So --

A. A month, month and a half.

Q. So, in 1971?

A. Correct.

Q. And when did you officially become employed at that location?

A. I believe it was the first of August, somewhere in there.

Q. Still in 1971?

A. Correct.

Q. Your time at transition time, what were your

job duties during that time period?

A. Basically just to, they kind of passed me around from one journeyman mechanic to another, and observed and helped and --

Q. Did you already have your automotive license by this time, mechanic license?

A. Yeah. I got a certificate for graduation, yeah.

Q. Now, it's my --

A. I was still considered an apprentice.

Q. When did you become a journeyman?

A. About 14 to 16 months after going to work for them they gave me that because I was fixing things that some of their journeyman mechanics couldn't.

Q. And it's my understanding -- well, Brewington Motors, where was that located?

A. That was located in the Lacey area around here. I believe the address was 3000 Pacific Avenue, as I recall.

Q. Was that in Olympia, Washington?

A. Yes.

Q. And what type of -- well, was Brewington a dealership?

A. Volkswagen dealership.

Q. Did they, I assume then they sold new Volkswagen cars and automobiles?
A. Correct.
Q. Did they have a used car section?
A. Yes, they did.
Q. Did they also sell other makes and models of cars?
A. They did, yes.
Q. Did they sell American-made cars?
A. Yes.
Q. It's my understanding Brewington Motors was bought out by Hanson and became Hanson Motors?
A. Correct.
Q. Do you know what year that was?
A. I believe it was the middle of '74, somewhere in there.
Q. For Brewington Motors you were an automobile mechanic?
A. Correct.
Q. What were you for Hanson Motors?
A. The same thing.
Q. For Hanson Motors was that still a Volkswagen dealership?
A. Initially, and then he branched out into the Audi and Porsche line.

Q. When it was characterized as Hanson Motors, did they still -- did he still sell used cars?

A. Correct.

Q. And did that include American-made cars?

A. Yes, it did.

Q. Do you remember what year you stopped working for Hanson Motors?

A. I quit just about a month prior to starting teaching in 1985.

Q. Would your work for Brewington Motors and Hanson Motors be, if I asked you questions generally, would your answers be the same?

A. Similar, yes.

Q. As a mechanic for Brewington and Hanson, what types of things did you do?

A. Wow. Any work that came in the door that they assigned me.

Q. And I guess that's -- you were a general mechanic, you did --

A. I was. I did anything, yes.

Q. I'll be a little more specific with my question.

Did you work on both new vehicles and used vehicles?

A. I did.

Q. Did you work, did you do engine work?
A. I did.
Q. Did you do electrical work?
A. I did.
Q. Did you do any brake work?
A. Yes.
Q. Did you do clutch work?
A. Yes.
Q. Did you do any transmission work?
A. Yes.
Q. Basically what one would think of as an automobile mechanic, you did that for both those entities?
A. Yes.
Q. Can you describe the garage itself?
A. The one on Pacific?
Q. Was there a time they changed locations?
A. Yeah. Later on, Hanson built a new facility up here in what we call the Auto Mall.
Q. Do you remember what year that was?
A. I would have to say probably, and this is just a guess, '84.
Q. Shortly before you left?
A. Yeah.
Q. Let me talk to you then about the initial

location.

What did the garage look like there?

A. It was about, I would say, 80 plus feet long and 50 feet wide inside, large overhead doors at both ends.

Q. How many bays did it have?

A. We had ten bays and employed typically anywhere from eight to 11 technicians.

Q. Would there be more than one technician working at the same time?

A. Oh, yes. Yeah.

Q. Was there any type of partition between the bays themselves?

A. No.

Q. How close would one mechanic's station be to another mechanic's station?

A. There was basically just enough room to get toolboxes and have doors open and that was about it, yeah.

Q. Did you work full time for Brewington Hanson?

A. I did, mm-hm (affirmative response).

Q. And how many hours a week would that normally entail?

A. 40 plus.

Q. Did you have any specific job duties related to ordering products at that location?

A. No. That was all done by the parts department.

Q. Do you believe that at least during the portion of the time that you'd worked at Brewington/Hanson that you used and were exposed to asbestos products?

A. I do.

Q. What types of products?

A. Mostly brake and clutch, yeah.

Q. Are you aware of any other type of product, I mean, general type, not brand names, other than brakes and clutches, that may have exposed you to asbestos?

A. Not really.

Q. How often, if you can characterize this, would you personally do -- let me ask you this.

Was there a point in time while you worked for Brewington/Hanson that you became aware there may be potential health hazards associated with asbestos?

A. It would have to be not until probably the later Seventies, when we started seeing some articles in automotive periodicals that we received there.

Q. Did you ever receive any specific training

as far as asbestos protection or things like that?

A. No.

Q. Once you became aware of these articles, did you change your work habits in any way?

A. Started to, yeah.

Q. What did you do?

A. Well, the articles were, you know, in retrospect, not the greatest. They gave certain warnings and stuff, and gave certain recommendations for being more careful on the job site, which later years proved to be totally ineffective.

Using particle masks was one suggestion, but when you pulled those off and looked at how dirty your face was underneath, you realized that was not. Taking shop rags and wetting them down with water and wearing them like masks over your mouth and nose, you know, those were common things suggested by these articles.

Q. And did you do those things?

A. We did, much to some ridicule from other people, but --

Q. And at the time you were doing these things you felt you were doing what was recommended and you needed to do?

A. At that point, yes.

Q. Did you change your job duties in any other way?

A. I did.

I requested and got more electrical and fuel injection and drivability type work and moved to the other end of the shop from the brake environment, but still, you know, when you have four or five other guys doing brakes, blowing that stuff all over the place, it was tough to get away from.

Q. Once you became aware of these potential hazards, did you ever knowingly expose yourself to asbestos?

A. No. I avoided it.

Q. I want to talk to you then about the period of time at Brewington/Hanson between '71 and this late Seventies.

How often did you do brake jobs during that time period?

A. That's tough. Say in a given week?

Q. The best way you can characterize it to. If you were going to tell somebody how often you did a brake job, what would you tell them, how would you characterize it?

A. I'd have to say I'd probably average one plus a week, and some weeks I'd be involved in an

engine overhaul or a transmission overhaul, and not do any, and sometimes I'd do four or five in a week, so --

Q. It varied. Would it be -- so, basically, you would do it, at a minimum, at least weekly?

A. I would say the average would be at least one plus a week, if you looked at it over time.

Q. Did you ever have occasions during this time period to do more than one job, brake job a day?

A. Oh, yes.

Q. Even if you were not doing a brake job, were there sometimes other men in the same garage doing brake jobs?

A. Oh, yeah. It was a very common repair.

Q. How, during this time period, can you characterize how often you did a clutch job?

A. Probably one a week. Yeah.

Q. Do you remember any of the brand names or brake shoe product names that you used at Brewington/Hanson between '71 and the late Seventies?

A. On their products?

Q. On any products that you used?

A. On their products, their stuff came in boxes that were stamped, you know, genuine Volkswagen parts, you know.

What actually was inside, who knew. Or who made them. If we were working on used cars, it could be, you know, depending on the type of vehicle, could have been Delco, Bendex, Wagner, Lockheed, you know, those were very common, Raybestos. There was a lot of -- just depends on where they got it because for their domestics they either went to dealership or parts stores.

Q. If I understand it then, when you all were working on Volkswagen products, did you all normally use genuine Volkswagen parts?

A. Correct.

Q. And if you were using it, working on a non-Volkswagen vehicle would you use aftermarket parts, original parts, or both?

A. Both.

Q. What aftermarket brake shoes do you remember specifically using during that time period at Brewington/Hanson?

A. Probably the most common were the Wagner, the Bendex.

Q. Did you physically use a Bendex brake while you worked for Brewington/Hanson during this time period?

A. Yes.

Q. And did you do that on more than one occasion?

A. Yes.

Q. Do you remember any of the original brand names of brakes that you've used at this location that were not Volkswagen?

A. For brake shoes?

Q. Yes.

A. Those I've already mentioned and Borg-Warner was something that we used in clutches for General Motors products.

Q. The brake procedure, let me just ask you this.

Do you believe you would have been exposed to asbestos dust through your work with these various brake shoes at that location?

A. Yeah. Yeah.

Q. In what way?

A. Well, early on a lot of vehicles were just four-wheel drum, and they had this wonderful tendency to rust and corrode onto the bearing flanges of the drive axles, or whatever, and so it was very common practice to have to hammer on them aggressively until they broke loose, and in the process of doing that, dust and everything would come pouring out. And then

once you pulled the drum off and set them down, there would typically be a cloud of dust that would come out at that time. And then the common practice at that time was to take a compressed air hose and blow everything off.

Q. Okay.

A. And, you know, with that many technicians in the shop, you know, especially early in the morning, you know, there would be possibly three, four, five brake jobs going at once, and we'd all did tear-down procedures about the same time. And there were many occasions which we turned the air in that shop just black, it would take a long time to clear out, but that was very common.

Q. Was there any brake dust exposure through the installing or installation of a brake shoe?

A. Yes, but it was much more limited than that.

Q. Explain in what way you were exposed.

A. There was residual grinding dust on the new brake shoes and, of course, we had our faces in there close, you know, on installation and, you know, it was just inherent with the job.

Q. Did you all have a grinding machine at that location?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) Did you all have a drum lathe at that location?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) Do you remember any of the manufacturer names or brand names of the grinding machine at that location?

A. Volkswagen, they just had one. It was an AAMCO, as well; very popular machine.

Q. And the drum lathe, what brand was that?

A. AAMCO.

Q. Was this, were both AAMCO grinder and AAMCO lathe mounted on the same table, or were they separate from each other?

A. They were on the same bench. It was actually a, I guess you'd call it homemade wood bench and the brake lathe was at one end and the grinder was on the other.

Q. And how do you know the grinder was an AAMCO?

A. It had a brand name. It was basically a metal plaque on it, on the grinder, on the lathe, and on the grinder was stenciled.

Q. And for the jury's understanding, what's the

difference between a brake grinder and a drum lathe?

A. A lathe is used as a bit, and machines metal, and so the one we had there did both drums and rotors for disc brakes.

Q. And distinguish that from the brake grinder.

A. The what we called the grinder was actually a brake shoe arcer, and it used a revolving cylinder with basically coarse sandpaper, I guess you'd call it, and you mounted the shoes in a jig and centered it, and entered the diameter of the drum that you measured on to that, and it would arc the shoe to fit that drum.

Q. Did you ever use that AAMCO brake grinder or arcing machine on brakes that you were using at that location?

A. Many times, yeah.

Q. Did that create dust?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) Do you believe you would have, during that time period, say from the early Seventies to the late Seventies, breathed that dust?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) Do you believe that would

have occurred on many occasions?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) Did that brake grinder, that system have any type of dust collection system?

MR. DONELSON: Objection.

THE WITNESS: They called it that, yeah. Again, it was just a cloth bag that inflated and wasn't that great. Air flowed through it, and dust flowed through it, as well. You could see the dust.

Q. (By Mr. Morrison) Was that grinder powered in any way?

A. It was electric.

Q. And can you describe the conditions when you turned on that grinder, what would happen?

A. When it was shut off the bag would deflate and hang down, and then when you fired it up it would inflate the bag, and there would be a cloud of dust initially.

Q. And do you believe a component of that dust would have been brake shoe dust?

A. Quite likely, yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) And do you believe you would have been exposed to that dust?

A. Yes.

MR. DONELSON: Objection.

Q. (By Mr. Morrison) When you were physically grinding a brake shoe on the grinder, how close would your face typically be to the shoe?

A. Again, 18 inches to two feet, yeah.

Q. Do you believe you would have breathed dust into your lungs from that process?

MR. DONELSON: Objection.

THE WITNESS: Quite probably, yes.

Q. (By Mr. Morrison) Did you ever have occasion to arc or grind any Volkswagen brake shoe products at that location?

A. Yes.

Q. And do you believe you would have breathed dust from your work with the Volkswagen brake shoes at that location?

A. Yes.

Q. And you physically handled Volkswagen brake shoes as far as taking them out of a box and installing them?

A. (Nodding head.) They were, on occasion, dusty, just like everybody else's, yes.

Q. And do you believe you would have been exposed to that dust?

A. Mm-hm (affirmative response).

Q. Do you believe you would have been exposed to asbestos from your work with Bendex brake linings at that location?

A. Yes.

Q. And I know some of these questions are redundant, but in what way, or how?

A. The same way, you know, removing them from the box there would be occasionally noticeable dust still on them, you know, a lot of times enough that we would wipe them off with rags, and there would be noticeable dust.

And, of course, in the occasions where drums and shoes didn't fit correctly, we would arc them, as well.

Q. So you believe you would have been exposed to dust associated with Bendex both through the arcing procedure and just the general handling of the Bendex brakes?

A. Yeah.

Q. Do you believe you would have been exposed to dust associated with any used Delco brakes at that location?

A. Yes.

Q. And in what way?

A. The same way.

Q. And can you state those ways for us?

A. Again, there would typically be dust on them, new out of the box.

And, also, if we had to arc them to fit the drum for any reason.

Q. Would it be correct to say then that you believe you were exposed to General Motors brake shoe dust both from the physical handling of those brake shoes and from the arcing of those brake shoes?

A. Yes.

MR. SINGEWALD: Objection.

THE WITNESS: Also as, this might be an aside, I don't know, but as more and more vehicles got disc brakes in front and sometimes objectionable squeaking noises with new friction material, it was a very common practice to take the disc brake pads, take them to a grinder, and grind chamfers on the edges, about a 45-degree angle to help eliminate squeaking. So that was a very common practice, too.

Q. So there were occasions where you used this grinding process both on drum materials and disc materials?

A. Well, arcing was one thing.

Just taking the disc brake pot, as we called

them, over to a grinder and grinding a chamfer on them was something totally different.

Q. Do you remember any specific brand names of the disc brakes as you used -- as differentiated from the drum brakes?

A. Again, it was mostly the product line that we did that on.

Q. That would be Volkswagen?

A. Volkswagen, Porsche, Audi, yeah.

Q. Now, you mentioned the name Borg-Warner?

A. Yes.

Q. And what type of work do you associate Borg-Warner with at that location?

A. Clutches.

Q. And how would you know you were using a Borg-Warner clutch?

A. It was stamped on the box the clutch came in.

Q. Did you use Borg-Warner clutches on more than one occasion while you worked for Brewington/Hanson?

A. Yes.

Q. Are you able to quantify on how many occasions?

A. That would be impossible.

Q. Do you believe you were exposed to asbestos through your work with Borg-Warner clutches?

A. I believe so, yes.

Q. Can you tell the jury how?

A. Mostly, again, just the dust that was inherent with them, whether new or used.

Clutch work was typically just as nasty, because the vehicle was typically up on a rack over your head, and occasionally you would have to tap on them with a hammer and pry them with pry bars to get them loose, and when that -- when they did break loose, then the residual dust would come raining down on you.

Q. Was there any dust associated with the Borg-Warner clutch itself from the box?

MR. DONELSON: Objection.

THE WITNESS: A small amount. A small amount. They typically weren't as pronounced as brake shoes.

Q. (By Mr. Morrison) Do you believe you would have been exposed to asbestos from that?

A. Possibly.

Q. Did you physically have to touch a Borg-Warner brake clutch at that location?

A. Yes.

Q. Did you ever have to hammer one or hit one?

A. Gently.

Q. Did that create some dust?

A. Some, yeah.

Q. Do you believe you would have been exposed to that dust?

A. Yes.

Q. Now, I want to continue along with some questions on automotive work --

A. Mm-hm (affirmative response).

Q. -- but outside of I guess your employment at Hanson/Brewington.

A. (Nodding head.)

Q. It's my understanding that you I guess during this time period -- well, did you ever basically kind of do work on the side for other people in your own garage at home?

A. I did, yes.

Q. Do you remember what period of time that was?

A. I actually had a business license, I believe it was in '76, '77, my daughter was born with serious complications, and there was some medical bills that accrued, and I started working at home as well as my day job. And Collins Automotive Enterprises, did

that for a couple of years.

Q. Was your home located in Olympia at that time?

A. Yes. The present address is the same.

Q. And do you believe you were exposed to asbestos through that work?

A. Yes.

Q. And through what types of products?

A. Brakes and clutch work and basically the same products, because I worked on those type of vehicles at home, as well.

Q. Would you do this work like either after hours or on weekends?

A. Yes.

Q. Are you able to quantify, characterize how often you did a brake job under the Collins Automotive?

A. Brake job, probably slightly less than one a week, on an average.

Q. Did you do any clutch work?

A. I did.

Q. Are you able to quantify how many times you did this during this two-year time period?

A. Probably a little less frequently than brakes, maybe one every two to three weeks.

Q. Did you have any type of a grinding machine or arcing machine in your own home?

A. No. I would take them to work and do them if it was necessary.

Q. Did you, when a customer came in to your place, did you purchase the replacement materials such as brakes or clutches, or did they bring those to you?

A. It was -- I mostly purchased them; occasionally a customer would bring their own parts.

Q. Do you remember any of the brand names of brake products you used while working on other people's cars for Collins Automotive?

A. Brakes?

Q. Yes.

A. Yes. Raybestos was a real common one. Delco I used. I was always kind of a Chevy guy, so I did a lot of General Motors work and, you know, so Delco, Bendex, Raybestos. There was another one that I used occasionally, I can't remember the brand right off the top of my head.

Q. If it comes to you later, you can let us know.

A. Okay.

Q. The aftermarket products, such as Bendex and

Raybestos, where did you purchase those at?

A. At local parts stores.

Q. And the Delco products, where did you purchase them?

A. Those were typically dealership.

Q. As far as clutches, do you remember any brand names of clutches you used while working for Collins Automotive?

A. Yeah. Most -- most of those were either the Volkswagen, Porsche, Audi, which I would just get from work, and then the General Motors stuff was typically Borg-Warner.

Q. And, again, how would you know you were using let's take a Bendex as opposed to a Raybestos or Delco brake product? What would tell you that?

A. They were right on the box, stamped on the box.

Q. And what would tell you that you were using a Volkswagen part as opposed to a Borg-Warner clutch?

A. Same, yeah, they were well marked.

Q. Do you believe you would have been exposed to asbestos from your work with the Bendex brake linings at Collins Automotive?

A. Yes.

Q. Do you believe you would have been exposed

to asbestos through your work with Delco brake linings?

A. Pardon me, could you restate that.

Q. Yes.

Do you believe you would have been exposed to asbestos through your work with Delco brake linings at Collins Automotive?

A. Yes.

Q. And in what way?

A. Virtually the same way, teardown, handling. I had my own compressor and I still blew brake dust off there at home, so --

Q. Do you believe you would have been exposed to any dust associated with your work with the Borg-Warner clutches with Collins Automotive?

A. Yes.

Q. And in what way?

A. Same way. Physically handling, removal, blowing the dust off.

Q. Now, I want to distinguish, have you also done brake and clutch work on your own personal vehicles where you were not being paid to do that work?

A. Oh, yes.

Q. And I'm going to ask you some similar

questions along those lines.

Can you give us a start year of approximately when you first did let's say a brake job? You can give us an estimation.

A. Wow. Actually, on my own cars, before I had any mechanical training really, so I would have to say '65, somewhere in there, '64, '65.

Q. And can you characterize how often through the years you've done work on your own personal vehicles or I don't know if you'd quantify how many times you've done a brake job.

A. Yeah, that's tough. Whenever it was needed, you know.

Q. Occasionally?

A. Yeah.

Q. Did you ever do any of your own, do more than let's say one or two brake jobs a year on your own personal vehicles?

A. No.

Q. Do you remember, I'm just going to ask you in the Sixties and Seventies, do you remember any brands of brake shoe materials you used on your own personal vehicles during the Sixties and the Seventies?

A. Pretty much the same as we've covered, you

know, my trucks were all Chevy's, always have been, and so I typically bought OEM for them.

Q. Do you remember -- well, let me ask you this.

Do you remember any, what were the OEM parts for Chevy's? What would they be characterized as?

A. Delco, Bendex, Borg-Warner for the clutches.

Q. Did you ever use any Delco brakes on your own personal vehicles?

A. Yes.

Q. Do you remember any specific vehicle that you've used a Delco brake on, in your personal vehicle?

A. Yeah. Probably the one that I remember the best is my '72 Chevy, 4 X 4, yeah.

Q. And what year?

A. I abused it a little bit, so it had required more work than most.

Q. And what year did you perform a brake job on that vehicle?

A. When I first got it, in '74, I did clutch and brakes, and then whenever needed after that, which was about three times, as I recall, before I sold it.

Q. Did you specifically use Delco brakes on

your replacement parts?

A. Yes.

Q. Where did you purchase those at?

A. At the dealership. I knew somebody there, so I got them cheap.

Q. Did you specifically, do you specifically remember how many, when you first did a clutch job on that vehicle?

A. It was -- I did clutch and brakes at the same time, '74.

Q. And do you specifically remember what brand name of clutch you reinstalled on that vehicle?

A. It was Borg-Warner.

Q. And do you remember where you purchased that product at?

A. At the dealer.

Q. So you could purchase Borg-Warner clutches from a GM dealer?

A. Yes.

Q. Do you believe you would have been exposed to asbestos using these Delco brakes and the Borg-Warner clutches on your own personal vehicles?

A. Quite possibly, yes.

Q. And would that be in the same manner as you've described before?

A. Correct.

Q. Sir, when you -- you began teaching at South Puget Sound Community College in 1985?

A. Correct.

Q. And are you aware of any asbestos exposure, at least knowingly, asbestos exposure at that location?

A. Knowingly, how do you mean that?

Q. Do you know if you all used any asbestos products at that location when you taught?

A. It was still in evidence, yes, in the products, but that wasn't my area of concern there for a couple years, but, yeah, the same old procedures were in place there that was accepted in the trade at the time.

Q. Did you use, if you were around brake shoes or dust associated with that, did you use masks?

A. They didn't, no, not the first two years I was there.

Q. To you, were you ever knowingly exposed to asbestos while you were there?

A. No. I never went into that area.

Q. As part of your teaching duties, does it relate to asbestos in any way at this point in time?

A. At this point in time?

Q. Yes, the last few years.
A. Uh, what do you mean?
Q. It's a bad question.
Did you ever have any specific teaching duties specifically related to asbestos safety or anything like that?
A. Yes.
Two years after I started there they bought out the contracts of the two gentlemen that were there, and I hired two new guys, and so two years into that I was the head of the department, basically.
Q. Okay.
A. And at that point in time we changed procedures. We got asbestos containment systems for our brakes and clutches. I don't know if you've heard of Clayton, but that was the systems we decided on.
Q. So you all used, after you became able to, got into that area at the school, you all used a -- asbestos safety procedures were in place?
A. Correct, mm-hm (affirmative response).
Q. And I assume you tried to adhere to whatever policies there were, and recommendations as far as safety; is that right?

A. Yes.
Q. To your knowledge, did you ever knowingly expose yourself to asbestos after that point in time?
A. Correct.
Q. Sir, just a few other questions, and then I'm going to move into a different area.
Are you still doing okay?
A. I could use a break in a little bit, yeah.
Q. Let me do this. Why don't I do one little short area, and then let's take a little break, and then I'll finish up. Okay?
A. Okay. Sounds good.
Q. Have you ever done any Sheetrock work yourself?
A. As far as nailing up Sheetrock?
Q. Yes.
A. Yes.
Q. Have you ever done any Sheetrock finishing work yourself?
A. A little bit, yes.
Q. When was that?
A. It was in remodeling my current home, did the bathroom, kitchen; late Seventies, early Eighties.
Q. Do you remember specifically what year that

was?

A. Kitchen would have been probably 77, '78, somewhere in there. Bathroom was later.

Q. Other than those occasions, have you ever -- well, did you use any joint compound during that work?

MS. MARTIN: Object to form.

THE WITNESS: I did.

Q. (By Mr. Morrison) Other than those occasions, have you ever used joint compound at any other time?

A. No.

Q. Did you perform this work yourself?

A. I did.

Q. Did anybody help you?

A. I had a buddy who was into Sheetrock and taping and stuff, and he kind of gave me pointers, and when I screwed up the joint work he repaired it for me.

Q. Do you remember any of the brand names or the manufacturer names of the joint compound you used on these occasions?

A. I really don't.

Q. Do you remember a product -- well, do you remember how the product came packaged at that time?

A. It was in a plastic barrel, probably what they would call five-gallon volume or something like that.

Q. Do you remember if it was a powder or a premixed substance?

A. It was a premix.

Q. Was there any dust associated with your use of this joint compound?

A. When I sanded it, yeah.

Q. Do you believe you would have breathed that dust into your lungs?

MS. MARTIN: Object to form.

Q. (By Mr. Morrison) Do you remember what quantity or how much joint compound you used let's say in the job that was in '77 or '78?

A. I used about two-thirds of that barrel, whatever size that would be, about so tall, about that big around (indicating).

Q. Sir, do you recall ever seeing on a specific product itself a warning label regarding asbestos hazards?

MS. MARTIN: Object to form.

THE WITNESS: I don't.

Q. (By Mr. Morrison) Did any manufacturer that you're aware of on their products ever inform you of

that asbestos dust could potentially cause cancer?

MS. MARTIN: Object to form.

THE WITNESS: On joint compound?

Q. (By Mr. Morrison) No, I'm sorry. On friction products. Let me just -- I'll restate that.

Do you recall ever seeing a specific product, a warning label on a friction product that warned you about asbestos hazards?

A. I don't recall any.

Q. Looking back, do you wish you would have received such a warning?

MR. DONELSON: Objection.

THE WITNESS: I do.

Q. (By Mr. Morrison) And given your nature and the way you've acted since you did become aware there could be health hazards with asbestos, do you believe you would have heeded any warning and followed whatever requirements?

MR. SINGEWALD: Objection.

THE WITNESS: Had I known, yeah.

Q. (By Mr. Morrison) Sir, I think we're going to take a short break, and I'm going to come back with some questions I believe more related to your medical situation and your lifestyle. And I won't have a whole lot longer.

A. Okay.

MR. MORRISON: Thank you.

VIDEOGRAPHER: We're going off the record. The time is approximately 10:23.

(A recess was taken from 10:23 a.m. to 10:38 a.m.)

VIDEOGRAPHER: Back on the record. The time is approximately 10:38.

Q. (By Mr. Morrison) Mr. Collins, I'd like to continue my questioning now with some questions regarding your diagnosis, your treatment and your lifestyle since you developed this illness.

A. Okay.

Q. I believe you said that you were told that you had mesothelioma sometime in either October or November of '05?

A. Correct.

Q. What led up to that diagnosis? What happened?

A. I guess the first symptom was just prior to my daughter's wedding, I developed a little cough and it kind of hung on. And the weekend of her wedding I didn't really pay any attention to it, that was a pretty high day, you know, and that was on a Saturday.

And by the following Saturday I was noticing shortness of breath. I had a golf tournament with some of my buddies, and we normally walked the golf course, and I got short of breath, which is unusual.

And then by the following Thursday I was very short of breath and had a rattling noise in my chest when I breathed.

And so that Friday I went in, and they did a bunch of tests and I thought, you know, it's a guy thing, I guess, they don't want to go to the doctor, but I thought maybe I had, you know, some sort of a chest cold or something. Everything showed good until the chest x-ray, and the chest x-ray showed that I basically didn't have any use of my right lung, it was compressed way up.

And so at that point in time they, I don't remember the exact name of the procedure, poked a hole in through the chest wall and took out 2,000 cc's of fluid from my chest wall.

Q. And when was this, approximately?

A. Whew, I don't know. I could tell you if I had a calendar, but I would say it was probably the first part of November, or excuse me, October.

Q. When was your daughter's marriage?

A. My daughter's wedding was the 7th of

September.

Q. Okay.

A. So it was --

Q. The fluid, was it sent off for testing?

A. It was.

Q. And what were the results?

A. They came back and told me that they had fairly conclusively identified mesothelioma and detected some asbestos fibroles (sic). That's what I was told.

Q. Did you then have a biopsy, actually a surgical procedure?

A. At a later date. That was the first part of November, they had to set up, took some time.

Q. And what were the -- were you told the results of that biopsy?

A. The surgeon basically told me when I went in, went in like ten days after the procedure, and he basically told me that the biopsies had confirmed what they had originally thought, and basically his recommendation to me at that time was do what you want to do and get your life in order because you probably only have about six months to live.

Q. Did they do any type of procedure, or anything at that time?

A. They did, trying to reattach the lung to the chest wall.

Q. Did they tell you, did they make any indication of whether they felt your illness was in an advanced or early stage?

A. They said what I had experienced was fairly typical of this disease, and was fairly advanced and aggressive.

Q. Was your wife with you when you received this information?

A. Yes.

Q. How did she react to this information?

A. I guess we were both shellshocked.

Q. After this information did you receive any treatment?

A. At the procedure in -- they explained what some of the options were. I decided to look into a more natural type approach, and went to a clinic in Mexico and listened to their recommendations and tried some of their recommendations which were more naturopathic, I guess you would call them, and diet change, exercise change, that sort of stuff.

Q. And where did you go in Mexico for this?

A. It was Tijuana, a place called Biomedical, formerly known as Hoxsey.

Q. And how long were you there?
A. About two days.
Q. And I guess they recommended more or less a holistic approach, herbs and vegetarian diet?
A. Correct, yeah.
Q. What, after this, after going to Mexico and receiving this advice, what happened there with your treatment?
A. Actually, on the way down I started having a fever, and this was after the surgical procedure, and so by the time I got back I was running 102 to 102.4 fever and went back to my health care provider.
They put me on antibiotics, and this was like the day before Thanksgiving, as I recall, oral antibiotics, and then the day after Thanksgiving they called and told me to come in and said I had -- they had found that I had a staph infection, and so I was two weeks on the intravenous antibiotics, and then another ten days on oral antibiotic to finally overcome this.
Q. Were you hospitalized during a portion of that stay?
A. I was not.
Q. After that, after the staph infection was I guess taken care of, take us from there, what

happened?

A. It wasn't too long after that, I would guess a couple weeks, suddenly a Friday evening my neck started swelling, became very tender, and I called the emergency room at my health care provider and told them what was going on, and it was decided at that point to try to wait until Monday, when they were open, but if any complications came up I could go to the local hospital, so it kind of, you know, puffed up and got large and was very tender to the touch, but I waited until Monday, and went in to them, and their diagnosis was that the tumors had grown enough and were blocking arterial flow, and their recommendation was to go get radiation to try to shrink up the tumors.

Q. And where did you receive your radiation at?

A. A place called Tacoma Radiology in Tacoma.

Q. And do you know how many sessions you had?

A. I had -- they originally scheduled me for 24 or 25. I did 20. And by that time I couldn't swallow. I had basically three levels of radiation burns on my external skin, couldn't lie down, had to try to sleep sitting up, lost a lot of weight because I didn't want to eat.

And so at that point, after 20, they gave me

a 10-day break so my skin could heal up, and then they finished off with seven more after that, seven more treatments, and basically maxed me out radiation-wise.

Q. Did the radiation burns cause you physical pain?

A. Excruciating, yes. And suffered some nerve damage as well. Couldn't sleep. There were many nights I didn't sleep at all, and some which I only got an hour, hour and a half sleep.

Q. Have you been told that you have any nerve damage specifically related to this procedure?

A. Most of it took care of itself after about eight weeks, but the pain would radiate, my neck, shoulder, arm. Driving sometimes I would lose function of my right arm and have to drive with my left arm. That was kind of scary.

Q. Did they prescribe any pain medication for you?

A. They did, but the side effects were so ugly that I didn't take them.

Q. It's my understanding that you physically had a pretty rough spring. Is that right?

A. Yeah.

I lost about 20 pounds in the radiation

aspect of it because I -- I didn't eat enough to maintain the cancer as well as keep weight on my body.

Q. What was, during the spring, what were you being told about your tumor size or growth of the cancer?

A. That it was growing. The radiation was specifically for here down to here, basically (indicating), on the airway.

Shortly after they got done with that then another complication occurred in which I started retaining fluid in my lower extremities, my feet, ankles, up my legs, and even through my lower abdomen, started retaining water, and I was feeling pretty pleased because my body weight went up, and I thought I was gaining weight, and it turns out that it was just fluid retention.

And so at that point in time they said my only option was to go on aggressive chemo and reduce the tumors that were down in my lower chest wall area that was restricting blood flow and, therefore, causing fluid retention in the lower extremities.

Q. What was your normal weight before the onset of this illness?

A. 185 to 190.

Q. And what has been your lowest weight during, since that time?

A. 132.

Q. And what is your current weight today?

A. 150, plus or minus.

Q. Did the cancer, during the spring, did it ever physically manifest itself to where you could actually see it?

A. Yes, it started to actually, a little bit prior to the spring, actually started growing out the incision points where I had the surgery, and started to grow between the skin and the chest, the ribs. And in February, March especially, you could on a weekly basis notice the enlargement. My wife noticed it, and it was tough.

Q. Was there any pain associated with that?

A. Not really. Just mild discomfort.

Q. Chemotherapy treatments, do you know approximately when you started those?

A. Would have been the first part of April.

Q. When was your last chemotherapy treatment?

A. Two weeks ago, Wednesday, two weeks ago, Thursday.

Q. Are you scheduled to continue any further chemotherapy treatments?

A. Of some form. We're still discussing that because the cis-platinum regime they don't want to continue because it's starting to affect my liver and kidneys and things.

Q. Have you been told whether the chemotherapy has reduced or had no effect, or what effect have you been told it's had on your cancer?

A. The cis-platinum regime has shrunk the tumors approximately 60 percent, and now we're looking at a way to maintain that, so we're discussing trials and other things.

Q. Were you told before the -- you were hesitant to take chemotherapy?

A. I was.

Q. Were you told what would happen if you did not begin chemotherapy treatment?

A. Yeah. I would die.

Q. The chemotherapy treatments themselves, have they caused you any physical hardship?

A. Yeah, yeah. It's -- it's a progression of things. Basically goes in phases. I take the chemo treatment, I usually have a good day after, and then by the second day after I'm extremely tired, and that continues for about five to seven days, depending, and on those days sometimes my biggest effort is

taking me from bed to shower to couch, and then fall asleep again. So it's extreme fatigue and your bones feel like they're made of lead, and it's something you can't really describe. You lose taste. Food has no flavor.

In that same time there's ringing in my ears, I've lost a lot of my hearing with the chemo. Numbness in feet, hands and around the head area, bloody noses randomly, uncontrollable sinus, eyes watering, nose running, that sort of stuff.

Q. What --

A. It's just part of the side effects of chemo.

Q. What's your feeling or what's your state of mind, if it is decided that you're going to do another chemotherapy treatment, what's your state of mind about that? What -- how do you feel about that?

A. Well, I guess I don't like it, but I don't have much choice. It's either that or all of this will come roaring back and get me.

Q. Was there any other health reason besides mesothelioma that caused you to stop working?

A. No. I loved what I was doing, and with this I just didn't have the stamina to do it.

Q. What was, I don't know if you can give us your annual income when you stopped, I don't know how

you were paid, but if you can characterize, what was your annual income when you stopped working?

A. It was a contract basically per year, and the last year I worked I was making 58,000 a year.

Q. Did you, outside of that employment, have any other source of income?

A. Occasionally I would in the summer go and work in a small shop, just to keep my skills up. The college would pay us to go to school.

Q. Those type --

A. Typical thing, yeah.

Q. Your wife, does she work?

A. She does.

Q. Where does she work?

A. She works for a company called Dove Development. They have assisted living homes and some other businesses, but she basically does the books for them.

Q. Has she had to miss any work because of your illness?

A. Miss and creative hours. They're very -- they have been great with her and, you know, during my bad days she'd stay home and help me take a shower and help cook meals even though I don't feel like eating, but I know I have to eat to keep going.

Q. Before this illness, did you have any plans for retirement?

A. Yeah. I planned to continue to work until probably age 64, 65, because I really loved what I was doing.

Q. Lifestyle outside, outside of work, has mesothelioma affected your lifestyle?

A. Yeah, in almost every way. I was typically very active, water-ski and snow ski and golfing, racquetball, tennis, backpacking.

Q. Since this illness, can you do any of those activities?

A. I've -- I try to go golfing with some of my buddies, and some days, you know, I'll make seven holes and have to quit, some days I can do 18, but it just depends, but the rest of them are pretty much curtailed.

Q. Are you making a conscious effort to try to remain somewhat active in some way?

A. Yes.

Q. Why is that?

A. Well, I'm not going to go down without swinging. Yeah, I just -- I feel worse if I don't keep pushing, you know, it's like eating, I don't feel like eating a lot of times, but I know I have to

have certain intake, so I just keep eating, even though it tastes like crap, I just do it.

Q. Has this illness been hard on your wife emotionally and physically?

A. Yeah. Yeah. You know, some times are worse than others, like with the radiation, and I had the nerve damage and was in excruciating pain, you know, sometimes I'd just be laying on the floor curled up in a ball crying where she would be hugging me and crying, too, you know, that's got to take its toll on a spouse.

And she doesn't sleep all that great at night sometimes and, you know, that was not evident before. And she's had some health issues that, she's pretty much a rock, but it does take its toll, you know, it's something she and the kids should not have to experience, but --

Q. Are your kids aware of your situation?

A. Oh, yes, yeah.

Q. Do you believe it's been difficult on your children?

A. Oh, yeah. Yeah. Yeah. We -- when we realized that I was going to beat their deadline they'd basically given me, which was my next -- they told me I probably wouldn't see my next birthday,

which was the 2nd of April. Mary's boss has a place in Palm Springs and they told us to go down and stay for a week, so the kids went down, and that's when the tumor growth was pretty aggressive and, you know, that reduced everybody to tears, you know, kids and spouses of the kids and all of that's tough. They shouldn't have to go through that.

Q. What, given the nature of your illness and what you've been told, what is your greatest fear regarding the future?

A. Oh, it's probably that Mary's taken care of when I'm gone, yeah.

Q. If, and I think I can speak for everybody here, that we hope you continue this battle and you can win this battle, but if the mesothelioma does end up taking your life, what is -- what do you think will be your biggest regret?

A. Well, just not being able to spend the time and watch my kids' families grow, and that's part of the pressure they feel, it's one of the things that you don't think about until this happens is that the pressure that they actually put on themselves, like my daughter, you know, she's questioning, well, why didn't we have kids, you know, so you could see your grandkids.

And I said, you know, you have to say that that's probably the worst reason to decide to have kids, you know, if it doesn't fit into your plan, you shouldn't do that.

And my daughter-in-law, the same way, she's got complications to where pregnancy is difficult and, you know, the things that come up, you know, shock me, because she expressed to me the fact that she's been scared at times because she feels that my son might not take it too well if they don't have kids so I could see grandkids, and he might not find her desirable and might want a divorce.

And, you know, you don't even think about stuff like that. And that kind of pressure shouldn't be there.

MR. MORRISON: Mr. Collins, I do appreciate your time today, and bearing with me on my questions.

Thank you, sir.

THE WITNESS: Thank you.

VIDEOGRAPHER: Going off the record. The time is approximately 11:04.

(The deposition concluded at 11:04 a.m.)

PAGE LINE CORRECTION

I hereby certify that I have read the foregoing deposition, and that this deposition, together with any corrections, is a true and accurate record of my testimony given at this deposition.

NAME DATE

SUBSCRIBED AND SWORN to before me this day of ,2006.

Notary Public for:
My commission expires:

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss.
COUNTY OF CLARK )

I, Marcia May, a Notary Public in and for the State of Washington, certify that the deposition of JAMES DANIEL COLLINS occurred at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all the testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction and the foregoing transcript, pages 1 through 83, both inclusive, contains a full, true and correct record of all such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and Notarial seal at Vancouver, Washington, this 18th day of August, 2006.

MARCIA MAY
CSR No. 2480
Notary Public for the State of Washington, residing at Vancouver
My Commission Expires: 9/30/06

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLIN, )
)
Plaintiff, )
)
vs. ) C.A. No. 06C-02-281 ASB
)
METROPOLITAN LIFE INSURANCE )
COMPANY, INC., et al., )
)
Defendants. )

DEPOSITION OF
JAMES DANIEL COLLINS

DISCOVERY

* * *

August 10, 2006

DISCOVERY DEPOSITION OF JAMES DANIEL COLLINS, produced as a witness duly sworn by me at the instance of the Defendants, taken in the above-styled and -numbered cause on the 10th day of August, 2006, from 11:15 a.m. to 3:20 p.m., before MARCIA MAY, Certified Shorthand Reporter No. 2480 in and for the State of Washington, at the Ramada Inn Governors House Hotel, 621 Capitol Way South, Olympia, Washington pursuant to the Delaware Rules of Civil Procedure and the provisions stated on the record or attached therein.

A P P E A R A N C E S

BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
BY: SCOTT MORRISON, ESQUIRE
Attorney for Plaintiffs

WHITE and WILLIAMS, LLP
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, Delaware 19899-0709
BY: CHRISTIAN J. SINGEWALD, ESQUIRE
Attorney for Ford Motor Company and
General Motors Corporation

PRESTON GATES ELLIS, LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
BY: KEVIN A. ROSENFIELD, ESQUIRE
Attorney for GARLOCK

THELEN REID & PRIEST, LLP
101 Second Street, Suite 1800
San Francisco, California 94105-3606
BY: ROBERTA R. RENDAHL, ESQUIRE
Attorney for DaimlerChrysler Corporation

GORDON THOMAS HONEYWELL
1201 Pacific Avenue, Suite 2100
Tacoma, Washington 98402
BY: ELIZABETH MARTIN, ESQUIRE
Attorney for Union Carbide and Certainteed

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
BY: SEAN MALCOLM, ESQUIRE
Attorney for Ingersoll-Rand Company

BULLIVANT HOUSER BAILEY, PC
333 SW Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
BY: STEPHEN F. DEATHERAGE, ESQUIRE
Attorney for Bondex International

WILLIAMS, KASTNER & GIBBS, PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
BY: JEFFREY M. ODOM, ESQUIRE
Attorney for Kaiser Gypsum and CBS

SCHWARTZ CAMPBELL, LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, Delaware 19899
BY: NICHOLAS E. SKILES, ESQUIRE
Attorney for Craneco and Aqua-Chem

ELZUFON AUSTIN REARDON TARLOV & MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899-1630
BY: MATTHEW P. DONELSON, ESQUIRE
Attorney for Borg-Warner, Hennessey and DB Riley

COOCH and TAYLOR
824 Market Street Mall, Suite 1000
P.O. Box 1680
Wilmington, Delaware 19899-1680
BY: NORISS E. COSGROVE, ESQUIRE
Attorney for Pneumo Abex Corp.

COSMICH & SIMMONS, PLLC
733 North State Street
P.O. Box 22626 (39225-2626)
Jackson, Mississippi 39202
BY: M. JAMES DEMPSEY, ESQUIRE
Attorney for Owens-Illinois

LAW OFFICES OF MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
1800 John F. Kennedy Blvd., Suite 1800
Philadelphia, Pennsylvania 19103
BY: STEVEN A. STOEHR, ESQUIRE
Attorney for Foster Wheeler

HACKETT, BEECHER & HART
1601 Fifth Avenue, Suite 2200
Seattle, Washington 98101-1651
BY: STEVEN A. BRANOM, ESQUIRE
Attorney for AW Chesterton

ATTENDING VIA TELEPHONE:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
1201 North Market Street
Wilmington, Delaware 19801
BY: KEVIN M. COEN, ESQUIRE
Attorney for Georgia-Pacific Corporation; Ametek, Inc.; Champlain Cable Corporation; Hercules, Inc.

JOSEPH W. BENSON, P.A.
1701 North Market Street
P.O. Box 248
Wilmington, Delaware 19899
BY: ANDREW G. AHERN III, ESQUIRE
Attorney for Crown Cork & Seal Company, Inc.

WILBRAHAM LAWLER & BUBA
901 North Market Street, Suite 800 & 815
Wilmington, Delaware 19801
BY: TIMOTHY A. SULLIVAN III, ESQUIRE
Attorney for Maremont Corporation; and T.H. Agriculture & Nutrition, LLC

CLEMENTE, MUELLER & TOBIA, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, New Jersey 07962-1296
BY: WILLIAM HARVEY, ESQUIRE
Attorney for Durabla Manufacturing Co.

I N D E X

| James Daniel Collins | PAGE |
|---|---|
| Appearances............................ | |
| Examination by Mr. Singewald | 6 |
| Further Examination by Mr. Dempsey | 88 |
| Further Examination by Mr. Donelson | 89 |
| Further Examination by Mr. Branom | 113 |
| Further Examination by Mr. Malcolm | 114 |
| Further Examination by Mr. Morrison | 116 |
| Corrigenda | 117 |
| Reporter's Certificate | 118 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| | (No Exhibits marked.) | |

P R O C E E D I N G S

JAMES DANIEL COLLINS,

having been sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. SINGEWALD:

Q. Sir, my name is Chris Singewald. I'm going to start off the deposition this afternoon. Basically, this is what we call a discovery deposition. It's our chance to ask you questions about your life, your work experiences, et cetera, and to learn more information about you and your employment and your possible exposures to asbestos.

A. Okay.

Q. A lot of what I cover is going to be duplicative of what Mr. Morrison already covered with you, because what he took was a videotaped trial deposition of you and that's something that might be played at trial someday.

I'll try not to be too repetitive, but some of what I'll ask you will be background, laying the background so that I can then expand upon some of the questions and areas that he asked you about. Okay?

A. (Nodding head.)

Q. And again, if you don't understand one of my questions, let me know, and I'll rephrase it. Try to make sure your answers are verbal instead of nodding your head and shrugging your shoulders so that the court reporter can take down what we're talking about. All right?

A. Okay. It's a new experience.

Q. I understand that. And certainly if you need to take a break at any time, just let us know, and we'll be happy to.

You told us you're 59 years old. What's your birth date?

A. April 2nd, '47.

Q. You live at 1904 Yew Avenue Northeast?

A. Correct.

Q. And you've been there since approximately 1975?

A. Correct.

Q. You live there with your wife, Mary?

A. Yes.

Q. Does anyone else presently live there with you?

A. No.

Q. Your two children, Scott and Cynthia, lived

there, are grown up?

A. True.

Q. Other than the two of them, did anyone else ever live at your house on a, in essence, permanent basis?

A. No.

Q. How is Mary's health, generally?

A. Good.

Q. No real health issues that she's treating with a doctor regularly for?

A. No, not -- not until lately. She's had trouble with weight gain and not sleeping consistently, and they're kind of indicating to her that it's mostly stress related, in spite of the fact that she seems to be handling everything well, it's tough.

Q. When you were diagnosed with mesothelioma in the last year, at that time was Mary the only person who was financially dependent upon you?

A. Yes.

Q. Your two kids had already moved out of the house and had been married?

A. Correct.

Q. How is the health of your children?

A. Good.

Q. No breathing, heart or cancer problems?
A. No.
Q. How about Mary, any breathing, heart or cancer problems?
A. Nothing apparent.
Q. I'll keep my voice up, and just try to keep your voice up for her sake.
A. Okay, yeah.
Q. Have you ever smoked?
A. No.
Q. Has Mary ever smoked?
A. No.
Q. Your children ever smoked?
A. No. Not that I'm aware of.
Q. Your parents, I saw in some of your medical records that your father is deceased, and at the time of the record your mother was still alive?
A. She's still alive, doing very well.
Q. Okay, great. How old is she?
A. She is 88, I believe, yeah.
Q. Any breathing, heart or cancer problems that she has?
A. No.
Q. Your father died from stomach cancer?
A. That's when it first became apparent, they

removed a portion of his stomach, and then it spread to the liver and that's what finally killed him.

Q. How old was he when he passed away?

A. I don't remember exactly. Late 60's, 71 or 2.

Q. Did anyone ever tell you the cause of his stomach or liver cancer?

A. Not really.

Q. Prior to being diagnosed with that cancer, had your father had any breathing, heart or other cancer-related problems?

A. No. He was a pretty healthy guy. We used to do a lot of woodcutting together, and he could outwork me.

Q. Other than your father's cancer and your mesothelioma, any other cancer in your family that you're aware of?

A. No.

Q. You mentioned earlier that your dad worked at Fort Lewis doing heating and AC work?

A. Correct.

Q. For how long did he do that job, do you know?

A. Boy, as long as I can remember.

I believe he got that job right after he was

discharged from the service, so it would have been late Forties.

Q. Did he keep that job until he retired?

A. He did, yes.

Q. I'm not familiar with Fort Lewis, but I'm assuming it's a military base?

A. It is, yeah.

Q. Army?

A. Army, mm-hm (affirmative response).

Q. Did your father, within the trade, the heating and AC trade, did your father have any specific specialty that you're aware of?

A. Um, what I was mostly aware of was he did the large coolers and freezers and stuff in the mess hall areas and as well as doing heating, you know, like stoves and refrigerators and that sort of stuff in the officers' quarters and the on-fort facilities for the -- I believe at the time it was mostly I think above a certain rank they could live on base, and below a certain rank they had to fend for themselves, so -- but those were his duties.

Q. To your knowledge, would your father work on boilers on the base?

A. I'm not aware of boiler work in his work. I never talked about that.

Q. When you visited his work sites, you did not see him work on boilers?

A. No.

Q. Do you have any recollection of him working on furnaces?

A. Furnaces?

Q. Yes.

A. No.

Q. Do you know if your father would work on -- would his job responsibilities entail working on the piping that may be feeding to hot water radiators?

A. I was never aware of that, no.

Q. As a heating and AC technician, did your father have insulating responsibilities, as far as you know?

A. I am not aware of that.

Q. Do you know if your father ever had to work with asbestos-containing pipe insulation as part of his job?

A. I am not aware of that, no.

Q. If your father worked with asbestos-containing products in his trade, what type of products do you believe he may have worked with?

A. I know out of the shop he worked out of, other guys had those responsibilities, but he

himself, I don't believe so. He pretty much did refrigerators, large refrigeration and stoves, you know, household stoves, and that sort of stuff.

Q. The other job, the other men in the shop who had those responsibilities that you just referred to that's responsibilities that would include boiler work, insulation work, pipe work, that, those types of jobs?

A. Yes.

Q. The shop where your father worked, how large of a facility was that?

A. They had about a dozen trucks that worked out of that, and the shop itself was probably, I would have to say 40 by 60, and they had all sorts of appliances and stuff in there that they were fixing on site, and then they would take them back out to the barracks or quarters or wherever they belonged.

Q. The shop was on Fort Lewis?

A. Correct.

Q. And your father's employer was actually the US Army?

A. Yes. He was a federal employee.

Q. The shop that was 40 by 60 feet, was actual work, repair work done within the shop?

A. Yes.

Q. If pipe insulation had to be cut would that type of activity be done in the shop?

A. I'm not aware of that particular part.

Q. Do you recall what type of job duties were performed within the shop?

A. There was some sheet metal work that I saw being done, you know, like ducting and stuff, and just repair work of the appliances that I mentioned. And that's about all I observed. I was pretty young.

Q. The product that your father brought home from work you described it as a three-by-three, quarter-inch panel that was for wall protection for a wood stove --

A. Mm-hm (affirmative response).

Q. -- in your grandfather's house.

Do you know what the use of that product was?

A. Out there?

Q. Yes.

A. I don't.

Q. So you don't know if it was some sort of like insulating panel for a stove?

A. I don't, no.

Q. You don't know?

A. Hm-mm (negative response).

Q. It just served as an insulating panel in your grandfather's house?

A. Wall protector, yeah.

Q. Did you do anything to that panel when it was in your grandfather's house?

A. Not that I recall.

Q. Did you have to nail it into place or cut it or anything like that?

A. No. I was young.

Q. If that type of work needed to be done to fit it to the area where it was, would that have been done by your father?

A. Yeah, Dad and Grandpa did that.

Q. Do you know the manufacturer of that panel?

A. No.

Q. Other than that insulating panel, did your father bring home any other asbestos-containing products from work into your house that you are aware of?

A. Not that I'm aware of, no.

Q. We've had some other plaintiffs tell us about how their dads would bring home pieces and they would use them as baseball bats in the back yard or on the gas grill or something like that; anything like that in your household?

A. Nothing so creative, no. No. Hm, wow.

Q. How about your mother, did she ever work outside the house?

A. No.

She had a daycare at the house. That was about it.

Q. What was the name of the high school that you graduated from?

A. It was called Auburn Academy in Auburn, Washington.

Q. Were you there for ninth through 12th grade?

A. Two years, junior, senior. I attended the ten-year, or, yeah, tenth grade at a school here in Olympia.

Q. What was that school?

A. Oh, God, that's going back a ways. I believe it was Olympia Junior Academy at the time that I attended it.

Q. Were you there for actually grades one through ten?

A. One through ten, yes.

Q. At Olympia Junior Academy, do you believe you were exposed to asbestos in any way?

A. It's hard to tell. I mean, the buildings were of the era, and oddly enough, that school, all

the buildings that comprised that school were transported from Fort Lewis to that site. They were old barracks that they put together, and the gymnasium was actually an old warehouse that they disassembled and brought down and reassembled.

Q. Today do you have any recollection of being in grade school and remembering seeing insulated pipes overhead in the classrooms and the locker room, in the gymnasium, anything like that?

A. No.

Q. Just don't recall?

At Auburn Academy, since you were a little bit older, did you have any maintenance responsibilities at the school, janitorial type responsibilities, as part of schoolwork or class work?

A. When I first attended there I went a little bit early the first summer before my junior year, I did maintenance work, but it was outside. And then once school started I worked in a mill, a furniture mill that was there, and basically I worked in the shipping and receiving end of it where I packed furniture and drove a forklift and stacked it and loaded semi's and that sort of thing.

Q. As part of your duties and responsibilities

of working in this furniture mill, do you believe you were exposed to asbestos in any way?

A. I have no idea.

Q. At the Auburn Academy, do you recall seeing insulated pipes on the ceilings in the classrooms and the locker rooms?

A. I honestly didn't notice.

Q. But nothing that you did on a day-to-day basis would make you in direct contact with the boiler in the school, the pipes, anything like that?

A. No.

Q. How about at Walla Walla College?

A. Mm-hm (affirmative response).

Q. That's where you did the predental work?

A. Yes.

Q. At that school, do you believe you were exposed to asbestos?

A. Again, I really don't have any idea.

Q. During your year and a half or so of taking classes at Walla Walla College, did you also engage in lab work?

A. Yes.

Q. As part of the lab work of the predental program, do you believe that you were exposed to or had to work with any products that contained

asbestos?

A. Not that I'm really aware of. I do remember formaldehyde.

Q. At Walla Walla, do you recall seeing the pipes insulated on the ceilings, up and down the walls, anything like that?

A. In some of the buildings there were, but it wasn't something that I was in contact with.

Q. Wasn't part of your class responsibilities?

A. No.

Q. How about at the trade school, do you recall seeing insulated pipe in that school?

A. Not that I recall. I don't recall what kind of heating was actually in that.

Q. And as part of your trade program that you were involved in, did any part of your class work involve maintenance of the boiler or the pipe or anything in that school?

A. No.

Q. When you were in the US Army from 1969 to 1971 did you personally work with any products that you believe may have contained asbestos?

A. Not that I'm aware of, no.

Q. Do you recall seeing insulated piping within the barracks?

A. Not that I really recall.

Q. Do you recall seeing insulated piping --

A. Not that they needed heat in those things.

Q. Not in Texas, hm?

A. God, it was awful.

Q. How did you get from the States over to Vietnam?

A. Flew.

Q. Commercial airline, or was it a US --

A. Yeah, it was commercial.

Q. When you were in Vietnam did you have any exposure to chemicals that you're aware of?

A. We passed through areas in our tanks -- I was assigned to a tank battalion -- that had been defoliated, but what it was exactly, I'm not sure.

Q. Do you have personal knowledge of being exposed to Agent Orange when you were in Vietnam?

A. Not that I'm aware of.

Q. You told us a little bit earlier about some of the work that you did at your residence, and I just want to talk about that right now.

And that's the residence at, on Yew Avenue?

A. Correct.

Q. And Yew is spelled Y-E-W?

A. Y-E-W, as in the tree.

Q. You told us about kitchen work and bathroom work.

A. Mm-hm (affirmative response).

Q. Any other renovation work to the house?

A. Not that I did, no.

Q. You didn't put on an addition, put on a new roof, anything like that?

A. Oh, I reroofed the house, and I built an outside garage, roofed it.

Q. So you put a roof on the house, you did an outside garage, you renovated a kitchen and you renovated a bathroom.

A. Mm-hm (affirmative response).

Q. Any other work on the house --

A. No.

Q. -- that you personally did?

A. No.

Q. Any other work on that house that you had any contractor do for you?

A. It was like gutter work, that sort of stuff.

Q. The roof on the house -- off the record.

(Pause in proceedings.)

Q. The roof that you put onto the house, when did you do that work?

A. Would have been towards the late Eighties.

Q. Was this the first time that a new roof had been put on the house since you lived there?
A. Yes.
Q. When you put the new roof on, did you remove the old shingles or did you just install new shingles on top?
A. Stripped it down to the bare roof.
Q. The old shingles that you removed, what type of shingles were they?
A. I don't recall.
Q. Were they --
A. You mean, brand versus --
Q. I'll get to that, but in essence, were they asphalt shingles? Were they cedar shingles?
A. Asphalt.
Q. And then you guessed my next question, do you know the manufacturer of those shingles?
A. (Shaking head.)
Q. Do you know if those shingles contained asbestos?
A. I don't know.
Q. When you removed those shingles, did you wear any type of respiratory protection?
A. No.
Q. Is there anyone who you know who would know

who manufactured those shingles, in essence, a buddy who helped you on the job, anybody familiar with roofing, that sort of thing?

A. I did it all myself.

Q. What type of shingles did you put back on the roof?

A. Three-tab. And again, I don't remember the brand.

Q. By three-tab, you're referring to asphalt shingles?

A. (Nodding head.)

Q. Do you know if the new shingles that you put on contained asbestos?

A. I don't.

Q. How long did it take you to do that roofing job?

A. About three and a half weeks, start to finish.

Q. How did you remove the old asphalt shingles?

A. With a flat plate shovel with notches.

Q. Shoveled the old shingles down into the yard?

A. Into a truck.

Q. Into a truck?

A. Yeah.

Q. Was that a dirty, dusty job?
A. I don't recall it being all that dirty, but --
Q. The new shingles that you installed, do you recall how many packages of new shingles you needed to surface the roof?
A. About 20 squares, 21 squares, something like that.
Q. The outside garage that you built, did you do that all by yourself?
A. I had some help with it, with pouring the cement and --
Q. Is that a, in essence, a finished garage on the inside with drywall?
A. No.
Q. Studs showing?
A. Mm-hm (affirmative response).
Q. Is it insulated at all?
A. No.
Q. Is there heat in there that runs out to the garage?
A. There's a -- there's a pellet stove in there.
Q. What year did you build that garage?
A. Probably around '80, early Eighties. It was

prior to going into teaching.

Q. What's the floor in the garage?

A. Cement.

Q. What type of roofing shingles on the roof?

A. Three-tab asphalt.

Q. Do you know the manufacturer of those shingles?

A. I don't remember.

Q. The pellet stove, is that insulated at all?

A. I'm not sure.

Q. Any rope or packing around the, any of the -- strike that, bad question.

Is there any piping that comes off of the stove?

A. Just regular heat flue, yeah.

Q. And is the heat flue insulated?

A. It's double-walled, so I guess you would call it insulated.

Q. Was the pellet stove installed in the early 1980's?

A. No. No. It was basically unheated until about six years ago.

Q. The work that you did in the kitchen in around '77, '78 time frame, what did you do?

A. Basically, refaced cabinets, replaced some

cabinets. That was about it.

Q. Put a new floor down?

A. Not at that time, no.

Q. Did you subsequently put a new floor down?

A. Yeah, later on.

Q. When did you put a new floor in the kitchen?

A. Totally gutted the kitchen about five years ago, started with four bare walls and redid the kitchen completely.

Q. Did you tear up the old kitchen floor?

A. No.

Q. Did someone do that for you?

A. Yes.

Q. Did a contractor do the total refurbishment of the kitchen?

A. No. I did it.

Q. Who was it who -- or why is it that someone else tore up the floor for you?

A. A buddy came over and helped and had some other building materials he was taking to the dump.

Q. The floor that was torn up, was that the floor that had been in the kitchen since you owned the house?

A. Yes.

Q. Do you know the manufacturer of the floor

tiles that were removed?

A. I don't.

Q. Do you know if those floor tiles contained asbestos?

A. I don't.

Q. When you redid the kitchen in around 2001, did you remove the old drywall?

A. No.

Q. The bathroom renovation work that you did, I know you told us earlier you used some joint compound, but what exactly were you doing in the bathroom?

A. Basically, gutted that to the studs. And it was a combination of plaster and lath and chicken wire and some green-colored-looking drywall board I guess you'd call it. And kept the old tub and basically replaced everything else.

Q. You say you gutted to the studs. I assume that means you took down or tore out the old drywall?

A. Yes. And chicken lath and plaster. And the floor was mosaic tile, and so I took all that, and the stuff underneath it was like cement, and had to chisel that out and threw everything out. There was about 2500 pounds of cement, tile and plaster and that stuff that I took out of there.

Q. The old drywall that you removed, any idea who manufactured that?

A. None.

Q. After taking it down to the studs, did you then insulate the bathroom?

A. Yes.

Q. What year are we talking about that you did this project? I know you told us a little bit later than '78, '77 time period.

A. Yeah. That was done after I started teaching, so it would have been after '85. I'm guessing '87, '88, somewhere.

Q. So you then insulated the inner walls and put up new drywall; is that correct?

A. Yeah.

I actually had a buddy come in and hand do the taping and sanding and all that stuff. I didn't do any of that.

Q. You told us earlier that obviously drywall, joint compound was used, but you do not recall the product name or the manufacturer; is that correct?

A. No.

Q. Other than the new roof on the house, the outside garage, the kitchen, kitchen floor and the bathroom, any other significant renovations that you

did on that house?

A. Personally, no.

Q. Any other significant renovations done on that house done by someone else, but you were present there observing?

A. No.

Q. Prior to Yew Avenue, you lived in a mobile home park?

A. I did.

Q. Any renovation type work on the trailer when you were there?

A. No.

Q. Prior to that you lived on Wandell Avenue?

A. Correct.

Q. And I guess that was for a few years after you got married?

A. Yeah. When I got stationed in Fort Lewis.

Q. Was that a house that you owned or rented?

A. That was a rental, yeah.

Q. Did you do any renovation work to that rental?

A. No.

Q. Then growing up, most of your years you lived at 3650 Pacific Avenue?

A. Correct.

Q. How was that home heated?

A. I believe that the whole time it was forced air natural gas.

Q. Do you know if the duct work for the furnace was insulated in any way?

A. I don't recall.

Q. Did you have any maintenance responsibilities with regards to the furnace on that house?

A. No.

Q. Were any home renovations performed on that house while you lived there, such as what we talked about before, tearing down walls, renovating rooms, new additions?

A. Hm-mm (negative response).

Q. Nothing?

And prior to 3650 Pacific Avenue you lived at an unidentified address in Olympia?

A. Yeah. It was about five miles east of there. I don't remember the exact address. I was very small then.

Q. From the dates it sounds like you were there from about birth to age eight or nine?

A. Yeah.

Q. Any recollection as to the --

A. Seven.

Q. Any recollection as to the heating system in that home?

A. Yeah, I do. It was wood.

Q. And how do you recall that?

A. Oh, I got into trouble.

Q. Did you actually have a wood-burning stove in the house?

A. A big, wood-burning stove in the basement, yeah. And boxes of matches.

Q. And how did the heating system in that house function, if you recall? Were there actually duct work?

A. I don't recall.

Q. Was it piping to radiators, in essence, or --

A. I honestly don't recall.

Q. Do you recall there being any insulated piping within that house?

A. I don't recall.

Q. Playing with the matches, you don't recall playing with the insulated pipes?

A. No.

Q. There is reference within your work history sheet of there being construction at a personal

residence from 1950 to 1952.

Do you know what that is referring to?

A. I think that date was kind of an all-encompassing date. The house at 3650 Pacific was constructed in the early Fifties.

Q. Was it a --

A. And I think that -- what was the dates?

Q. It says in your work history, it says personal residences, 1950, 1952, construction.

A. That would have been Pacific Avenue.

Q. Was that home built for your family?

A. Yes.

Q. And you were young, obviously, but did you have any involvement in the construction of that home?

A. No. Just being there when the work was done, and pounding nails where I shouldn't, and that sort of thing.

Q. Do you recall there being workers on the job building the home?

A. Yes.

Q. Do you recall seeing people install drywall in the home?

A. I don't.

Q. Do you recall the job site being dusty?

A. Sawdust.

Q. Do you recall there being individuals in the home, contractors, insulating the house?

A. I was not present then. I remember being there in the framing and cement pouring times, I distinctly remember that, but the rest of it, I don't recall.

Q. Your employer in 2005 was actually South Puget Sound Community College; is that right?

A. Correct.

Q. And if I understood your prior testimony correctly, you were on a year-to-year contract with them?

A. Correct.

Q. It's probably self-explanatory, but does that mean, in essence, your contract that you have to teach there runs for one year and one year only?

A. Correct.

Q. And at the end of the year the school and the School Board decide whether to renew your contract?

A. That's correct.

Q. There's no obligation for them to renew your contract?

MR. MORRISON: Object to form.

THE WITNESS: Well, as a tenured faculty, there is, you know, some procedural processes but, in essence, yes.

Q. (By Mr. Singewald) I did not realize, but you were considered tenured faculty?

A. Correct.

Q. From what you've indicated, would there have been a process that the School Board would need to undergo if your contract was not going to be renewed?

A. Right. They would have to show cause.

Q. Was there some sort of a union that oversaw the teachers for the community college?

A. Yes.

Q. And were raises structured or dictated by the union and union contract?

A. No.

Q. What's your knowledge as far as how raises worked?

A. Erratically.

There were many years in which there were absolutely no raises, and other times in which they were on a voted-upon, agreed-upon schedule, and so it was, as I said, erratic.

Q. And do you know what your salary would have been in 2006 if you had taught at the school?

Strike that. Let me rephrase the question.

When you were diagnosed with your cancer, I'm assuming you were under a contract for the 2005-2006 school year?

A. Correct.

Q. When is it that your salary would have been determined for the 2006-2007 school year?

A. At the time of signing the contract there is a schedule. Basically, you do certain things, whether it be training, or whatever, and meeting certain requirement, and then you have an incremental raise based upon that.

Now, whether I would have achieved that, I probably would have, and would have gotten the next increment, but --

Q. Do you know about how much that net increment would have been?

A. It would have been in the neighborhood of about $1400.

Q. So there is certain criteria that you have to meet in order to get that next increment?

A. Correct. Correct.

Q. As far as you know, is that all laid out in some sort of employee handbook, for lack of a better term?

A. Yeah.

Q. Since you are making an economic loss claim here, let me ask you some more, some personal questions, but as far as a 401(k) plan or anything like that, does the university, did the university, the college offer that type of program?

A. It's through TIA Kreft.

Q. And do you have one?

A. I do.

Q. And do you know the amount that you have in your 401(k)?

A. It's not a 401(k).

Q. I'm sorry, whatever the term is?

A. Yeah, it's -- exact, it's -- I don't know. I would guess in the neighborhood of 340,000, somewhere in there.

Q. And who's the beneficiary of that?

A. My wife.

Q. Do you have any life insurance policies?

A. Yes.

Q. And do you know, one or more than one?

A. More than one.

Q. Do you know who those policies are with?

A. There's a small one with New York Life, there's a very small one associated with the college,

and I believe we still have one more through -- I don't know, I'd have to look it up, Northwest or something.

Q. Do you know the total amount of the life insurance policies?

A. Death benefit?

Q. Right.

A. In the neighborhood of probably 150, maybe a little bit less.

Q. And who's the beneficiary on those policies?

A. My wife.

Q. Other than your residence on Yew Avenue, do you own any other property?

A. I'm sorry, I didn't hear the first part.

Q. Other than your home that you currently own, do you own any other property?

A. Any other property? We have a time-share. That would be the only thing that -- only other thing that could be indicated as property, I guess.

Q. And where is the time-share?

A. In Hawaii.

Q. For how long have you had that?

A. About ten years now.

Q. Since we're approaching the lunch hour, let me see if I can ask you some questions about some

other areas before getting into your employment, because we'll take a lot more time covering your employment.

You mentioned some activities that you used to do before you were diagnosed with mesothelioma.

Let me follow up with some of that.

You mentioned golf, and you said that you actually do still try to play some golf?

A. (Nodding head.)

Q. Are you a member of any club out here?

A. Not a real club. It's a -- I guess you could call it -- it used to be called a men's club, but then when the next owner bought it they didn't allow that, but they have memberships which are, you know, give you a discount and a break on merchandise and stuff.

Q. What's the name of that?

A. Capitol City Golf Course.

Q. And before you got sick, how frequently did you play?

A. Oh, averaged one to two times a week.

Q. How about the water-skiing, snow skiing? Obviously, seasonal, but how frequently would you do that?

A. Water-skiing, again, was kind of in clumps

but, you know, one- or two-week vacation, a lot of water-skiing, you know, daily, and sporadically during the summer. And snow skiing, sporadically during the winter, probably no more than four, five times a season.

Q. Do you folks own a boat?

A. Yes.

Q. What size boat?

A. 18 foot.

Q. What type?

A. Blue Water is the name.

Q. Is that a ski boat?

A. Yeah.

Q. Do you have that moored somewhere, or docked somewhere?

A. No. It's at home, garaged.

Q. When was the last time you've been out on the ski boat?

A. Just to ride around in it, about six weeks ago. My wife's boss has a house on a local lake.

Q. I'm sorry, your wife's --

A. Boss.

Q. Boss. Is that where you would typically bring the boat is to that lake?

A. No. No, not usually. We would take it to a

small lake up by Hoodsport, which is about 20 miles from here. Or go over to Lake Chelan, which is in eastern Washington, central Washington.

Q. Any lake house or anything like that?

A. (Shaking head.)

Q. How about with the skiing, any house or condo at ski slopes, anything like that?

A. Pardon me?

Q. You mentioned the snow skiing. Was there a particular resort that you would go to to do the snow skiing?

A. Crystal Mountain was probably our favorite, and White Pass is kind of another nice little resort, but no property there.

Q. Have you ever owned a house by a mountain where you would ski?

A. No.

Q. The backpacking, where would you do that?

A. A lot in the Olympics.

Q. How frequently did you used to do that?

A. Four times a summer, at least.

Q. When you were at Puget Sound Community College, I think you said after two years you became the head of the department?

A. Mm-hm (affirmative response).

Q. Is that right?

A. Mm-hm (affirmative response).

Q. Is that a yes?

A. Yes, excuse me.

Q. What were you considered before becoming the head? Were you an associate professor?

A. Yes.

Q. And I was a little confused, but when you first started there, what did you do those first couple years when you were an associate professor?

A. The first couple of years my responsibilities were basically to teach basic shop safety, tools, proper tool use, identification, basic repair procedures and skills, you know, like how to use tap and dyes, and basic skills that were required to be a mechanic, and basic electrical, that sort of stuff. Meters and equipment, and that sort of thing. Things that they used as a springboard then to go into different areas of car repair.

Q. It was all automotive related?

A. Yes.

MR. SINGEWALD: Do you want to take a break now?

MR. MORRISON: This is a good time.

(A discussion was had off the record; A

recess was taken from 12:06 p.m. to 1:19 p.m.; Ms. Collins present for the following proceedings.)

Q. (By Mr. Singewald) All set?

A. (Nodding head.)

Q. Okay, sir, let me shift gears now and start talking to you about, in greater detail, about your employment history and the various places that you've worked over the years.

First place to start is an employer who I don't think was identified at all during your direct examination, but yet we have several years identified here on your Social Security printout, and that is the University of Washington.

A. (Shaking head.)

Q. You're shaking your head no.

A. Never been employed by University of Washington.

Q. When you were in high school, you graduated from high school in 1965?

A. Correct.

Q. When you were in high school, did you have any sort of part-time job at that time?

A. I did, on site there at the Academy there was a -- I believe it was Harris Pine Furniture Factory, and students at the school worked in there

to defray expenses.

Q. I think before you referred to it as a furniture mill, or something along those lines.

A. Furniture factory, yeah.

Q. After graduating from high school that summer, did you have a job?

A. I did.

Q. Where did you work?

A. I worked for what was then called the Youth Conservation Corps, and my work site was actually Millersylvania State Park, south of here.

Q. What was your next job after that job?

A. Let's see, that was the summer of '65.

Q. Summer of '65.

A. Then I went to --

Q. In the fall of '65 did you enter --

A. I went to Walla Walla College.

Q. Okay.

A. And I worked on the college campus there doing maintenance work and delivery service for the time that I was there at the college, that school year.

Do you want me to keep going?

Q. No, let me stop you there.

What type of maintenance work did you do at

Walla Walla?

A. Basically, yard type, you know, landscaping type things for a while. And then the more desirable job was the inter-campus delivery, which was basically driving a truck.

Q. Did your maintenance responsibilities take you into the boiler room at all at the college?

A. No. No. It was mostly outside work.

Q. While at Walla Walla, other than working at the school, did you work anyplace else?

A. No.

Q. You stopped there in approximately 1996, and you started up --

MR. MORRISON: '66, excuse me.

Q. (By Mr. Singewald) I'm sorry, 1966. And then you started up at the trade school in 1967?

A. I attended Walla Walla '65-'66, and part of '66-'67, yeah.

Q. And when you stopped Walla Walla, and before entering trade school, did you work anywhere?

A. The summer after the first year at Walla Walla I went to work for Department of Natural Resources as a lookout tower person, fire watch, and did the same thing for the next, the following two summers.

Q. While working for the Department of Natural Resources, do you believe you were exposed to asbestos in any way?

A. Not that I'm aware of.

Q. Did you have any duties or responsibilities that would bring you into contact with or in the vicinity of industrial equipment while working for the Department?

A. No.

Q. You then enter into trade school?

A. Yes.

Q. And you complete trade school approximately 1968?

A. Spring of '69.

Q. '69. And then from there you go right into the Army?

A. Correct.

Q. Did you work anyplace between trade school and before entering the Army?

A. No.

Q. Your Social Security printout indicates that you worked for the University of Washington in 1965, '66, '67 and '68. But you don't have any recollection of that?

A. I have no idea where that came from.

Q. It also has you working for the University of Washington in 1976, '77, '80, '81, '85 and '86. Any recollection of that?

A. No. That would have been really difficult. I have no idea where that came from.

And that's through Social Security, you say?

Q. Yes.

A. I'll have to check on that.

Q. Is South Puget Sound Community College affiliated with the University of Washington in any way?

A. Not in any pay format that I'm aware of.

Q. How about Centralia College?

A. Centralia College was -- South Puget Sound was under Centralia College District for a couple of years I believe when it first started, and then it became its own identity.

Q. You first started teaching in 1986; is that right?

A. '85-'86, yeah.

Q. '85-'86, okay.

A. Yeah, was my first school year.

Q. I understand that you worked at a junkyard for a period of time.

A. Salvage yard.

Q. Salvage yard.

A. Yes.

Q. My mistake.

What did you do at the salvage yard?

A. Basically, my responsibilities were to go to different sites and pick up salvage, bring it to the yard, clean it, if it were other than just the basic metal, removed foreign material from it, including burning insulation from wiring and that sort of stuff, and then, when required, driving the scrap metal up to Tacoma or Seattle for disposal.

Q. And how long did you work there?

A. Just for a short while between when I left Walla Walla College the second year and going back to work with DNR that summer. I believe that was '67.

Q. According to your Social Security printout it has you there in 1967, and the name of the company was Les Fauver Junk Company.

A. Fauver, yeah. Interesting.

Q. Do you recall what type of salvage you would pick up?

A. Any types of scrap metals, old buildings, piping, that sort of stuff. Wiring from what was then Puget Power, did a lot of that, a lot of scrap wiring, and that's the stuff that we would put into

large barrels and burn the insulation from, and then clean it up so we could take it as a clean metal.

Q. How would you go about this process of burning insulation from wiring?

A. You're not from the EPA, right?

Q. No.

A. Basically, they would make up, mix up a concoction of gas and diesel. They would throw the wiring with the insulation into these quarter-inch metal barrels, pour the gas and diesel on it, and light it off, and then through the process, reach in there and stir it up and break the then burned insulation off of the raw wire.

Q. During that process would you wear any type of safety equipment?

A. No.

Q. Describe for me how you would then break off or knock off the burnt-off insulation off of the wire.

A. It was just a loan metal rod that you'd reach in there and beat on the wiring as the flames were at a much lower level.

Q. Is that dirty?

A. Occasionally, you know, you wouldn't want to stand in the way of it; you just selected your site

where the wind was blowing away from you, but, yeah.

Q. You could see the wind blow in the particles or whatever, the burnt-out, the residue?

A. Yeah; most of it stayed in the barrel.

Q. You didn't wear gloves or a mask or anything like that?

A. Well, leather gloves. Obviously, it's hot.

Q. Where did, if it was one particular place, where did the majority of the wire come from?

A. Mostly Puget Power.

Q. And from the size, from a gauge standpoint, how large was the wire?

A. Anywhere from your standard household size to half-inch in diameter, sometimes a little bit bigger.

Q. Do you know the manufacturer of the wire?

A. I don't.

Q. The insulating cover that you were burning off, was that kind of like a plastic type covering?

A. Some of it was, some of it was like almost a fabric looking, woven.

Q. You also mentioned that you got scrap metals from, including old building piping; is that right?

A. (Nodding head.)

Q. And would you do a similar process with that

piping? Would you have to clean that off?

A. No.

Q. What would you do with that old piping?

A. Basically, if it needed to be cut, one of Les' sons would cut it to the correct lengths and stack it.

Q. Would it eventually be delivered up to Seattle?

A. Tacoma or Seattle, yeah.

Q. The old piping, do you recall that being insulated at all?

A. I honestly don't.

Q. Do you recall working at the salvage yard in general being a pretty dirty job?

A. It could be.

Q. A lot of dust and stuff blowing around?

A. (Nodding head.) Meaning -- yes, sorry.

Q. Thank you.

A. Meaning dirt dust?

Q. It's a dirty job, was outside?

A. Yeah, yeah.

Q. Do you know if you were exposed to asbestos in any way while working at the salvage yard?

A. I don't know.

Q. How is it that you first learned how to do a

brake job?

A. Watching.

Q. Who did you watch?

A. I watched my uncle.

Q. Was he a mechanic?

A. He was.

Q. Did he work, in essence, professionally as a mechanic, or was he just kind of your back yard type mechanic?

A. Kind of back yard at the time, yeah.

Q. Did he specifically teach you how to do a brake job, or was it purely just from you watching?

A. Just observation, yeah.

Q. At any time during your career have you ever consulted a manual to help you do a brake job?

A. In -- how specifically do you mean?

Q. In general, I mean, if you were working on a certain type vehicle from a certain manufacturer, would you have to look at that manufacturer's owner's manual to tell you how to do a brake job?

A. No, not after my initial training at the voc school. Then after that you'd basically looked at the design and, you know, when I went to work for Volkswagen, obviously, I had to attend their schools and learn their product, but that was about it. Once

that was done, no.

Manual was there for torque specs and that sort of stuff.

Q. So you went in, once you, as you said, once you graduated from trade school and once you received various training from the various employers, when you then would do a brake job, whether professionally or a personal job, you wouldn't have to consult a manual to tell you how to do a job or anything like that?

A. Step by step, no.

Q. The first brake job that you ever did, I think you said you were -- let me rephrase that.

How old were you when you first did a brake job?

A. Oh, fresh out of high school, so probably 18'ish.

Q. I found an error in my notes. You said you first did a brake job in 1964 or '65 on your own car?

A. Correct.

Q. Does that sound about right?

A. (Nodding head.)

Q. You were eight to ten years old?

A. I was 18.

Q. 18. I'm sorry.

A. 17, 18. My first car.

Q. When's the last time you did a brake job?

A. Probably three years ago, two years ago, something like that. It was on my wife's car.

Q. When you were at Clover Park Voc School, you mentioned earlier that you were required to do two brake jobs as part of your training?

A. Correct.

Q. And you were required to do one clutch replacement and you said that you did three.

Does that sound right?

A. (Nodding head.) Yeah. One was considered a minimum.

Q. The two brake jobs that you did at Clover Park Voc School, do you recall the specific vehicle that you removed the brakes from?

A. One of them, distinctly, yes. It was my own '58 Chev.

Q. Do you recall the other one?

A. I don't.

Q. That '58 Chevy, you bought that used?

A. Yes.

Q. The brakes that you removed from the '58 Chevy when you were at voc school, do you know the manufacturer of those brakes?

A. I don't.

Q. The replacement brakes that you put on that '58 Chevy while at voc school, do you specifically know who the manufacturer was of those brakes? I know before you gave us five or six different brand names or manufacturers that you recalled being at the school, but what I'm asking you is, do you recall specifically what type you put on that '58 Chevy?

A. I don't.

Q. How about that second brake job that you did at the voc school? Do you specifically recall the particular brand that you used during that second brake job?

A. I don't.

Q. And how about the clutch replacements? Do you recall any of the vehicles that you removed clutches from at voc school?

A. I remember one specifically. It was a little Volvo 544, and I don't remember the other one.

Q. I take it that Volvo was the vehicle of the teacher or another student or something?

A. Actually, the administrator of the college, so there was some pressure there.

Q. The old clutch that you removed, I assume you know who the manufacturer of that old clutch was?

A. I don't.

Q. The new clutch that you installed, do you have a specific recollection as to who manufactured that clutch?

A. No.

Q. For any of the three clutch replacements that you did at the voc school, do you have a specific recollection of the particular brand that you installed during those clutch replacements?

A. I don't.

MR. MORRISON: Object to form.

Q. (By Mr. Singewald) As you sit here today, do you actually have a specific recollection of working with Delco brakes while at the Clover Park Voc School?

MR. MORRISON: Object to form.

THE WITNESS: Personally?

Q. (By Mr. Singewald) Yes.

A. Myself, I recall seeing the brand on the box, but to say specifically that 100 percent that I was involved in that brake job would be tough.

Q. Okay. You're just not sure?

A. Yeah.

Q. You recall seeing the boxes --

A. The boxes, yeah.

Q. Where was the Bridgeport American service

station located?

A. I don't remember the cross street, but it was on Bridgeport. I believe it was called Bridgeport Way in Lakewood. I don't remember what the cross street and the corner it was located on.

Q. Any idea if the service station's still there today?

A. I don't know.

Q. And Brewington Motors, you told us initially it was at 3000 Pacific Avenue?

A. Correct.

Q. And then it moved to the Auto Mall?

A. It was then Hanson Motors.

Q. That's right. It was Brewington first, then it became Hanson, and when it was Hanson it then moved in '84 to the Auto Mall?

A. Yeah.

Q. The facility where Brewington Motors was located on 3000 Pacific Avenue in Olympia, do you know if that facility is still there today?

A. No, it's not.

Q. What is there now?

A. Office buildings, I believe. Yeah.

Q. So whatever was there was leveled?

A. Yeah.

And actually, I think Ernst moved in there and then later just buildings.

Q. The facility that housed Brewington Motors, was that a heated garage?

A. Yes.

Q. Do you recall whether that was heated by a boiler, by a furnace?

A. I don't.

Q. Do you recall seeing pipes running up and down the walls and across the ceiling?

A. Like insulated pipes?

Q. Yes.

A. No, as far as I know now.

Q. I take it you never had to do any maintenance work on the heating system for that building?

A. No.

Q. You generally testified that you recall servicing foreign automobiles there as well as American automobiles?

A. Correct.

Q. Do you have a specific recollection of any particular American-made vehicle that you serviced while at Brewington/Hanson Motors for a customer?

A. For a customer?

Q. As opposed to your own?
A. A customer meaning --
Q. Let me rephrase the question for you.
A. Yeah. We did their used car repairs.
Q. Okay.
A. And occasionally worked on a customer's other than Volkswagen product, if they were a good customer.
Q. Okay.
A. But I don't recall a specific model.
Q. What I was getting at, in essence, is while working at Brewington or at Hanson, do you have a specific recollection of working on a particular General Motors vehicle?
A. Other than my own?
Q. Yes.
A. No.
Q. Do you have a -- is it fair to say that your recollection is while you worked there, you would have worked on General Motors vehicles?
A. In all likelihood, yeah.
Q. But as you sit here today, you can't tell me a specific General Motors vehicle that you worked on?
A. Year or model, yeah.
Q. Do you, since you can't recall any specific

General Motors vehicle that you serviced while at Brewington -- strike that.

When I refer to Brewington, can I just refer to it as Brewington instead of Brewington/Hanson?

A. Sure.

Q. Is that fine?

A. Fine with me.

Q. Just so we're understanding each other and talking about the same place, I'll just call it Brewington, but it encompasses the entire time period from '71 to '85 when you worked at Brewington/Hanson.

A. Okay. Well, that would alter things a bit.

Q. Okay.

A. Yes.

Q. How would it alter things?

A. Well, Brewington Motors time frame was a while back, it was, you know, early on. And I can remember the Hanson clearly, more clearly than the Brewington as far as some of these questions.

Q. All right. Well, then maybe it would be better if I just break it down for you so that you're not confused and I'm not confused.

While working at Brewington is it fair to say that you have no personal knowledge of removing original brakes from any particular General Motors

vehicle?

A. Correct.

Q. While working at Brewington is it fair to say that you have no personal knowledge of installing any General Motors or Delco brakes into a customer's vehicle?

MR. MORRISON: Object to form.

THE WITNESS: Yeah.

Q. (By Mr. Singewald) Would the same be true for Ford Motor Company?

A. Correct.

Q. Would the same be true for clutches on General Motors vehicles?

A. For Brewington?

Q. For Brewington, yes.

A. Correct.

Q. And would the same be true for clutches on Ford Motor Company vehicles at Brewington?

A. Correct.

Q. Just so the record's clear, that is that you have no specific recollection or knowledge of removing original equipment from any of those vehicles or installing manufacturers' equipment as replacement parts onto those vehicles?

A. Right.

Q. And how about at Hanson, when you were at Hanson, do you, as you sit here today, do you have a specific recollection of performing a brake job on a particular General Motors vehicle?

A. I do.

Q. And what type of vehicle was that?

A. It was a Chevy van. I do not recall the exact year.

Q. Did you own that van?

A. No. It was a used car.

Q. Was it a customer's van or --

A. Used car.

Q. It was a car that the company, that Hanson had purchased and that you were fixing up to resell?

A. To put on the lot, yes.

Q. Is it fair to say that when you performed the brake job on that vehicle that you had no personal knowledge as to that vehicle's repair or maintenance history?

A. Correct.

Q. The brakes that you removed from that Chevy van, is it fair to say that you do not know whether those were the original brakes, or not?

A. Correct.

Q. The replacement brakes that you put onto

that Chevy van, do you have any personal recollection as to the manufacturer of those brakes?

A. Honestly, no. They were procured by the parts department.

Q. Sure.

With regards to clutches, as you sit here today, do you have any personal recollection of removing a clutch from a General Motors vehicle while working at Hanson?

A. Yes.

Q. And what type of vehicle was that?

A. It was a General Motors product.

Q. You're not sure specifically a make?

A. It was a pickup, but again, year, I don't recall.

Q. Was it a GMC pickup or Chevy pickup, do you know?

A. It had a Chevrolet emblem on the front, I remember that.

Q. Okay.

A. As to its exact designation, I don't recall.

Q. Was that a vehicle that was going to be sold by Hanson?

A. Correct.

Q. As a used car?

A. Mm-hm (affirmative response).

Q. When you removed the clutch from that vehicle, is it fair to say that you did not know the repair history for that vehicle?

A. Correct.

Q. The clutch that you removed, you you're not sure, you do not know if that was the original clutch, or not; is that fair to say?

A. Correct.

Q. And the replacement clutch that you installed, is it fair to say that you do not know with any specificity as to the manufacturer of that clutch?

A. That particular one I do.

Q. And what was that?

A. It was a, one from the dealership, and it had a Delco symbol on the box.

Q. And how is it that you recall that particular clutch?

A. Because I dropped it on my foot.

Q. After you dropped it on your foot, was it still usable?

A. Oh, yes. My foot?

Q. Did you have to do anything to that clutch, manipulate it in any way before installing it into

the vehicle?

A. Just, I don't know, what do you mean?

Q. I mean, did you have to grind anything?

A. No.

Q. You didn't have to alter the flywheel or do anything like that?

A. The flywheel was machined, but I didn't do that.

Q. Do you believe you were exposed to asbestos in any way by simply installing that particular clutch?

A. Simply installing it?

Q. The installation process?

A. It's possible.

Q. How about Ford vehicles? Any recollection of working on any Ford vehicles at Hanson?

A. Mm-hm (affirmative response).

Q. Any brake jobs --

A. That's a yes.

Q. Any brake jobs on any Ford vehicles?

A. Yes.

Q. Do you recall with particularity a specific Ford vehicle that you removed brakes from while working at Hanson?

A. Yes.

Q. And what type of car was that?
A. It was a Ford van.
Q. Used car?
A. Yes.
Q. Going to be sold by the company?
A. Yes.
Q. Any brakes that you removed, is it fair to say that you do not know if those were the original brakes, or not?
A. I don't.
Q. The replacement brakes that you installed, is it fair to say that you do not have a specific recollection as to the manufacturer of those replacement brakes?
A. I don't.
Q. For any of the Ford vehicles that you replaced brakes on while working at Hanson, for any of them, can you state with certainty that the brakes that you removed from any of those Ford vehicles were the original brakes?
A. Not with certainty.
Q. With regards to the replacement linings that you installed into those Ford vehicles, do you, as you sit here today, do you have any specific knowledge and recollection as to installing Ford

Motor Company brake linings into those vehicles, as opposed to aftermarket?

A. No. I believe they were aftermarket.

Q. When you were at, I guess it was Hanson, you mentioned seeing some articles that were talking about potential health hazards related to asbestos?

A. (Nodding head.)

Q. Do you recall that testimony?

A. Yes.

Q. What time frame are we talking about, any idea?

A. It would be in the late Seventies. I would say '77, '78 era.

Q. What type of publications do you recall seeing these articles in?

A. It was a foreign car service periodical.

Q. You didn't save those articles, did you?

A. No.

Q. No specific recollection as to the actual title of the periodical?

A. It had foreign service on it. That's -- I remember that. Whether there was more in the title --

Q. Was it a magazine or periodical that the garage subscribed to?

A. Yes.

Q. Do you recall specifically what it said in those articles about possible health hazards?

A. Yeah. I remember when I initially read it that there was potential concern about the risk of the brake service process, and the detail was kind of sketchy. They indicated in the article that wearing a particle mask or dampening a shop cloth and wearing it over your face would be adequate protection. And that's the thing that stands out in my recollection.

Q. And then I think you said earlier that you took those types of measures for a period of time?

A. Correct.

Q. That you would wear a mask or you'd put a damp cloth over your face?

A. Yeah.

Q. For how long did you do that?

A. I would say probably a matter of months to close to a year. Occasionally the company bought the masks, and the rest of the time we supplied them or wore rags over our face, some of us did.

Q. So during those few months after you read the article, possibly as long as a year, you would take the precaution of wearing a mask or putting a damp cloth over your face?

A. Correct.
Q. And you would do that when you did a brake job?
A. Correct.
Q. Would you do that when you were replacing a clutch?
A. No.
Q. Would you do it during, doing any other type of mechanical job?
A. No.
Q. Just when changing brakes?
A. (Nodding head.)
Q. Why is it that you stopped doing that after a few months or a year?
A. I requested that I do other types of work and moved from that particular area of the shop.
Q. Is my understanding correct, let's see, from a time frame standpoint, we're about 1979, does that sound accurate?
A. Mm-hm (affirmative response).
Q. So around 1979 you requested a move into a different part of the shop?
A. Correct.
Q. After 1979 you continued to do brake jobs?
A. Very rarely.

Q. When you did those brake jobs on rare occasions, would you wear any type of protection?
A. Yes.
Q. What would you wear?
A. We had what were called 3M masks, particle masks.
Q. Okay.
A. Yeah. And spray it down with water.
Q. How many brake jobs do you think you've done since 1979?
A. For business or personal?
Q. Total.
A. Probably a max of 20. Probably less than that.
Q. Since you asked me, I'll ask you, how would you break that down between business and personal vehicles?
A. Four or five personal.
Q. When's the last time you replaced a clutch?
A. Oh, God, not since I left Hanson.
Q. When you moved to the other end of the shop at Hanson, what end of the shop, I mean, what were you doing?
A. I was doing electrical, drivability, fuel injection type work.

Q. What would you call the section of the shop at Hanson that you worked in before you moved to the electrical portion section?

A. It was more towards the rear of the shop. It's where a lot of the equipment was located, compressor room and what we called the unit repair section of the shop for engine overhauls and stuff on the transmission.

Q. And is that where you would do brake jobs and clutch replacements?

A. Correct.

Q. When you worked in that area, before moving over to the electrical side, do you ever recall seeing any warnings on any boxes that contained brake linings?

A. Not that I recall, no.

Q. Do you have any recollection of ever seeing any warnings on boxes, brake boxes, brake lining boxes?

A. Not while I was working in the shop.

Q. What is your recollection as to when you first saw a warning on a set of brake linings?

MR. MORRISON: Object to form.

THE WITNESS: Hm, I noticed them mostly when I became aware of the severity of the situation after

I started teaching. Prior to that, I really don't recall.

Q. (By Mr. Singewald) Time-frame-wise, would that be the '85, '86, '87 time period?

A. Mid Eighties.

Q. As you sit here today, do you have a specific recollection of actually grinding a particular set of Delco brake shoes or brake linings while working at Brewington?

A. Brewington.

MR. MORRISON: Objection.

THE WITNESS: Yes.

MR. MORRISON: How about at Hanson?

THE WITNESS: Yes.

MR. MORRISON: Object to form.

Q. (By Mr. Singewald) How is it that you recall that in regards to Hanson?

A. Because they didn't fit the new drums, the shoes didn't fit the new drums.

Q. But do you actually specifically recall that --

A. Yes.

Q. -- as you sit here today?

A. Yes, sir.

Q. What was the name of the General Motors

dealership where you would buy Borg-Warner clutches?

A. That time frame, I don't honestly recall. It was Capitol City Chevrolet and then somebody else bought it. I don't remember the business name.

Q. What was the name when you had your own personal business? You mentioned you had a business license. What was the name of your business?

A. Collins Automotive Enterprises.

Q. And that business entity is not on your Social Security itemization. Do you recall if you reported taxes based on earnings made at Collins Automotive Enterprises?

A. I was never profitable, but, yes, I made quarterly reports.

Q. With regards to your work on personal vehicles, have you done -- by personal, let me -- strike that.

While at Collins do you have a specific recollection of working on a GM vehicle where you believe you removed the original brakes from that vehicle?

A. A hundred percent sure, no.

Q. For your Collins Automotive Enterprise, as you sit here today, do you have a specific recollection of any particular vehicle where you know

with a hundred percent certainty that you installed GM brake linings back onto that vehicle?

A. Yes.

Q. What type of vehicle was that?

A. Chevy pickup.

Q. And how is it that you recall replacing or installing a General Motors brake lining product onto that vehicle?

A. It was my truck.

Q. Were those Delco linings?

A. I believe so.

Q. How about with regards to clutches? Do you have a specific recollection of removing an original clutch from any GM vehicle for Collins Automotive Enterprises?

A. A hundred percent sure it was original, no.

Q. And with regards to the installation of new clutches, do you have any specific knowledge of using a GMC clutch to install into a vehicle for Collins Automotive Enterprise?

A. GMC?

Q. A GM product.

A. If Borg-Warner is considered OEM, yeah.

Q. How about for Ford Motor Company, any recollection of removing original brakes from a Ford

vehicle for Collins Automotive?

A. No.

Q. Any recollection of installing Ford or replacement brake linings for Collins Automotive?

A. No. I wasn't too fond of Fords.

Q. Any recollection of removing an original clutch from any Ford vehicle while working for Collins Automotive?

A. No.

Q. Any recollection of installing a Ford clutch while working for Collins Automotive?

A. No.

Q. On your personal vehicles, with regards to GM, you mentioned the Chevy pickup that you installed Delco brakes on.

A. (Nodding head.)

Q. Is that a yes?

A. Yes.

Q. Any --

A. Can you speak up a little bit?

Q. Yes, I'm sorry.

With regards to personal vehicles, do you believe you ever removed original GM brakes from any GM vehicle?

A. A hundred percent sure?

Q. Yes.

A. No.

Q. With regards to GM vehicles, do you have recollection of installing GM replacement brake linings into any GM vehicle other than the Chevy pickup truck you already told us about?

A. A hundred percent sure? No.

Q. How about with regards to clutches? Any recollection of removing an original clutch from a GM vehicle?

A. Personal?

Q. Personal vehicle, sir?

A. No.

Q. Any recollection of installing a GM replacement clutch into a GM vehicle, personal vehicles?

A. No.

Q. And how about with regards to Ford, any recollection of -- maybe I can short-circuit for us. Any recollection of removing or installing original Ford products on any Ford vehicle?

A. On any Ford vehicle. Personal?

Q. Personal vehicles?

A. Didn't own a Ford.

Q. Okay.

A. Until recently.

Q. When you started at South Puget Sound Community College, Mr. Morrison was asking you some questions, and I wrote down here a quote, and I want to ask you about that.

If I recall correctly, the context was generally kind of what you were doing that first year or two when you were there, what was going on in the shop, that type of stuff. You were talking about your employment there. And the quote you've made was that you did the same, or you followed the same procedures that were in place as was accepted in the trade at the time, and I wasn't sure what you meant by that.

It sounded like what you were doing was you were saying that what the school was doing at the, in essence, community college, in the classroom or laboratory setting there was similar to what a similarly situated garage, privately-owned garage would be doing at the same time?

A. In relationship to what kind of repair?

Q. Automotive repair.

I think it was in general. I don't think there was a specific type of repair being discussed.

A. That's pretty vague.

Q. I realize that.

A. But at the time when I first got there, yes, that's true. I had my classroom area separate from their classroom, however.

Q. I guess what I'm getting at is the types of safety measures that were followed at Puget Sound Community College when you first got there in the laboratory, was that similar to what was going on in the field?

A. Yes.

Q. It was no different in any way?

A. Not really.

Q. So if an individual was being instructed on how to do a brake repair at a community college when you first got there, how he or she would be trained was similar to how somebody down the street might be doing it at a garage?

A. Correct. Unfortunately.

I hope you're not intimating that I was part of it.

Q. No. I'm just trying to figure out what was going on when you first got there.

A. Okay.

Q. Let me rephrase it a little bit differently, because you used the term what was accepted in the

trade at the time.

What was, when you first started at Puget Sound Community College in 1985, what was accepted in the trade at the time in 1985, in your opinion, with regards to how to do a brake repair?

MR. MORRISON: Object to form.

THE WITNESS: As far as removal?

Q. (By Mr. Singewald) Yes.

A. Pretty much put it up on the rack, take the wheels and tires off, if the drums were stuck on, hammer them off with a hammer, and use compressed air to blow them off.

Q. And is that pretty much how you had been doing it since as early as 1971?

A. Correct.

Q. So what had been accepted in 1971 as standard procedure was still what was in place in 1985 as normal procedure?

MR. MORRISON: Object to form.

THE WITNESS: For the most part, for the most part, yes.

Q. (By Mr. Singewald) And then my specific question was regards to brake replacements. Would that also be true with regards to clutch replacements?

A. Yes.

MR. MORRISON: Object to form.

Q. (By Mr. Singewald) Now, when you became head of the department two years later, you said you changed things some. Is that correct?

A. Correct.

Q. You said you had some sort of asbestos-containing systems for brakes and clutches; is that right?

A. Correct.

Q. What did you have installed in 1987, approximately, with regards to brake replacements?

A. We looked at what was available, and decided upon a Clayton, I don't know if you heard of them, from back east, Clayton asbestos containment system, which would enclose the brake assembly, once you took the wheel and tire off, and then you could disassemble it in an enclosure that had a vacuum present on it which went through a collection bag, a prefilter and then a hepa filter as part of its containment system.

So even if say a drum required being hammered off, that was still within the enclosure and the dust was extracted into the system.

Q. And you first started using those at the

college in approximately 1987?

A. Correct.

Q. Was that same type of containment system used for clutch replacements?

A. Correct.

Q. Was it the same actual system, or was it a different system for clutches?

A. It had a slightly different adapter, but it was the same machine.

Q. Since 1987 when you started working at Puget Sound Community College and using this containment system, did you do, or have you done any brake replacements in a professional capacity, in essence, for Hanson Motors or some other professional entity?

A. While working at the college?

Q. Well, during the time frame that you were working at the college, but for the other business, for Hanson or for Foreign Auto Works?

A. I worked for them in the summertime to keep my skills up, but I avoided brake work.

Q. Have you done any brake work at Foreign Auto Works?

A. Foreign Auto Works?

Q. Yes.

A. I basically, for them, ran the shop and

ordered parts and scheduled customers and made sure that the technicians had parts for their jobs at Foreign Auto Works.

Q. Whereas, your Social Security itemization, the last year that you worked at Hanson Motors was in 1989.

A. Sounds about right.

Q. From 1987 to 1989 did Hanson Motors ever install any of these asbestos containment systems?

A. Not that I'm aware of, no.

Q. Did you recommend to the owner that they purchase the systems?

A. Yeah.

Q. You're kind of smirking.

A. It was met with great skepticism. I believe there's still only three or four in town at that time.

MR. SINGEWALD: Break?

MR. MORRISON: Yeah.

MR. SINGEWALD: Sir, do you want to take a break now? I think I'm pretty close to being done, but if we take a break I can take a look at my notes and see if I need to fill in any blanks, and then some of these other folks might have some questions for you. Okay?

THE WITNESS: Sounds good.

(A recess was taken from 2:19 p.m. to 2:31 p.m.)

Q. (By Mr. Singewald) Okay, Mr. Collins, a few more questions for you.

With regard to your current medical situation, do you presently have any doctors' appointments scheduled?

A. Yes.

Q. And who are they scheduled with?

A. My oncologist, Dr. Ann Williams.

Q. Any others?

A. No.

Q. So the only current doctor's appointment that you have scheduled is a follow-up visit with Dr. Williams?

A. Correct. It's an ongoing, every three weeks thing.

Q. Is Dr. Williams administering the chemotherapy for you or is that done by someone else?

A. That's done by lab techs.

Q. I have a list of names that were attached to your first amended work history sheet. I'm going to ask you who some of these folks are and how you know them, where you worked with them.

James Beckford.

A. Beckford, yeah.

Q. Who is he?

A. He is a -- or was a technician at Hanson.

Q. Is he still alive?

A. At the same time. Yes.

Q. Have you seen him recently?

A. Personally, I have not seen him, no.

Q. Have you spoken with him recently?

A. No.

Q. Harold Foshaug?

A. Foshaug.

Q. Foshaug, F-O-S-H-A-U-G?

A. Yeah.

Q. Who is he?

A. He was my instructor at Clover Park. He was also kind of a mentor and he was actually teaching at South Puget Sound Committee College when I became employed there.

Q. Is he still alive?

A. He is still alive.

Q. Have you spoken with him recently?

A. Oh, yeah, not too awfully long ago, mm-hm (affirmative response).

Q. And how long ago was that?

A. I would say a couple months, month and a half, something like that.

Q. Is he aware of your pending lawsuit?

A. He is.

Q. Have you spoken with him about your prior work together?

A. Not specifically, no.

Q. How about Mike Matthews?

A. Mike Matthews I have not spoken with him, but I gave him as someone I worked with.

Q. Where did you work with him?

A. At Hanson, and I believe he was there when I worked, when Brewington owned it, too.

Q. As far as you know, he's still alive?

A. Yes. He has a business in Brinnon, Washington.

Q. Dick Stewart?

A. Dick Stewart.

Q. Who is he?

A. I worked with him at Hanson. I have spoken with him three, four times.

Q. Is he aware of your pending lawsuit?

A. Um, I would assume so, since he's been contacted, yeah.

Q. Have you spoken to him about the lawsuit?

A. Specifically, no.

Q. Did you speak to him about the types of stuff the two of you used to do at Brewington and Hanson?

A. Yes. And I inquired as to his health. And I went and visited him at Hanson to see how he was doing.

Q. Roger Creech, C-R-E-E-C-H, do you recognize that name?

A. No. Where's that?

Q. It's just something I've handwritten here, but I'm asking if you recognize that name?

A. Roger Creech. Doesn't ring a bell.

Q. How about a Fred Kast, K-A-S-T?

A. Yeah. Fred Kast was a salesman at --

Q. Where did he work?

A. At -- I don't remember the exact years, but I would say it was, boy, that's tough. I don't remember if it was there during the transition between one or the other, but he worked at, for one of them as a salesman.

Q. And you've been talking about them and there, but you haven't said what yet.

A. Oh, I'm sorry.

Q. Brewington and Hanson?

A. Yeah. He was kind of, as I recall, kind of in the transition period, so it's hard to be specific about whether he was Hanson employed or Brewington.

Q. He was a salesman?

A. Correct.

Q. Jose Peppy Herrara?

A. Correct.

Q. Where did he work?

A. He worked with me at Hanson, and he was the other person who we kind of, you know, discussed this kind of stuff, were concerned about the asbestos stuff, and he is the one who typically wore the rag on his face and was laughed at by most of the other technicians.

Q. Richard Klooz, K-L-O-O-Z, who is he?

A. He worked there as a technician for a while.

Q. Jerry Landers?

A. Jerry Landers was the shop foreman at Hanson, yes.

Q. Mac Richards?

A. Service manager for a period of time.

Q. As the service manager would he have been your supervisor?

A. Correct.

Q. Steve Smith?

A. Steve Smith was at Brewington, and I have not seen or heard from him since he quit there.

Q. Swede Tournquist?

A. He was my other instructor at Clover Park.

Q. And Roland Vorone, V-O-R-O-N-E?

A. I put him down in the hopes that I could possibly locate him. He worked with me at Bridgeport American service station.

Q. And for all these gentlemen who you have listed here, do you believe all of them are still alive, I guess with the possible exception of Vorone and Steve Smith who it sounds like you haven't had much contact with?

A. Correct. I would hope that Vorone is still alive. He was a young man.

Q. Younger than you?

A. About the same age, yeah.

MR. MORRISON: I have no idea.

MR. SINGEWALD: Sir, that's all the questions I have for you right now. I'm going to let some of these other folks ask you some questions, and I might have some when everybody else is done. Okay?

THE WITNESS: Okay.

MR. MORRISON: Thanks, Chris. Next up, and probably best if whoever's asking questions maybe

comes up fairly close to him, or if somebody thinks they can speak loud enough, that's okay, but I don't want to put the people in a position to feel like they're yelling.

EXAMINATION

BY MR. DEMPSEY:

Q. Good afternoon, Mr. Collins. My name's Jimmy Dempsey.

You spoke earlier about your father's work history at Fort Lewis.

Do you know if your father ever worked in any other setting, like an industry setting, maybe a plant or a factory?

A. Not that I'm aware of.

Q. And you yourself have never worked in any type of industrial setting, correct? Or have you?

A. What do you mean by --

Q. When I say industrial, I'm talking about a plant or a factory.

A. Other than the furniture factory, no, when I was in high school.

MR. DEMPSEY: Thank you, sir. That's all I have.

MR. MORRISON: Thanks.

EXAMINATION

BY MR. DONELSON:

Q. Good afternoon, sir. My name's Matt Donelson and I represent some of the defendants in your lawsuit.

A. Matt?

Q. Yes. Nice to meet you.

I want to talk first about the, you talked a little bit about some grinding machines and arc machines?

A. Correct.

Q. And lathe machines?

A. And what?

Q. Lathe?

A. Oh, lathe, yes.

Q. I understand that there was one at Clover Park; is that correct?

A. Correct.

Q. How many grinding machines were at Clover Park?

A. Only one that I recall.

Q. How about the lathe machines, how many lathe machines were at Clover Park?

A. Only one that I recall.

Q. Who manufactured the grinding machine?

A. The --

Q. The grinding machine, who manufactured that?

A. Are you talking about the arcing machine?

Q. Yes.

A. The name on it was AAMCO.

Q. And just so we're clear, the arcing machine, is that the same as the grinder or is that a different machine?

A. Arcer is different than -- the arcing machine is for brake shoes, the lathe is for machining drums and rotors.

Q. How about a grinding machine? Is that something different all together?

A. Grinding was kind of a loose term we gave to the arcer.

Q. And how did you know that AAMCO made that arcing machine?

A. The name was stenciled on it.

Q. Can you describe the machine for me?

A. Yes. I guess the bed you would call is rectangular in the rear, square, comes around and is rounded at the front, has a handle on the front which you actually move to arc the shoe. The motor is a little off centered and about so tall (indicating), and it has a spinning drum in there with the

sandpaper on it, and then off to the side of that is the quote, unquote containment bag. And it's blue in color.

Q. The bag or the arcing machine?

A. The arcing, the, yeah, arcing machine.

Q. Is it freestanding, or is it mounted to something?

A. Well, it -- I'm not sure I understand your question.

Q. Is the machine mounted to a table or is it freestanding by itself?

A. It should be mounted to something but, you know, they could buy a bench for it, or they could make a bench for it and mount them to it.

Q. How was it mounted at Clover Park? Was it --

A. It was bolted down.

Q. Now, did you ever see the packaging for this arcing machine?

A. Packaging?

Q. Yes.

A. I'm not sure I understand.

Q. Do you know how this arcing machine ever came packaged?

A. I didn't see a package that it came in, no.

Q. Does the arcing machine itself contain any asbestos?

A. I'm not sure I understand your question.

Q. Do you know whether the arcing machine contained any asbestos?

A. If we were grinding shoes that contained asbestos, then the machine had asbestos in it.

Q. I understand that. I'm talking about if the arcing machine itself, did the arcing machine itself have any asbestos?

A. As part of its makeup?

Q. Yes.

A. Not that I'm aware of. It was metal.

Q. The containment bag, did that come with the machine or did that come separately?

A. It had AAMCO on it. I'm assuming it came with the machine. It looked like a factory part, let's put it that way.

Q. How long would it take you to use the arcing machine for a brake shoe?

A. Two shoes per drum, it would take you about three to five minutes to set it up and arc them.

Q. How about just to do the actual arcing?

A. The arcing itself, once it was in the machine and the dimensions installed?

Q. Correct.

A. Average about a minute. Depends on how much you had to grind off. Sometimes less, sometimes a little more.

Q. Now the brake lathe, that was something separate from the arcing machine?

A. It's a separate machine.

Q. What did that look like?

A. Looks like a streamlined locomotive, I guess. It was -- the main, the main body of it was about so big around and about so long, mounted on a flared base, and the shaft ran from one end to the other, and the adaptors would be changed on the left-hand side to do either drums or rotors.

Q. Now, the court reporter can't take down so round and so long. Was that about two feet long?

A. Ballpark figure, yeah, maybe a little bit longer than that, talking about the main body, not including the adaptor.

Q. And how did you know that was an AAMCO product?

A. They had a little metal stamp plaque on it that said AAMCO and model and a bunch of other information.

Q. Do you know what model this was?

A. Boy, that's a long time ago. Boy, it was very popular. I think it was called a 6000 series, something like that. That's the best of my recollection.

Q. How about the arcing machine, does that have any model numbers on it?

A. I don't recall.

Q. Did you ever see any manuals or instruction booklets for these machines?

A. Where at?

Q. At the Clover Park?

A. No.

Q. Did the lathe machine itself have any, contain any asbestos?

A. Boy, probably.

Q. When you say --

A. Just because of the proximity of it to the grinder, more than anything, because it was a metal lathe basically rather than --

Q. I understand that it's a metal lathe, so, the metal lathe would not contain any asbestos itself, correct?

A. I would imagine inherently it would have to.

Q. Why would you say that?

A. Well, because sometimes some guys would,

myself included, would wash the drums off with soap and water in the sink prior to machining, where others would just drag them off the vehicle and throw them on there, so they would have asbestos.

Q. Are we talking about the lathe, or are we talking about the brakes?

A. We're talking about the lathe. That's what you said.

Q. Correct.

Did you ever see any packaging for the lathe?

A. What do you mean by packaging? I'm at a loss here, packaging.

Q. I'll try and break it --

A. The box it came in?

Q. Did you ever see -- did it come in a box?

A. I don't -- I have no idea. I'm assuming it did, but it was already there installed when I got there.

Q. And that was my question. So if it was already installed, you wouldn't have seen the packaging, correct?

A. I guess, yeah.

Q. I'm not trying to trip you up. The question is --

A. I'm just trying to put --

Q. If you don't know what the packaging is, you don't know what is.

A. Yeah.

Q. Okay. I believe you said there was an arcing machine at the Brewington facility, correct?

A. Correct.

Q. And there was one there, correct?

A. One.

Q. Did that look any different than the one at Clover Park?

A. Looked identical, a new one.

Q. Was that machine already there when you got to Brewington?

A. Correct.

Q. How about the lathe, did that look any different than the one at Clover Park?

A. (Shaking head.)

Q. You're shaking your head.

A. No. Excuse me.

Q. How long did you have to use a lathe machine for?

A. Depended on how much material you had to remove and how long it took to make -- how many cuts to clean it up, but I would say on a drum, five

minutes, max; part of that time you would be away doing things because you could set up the machine and make a cut and walk away and do something else and come back.

Q. What's the minimum time you would have to use a brake lathe?

A. If you just had to do one cut to clean it up and put it back in service, two, three minutes.

Q. The brake lathe and the brake arcer at Clover Park, do you know where they purchased that?

A. I don't.

Q. Did that ever have to be repaired while you were there?

A. Not that I'm aware of.

Q. How about the one at Brewington? Brewington?

A. Brewington.

Q. Did that ever have to be repaired?

A. One time that I know of.

Q. Did you ever repair that?

A. Some company came in and did it, needed new bushings to keep it accurate.

Q. Do you recall what year it was that that got repaired?

A. I don't know.

Q. Do you know the name of the company that repaired it?

A. No.

Q. Are those the only two places that you've ever used a -- or that you've used a brake arcer or brake lathe?

A. No. We have brake lathes at the college.

Q. At the college you're currently working at, or that you were working at?

A. Was working at, correct.

Q. Who manufactured those brake lathes?

A. When I got there, there was an AAMCO already there; actually, yeah, two already there. And we purchased a third after I was there.

Q. What year did you purchase the third one?

A. I don't recall for sure.

Q. Did you personally use the brake lathes at the college?

A. I have, yes.

Q. How many times do you believe you used the brake lathe at the college?

A. Boy, that's a tough one. I demo'd it for every class, so I taught that class one quarter every year, so 20 plus times.

Q. Did the brake lathes look similar to what

you've already described?

A. Just a newer version.

Q. Newer.

A. I think its series number was a little bit different number.

Q. Do you recall the series number on that?

A. I think it was like a 7000.

Q. How about the one at the Brewington facility, do you recall the series number on that?

A. A hundred percent sure, no.

Q. How about on the brake arcing machine, do you know the series number for that?

A. No.

Q. You talked about the cloth bag at the Brewington facility, as well. Was that the same bag as you described before at Clover Park?

A. Mm-hm (affirmative response).

Q. Do you know if there's brake lathes are still at the college today?

A. Yes.

Q. And they're still in use?

A. Yes.

Q. Sir, I want to turn your attention to some of the clutch work that you did.

You talked about Borg-Warner clutches. Over

the years, or during your lifetime, during your work history, did the clutch itself ever change appearance?

A. The disc itself?

Q. (Nodding head.)

A. Not much. Not much. It was a good quality, had a good reputation.

Q. Was there any markings on the clutch that you can recall throughout your lifetime?

A. Not a big change, no. Markings like --

Q. I'm asking you, do you recall seeing any markings on any of the Borg-Warner clutches?

A. Not really.

Q. Whenever you removed a clutch, would there be any way for you to distinguish between a Borg-Warner clutch and another manufacturer's clutch?

A. In removal?

Q. Yes.

A. Didn't pay any attention. When it was removal time, it was junk, so --

Q. Well, how about when the clutch itself was out of the packaging, because you testified that there was no markings on the clutch? Are you able to distinguish one clutch from another manufacturer's clutch?

MR. MORRISON: Object to form.

THE WITNESS: On some it's stamped in the middle, but specifically a Borg-Warner, I don't know, you just look at the box, pull it out of the box, and compare its shape with the old one and put it in.

Q. (By Mr. Donelson) Do you recall the manufacturer of the clutches that had their stamp in the middle?

A. I mostly noticed it with the Volkswagen, Porsche, Audi product.

Q. So just so I'm clear, the only way you could tell if it was a Borg-Warner clutch is by the packaging; is that correct?

A. That's all I ever paid any attention to.

Q. Did the packaging itself throughout your work history ever change in appearance?

A. That's a tough one. Not that I'm aware of.

Q. Can you describe for me the packaging of the Borg-Warner clutch?

A. Typically, kind of a whitish box and stripes and Borg-Warner name on it, and colors that kind of stood out.

Q. Do you recall what colors those were?

A. Blue, red, typically.

Q. What color was the name Borg-Warner?

A. As I recall, mostly blue.

Q. Sir, at the Brewington Motors, and I'm going to use Brewington Motors and Hanson Motors together, if that's okay with you?

A. (Nodding head.)

Q. Because it's essentially the same?

A. Right, yeah.

Q. You testified earlier that you did about one clutch job a week; does that sound about correct?

A. On an average, yeah.

Q. How long would it take you to do a clutch job, clutch change?

A. Depends on the vehicle. A Volkswagen Beetle, hour and a half, two hours. If it was a Porsche 924, substantially more.

Q. I'm unfamiliar with this site. Is this a foreign car dealer or foreign car service station?

A. Which?

Q. Brewington.

A. Brewington? When it was there, yeah, it was Volkswagen.

Q. Did you do any American-made cars at Brewington?

A. We did some repair work on used cars.

Q. Percentage-wise, what percentage of your

work would have been American-made cars versus foreign cars?

A. Small.

Q. Would it be less than 10 percent?

MR. MORRISON: Object to form.

THE WITNESS: For me, personally?

Q. (By Mr. Donelson) Yes.

A. Yes.

Q. Now I believe you testified earlier that the Volkswagens and the Porsches, that you used Volkswagen and Porsche parts; is that correct?

A. Correct.

Q. Did that include the clutches, as well?

A. Yes.

Q. During your time at Brewington, do you have a specific recollection of ever removing a Borg-Warner clutch?

A. Specifically, I can't say.

Q. Do you have a specific recollection of ever installing a Borg-Warner clutch?

A. At Brewington?

Q. Yes.

A. No.

Q. Do you know where they would have gotten any of the Borg-Warner parts from?

A. Parts department issue, not mine.

Q. Were there other manufacturers of clutches there besides Borg-Warner?

A. Where?

Q. In the parts department.

A. In the parts department was genuine Volkswagen, if you're talking about Brewington. If you're talking about Hanson, then the boxes would say genuine Volkswagen, genuine Porsche, genuine Audi, as it related to those car lines.

Q. Did you work at Brewington and Hanson straight through, when it changed over, as well?

A. I did.

Q. And were you working full time, as well?

A. Yes.

Q. I understand you had your own shop, as well, for a couple years; is that correct?

A. Correct.

Q. If you're working full time at Brewington/Hanson, how many hours were you working in your own company?

A. Anywhere from two to possibly four hours a night. And some nights not at all.

Q. When you had your own shop, you said you did clutch jobs every two or three weeks I believe was

your testimony; is that correct?

A. Mm-hm (affirmative response). That was an average figure.

Q. How long would it take you to do a clutch change?

A. A little bit longer than normal because the, you know, I wasn't on a lift, I was working on the ground, and so it would take a little bit longer.

Q. Did anybody assist you in any of these clutch changes during your own personal business?

A. No. No.

Q. Do you have a specific recollection of ever removing a Borg-Warner clutch while you had your own business?

A. For a customer?

Q. Yes.

A. Specifically? No.

Q. Do you have a specific recollection of ever installing a Borg-Warner clutch for a customer?

A. For a customer? No.

Q. Do you know where you would have gotten any Borg-Warner parts for your, when you had your own business?

A. Borg-Warner was handled by a local dealer as well as some of the aftermarket suppliers. Cut rate

was just opening up. Rod & Bush Motors was here. They handled Borg-Warner.

Q. Is Rod & Bush still in business?

A. Not here. I think they might be out in Yelm, which is a town southeast of here.

Q. What was the address of the Rod & Bush facility?

A. I don't remember the specific address. It was down on the corner of Fourth Avenue and Cherry Street here in Olympia.

Q. Do you know the name of the dealer where you would have gotten any Borg-Warner clutches?

A. As I stated earlier, I don't recall the exact name of the dealer in the time I was working, but prior to that time it was Capitol City Chevrolet, and then after that it was purchased by somebody. I don't remember what the name change was. Now it's Titus-Will Chevrolet, but they came much later.

Q. I lost my train of thought.

MR. MORRISON: Mr. Collins, let me confer off the record.

(A discussion was had off the record.)

Q. (By Mr. Donelson) Sir, going back to the packaging of the Borg-Warner clutch, did you recall seeing any other writing or any other information on

the product or the package itself?

A. Not really.

Q. Do you know whether the Borg-Warner clutch contained any asbestos?

A. At which period?

Q. Whenever you used it?

MR. MORRISON: Object to form.

THE WITNESS: Not really.

Q. (By Mr. Donelson) Sir, when Mr. Singewald was asking you questions about clutches, you testified you didn't have to manipulate those clutches; is that correct?

MR. MORRISON: Object to form.

THE WITNESS: First of all, what -- are you referring to Chris?

Q. (By Mr. Donelson) Yes.

A. And what?

Q. He had asked you before about I believe certain clutches and he asked you if you had ever had to manipulate any of those clutches, and I believe your testimony was no. Correct?

MR. MORRISON: Object to form.

THE WITNESS: Like meaning what? I think he said grinding.

Q. (By Mr. Donelson) Did you have to alter them

or grind them in any way?

A. No.

Q. Would that be true for -- would that be the same for Borg-Warner clutches?

A. Yes.

Q. What is your, to the best of your recollection, when's the last time you believe you would have installed a Borg-Warner clutch?

A. I would say '74, '75, that era.

Q. In your personal vehicles, did you ever use any Borg-Warner products?

A. That was mine.

Q. That was the '74, '75?

A. Mm-hm (affirmative response).

Q. What vehicle was that?

A. That was a Chevy pickup, 4 X 4.

Q. Was that a new or used vehicle?

A. I bought it used.

Q. Is '74 '75, is that the year you --

A. Purchased it.

Q. -- purchased it?

A. Yes.

Q. When did you actually do the clutch change on that?

A. When I purchased it, I did the brakes and

the clutch.

Q. Do you know the manufacturer of the clutch you replaced on that 4 X 4?

A. The one that was in it?

Q. Yes.

A. I honestly don't. I didn't pay any attention to it, just pulled it apart.

Q. And it's your testimony that you installed a Borg-Warner clutch, correct?

A. Yes, sir.

Q. Did you have to manipulate or alter that, or grind that clutch when you installed it?

MR. MORRISON: Object to form.

THE WITNESS: (Shaking head.)

Q. (By Mr. Donelson) You're shaking your head no?

A. No. Excuse me.

Q. You distinguished Brewington from Hanson a little bit. Was Hanson a foreign car service station, as well, or was that a --

A. Correct, it's a dealer. It bought the -- it bought the Volkswagen business, and then added the Audi, Porsche businesses at a later date.

Q. If you could estimate, what percentage of your work was on American cars while you were at

Hanson?

A. At Hanson?

MR. MORRISON: Object to form.

THE WITNESS: Very little.

Q. (By Mr. Donelson) And, again, you're saying very little. Would it be less than ten percent, less than five percent?

MR. MORRISON: Object to form.

THE WITNESS: Wow. I would say less than five percent.

Q. (By Mr. Donelson) So most of the clutch work you would have done would have been on Volkswagens and Porsches and Audis?

A. Correct.

Q. And you would have used those products, to replace them, the Volkswagen products?

A. Correct.

Q. The Audi products?

A. (Nodding head.)

Q. The Porsche products?

A. (Nodding head.)

Q. Correct?

When you were at Hanson, do you have a specific recollection of ever removing any Borg-Warner clutches?

A. Hard to say.

Q. What do you mean hard to say?

A. Again, if you removed them they were typically nonfunctional, we didn't really pay that much attention, just take them out.

Q. How about, do you have a specific recollection of ever installing a Borg-Warner clutch while you were at Hanson?

A. A hundred percent sure? No.

Q. Sir, you mentioned earlier about OEM on some of your personal vehicles, original equipment.

And you described Borg-Warner as being original equipment. Why do you describe Borg-Warner as original equipment?

A. Are you saying it wasn't?

Q. I'm asking you.

A. It had a good reputation. It was so stated that it was OEM, and so I used it.

Q. Where was it so stated?

A. In information available, yeah.

Q. What information would that have been?

A. Oh, textbooks, yeah, manuals.

Q. Do you recall the name of any of those textbooks or manuals?

A. I don't.

Q. How did you learn how to change a clutch?

A. It was demonstrated in school, and then we were required to do it.

Q. That was at Clover Park?

A. Correct.

Q. Can you describe for me the process of changing a clutch?

A. Unbolt the transmission, separate it from the bell housing or take the bell housing together with it, basically exposing the clutch assembly, unbolt the pressure plate for most common designs, unbolt the pressure plate, the disc would then be released, and reverse order for assembly.

Occasionally, machining was required of the flywheel, pilot bearings would need to be replaced, that sort of stuff.

MR. DONELSON: Let me check my notes for a second.

(Pause in proceedings.)

MR. DONELSON: Sir, I believe that's all the questions I have.

Thank you.

MR. MORRISON: Thanks, Matt.

Counsel, let's just go off the record real quick, and maybe -- do we have an idea of who has

questions?

(A discussion was had off the record.)

EXAMINATION

BY MR. BRANOM:

Q. Sir, my name is Steve Branom. I represent A W Chesterton.

Have you ever -- well, you've already testified as to all the products that you've used in your lifetime that you think may have contained asbestos, have you not?

A. Correct.

Q. Have you ever heard the name of A W Chesterton before?

A. Doesn't ring a bell.

Q. They manufacture gaskets and packing for industrial use in paper mills and that sort of thing. No reason for you to have ever encountered those products?

MR. MORRISON: Object to form.

THE WITNESS: The name doesn't ring a bell, unless they made some stuff for McChord or Victor.

Q. (By Mr. Branom) Just packing and gaskets for paper mills and that sort of thing?

A. No, sir.

MR. BRANOM: Okay. Thank you.
That's all I have.
THE WITNESS: You bet.
MR. MORRISON: Thank you.

EXAMINATION

BY MR. MALCOLM:

Q. Mr. Collins, my name's Sean Malcolm. Can you hear me from here?
A. Tom?
Q. Sean.
MR. MORRISON: Do you need him to move up a little closer?
THE WITNESS: Oh, Sean. If he speaks in that tone, I think we're good.
Q. (By Mr. Branom) I represent one of the defendants in this lawsuit, and I just have a few questions for you.
A. Okay.
Q. During any of the work history that you've described today, did you ever have occasion to perform any maintenance on a compressor?
A. Only my own, small compressor, not big.
Q. Okay. What type of compressor is your own compressor?

A. It's a DeVilbiss, one-horse, twin-piston. Replaced gaskets and piston in it once.

Q. And approximately when did you perform that work?

A. Oh, gosh. That's been ten years ago, probably.

Q. You mentioned that there was a compressor room at Hanson and Brewington?

A. Correct.

Q. Did you ever have occasion to enter that room?

A. Only to drain the tank at the end of the day occasionally when somebody forgot.

Q. You didn't perform any maintenance on that compressor?

A. No, sir.

Q. During any of the work history that you've described today, did you ever have an occasion to perform any maintenance on a pump?

A. No.

Q. How about a turbine?

A. No.

MR. MALCOLM: Nothing further. Thanks.

THE WITNESS: Thank you.

MR. MORRISON: I just got a couple

follow-ups that just came up.

EXAMINATION

BY MR. MORRISON:

Q. Mr. Collins, I just wanted to ask you, just in response to another counsel's questions you mentioned the names Victor and McChord?

A. Yes, sir.

Q. What do you associate those names with?

A. Gaskets.

Q. And did you ever use Victor and McChord gaskets?

A. I did.

Q. And is that in the automobile setting?

A. Correct.

MR. MORRISON: Okay. That's all I have.

I guess then, Chris, are you done?

MR. SINGEWALD: Yes. Let's go off the record.

(A discussion was had off the record.)

(The deposition concluded at 3:20 p.m.)

PAGE LINE CORRECTION

I hereby certify that I have read the foregoing deposition, and that this deposition, together with any corrections, is a true and accurate record of my testimony given at this deposition.

NAME DATE

SUBSCRIBED AND SWORN to before me this day of ,2006.

Notary Public for:
My commission expires:

C E R T I F I C A T E.

STATE OF WASHINGTON )
) ss.
COUNTY OF CLARK )

I, Marcia May, a Notary Public in and for the State of Washington, certify that the deposition of JAMES DANIEL COLLINS occurred at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all the testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction and the foregoing transcript, pages 1 through 117, both inclusive, contains a full, true and correct record of all such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and Notarial seal at Vancouver, Washington, this 18th day of August, 2006.

______________________________
MARCIA MAY
CSR No. 2480
Notary Public for the State of
Washington, residing at Vancouver
My Commission Expires: 9/30/06

# EXHIBIT "E"

EFiled: Aug 17 2006 5:00PM EDT
Transaction ID 12109224

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS,<br><br>Plaintiff(s)<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, INC., ET AL.,<br><br>Defendant(s). | : | C.A. No. 06C-02-281 ASB<br><br>ASBESTOS |

**NOTICE OF PLAINTIFFS' MOTION TO AMEND THE COMPLAINT TO ADD CERTAIN DEFENDANT**

TO ALL COUNSEL:

PLEASE TAKE NOTICE that the Order attached to the following motion will be signed on August 29, 2006, if no objections are filed on E-File by August 28, 2006.

**JACOBS & CRUMPLAR, P.A.**

By: /s/Robert Jacobs Esquire
Robert Jacobs Esquire, #0244
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

Date: August 17, 2006

EFiled: Aug 17 2006 5:00PM EDT
Transaction ID 12109224

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS,<br><br>Plaintiff(s)<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, INC., ET AL.,<br><br>Defendant(s). | : | C.A. No. 06C-02-281 ASB<br><br>ASBESTOS |

**PLAINTIFFS' MOTION TO AMEND THE COMPLAINT TO ADD CERTAIN DEFENDANT**

1. Plaintiffs, by and through their counsel, Jacobs & Crumplar, P.A., hereby move this Honorable Court to amend the complaint to add Defendant VOLKSWAGON OF AMERICA, INC.

2. The caption shall read as follows:

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY;

FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);

ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS); :

GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.); :

AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION); :

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION); :

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION); :

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION); :

UNION CARBIDE CORPORATION; :

DANA CORPORATION; :

CRANE COMPANY; :

INGERSOLL-RAND COMPANY; :

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY); :

3M COMPANY (individually and f/k/a MINNESOTA, MINING, AND MANUFACTURING COMPANY, a/k/a "3M"); :

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY); :

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC); :

KAISER GYPSUM COMPANY, INC.; :

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :

HANSON PERMANENTE CEMENT, INC. :

(f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION);

THE GOODYEAR TIRE & RUBBER COMPANY;

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION);

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNUEMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS,

INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS); :

A.W. CHESTERTON, INC.; :

DURABLA MANUFACTURING COMPANY, INC.; :

VOLKSWAGON OF AMERICA, INC.

Defendants.

3. References in the body of the complaint to Defendants should include the defendant added by this motion.

Plaintiffs respectfully request that an order be entered allowing the amendment as set forth above.

**JACOBS & CRUMPLAR, P.A.**

By: /s/Robert Jacobs Esquire
Robert Jacobs Esquire, #0244
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorney for Plaintiff

Date: August 17, 2006

EFiled: Aug 17 2006 5:00PM EDT
Transaction ID 12109224

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiff(s)

vs.

METROPOLITAN LIFE INSURANCE COMPANY, INC., ET AL.,

Defendant(s).

C.A. No. 06C-02-281 ASB

ASBESTOS

**ORDER**

NOW THIS_________ day of ____________________, 2006 the Court having duly considered Plaintiffs' Motion to Amend the Complaint to Add Certain Defendant;

IT IS HEREBY ORDERED

1. That the amendment is allowed as set forth in Plaintiffs' motion; and

2. Service of the First Amended Complaint shall be made upon Defendant VOLKSWAGON OF AMERICA, INC. and upon Defendant VOLKSWAGON OF AMERICA, INC.'s counsel; and

3. No answer to the First Amended Complaint will be required if an answer to the original complaint was filed.

_________________________
JUDGE

# EXHIBIT "F"



SO ORDERED Filed: Oct 6 2006 2:02PM EDT
Transaction ID 12566951

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS and MARY M. COLLINS,

Plaintiff(s)

vs.

METROPOLITAN LIFE INSURANCE COMPANY, INC., ET AL.,

Defendant(s).

C.A. No. 06C-02-281 ASB

ASBESTOS

SO ORDERED

## ORDER

NOW THIS_________ day of ____________________, 2006 the Court having duly considered Plaintiffs' Motion to Amend the Complaint to Add Certain Defendant;

IT IS HEREBY ORDERED

1. That the amendment is allowed as set forth in Plaintiffs' motion; and

2. Service of the First Amended Complaint shall be made upon Defendant VOLKSWAGON OF AMERICA, INC. and upon Defendant VOLKSWAGON OF AMERICA, INC.'s counsel; and

3. No answer to the First Amended Complaint will be required if an answer to the original complaint was filed.

_____________________________
JUDGE

Court: DE Superior Court-New Castle County

Judge: Judge, Asbestos

File & Serve reviewed Transaction ID: 12109224

Current date: 10/6/2006

Case number: 06C-02-281 ASB

Case name: Collins, James Daniel vs Metropolitan Life Insurance Co


/s/ Judge Asbestos   Judge

# EXHIBIT "G"

EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | C.A. No. 06C-02-281 ASB |
| Plaintiffs, | : | COMPLAINT |
| v. | : | "FIRST AMENDED COMPLAINT - UNDERSCORED LANGUAGE REPRESENTS CHANGES MADE FROM THE FIRST AMENDED COMPLAINT AND BRACKETS INDICATE DELETION FROM THE ORIGINAL COMPLAINT" |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | NON-ARBITRATION |
| FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION); | : | ASBESTOS |
| GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY); | : | JURY TRIAL DEMANDED |
| KELLY-MOORE PAINT COMPANY, INC.; | : | |
| AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION); | : | |
| CERTAINTEED CORPORATION; | : | |
| OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I); | : | |
| ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS); | : | |
| GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.); | : | |
| AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION); | : | |

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION);

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY);

3M COMPANY (individually and f/k/a MINNESOTA, MINING, AND MANUFACTURING COMPANY, a/k/a "3M");

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC);

KAISER GYPSUM COMPANY, INC.;

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :

BONDEX INTERNATIONAL, INC.; :

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.); :

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.); :

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION); :

THE GOODYEAR TIRE & RUBBER COMPANY; :

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION); :

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION); :

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION); :

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION); :

GENERAL MOTORS CORPORATION; :

FORD MOTOR COMPANY;

PNEUMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.;

VOLKSWAGEN OF AMERICA, INC.;

Defendants.

**COUNT I**

1. Plaintiff, JAMES DANIEL COLLINS, was wrongfully exposed to asbestos, an inherently dangerous toxic substance while employed at the following places:

(a) Plaintiff JAMES DANIEL COLLINS was exposed thru his father, James Collins, from his father's work at Fort Lewis where he worked from

1947-1965; and 1967-1967 as a heating and cooling specialist in Fort Lewis, WA.

(b)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at personal residences from 1950-1952.

(c)    Plaintiff JAMES DANIEL COLLINS performed mechanic jobs at personal residences from 1964-2005.

(d)    Plaintiff JAMES DANIEL COLLINS performed construction jobs at residential sites in Olympia, Washington in 1977.

(e)    Plaintiff JAMES DANIEL COLLINS worked at a salvage yard in Tumwater, Washington in1965.

(f)    Plaintiff JAMES DANIEL COLLINS attended Clover Park Vocational School in Tacoma, Washington from 1967-1969 as a student.

(g)    Plaintiff JAMES DANIEL COLLINS worked at America Oil Service Station in Tacoma, Washington from 1968-1969 as a laborer and light mechanic.

(h)    Plaintiff JAMES DANIEL COLLINS worked at Brewington Motors in Olympia, Washington as a mechanic from 1971-1976.

(i)    Plaintiff JAMES DANIEL COLLINS worked at South Puget Sound Community College in Olympia, Washington from 1985-2005 as an instructor.

(j)    Plaintiff JAMES DANIEL COLLINS worked at Hanson Motors in Olympia, Washington from 1976-1985 as a mechanic.

(k)    Plaintiff JAMES DANIEL COLLINS was employed by Collins Automotive Enterprises where he worked at personal residences in Olympia, Washington from 1975-1976 as a mechanic.

Plaintiff was exposed to asbestos and/or asbestos-containing products which were mixed, mined, manufactured, distributed, sold, removed, installed and/or used by the Defendants.

2. As a result of the Defendants' wrongful conduct, Plaintiff, JAMES DANIEL COLLINS developed the following asbestos related diseases and health problems:

Mesothelioma;

and other asbestos-related injuries and diseases.

3. As a result of Defendants wrongful conduct which caused Plaintiff, JAMES DANIEL COLLINS's asbestos related diseases and health problems, Plaintiffs, JAMES DANIEL COLLINS and MARY M. COLLINS suffer extensive mental anguish, pain and suffering, medical bills, physical impairment, permanent disability, loss of earning capacity, loss of consortium and loss of enjoyment of life, all of which are recoverable under applicable law. In addition, Plaintiff(s) MARY M. COLLINS has suffered extensive mental anguish and has been and will continue to be deprived of pecuniary benefits, contributions of support and household services, all of which are recoverable under applicable law.

4. The above injuries have or will in the future result in a decrease of past or future earnings and various other past and future expenses Plaintiff would not have otherwise incurred.

**COUNT II**

5. The allegations in paragraph one (1) through four (4) are realleged and incorporated by reference within this Count.

6. FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);

GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);

KELLY-MOORE PAINT COMPANY, INC.;

AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);

CERTAINTEED CORPORATION;

OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);

ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS);

GARLOCK SEALING TECHNOLOGIES, LLC (individually and as a successor-in-interest to GARLOCK, INC.);

AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION);

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION);

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION);

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION);

UNION CARBIDE CORPORATION;

DANA CORPORATION;

CRANE COMPANY;

INGERSOLL-RAND COMPANY;

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY);

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY);

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC);

KAISER GYPSUM COMPANY, INC.;

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.);

BONDEX INTERNATIONAL, INC.;

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.);

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.);

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION);

THE GOODYEAR TIRE & RUBBER COMPANY;

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION);

BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION;

FORD MOTOR COMPANY;

PNEUMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING COMPANY, INC.;

VOLKSWAGEN OF AMERICA, INC.;

were at all times pertinent directly or indirectly engaged in the mining, manufacturing, distribution, sales, licensing, leasing, installation, removal and/or use of asbestos and asbestos-containing products. They were also engaged in the development, manufacture, distribution, sales, licensing or leasing of equipment procedures and/or technology necessary to mine, manufacture, sell, distribute, install, remove and the use of asbestos and asbestos-containing products.

7. Defendant Metropolitan Life Insurance Company, as well as other members of the asbestos industry, including but not limited to Defendants listed herein, engaged in investigations and research as to the hazards of asbestos and often edited out material harmful to the asbestos industry and only published certain portions of their findings and/or refrained from publishing anything. Furthermore, Metropolitan Life financially aided the asbestos industry in its endeavors.

8. The illnesses and disabilities of Plaintiff is a direct and proximate result of 3M's negligence in placing into the stream of commerce respiratory devices defective in design and inadequate for the purposes for which they were intended, namely preventing the inhalation of dust, including asbestos dust, generated from construction and/or insulation activities.

9. 3M knew or should have known that workers would use and rely upon 3M's respiratory devices at sites where asbestos materials were commonly and extensively used which created substantial and constant quantities of dust and that 3M's respiratory devices would provide inadequate protection against the inhalation of asbestos dust.

10. Furthermore, 3M was negligent for failing to warn and/or properly instruct workers regarding the inadequacies of its respiratory devices for preventing the inhalation of asbestos dust.

11. As a direct and proximate result of the above wrongful activities of the Defendants, Plaintiff was exposed to asbestos and the Plaintiff developed the asbestos-related diseases discussed and sustained the injuries described herein.

**COUNT III**

12. The allegations in paragraphs One (1) through Eleven (11) are realleged and incorporated by reference within this Count.

13. The Defendants were negligent in conducting the above activities and/or in the safety conditions at their plants and facilities in that despite the fact that the Defendants knew or should have known that asbestos exposure could result in serious injury, disease and/or death they:

(a) Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;

(b) Failed to adequately warn all the potential victims of asbestos including the Plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos;

(c) Failed to adequately test, research investigate asbestos and/or its effects prior to sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d) Failed to adequately package, distribute and/or use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff and others similarly situated;

(e) Failed to take adequate steps to remedy the above failure, including but not limited to recall of asbestos, abatement of asbestos on their property, recall of asbestos products, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

14. As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT IV**

15. The allegations in paragraphs one (1) through Fourteen (14) are realleged and incorporated by reference within this Count.

16. The Defendants willfully and wantonly for their own economic gain and with reckless indifference to the health and safety of the Plaintiff and others similarly situated:

(a) Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;

(b) Failed to adequately warn all the potential victims of asbestos including the Plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos exposure;

(c) Failed to adequately test, research and investigate asbestos and/or its effects prior to sale, use, and/or exposure of the Plaintiff and others similarly situated;

(d) Failed to adequately package, distribute and use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the Plaintiff and others similarly situated;

(e) Failed to take adequate steps to remedy the above failure, including but not limited to recall asbestos and asbestos products, to abate asbestos on their property, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

17. As a direct and proximate result of the above actions and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT V**

18. The allegations in paragraphs one (1) through Seventeen (17) are realleged and incorporated by reference within this Count.

19. Asbestos and asbestos-containing products are inherently dangerous and as such all Defendants who made or sold asbestos or the equipment, processes or other things necessary for its use, are strictly liable to the Plaintiff for all injuries and damages which were contracted thereby.

20. All Defendants who assisted, directly or indirectly, in the leasing or licensing of asbestos and all equipment necessary for its use are strictly liable to the Plaintiff for all the injuries and damages which were contracted thereby.

21. The handling of asbestos packages, installation, removal and use of asbestos is an ultrahazardous activity and all Defendants who assisted directly or indirectly in this are strictly liable for the Plaintiff injuries which were caused thereby.

22. The Defendant manufacturers and suppliers warranted the asbestos products for their intended purpose and use. Defendants violated this warranty as the product was neither packaged nor provided in a method proper for its intended use and are strictly liable to the Plaintiff for all injuries caused thereby.

23. As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT VI**

24. The allegations in paragraphs One (1) through Twenty-three (23) are realleged and incorporated by reference within this Count.

25. The Defendants knowing of significant risks of health hazards resulting from exposure to asbestos, did willfully, wantonly, recklessly and/or intentionally;

(a) Conceal the existence, nature and extent of that risk; and,

(b) Failed to disclose the existence, nature and extent of that risk to Plaintiff and those similarly situated.

26. The Defendants had reason to expect that Plaintiff, whose injuries were caused by his exposure, was within the class of persons whose actions or inaction would-be materially affected by the aforementioned concealment and nondisclosure.

27. As a direct and proximate result of the above action and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT VII**

28. The allegations in paragraphs one (1) through Twenty-seven (27) are realleged and incorporated by reference within this Count.

29. The Defendant directly and indirectly materially misrepresented that asbestos was not hazardous and/or could be used safely when they:

(a) Had no adequate basis for such representations;

(b) Knew that a significant health hazard to human life existed from asbestos.

30. Defendants had reason to expect that as a result of such representation, Plaintiff and others similarly situated would be exposed to asbestos.

31. As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

**COUNT VIII**

32. The allegations in paragraphs One (1) through Thirty-one (31) are realleged and incorporated by reference within this Count.

33. The Defendants knowingly and wilfully conspired among themselves to perpetuate the actions and omissions referred to herein as well as aided and abided their co-Defendants and manufacturers of asbestos products in keeping the Plaintiff and others similarly situated ignorant of the risks they faced when exposed to asbestos and asbestos containing products.

34. As a result of this conspiracy, the Plaintiff was exposed to asbestos and suffered the injuries complained of herein.

**COUNT IX**

35. The allegations in paragraphs One (1) through Thirty-four (34) are realleged and incorporated by reference within this Count.

36. Even after the dangers of asbestos finally began to be known to Plaintiff or others similarly situated, Defendants continued to act wrongfully both individually and together in a conspiracy to mislead and misrepresent the extent of the past wrongful actions and omissions and to destroy records and hide witnesses and other evidence and to such other wrongful and unnecessary action so as to:

(a) Prevent and delay Plaintiff and others similarly situated from filing legal action to recover for these injuries and/or;

(b) Defeat and/or delay such legal actions and the final collection of any judgment.

37. Similarly, Defendants aided and abided the manufacturers, miners, suppliers, and users of asbestos and asbestos products in keeping the true dangers of asbestos exposure secret and/or misrepresented.

38. As a result of this wrongful representation, Plaintiff was exposed to asbestos and suffered the injuries referred to herein.

**COUNT X**

39. The allegations in paragraphs One (1) through Thirty-eight (38) are realleged and incorporated by reference within this Count.

40. Plaintiff used a respiratory device designed and manufactured by 3M, commonly known as a "dust mask." Plaintiff would show that the defective condition of such respiratory devices rendered them unreasonably dangerous for use as devices for protection against the

inhalation of asbestos dust and fibers. Plaintiff would further show that the respiratory devices were in a defective condition at the time that they left the hands of the Defendant, 3M.

41. Defendant 3M was engaged in the business of manufacturing and selling respiratory devices, commonly known as dust masks, and these products, without substantial change in the condition in which they were sold, were a proximate cause of the injuries of Plaintiff.

42. Defendant 3M knew that its respiratory device would be used without inspection for defects and, by placing them on the market, represented that they would safely preclude the inhalation of asbestos fibers.

43. Plaintiff was unaware of the defects in the 3M respiratory devices which rendered them ineffective as protection against the inhalation of asbestos dust.

44. During the periods Plaintiff used and relied upon Defendant's respiratory devices, the devices were utilized in a manner for which they were intended to be used.

45. As a direct and proximate result of the above acts and omissions of Defendants, Plaintiff was injured as described herein.

**COUNT XI**

46. The allegations in paragraphs One (1) through Forty- five (45) are realleged and incorporated by reference within this Count.

47. Plaintiff, JAMES DANIEL COLLINS, would show that for a period of many years, he worked with and/or was exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products in the household setting as a result of Plaintiff, JAMES DANIEL COLLINS', father working in various shipyards, steel mills, refineries, paper mills, chemical plants and/or other facilities in the United States. Plaintiff, JAMES DANIEL COLLINS, would show that he has been exposed, on numerous occasions, to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products produced and/or sold by Defendants and, in so doing, has inhaled great

quantities of asbestos fibers. Further, Plaintiff, JAMES DANIEL COLLINS, alleges, as more specifically set out below, that he has suffered injuries proximately caused by his exposure to asbestos-containing products designed, manufactured and sold by Defendants.

48. Plaintiff, JAMES DANIEL COLLINS, alleges that he was exposed to asbestos fibers and dust emanating from the work clothing, body and hair of Plaintiff, JAMES DANIEL COLLINS' father originated from the asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products manufactured, sold, and/or distributed by Defendants. Plaintiff, JAMES DANIEL COLLINS, was exposed to the asbestos dust and fibers brought home by Plaintiff, JAMES DANIEL COLLINS', father in the normal course of performing household activities, such as shaking out and laundering work clothing. In that each exposure to such products caused or contributed to Plaintiff, JAMES DANIEL COLLINS' injuries, Plaintiff, JAMES DANIEL COLLINS, says that the doctrine of joint and several liability should be extended to apply to each Defendant herein.

WHEREFORE, Plaintiffs demand judgment against each of the Defendants jointly and severally for such sums, including, but not limited to prejudgment and postjudement interest, as would be necessary to compensate the Plaintiffs for the injuries they have and will suffer.

Plaintiffs further demand judgment against each of the Defendants for punitive damages.

Plaintiffs further demand payment by each of the Defendants jointly and severally of the costs and attorney fees of this action.

Plaintiffs further demand payment by each Defendant jointly and severally of interest on the above and such other relief as the Court deems just.

**WEISS & SAVILLE, P.A.**

By: /s/ Yvonne Takvorian Saville
          Yvonne Takvorian Saville, #3430
          Weiss & Saville, P.A.
          1220 North Market Street, Suite 604
          P.O. Box 370
          Wilmington, DE 19899
          Phone (302)656-0400
          Fax (302)656-5011
          Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605

Date:  October 17, 2006

EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

**SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY : N K S CIVIL ACTION NUMBER: 06C-02-281 ASB

CIVIL CASE CODE: ASB CIVIL CASE TYPE: Asbestos
(SEE REVERSE SIDE FOR CODE AND TYPE)

| Caption: | Name and Status of Party filing document: |
|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS | Plaintiff |
| Plaintiffs, | Document Type: (E.G. COMPLAINT; ANSWER WITH COUNTERCLAIM) |
| v. | FIRST AMENDED COMPLAINT |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., et al., | Non-Arbitration x eFile x (CERTIFICATE OF VALUE MAY BE REQUIRED) |
| | Arbitration ___ Mediation ___ Neutral Assessment ___ |
| | DEFENDANT (Circle one) **ACCEPT** **REJECT** |
| | JURY DEMAND x YES ___ NO |
| Defendants. | TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE) |
| | EXPEDITED STANDARD **COMPLEX** |

| ATTORNEY NAME(S): Yvonne Takvorian Saville | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS |
|---|---|
| ATTORNEY ID(S): DE BAR ID#3430 | |
| FIRM NAME: Weiss & Saville, P.A. | EXPLAIN THE RELATIONSHIP(S): |
| ADDRESS: 1220 North Market Street, Suite 604<br>P. O. Box 370<br>Wilmington, DE 19899 | |
| TELEPHONE NUMBER: (302) 656-0400 | OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT: |
| FAX NUMBER: (302) 656-5011 | |
| E-MAIL ADDRESS: | (IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

REVISED 9/2003



EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE, DELAWARE

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | C.A. No. 06C-02-281 ASB |
| | : | |
| | : | COMPLAINT |
| Plaintiffs, | : | |
| | : | "FIRST AMENDED COMPLAINT - UNDERSCORED LANGUAGE REPRESENTS CHANGES MADE FROM THE FIRST AMENDED COMPLAINT AND BRACKETS INDICATE DELETION FROM THE ORIGINAL COMPLAINT" |
| v. | : | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., et al., | : | |
| Defendants. | : | |
| | : | NON-ARBITRATION |
| | | ASBESTOS |
| | | JURY TRIAL DEMANDED |

**CERTIFICATION OF VALUE**

I, Yvonne Takvorian Saville , attorney for Plaintiff, hereby certify in good faith at this time in my opinion that the sum of damages of Plaintiff is in excess of $100,000.00, exclusive of costs and interest.

WEISS & SAVILLE, P.A.

By: /s/ Yvonne Takvorian Saville
Yvonne Takvorian Saville, #3430
Weiss & Saville, P.A.
1220 North Market Street, Suite 604
P.O. Box 370
Wilmington, DE 19899
Phone (302)656-0400
Fax (302)656-5011
Attorney for Plaintiff

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605
FAX: (214) 520-1181

Date: October 17, 2006

EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS, | : | C.A. No. 06C-02-281 ASB |
| Plaintiffs, | : | "FIRST AMENDED COMPLAINT - UNDERSCORED LANGUAGE REPRESENTS CHANGES MADE FROM THE FIRST AMENDED COMPLAINT AND BRACKETS INDICATE DELETION FROM THE ORIGINAL COMPLAINT" |
| v. | : | |
| METROPOLITAN LIFE INSURANCE COMPANY; | : | |
| FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION); | : | NEW CASTLE COUNTY PRAECIPE NON-ARBITRATION |
| | : | ASBESTOS |
| GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY); | : | JURY TRIAL DEMANDED |
| KELLY-MOORE PAINT COMPANY, INC.; | : | |
| AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION); | : | |
| CERTAINTEED CORPORATION; | : | |
| OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I); | : | |
| ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS); | : | |
| GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.); | : | |

AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION); :

CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION); :

HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION); :

RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION); :

UNION CARBIDE CORPORATION; :

DANA CORPORATION; :

CRANE COMPANY; :

INGERSOLL-RAND COMPANY; :

CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY); :

3M COMPANY (individually and f/k/a MINNESOTA, MINING, AND MANUFACTURING COMPANY, a/k/a "3M"); :

T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON- :

HAYWARD CHEMICAL COMPANY); :

PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC); :

KAISER GYPSUM COMPANY, INC.; :

KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :

HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :

BONDEX INTERNATIONAL, INC.; :

RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.); :

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.); :

VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION); :

THE GOODYEAR TIRE & RUBBER COMPANY; :

BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION); :

BORGWARNER, INC.,(individually and :

successor in interest to BORG-WARNER CORPORATION);

HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION);

DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION);

GENERAL MOTORS CORPORATION; FORD MOTOR COMPANY;

PNEUMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION);

MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.);

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS);

A.W. CHESTERTON, INC.;

DURABLA MANUFACTURING

COMPANY, INC.; :
:
VOLKSWAGEN OF AMERICA, INC.;

Defendants.

**NEW CASTLE COUNTY PRAECIPE**

PLEASE ISSUE Summons and Complaint through the Sheriff of New Castle County to the defendants at the address indicated herein:

VOLKSWAGEN OF AMERICA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

WEISS & SAVILLE, P.A.

By: /s/ Yvonne Takvorian Saville

Yvonne Takvorian Saville, #3430
Weiss & Saville, P.A.
1220 North Market Street, Suite 604
P.O. Box 370
Wilmington, DE 19899
Phone (302)656-0400
Fax (302)656-5011
Attorney for Plaintiffs

and

BARON & BUDD
A PROFESSIONAL CORPORATION
The Centrum
Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605
FAX: (214) 520-1181

Date: October 17, 2006



EFiled: Oct 17 2006 12:26PM EDT
Transaction ID 12649530
SUPERIOR COURT
STATE OF DELAWARE

SUMMONS

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| JAMES DANIEL COLLINS and MARY M. COLLINS,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY;<br>FOSTER WHEELER NORTH AMERICA CORPORATION (f/k/a FOSTER WHEELER ENERGY CORPORATION);<br>GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY);<br>KELLY-MOORE PAINT COMPANY, INC.;<br>AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION);<br>CERTAINTEED CORPORATION;<br>OWENS-ILLINOIS, INC. (individually and as successor-in-interest to OWENS-ILLINOIS GLASS COMPANY and d/b/a O-I);<br>ZURN INDUSTRIES, INC. (a/k/a and successor-by-merger to ERIE CITY IRON WORKS);<br>GARLOCK SEALING TECHNOLOGIES LLC (individually and as a successor-in-interest to GARLOCK, INC.);<br>AMETEK, INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-by-merger with HAVEG CORPORATION);<br>CHAMPLAIN CABLE CORPORATION (individually, and as successor-in-interest to AMERICAN SUPER TEMPERATURE WIRE, and successor- | : | C.A. No. 06C-02-281 ASB<br><br>"FIRST AMENDED COMPLAINT - UNDERSCORED LANGUAGE REPRESENTS CHANGES MADE FROM THE FIRST AMENDED COMPLAINT AND BRACKETS INDICATE DELETION FROM THE ORIGINAL COMPLAINT"<br><br>NEW CASTLE COUNTY<br><br>NON-ARBITRATION<br><br>ASBESTOS<br><br>JURY TRIAL DEMANDED |

in-interest to HAVEG INDUSTRIES, INC. successor-by-merger to HAVEG CORPORATION); :
HERCULES INC. (individually, and as successor-in-interest to HAVEG INDUSTRIES, INC. successor-be-merger to HAVEG CORPORATION); :
RILEY POWER, INC. (f/k/a BABCOCK BORSIG POWER, INC., f/k/a D.B. RILEY, INC., f/k/a RILEY STOKER CORPORATION); :
UNION CARBIDE CORPORATION; :
DANA CORPORATION; :
CRANE COMPANY; :
INGERSOLL-RAND COMPANY; :
CROWN CORK & SEAL COMPANY, INC. (individually and as successor-in-interest to MUNDET CORK COMPANY); :
3M COMPANY (individually and f/k/a MINNESOTA, MINING, AND MANUFACTURING COMPANY, a/k/a "3M"); :
T.H. AGRICULTURE & NUTRITION, LLC (individually and f/k/a T.H. AGRICULTURE & NUTRITION COMPANY, INC. f/k/a THOMPSON-HAYWARD CHEMICAL COMPANY); :
PHILIPS ELECTRONICS NORTH AMERICA CORP. (individually and as successor-in-interest to T H AGRICULTURE & NUTRITION, LLC); :
KAISER GYPSUM COMPANY, INC.; :
KAISER CEMENT CORPORATION (individually, and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :
HANSON PERMANENTE CEMENT, INC. (f/k/a KAISER CEMENT CORPORATION, individually and as successor-in-interest to KAISER GYPSUM COMPANY, INC.); :
BONDEX INTERNATIONAL, INC.; :
RPM, INC. (individually, and as successor-in-interest to BONDEX INTERNATIONAL, INC.); :

RPM INTERNATIONAL, INC. (individually and as successor-in-interest to RPM, INC., and BONDEX INTERNATIONAL, INC.); :
VIACOM, INC. (individually and as successor-by-merger to CBS CORPORATION, successor-by-merger to WESTINGHOUSE ELECTRIC CORPORATION); :
THE GOODYEAR TIRE & RUBBER COMPANY; :
BORGWARNER MORSE TEC, INC., (individually and successor in interest to BORG-WARNER CORPORATION); :
BORGWARNER, INC.,(individually and successor in interest to BORG-WARNER CORPORATION); :
HONEYWELL INTERNATIONAL, INC. (individually and as successor-in-interest to ALLIED-SIGNAL, INC. and THE BENDIX CORPORATION); :
DAIMLERCHRYSLER CORPORATION (f/k/a CHRYSLER CORPORATION); :
GENERAL MOTORS CORPORATION; :
FORD MOTOR COMPANY; :
PNEUMO ABEX, LLC (individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE and FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE and FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION); :
MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC., individually and as successor-in-interest to GRIZZLY MANUFACTURING CO.); :

HENNESSY INDUSTRIES, INC., (individually and as successor by merger to AMMCO TOOLS, INC. and AMMCO TOOLS, CO., d/b/a AMMCO TOOLS); A.W. CHESTERTON, INC.; DURABLA MANUFACTURING COMPANY, INC.; VOLKSWAGEN OF AMERICA, INC.; :

Defendants. :

**THE STATE OF DELAWARE,**
**TO THE SHERIFF OF NEW CASTLE COUNTY:**
**YOU ARE COMMANDED:**

To summon the above named defendant so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Yvonne Takvorian Saville, Esquire, #3430, plaintiffs' attorney, whose address is 1220 North Market Street, Suite 604, Wilmington, DE 19899, an answer to the complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

To serve upon defendant a copy hereof and of the complaint (and of the affidavit of demand if any has been filed by plaintiff).

Dated:

SHARON AGNEW
Prothonotary

______________________
Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiffs' attorney named above an answer to the complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the complaint (or in the affidavit of demand, if any).

SHARON AGNEW
Prothonotary

____________________________
Per Deputy

# EXHIBIT "H"

EFiled: Oct 31 2006 11:21AM EST
Transaction ID 12775580

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS, and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY, et al.,

Defendants.

C.A. No. : 06C-02-281

ASBESTOS

**DEFENSE COORDINATING COUNSEL'S NOTICE OF DEPOSITIONS OF COWORKER AND PRODUCT IDENTIFICATION WITNESS**

***PLEASE TAKE NOTICE*** that the undersigned, or any Delaware asbestos litigation defense counsel working with or designated by the undersigned, will take the following depositions, to be recorded by stenographic means, as follows:

| WITNESS | DATE | TIME | LOCATION |
|---|---|---|---|
| James Beckford | 11/07/2006 | 9:00 am Lacey Washington Time | LaQuinta Inn<br>4704 Park Center Ave NE<br>Lacey, Washington |
| Harold Foshaug | 11/07/2006 | 1:00 pm Lacey Washington Time | LaQuinta Inn<br>4704 Park Center Ave NE<br>Lacey, Washington |
| Richard Stewart | 11/07/2006 | 7:00 pm Lacey Washington Time | LaQuinta Inn<br>4704 Park Center Ave NE<br>Lacey, Washington |

Arrangements may be made for telephonic participation in this deposition in Delaware for those unable to travel to the deposition site. Telephone ports will be distributed upon request and based on need and availability. Anyone interested in participation by

telephone should contact Rufo A ssociates, PA. at least twenty-four hours before any deposition.

***DUCES TECUM***

The witnesses are instructed to produce to the undersigned, at least two days prior to the depositions, the following materials:

(1) Copies of any and all documents and materials in your possession or within your ability to obtain indicating, illustrating, reflecting upon, or in any way related to any of the following items:

(a) Places where Plaintiff worked and, as to each, the dates of such work;

(b) Employers Plaintiff worked for and, as to each, the places where he performed work for each employer;

(b) The type of work Plaintiff did and, as to each type, the places wher e the work was performed;

(c) Individuals Plaintiff worked with and, as to each, the places where he worked with such individuals;

(d) Products or materials Plaintiff worked with and, as to each, the places and time periods when he worked with such products.

Dated : October 30, 2006

***RUFO ASSOCIATES, PA.***

By : /S/ Loreto P. Rufo

Loreto P. Rufo
Delaware Bar ID : 2534
Hockessin Village Center
7217 Lancaster Pike, Suite F
Hockessin, Delaware 19707
Telephone : 302-234-5900

Defense Coordinating Counsel

EFiled: Nov 1 2006 1:56PM EST
Transaction ID 12791528

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JAMES DANIEL COLLINS, and MARY M. COLLINS,

Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY, et al.,

Defendants.

C.A. No. : 06C-02-281

ASBESTOS

**DEFENSE COORDINATING COUNSEL'S NOTICE OF DEPOSITIONS OF COWORKER AND PRODUCT IDENTIFICATION WITNESS**

***PLEASE TAKE NOTICE*** that the undersigned, or any Delaware asbestos litigation defense counsel working with or designated by the undersigned, will take the following depositions, to be recorded by stenographic means, as follows:

| WITNESS | DATE | TIME | LOCATION |
|---|---|---|---|
| Michael Matthews | 11/08/2006 | 10:00 am<br>Brinnon<br>Washington Time | Brinnon Community Center<br>306144 Highway 101<br>Brinnon, WA 98320 |

Arrangements may be made for telephonic participation in this deposition in Delaware for those unable to travel to the deposition site. Telephone ports will be distributed upon request and based on need and availability. Anyone interested in participation by telephone should contact Rufo Associates, PA. at least twenty-four hours before any deposition.

***DUCES TECUM***

The witnesses are instructed to produce to the undersigned, at least two days prior to the depositions, the following materials:

(1) Copies of any and all documents and materials in your possession or within your ability to obtain indicating, illustrating, reflecting upon, or in any way related to any of the following items:

(a) Places where Plaintiff worked and, as to each, the dates of such work;

(b) Employers Plaintiff worked for and, as to each, the places where he performed work for each employer;

(b) The type of work Plaintiff did and, as to each type, the places wher e the work was performed;

(c) Individuals Plaintiff worked with and, as to each, the places where he worked with such individuals;

(d) Products or materials Plaintiff worked with and, as to each, the places and time periods when he wor ked with such products.

Dated : October 30, 2006

***RUFO ASSOCIATES, PA.***

By : /S/ Loreto P. Rufo
Loreto P. Rufo
Delaware Bar ID : 2534
Hockessin Village Center
7217 Lancaster Pike, Suite F
Hockessin, Delaware 19707
Telephone : 302-234-5900

Defense Coordinating Counsel

Collins Coworkers 110806

# EXHIBIT "I"

EFiled: Dec 21 2006 12:24PM EST
Transaction ID 13258142

December 12,

OFFICE OF THE SHERIFF

Served: VOLKSWAGEN OF AMERICA INC

By serving their *RJA* CORPORATION TRUST COMPANY, by delivering a copy of the within writ together with a copy of the Summons and Complaint AMENDED to SCOTT LA SCALA, , of the said registered agent on 12/11/2006 at 11 :45AM.

Fees Paid: $30.00

Civil Action # 06C-02-281AM
Per: Deputy Sheriff, Burnell Bevenour

WRIT RET. 12-13-06

PER Doreen Simmons

Document # 06020700

# EXHIBIT "J"

# BARON & BUDD

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

3102 OAK LAWN AVENUE
SUITE 1100
DALLAS, TEXAS 75219-4281
(214) 521-3605
Telecopier (214) 520-1181

FREDERICK M. BARON †
RUSSELL W. BUDD (TX & MI)
BRENT M. ROSENTHAL
LISA A. BLUE, PH.D. †
MARY E. SKELNIK
STEVEN D. WOLENS
MELISSA K. HUTTS (TX & MO)
STEVE BAUGHMAN JENSEN
ALLEN M. STEWART (TX & PA)
LAURA BAUGHMAN (TX & NY)
LAURIE J. MEGGESIN †
ALAN B. RICH (TX & IL) †
ELLEN A. PRESBY
SCOTT SUMMY (TX & NC)
MISTY A. FARRIS
KEVIN D. MCHARGUE
JAMES D. PIEL (TX, OK & PA)
LANCE A. POOL (TX & OK)
JOHN J. SPILLANE
BEN K. DUBOSE
LAWRENCE G. GETTYS (TX & LA)
FRANK E. GOODRICH

CELESTE A. EVANGELISTI (TX, CA & NY)
CHARLA G. ALDOUS
CARY L. MCDOUGAL
STEVEN T. BARON
SCOTT R. FRIELING
GARY CRUCIANI ††
JANICE PENNINGTON (TX & AZ) †
JOHN L. YATES †
BRUCE W. STECKLER †
ROBERT D. CRAIN †

DIANE M. ANDREW (IL & MO ONLY)
SAM T. RICHARD (TX & OK)
CHRISTINA E. MANCUSO
SCOTT MORRISON
WESLEY K. YOUNG
STEPHEN C. JOHNSTON
AMY J. SHAHAN
J. H. GRIMES (TX & GA)
MARTY A. MORRIS
LAURA M. CABUTTO

NATALIE F. DUNCAN
CARLA M. BURKE (TX & NY)
TIFFANY NEWLIN DICKENSON (TX & MS)
JACQUELINE MONTEJANO
REY FERNÁNDEZ
EDMOND L. MARTIN
DONNA J. BLEVINS
STEPHANIE N. BROOKS
DAVID T. RITTER
CHRIS J. PANATIER
RENÉE MELANÇON (TX & LA)
THERESA NELSON RUCK (KY & OH ONLY)
D. CARL MONEY (TX & NY)
CHAD R. COTTEN
ERIN ANDERSON FARRIS
JORY D. LANGE, JR.
STEPHEN T. BLACKBURN (TX & CA)
RANDALL K. PULLIAM (TX & AR)
JOHN L. LANGDOC (TX & CA)
ROXANNE MCKENZIE LINTON (LA ONLY)
DENYSE F. CLANCY
RYAN C. LEGGIERO (TX & CO)

BART DALTON (TX & CA)
DAVID L. GREEN
CLAIRE T. BRIGGS
M. CRISTINA SANCHEZ
TINA POTTER
SHARON D. BAUTISTA
CHARLES E. SOECHTING, JR.
CAROLIN K. SHINING (CA & IL ONLY)
PAUL M. LYNCH (TX & AR)
CARRIE A. HILL
SHERRY L. TALTON
SUSAN LAUREA LASALLE
ELIZABETH A. SALINAS
LISA WHITE SHIRLEY (TX, LA & FL)
STEFANIE K. MAJOR
KIRK M. CLAUNCH (TX & WI)
ERIC L. BROWN (CA ONLY)

†† SPECIAL COUNSEL
† OF COUNSEL

January 16, 2007

***VIA FEDEX***

Loreto P. Rufo
Hockessin Village Center
7217 Lancaster Pike, Suite F
Hockessin, DE 19707

Re:

***Plaintiff:*** ***James Daniel Collins***

Dear Ms. Rufo:

Enclosed please find a copy of the death certificate on the above referenced plaintiff.

Should you have any questions, do not hesitate to call me.

Sincerely,

BARON & BUDD, P.C.

Danny Villalon
Medical Paralegal

Enclosure

X:\CORRES\JAN07\0116A.DVV.WPD

# STATE OF WASHINGTON DEPARTMENT OF HEALTH

Washington State Certificate of Death — State File Number

Part 1 completed by Funeral Director

1. Legal Name (Include AKA's if any) First: James Middle: Daniel LAST: Collins Suffix:
2. Death Date: Sept. 25, 2006
3. Sex (M/F): Male
4a. Age—Last Birthday: 59
4b. Under 1 Year: Months / Days
4c. Under 1 Day: Hours / Minutes
5. Social Security Number: 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
6. County of Death: Thurston
7. Birthdate: April 2, 1947
8a. Birthplace (City, Town, or County): Olympia
8b. (State or Foreign Country): Washington
9. Decedent's Education: Bachelor's Degree
10. Was Decedent of Hispanic Origin? (Yes or No) If yes, specify: No
11. Decedent's Race(s): White
12. Was Decedent ever in U.S. Armed Forces? Yes
13a. Residence: Number and Street (e.g., 624 SE 5th St.) (Include Apt. No.): 1904 Yew Street
13b. City or Town: Olympia
13c. Residence: County: Thurston
13d. Tribal Reservation Name (if applicable):
13e. State or Foreign Country: Washington
13f. Zip Code + 4: 98506
13g. Inside City Limits? [X] Yes [ ] No [ ] Unk
14. Estimated length of time at residence: 31 years
15. Marital Status at Time of Death: Married
16. Surviving Spouse's Name (Give name prior to first marriage): Mary Wiemerslage
17. Usual Occupation (Indicate type of work done during most of working life. DO NOT USE RETIRED): Mechanic/Teacher
18. Kind of Business/Industry (Do not use Company Name): Automotive
19. Father's Name (First, Middle, Last, Suffix): James Collins
20. Mother's Name Before First Marriage (First, Middle, Last): Lenore Geier
21. Informant's Name: Mary Collins
22. Relationship to Decedent: Wife
23. Mailing Address: Number and Street or RFD No.: 1904 Yew St. City or Town: Olympia, State: WA Zip: 98506
24. Place of Death, If Death Occurred in a Hospital:
Place of Death, If Death Occurred Somewhere Other than a Hospital: Decedent's residence
25. Facility Name (If not a facility, give number & street or location): 1904 Yew Street
26a. City, Town, or Location of Death: Olympia
26b. State: WA
27. Zip Code: 98506
28. Method of Disposition: Cremation
29. Place of Final Disposition (Name of cemetery, crematory, other place): First Cremation Services of Washington
30. Location-City/Town, and State: Kent, Washington
31. Name and Complete Address of Funeral Facility: Klontz Funeral Home 410 Auburn Way North Auburn, Washington 98002
32. Date of Disposition: Sept. 26, 2006
33. Funeral Director Signature X [signature]

Part 2 completed by Certifier

Cause of Death (See instructions and examples)

34. Enter the chain of events – diseases, injuries, or complications – that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Add additional lines if necessary.

IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. mesothelioma — Interval between Onset & Death: 1 year
Due to (or as a consequence of):
Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST
b. — Interval between Onset & Death:
Due to (or as a consequence of):
c. — Interval between Onset & Death:
Due to (or as a consequence of):
d. — Interval between Onset & Death:

35. Other significant conditions contributing to death but not resulting in the underlying cause given above:
36. Autopsy? [ ] Yes [X] No
37. Were autopsy findings available to complete the Cause of Death? [ ] Yes [ ] No
38. Manner of Death: [X] Natural [ ] Homicide [ ] Accident [ ] Undetermined [ ] Suicide [ ] Pending
39. If female: [ ] Not pregnant within past year [ ] Pregnant at time of death [ ] Not pregnant, but pregnant within 42 days before death [ ] Not pregnant, but pregnant 43 days to 1 year before death [ ] Unknown if pregnant within the past year
40. Did tobacco use contribute to death? [ ] Yes [ ] Probably [X] No [ ] Unknown
41. Date of Injury (MM/DD/YYYY):
42. Hour of Injury (24 hrs):
43. Place of Injury (e.g., Decedent's home, construction site, restaurant, wooded area):
44. Injury at Work? [ ] Yes [ ] No [ ] Unk
45. Location of Injury: Number & Street: Apt No. City or Town: County: State: Zip Code+4:
46. Describe how injury occurred:
47. If transportation injury, specify: [ ] Driver/Operator [ ] Pedestrian [ ] Passenger [ ] Other (Specify)
48a. Certifying Physician — X [signature: Ann R. Williams]
48b. Medical Examiner/Coroner —
49. Name and Address of Certifier – Physician, Medical Examiner or Coroner (Type or Print): Ann Williams, MD 209 MLK Jr. Way Tacoma, Washington 98405
50. Hour of Death (24 hrs): 1900
51. Name and Title of Attending Physician if other than Certifier (Type or Print):
52. Date Signed (MM/DD/YYYY): 9/26/06
53. Title of Certifier: MD
54. License Number: 20163
55. Medical Examiner/Coroner File Number:
56. Was case referred to ME/Coroner? [X] Yes [ ] No
57. Registrar Signature X [signature]
58. Date Received: SEP 2 6 2006
59. Amendments:

DOH 01-003 (5/99)

THIS IS A CERTIFIED COPY OF THE RECORD ON FILE WITH CENTER FOR HEALTH STATISTICS. CERTIFIED COPIES MUST HAVE THE OFFICIAL SEAL.

Washington State Department of Health

# Affidavit for Correction

**This is a legal Document. Complete in ink and do not alter.**

Center for Health Statistics
P.O. Box 9709
Olympia, WA 98507-9709
(360) 236-4300

**STATE OFFICE USE ONLY**

| State File Number | Fee Number | Initials | Date | Affidavit Number |
|---|---|---|---|---|
| | | | | |

**Use the section below for requesting any changes on the record.**

Record Type: ☐ **Birth** ☐ **Death** ☐ **Marriage** ☐ **Dissolution**

| 1. Name on record: | 2. Date of Event: | 3. Place of Event: (City or County) |
|---|---|---|
| | | |

| 4. Father's Full Name (For Birth): (Husband for Marriage or Dissolution) | 5. Mother's Full Name (For Birth): (Wife for Marriage or Dissolution) |
|---|---|
| | |

The Record is Incorrect or Incomplete as follows:

| The Record now shows: | The True fact is: |
|---|---|
| 6. | 7. |
| 8. | 9. |
| 10. | 11. |
| 12. | 13. |

14. I represent the person as: ☐ **Self** ☐ **Parent** ☐ **Guardian** ☐ **Informant** ☐ **Funeral Director** ☐ **Other (Specify)**

Telephone Number:

I declare under penalty of perjury under the laws of the State of Washington that the forgoing is true and correct.

| 15. Signature: | 16. Date: | 17. Address: |
|---|---|---|
| | | |

All vital records are registered as received. An item may be changed by affidavit only once. Subsequent changes must be made by court order. The incorrect certificate must be returned within one year of the date it was issued to receive a replacement copy free of charge.

**All changes must be established by documentary proof submitted with the affidavit**

Examples of documentary proof: Certificate of Naturalization, Hospital Records, Insurance Records, Marriage/Divorce Records, Medical Record, Military Record (DD-214), Birth Record, Passport, School Record, Voter's Registration Card (if it bears an effective date), Alien Registration Card (front and back)

Birth Certificates:

1 Only a parent, legal guardian (if the child is under 18), or the adult themselves (if 18 or older) may change the birth certificate.
2 The proof(s) must match exactly the asserted true fact(s). For example, if the affidavit says the name is Mary Ann Doe, then the proof must show the name to be Mary Ann Doe. Mary A. Doe or M.A. Doe does not prove the name is Mary Ann Doe.
3 Proof must be five (or more) years old or have been established within five years of birth.
4 Up to age one, the parent(s) or legal guardian may change the child's last name with an affidavit for correction, provided:
- This is a one time only change. Subsequent changes will require a certified copy of a court ordered name change.
- The new last name may be the mother's maiden name or father's name (if present on the certificate) or any combination of the two.
- After age one, last name changes require a certified copy of a court ordered name change. Minor spelling changes may be made with an affidavit and documentary proof

5 Parent(s) may change their child's first or middle name by completing and signing an affidavit for correction (until their child's 18th birthday).
6. **This affidavit cannot be used to add a father to a birth certificate. (Use the paternity affidavit - form DOH/CHS 021)**

Death Certificates:

1 Only the informant, the funeral director, or executors/administrators (if evidence confirming such position is presented) may change the non-medical information.
2 The medical information (cause of death) may be changed only by the certifying physician or the coroner/medical examiner.
3. If it is less than sixty days from date of death please contact the county health department where the death occurred to make changes.

Marriage/Dissolution (Divorce) Certificates

1 Personal fact(s) (minor spelling changes in name, date or place of birth or residence) may be changed by affidavit (with proof) by the person.
2. To change the date or place of marriage or dissolution, the officiant (marriage) or clerk of court (dissolution) must sign the affidavit.

DOH/CHS 023 (Rev 1/2002)

CERTIFIE[illegible] ... STATE ... OF VITAL ...

[illegible] NOT DEST[illegible]

NN01308965